UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN | : | CIVIL NO. 3:22-CV-01118(JBA) |
| RIGHTS, ET. AL. | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, ET AL., | : | JANUARY 31, 2023 |
| *Defendant.* | | |

**TABLE OF CONTENTS**

I.   BACKGROUND ................................................................................................ 4

II.  ARGUMENT .................................................................................................... 7

  A.  Legal Standard. ........................................................................................... 7

  B.  Plaintiffs cannot show a substantial likelihood of success on the merits. .................... 9

    1.  Plaintiffs' facial challenge fails because some applications of the challenged statutes plainly fall outside the Second Amendment's protections. ................................... 9

    2.  Plaintiffs are unlikely to succeed on the merits because they fail to show that the Second Amendment protects assault weapons or LCMs. ................................. 11

      a.  Plaintiffs do not show that the regulated LCMs and features are "arms" instead of accoutrements. ................................................................................. 12

      b.  Plaintiffs do not show that assault weapons and LCMs are anything other than "dangerous and unusual" weapons. ........................................................ 16

      c.  Plaintiffs fail to show that assault weapons and LCMs are typically used by law-abiding citizens for lawful purposes like self-defense. ................................... 20

      d.  Assault weapons and LCM's are not even commonly *owned*. .............................. 24

    3.  Even if Plaintiffs could show that the Second Amendment extends to assault weapons and LCMs, they cannot show substantial likelihood of success because Connecticut's common-sense gun regulations are consistent with the American tradition of firearm regulation. ....................................................................... 26

      a.  The historical analogue analysis is broader here because the challenged statutes respond to unprecedented societal concerns and technological advancements. ........ 28

      b.  Plaintiffs cannot show a likelihood of success because Connecticut's regulations are relevantly similar to regulations throughout American history. .......................... 32

**i.      There is a historical tradition of restricting possession of specific types of dangerous new weapons technologies.** .......................................................................... 33

**ii.     Historical regulations on carrying certain weapons are also relevant analogues showing that the challenged statutes comport with the tradition of American firearm regulation.** ............................................................................................................. 35

**C.   Plaintiffs cannot satisfy the remaining criteria for a mandatory preliminary injunction.** ..................................................................................................................... 39

**III.  CONCLUSION** ................................................................................................................. 41

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF # 28)**

Connecticut enacted common-sense gun safety laws almost a decade ago to protect its residents from mass murder—like the 2012 execution of 26 Connecticut students and teachers by a killer armed with an AR-15 style rifle and large capacity magazines. Now Plaintiffs, without discovery and trial, seek a mandatory injunction that would force the State to immediately lift restrictions on residents selling and owning those same military-style weapons—and some even more deadly ones, like grenade launchers. But Plaintiffs have not carried their heavy burden on any of the preliminary injunction factors, so they cannot prevail.

First: Plaintiffs' facial challenge fails because Connecticut's gun safety laws cover some weapons—like grenade launchers—that the Second Amendment undisputedly does not reach. So Plaintiffs cannot show—as they must—that Connecticut's statutory scheme is categorically unconstitutionally in every application.

Second: Plaintiffs fail to show a substantial likelihood of success on the merits of their Second Amendment claim, because neither large capacity magazines ("LCMs") nor assault weapons meet the threshold criteria for constitutional protections. First, many of the regulated items are firearm accessories, not "arms" within the meaning of the Second Amendment. Second, the regulated weapons, features, and LCMs are dangerous and unusual, military style weapons outside the Second Amendment's scope. Third, Plaintiffs have not met their burden to demonstrate the regulated weapons are in common use. Lastly, neither assault weapons nor LCMs are typically possessed by law-abiding individuals for lawful purposes like self-defense. And even if all the regulated assault weapons and LCMs were within the Second Amendment's scope, Plaintiffs still could not show a substantial likelihood of success on the merits, since Connecticut's regulations are entirely consistent with historical tradition.

Third, and finally: Plaintiffs are not entitled to the extraordinary relief they seek because they fail to show irreparable injury or to explain how the balance of equities and public interest favor immediate relief. These factors heavily weigh against Plaintiffs, given the minute impact of the challenged statutes on Plaintiffs and the extraordinary and potentially irreversible damage the requested injunction would do to public health and safety.

On this inadequate showing and in an emergency posture, Plaintiffs ask this Court to be the first to find Conn. Gen. Stat. §§ 53-202a-c and Conn. Gen. Stat. § 53-202w—Connecticut's assault weapons ban and LCM ban—unconstitutional. The Court should reject Plaintiffs' arguments, decline to provide the extraordinary relief they seek, and heed the Supreme Court's instruction that the Second Amendment's right to armed self-defense is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller (Heller I)*, 554 U.S. 570, 626 (2008)).

## I. BACKGROUND

The Connecticut General Assembly recognized the significant threat to public safety posed by dangerous military-style weapons when it adopted the state's original assault weapon ban in 1993. Like other laws that have existed for decades at the federal, state, and local levels, the 1993 statute prohibited a small subset of dangerous military-style semiautomatic weapons. Alongside this common-sense law, Connecticut residents have continued to enjoy their constitutionally protected rights to possess firearms, including handguns, rifles, and shotguns.

In 2013, responding to the 2012 massacre at Sandy Hook Elementary School, the General Assembly passed the challenged statutes: Conn. Gen. Stat. §§ 53-202a-c and 53-202w. These statutes strengthened existing law by prohibiting semiautomatic firearms with enumerated

military-style features and by regulating the possession of LCMs, which render any weapon more dangerous and more lethal. These statutes continue to recognize the rights of law-abiding citizens. There remain more than one thousand different makes and models of firearms that Connecticut residents can purchase for responsible and lawful uses like self-defense. Ex. A, Declaration of Detective Brindiana Warenda, ¶ 33.[1]

The statutes prohibit a sub-category of semiautomatic weapons. *Id.*, ¶ 20. A semiautomatic weapon fires one round for each squeeze of the trigger. *Id.* After each shot, the firearm automatically loads the next round in the chamber and arms the firing mechanism for the next shot, permitting a faster rate of fire as compared to manually operated guns. *Id.* ¶¶ 20-21. Unlike semiautomatic weapons, fully automatic weapons, such as machine guns, fire continuously as long as the trigger is pressed. *Id.*

Assault weapons listed in the statutes are essentially civilian versions of military weapons used by armed forces around the world. *Id.* ¶¶ 23-26. The most widely used military firearms are the M-16/AR-15 and the AK-47. *Id.* The AR-15 originally was manufactured as a selective-fire— capable of either semi-automatic or fully automatic firing—machine gun and was adopted by the United States military in the form of the M-16 machine gun during the Vietnam War. *Id.,* ¶ 24. Colt Manufacturing Company retained the AR-15 trademark for its semiautomatic version of the AR-15, which it began selling to civilians in the early 1960s. *Id.,* ¶ 25. The AR-15 is now the civilian commercial version of the M-16, without the fully automatic fire option. *Id.* Like other military weapons, the AR-15 and M-16 were designed expressly to kill large numbers of people

---

[1] The statutes allow a person who applied for a certificate of possession to continue possessing assault weapons that they lawfully possessed before the 2014 effective date. Conn. Gen. Stat. § 53-202d(a), (f). There are also exceptions to assault weapons LCM restrictions for law enforcement and members of the military. *See* Conn. Gen. Stat. §§ 53-202b(b)(1), 53-202c(b), 53-202d(a)(1)(B), (2)(B), § 53-202d(d).

as quickly as possible, and the M-16 has been called a "perfect killing machine." Ex. B, Declaration of John Donohue, ¶ 108. Most of the firearms specifically enumerated in the challenged statutes and the 1993 law are semiautomatic versions of the original selective-fire AR-15/M-16 and the AK-47.[2]

The statutes also prohibit LCM possession. An LCM is a particular type of "magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device…" Conn. Gen. Stat. § 53-202w(a)(1). It is not itself a bullet or other type of ammunition. It contains no firing mechanism. Ex. A, ¶¶ 35-37. Rather, it holds bullets or ammunition and feeds it into a firearm, often attaching at the bottom of the weapon. See Ex. H, Figures 14, 15. Like assault weapons, magazines capable of holding large amounts of ammunition, regardless of type, are particularly designed and most suitable for military and law enforcement applications. Ex. B, ¶ 162. Magazines are manufactured for all types of firearms, including handguns, rifles, and shotguns. Ex. A, ¶¶ 41-42. LCMs, as defined by the statute, can hold more than 10 rounds of ammunition at a time. *Id.* LCMs have been manufactured for many firearms, including handguns, rifles, and shotguns. *Id.* Most firearms, however, can accept magazines with a capacity of fewer than 10 rounds, and thus can still function without an LCM—but without the same mass-killing capacity. *Id.* ¶ 42.

