# EXHIBIT A

## Declaration of Detective Brindiana Warenda

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NATIONAL ASSOCIATION FOR GUN   :     CIVIL NO. 3:22-CV-01118(JBA)
RIGHTS, ET. AL.                  :                                     :
    *Plaintiff*,               :
                           :
    v.                      :
                           :
NED LAMONT, ET AL.,        :     JANUARY 31, 2023
    *Defendant.*

**AFFIDAVIT OF BRINDIANA WARENDA**

I, Brindiana Warenda, having been duly sworn, testifies and affirms as follows:

1.    I am over eighteen years of age and understand the obligations of an oath.

2.    I have been employed as a Trooper with the Connecticut State Police (CSP) since 2012. The CSP is a division within the Connecticut Department of Emergency Services and Public Protection (DESPP).

3.    I am presently assigned to the Special Licensing & Firearms Unit (SLFU) as a Detective and have been since September 2018. There are several different detective sections within SLFU including but not limited to Revocations, the Firearms Vault, Boxing/MMA, and Special Licensing (e.g. Bail Bondsmen, Security Guards, Armed Security Guards, etc.). From September 2018 to October 2019, I was assigned to Revocations. In October 2019, I was reassigned to the Firearms Vault and I am currently the primary detective at the Firearms Vault.

4.    In my capacity as a Detective at the Firearms Vault, I specialize in firearm destruction and firearm legality. The Firearms Vault is the clearinghouse for firearm destruction in the State of Connecticut and processes over 3,000 firearms per year for destruction. I also assist local, State and Federal law enforcement, as well as Federal Firearm Licensed (FFL) dealers and public, with Connecticut State Statutes regarding firearm legality within the State of Connecticut.

5.    While I am directly assigned to the Firearms Vault, I assist on a regular basis with Revocations. Revocation duties include, but are not limited to revoking pistol permits for statutory prohibitors, making the determination if a person is suitable for a pistol permit, interacting with law enforcement agencies in the State of Connecticut and Federal, State and local law enforcement agencies throughout the United States, preparing Board of Firearms Permit Examiners (BFPE) hearing packets for DESPP's Legal Affairs Unit, and explaining firearms laws/regulations to various agencies, organizations and citizens.

1

6.      I am certified by the Police Officer Standards and Training Council (P.O.S.T.) to instruct in "Weapons and Permits." The purpose of "Weapons and Permits" is to familiarize recruits and sworn law enforcement with the Connecticut State Statutes and federal laws relative to various firearms and firearms permits. One of the performance objectives is to identify the Connecticut Statutes relative to the illegal sale, carrying of, and safe securing of various firearms such as rifles, shotguns, and handguns. I am re-certified every three years by P.O.S.T.

7.      I have received extensive training with respect to the use and safe handling of firearms. In addition, I have been trained and certified as an "armorer" on specific firearm platforms. An armorer is someone who is authorized by the manufacturer to repair and replace parts of firearms.

8.      In 2020, I attended an armorer school established by Glock, Inc., a firearm manufacturer, and became a certified armorer on all Glock model pistols, excluding the G18 select fire models. I was trained to take apart a Glock pistol and replace/repair any defective part to make the firearm functional. In 2022, I attended a similar armorer school established by Smith & Wesson, another firearm manufacturer, where I became certified in repairing Smith & Wesson M&P 2.0 pistols.

9.      I am also certified by the International Firearm Specialist Academy (IFSA) as a Certified Firearm Specialist. The training included, but was not limited to rules of safe handling, clearing procedures, safety precautions, classification of firearms pursuant to the Gun Control Act (GCA), firearm markings, nomenclature (identification of parts necessary to safety and/or marking locations), ammunition components, mechanical types of operations (e.g. semiautomatic versus fully automatic), and National Firearms Act (NFA) items.

10.     Since I have been assigned to the Firearms Vault, I have had an opportunity to work with thousands of different types of firearms beyond what is issued to me by CSP. This handling of non-CSP issued firearms is invaluable because, not only do I need to know how to make firearms safe, but I also need to be able to identify features that could make a firearm illegal in the State of Connecticut.