The statutes also restrict firearms with certain features that either may be manufactured already attached to a weapon or manufactured separately and attached to enhance lethality. For example, the statutes prohibit semiautomatic weapons with telescoping stocks, shrouds, flash suppressors, or grenade launchers. None of these are weapons themselves. All are features—often

---

[2]  The statutes list 49 assault rifles (as opposed to handguns or shotguns) by name. Of these, 20 are variants of the AK-47; 13 are variants of the AR-15/M-16; and 3 are variants of the HK 91 or FN type. Ex. A, ¶ 27. The statutes also ban certain semiautomatic pistols. *Id.*, ¶ 30. A pistol is defined under Connecticut law as any firearm that has a barrel under twelve inches long. Conn. Gen. Stat. § 29-27. Of the 22 assault pistols listed in the statutes, 6 are variants of the AK-47 and 7 are variants of the M-16/AR-15. *Id.*, ¶ 30.

detachable—that facilitate use of weapons for crimes or mass-killing. A folding or telescoping stock is a stock that makes it easier to conceal a firearm by reducing its length or size. Ex. A, ¶ 15. A flash suppressor attaches to a rifle's muzzle to reduce visible muzzle flash. *Id*., ¶ 16.

## II. ARGUMENT

### A.  Legal Standard.

Plaintiffs seek to preliminarily enjoin state officials and a state statutory scheme on constitutional grounds. This is "an extraordinary and drastic remedy," requiring a "clear showing" of the "most compelling necessity." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007); *Cerilli v. Rell*, No. 3:08CV242(SRU), 2010 WL 1330998, at *1 (D. Conn. Mar. 31, 2010). Plaintiffs' burden is even higher than usual because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995).

Plaintiffs' burden is higher still because they seek a mandatory injunction that gives them all the relief they will ultimately seek at trial, enjoining enforcement of in-force statutes that have been upheld as constitutional.[3] *See Consumer Directed Pers. Assistance Ass'n of N.Y. State v. Zucker*, No. 1:18-CV-746 (FJS/CFH), 2018 U.S. Dist. LEXIS 123988, at *6 n.2 (N.D.N.Y. July 25, 2018) (citing *Pankos Diner Corp. v. Nassau Cty. Legislature*, 321 F. Supp. 2d 520, 524 (E.D.N.Y. 2003)). Plaintiffs therefore seek to change the status quo: "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). "[The] heightened standard also

---

[3] *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 269 (2d Cir. 2015) ("The core prohibitions by New York and Connecticut of assault weapons and large-capacity magazines do not violate the Second Amendment."); see ECF # 26, at 13.

applies where the injunction 'will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Democratic Cong. Campaign Comm. v. Kosinski*, No. 22-CV-1029 (RA), 2022 WL 2712882, 2022 U.S. Dist. LEXIS 124144, at \*26 (S.D.N.Y. July 13, 2022) (quoting *People ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).

Plaintiffs must "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Since Plaintiffs seek a mandatory injunction, they must "carry the burden of persuasion by a clear showing for each factor." *Bergamaschi v. Cuomo*, No. 20 CIV. 2817 (CM), 2020 U.S. Dist. LEXIS 68937, at \*15 (S.D.N.Y. Apr. 20, 2020) (quoting *Abbott Labs. v. Adelphia Supply USA*, No. 15 CV 5826, 2015 WL 10906060, 2015 U.S. Dist. LEXIS 189555, at \*45 (E.D.N.Y. Nov. 6, 2015), *aff'd sub nom. Abbott Labs. v. H&H Wholesale Servs., Inc.*, 670 Fed. Appx. 6 (2d Cir. 2016)).

The burden of persuasion for each factor is clear and convincing evidence. *Sound Around Inc. v. Shenzhen Keenray Innovations Ltd.*, No. 22-CV-06943 (HG), 2022 U.S. Dist. LEXIS 227247, at \*6 (E.D.N.Y. Dec. 18, 2022). To win a mandatory injunction, a movant's "right to relief must be indisputably clear." *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235 (1972). "Thus, 'if there is doubt as to the probability of plaintiff's ultimate success, a request for preliminary mandatory relief must be denied.'" *Audio-Video Grp., LLC v. Green*, No. 1:14cv169 (JCC/TCB), 2014 U.S. Dist. LEXIS 25413, at \*14 (E.D. Va. Feb. 26, 2014) (quoting *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 704 (E.D. Va. 2000)).

Plaintiffs can only meet their burden by "evidentiary submissions." *Thurman v. Bun Bun Music*, No. 13-CV-5194 (CM) (MHD), 2015 U.S. Dist. LEXIS 61514, at *10 (S.D.N.Y. May 7, 2015) (denying preliminary injunction because Plaintiffs did not carry their burden to submit credible evidence in support of their application). "If Plaintiff's evidence is contested, the court cannot consider it in adjudicating the motion unless an evidentiary hearing is held." *Id.* (citing *Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003) ("The existence of factual disputes necessitates an evidentiary hearing. . . before a motion for a preliminary injunction may be decided.")).

**B. Plaintiffs cannot show a substantial likelihood of success on the merits.**

Plaintiffs cannot point to a single controlling case where an assault weapon or LCM ban has been struck down. The only case from the Second Circuit which has considered such laws was *Cuomo*, which upheld both of the statutes Plaintiffs challenge here, albeit under a pre-*Bruen* analysis. 804 F.3d 242, 269. The Supreme Court has never considered the constitutionality of any similar law. So there is certainly "doubt" as to Plaintiffs' likelihood of success, and so their motion should be denied.

Plaintiffs also fail to satisfy the first *Winter* factor because their facial challenge is deficient; they cannot demonstrate that the Second Amendment applies to the prohibited firearms and accoutrements; and even if they could, there are historical analogues that satisfy *Bruen*.

**1. Plaintiffs' facial challenge fails because some applications of the challenged statutes plainly fall outside the Second Amendment's protections.**

Plaintiffs do not carry their burden of showing that any regulated weapons and accoutrements warrant Second Amendment protections. But their facial challenge fails even if this Court finds that some—but not all—weapons and accoutrements regulated by the challenged statutes are within the Amendment's scope.

Plaintiffs bring facial challenges to Connecticut's assault weapons and LCM statutes. *See* ECF # 26 (seeking "a declaratory judgment…that the Statutes identified herein are unconstitutional *on their face*…"). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also United States v. Westley*, No. 3:17-CR-171 (MPS), 2018 U.S. Dist. LEXIS 64009, at *8 (D. Conn. Apr. 17, 2018) ("To prevail on a facial challenge, a plaintiff must show that the law is unconstitutional in all possible applications."). "The Second Circuit has upheld gun regulations after acknowledging *Salerno's* application to facial challenges in the Second Amendment context." *United States v. Jimenez*, 2016 U.S. Dist. LEXIS 73169, at *4 (S.D.N.Y. June 3, 2016). Plaintiffs bear a "heavy burden" in bringing a facial challenge, and such challenges are "disfavored." *Salerno*, 481 U.S. at 745); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).

This distinction between facial and as-applied challenges is particularly important here, where the challenged statutes restrict ownership and possession of a range of weapons and features. *See* Conn. Gen. Stat. § 53-202(a) (listing specific weapons, parts, and features which render a weapon prohibited). For example, some restricted weapons or parts include "grenade launcher[s]," types of "Uzis" and various types of shotguns, including "Street Sweepers." *Id.* Plaintiffs do not target particular weapons or features, but rather argue the *entire statute* is unconstitutional. They must therefore show that the statute is unconstitutional in all aspects, which means here that every weapon and feature merits Second Amendment protection and that the challenged restrictions fail to meet the *Bruen* test.

Plaintiffs have not met and cannot meet their high burden to show that the statute is "unconstitutional in all of its applications" because they have not even tried to explain how or why a grenade launcher, an Uzi carbine, or other weapons designed for combat would be protected by the Second Amendment. They could not do so. *See, e.g., N.Y. State Rifle & Pistol Ass'n v. Cuomo,* 990 F. Supp. 2d 349, 369-70 (W.D.N.Y. 2013), *affirmed in relevant part by Cuomo*, 804 F.3d at 247 (noting certain "outlawed features" are "particularly unnecessary for lawful use" such as "a grenade launcher, bayonet mount, or a silencer" and that bans on such features "require no explanation."); *United States v. Fincher*, 538 F.3d 868, 870, 873-74 (8th Cir. 2008) (sawed-off shotgun is not protected by the Second Amendment because it is not in common use by law-abiding citizens for lawful purposes); *United States v. White*, No. 13-0440-01-CR-W-SRB, 2017 U.S. Dist. LEXIS 229493, at *8-9 (W.D. Mo. Oct. 13, 2017) ("[T]he Street Sweeper is both a 'dangerous and usual weapon' and well within the 'historical tradition of prohibiting the carrying of dangerous and usual weapons.'") (citing *Heller I*, 554 U.S. at 627).

Ultimately, Plaintiffs' inability to support their facial challenges is dispositive at this preliminary stage, and this Court should deny their Motion.