11.     In 1993, the Connecticut State Legislature passed Public Act 93-306 which prohibited possessing, selling, or transporting assault weapons with limited exceptions. The act defined an assault weapon as: 1. Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user, including but not limited to AK-47 type, MAC-type, Auto-Ordnance Thompson-Type, and Colt AR-15; 2. any of a list of named firearms; 3. A part or combination of parts designed or intended to convert a firearm into an assault weapon or from which an assault weapon may be rapidly assembled if they are in the possession or under the control of the same person.

12.     In 2001, the Connecticut State Legislature passed Public Act 01-130 which expanded the definition of assault weapon to include semiautomatic firearms with certain features. The features that were added consisted of the following: 1. semiautomatic rifle that can accept a detachable magazine if the rifle has any two of the following features: (a) a folding or

2

telescoping stock, (b) a pistol grip that protrudes conspicuously beneath the action of the weapon, (c) a bayonet mount, (d) a flash suppressor or threaded barrel designed to accommodate a flash suppressor, or (e) a grenade launcher; 2. semiautomatic pistol that can accept a detachable magazine if the pistol has any two of the following features: (a) an ammunition magazine that attaches to the pistol outside of the pistol grip; (b) a threaded barrel that can accept a barrel extender, flash suppressor, forward handgrip, or silencer; (c) a shroud attached to, or partially or completely encircling, the barrel that permits the shooter to hold the firearm with the non-trigger hand without being burned; (d) a manufactured weight of 50 ounces or more when unloaded; and (e) a semiautomatic version of an automatic firearm; 3. semiautomatic shotgun with any two of the following features: (a) a folding or telescoping stock, (b) a pistol grip protruding conspicuously beneath the action of the weapon, (c) a fixed magazine capacity over five rounds, and (d) the ability to accept a detachable magazine; and 4. part or parts in one person's possession either designed or intended to convert any firearm into one of the newly covered assault weapons or from which one may be assembled rapidly.

13.    In 2013, the Connecticut State Legislature passed Public Act 13-3 which made extensive changes to the firearm laws. Three of the major changes were significantly expanding the assault weapon ban, banning the sale, purchase, or transfer of large capacity magazines (LCMs) and requiring a state issued permit or eligibility certificate to purchase long guns.

14.    Public Act 13-3 (Conn. Gen. Stat. § 53-202a) retained the list of firearms banned by name in Public Act 93-306 but added additional semiautomatic firearms by name and created a new features test for firearms not banned by name.    The new features were: 1. semiautomatic centerfire rifles that can accept a detachable magazine and at least one of five specified features (folding/telescoping stock, any grip of the weapon that would result in any finger on the trigger hand being directly below that action of the weapon when firing, a forward pistol grip, a flash suppressor, or grenade/flare launcher); 2. semiautomatic centerfire rifles that have a fixed magazine that can accept more than 10 rounds of ammunition; 3. Semiautomatic centerfire rifles that are less than 30 inches long; 4. Semiautomatic pistols with a fixed magazine that can accept more than 10 rounds of ammunition; 5. Semiautomatic pistols that can accept a detachable magazine and have at least one of four specified features (ability to accept a detachable magazine outside of pistol grip, a threaded barrel, a shroud permitting the shooter to fire the firearm without being burned, or a second hand grip); 5. semiautomatic shotguns that have both of the following features: a folding or telescoping stock and any grip of the weapon that would result in any finger on the trigger hand being directly below that action of the weapon when firing; 6. semiautomatic shotgun that can accept a detachable magazine; and 7. a shotgun with a revolving cylinder

15.    A telescoping stock or collapsible stock is a stock that can retract into and shorten itself to make a firearm more compact.

16.    A flash suppressor is a device attached to the muzzle of a firearm that reduces its visible signature while firing.