**2. Plaintiffs are unlikely to succeed on the merits because they fail to show that the Second Amendment protects assault weapons or LCMs.**

Plaintiffs must make several threshold showings before they may invoke the Second Amendment's protections. First, they must prove that they are members of "the people" and that the regulated instrument is a "bearable arm" as those phrases are used in the Second Amendment. *Bruen*, 142 S. Ct. at 2132. Next, even if the instrument is an "arm," Plaintiffs must demonstrate that it is not a "dangerous and unusual" weapon that falls outside the Second Amendment's protection. *See Cuomo,* 804 F.3d at 256 (quoting *Heller I,* 554 U.S. at 627) (weapons that are "'dangerous and unusual' in the hands of law-abiding civilians… including 'weapons that are most

useful in military service' such as the fully automatic M-16 rifle" fall outside Second Amendment protection). Further, Plaintiffs must prove that such weapons are in "common use" for "lawful purposes like self-defense." *Heller I*, 554 U.S. at 624. Lastly, Plaintiffs must show that such weapons are "typically owned by 'law-abiding citizens for lawful purposes.'" *United States v. Perez,* 6 F.4th 448, 451 (2d Cir. 2021) (quoting *Heller I,* 554 U.S. at 624, 627). Unless a plaintiff makes all these showings, any claim brought pursuant to the Second Amendment must fail on the threshold inquiry of whether the Second Amendment even applies.

Even assuming that plaintiffs are all members of "the people" within the meaning of the Amendment—NAGR is not and cannot assert the rights of those who are, Defendants' motion to dismiss shows, ECF # 32—they still cannot carry their threshold burden. "If the challenged restriction does not implicate conduct within the scope of the Second Amendment, our analysis ends." *Cuomo,* 804 F.3d at 254.[4]

### a. Plaintiffs do not show that the regulated LCMs and features are "arms" instead of accoutrements.

The Second Amendment only applies to "arms" as that term was historically understood. *Bruen,* 142 S. Ct. at 2132 (quoting *Heller I,* 554 U.S. at 582) (internal quotation marks omitted). Plaintiffs fail to show that either LCMs under § 53-202w or the assault weapon accessories listed under § 53-202a fall within that historical understanding of "arms" when either the Second or

---

[4] Plaintiffs' argument that *Cuomo* "is no longer good law"—See ECF #28-1, at 10-12—misstates *Bruen's* holding. While *Bruen* did away with any means-end test for Second Amendment claims as applied in *Cuomo* (and nearly every Second Amendment challenge before *Bruen*), it did not eliminate the primary threshold question of whether the challenged restrictions even reach conduct protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2157 (Alito, J. concurring) ("Our holding decides nothing about . . . the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or [*McDonald*]. . ."). Rather, *Bruen* altered "step two" of the framework set out in *Cuomo. See Bruen,* 142 S.Ct. at 2129 ("The Courts of Appeals' *second step* is inconsistent with *Heller's* historical approach and its rejection of means-end scrutiny") (emphasis added). Thus, as reiterated in *Bruen*, Plaintiffs must still make the threshold showing that the Second Amendment is implicated.

Fourteenth Amendments were ratified[5], nor can they. LCMs and other prohibited accessories are analogues to the Founding-era cartridge boxes and would have been considered "accoutrements" beyond the Second Amendment's scope. That is why two post-*Bruen* federal courts have agreed that LCMs are not "arms." *Ocean State Tactical, LLC v. Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 U.S. Dist. LEXIS 227097 (D.R.I. Dec. 14, 2022); *Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391 (D. Or. Dec. 6, 2022).

When the Second Amendment was ratified, the term "arms" referred only to weapons: typically swords, knives, rifles, and pistols. Ex. E, Declaration of Dr. Dennis E. Baron, ¶ 9. *Heller* explained that, in Founding-era dictionaries, "arms" meant "'[w]eapons of offence, or armour of defence'" and "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id.* (quoting Samuel Johnson, 1 Dictionary of the English Language 106 (4th ed. 1773) (reprinted 1978) and Timothy Cunningham, 1 A New and Complete Law Dictionary (1771), respectively). Samuel Johnson's dictionary further defines "weapon" as an "instrument of offence; something with which one is armed to hurt another." Samuel Johnson, 2 Dictionary of the English Language (4th ed. 1773).

At the Founding, militiamen kept cartridge boxes with ammunition, which they manually fed into their weapons. They did not carry ammunition in "magazines." Ex. E, ¶ 32. Neither the Founders, nor Reconstruction lawmakers would have considered a magazine an "arm." To them, a magazine was a building or physical location that stored gunpowder. The modern-day usage of "magazine" as "a bullet storage container" only first appeared in the late 1880s and remained relatively rare until the 1920s. Ex. E, ¶ 24.

---

[5] *See Bruen*, 142 S. Ct. at 2136 (2022) (quoting *Heller* and noting that "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" represented a "critical tool of constitutional interpretation.").

Founding-era Americans classified a cartridge box, the closest historical equivalent to the modern-day magazine, as an "accoutrement"—"ancillary equipment associated with soldiering, or service in the military"—in contrast to "arms," or actual weapons. Ex. E, ¶ 24. These terms identified distinct categories. See *id.* ¶¶ 27, 38 ("arms and accoutrements are separate categories"); *Id.*, ¶ 78 (finding "no data" that "arms" includes "accoutrements"). A 1778 Continental Congress resolution promised that the United States would reimburse states for "[e]very horse and all arms and accoutrements, which shall be taken, by the enemy in action . . .." Congress Undertakes to Raise a Cavalry Corps., in 2 PUBLIC PAPERS OF GEORGE CLINTON, FIRST GOVERNOR OF NEW YORK 827, 828 (Wynkoop Hallenbeck Crawford Co. ed., 1900). And the Connecticut General Assembly distinguished between "arms," "accoutrements," and "ammunition" in its own eighteenth century militia regulations. *See* 1799 Conn Acts 511, *An Act For The Militia*, § 4 (referring to "Arms," "Ammunition," and "Accoutrements" separately).

LCMs regulated by the challenged statutes are not arms or even weapons, but accessories or "accoutrements." "An LCM is a particular type of "magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device . . . ." Conn. Gen. Stat. § 53-202w(a)(1). It is not itself a bullet or other type of ammunition. It contains no firing mechanism. Ex. A, ¶ 40. Rather, it holds bullets or ammunition and feeds it into a firearm. A firearm can be used for self-defense without a large capacity magazine—any ammunition feeding device of lesser capacity will do the job. *See Cuomo*, 804 F.3d at 260 (noting that "while citizens may not acquire high-capacity magazines, they can purchase any number of magazines with a capacity of ten or fewer rounds"). Because LCMs are an enhancement that does not affect the functioning of the firearm—the firing of a projectile loaded into the chamber—they are more akin to silencers, which federal courts of appeals have held do not fall within the scope of the Second Amendment. *See United States v. Cox*, 906 F.3d 1170, 1186

14

(10th Cir. 2018) (holding that "[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defense')" and thus "can't be a 'bearable arm' protected by the Second Amendment"); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) (same), *aff'd*, 26 F.4th 610 (4th Cir. 2022).

Similarly, to the extent that Conn. Gen. Stat. § 53-202a lists banned features rather than weapons themselves, such restrictions fall outside the Second Amendment because those features are not "arms." For example, the statute restricts "folding or telescoping stock[s]" as well as "a forward pistol grip… a flash suppressor… a second hand grip." Conn. Gen. Stat. § 53-202a(1)(E). None of these features are weapons. A folding or telescoping stock is a stock that makes it easier to conceal a firearm by reducing its length or size. Ex A, ¶ 15. A forward pistol grip or a second hand grip are merely features on weapons, are not essential to the operation of a firearm, are often detachable, and are not weapons themselves. *Id.*, ¶ 17. Similarly, a flash suppressor is not a weapon but is instead a device attached to the muzzle of a rifle that reduces the visibility of discharging muzzle flash and is like a silencer, which reduces sound of gunfire rather than visibility. *Id.*, ¶ 16. Unless used to bludgeon someone, a stock, pistol grip, silencer, or suppressor are not weapons. They are merely features, accessories, or "accoutrements" to weapons which would otherwise be obtainable without such features or accessories. The restricted items in § 53-202a(1)(E) are not arms and do not warrant Second Amendment protection.

Because Plaintiffs do not even argue that LCMs or the features listed in Conn. Gen. Stat. § 53-202a(1)(E) are protected arms, they have failed to carry their preliminary burden. The Court's analysis need go no further. LCMs and the features listed in Conn. Gen. Stat. § 53-202a(1)(E) are firearms accessories, not arms, so Plaintiffs cannot succeed on the merits.

**b.  Plaintiffs do not show that assault weapons and LCMs are anything other than "dangerous and unusual" weapons.**

Even if the LCMS and regulated features were "arms" within the Second Amendment's public meaning, they would not be entitled to constitutional protection, and neither would assault weapons themselves. The Second Amendment "extends only to certain types of weapons," and does not encompass a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller I*, 554 U.S. at 623, 626 (citing *Miller*, 307 U.S. at 178-82). It does not protect "dangerous and unusual" weapons, which can include "weapons that are most useful in military service—M-16 rifles and the like—[that] may be banned." *Heller I*, 554 U.S. at 627.