3

17. A forward pistol grip or second pistol grip is a grip on the front of the firearm or simply a second grip on a firearm.

18. Public Act 93-306 and Public Act 13-3 allowed individuals who possessed assault weapons as defined by Connecticut law to obtain a Certificate of Possession by specific dates to retain the firearms lawfully.

19. Since the passage of Public Acts 93-306 and 13-3 and as of January 30, 2023, the total number of Certificate of Possessions that have been issued is 81,982. This number is subject to change due to the provision that allows members of the military and law enforcement to purchase assault weapons.

20. The assault weapons banned in Connecticut are a sub-category of the larger group of all semiautomatic weapons. A semiautomatic weapon fires one round for each squeeze of the trigger. After each shot, the firearm automatically loads the next round in the chamber and arms the firing mechanism for the next shot, thereby permitting a faster rate of fire as compared to manually operated guns.

21. In contrast to semiautomatic weapons, fully automatic weapons (e.g. machine guns) fire continuously for as long as the trigger is pressed. A federal tax stamp is required to legally possess a machine gun in Connecticut. Further, Connecticut State law requires that anyone that owns a machine gun to register it with DESPP within 24 hours of acquiring it and annually thereafter.

22. Assault weapons listed in both Public Acts 93-306 and 13-3 are essentially civilian versions of military weapons used by armed forces across the world. The most prolific military firearms in the world are the M-16/AR-15 and the AK-47. The primary difference between these military weapons and those assault weapons listed in the Public Acts is that the civilian commercial version does not have the fully automatic selective-fire option. Selective-fire allows the operator to choose between semiautomatic and fully automatic.

23. Based upon my experience and expertise, the majority of the firearms specifically named in the statutes are semiautomatic versions of the original selective-fire AR-15/M-16, the AK-47, or variants of these weapon platforms in an assortment of calibers.

24. The AR-15 originally was manufactured as a selective-fire machine gun and was adopted by the United States military as the M-16 machine gun during the Vietnam War. The M16 rifle was designed by Eugene Stoner of ArmaLite Corporation in response to a request from the U.S. military for an improved infantry weapon in the 1950s. The ArmaLite AR-15, the predecessor firearm to the M16, first went into mass production in June 1959.

25. Colt Manufacturing Company retained the AR-15 trademark for its semiautomatic version of the AR-15, which it began selling to the civilian market in the early 1960s.  The AR-15 is now the civilian commercial term for the M-16, without the fully automatic fire option.

4

26.   The AK-47 was created by Mikhail Kalashnikov and was initially intended to replace the rifles and submachine guns carried by Soviet forces at the end of World War II. The AK-47 was officially adopted by the Soviet Army in 1949 and has since been used by countries throughout the world due to its simplicity, reliability and affordability. The AK-47 is one of the most recognizable rifles in the world.

27.   Conn. Gen. Stat. § 53-202a lists 49 assault rifles by name. Of these 49 assault rifles, nineteen (19) are variants of the AK-47; thirteen (13) are variants of the AR-15/M-16; and three (3) are variants of the HK 91 or FN type.

28.   The remaining twelve (12) rifles listed are types of rifles that are unique and different from the AK-47, M-16/AR-15 and HK91. It would be fair to say that although 49 rifles are listed in the Act, only fifteen (15) distinct types of rifles are covered by the Act: semiautomatic versions of AK-47s, M-16/AR-15s, HK91, and the twelve (12) distinct rifles that are unique and not of "a type."

29.   The assault rifle provision of Conn. Gen. Stat. § 53-202a only covers semiautomatic, centerfire rifles, except for the Remington Tactical 7615, which is a pump action rifle. Centerfire rifles are designed for centerfire cartridges which are more powerful projectiles because they have a larger bullet, higher velocity, greater range, and more "foot pounds of energy" or stopping power, than other cartridges such as rimfire or pistol ammunition. An example of a centerfire cartridge would be a .223 round that is often used in an AR-15 type assault rifle.