Plaintiffs' motion fails because they offer no evidence that the challenged weapons and LCMs are anything other than "dangerous and unusual." But even if they had tried, they would fail. All the evidence shows that assault weapons and LCMs are military style weapons and accoutrements; are unusually and particularly dangerous; and so are excluded from the Second Amendment's ambit.

Assault weapons are not manufactured for self-defense in a home. Donohue ¶ (Assault weapons are less maneuverable than handguns in confined areas). Instead, they are built for killing large numbers of people rapidly in open spaces. When used against others, assault weapons and LCMs result in more shots fired, more victims wounded, and more wounds per victim. That means more injuries, more lethal injuries, and higher rates of death than incidents involving more conventional firearms. "[S]emiautomatic assault weapons have been understood to pose unusual risks. When used, these weapons tend to result in more numerous wounds, more serious wounds, and more victims." *Cuomo*, 804 F.3d 242, 262.

16

Most of the weapons restricted by the challenged statutes are adaptations of the M-16 or AK-47, the most commonly used military weapons in the world. Ex. A, ¶ 22-28; *see also Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon."). Like other military weapons, the M-16 was designed expressly to kill large numbers of people as quickly as possible. Ex. B, 106. Precisely for that reason, the Supreme Court highlighted the M-16 as exemplifying a "dangerous and unusual" weapon that falls outside the Second Amendment's protections. *Heller I*, 554 U.S. at 627; *see United States v. Zaleski*, 489 Fed. App'x 474, 475 (2d Cir. 2012). Similarly, the original, automatic AR-15 was designed for combat use, not for civilian use, due to its "phenomenal lethality," and was "engineered to generate maximum wound effect" as a "perfect killing machine." Ex. B, ¶¶ 106-108; Ex. C, Declaration of Professor Louise Klarevas, Pgs. 112-115.

LCMs allow shooters to continuously fire without reloading: a "uniquely military feature" intended to "enable a shooter to hit multiple human targets very rapidly." *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017). The first detachable, interchangeable LCMs were originally designed for military use during World War I. The LCMs that the statutes restrict were also designed for military use. Ex. F, ¶¶ 49, 51. Handguns capable of accepting LCMs like those the Plaintiffs seek did not become widely available for civilian use until the 1980s. *Id*., ¶ 51 The District of Columbia Circuit Court noted in its consideration of *Heller* after remand that LCMs are engineered for particular dangerousness and suited for military use: They are designed to "shoot multiple human targets very rapidly" and to "allow the shooter to spray-fire from the hip position." *Heller II*, 670 F.3d at 1262-63. Large capacity magazines pose a grave danger to public health and safety in part because they can be and are used with assault weapons and non-assault weapons alike. Like assault weapons, magazines capable of holding large amounts of ammunition,

regardless of type, are particularly designed and most suitable for military and law enforcement applications.

The challenged statutes regulate military-style features that enhance a weapon's offensive killing capacity. As discussed above, various features regulated by the statutes including silencers, flash suppressors, forward pistol grips, and grenade launchers all increase a weapon's dangerousness, lethality, and concealability. "The dangers posed by [these] military-style features prohibited by the statutes—such as grenade launchers and silencers—are manifest and incontrovertible." *Cuomo*, 804 F.3d at 262.

The unusual dangerousness and lethality of the restricted weapons, features, and accoutrements is borne out by their undisputed ability to cause significantly more deaths, injuries, and severe injuries than other firearms. Attacks with assault weapons and LCMs result in "more shots fired, persons wounded, and wounds per victim than do other gun attacks." *Heller II*, 670 F.3d at 1263 (internal quotations omitted); Ex. F, ¶ 56 ("[W]ith extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semi-automatic handguns").

Because assault weapons and LCMs are designed, suitable, and useful for causing severe injuries and deaths, they are often the weapons and accoutrement of choice for mass-murderers. *See* Ex. C, ¶ 12 ("among mass shooters, there is a growing preference for using assault weapons and LCMS to perpetrate their attacks"); Ex. B, ¶ 92 ("Unsurprisingly, a growing number of mass killers turn to these assault rifles when they launch their deadly onslaughts" and have been used in 80% of all massacres with 25 or more deaths); Ex. D, Declaration of Lucy Allen ¶ (LCMs have been used in 73 out of 115, or 63% of mass shootings). Examples—including the horrific slaughter of 26 students and teachers at Connecticut's Sandy Hook Elementary School—demonstrate the

dangerousness and lethality of these weapons: "[The Sandy Hook Killer] was able to slaughter 26 in less than five minutes with his Bushmaster AR-15. [The Aurora Killer] used a Smith & Wesson 'Military & Police' (M&P) AR-15 fitted with a 100-round magazine to kill 12 and wound 58 in a Colorado movie theater. The ISIS-inspired San Bernardino, California, shooters used a pair of AR-15s to kill 14. [The Orlando Killer] unleashed Sig Sauer's concealable 'next-generation AR' to leave 49 dead and dozens more injured at the Pulse nightclub." Ex. B, ¶ 111.

For these reasons, courts have found assault weapons and LCMs to be "dangerous and unusual" and placed them outside the Second Amendment's scope. For example, the district court in *Heller II* held that assault weapons and LCMs are "military-style weapons of war, made for offensive military use," are "disproportionately likely to be used by criminals," and "are not generally recognized as particularly suitable or readily adaptable to sporting [or self-defense] purposes." The court further noted that such weapons "are unusually dangerous because they place law enforcement officers at a particularly grave risk due to their high firepower." *Id.* at 194. Based on these findings, the court concluded that "assault weapons and large capacity ammunition feeding devices constitute weapons that are not in common use, are not typically possessed by law-abiding citizens for lawful purposes and are 'dangerous and unusual' within the meaning of *Heller*." *Id.* at 194; *see also Kolbe*, 849 F.3d at 136 ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield" (quoting *Heller I*, 554 U.S. at 627)). Ultimately, as the Second Circuit found, the "net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." *Cuomo*, 804 F.3d at 262.

All the evidence demonstrates that assault weapons and LCMs are military-style weapons and are dangerous and unusual because of their extreme lethality. Assault weapons and LCMs are therefore "categorically unprotected," and Plaintiffs' challenge fails. *Bruen*, 142 S. Ct. at 2126.

      **c.   Plaintiffs fail to show that assault weapons and LCMs are typically used by law-abiding citizens for lawful purposes like self-defense.**

Again, the Court need inquire no further. The regulated weapons and accoutrements are outside the Second Amendment's scope both because they are not arms and because they are dangerous and unusual. And there is another reason that Second Amendment does not protect the regulated instrumentalities: they are unsuited to, and used vanishingly rarely in, self-defense. But the Second Amendment only protects arms "'in common use at the time' for lawful purposes like self-defense." *Heller I,* 554 U.S. at 624 (quoting *Miller,* 307 U.S. at 179); *see also id.* at 625 (asking whether the arms are "typically possessed by law-abiding citizens for lawful purposes.").

This part of the threshold inquiry looks to suitability and purpose, not mere ownership. Rather than ask how many people own the regulated weapons and accoutrement, this factor requires a court to determine how the regulated instrumentalities are actually designed and function—what they are "useful" for, *Heller I*, 554 U.S. at 627—and how they are actually "used." *Bruen*, 142 S. Ct. at 2138 (referring to "commonly used firearms for self-defense."). That is why *Heller I* takes the time to look at the functionality of handguns—the "reasons that a citizen may prefer a handgun for home defense." 554 U.S. at 629 (listing, among other things, ease of accessible storage and design that accommodates one-handed use).

Unlike the laws at issue in *Heller*, *McDonald*, and *Bruen*, the challenged Connecticut statutes do not prohibit or impact an entire class of firearms, like conventional handguns that are the "quintessential self-defense weapon." *Heller I*, 554 U.S. at 629. Nor do they even ban all semiautomatic firearms, long guns, rifles, or fully automatic firearms. Rather, the statutes ban a

small subset of unusually dangerous military-style weapons, features, and magazines (with some exceptions for particular individuals) that "are designed to enhance [firearms'] capacity to shoot multiple human targets very rapidly." *Heller II*, 670 F.3d at 1262. Such weapons, features, and LCMs are not actually useful or used for any such lawful self-defense purposes in practice.

Firearms of any kind are used defensively in fewer than 1% of all U.S. violent crimes. Ex. D, ¶¶ 9-10; Ex. B ¶ 150 (recent study showed victims of violent crime did not defend with any type of gun in 99.2 % of those incidents). And the overwhelming majority of lawful defensive firearm shootings involve handguns, not assault weapons. Ex. D, ¶¶ 23-24. Only a handful of anecdotal incidents of use of assault weapons for self-defense exist. And there is no evidence that the federal assault weapons ban had any negative effect on the self-defense of average citizens. Ex. B, ¶¶ 147-149.