30.   Conn. Gen. Stat. § 53-202a also banned certain semiautomatic pistols listed.  A pistol is defined under Connecticut law as any firearm that has a barrel under twelve inches in length (Connecticut General Statute § 29-27). Of the 22 assault pistols listed in the Act, six (6) are variants of the AK-47 and seven (7) are variants of the M-16/AR-15.  The remaining nine (9) pistols are unique and not of "a type."

31.   There is only one shotgun specifically listed in Public Act 13-3: the IZHMASH SAIGA 12 shotgun.  Although it is a shotgun, the IZHMASH is based on an AK-47 platform.

32.   The Remington Tactical 7615 is a pump action rifle, not a semiautomatic. It uses detachable magazines that can accept more than ten rounds of ammunition. However, in 2015, the United States Court of Appeals for the Second Circuit decided in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) that the ban on the Remington Tactical 7615 pump action rifle was unconstitutional.

33.   Notwithstanding the assault weapons prohibited by Connecticut General Statute § 53-202a, there remain more than one thousand firearms that Connecticut residents can purchase for responsible and lawful uses like self-defense, home defense, and other lawful purposes such as hunting and sport shooting.

34.   There are many resources such as "Guns and Ammo" and "Gun Digest" that identify numerous firearms (including rifles, pistols, revolvers and shotguns) that remain legal in Connecticut. Many of these firearms are suitable for home and self-defense.

35.   Conservatively speaking, I would expect that a gun purchaser could identify over a thousand firearms he/she could purchase as an alternative to those banned in Connecticut.

36.   Conn. Gen. Stat. § 53-202w defined an LCM as any firearm magazine, belt, drum, feed strip, or similar devices that can be readily restored or converted to accept more than 10 rounds of ammunition with limited exceptions.

37.   Public 13-3 allowed individuals who possessed LCMs to declare them by January 1, 2014 to retain possession of them lawfully.

38.   As of January 30, 2023, there are 3,822,718 large capacity magazines declared in the State of Connecticut to 41,241 individuals. This number is subject to change due to the provision that allows members of the military and law enforcement to purchase LCMs.

39.   A magazine, sometimes incorrectly referred to as a "clip," is a container that holds ammunition for a firearm. Typically, they hold bullets and feed the ammunition into the firearm. There are both fixed and detachable magazines. Detachable magazines may be removed from the firearm and replaced quickly with another fully loaded magazine. Fixed magazines are typically reloaded by reloading bullets into a magazine that is attached to the firearm.

40.   A magazine contains no firing mechanism.

41.   Ordinary ammunition magazines extend perpendicularly from the frame of the firearm and are fed with one round on top of the other.  Tubular magazines, by contrast, generally are fixed magazines that run horizontally along the length of the barrel and are fed with cartridges end to end. Tubular magazines are only typically designed for lever action rifles, rimfire rifles and shotguns.

42.   Magazines are manufactured for all types of firearms, including handguns, rifles, and shotguns. Large capacity magazines, as defined by the statute, are those which can hold more than 10 rounds of ammunition at a time. Large capacity magazines have been manufactured for a variety of firearms, including handguns, rifles, and shotguns.

43.   Most firearms that accept large capacity magazines can also function using a magazine that has a capacity of under ten rounds.

44.   Beginning April 1, 2014, Conn. Gen. Stat. § 29-37a required anyone purchasing or receiving a long gun to hold a valid state-issued permit to carry a pistol or revolver, handgun eligibility certificate or long gun eligibility certificate with limited exceptions (e.g. peace officer).  Under prior law, no credential was required to buy long guns.

45.     As of January 30, 2023, there are 328,502 active permits to carry a pistol or revolver, 187
        active handgun eligibility certificates and 1,886 long gun eligibility certificates.

### DECLARATION UNDER PENALTY OF PERJURY
### PURSUANT TO 28 U.S.C. § 1746

I declare that the foregoing is true and correct under penalty of perjury under the laws of

the United States.

Executed on _January 30_, 2023

Brindiana Warenda