In contrast, significant data show that assault weapons are frequently used in mass shootings and unlawful violence. This trend has increased over time, with 62% of all high fatality gun massacres in the last four years perpetrated with an assault weapon. Ex. C, ¶ 12. Their use is "particularly prominent in public mass shootings and those resulting in the highest casualty counts." *Id.*, Pgs. 169-170 (citing *Koper*). They are also used to "inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff." Ex. F, ¶ 51. The fact that assault weapons and LCMs are typically used for non-lawful purposes like gun massacres is underscored by the significant decrease in both fatalities and instances of mass shootings/gun massacres while the federal assault weapons ban was in place. *See* Ex. C, Pg. 169 (gun massacres decreased during the decade the ban was in place, then skyrocketed after the ban was lifted); Ex. B, ¶ 72 (the decade after the ban was lifted showed an overall 266% increase in mass shootings

and 347% increase in fatalities). Such weapons are also particularly popular weapons for drug traffickers and gang members both in the U.S. and Mexico. Ex. B, ¶¶ 64-65.

LCMs are similarly chosen for mass shootings and unlawful purposes rather than self-defense. Semiautomatic rifles "equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history, including horrific events in Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012)." *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019). "Large-capacity magazines are disproportionately used in mass shootings, like the one in Newtown, in which the shooter used multiple large-capacity magazines to fire 154 rounds in less than five minutes." *Cuomo*, 804 F.3d at 242. "In Thousand Oaks, California, a shooter equipped with large-capacity magazines murdered twelve people at a bar in 2018." *Duncan v. Bonta*, 19 F.4th 1087, 1106 (9th Cir. 2021), *vacated and remanded by Duncan v. Bonta*, 142 S. Ct. 2895 (2022). As the Fourth Circuit observed,

> Other massacres have been carried out with handguns equipped with magazines holding more than ten rounds, including those at Virginia Tech (thirty-two killed and at least seventeen wounded in April 2007) and Fort Hood, Texas (thirteen killed and more than thirty wounded in November 2009), as well as in Binghamton, New York (thirteen killed and four wounded in April 2009 at an immigration center), and Tucson, Arizona (six killed and thirteen wounded in January 2011 at a congresswoman's constituent meeting in a grocery store parking lot).

*Kolbe*, 849 F.3d at 120. "These weapons are disproportionately used in crime, and particularly in criminal mass shootings like the attack in Newtown. They are also disproportionately used to kill law enforcement officers: one study shows that between 1998 and 2001, assault weapons were used to gun down at least twenty percent of officers killed in the line of duty." *Cuomo*, 804 F.3d at 262.

There is also little evidence that LCMs are used or needed in self-defense. In reported instances of self-defense involving firearm use from 2011-2017, on average, only 2.34 shots are

fired in self-defense. Ex. D, ¶ 16. In 97.3 % of all incidents, individuals using a firearm in self-defense fire 5 or fewer shots. *Id.* This national data also holds true in Connecticut, where a review of incidents from 2011-2017 yielded no evidence that any individual fired more than 10 rounds in self-defense, nor is there any evidence that it would have been necessary to do so. *Id.*

Manufacturers' advertising evidences assault weapons' intended purposes. Even manufactures do not tout assault weapons as "quintessential" self-defense weapons, like handguns. *Heller I*, 554 U.S. at 629. Instead, advertising campaigns for assault weapons "are hawked with explicit depictions of combat and phrases like 'the closest you can get without having to enlist.'" Ex. B, ¶ 91. Tragically, in the closest to home and perhaps the most infamous and horrific example of a mass shooting—the Newtown Sandy Hook massacre where first graders and teachers were gunned down—the weapons of choice included an assault weapon that had been advertised under the slogan "Forces of opposition, bow down." *Id.* The typical purpose of these weapons is attack, domination, and death, not self-defense.

Other courts have found little or no evidence of civilian use of assault weapons and large capacity magazines for home or self-defense. *See Hightower* v. *City of Boston*, 693 F.3d 61, 66, 71 & n.7 (1st Cir. 2012) ("[L]arge capacity weapons" with the capacity to carry more than ten rounds are not "of the type characteristically used to protect the home"); *Heller II*, 698 F. Supp. 2d at 193-94 (banned weapons and magazines do not have "any legitimate use as self-defense weapons" and "in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations") (internal quotation marks omitted); *Heller II*, 670 F.3d at 1263-64 ("[H]igh-capacity magazines are dangerous in self-defense situations because the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders.") (internal quotation marks omitted).

23

Plaintiffs have not met their burden of showing that assault weapons and LCMs are "typically possessed by law-abiding citizens for lawful purposes," or that such weapons or accoutrements are even suitable for purposes like self-defense. The overwhelming evidence points the other way. So the Second Amendment does not apply.

### d.   Assault weapons and LCM's are not even commonly *owned*.

Plaintiffs would reduce their threshold burden to a circular inquiry into whether the regulated weapons and accoutrements are commonly owned, without regard to their usage or purpose. That is not what Supreme Court precedent requires. *See, e.g., Bruen*, 142 S. Ct. at 2138 (reiterating the phrase "commonly *used* firearms for *self-defense*") (emphasis added); *Heller I*, 554 U.S. at 629 (examining the "reasons" a handgun may be used for "home defense"); *see also Friedman*, 784 F.3d at 409 ("[R]elying on how common a weapon is at the time of litigation would be circular."); *Worman*, 922 F.3d at 35 (measuring "common use" by the sheer number of weapons lawfully owned is "illogical"); *Heller II*, 670 F.3d at 1261 (numerosity is not enough where "we cannot be certain whether" the weapons are "used or useful specifically for self-defense or hunting."); *Kolbe,* 849 F.3d at 143-44 (finding large capacity magazines to be "most useful in military service" and therefore not protected by the Second Amendment, no matter their popularity).

But Plaintiffs could not carry their burden even if common ownership were the end of the threshold inquiry. Their sole evidence of common ownership of the regulated weapons is that "between 1990-2021, more that 20 million AR-15 platform rifles have been manufactured in the United States and are owned by millions of persons in the United States." ECF # 28-4. But the simple and vague assertion there are "millions" of assault weapon owners does not tell us how many people actually possess those weapons or how many of those people are the "law abiding citizens" at the core of the Second Amendment's concerns. *Heller I*, 554 U.S. at 625. Even an

24

accurate raw number, which Plaintiffs do not provide, would shed no light on commonality absent analysis of how many individuals *could* possess such weapons. And even knowing a percentage would tell us nothing legally relevant without some presentation of authority on what "common" means as used in *Heller* and *Bruen*. Plaintiffs offer none.

So here are the facts. AR-15 platform rifles—which include the assault weapons regulated in Connecticut—make up approximately 5% of privately owned guns, compared to 50% for handguns. Ex. B, ¶¶ 27-28. Even among gun owners, such weapons are not commonly owned.

Plaintiffs' 20 million number for AR-15 platform rifles does not represent the number of *individuals* who own these weapons but represents the number of these weapons that have been *produced*. And research has shown that the average assault weapons owner has "three or more of the guns." Ex. B, ¶ 92. So while the number of assault weapons produced is relatively small in the context of the overall gun stock of an estimated 461.9 million firearms in circulation the nation, the number of individual owners of assault weapons is likely even smaller. Ex. C, ¶ 13. Even if 20 million individuals owned AR-15 style weapons (which they do not, as Plaintiffs seem to concede), that would still only be about 6% of the entire United States population. *Id.,* ¶ 27.

Put simply, AR-15 style weapons constitute a fraction of guns in existence today, and even a smaller slice of the entire American population actually owns them. These weapons are not in common use on a national level. In Connecticut, assault weapons and AR-15 style weapons are even rarer. Only 81,982 assault weapon certificates have been issued in Connecticut since the passage of the challenged statutes. Ex. A, ¶ 19. Thus, even if the inquiry were limited to common ownership, and even if we assume (baselessly) that each assault weapon is owned by a unique individual, at *best* 2% of the Connecticut population owns an AR-15 style weapon. In actuality, nationwide, 70% of adults nationwide do not own *any* firearms, let alone assault weapons or

LCMs. Ex. B, ¶ 28. This data is underscored by the majority, common support for assault weapons bans and LCM bans among the general population. *See id.*, ¶ 135 (two-thirds of Americans favor bans high-capacity magazines). Owning an assault weapon is both uncommon and unpopular.

Statistics on LCMs in Connecticut also undercut Plaintiffs' claims. In Connecticut, about 3.8 million LCMs are lawfully owned. Ex. A, ¶ 38. These LCMs, though, were owned by only about 41,000 individuals. *Id.* Thus, only about 1% of the 3.6 million citizens of this state lawfully own LCMs. The preferences of this extraordinarily small minority of the population cannot amount to commonality.

Plaintiffs have not established and cannot establish that either LCMs or assault weapons are commonly owned. So even if this question were the end of the inquiry, as they erroneously assert, Plaintiffs have not shown any likelihood of success on the merits of their claims.

3. **Even if Plaintiffs could show that the Second Amendment extends to assault weapons and LCMs, they cannot show substantial likelihood of success because Connecticut's common-sense gun regulations are consistent with the American tradition of firearm regulation.**

Because the Second Amendment does not protect the regulated weapons and accoutrements, Plaintiffs cannot show any likelihood —much less a substantial likelihood—of success on the merits, and their request for a mandatory injunction against Connecticut's gun safety laws should be denied. *See Bruen*, 142 S. Ct. at 2126 (decreeing that the analysis can stop, and the state's regulations survive, if the threshold inquiry shows that the regulated conduct is beyond the scope of the Second Amendment protections). But even if they survived the threshold inquiry, Plaintiffs would still fail because Connecticut's regulations are entirely "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-2130.

If a plaintiff shows that they are entitled to the Second Amendment's protections, courts must consider whether "historical precedent from before, during, and even after the founding

evinces a comparable tradition of regulation" as to that before the Court. *Id.* at 2131-32. As the Court noted in *Bruen*, "[i]n some cases, that inquiry will be fairly straightforward." *Id.* at 2131. Such cases include situations where states try to address "a general societal problem that has persisted since the founding" and where there may be previous attempts to enact "analogous regulations during the time frame" that would suggest a modern-day restriction's constitutionality. *Id.*

The Court recognized that regulations intended to address "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. So even when they trigger Second Amendment scrutiny, state gun safety regulations like Connecticut's—motivated by unprecedented concerns and dramatic technological change that would have been "unimaginable at the founding," *id.*—are constitutional where a court can identify a "well-established and representative historical *analogue*, not a historical *twin*" for regulations. *Id.* (emphasis in original). To survive, the challenged regulation need only be "relevantly similar" to a historical regulation. *Id.* at 2133.

At this early stage, Defendants and their experts have not yet completed the expansive historical inquiry mandated by *Bruen*. They have not yet exhaustively surveyed 300 years of evolving state and municipal laws or the rich literature on arms regulation throughout the Nation's history. Because of the impossibility of complete research at this stage, the Court should deny the mandatory injunction and permit discovery to flesh out the record rather than granting extraordinary preliminary relief on an issue of unsettled law. It should also deny the motion

because Plaintiffs cannot demonstrate a substantial likelihood of success. The record at this preliminary stage record shows that the challenged statutes are consistent with historical tradition.

> **a.  The historical analogue analysis is broader here because the challenged statutes respond to unprecedented societal concerns and technological advancements.**

This case, unlike *Bruen* and *Heller*, does not address restrictions on handguns, and the statutes here were not designed to address a general societal concern that has remained relatively unchanged since the 18th century. Rather, Connecticut's General Assembly enacted the challenged statutes to address an unprecedented societal concern resulting from rapid and dramatic technological advancements that have, tragically and with irreversible consequences, facilitated a national epidemic of mass shootings.

The Connecticut legislature enacted the challenged statutes in response to the horrific shooting that took 26 lives in Newtown in 2012. *See Cuomo*, 804 F.3d at 242 ("The legislation is also specifically targeted to prevent mass shootings like that in Newtown, in which the shooter used a semiautomatic assault weapon" and LCMs); *Shew v. Malloy*, 994 F. Supp. 2d 234, 249 (D. Conn. 2014) ("Connecticut's General Assembly made its legislative judgment concerning assault weapon and LCM possession after the mass-shooting at Sandy Hook Elementary School").[6]

Mass shootings and gun massacres are not something that "the Founders themselves could [have] confront[ed]" and were not a "general societal problem" in the 18th century. *Bruen*, 142 S. C.t at 2132. Rather, such incidents are a modern phenomenon that have dramatically increased in frequency in the last 25 years. Ex. B, ¶ 35. There was simply no "comparable societal ill" to mass

---

[6] "At the end of that unimaginable day, we learned that we had lost 20 elementary school children and 6 teachers and administrators. They were killed with a weapon of war, a semi-automatic assault rifle, the platform of which - was originally designed for the battlefield and mass killings. . . The legislature recognized that access to guns is a big part of the public health challenges in our country today." *Shew*, 994 F. Supp. 2d at 249 n.50 (D. Conn. 2014) (citing Connecticut Senate Session Transcript for April 3, 2013).

shootings in the 18th century. Ex. G, ¶ 18; Ex. F, ¶¶ 14-16. Even general gun violence was very low compared to the current day, particularly in New England. Ex. G, ¶ 19. As one expert concludes: Guns were not the "weapon of choice for those with evil intent" during the founding. Ex. G, ¶ 21.

Founding and Reconstruction era firearms lacked the lethal potential of the modern assault weapons, features, and LCMs the challenged statutes restrict. *Id.*, ¶ 24; Ex. F, ¶ 56. The new generation of unprecedentedly lethal weapons and accoutrements targeted by Connecticut's safety laws emerged from technologies developed for military use during the Cold War. Ex. F, ¶ 49.

During the Founding Era and Reconstruction, America was not daily put at mortal risk by weapons that let a single person decimate an elementary school in under five minutes. There were no such weapons and no such incidents. *See* Ex. F. Rather, at the Founding, most arms were flintlock muzzleloaders capable of firing a single lead ball.[7] *Id.*, ¶¶ 15-30. For example, the Boston Massacre—which drove Colonial America and particularly New England closer to revolution—resulted in *five* deaths from *nine* British soldiers firing into a crowd. *Id.*, ¶ 41. A single person murdering dozens of children within seconds with a single weapon would have been impossible given then-existing weaponry, and therefore unthinkable to the Founding generation.

The near-exponential increase in firearms' lethality is precisely the "dramatic technological change" that *Bruen* anticipated. The lethality of the regulated weapons is evident in an index devised for the U.S. Army, which classifies the lethality of various weapons—defined as the number of people who could be killed in one hour by a particular weapon. *See* Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508

---

[7] For this reason, as discussed above, ammunition or bullets were not stored in a type of device like a modern day "magazine" because such devices did not exist. Ex. E, ¶ 24.

(2022). This index demonstrates that the lethality of a Founding-era flintlock muzzleloader was 43; that of a Civil War-era rifle capable of firing conoidal bullets was 102; and that of a 1903 bolt-action rifle equipped with a magazine was 495—"a ten-fold increase over the flintlock musket." *Id.* at 2507–08 (And that manually re-loaded rifle did not even have an LCM—it carried only a five-round clip-magazine. Classic Firearms, "U.S. Model 1903," https://tinyurl.com/2p8c74rj).

In contrast, the Sandy Hook Killer murdered 26 children and adults in five minutes, and an expert can fire an entire 30-round LCM from a Glock handgun in five seconds. Ex. B, ¶ 58; Ex. F, ¶ 50. Weapons at the time of the Founding and Reconstruction simply did not have the lethality potential as the weapons regulated by the challenged statutes. Ex. C, ¶ 18; Ex. B, ¶¶ 171-172; See also, Ex. G, ¶ 20 ("limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period"). And, as discussed above, LCMs for handguns did not become widely available for civilian use until the 1980s—similarly rendering them a thoroughly modern development. Ex. C, ¶ 12.

It would be no surprise to the legislators at the Founding or the Reconstruction that their modern counterparts would try to address a thoroughly modern problem just as they themselves sought to address the problems of their day, albeit through sometimes different legislative approaches. Lawmakers at the Founding and Reconstruction were not strangers to the idea of mass casualty events, and even mass murder. But the problem of gun massacres by a single individual, facilitated by the lethality of a single weapon, was never before a major societal concern like it is today. *See* Ex. F, ¶ 41 (mass murder "has been a fact of life in the United States" but it was a "group activity" until technological advancements like advances in weaponry permitted otherwise). Before technological advancements in the 20th century allowed individuals to create unthinkable carnage, "the only way to kill a large number of people was to rally like-minded

neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal" but simply did not have anywhere near the lethality of modern assault weapons and LCMs. *Id.*

Technology was not the driver before the contemporary era—criminality and ideology were. *Id.*, ¶¶ 41-43. And Congress tried to respond, just as contemporary legislators do to our own crises. For instance: in the Reconstruction era, Congress responded to a crisis of domestic mass-murder events by deploying federal troops to prevent lynchings by the Ku Klux Klan. *Id.* Lawmakers during Reconstruction tried to regulate and address the conduct through enforcement of existing criminal laws. At the time, the United States Army and loyal state militias sought to prevent arms from reaching unlawful insurgent groups, using intelligence gathering to intercept arms shipments. *Id.* They targeted the perpetrators, rather than particular instrumentalities, since post-Civil War mass violence was perpetrated with a variety of weapons rather than with a specific, identifiable type of weapon. *Id.*

At the Founding, military style weapons were not as easily accessible and purchasable as today. Such weapons were expensive and had less utility in rural colonial society than other non-military weapons. Ex. G, ¶ 19 ("Nobody bayoneted turkeys…the most widely owned and desired weapons were fowling pieces and light hunting muskets"). But today, new semiautomatic handgun can be bought for less than $200 and equipped with a 33-round magazine for less than $15. Ex. F, ¶ 46. Given the lack of any technology or concern which could allow one person to murder so many others in such a small time as assault weapons and LCMs allow, let alone technologies as easily accessible as LCMs, it would likely have been incomprehensible to the Founders that mass shootings like those the statutes attempt to address could ever become a societal problem.

Mass shootings are an unprecedented societal concern driven by dramatic technological advancements, and Connecticut's responsive laws are "modern regulations . . . unimaginable at the founding." *Bruen*, 142 S. Ct. at 2132. It is unsurprising that legislators in the 1790s and 1860s did not regulate non-existent military-style firearms capable of killing hundreds in minutes. *See McCullen v. Coakley*, 573 U.S. 464, 481–82 (2014) (noting that the Constitution does not "require States to regulate for problems that do not exist."). So this Court should uphold Connecticut's challenged regulations without looking for a "historical twin." Instead, as *Bruen* commands, it should look to the relevantly similar historical analogues identified below and should deny Plaintiffs their extraordinary injunction.

**b. Plaintiffs cannot show a likelihood of success because Connecticut's regulations are relevantly similar to regulations throughout American history.**

The *Bruen* Court held that defendants need only identify a "well-established and representative historical *analogue*, not a historical *twin*" for modern day challenged regulations in order to demonstrate it is consistent with historical tradition. *Bruen*, 142 S. Ct. at 2132. (emphasis in original). The Court did not specify how narrow or how similar this analogue must be, particularly in cases like this where an unprecedented societal concern and modern technological advancement is implicated. The Court did, however, note that "[w]hen confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* Building on *Heller* and *McDonald*, the Court identified "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.

Throughout American history, states' inherent police power—their sovereign prerogative to protect public safety—included the power to regulate firearms and accessories and protect residents from interpersonal violence. Ex. G, ¶¶ 25-32. As societal and technological change brought new types of weapons that posed new social concerns and public safety threats, states responded with new regulations. This tradition of common-sense regulation offers multiple clear analogues to Connecticut's gun safety laws which, like their predecessors, target new weapons technologies used primarily for crime while allowing multiple options for self-defense.

### i. There is a historical tradition of restricting possession of specific types of dangerous new weapons technologies.

Historically, states used their police powers to regulate new weapons that posed an unprecedented risk to public safety, albeit on a far less deadly scale than assault weapons and LCMs do today. *Id*. For example, as technologies developed and new weapons emerged that were primarily used for attacking others rather than self-defense, states and territories regulated those weapons. Folding knives, dirk knives, and Bowie knives—newer inventions specifically designed for and primarily used in "an alarming proportion of the era's murders and serious assaults"— were banned in their entirety. Ex. F, ¶ 24. These weapons, just like assault weapons and LCMs, were newer technologies that created a societal concern until then unmatched and were therefore regulated for the same purpose as the challenged statutes here—public safety and reducing ambush and attacks.[8] See *id.*, ¶ 25 ("Dirks and Bowie knives had longer blades than ordinary knives,

---

[8] Relevant regulations included: *See, e.g.*, 1837 Ala. Laws 7, No. 11, § 2 (prohibitive tax on Bowie knives); 1837 Ga. Laws 90, § 1 (prohibiting sale and possession of Bowie and other kinds of knives as well as "pistols, dirks, sword canes, [and] spears"); 1837-1838 Tenn. Pub. Acts 200-01, §§ 1–2 (prohibiting sale and carrying of Bowie knives, Arkansas toothpicks, and other fighting knives); 1838 Fla. Laws 36, No. 24, § 1 (prohibitive tax on sale and possession of pocket pistols, sword canes, and Bowie knives); 1838 Va. Acts 76, ch. 101, § 1 (banning "keep[ing] or carry[ing]" Bowie knives and other deadly weapons); 1839 Ala. Acts 67, ch. 77 (banning the concealed carry of Bowie knives and other deadly weapons); 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws., ch. 25, § 27, pt. 15 (imposing $1.25 tax on "[e]very dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane," while exempting weapons "used for mustering"); 1868 Ala. Laws 11 (prohibiting the "carrying of hostile deadly weapons" known as "'rifle' walking canes" or

crossguards to protect the combatants hands, and clip points to make it easier to cut or stab opponents."). These regulations did not entirely ban knives, or bladed weapons, or arms in general. They simply banned specific kinds of knives that were particularly dangerous, leaving the citizenry more than capable of defending itself with other weapons. So too here.

These types of regulations on classes of unprecedentedly dangerous weapons also included some handguns. For example, during the Founding era, some areas in the country restricted newly developed percussion-cap pistols, which users could carry loaded for a long period without concern for corrosion—a concern that previously limited the use of weapons. These new kinds of handguns, thought to be "primary murder weapons," were restricted "during the lifetimes of Jefferson, Adams, Marshall, and Madison." *Id.*, ¶¶ 25-27. Even during the Reconstruction era, as behaviors and technologies changed, states "singled out weapons" that posed a new danger or concern and regulated them. Ex. G, ¶¶ 30-45.

As technologies with high killing capacity developed and contributed to problems of violence or death, they were immediately regulated and banned. For example, dynamite and the submachine gun—which had much higher potential for lethality than any other weapons at the time, just like assault weapons and LCMs— were quickly regulated. See Ex. F, ¶¶ 44-45 (dynamite and submachine guns were mainly used for attacking others and had high capacity for lethality that had never been experienced before and had little use in self-defense).

---

"'gunshot' walking canes"); 1868 Fla. Laws 95, ch. 7, § 11 (prohibiting the manufacture or selling of slung shots or metallic knuckles). Bowie knives, like assault weapons used with an LCM, was considered "in its device and design . . . the instrument of *almost certain death*." *Cockrum v. State*, 24 Tex. 394, 402 (1859) (emphasis added); *see also Aymette v. State*, 21 Tenn. 154, 158 (1840) (explaining that Bowie knives "are efficient only in the hands of the robber and the assassin"). Massachusetts, Connecticut's neighbor, also passed a law banning "slungshots," a weapon like a slingshot with a large, heavy shot that was primarily used to attack others. See 1850 Mass. Gen. Law, ch. 194 § 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.

The challenged statutes here are entirely consistent with the kind of laws that states have passed to address new and evolving societal concerns presented by technologically advanced weapons throughout history.

### ii. Historical regulations on carrying certain weapons are also relevant analogues showing that the challenged statutes comport with the tradition of American firearm regulation.

So states traditionally regulated by banning possession of some particularly dangerous new weapons. They also have a relevant tradition of regulating how some advanced new weapons— which posed new threats because they were readily concealable—could be carried.

For example, after Reconstruction, Colt revolvers were more deadly than predecessor handguns because they could fire more shots in rapid succession. Ex. F, ¶¶ 33-35. Similarly, revolvers began to develop features which allowed shooters to shoot more quickly without having to reload, and were designed to be concealed, allowing for easier ability to murder. *Id.*, ¶ 33-34. As a result of these technological advancements, homicide and violence rates increased around the country. *Id.*, ¶ 34. States and territories tried to regulate this problem of ambushes, attacks, assaults, and rising homicide rates by prohibiting concealed carrying of such weapons—indeed, every state (including Connecticut) except one passed regulations restricting carrying certain concealable weapons. *Id.*, ¶¶ 35-40. In short, when faced with changes in technology, consumer behavior, and faced with novel threats to public safety, individual states enacted laws to address these problems.

These regulations responded to changing technology and new societal threats. But, like the challenged statutes, they ultimately did not prevent citizens from defending themselves. Restrictions on concealed carrying certainly touched on the bearing of arms but were never considered anathema to the Second Amendment or struck down by the courts. So too with the challenged statutes, which are a contemporary equivalent of longstanding firearm regulation that addresses a newly-pressing problem.

### iii.  Historical regulations about the possession and storage of gunpowder are relevantly similar to Connecticut's modern efforts to address gun safety.

Because mass shootings are a modern problem and because there were no weapons at the Founding or Reconstruction that contributed to mass casualty events the way assault weapons do today, the Court should look to laws aimed at preventing other types of mass casualty events to find similar historical analogues.

For example, access to unlimited amounts of gunpowder has never been permitted. Gunpowder was highly regulated throughout the colonial era, when individuals were not free to stockpile as much gunpowder and ammunition as they wished or to store it as they wished. *See, e.g.*, 1706-7 Mass. Acts ch. 4, reprinted in Acts and Resolves Passed by the General Court 588 (1869), available at https://tinyurl.com/27ubvvvn; A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763), https://tinyurl.com/5273xd57; 1821 Me. Laws 98, chap. 25, § 5, https://tinyurl.com/up948844. Colonial era restrictions often limited how much gun powder could be stored in the home and citizens would often have to store such excess gunpowder in the public "magazine"—a place, as noted above, not a device or accessory. These gunpowder storage laws have been historically regarded as appropriate exercises "of the police power." *Brown v. Maryland,* 25 U.S. 419, 443 (1827); Ex. G, ¶¶ 26-30. Since munitions posed a uniquely dangerous risk to society, the government could lawfully regulate them. See *id.*

The historical analogues were many, if not necessarily uniform. For instance, some jurisdictions placed a predetermined limit on the quantity of gunpowder a citizen could store in his home: New York City (28 pounds) 1784 N.Y. Laws 627, *An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof*, ch. 28; Philadelphia (30 pounds) *A Digest of the Acts of Assembly, and the Ordinances, of the*

36

*Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District*, Pg. 45-47, Image 48-50 (1832) available at The Making of Modern Law: Primary Sourcesor; Portsmouth, New Hampshire (10 pounds) 1786 N.H. Laws 383-84.

Other jurisdictions, like Connecticut, went further and empowered local officials to determine, based on their "opinion," whether a certain "quantity of gunpowder" in the possession of a private citizen "may endanger the persons or dwellings of any individuals whatsoever." If so, the officials could order the owner to move their gunpowder to "some safe and convenient place within said town" at a time and place of their choosing. If the citizen failed to do so, the officials could move it "to such place within said town, as in their opinion shall be deemed safe and convenient." The officials even retained "a lien upon the said powder for all necessary expenses in removing and keeping the same." 1832 Conn. Acts 391, *An Act Regulating the Mode Of Keeping Of Gunpowder,* Chap. 25, § 1-2. In other words, the first selectman or mayor or town council of a locality had the right to determine how much stored gunpowder was "too much" for a private citizen and could force him to move it—or actually seize it.

Such a law placed a far greater burden on the right to "keep and bear arms" than a restriction on possessing assault weapons and LCMs while leaving hundreds of types of firearms untouched by regulation. If in 1832, the first selectman of Granby decided an amount of gunpowder in excess of half a pound was "dangerous," he could order it removed to basically any location he desired.[9] The only limit on this discretion was the official's "opinion." A citizen could therefore have been prevented from possessing gunpowder, making it impossible to use any and

---

[9] This would not have been an unusually small amount. Indeed, New Haven limited gun powder possession in the home to one pound only a few years earlier. *See* Charter and By-Laws of the City of New Haven, November, 1848 Page 48-49, Image 48-49 (1848).

all of their firearms, since all such weapons required gunpowder to operate. This is unlike modern day LCMs, which are not an essential part of most firearms.

It is not difficult to understand why such regulations were in place. Storing too much gun powder in a private home could lead to an explosion or a fire that could threaten a large portion of a community. *See Saul Cornell and Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 511-12 (2004) ("the point of these statutes, was, as they themselves proclaimed, to protect communities from fire and explosion… [and] also provided a check on the creation of a private arsenal."). Such an explosion or fire would be the mass casualty event of the Founding era, and legislators then understood that limiting the right to "keep," in the form of a restriction on the amount of gun powder possessed, was a perfectly permissible limitation on the Second Amendment right. Much like the challenged statutes, such regulations did not deprive a law-abiding citizen of his ability to defend himself either in the home or in public.

As argued above, the Founders would not have considered an LCM as an "arm" but rather an "accoutrement." But the gun powder storage analogues fit even more precisely regarding LCMs because these would have been the Founding era equivalent of a limitation on magazine size or capacity. Again, the word "magazine" had a specific meaning to the Founders and Reconstruction era legislators: it was not a cartridge holding ammunition but was instead an actual physical building or location. Connecticut's LCM ban does not limit the number of rounds or magazines one can own or carry on their person, the way that historical regulations of gunpowder and bullets limited a person's ability to use a firearm. Connecticut does not limit the number of firearms a resident can carry on their person or store in their home. The statute merely limits how many rounds can be in one magazine at one time. This statute does not burden the right of self-defense

and certainly far less than a law requiring excess bullets or firearms or gunpowder to be stored in a communal location based on the opinion of a local official.

The right to keep and bear arms is not a "regulatory straightjacket." *Bruen*, 142 U.S. at 2133. It accommodates state and local variation in "devis[ing] solutions to social problems that suit local needs and values," *McDonald v. City of Chi.*, 561 U.S. 742, 784 (2010). Principles of federalism permit variation among the states in addressing matters of public safety and concern, consistent with the Second Amendment. Indeed, in determining that the Second Amendment applies to the states, the Court explained that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *Id*. The regulations here are consistent with historical regulation of arms and are a permissible exercise of the long accepted and traditional police powers the states enjoy to promote public safety. So Plaintiffs have failed to show a substantial likelihood of success on the merits, and this Court should deny their motion.

## C. Plaintiffs cannot satisfy the remaining criteria for a mandatory preliminary injunction.

Plaintiffs' motion should be denied because they cannot show a substantial likelihood of success on the merits. They cannot satisfy the other three *Winter* factors, either. They do not even try. They offer no argument, evidence, or briefing on the factors of balance of the equities or public interest. ECF 28-1 at 4. So they cannot have met their burden to demonstrate each factor by a clear showing. *See Abbott Labs. v. Adelphia Supply USA,* No. 15-CV-5826 (CBA)(MDG), 2015 U.S. Dist. LEXIS 189555, at *45 (E.D.N.Y. Nov. 6, 2015) ("Preliminary injunctive relief is an extraordinary remedy that requires the plaintiff to carry the burden of persuasion by a clear showing for each factor") (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). But even if they tried, they would ultimately prove unsuccessful.

Plaintiffs cannot show irreparable injury for the same reason they cannot show a substantial likelihood of success on the merits. Plaintiffs' entire argument for irreparable harm stems from their presumption that the prohibited assault weapons, features, and LCMs merit constitutional protection. But Plaintiffs fail to show any likelihood of success on the merits, so they also cannot show irreparable harm.

Plaintiff Flanigan's only alleged "hardship" is the asserted impairment to her ability to defend herself through wielding multiple redundant weapons of war. But she has been unable to purchase and possess assault weapons and LCMs for the last 10 years, and there is no evidence she has ever needed them. And Connecticut places no limit on how many firearms or magazines she may carry on her person, let alone how many she may possess in her home. Since assault weapons are not typically used for self-defense and the likelihood that she will need to discharge firearms in self-defense in Connecticut is extremely low, as discussed above, Ms. Flanigan's ability to defend herself is not impacted by the challenges statutes at all. Indeed, the risk that Ms. Flanigan or any American will be the victim of an accidental shooting is 35 times higher than the chance that she will need to defend herself at all—much less with an assault rifle—from an armed attacker. Ex. D, ¶ 37.

The organizational Plaintiff has alleged even less hardship. At best, NAGR claims they may need to simply continue to do more of the activities their members already expect them to do—answer questions and advocate on behalf of their members.

In contrast, a mandatory injunction will work immediate and severe hardship on Defendants, the State of Connecticut, and the public. The public interest in avoiding mass shootings dramatically outweighs a single plaintiff's interest in owning one more gun that she is wildly unlikely to ever use for any legitimate self-defense purpose.

An injunction would cut directly against the public interest, striking down public safety legislation demanded by Connecticut citizens and enacted by their elected representatives in response to one of the worst mass shootings in American history. It would severely, negatively, and potentially irreversibly harm Connecticut and its citizens. Connecticut's gun safety laws protect every person in the state against "the ultra-lethal pathogen of mass murders—shootings in which multiple people are killed and, often, dozens of others injured." *Ocean State Tactical*, 2022 U.S. Dist. LEXIS 227097, at *43. Courts have found that governments have "a very strong interest in regulating the use of [firearms]. The threat to public safety posed by illegal and/or irresponsible [firearm] usage is well known." *Waltier v. N.Y. Police Dep't*, 856 F. Supp. 196, 200 (S.D.N.Y. 1994). "A State's most basic responsibility is to keep its people safe," *Caetano v. Massachusetts,* 477 U.S. 411, 421 (2016) (Alito, J. concurring), and the "interest of public safety stemming from mass gun murders could not be more undeniably compelling." *Ocean State Tatical*, 2022 U.S. Dist. LEXIS 227097, at *46.

This Court should deny Plaintiffs' extraordinary and dangerous request for mandatory injunctive relief. They have not met their heavy burden to demonstrate the balance of harms weigh in their favor or that the public interest would be best served by granting their Motion.

## III. CONCLUSION

For all these reasons the Defendants respectfully ask this Court to deny the Plaintiffs' Motion for Preliminary Injunction.

                         DEFENDANTS
                         Lamont, et al.

                         WILLIAM TONG
                         ATTORNEY GENERAL

                    BY:

/s/ *Janelle R. Medeiros*

Janelle R. Medeiros
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct30514
E-Mail: janelle.medeiros@ct.gov
Tel.: (860) 808-5450
Fax: (860) 808-5590

_____
James M. Belforti
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Tel: (860) 808-5450
Fax: (860) 808-5591
Federal Bar No. ct30449
E-Mail: james.belforti@ct.gov

**CERTIFICATION**

I hereby certify that on January 31, 2023, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

/s/ *Janelle R. Medeiros*

Janelle R. Medeiros
Assistant Attorney General

42