# EXHIBIT C

## Declaration of Professor Louis Klarevas

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ET. AL.<br>*Plaintiff,*<br><br>v.<br><br>NED LAMONT, ET AL.,<br>*Defendants* | :<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL NO. 3:22-CV-01118(JBA)<br><br><br><br><br><br>JANUARY 31, 2023 |

**DECLARATION OF LOUIS KLAREVAS**

I, Louis Klarevas, hereby depose and state:

1. I am over the age of 18 and am competent to testify to the matters stated below based on personal knowledge.

2. I have attached a copy of an expert report I have prepared, together with a copy of my curriculum vitae (attached as **Exhibit A** of my expert report). The opinions expressed in this report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty. I hereby adopt and incorporate my report in this declaration as if set forth in full.

I declare under penalty of perjury on this 31st day of January, 2023, that the foregoing is true and correct.

Louis Klarevas

# EXPERT REPORT OF LOUIS KLAREVAS

I, Louis Klarevas, declare:

1. I have been asked by the Defendants to prepare an expert report addressing the relationship between assault weapons, large-capacity magazines (LCMs), and mass shootings, including how restrictions on assault weapons and LCMs impact mass shooting violence. This expert report is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this expert report ("Report" hereinafter).

## PROFESSIONAL QUALIFICATIONS

2. I am a security policy analyst and, currently, Research Professor at Teachers College, Columbia University, in New York. I am also the author of the book *Rampage Nation*, one of the most comprehensive studies on gun massacres in the United States.[1]

3. I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University. My current research examines the nexus between American public safety and gun violence, including serving as an investigator in a study funded by the National Institutes of Health that is focused on reducing intentional shootings at elementary and secondary schools.

4. During the course of my 20-year career as an academic, I have served on the faculties of the George Washington University, the City University of New York, New York University, and the University of Massachusetts. I have also served as a Defense Analysis Research Fellow at the London School of Economics and Political Science and as United States Senior Fulbright Scholar in Security Studies at the University of Macedonia.

5. In addition to having made well over 100 media and public-speaking appearances, I am the author or co-author of more than 20 scholarly articles and over 70 commentary pieces. In 2019, my peer-reviewed article on the effectiveness of restrictions on LCMs in reducing high-

---

[1] Louis Klarevas, *Rampage Nation Securing America from Mass Shootings* (2016).

fatality mass shootings resulting in six or more victims killed was published in the *American Journal of Public Health*.[2]  This study found that jurisdictions with LCM bans experienced substantially lower gun massacre incidence and fatality rates when compared to jurisdictions not subject to similar bans.  Despite being over 3 years old now, this study continues to be one of the highest impact studies in all of academia.  It was recently referred to as "the perfect gun policy study," in part due to the study's "robustness and quality."[3]

6.      In the past four years (since January 1, 2019), I have been deposed or testified in the following cases: *Miller v. Bonta*, Case No. 3:19-cv-1537-BEN-JBS, Southern District of California, and *Nguyen v. Bonta*, Case No. 3:20-cv-02470-WQH-MDD, Southern District of California.  *Miller* involves a challenge to California's restrictions on assault weapons and *Nguyen* involves a challenge to California's regulation limiting the sale of certain firearms to one purchase per month.

7.      In 2021, I was retained by the Government of Canada in the following cases which involved challenges to Canada's regulation of certain categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.:

---

[2] Louis Klarevas, et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings," 109 *American Journal of Public Health* 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed December 27, 2022).

[3] Lori Ann Post and Maryann Mason, "The Perfect Gun Policy Study in a Not So Perfect Storm," 112 *American Journal of Public Health* 1707 (2022), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2022.307120 (last accessed December 27, 2022).  According to Post and Mason, "Klarevas et al. employed a sophisticated modeling and research design that was more rigorous than designs used in observational studies.  Also, they illustrated the analytic steps they took to rule out alternative interpretations and triangulate their findings, for example examining both state bans and federal bans.  They helped build the foundation for future studies while overcoming the limitations of previous research."  *Ibid.*

T-735-20; and *Eichenberg, et al v Attorney General of Canada*, Federal Court, Court File No.: T-905-20. I testified under oath in a consolidated court proceeding involving all six cases in the Federal Court of Canada.

8. A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this Report.

9. I have been retained by the Defendant to render expert opinions in this case. I will be compensated at a rate of $600 per hour for any testimony (in deposition and in court), and am being compensated at a rate of $480 per hour for all other services.

**OPINIONS**

10. It is my professional opinion, based upon my extensive review and analysis of the data, that (1) in terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post-9/11 era, and the problem is growing nationwide; (2) high-fatality mass shootings involving assault weapons and/or LCMs, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons and/or LCMs; (3) mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history, largely related to the use of assault weapons and LCMs; (4) assault weapons are used by private citizens with a far greater frequency to perpetrate mass shootings than to stop mass shootings; (5) handguns, as opposed to rifles (let alone rifles that qualify as assault weapons), are the most commonly owned firearms in the United States; and (6) states that restrict both assault weapons and LCMs experience fewer high-fatality mass shooting incidents and fatalities, per capita, than states that do not restrict assault weapons and LCMs. Based on these findings, it is my opinion that restrictions on assault weapons and LCMs have the potential to save lives by reducing the frequency and lethality of high-fatality mass shootings.[4]

---

[4] For purposes of this Report, "high-fatality mass shootings" (also referred to as "gun massacres") are defined as shootings resulting in 6 or more fatalities, not including the perpetrator(s), regardless of location or underlying motive. The data on high-fatality mass shootings is from a data set that I maintain and continuously update. This data set is reproduced

## I. Mass Shootings Are a Growing Threat to Public Safety

11. Examining mass-casualty acts of violence in the United States since 1991 points to two disturbing patterns.[5] First, as demonstrated in Table 1, the deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings. Second, as displayed in Figures 1-2, the problem of high-fatality mass shooting violence is on the rise. To put the increase over the last three decades into perspective, between the 1990s and the 2010s, the average population of the United States increased approximately 20%. However, when the number of people killed in high-fatality mass shootings in the 2010s is compared to the number killed in such incidents in the 1990s, it reflects an increase of 260%. In other words, the rise in mass shooting violence has far outpaced the rise in national population—by a factor of 13. The obvious takeaway from these patterns and trends is that mass shootings pose a significant—and growing—threat to American public safety.

**Table 1. The Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

| | Deaths | Date | Location | Type of Violence |
|---|---|---|---|---|
| 1 | 60 | October 1, 2017 | Las Vegas, NV | Mass Shooting |
| 2 | 49 | June 12, 2016 | Orlando, FL | Mass Shooting |
| 3 | 32 | April 16, 2007 | Blacksburg, VA | Mass Shooting |
| 4 | 27 | December 14, 2012 | Newtown, CT | Mass Shooting |
| 5 | 25 | November 5, 2017 | Sutherland Springs, TX | Mass Shooting |
| 6 | 23 | August 3, 2019 | El Paso, TX | Mass Shooting |
| 7 | 21 | May 24, 2022 | Uvalde, TX | Mass Shooting |

in **Exhibit B**. Unless stated otherwise, all of the data used to perform original analyses and to construct tables and figures in this Report are drawn from **Exhibit B**.

[5] Because the analysis in Section VI of this Report necessarily uses data from 1991 through 2022, for purposes of consistency (and to avoid any confusion), the analyses in Sections I and II also use data from 1991 through 2022.

**Figure 1. Annual Trends in High-Fatality Mass Shooting Incidents, 1991-2022**

Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

**Figure 2. Annual Trends in High-Fatality Mass Shooting Fatalities, 1991-2022**

Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

## II.   THE USE OF ASSAULT WEAPONS AND LCMS ARE MAJOR FACTORS IN THE RISE OF MASS SHOOTING VIOLENCE

12.    In addition to showing that the frequency and lethality of high-fatality mass shootings are on the rise nationally, the data point to another striking pattern: both assault weapons and LCMs are being used with increased frequency to perpetrate gun massacres.[6]  As shown in Figures 3 and 4, based on incidents where the details on the use of assault weapons and LCMs are available, the pattern is particularly marked of late, with over half of all high-fatality mass shootings in the last four years involving assault weapons and all high-fatality mass shootings in the last four years involving LCMs.  A similar pattern is found when examining fatalities in the last four years, with 62% of all high-fatality mass shooting deaths in the last four years involving assault weapons and 100% of all high-fatality mass shooting deaths in the last four years involving LCMs, as shown in Figures 5 and 6.  These trends clearly demonstrate that, among mass shooters, there is a growing preference for using assault weapons and LCMs to perpetrate their attacks.[7]

---

[6] LCMs, also referred to as "high-capacity magazines," are generally ammunition-feeding devices that hold more than 10 bullets.  As referenced in the present case, LCMs are defined by statute (CONN. GEN. Stat. § 53-202a).  Assault weapons are generally semiautomatic firearms that fall into one of the following three categories: assault handguns, assault rifles, and assault shotguns.  While the term "assault weapons" as referenced in the present case is defined by statute (CONN. GEN. Stat. § 53-202w), the modern-day roots of the term can be traced back to the 1980s, when gun manufacturers branded military-style firearms with the label in an effort to make them more marketable to civilians.  *See*, Violence Policy Center, *Assault Weapons and Accessories in America* (1988) (Attached as **Exhibit C**); Violence Policy Center, *Bullet Hoses: Semiautomatic Assault Weapons—What Are They? What's So Bad about Them?* (2003), (Attached as **Exhibit D**); Phillip Peterson, *Gun Digest Buyer's Guide to Assault Weapons* (2008) (Relevant Excerpt Attached as **Exhibit E**); and Erica Goode, "Even Defining 'Assault Rifles' Is Complicated," *New York Times*, January 16, 2013, *available at* https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html (last accessed January 24, 2023).

[7] Out of all 93 high-fatality mass shootings in the United States between 1991 and 2022, it cannot be determined whether LCMs were used in 14 of those incidents.  Furthermore, for 2 of these 14 incidents, it is also not possible to determine whether they involved assault weapons.  Therefore, the graphical depictions in Figures 3-6 and the percentages discussed in Para. 12 of this Report are based on calculations that only use data points from the 79 incidents in which the involvement of assault weapons and LCMs could be determined.

**Figure 3.  Share of High-Fatality Mass Shooting Incidents Involving Assault Weapons, 1991-2022**



Note: The calculations in Figure 3 exclude incidents in which the firearms used are unknown.

**Figure 4.  Share of High-Fatality Mass Shooting Incidents Involving LCMs, 1991-2022**



Note: The calculations in Figure 4 exclude incidents in which it is unknown if LCMs were used.

**Figure 5. Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving Assault Weapons, 1991-2022**

Note: The calculations in Figure 5 exclude incidents in which the firearms used are unknown.

**Figure 6. Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving LCMs, 1991-2022**

Note: The calculations in Figure 6 exclude incidents in which it is unknown if LCMs were used.

13.     The growing use of assault weapons to carry out high-fatality mass shootings is an obvious theme reflected in the data.  The *disproportionate* resort to assault weapons by perpetrators of high-fatality mass shootings is another clear theme.  Based on National Sport Shooting Foundation (NSSF) and federal government data, "modern sporting rifles"—which is a firearm industry term for AR-15-platform and AK-47-platform rifles—make up approximately 5.3% of all firearms in circulation in American society, according to the most recent publicly-available data (24.4 million out of an estimated 461.9 million firearms).[8]  And, in all likelihood, this is an over-estimation because the figures appear to include firearms belonging to law enforcement agencies in the United States.[9]  But even using this estimate (which is based in part on NSSF data), if assault weapons were used in proportion to the percentage of modern sporting rifles in circulation, approximately 5% of all high-fatality mass shootings would involve assault weapons.  However, as seen in Figure 3 above, civilian ownership rates and mass-shooter use rates are not similar.  Indeed, the current difference is approximately ten-fold, with the rate at

---

[8] The 5.3% ownership rate for modern sporting rifles was calculated using NSSF and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) data.  The NSSF estimates that there are approximately 24.4 million modern sporting rifles in civilian hands in the United States as of the end of 2020 (when the most recent data are available).  NSSF, "Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation," July 20, 2022, *available at* https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation (last accessed January 3, 2023).  In a 2020 report that captured data through the end of 2018, the NSSF estimated that there were 433.9 million total firearms in civilian circulation in the United States.  NSSF, *Firearm Production in the United States with Firearm Import and Export Data*, Industry Intelligence Report, 2020, at 18, *available at* https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (last accessed January 3, 2023).  According to ATF data, in 2019 and 2020, an additional 28.0 million firearms entered the civilian stock nationwide.  ATF, *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce* (2022), at 181, 188, 193, *available at* https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume/download (last accessed January 3, 2023).  Assuming these figures reported by the NSSF and ATF are accurate, this brings the estimated number of firearms in civilian circulation through the end of 2020 to approximately 461.9 million.  The ownership rate is calculated as follows: 24.4 million modern sporting rifles divided by 461.9 million total firearms equals approximately 5.3%.

[9] ATF, 2022, *supra* note 5, at 12; NSSF, 2020, *supra* note 5, at 2-3.

which assault weapons are now used to commit gun massacres far outpacing the rate at which modern sporting rifles circulate amongst civilians in the United States.[10]

14. Another pattern that stands out when examining the relationship between assault weapons use and mass shooting violence reflects the disproportionately greater lethality associated with the use of assault weapons and LCMs. For instance, returning to the list of the 7 deadliest individual acts of intentional criminal violence in the United States since the coordinated terrorist attack of September 11, 2001, besides all seven of the incidents being mass shootings, two other prominent traits are that 6 of the 7 incidents (86%) involved assault weapons and all 7 incidents (100%) involved LCMs, as shown in Table 2. When examining all high-fatality mass shootings since 1991, the relationship between assault weapons use, LCM use, and higher death tolls is striking. In the past 32 years, assault weapons and LCMs have been used, respectively, in 34% and 77% of all high-fatality mass shootings. However, as the fatality thresholds of such incidents increase, so too do the shares of incidents involving assault weapons and LCMs. For instance, assault weapons and LCMs were used, respectively, in 75% and 100% of all mass shootings resulting in more than 20 deaths (Figures 7-8). As the data show, there is an association between mass shooting lethality and the use of assault weapons and LCMs.

**Table 2. The Use of Assault Weapons and LCMs in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

| Deaths | Date | Location | Involved Assault Weapon(s) | Involved LCM(s) |
|---|---|---|---|---|
| 60 | October 1, 2017 | Las Vegas, NV | ✓ (AR-15) | ✓ |
| 49 | June 12, 2016 | Orlando, FL | ✓ (AR-15) | ✓ |
| 32 | April 16, 2007 | Blacksburg, VA | | ✓ |
| 27 | December 14, 2012 | Newtown, CT | ✓ (AR-15) | ✓ |
| 25 | November 5, 2017 | Sutherland Springs, TX | ✓ (AR-15) | ✓ |
| 23 | August 3, 2019 | El Paso, TX | ✓ (AK-47) | ✓ |
| 21 | May 24, 2022 | Uvalde, TX | ✓ (AR-15) | ✓ |

[10] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar comparison using LCMs instead of modern sporting rifles.

**Figure 7.  Percentage of High-Fatality Mass Shootings Involving Assault Weapons by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 7 exclude incidents in which the firearms used are unknown.

**Figure 8.  Percentage of High-Fatality Mass Shootings Involving LCMs by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 8 exclude incidents in which it is unknown if LCMs were used.

15.     Of the 91 high-fatality mass shootings since January 1, 1991, in which the type of firearm used is known, 31 involved assault weapons, resulting in 425 deaths.  The average death toll for these 31 incidents is 13.7 fatalities per shooting.  By contrast, the average death toll for the 60 incidents in which it is known assault weapons were not used (which resulted in 490 fatalities) is 8.2 fatalities per shooting (Table 3).  Furthermore, of the 79 high-fatality mass shootings since January 1, 1991, in which LCM use is known, 61 involved LCMs, resulting in 704 deaths.  The average death toll for these 61 incidents is 11.5 fatalities per shooting.  By contrast, the average death toll for the 18 incidents in which it is known LCMs were not used (which resulted in 132 fatalities) is 7.3 fatalities per shooting (Table 4).  In other words, in the last 32 years, the use of assault weapons and LCMs in high-fatality mass shootings has resulted, respectively, in 67% and 58% increases in average fatalities per incident (Tables 3 and 4).

16.     Table 5 shows the average death tolls per high-fatality mass shooting incident that are attributable to assault weapons beyond deaths associated with the use of LCMs.  When LCMs are not used, the average death toll is 7.3 fatalities.  When LCMs are used, but not in conjunction with assault weapons, the average death toll is 9.2 fatalities.  When LCMs are used with assault weapons, the average death toll is 14.0 fatalities.  The data show that using LCMs without an assault weapon results in a 26% increase in the average death toll.  However, using LCMs with an assault weapon results in a 52% increase in the average death toll associated with incidents that involved LCMs without assault weapons and a 92% increase in the average death toll associated with incidents that involve neither LCMs nor assault weapons.  In other words, the increase in the death tolls for high-fatality mass shootings involving assault weapons appears to about one-third attributable to LCMs and about two-thirds attributable to assault weapons

17.     This review of the data supports an obvious takeaway: assault weapons and LCMs are force multipliers when used to perpetrate mass shootings.

**Table 3. The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

| | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| Last 32 Years | 8.2 Deaths | 13.7 Deaths | 67% |

Note: The calculations in Table 3 exclude incidents in which the firearms used are unknown.

**Table 4. The Average Death Tolls Associated with the Use of LCMs in High-Fatality Mass Shootings in the U.S., 1991-2022**

| | Average Death Toll for Incidents That Did Not Involve the Use of LCMs | Average Death Toll for Incidents That Did Involve the Use of LCMs | Percent Increase in Average Death Toll Associated with the Use of LCMs |
|---|---|---|---|
| Last 32 Years | 7.3 Deaths | 11.5 Deaths | 58% |

Note: The calculations in Table 4 exclude incidents in which it is unknown if LCMs were used.

**Table 5. The Average Death Tolls Associated with the Use of LCMs and Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

| Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs but Not AWs | Percent Increase | Average Death Toll for Incidents Involving LCMs but Not AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase | Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase |
|---|---|---|---|---|---|---|---|---|
| 7 3 | 9 2 | 26% | 9 2 | 14 0 | 52% | 7 3 | 14 0 | 92% |

Note: The calculations in Table 5 exclude incidents in which it is unknown if assault weapons or LCMs were used.

## III. Double-Digit-Fatality Mass Shootings Are a Post-World War II Phenomenon in American History and They Increasingly Involve Assault Weapons

18. I have also examined the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed since 1776 (Table 6 and Figure 9). A lengthy search uncovered several informative findings.[11] In terms of the origins of this form of extreme gun violence, there is no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948. The first known mass shooting resulting in 10 or more deaths occurred in 1949. In other words, for 70% of its 247-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities, making them a relatively modern phenomena in American history.[12]

19. After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966. The third such mass shooting then occurred 9 years later, in 1975. And the fourth such incident occurred 7 years after, in 1982. Basically, the first few mass shootings resulting in 10 or more deaths did not occur until the post-World War II era. Furthermore, these first few double-digit-fatality incidents occurred with relative infrequency, although the temporal gap between these first four incidents shrank with each event (Table 6 and Figure 10).[13]

---

[11] I searched for firearm-related "murders," using variations of the term, setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, *available at* www.newspaperarchive.com (last accessed October 2, 2022). The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607. Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

[12] Using the Constitution's effective date of 1789 as the starting point would lead to the conclusion that, for 68% of its 234-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.

[13] Figures 9-10 are reproduced in larger form as **Exhibit F** of this Report.

**Table 6. Mass Shootings Resulting in Double-Digit Fatalities in American History, 1776-2022**

| | Date | Location | Deaths | Involved Assault Weapon(s) | Involved LCM(s) |
|---|---|---|---|---|---|
| 1 | 9/6/1949 | Camden, NE | 13 | N | N |
| 2 | 8/1/1966 | Austin, TX | 14 | N | Y |
| 3 | 3/30/1975 | Hamilton, OH | 11 | N | N |
| 4 | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y |
| 5 | 2/18/1983 | Seattle, WA | 13 | N | N |
| 6 | 4/15/1984 | Brooklyn, NY | 10 | N | N |
| 7 | 7/18/1984 | San Ysidro, CA | 21 | Y | Y |
| 8 | 8/20/1986 | Edmond, OK | 14 | N | N |
| 9 | 10/16/1991 | Killeen, TX | 23 | N | Y |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | Y |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | Y |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | Y |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y |
| 23 | 5/18/2018 | Santa Fe | 10 | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | Y |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | Y |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y |

Note: Death tolls do not include perpetrators. An incident was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 Federal Assault Weapons Ban; (2) the statutes of the state where the gun massacre occurred; or (3) a legal or judicial declaration issued by a state official. An incident was coded as involving an LCM if at least one of the firearms discharged had an ammunition-feeding device holding more than 10 bullets.

**Figure 9.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**



**Figure 10.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1949-2022**



20.     The distribution of double-digit-fatality mass shootings changes in the early 1980s, when five such events took place in a span of just five years.  (Table 6 and Figure 10). This timeframe also reflects the first time that assault weapons were used to perpetrate mass shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the 1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths).  But this cluster of incidents was followed by a 20-year period in which only 2 double-digit-fatality mass shootings occurred (Figure 10).  This period of time from 1987-2007 correlates with three important federal firearms measures: the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994 Federal Assault Weapons Ban.

21.     It is well-documented in the academic literature that, after the Federal Assault Weapons Ban expired in 2004, mass shooting violence increased substantially.[14]  Mass shootings that resulted in 10 or more deaths were no exception, following the same pattern.  In the 56 years from 1949 through 2004, there were a total of 10 mass shootings resulting in double-digit fatalities.  In the 18 years since 2004, there have been 20 double-digit-fatality mass shootings.  In other words, the average rate of occurrence has increased over six-fold since the Federal Assault Weapons Ban expired (Table 6 and Figure 10).  (The 1994 Federal Assault Weapons Ban and its impact on mass shooting violence is discussed in further detail in Section VI of this Report.)

22.     As with the analyses of mass shootings discussed above in Section II, death tolls in double-digit-fatality mass shootings are largely related to the use of assault weapons and LCMs—firearm technologies that, in terms of mass shootings, serve as force multipliers.

---

[14] *See*, for example, Louis Klarevas, *supra* note 1 (Relevant Excerpt Attached as **Exhibit G**); Louis Klarevas, et al., *supra* note 2 (Attached as **Exhibit H**); Charles DiMaggio, et al., "Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data," 86 *Journal of Trauma and Acute Care Surgery* 11 (2019) (Attached as **Exhibit I**); Lori Post, et al., "Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis," 7 *JMIR Public Health and Surveillance* (2021) (Attached as **Exhibit J**); and Philip J. Cook and John J. Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," 328 *JAMA*, September 27, 2022 (Attached as **Exhibit K**).

## IV. Assault Weapons Are Almost Never Used by Private Citizens in Self-Defense during Active Shootings

23. An important question that, until now, has gone unanswered is: Are assault weapons used as frequently to stop mass shootings as they are to perpetrate them? As shown above in Section II, assault weapons have been used to perpetrate approximately one-third of high-fatality mass shootings in the past 32 years (Figure 3). And in the past 8 years, the share of high-fatality mass shootings that has been perpetrated with assault weapons has risen to approximately half (Figure 3).

24. The Federal Bureau of Investigation (FBI) has been documenting active shooter incidents since 2000.[15] According to the FBI, active shootings are violent attacks that involve "one or more individuals actively engaged in killing or attempting to kill people in a populated area."[16] A simple way to conceptualize active shooter incidents is to think of them as attempted mass shootings. As part of its analysis of attempted mass shootings, the FBI identifies incidents that involved armed civilians using their personal firearms to intervene, regardless of whether the interventions were successful in stopping the attacks and/or neutralizing the perpetrator(s).

25. In the 22 years between January 1, 2000, and December 31, 2021, the FBI has identified 406 active shootings occurring in the United States. Out of these 406 active shooter incidents, 15 incidents (3.7%) involved defensive gun uses (DGUs) by civilians, excluding law enforcement or armed security.[17] Of these 15 DGUs that involved an armed private citizen

[15] All of the information in this section, including definitions and data, are publicly available from the FBI. *See* FBI, "Active Shooter Safety Resources," *available at* https://www.fbi.gov/how-we-can-help-you/safety-resources/active-shooter-safety-resources (last accessed January 2, 2023). At the time that this Report was being prepared, active shooter incident data was not yet available for the year 2022. This data will likely be released by the FBI at some point in 2023. As such, the time parameter for the analysis in this section is 2000-2021.

[16] The FBI adds, "Implicit in this definition is the shooter's use of one or more firearms. The 'active' aspect of the definition inherently implies the ongoing nature of the incidents, and thus the potential for the response to affect the outcome." *Ibid.*

[17] In 14 of these 15 DGU-involved active shooter incidents, there was an exchange of gunfire. For the one incident that did not involve an exchange of gunfire, the gun (a handgun) was used to detain the active shooter after the shooting had ceased. *Ibid.*

intervening, 12 incidents involved handguns. The remaining 3 incidents involved long guns: 1 shotgun, 1 bolt-action rifle, and 1 assault rifle. In other words, out of the 15 incidents where an armed civilian intervened, only 1 incident (6.7%) involved an assault weapon.[18] Within the broader context of all active shooter incidents, only 1 incident out of 406 in the past 22 years (0.2%) involved an armed civilian intervening with an assault weapon.[19]

26. The bottom line: assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings.[20]

---

[18] The FBI also identifies an incident in which an armed individual (a local firefighter) subdued and detained a school shooter, but there is no evidence that the armed firefighter drew his handgun during the incident. Moreover, local authorities have refused to comment on whether the firefighter ever drew his handgun. *See* Carla Field, "Firefighter Was Armed During Takedown of Shooting Suspect, Sheriff Says," WYFF, October 3, 2016, *available at* https://www.wyff4.com/article/firefighter-was-armed-during-takedown-of-shooting-suspect-sheriff-says/7147424 (last accessed January 3, 2023). Adding this incident to the 15 DGU-involved incidents would mean that 6.3% (as opposed to 6.7%) of the active shooter incidents, where an armed civilian intervened, involved an assault weapon.

[19] FBI, *supra* note 12. The one DGU that involved an assault weapon was the 2017 church massacre in Sutherland Springs, Texas. In that incident, an armed private citizen used an AR-15-style assault rifle to wound the perpetrator as he was attempting to flee the scene. While the perpetrator was still able to flee the scene despite being shot, minutes later, he crashed his vehicle trying to escape and then took his life with his own firearm before law enforcement could apprehend him. *See* Adam Roberts, "Man Who Shot Texas Gunman Shares His Story," KHBS/KHOG, November 7, 2017, *available at* https://www.4029tv.com/article/man-who-shot-texas-church-gunman-shares-his-story/13437943 (last accessed January 3, 2023).

[20] Given the limitations of the active shooter incident data reported by the FBI, it is not possible to discern whether any of the civilian DGUs involved an armed civilian using a firearm with an LCM at the time of the intervention. As such, it is not possible to perform a similar comparison between mass shootings perpetrated with LCM-equipped firearms and mass shootings thwarted with LCM-equipped firearms.

## V. Ownership Rates of "Modern Sporting Rifles" in the U.S.

27. As noted above in Para. 13, based on NSSF and federal government data, modern sporting rifles—such as AR- and AK-platform rifles—make up approximately 5.3% of all firearms in circulation in American society, according to the most recent publicly-available data (24.4 million out of an estimated 461.9 million firearms). Furthermore, in its most recent survey data (2022), the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle.[21] Based on this data, only 6.4 million gun owners—out of an estimated 81 million Americans who own at least one personal firearm—own modern sporting rifles.[22] In other words, less than 8% of all civilian gun owners in the United States own modern sporting rifles.[23] In terms of the total population of the United States, estimated by the Census Bureau to be approximately 333 million people in 2022, less than 2% of all Americans own a modern sporting rifle.[24]

---

[21] NSSF, *Modern Sporting Rifle: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles*, Comprehensive Consumer Report, 2022, at 12, *available at* https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf (last accessed January 16, 2023).

[22] The estimate that approximately 6.4 million gun owners possess what the NSSF considers to be modern sporting rifles is calculated by dividing the 3.8 average number of such rifles that each modern sporting rifle owner possesses into the 24.4 million such rifles estimated to be in civilian circulation. This calculation (24.4 million divided by 3.8) equals 6.4 million. Based on survey data, 81 million American adults are estimated to own guns. Andy Nguyen, "Proposed Assault Weapons Ban Won't Turn Gun Owners into Felons Overnight," PolitiFact, The Poynter Institute, August 3, 2022, *available at* https://www.politifact.com/factchecks/2022/aug/03/instagram-posts/proposed-assault-weapons-ban-wont-turn-gun-owners- (last accessed January 16, 2023).

[23] The finding that less than 8% of all gun owners possess modern sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 81 million American adults estimated to be gun owners. This calculation (6.4 million divided by 81 million) equals 7.9%.

[24] The Census Bureau's total population estimate for 2022 is 333,287,557 persons. U.S. Census Bureau, "Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic," December 22, 2022, *available at* https://www.census.gov/newsroom/press-releases/2022/2022-population-estimates.html#:~:text=DEC.,components%20of%20change%20released%20today (last accessed January 16, 2023). The finding that less than 2% of all Americans possess modern sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 333

28. In deriving its estimates, the NSSF often relies on United States government data, particularly ATF data.[25] According to the ATF, from 1986 through 2020 (which reflects the most currently-available data), the civilian stock of firearms in the United States has been made up predominantly of handguns.[26] As Figure 11 shows, handguns account for 50% of the civilian stock of firearms, rifles account for 33%, and shotguns account for 17%.

29. According to ATF data, handguns are the most commonly owned firearms; not rifles, and most certainly not modern sporting rifles that qualify as assault weapons.[27]

**Figure 11. Share of Firearms in Civilian Circulation in the United States, 1986-2020**

million persons in United States. This calculation (6.4 million divided by 333 million) equals 1.9%.

[25] NSSF, 2020, *supra* note 6.

[26] For data on the number of firearms manufactured, imported, and exported, by category of firearm, from 2000-2020, *see* ATF, *supra* note 6. For similar data covering 1986-1999, *see* ATF, *Firearms Commerce in the United States: Annual Statistical Update, 2021*, *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed January 16, 2023).

[27] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar analysis of ownership rates using LCMs instead of modern sporting rifles.

## VI. Restrictions on Assault Weapons and LCMs Reduce the Incidence of Gun Massacres, Resulting in Lives Saved

### VI. A. Bans in Theory

30. As conceptualized in the Trinity of Violence model that I developed in my book on mass shootings, every act of violence involves three elements: a perpetrator, a weapon, and a target (Figure 12).[28] The key to mitigating violence is to "break the trinity" by hindering at least one of the three elements. This is accomplished by dissuading the potential offender(s), denying the potential instrument(s) of violence, or defending the potential victim(s).[29]

**Figure 12. The Trinity of Violence**

31. Bans are law-based concepts that prohibit certain behaviors by criminalizing them.[30] Bans on assault weapons and LCMs generally make it illegal to manufacture, import, transfer, own, or possess assault weapons and/or LCMs. Bans work in relation to two of the three elements of the Trinity of Violence: dissuasion and denial. With regard to perpetrators,

---

[28] Klarevas, *supra* note 1.

[29] *Ibid.*

[30] Philip J. Cook, "Research in Criminal Deterrence Laying the Groundwork for the Second Decade," 2 *Crime and Justice* 211 (1980) (Attached as **Exhibit L**); and Daniel S. Nagin, "Deterrence in the Twenty-First Century," 42 *Crime and Justice* 199 (2013) (Attached as **Exhibit M**).

bans use the threat of criminal penalty to *deter potential offenders* from engaging in the prohibited behavior. In the case of bans on assault weapons and LCMs, they threaten conviction, imprisonment, and/or fines should an individual build or otherwise acquire a prohibited assault weapon or LCM. The primary mechanism at work here centers around dissuading potential shooters from trying to acquire banned firearm technologies. But there is also a secondary mechanism at work, focused on the assault weapon or LCM itself: *deprive potential instruments of violence*. Knowing that someone who is willing to commit murder might not be deterred from violating another criminal law, like possessing a prohibited item, bans on assault weapons and LCMs also threaten punishment against anyone who tries to transfer (through sale, gift, or loan) a restricted item to someone who is prohibited from acquiring it. This, in essence, reinforces the strategy of dissuading the offender with the strategy of denying the instruments of violence.[31]

32. Ideally, someone intent on committing a mass shooting with an assault weapon and/or LCM would be dissuaded from going on a rampage by the fact that their means of choice are not available. In such a scenario, the attack would be quashed. This *suppression effect* is akin to what economists and psychologists refer to as a positive spillover effect, where one desirable outcome produces a second, loosely-related desirable outcome.[32] A real-world example of this is the so-called "Matrix Killings," where a 19-year-old Virginia man blamed *The Matrix* film for driving him to murder his parents with a shotgun. At the time of the crime in 2003, the federal Assault Weapons Ban was in effect, preventing him from obtaining an assault rifle. In a 2013 jailhouse interview, he told CNN, "If I had an assault weapon, things would have been much worse." He added that had he had an AR-15 instead of a shotgun, he is positive that, after killing his parents, he would have gone on rampage and "killed as many people as I

---

[31] Klarevas, *supra* note 1.

[32] Paul Dolan and Mateo M Galizzi, "Like Ripples on a Pond. Behavioral Spillovers and Their Implications for Research and Policy," 47 *Journal of Economic Psychology* 1 (2015) (Attached as **Exhibit N**); K. Jane Muir and Jessica Keim-Malpass, "Analyzing the Concept of Spillover Effects for Expanded Inclusion in Health Economics Research," 9 *Journal of Comparative Effectiveness Research* 755 (2020) (Attached as **Exhibit O**).

possibly could." As he noted, "because I didn't have an assault weapon, that didn't happen."[33] In this case, the unavailability of an assault weapon due to the federal ban suppressed the perpetrator's impulse to commit a mass shooting.

33. Of course, many potential mass shooters will not be discouraged from going on a killing spree just because their means of choice are unavailable. They will instead replace their desired instruments of violence with available alternatives. This is commonly referred to as the *substitution effect*, wherein an act of violence is still perpetrated, but with a different, less lethal instrument of violence.[34] A real-world example of the substitution effect at work is the 2019 synagogue rampage in Poway, California. In that attack, the gunman appears to have been unable to acquire an assault rifle and large-capacity magazines due to California's ban on both. Instead, he acquired what is known as a California-compliant semiautomatic rifle (which lacked features such as a pistol grip and a forward hand grip) and 10-round magazines. As a result, the gunman quickly ran out of bullets, and while pausing to reload—which was extremely difficult given that he did not have assault weapon features on his rifle that facilitated fast reloading—a congregant chased him away, preventing him from continuing his attack.[35] In this incident, which resulted in only one death, California's ban on assault weapons and LCMs worked exactly as intended. It prevented the active shooter from being able to kill enough people to surpass the fatality threshold of a mass shooting. Stated differently, if you examine data sets that identify mass shootings, you will not find the Poway synagogue attack listed in them.

---

[33] "Inside the Mind of a Killer," CNN (Transcripts), August 23, 2013, *available at* https://transcripts.cnn.com/show/pmt/date/2013-08-23/segment/01 (last accessed January 24, 2023.

[34] Philip J. Cook, "The Effect of Gun Availability on Violent Crime Patterns," 455 *Annals of the American Academy of Political and Social Science* 63 (1981) (Attached as **Exhibit P**); Anthony A. Braga, et al. "Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?" 4 *Annual Review of Criminology* 147 (2021) (Attached as **Exhibit Q**).

[35] Elliot Spagat and Julie Watson, "Synagogue Shooter Struggled with Gun, Fled with 50 Bullets," Associated Press, April 30, 2019, *available at* https://apnews.com/article/shootings-north-america-us-news-ap-top-news-ca-state-wire-8417378d6b934a8f94e1ea63fd7c0aea (last accessed January 24, 2023).

34. It might seem perverse to think that restrictions on certain instruments of violence operate on the premise that, if an act of violence cannot be averted, then it will proceed with an alternative instrument. Nevertheless, this is exactly how bans on assault weapons and LCMs work in theory. They suppress the inclinations of potential mass shooters to go on killing rampages in the first place because their means of choice are unavailable. And, should deterrence fail, bans force perpetrators to substitute less lethal instruments for more dangerous, prohibited ones, reducing the casualty tolls of attacks when they do occur.

### VI. B. BANS IN PRACTICE

35. In light of the growing threat posed by mass shootings, legislatures have enacted restrictions on assault weapons and LCMs in an effort to reduce the occurrence and lethality of such deadly acts of firearm violence. Prominent among these measures was the 1994 Federal Assault Weapons Ban. In September 1994, moved to action by high-profile shooting rampages that occurred the previous year at a San Francisco law firm and on a Long Island Rail Road commuter train, the U.S. Congress enacted a ban on assault weapons and LCMs that applied to all 50 states plus the District of Columbia, bringing the entire country under the ban.[36]

36. Like the state bans on assault weapons and LCMs that were implemented before it, the federal ban was aimed primarily at reducing mass shooting violence—an objective the ban sought to achieve by prohibiting the manufacture, importation, possession, and transfer of assault weapons and LCMs not legally owned by civilians prior to the date of the law's effect (September 13, 1994).[37] Congress, however, inserted a sunset provision in the law which allowed the federal ban to expire in exactly 10 years, if it was not renewed beforehand. As

---

[36] Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).

[37] Christopher Ingraham, "The Real Reason Congress Banned Assault Weapons in 1994—and Why It Worked," *Washington Post*, February 22, 2018, *available at* https://www.washingtonpost.com/news/wonk/wp/2018/02/22/the-real-reason-congress-banned-assault-weapons-in-1994-and-why-it-worked (last accessed January 2, 2023).

Congress ultimately chose not to renew the law, the federal ban expired on September 13, 2004. In the aftermath of the federal ban's expiration, mass shooting violence in the United States increased substantially.[38]

37.     In 2013, following the mass shooting that occurred at Sandy Hook Elementary School, in Newtown, Connecticut, that claimed the lives of 20 first-graders and 6 educators and that left another 2  educators injured, the Connecticut legislature passed S.B. 1160, which enacted new statewide restrictions on assault weapons and LCMs.  In introducing S.B. 1160 on the Senate floor, the President Pro Tempore of the Senate, Senator Donald Williams, noted that the legislature felt compelled to take action in response to the tragedy in Newtown as well as a dozen other shooting rampages, including one at a Connecticut beer distribution center and another at the offices of the Connecticut state lottery.[39]  Senator Williams characterized "the heart of our response … to the Newtown tragedy and all of the other mass shootings that I enumerated at the outset," as reflected in S.B. 1160, as com[ing] down to a stronger restriction on the assault weapons that have been used in these mass shootings and a limitation on the large-capacity magazines."[40]

38.     The legislative intent of Connecticut is similar to that of other legislative bodies that have restricted assault weapons and LCMs.  The primary objective of bans on assault weapons and LCMs is to reduce the frequency and lethality of mass shootings.  Because, on average, the use of assault weapons and LCMs results in higher death tolls in mass shootings, the rationale for imposing restrictions on assault weapons and LCMs is to reduce the loss of life associated with the increased kill potential of such firearm technologies.

---

[38] *See* sources cited *supra* note 11.

[39] *See*, Connecticut Senate, "P A. 13-3, S B. 1160," Senate Session Transcripts, April 3, 2013, at 2 (Attached as **Exhibit R**).

[40] *Ibid.*, at 65.

39.    Currently, 30% of the U.S. population is subject to a ban on both assault weapons and LCMs.  The following is a list of the ten state-level jurisdictions that presently ban both assault weapons and LCMs: New Jersey (September 1, 1990); Hawaii (July 1, 1992, assault pistols only); Maryland (June 1, 1994, initially assault pistols but expanded to long guns October 1, 2013); Massachusetts (July 23, 1998); California (January 1, 2000); New York (November 1, 2000); the District of Columbia (March 31, 2009); Connecticut (April 4, 2013); Delaware (August 29, 2022); and Illinois (January 10, 2023).[41]  As a reminder, from September 13, 1994, through September 12, 2004, the entire country was also subject to federal ban on both assault weapons  and LCMs.

40.    In the field of epidemiology, a common method for assessing the impact of laws and policies is to measure the rate of onset of new cases of an event, comparing the rate when and where the laws and policies were in effect against the rate when and where the laws and policies were not in effect.  This measure, known as the incidence rate, allows public health experts to identify discernable differences, while accounting for variations in the population, over a set period of time.  Relevant to the present case, calculating incidence rates across states, in a manner that captures whether or not bans on both assault weapons and LCMs were in effect during the period of observation, allows for the assessment of the effectiveness of such bans.  In addition, fatality rates—the number of deaths, per population, that result from particular events across different jurisdictions—also provide insights into the impact bans on assault weapons and LCMs have on mass shooting violence.[42]

---

[41] The dates in parentheses mark the effective dates on which the listed states became subject to bans on both assault weapons and LCMs.

[42] For purposes of this Report, incidence and fatality rates are calculated using methods and principles endorsed by the Centers for Disease Control.  *See* Centers for Disease Control and Prevention, *Principles of Epidemiology in Public Health Practice: An Introduction to Applied Epidemiology and Biostatistics* (2012), *available at* https://stacks.cdc.gov/view/cdc/13178 (last accessed January 3, 2023).

41.     Since September 1, 1990, when New Jersey became the first state to ban both assault weapons and LCMs, through December 31, 2022, there have been 93 high-fatality mass shootings in the United States (**Exhibit B**).[43]  Calculating incidence and fatality rates for this time-period, across jurisdictions with and without bans on both assault weapons and LCMs, reveals that states subject to such bans experienced a 56% decrease in high-fatality mass shooting incidence rates.  They also experienced a 66% decrease in high-fatality mass shooting fatality rates, regardless of the weaponry used by the mass murderers (Table 7).[44]

42.     When calculations go a step further and are limited to mass shootings involving assault weapons or LCMs, the difference between the two jurisdictional categories is even more pronounced.  In the time-period from January 1, 1991, through December 31, 2022, accounting for population, states with bans on both assault weapons and LCMs experienced a 62% decrease in the rate of high-fatality mass shootings involving the use of assault weapons or LCMs.  Similarly, jurisdictions with such bans in effect experienced a 72% decrease in the rate of deaths resulting from high-fatality mass shootings perpetrated with assault weapons or LCMs (Table 7).

43.     All of the above epidemiological calculations lead to the same conclusion: when bans on assault weapons and LCMs are in effect, per capita, fewer high-fatality mass shootings occur and fewer people die in such shootings—especially incidents involving assault weapons or LCMs, where the impact is most striking.

---

[43] There were no state bans on both assault weapons and LCMs in effect prior to September 1, 1990.  Therefore, January 1, 1991, is a logical starting point for an analysis of the impact of bans on assault weapons and LCMs.  As there were no high-fatality mass shootings in the last four months of 1990, extending the analysis back to September 1, 1990, would make no difference.

[44] Between September 13, 1994, and September 12, 2004, the Federal Assault Weapons Ban was in effect.  During that 10-year period, all 50 states and the District of Columbia were under legal conditions that restricted assault weapons and LCMs.  As such, the entire country is coded as being under a ban on both assault weapons and LCMs during the timeframe that the Federal Assault Weapons Ban was in effect.

44.     The main purpose of bans on assault weapons and LCMs is to restrict the availability of assault weapons and LCMs.  The rationale is that, if there are fewer assault weapons and LCMs in circulation, then potential mass shooters will either be dissuaded from attacking or they will be forced to use less-lethal firearm technologies, resulting in fewer lives lost.  The epidemiological data lend support to the policy choices of Connecticut that seek to enhance public safety through restrictions on civilian access to assault weapons and LCMs.

45.     While imposing constraints on assault weapons and LCMs will not prevent every mass shooting, the data suggest that legislative efforts to deny gunmen access to assault weapons and LCMs should result in lives being saved.

**Table 7.  Incidence and Fatality Rates for High-Fatality Mass Shootings, by Whether or Not Bans on Assault Weapons and LCMs Were in Effect, 1991-2022**

|  | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| All High-Fatality Mass Shootings |  |  |  |  |  |
| Non-Ban States | 162.0 | 68 | 1.31 | 720 | 13.89 |
| Ban States | 135.8 | 25 | 0.58 | 208 | 4.79 |
| Percentage Decrease in Rate for Ban States |  |  | 56% |  | 66% |
| High-Fatality Mass Shootings Involving Assault Weapons or LCMs |  |  |  |  |  |
| Non-Ban States | 162.0 | 47 | 0.91 | 575 | 11.09 |
| Ban States | 135.8 | 15 | 0.35 | 135 | 3.11 |
| Percentage Decrease in Rate for Ban States |  |  | 62% |  | 72% |

Note: Population data are from U.S. Census Bureau, "Population and Housing Unit Estimates Datasets," *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed January 3, 2023).

# EXHIBIT A

## to Expert Report of Professor Louis Klarevas

**Louis J. Klarevas**
**Email: ljk2149@tc.columbia.edu**

## Education

Ph.D. International Relations, 1999
School of International Service
American University
Washington, DC

B.A. Political Science, *Cum Laude*, 1989
School of Arts and Sciences
University of Pennsylvania
Philadelphia, PA

## Author

*Rampage Nation: Securing America from Mass Shootings*

## Current Positions

Research Professor, Teachers College, Columbia University, New York, NY, 2018-Present

Faculty Affiliate, Media and Social Change Lab (MASCLab), Teachers College, Columbia University, New York, NY, 2019-Present

## Professional Experience

*Academic Experience (Presented in Academic Years)*

Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2011-2012

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York, NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

*Professional Experience (Presented in Calendar Years)*

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, United States Institute of Peace, Washington, DC, 2005, 2008-2009

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

**Courses Taught**

*Graduate*

Counter-Terrorism and Homeland Security
International Political Economy
International Politics in a Post-Cold War Era
International Security
Machinery and Politics of American Foreign Policy
Role of the United States in World Affairs
Security Policy
Theories of International Politics
Transnational Security
Transnational Terrorism
United States Foreign Policy

*Undergraduate*

American Government and Politics
European-Atlantic Relations
International Political Economy
International Relations
Transnational Terrorism
United States Foreign Policy

**Scholarship**

"State Firearm Laws, Gun Ownership, and K-12 School Shootings: Implications for School Safety," *Journal of School Violence*, 2022 (co-authored with Paul M. Reeping, Sonali Rajan, et al.)

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, May 2019 (correspondence)

*Firearms on College Campuses Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

*Rampage Nation Securing America from Mass Shootings*, Prometheus Books, 2016

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece History and Power, 1950-1974*, *Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy'  Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2 0. Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v  District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus  An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed , *The Media and American Politics  An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends. The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations The Cases of Somalia, Rwanda, and Haiti*, University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus. Reviewing the Implications of *Loizidou v Turkey*," *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U S Foreign Policy Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis) [Reproduced as "Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U S -Greek–Relationship*, London Brassey's, 1997 (co-authored with Theodore A. Couloumbis)]

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

**Commentaries and Correspondence**

"Why Our Response to School Shootings Is All Wrong," *Los Angeles Times*, May 25, 2022 (co-authored with Sonali Rajan and Charles Branas)

"COVID-19 Is a Threat to National Security Let's Start Treating It as Such," *Just Security*, August 6, 2020 (co-authored with Colin P. Clarke)

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015 [Reproduced as "Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015]

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998 [Reproduced as "Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998]

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993

**Commentaries Written for *New York Daily News* – https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Careful How You Talk about Suicide, Mr. President," March 25, 2020 (co-authored with Sonali Rajan, Charles Branas, and Katherine Keyes)

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007


**Commentaries Written for *The Huffington Post* – www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009

**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011

**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)

**Legal Analyses Written for *Writ* – writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)

**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Mass Shootings: What We Know, What We Don't Know, and Why It All Matters," keynote presentation to be delivered at the Columbia University Center for Injury Science and Prevention Annual Symposium, virtual meeting, May 2020

"K-12 School Environmental Responses to Gun Violence: Gaps in the Evidence," paper presented at Society for Advancement of Violence and Injury Research Annual Meeting, virtual meeting, April 2020 (co-authored with Sonali Rajan, Joseph Erardi, Justin Heinze, and Charles Branas)

"Active School Shootings," Post-Performance Talkback following Presentation of *17 Minutes*, Barrow Theater, New York, January 29, 2020 (co-delivered with Sonali Rajan)

"Addressing Mass Shootings in Public Health· Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

"Treating Mass Shootings for What They Really Are· Threats to American Security," Framingham State University, October 26, 2017

"Book Talk Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border. The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U S. National Intelligence The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy· The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway  An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks  Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect. Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy. A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Preventive Medicine*

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Injury Epidemiology*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Victims & Offenders*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge

**Service to University, Profession, and Community**

Participant, Minnesota Chiefs of Police Association, Survey of Measures to Reduce Gun Violence, 2023

Member, Regional Gun Violence Research Consortium, Nelson A. Rockefeller Institute of Government, State University of New York, 2022-

Founding Member, Scientific Union for the Reduction of Gun Violence (SURGE), Columbia University, 2019-

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

**Expert Witness Service**

Expert for State of Oregon, *Oregon Firearms Federation, et al v Brown, et al* , United States District Court for the District of Oregon, Case Number 22-cv-01815-IM, Portland, OR, 2023-

Expert for State of Hawaii, *National Association for Gun Rights, et al v Shikada*, United States District Court for the District of Hawaii, Case Number 22-00404-DKW-RT, Honolulu, HI, 2023-

Expert for State of Massachusetts, *National Association for Gun Rights and Capen v Baker and Healey*, United States District Court for the District of Massachusetts, Case Number 22-cv-11431-FDS, Boston, MA, 2023-

Expert for City of Highland Park, Illinois, *National Association for Gun Rights and Goldman v Highland Park*, United States District Court for Northern District of Illinois, Case Number 22-cv-04774, Chicago, IL, 2022-

Expert for State of Colorado, *Gates, et al v Polis*, United States District Court for District of Colorado, 22-cv-01866-NYW-SKC, Denver, CO, 2022-

Expert for State of Washington, *Brumback and Gimme Guns v Ferguson, et al* , United States District Court for Eastern District of Washington, Case Number 22-cv-03093-MKD, Yakima, WA, 2022-

Expert for State of Washington, *Sullivan, et al v Ferguson, et al* , United States District Court for Western District of Washington, Case Number, 22-cv-05403-DGE, Seattle, WA, 2022-

Expert for State of California, *Rupp v Bonta*, United States District Court for Eastern District of California, Case Number 17-cv-00903-WBS-KJN, Sacramento, CA, 2022-

Expert for County of Cook, Illinois, *Viramontes v County of Cook, IL,* United States District Court for Northern District of Illinois, Case Number 21-cv-04595, Chicago, IL, 2022-

Expert for Government of Canada, *Parker and K K S Tactical Supplies Ltd v Attorney General of Canada*, Federal Court, Court File No.: T-569-20, 2021-

Expert for Government of Canada, *Canadian Coalition for Firearm Rights, et al v Attorney General of Canada*, Federal Court, Court File No.: T-577-20, 2021-

Expert for Government of Canada, *Hipwell v Attorney General of Canada*, Federal Court, Court File No.: T-581-20, 2021-

Expert for Government of Canada, *Doherty, et al v Attorney General of Canada*, Federal Court, Court File No.: T-677-20, 2021-

Expert for Government of Canada, *Generoux, et al v Attorney General of Canada*, Federal Court, Court File No.: T-735-20, 2021-

Expert for Government of Canada, *Eichenberg, et al v Attorney General of Canada*, Federal Court, Court File No.: T-905-20, 2021-

Expert for State of California, *Nguyen v Bonta*, United States District Court for Southern District of California, Case Number 20-cv-02470-WQH-MDD, San Diego, CA, 2021-

Expert for State of California, *Jones v Bonta*, United States District Court for Southern District of California, Case Number 19-cv-01226-L-AHG, San Diego, CA, 2021-

Expert for State of California, *Miller v Becerra*, United States District Court for Southern District of California, Case Number 19-cv-1537-BEN-JLB, San Diego, CA, 2019-

Expert for Plaintiffs, *Ward et al v Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019-2019

Expert for State of California, *Duncan v Becerra*, United States District Court for Southern District of California, Case Number 17-cv-1017-BEN-JLB, San Diego, CA, 2017-

Expert for State of California, *Wiese v Becerra*, United States District Court for Eastern District of California, Case Number 17-cv-00903-WBS-KJN, Sacramento, CA, 2017-

Expert for State of Colorado, *Rocky Mountain Gun Owners v Hickenlooper*, District Court for County and City of Denver, Colorado, Case Number 2013CV33879, Denver, CO, 2016-2017

**Affiliations, Associations, and Organizations (Past and Present)**

Academy of Political Science (APS)

American Political Science Association (APSA)

Anderson Society of American University

Carnegie Council Global Ethics Network

Columbia University Scientific Union for the Reduction of Gun Violence (SURGE)

Firearm Safety among Children and Teens (FACTS)

International Political Science Association (IPSA)

International Studies Association (ISA)

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Regional Gun Violence Research Consortium

Society for Advancement of Violence and Injury Research (SAVIR)

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Grants, Honors, and Awards**

Co-Investigator, A Nationwide Case-Control Study of Firearm Violence Prevention Tactics and Policies in K-12 School, National Institutes of Health, 2021-2024 (Charles Branas and Sonali Rajan MPIs)

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

# EXHIBIT B

## to Expert Report of Professor Louis Klarevas

**Exhibit B**
**High-Fatality Mass Shootings in the United States, 1991-2022**

|  | Date | City | State | Deaths | Involved Assault Weapon(s) | Involved Large-Capacity Magazine(s) |
|---|---|---|---|---|---|---|
| 1 | 1/26/1991 | Chimayo | NM | 7 | N | N |
| 2 | 8/9/1991 | Waddell | AZ | 9 | N | N |
| 3 | 10/16/1991 | Killeen | TX | 23 | N | Y |
| 4 | 11/7/1992 | Morro Bay and Paso Robles | CA | 6 | N | N |
| 5 | 1/8/1993 | Palatine | IL | 7 | N | N |
| 6 | 5/16/1993 | Fresno | CA | 7 | Y | Y |
| 7 | 7/1/1993 | San Francisco | CA | 8 | Y | Y |
| 8 | 12/7/1993 | Garden City | NY | 6 | N | Y |
| 9 | 4/20/1999 | Littleton | CO | 13 | Y | Y |
| 10 | 7/12/1999 | Atlanta | GA | 6 | N | U |
| 11 | 7/29/1999 | Atlanta | GA | 9 | N | Y |
| 12 | 9/15/1999 | Fort Worth | TX | 7 | N | Y |
| 13 | 11/2/1999 | Honolulu | HI | 7 | N | Y |
| 14 | 12/26/2000 | Wakefield | MA | 7 | Y | Y |
| 15 | 12/28/2000 | Philadelphia | PA | 7 | N | Y |
| 16 | 8/26/2002 | Rutledge | AL | 6 | N | N |
| 17 | 1/15/2003 | Edinburg | TX | 6 | Y | U |
| 18 | 7/8/2003 | Meridian | MS | 6 | N | N |
| 19 | 8/27/2003 | Chicago | IL | 6 | N | N |
| 20 | 3/12/2004 | Fresno | CA | 9 | N | N |
| 21 | 11/21/2004 | Birchwood | WI | 6 | Y | Y |
| 22 | 3/12/2005 | Brookfield | WI | 7 | N | Y |
| 23 | 3/21/2005 | Red Lake | MN | 9 | N | Y |
| 24 | 1/30/2006 | Goleta | CA | 7 | N | Y |
| 25 | 3/25/2006 | Seattle | WA | 6 | N | N |
| 26 | 6/1/2006 | Indianapolis | IN | 7 | Y | Y |
| 27 | 12/16/2006 | Kansas City | KS | 6 | N | N |
| 28 | 4/16/2007 | Blacksburg | VA | 32 | N | Y |
| 29 | 10/7/2007 | Crandon | WI | 6 | Y | Y |
| 30 | 12/5/2007 | Omaha | NE | 8 | Y | Y |
| 31 | 12/24/2007 | Carnation | WA | 6 | N | U |
| 32 | 2/7/2008 | Kirkwood | MO | 6 | N | Y |
| 33 | 9/2/2008 | Alger | WA | 6 | N | U |
| 34 | 12/24/2008 | Covina | CA | 8 | N | Y |
| 35 | 1/27/2009 | Los Angeles | CA | 6 | N | N |
| 36 | 3/10/2009 | Kinston, Samson, and Geneva | AL | 10 | Y | Y |

| | Date | City | State | Deaths | Involved Assault Weapon(s) | Involved Large-Capacity Magazine(s) |
|---|---|---|---|---|---|---|
| 37 | 3/29/2009 | Carthage | NC | 8 | N | N |
| 38 | 4/3/2009 | Binghamton | NY | 13 | N | Y |
| 39 | 11/5/2009 | Fort Hood | TX | 13 | N | Y |
| 40 | 1/19/2010 | Appomattox | VA | 8 | Y | Y |
| 41 | 8/3/2010 | Manchester | CT | 8 | N | Y |
| 42 | 1/8/2011 | Tucson | AZ | 6 | N | Y |
| 43 | 7/7/2011 | Grand Rapids | MI | 7 | N | Y |
| 44 | 8/7/2011 | Copley Township | OH | 7 | N | N |
| 45 | 10/12/2011 | Seal Beach | CA | 8 | N | N |
| 46 | 12/25/2011 | Grapevine | TX | 6 | N | N |
| 47 | 4/2/2012 | Oakland | CA | 7 | N | N |
| 48 | 7/20/2012 | Aurora | CO | 12 | Y | Y |
| 49 | 8/5/2012 | Oak Creek | WI | 6 | N | Y |
| 50 | 9/27/2012 | Minneapolis | MN | 6 | N | Y |
| 51 | 12/14/2012 | Newtown | CT | 27 | Y | Y |
| 52 | 7/26//2013 | Hialeah | FL | 6 | N | Y |
| 53 | 9/16/2013 | Washington | DC | 12 | N | N |
| 54 | 7/9/2014 | Spring | TX | 6 | N | Y |
| 55 | 9/18/2014 | Bell | FL | 7 | N | U |
| 56 | 2/26/2015 | Tyrone | MO | 7 | N | U |
| 57 | 5/17/2015 | Waco | TX | 9 | N | Y |
| 58 | 6/17/2015 | Charleston | SC | 9 | N | Y |
| 59 | 8/8/2015 | Houston | TX | 8 | N | U |
| 60 | 10/1/2015 | Roseburg | OR | 9 | N | Y |
| 61 | 12/2/2015 | San Bernardino | CA | 14 | Y | Y |
| 62 | 2/21/2016 | Kalamazoo | MI | 6 | N | Y |
| 63 | 4/22/2016 | Piketon | OH | 8 | N | U |
| 64 | 6/12/2016 | Orlando | FL | 49 | Y | Y |
| 65 | 5/27/2017 | Brookhaven | MS | 8 | Y | Y |
| 66 | 9/10/2017 | Plano | TX | 8 | Y | Y |
| 67 | 10/1/2017 | Las Vegas | NV | 60 | Y | Y |
| 68 | 11/5/2017 | Sutherland Springs | TX | 25 | Y | Y |
| 69 | 2/14/2018 | Parkland | FL | 17 | Y | Y |
| 70 | 5/18/2018 | Santa Fe | TX | 10 | N | N |
| 71 | 10/27/2018 | Pittsburgh | PA | 11 | Y | Y |
| 72 | 11/7/2018 | Thousand Oaks | CA | 12 | N | Y |
| 73 | 5/31/2019 | Virginia Beach | VA | 12 | N | Y |
| 74 | 8/3/2019 | El Paso | TX | 23 | Y | Y |
| 75 | 8/4/2019 | Dayton | OH | 9 | Y | Y |

| | Date | City | State | Deaths | Involved Assault Weapon(s) | Involved Large-Capacity Magazine(s) |
|---|---|---|---|---|---|---|
| 76 | 8/31/2019 | Midland and Odessa | TX | 7 | Y | Y |
| 77 | 3/15/2020 | Moncure | NC | 6 | U | U |
| 78 | 6/4/2020 | Valhermoso Springs | AL | 7 | Y | Y |
| 79 | 9/7/2020 | Aguanga | CA | 7 | U | U |
| 80 | 2/2/2021 | Muskogee | OK | 6 | N | U |
| 81 | 3/16/2021 | Acworth and Atlanta | GA | 8 | N | Y |
| 82 | 3/22/2021 | Boulder | CO | 10 | Y | Y |
| 83 | 4/7/2021 | Rock Hill | SC | 6 | Y | Y |
| 84 | 4/15/2021 | Indianapolis | IN | 8 | Y | Y |
| 85 | 5/9/2021 | Colorado Springs | CO | 6 | N | Y |
| 86 | 5/26/2021 | San Jose | CA | 9 | N | Y |
| 87 | 1/23/2022 | Milwaukee | WI | 6 | N | U |
| 88 | 4/3/2022 | Sacramento | CA | 6 | N | Y |
| 89 | 5/14/2022 | Buffalo | NY | 10 | Y | Y |
| 90 | 5/24/2022 | Uvalde | TX | 21 | Y | Y |
| 91 | 7/4/2022 | Highland Park | IL | 7 | Y | Y |
| 92 | 10/27/2022 | Broken Arrow | OK | 7 | N | U |
| 93 | 11/22/2022 | Chesapeake | VA | 6 | N | U |

Note: High-fatality mass shootings are mass shootings resulting in 6 or more fatalities, not including the perpetrator(s), regardless of location or motive. For purposes of this Exhibit, a high-fatality mass shooting was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban; (2) the statutes of the state where the shooting occurred; or (3) a legal or judicial declaration issued by a state official. For purposes of this Exhibit, a high-fatality mass shooting was coded as involving a large-capacity magazine if at least one of the firearms discharged had an ammunition-feeding device holding more than 10 bullets. Incidents in gray shade are those incidents that occurred at a time when and in a state where legal prohibitions on both assault weapons and large-capacity magazines were in effect statewide or nationwide.

Sources: Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016); Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 109 American Journal of Public Health 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed December 27, 2022); and "Gun Violence Archive," *available at* https://www.gunviolencearchive.org (last accessed January 3, 2023). The Gun Violence Archive was only consulted for identifying high-fatality mass shootings that occurred since January 1, 2018.

# EXHIBIT C

## to Expert Report of Professor Louis Klarevas

# ASSAULT WEAPONS AND ACCESSORIES IN AMERICA

Firearms Policy Project
of the
Violence Policy Center

1834 18th Street, NW
Washington, D.C. 20009
(202) 265-1920



# Assault Weapons and Accessories in America

Josh Sugarmann

Executive Director
Violence Policy Center

September 1988

This study was funded in part by a grant from the
Educational Fund to End Handgun Violence.

Copyright 1988
Violence Policy Center

TABLE OF CONTENTS

| | |
|---|---|
| Introduction | p. 1 |
| Assault Weapons Violence | p. 2 |
| Drug Traffickers, Paramilitary Groups... | p. 5 |
| And Just Plain Folk | p. 8 |
| Assault Weapons Marketing | p. 9 |
| Assault Weapon Look-Alikes: Airguns and Toy Guns | p. 10 |
| Publications | p. 11 |
| Accessories | p. 14 |
| Paramilitary Training Camps and Combat Schools | p. 19 |
| The Assault Weapons Debate | p. 21 |
| Conclusion | p. 26 |
| Appendix I | p. 30 |
| Appendix II | p. 32 |
| Footnotes | p. 34 |

## INTRODUCTION

Across America, the firepower in the hands of gun owners of varying stripes is increasing dramatically. The reason: assault weapons. Drug traffickers are finding that assault weapons--in addition to 'standard issue' handguns--provide the extra firepower necessary to fight police and competing dealers. Right-wing paramilitary extremists, in their ongoing battle against the "Zionist Occupational Government," have made these easily purchased firearms their gun of choice. And rank and file gun aficionados--jaded with handguns, shotguns, and hunting rifles--are moving up to the television glamour and movie sex appeal of assault weapons. The growing market for these weapons--coupled with a general rising interest in the non-sporting use of firearms--has generated an industry of publications, catalogs, accessories, training camps, and combat schools dedicated to meeting its needs.

Assault weapons are growing in popularity for a variety of reasons. For manufacturers, assault weapons are a necessary new product line in the wake of the mid-1980s decline in handgun sales. Yet, manufacturers didn't create a market, they recognized one. For criminals, the weapons look intimidating, have increased firepower, and can be purchased under the same controls as a hunting rifle or shotgun: that is, virtually none. For survivalists who envision themselves fending off a horde of desperate neighbors from their bomb shelters, the high ammunition capacity and other anti-personnel capabilities of assault weapons are exactly what is needed. And for fans of Rambo and "Miami Vice," assault weapons offer the look and feel of the real thing. Not surprisingly, this shift to increased firepower--in both criminal and law-abiding hands--has law enforcement worried.

The assault weapons threat is exacerbated by the fact that the weapons are difficult to define in legal terms. Legislators and members of the press have proposed placing increased restrictions on all semi-auto firearms, which would include some hunting rifles. Whether these proposals are merely the result of ignorance of the wide variety of firearms that are semi-automatic, or misguided efforts in the face of definitional problems, they only lend credence to the gun lobby's argument that restrictions on assault weapons are merely the first step toward banning all semi-automatic guns.

Assault firearms are semi-automatic (firing one bullet per trigger pull) and fully automatic (the weapon will keep on firing as long as the trigger is depressed) anti-personnel rifles, shotguns, and handguns that are designed primarily for military and law enforcement use. With muzzle velocities that are often greater than standard long guns, and high-capacity ammunition magazines, assault weapons are built to kill large numbers of human beings quickly and efficiently. In tests at their firing range, San Jose, California police found that a fully automatic UZI could fire its 30-round magazine in slightly less than two seconds. A semi-automatic version of the weapon required only five seconds for the magazine to be emptied.[1] Most assault weapons have no legitimate hunting or sporting use. Assault rifles and shotguns often have pistol grips and folding stocks, and are typically lighter and more concealable than standard long guns. Some assault pistols have threaded barrels for the easy attachment of silencers. Many assault weapons are merely semi-automatic versions of military machine guns, making them easier to convert to fully automatic machine guns.

The number of assault weapons in civilian hands--both criminal and law abiding--is estimated to be in the hundreds of thousands, perhaps millions.[2] No exact figures are available. An unknown number of these weapons have been illegally converted to full-auto. (For an explanation of the different categories and types of firearms, please see Appendix I.)

**ASSAULT WEAPONS VIOLENCE**

- October 1984. San Jose, California police officer Joe Tamarett is shot and wounded with an UZI carbine.[3]
- January 1988. Virginia resident Michael Anthony Eberhardt is arrested in Washington, D.C., for allegedly purchasing 72 guns in Virginia during an 18-month period and then smuggling them into D.C. for sale to drug dealers. According to The Washington Post, "Many of the weapons were the semi-automatic TEC-9s favored by local drug dealers."[4]
- April 1986. Two FBI agents are killed with a Ruger Mini-14 in a shootout in Miami, Florida.[5]
- April 1984. Dennis Cresta, dressed in camouflage fatigues and carrying a Ruger Mini-14 and Colt AR-15, opens fire in Oakland, California, after being questioned by a policeman. No one is hit.[6]
- July 1987. An elderly woman and her three sons kill three police officers who come to their motel room in Inkster, Michigan, to serve a warrant for a $286.40 bad check. One of the weapons used to slay the officers is a Heckler & Koch assault rifle.[7]

- September 1988. Samuel Eloud holds 11 people hostage in a Richmond, Virginia shopping center with a semi-automatic AK-47 and handgun in order to bring "peace to Lebanon."[8]

- June 1984. Denver, Colorado radio show personality Alan Berg is gunned down with a silenced MAC-10 by right-wing extremists.[9]

- July 1984. James Huberty goes "hunting for humans" with an UZI, a handgun, and a shotgun in a San Ysidro, California McDonald's. Twenty-one die; 19 are injured.[10]

- December 1985. Portland, Connecticut eighth-grader Floyd Warmsley kills school janitor David Bengston with his father's TEC-9, then holds a classroom of children hostage.[11]

- July 1988. Manassas, Virginia, police officer John Conner is gunned down with a Colt AR-15 by a man whose wife had recently left him.[12]

- April 1987. William B. Cruse opens fire with a Ruger Mini-14 outside a Palm Bay, Florida shopping center, killing six and injuring 10.[13]

- March 1988. An arsenal that includes a Chinese-made semi-automatic AK-47, a hand grenade, 14 other semi-automatic guns, 32-round ammunition magazines, and a handgun outfitted with a laser sight is seized from five men in New York City's Port Authority bus terminal.[14]

- February 1988. At a press conference decrying the increase in assault weaponry, Prince Georges County (Maryland) Police Chief Michael J. Flaherty states, "The real issue is the safety of our officers." Holding up a TEC-9, he adds,"It's not used for hunting, and it's not used for sporting events. In my opinion, they should not be sold in the United States."[15]

These events are not isolated incidents. Although no comprehensive, nationwide statistics are available on the misuse of assault weapons specifically, police organizations, police departments, government agencies, and handgun restriction organizations agree that the sale and misuse of assault weapons has escalated dramatically during the 1980s. (Most law enforcement reporting systems are set up only to separate handguns from long guns. The federal Bureau of Alcohol, Tobacco and Firearms (ATF), the government agency charged with enforcing federal firearms laws, will soon begin breaking out assault weapons from standard long guns.[16])

"There has been an increase in [assault] weapons by all walks of life--gang members, drug dealers, your next door neighbor, even police officers," states Detective Bohannon of the

Los Angeles Police Department Gun Detail. In Los Angeles, assault weapons have turned up increasingly in gang violence and drive-by shootings. Says Bohannon, "These are not sporting weapons. They're designed for one purpose and one purpose only, and that's to kill people." (Bohannon stresses that his opinions are personal and do not reflect the view of the Los Angeles Police Department.) According to Bohannon, essentially the same models of weapons are being seen on the streets by police: "Your least expensive weapons are your MACs and TECs. In the middle you've got your AK-47s and your UZI. At the top level are going to be your AR-15s....[and others]."[17]

During fiscal year 1987, almost a third of the firearms seized by agents of the Drug Enforcement Agency (DEA)--the leading federal agency charged with enforcing America's federal drug laws--from drug traffickers were semi-automatic and fully automatic. (These figures include non-assault semi-automatic pistols. Figures on solely assault rifles and pistols are not available.) Sixteen percent were fully automatic. On a daily basis, DEA agents seized automatic weapons that included M-16s, AK-47s, MAC-10s, MAC-11s, and UZIs.[18]

From January 1 to February 10, 1988, of the 388 guns seized by District of Columbia police, the vast majority were either semi-automatic or fully-automatic. Only seven such weapons were seized during the first six months of 1987, six in 1986, one in 1985, and two in 1984.[19]

In neighboring Prince George's County, Maryland, from July 1987 through February 1988, police seized 140 semi-automatic or automatic weapons, including a TEC-9 and several UZI submachine guns, some equipped with silencers.[20]

In 1986, ATF seized 2,854 illegal machine guns. These weapons were either converted illegally or illegally possessed. In 1985, the number of illegal weapons seized was 2,042. In 1984, 539.[21]

The most popular assault weapons are the AK-47, AR-15A2, MAC-10, MAC-11, Ruger Mini-14, TEC-9 and UZI. (For a description and brief history of each weapon, as well as select advertising information, please see Appendix II.) Recognizing the strong market for high-capacity, concealable assault weapons that are painted black and look threatening, America's firearms industry continues to introduce new models. Two of the latest are:

- The Calico M100P pistol, manufactured by American Industries in Bakersfield, California. With its futuristic lines and black finish, this .22 caliber weapon is the Darth Vader of handguns. Composed of a lightweight alloy frame, it has a "helical feed" 100-round capacity plastic magazine. A 50-round magazine is also available. The weapon also comes in

a carbine (a short-barreled, lightweight rifle) version with a folding stock. Under the headline "Durable, Accurate, Light, Versatile," an ad for the gun shows an intimidating M100P pistol with an optional "Klear-Vue" magazine (a see-through magazine that gives the shooter "complete visibility of rounds remaining in the magazine") and laser sight.[22]

The pistol version of the weapon is 17 inches long with the 100-round magazine, and weighs 3.75 pounds. The carbine version, with its stock retracted and the 100-round magazine, is 29.8 inches long. In November 1988, Calico will introduce a 9mm version of the weapon.[23]

- The Street Sweeper is a 12-gauge riot shotgun with a revolving cylinder that rotates with each trigger pull. Able to fire 12 rounds in less than three seconds, the weapon is manufactured by SWD, Inc. (manufacturers of the MAC-11). An ad for the weapon reads, "It's a Jungle Out There! There Is A Disease And We've Got the Cure." It invites the reader to "Make you [sic] streets safe and clean with the help of 'The Street Sweeper'!" With its folding stock retracted, the weapon has an overall length of 25 5/8 inches.[24] The SWD weapon is modeled on a shotgun used by South African security personnel, the Striker 12. Efforts had been made to import the Striker, but the weapon was the first long gun ever to fail the sporting-use test that ATF applies to imported long guns. (Domestically produced firearms do not have to meet any sporting use standard.)

**DRUG TRAFFICKERS, PARAMILITARY GROUPS...**

Because of their ease of purchase, effectiveness, convertibility, and mystique, assault weapons have become increasingly popular among people involved in the drug trade. Or as one DEA spokesman put it, "There's a machismo to carrying the biggest, ugliest, and most powerful weapon available."[25]

According to DEA Special Agent Maurice Hill, drug dealers in Miami began to switch over from revolvers to higher capacity pistols in the early 1970s. By the end of the decade, they had begun using shoulder-carried weapons, and by the early 1980s had upgraded to weapons like the UZI. Since then, criminals nationwide have expanded into a broad category of assault weapons. Regarding assault weapons, Special Agent Maurice Hill says, "They're all over now."[26]

Noting that drug traffickers "seem to like the AR-15s, AK-47s, TEC-9s," ATF spokesperson Tom Hill concurs: "We've seen a proliferation because of the drug trade. More and more people

want to have increased firepower and the status of having the semi-automatic assault type weapon. It looks dangerous. Most assault weapons used in criminal acts were initially purchased legally. Some are stolen, some come from over the counter through straw purchases, some are from people who fill out the forms illegally."[27]

In 1987, ATF traced weapons seized from two members of a Jamaican drug gang (known as "posses") in Tampa, Florida. The trace found that 149 weapons had been purchased over the counter from Tampa-area dealers. The majority of the weapons were TEC-9s, MACs, AR-15s, and Glock 17 handguns, "all preferred weapons of the Jamaican posses."[28] (The Glock 17, the first handgun to incorporate plastic into its structural design, is not considered an assault weapon.) As the result of this increased criminal firepower, police departments are beginning to abandon their six-shot revolvers for higher-capacity semi-automatic handguns.

Assault weapons have also become the weapon of choice for a different category of criminal: America's right-wing paramilitary extremists. In his book, Armed and Dangerous: The Rise of the Survivalist Right, author James Coates describes the scene outside the 224-acre compound of the paramilitary extremist organization, The Covenant, Sword and Arm of the Lord (CSA), located in Three Brothers, Arkansas, prior to a raid by law enforcement officials in 1985:[29]

"[A]ll visitors were greeted by a group of roughly half a dozen obviously frightened and surly young men carrying Mini-14s, MAC-10s and other automatic and semi-automatic weapons. Other armed CSA soldiers were clearly visible in a fifty-foot-tall guard tower overlooking the front gate, from which they pointed machine guns at reporters. Noble [a CSA member], wearing a Bowie knife strapped to one leg and cradling a converted AR-15 automatic rifle in his arm, repeatedly came to the gate to spar verbally with the nervous news media."[30]

Until recently, police had believed that the CSA--after its members were subjected to increased government prosecution, its compound deserted, and its leader, James Ellison, imprisoned for crimes that included the manufacture of automatic weapons--had disbanded. But in May of 1988, CSA member Londell Williams was charged with conspiring to assassinate presidential candidate Jesse Jackson. Police recovered a converted AR-15 from Williams.[31]

Other paramilitary organizations that favor assault weapons and have been known to convert them to fully automatic machine guns include the Posse Comitatus, Aryan Nations, and The Order.

Although many drug traffickers and members of paramilitary organizations are convicted felons, they are often able to

illegally buy these weapons from retail sales outlets.  In every state, assault rifles and shotguns are sold under the same lax restrictions that apply to hunting rifles and shotguns.  Assault pistols are sold under the same laws that apply to handguns, which vary from locality to locality.

Some states do require that the purchaser of any firearm first receive an owner's ID card or permit, while other states have a waiting period for all firearms.  Yet most states' standards for the sale of long guns are no more severe than the federal law, which requires only that the purchaser be 18 years old and fill out a federal form 4473.  On this form, the purchaser swears that he is not a convicted felon, drug addict or alcoholic, and that he does not have a history of mental illness.  Most purchases are cash and carry, and long guns can be purchased interstate, with no limit on the number of weapons that can be purchased.[32]

The federal standards for handguns are essentially identical to that of long guns, except that they cannot be sold interstate, the purchaser must be 21 years old, and multiple purchases (more than one handgun purchased within five working days) must be reported to ATF.[33]

(In 1986, Congress outlawed the future production of machine guns for civilian use.  Currently, there is a pool of more than 187,000 machine guns that citizens can legally purchase.[34]  To obtain a machine gun, a citizen must be fingerprinted, photographed, submit to a background check, wait five to six months, and a $200 transfer tax must be paid.  These same standards must be met to possess silencers, sawed-off rifles and shotguns, and military weaponry, such as hand grenades, land mines, grenade launchers, and other weapons and accessories restricted under the National Firearms Act of 1934.[35])

The most restrictive handgun laws are on the state and local level, and assault pistols would be sold under these standards.  Handgun laws in America range from Morton Grove, Illinois, which has banned the sale and private possession of handguns, to the state of Florida, which operates essentially under only the federal standards.[36]

Because many assault weapons--such as the AR-15A2, M100P carbine, Ruger Mini-14, Street Sweeper, and UZI carbine--can be purchased as standard long guns by virtually anyone who is willing to lie on the form, they are a boon to criminals.  Assault pistols can be purchased easily by criminals in states with lax handgun laws such as Texas, Virginia, and Florida.  From there, these weapons can then be sold to criminals in cities and states with more restrictive laws.

AND JUST PLAIN FOLK

Although much attention has been focused on drug traffickers and paramilitary extremists, many assault weapons are purchased by "just plain folk." These people run the gamut from survivalists who want to be ready "just in case" to gun owners who want the thrill of owning the latest high-tech weapons.

A 1986 Defense Monitor on "Militarism in America," published by the Center for Defense Information (CDI), in Washington, D.C., notes an increasing "fascination for paramilitary weapons and training" among the general public.[37]

Television shows such as "The A-Team," first broadcast on ABC in 1983, "Miami Vice," first broadcast on NBC in 1984, and other action/adventure/police dramas have acted as a showcase for new weaponry. In effect, these shows supply free advertising for assault weapons manufacturers.

The Center for Media and Public Affairs, based in Washington, D.C., monitored 620 television programs throughout the past 30 years, revealing a noticeable shift toward military-style assault weapons.[38]

According to Daniel Amundson, research director for The Center, "There certainly is a greater number of automatic weaponry," and this is "partly reflecting news from the front pages and partly reflecting artistic embellishment." Noting that guns have been "ever present" in television, Amundson adds, "The presence hasn't changed, but which ones are present has. 'Miami Vice' requires very sleek and modern weapons. This shows a reflection of the headlines. If drug lords are using more UZIs and MAC-10s, you're going to see it in 'Miami Vice' six to nine months later."

According to Amundson, television has a "tremendous potential to act as a marketplace for anything: weapons, violence, soap, attitudes toward blacks and women. Television has helped the average person to identify weapons more than we'd ever thought, expanded our knowledge, terminology, of the types of guns available. UZI, MAC-10 is no longer jargon for firearms specialists; and that tells us a great deal."[39]

Meanwhile, in movie theaters, the .44 magnum handgun of Clint Eastwood pales in comparison to the weapons of Rambo and his ilk. Throughout the 1980s, Sylvester Stallone films such as the Rambo series and "Cobra," Chuck Norris movies such as the "Missing in Action" series and "Invasion USA," and Arnold Schwarzenegger movies such as "Terminator," "Predator," and "Commando" have helped popularize paramilitary weapons and accessories.

**ASSAULT WEAPONS MARKETING**

The marketing of assault weapons throughout this decade is in large part due to the slump in handgun sales that has afflicted the industry since 1982. Handgun production dropped from a high of 2.7 million that year to less than 1.7 million in 1984--a decrease of nearly 40 percent. In 1986, production increased to 1.9 million, a level still well below that of the early 1980s.[40] (Because handgun manufacturers will not release sales figures, and are not required to do so by law, production figures are the only available gauge of the market.) With an estimated 35 to 40 million handguns in American hands,[41] the slump is apparently the result of saturation of the primary market--white males--and the increasing resale of used handguns.

In their marketing of assault weapons, manufacturers often focus on their police or military functions, their ruggedness and dependability, and the cache of a lone man and his gun against the elements, crime, or the unstated threat of post-nuclear survival.

Colt Industries has even developed an ad aimed directly at survivalists. The 1985 ad features a handsome rancher looking across his land. He has leather patches on the elbows of his flannel shirt and an AR-15A2 in one hand. The headline reads: "Survival means different things to different people. For a rancher in the high country of Wyoming, being self-sufficient can mean keeping varmints from his sheep. For a rugged individual in the wilderness, it means being prepared for any eventuality. For both these men, and thousands like them, there's only one gun. The Colt AR-15A2. The reasons are as simple as they are plentiful. First, it's the rifle they're already familiar with. The AR-15A2 Sporter II is the civilian version of the battle proven and recently improved U.S. military M-16A1..."[42]

This survivalist sales pitch is echoed in an ad for Heckler & Koch's HK 91 semi-automatic assault rifle. The ad's headline reads, "When you're determined to survive, you leave nothing to chance. In a survival situation, you want the most uncompromising weapons that money can buy. The HK 91 Semi-Automatic Assault Rifle from Heckler & Koch." The ad ends with the tag line, "In a world of compromise, some men don't."[43]

An ad for the FIE/Franchi LAW-12 shotgun--which comes in standard hunting and assault configurations--urges the reader to "Take the 'LAW' Into Your Own Hands. Whether you patrol the birdlands when the sun is rising...or patrol the boonies when the sun sets...the FIE/Franchi LAW-12 is the LAW of the land! All the LAW you need! Situation - The sun has set, it's now midnight, you're called to a Code 3 situation! Your backup is deployed to another sector. You're all alone, left to handle a tough situation...What do you do? Take the LAW-12 into your hands - A possible 9 rounds of heavy hitting 12 guage [sic] "00"

Buck - All 9 rounds can be emptied on target in less than 3 seconds...operation successful..."[44]

ASSAULT WEAPON LOOK-ALIKES: AIRGUNS AND TOY GUNS

Paramilitary enthusiasm has not been limited to the firearms market. America's manufacturers of non-powder firearms (such as BB guns and pellet guns) and toy guns have been quick to realize that assault weaponry is in. These manufacturers' role models are no longer hunting rifles and Western-style six-shooters, but machine guns and large-caliber handguns. This shift has been accompanied by a keener eye to detail and advances in plastic molding. The result: non-powder firearms and toy guns that are virtually indistinguishable from their more lethal counterparts.

Daisy Manufacturing was one of the first to recognize this potential market. The company introduced its paramilitary line of imported Softair guns in 1986. Softair guns are working replicas, down to the point of expelling spent shells and firing plastic pellets. They retail for approximately $60. "So accurate in detail you'll swear it's the real thing!...a 'must have' for paramilitary enthusiasts of all ages," reads the catalog description for a replica of the UZI Assault pistol. Copy for a replica of the KG9-SP (predecessor of the TEC-9) boasts that it's "an authentic reproduction of the American-made semiautomatic defense weapon used by anticommunist guerrillas in Angola." A replica of a Heckler & Koch weapon is described as being "without a doubt the most exciting paramilitary airgun on the market today! Styled after the semiautomatic firearm carried by the German police and made famous in the motion picture, 'Rambo: First Blood, Part II,' the Model 15 has the look and feel of the real thing."[45]

Rival manufacturer Crosman has its own UZI look-alike (which fires metal projectiles) and a reproduction of Colt's M-16 machine gun dubbed the A.I.R. 17. Crosman guarantees that "it looks just like the real thing," down to a detachable pellet clip and flash guard on the muzzle of the gun.[46]

Larc International, located in Longwood, Florida, offers--by mail--the M19-A BB submachine gun. "Imagine--a 3,000 BB per minute cycle rate with an effective range of over 50 yards--That's some AWESOME Fire Power!!!" With a magazine capacity of 3,000 BBs, the weapon also comes in a pistol version. Each sells for $39. On the ordering coupon, the purchaser must promise that he or she is 18 years or older.[47]

The Para-Ordnance M-85 is a full-auto paint ball "splat gun" MAC-11 machine pistol replica that fires 1,200 rounds per minute at 440 feet per second. The 24-round magazine can be emptied in 1.2 seconds. It sells for $299.50.[48]

Far more common than paramilitary non-powder firearms are plastic-molded toy assault weapons. In addition to such staples as M-16s, AK-47s, UZIs, and KG-9s, Daisy, the self-proclaimed leader in the field, offers toy silenced MAC-10 pistols (the Alan Berg murder weapon) and bolt action machine guns.[49]

The International Association of Chiefs of Police (IACP), located in Gaithersburg, Maryland views look-alikes as a unique threat to public safety. As criminal misuse of assault weapons increases, police are more likely to assume that look-alikes are in fact real firearms. People who thoughtlessly display or brandish look-alikes run the risk of finding themselves in a deadly face-off with a police officer who must make a split-second decision on whether to draw a weapon and fire. According to the IACP, incidents involving airguns, highly detailed toy guns, and paint "splat guns" are increasing dramatically.[50]

In May 1988, as an amendment to a bill dealing with the threat posed by non-detectable "plastic" firearms, Congress voted to require that every look-alike sold in America be clearly marked with an orange stripe or other color to distinguish it from its real counterpart. The bill is awaiting presidential signature, which is expected. On the state and local level, laws have been introduced and enacted regarding the sale, production, and brandishing of look-alikes.

But even prior to the bill, various companies, reacting to the growing debate over look-alikes and the increasing negative publicity their sales generated, began to shift their product lines and mark their products to help distinguish them from real firearms. In late 1987, Daisy stopped the sale of its SoftAir guns, which had been imported from Japan. A spokesman for the company noted, however, that the decision was "90 percent financial. The guns just weren't selling."[51]

Critics of the marking concept point out that the markings can be easily painted over and will do little good in the dark, while criminals can paint similar markings on real guns.

What makes look-alikes so appealing--that they look <u>just like</u> the increasingly popular assault weapons--is precisely what makes them so dangerous.

## PUBLICATIONS

The growing fascination with assault weapons has been accompanied by a growth in the number of publications dedicated to the non-sporting use of firearms.

<u>Firepower</u>, published by Everett Moore out of Cornville, Arizona, is the only magazine in America dedicated to full-auto and high-capacity firearms and has a circulation of 90-95,000.

(Prior to the 1986 machine gun ban, the magazine had been devoted exclusively to full-auto.) Each issue of the magazine is filled with weapon, ammunition, and accessory reviews. Virtually all of the weapons reviewed are assault weapons.

According to Moore, "We jokingly refer to them as black and wicked-looking types of guns. They fill a need in the consumer market for people...who cannot afford the automatic version of the same weapon." Moore acknowledges that violence involving these weapons is "a legitimate concern. It's reality and you can't deny that." He adds, though, that, "it seems like any time we go to disarm the criminal, we end up disarming the legitimate, honest civilian."[52]

American Survival Guide is "the magazine for safer living." Published by McMullen Publishing in Anaheim, California, articles are listed under headings that include "Survival Weapons," "Survival Gear," and "Survival How To."[53] It also contains the "Survivalist Directory," a post-apocalypse personals column that offers a "confidential listing of survivalists who wish to become known to others of like mind." Personal ads in the August issue include:

- "Melbourne, Florida. Teenage military organization that does U.F.O. research would like to recruit members. Also would like to set-up [sic] information exchange and meet others in this area for training. All races and sexes are welcome. Ages 12 and over only. No racists or religious fanatics need apply."

- "Northern Arkansas. Young, conservative male seeks correspondence with other survivalists in area. Special interest is nuclear survival. No liberals, atheists, druggies or alcoholics. Females welcome. All ages reply."

- "Baltimore, Maryland. Urban group which meets biweekly is looking for interested local survivalists wishing to exchange information. We are not Rambos, racists, or extremists, but family-oriented and interested in workable, realistic solutions to short and long term survival scenarios."[54]

Published since 1979, Survival Guide has a circulation of between 30,000 and 70,000.[55]

In addition to his mainstay, the monthly Combat Handguns, New York-based Stanley Harris also publishes such annuals as Guns & Survival and Special Weapons. Another Harris publication, Eagle, which had promised its readers "violent combat action," has ceased publication. An October 1983 issue of the magazine featured an article entitled, "The Amazing Soft Drink Silencer -- I'm a Pepper, You're a Dead Man." The article outlined the ease

with which a two-liter plastic soft-drink container could be used as a silencer for a MAC-10.  Eagle found it to be "the best suppressor found in today's supermarkets.  It's cheap, effective, and mixes well at parties.  What more could you want?"[56]

The Special Weapons annual offers "The Newest Ideas in Guns and Equipment as Well as Combat-Proven Tactics."[57] Articles in Special Weapons include:  "Colt Delta HBAR--Boasting sniper rifle accuracy we compare this new Colt to the combat-proven Galil"; "The Search for Compact Firepower--We compare submachine guns to short assault rifles"; "The Offensive Handgun--It's the tool of the assassin"; "How to Buy Automatic Weapons--Latest prices and availability of Class III firearms"; and the "Assault Rifle Buyer's Guide."[58]

"The Offensive Handgun" is a how-to piece on assassination.  The article advises that "single shots are preferred.  The head, neck, and spine are the best targets."[59] Recognizing that sometimes "an unsuppressed pistol may be the only one available," the article advises that, "the sound can be muffled by shooting through...a potato or pillow.  If the muzzle is held against the target this also may muffle the sound, but it can also cause him to react in unexpected ways, besides presenting the possibility of the pistol jamming from bits of clothing or flesh caught in the muzzle or chambers."[60]  The article notes that the speed and capacity of a modern machine pistol are "important when shooting a number of people at once."[61]

Soldier of Fortune, published out of Boulder, Colorado, describes itself as "The Journal of Professional Adventurers." In a disclaimer on its title page (a trait many of these magazines share), it warns readers that the magazine "does not verify validity of every advertisement and/or the legality of every product contained herein.  Soldier of Fortune magazine does not intend for any product or service to be used in any illegal manner."[62]  The magazine has been published since 1975 by National Rifle Association board member Robert K. Brown.

In addition to various "you are there" articles such as "Sandinista Staredown" and "Bum Trip in Bolivia,"[63] the magazine contains weapon reviews and combat tactics.  Soldier of Fortune had also carried classified ads for mercenaries for hire.  This practice has since been discontinued as the result of a lawsuit filed by the family of a victim whose murderer was hired as the result of an ad placed in the September 1984 issue of the magazine.  The ad read:  "Ex-marines.  67-69 Nam Vets.  Ex-DI, weapons specialist--jungle warfare.  Pilot.  ME.  High risk assignments.  US or overseas."

In 1984 Robert Black hired John Wayne Hearn to kill his wife.  Hearn did so in February 1985.  It had been Hearn's third murder in 19 days.  As the result of this, the victim's parents and son sued Soldier of Fortune for $21 million, arguing that the

magazine was aware of the implication contained in the ad.[64] In March 1988, a Colorado jury found that the magazine should have known that the ad was offering the services of a hired killer and ordered it to pay $9.4 million. The decision is currently being appealed.[65] (Soldier of Fortune refused to answer any questions for this report, including circulation and initial date of publication, on advice of their legal counsel pending outcome of the suit.)

New Breed, "the magazine for military adventure,"[66] is published by Harry S. Belil, out of Nanuet, New York. Though the magazine focuses more on military action, it does contain articles on assault weaponry and tactics. The August 1988 issue also contains a review of the 1988 SHOT (Shooting, Hunting, Outdoor Trade) show, the annual trade show of the firearms industry, held last January. In the piece, the author notes that "there were plenty of assault rifles at the show."[67]

Shotgun News describes itself as "The Trading Post for anything that shoots." Published three times a month out of Hastings, Nebraska, the 200-page, tabloid-style magazine has a circulation of nearly 190,000.[68] The magazine is crammed with classified and display ads for firearms and accessories, most of which are geared to firearms dealers.

In addition to a cavalcade of gun ads, Shotgun News carries ads for a variety of accessories (including Nazi memorabilia such as coffee mugs with swastikas[69]), firearms, and publications, including The Turner Diaries, the "bible of right-wing extremists." In the book, "Earl Turner and his fellow patriots...are forced underground when the U.S. government bans the private possession of firearms and stages the mass Gun Raids to round up suspected gun owners. An all-out race war occurs as the struggle escalates. Turner and his comrades suffer terribly, but their ingenuity and boldness in devising and executing new methods of guerrilla warfare lead to a victory of cataclysmic intensity and worldwide scope. If the government had the power to ban books, The Turner Diaries would be at the top of their list. Order your copy today." The $5.95 book is offered by the neo-Nazi National Vanguard located in Arlington, Virginia.[70]

## ACCESSORIES

Not only do these publications supply information, but they also contain advertisements for various catalogs and products. The Survival Systems book catalog describes itself as offering "the most unusual and controversial books you've ever seen in your life."[71] In a disclaimer, the company notes, "Certain of the books in this catalog deal with activities and items which could be in violation of various laws if actually performed or constructed. We do not advocate the breaking of any law. Our books are sold for entertainment purposes only and only to adults!"[72]

With a toll-free number for credit-card orders, the catalog contains books on revenge, fraud, dirty tricks, firearms conversion, home construction of firearms and explosives, and murder techniques.

Books offered by Survival Systems include:

- How to Build Silencers: An Illustrated Manual. "A complete manual for the construction of silencers at home with simple tools. Build in less than one hour. $5.95."[73]

- Improvised Weapons of the American Underground. "This book makes other 'cookbooks' things for Sunday School picnics. This collection of original articles covers: Making of Nitroglycerin; Plastic Explosives; Detonators and Primers; Fuses; Impact Ignition Incendiary Devices; and Construction of Various Types of Silencers; and Complete Plans for a Home Made Machine Gun which can be built for less than $20.00. An absolutely incredible manual. $7.50."[74]

- Full Auto. "A completely illustrated modification manual on selective fire conversions for the following weapons: Mini-14; AR-15; HK-91-93; MAC 10-11; and the M1 Carbine. With this new edition, you can convert all five weapons into their full-automatic configurations with ease, as all procedures are thoroughly explained in an easily understood, fully illustrated, step-by-step manner. Without a doubt, this is the finest conversion manual on the market. $12.00."[75]

Robert K. Brown's Paladin Press offers a 47-page, glossy catalog that includes sections on sniping, revenge and humor, survival, weapons, explosives and demolitions, guerrilla warfare, silencers, new ID and personal freedom, locksmithing, and terrorism. In an essay entitled "New Age Survival," readers are reassured that "We don't want to alarm you into heading for the hills today--but will help you become prepared to do so tomorrow."[76]

Books offered in the catalog include:

- Anarchist Handbook. "For the modern anarchist, all you need to know to construct an impressive selection of improvised weapons," including "an expedient silencer; a pipe hand grenade; plastic explosive; and a rocket launcher. For each weapon, the author supplies a list of materials easily acquired from drug or hardware stores, hobby shops, supermarkets or even junk piles; step-by-step procedures; simple diagrams and how-to-use instruction for certain weapons. $7.00."[77]

- The Mini-14 Exotic Weapons System. "Convert your Mini into a full-auto, silenced, SWAT-type weapon that is capable of field clearing firepower. Note that this conversion process requires no machining or special tools. Once completed it takes just five minutes to drop in the Automatic Connector (the book's secret!) or remove it as needed. It's that simple! $15.00"[78]

- Improvised Explosives--How to Make Your Own. "Ten simple but powerful formulas for explosives and incendiaries" that gives the reader the ability "to construct actual bombs, booby traps and mines. Learn how to obtain or make all the necessary chemicals or get acceptable substitutes. Various fuses, detonators, and chemical and electrical timers are covered, as are pipe bombs, plastic bottle bombs, jerry can bombs and tamperproof bombs. With ease, you can construct such devices as a package bomb, booby-trapped door, auto trap, sound-detonated bomb, or pressure mine--to name just a few. $10.00"[79]

- How to Kill (volumes one through six). "[M]akes no moral judgments, but merely describes what has been known for years by the professionals who are part of the shadowy world of international espionage and intrigue. As the author states in his preface, 'My only premise is that there are times when one must attack with complete ruthlessness and fight with lethal fury. This fury and ruthlessness must be harnessed and directed to the gravest possible damage--to kill.'" Priced at $8 per volume, the catalog notes that no book in the How to Kill series is available in Canada due to legislation by the Canadian solicitor general.[80]

In addition to operating a 24-hour-a-day, toll-free order line and offering a "no questions asked" money-back guarantee, Paladin Press also offers gift certificates, which "make excellent gifts for you to send to friends and relatives."[81]

Firepower's Everett Moore also runs a mail-order publications house. Moore's Desert Publications offers many of the same publications as his competitors under headings that include: weapons and firearms, specialized warfare, police science, survival, self-defense, full-auto, suppressors, and improvised munitions.[82] Moore, who sells between 2,000 and 5,000 copies of specific titles a year, refers to the publications as "big boy toys," adding, "I haven't known a man yet who didn't like [to know how] to pick a lock."[83]

The catalog of Phoenix Systems, Inc., located in Evergreen, Colorado, offers its buyers "The Right Stuff," which includes:

- U.S. Military Practice Grenades "with ALL the mechanical parts IN THE FUSE ASSEMBLY!!! -- NO EXPLOSIVES." The ad warns that "ACTIVATION OF THESE DEVICES REQUIRES PRIOR BATF APPROVAL. $19.95 each."[84]

- Booby Trap Firing Device (M-1), "Standard U.S. Military PRESSURE RELEASE firing device used to initiate detonation of explosive charges in BOOBY TRAP applications or remote firing of Claymore mines. EXCELLENT training device because it is RELOADABLE with new primer caps (when not coupled DIRECTLY TO AN EXPLOSIVE CHARGE). Hundreds of applications -- can be screwed directly into an explosive charge for instantaneous detonation or coupled to detonator cord for remote firing. $14.95 each."[85]

- The Ballistic Knife--The Knife That Shoots. "CONGRESS OUTLAWED THE SPRINGS--BUT YOU CAN STILL BUY THE KNIFE!" The knife "can be fired up to an effective range of 30 feet. The typical penetration of this knife is about three times that of a manual stab. Extra blades and flight stabilizer available. $79.95 each." Under the heading "ATTENTION COLLECTORS AND SPORTSMEN," the ad notes, "Due to recent Federal regulation, the Ballistic Knife may no longer be sold with the projection spring. The Ballistic Knife, IN LEGAL KIT FORM, that we are now able to sell, is identical to the original knife without the spring included." The ad adds, "WE SELL NO SPRINGS."[86]

- "FULL AUTOMATIC FIRE FOR YOUR AR-15. The drop-in auto sear is the KEY component in converting an AR-15 to M-16 selective fire capability (semi or full automatic) and is the ONLY part for this conversion that is now required to be registered if CURRENTLY manufactured. OUR auto sears were manufactured prior to 11/1/81 when it was NOT required to have a serial number stamped on this part. COMPLETELY LEGAL TO PURCHASE." With the purchase of "five other commonly available M-16 replacement parts," the conversion can be made "in SECONDS without tools." The ad urges readers to "Act now while it is still legal to purchase these auto sears. When existing supplies are exhausted, THERE WILL BE NO MORE!! $175.00 each."[87]

The recommended reading list of the catalog includes books on silencers; on UZI, MAC-10, and AR-15 conversions; and on home munitions. Other products available through ads placed in these magazines include:

- The BMF Activator, a hand crank that can be attached to a rifle, boasts the "newest crank-operated rapid fire capability since the gatling gun!! Legally fire up to 1200 rounds per minute on your semi-automatic .22 rifle. Imagine the sensation of firing a truly rapid fire rifle. Since each turn of the crank handle fires the rifle four times, it is capable of pulling the trigger many times faster than you can." The advertising flyer for the activator includes a copy of a letter from ATF stating that "a manually operated device of this type is not subject to any of the provisions of the Gun Control Act of 1968."[88]

- The Tri Burst Trigger Activator, distributed by Orpheus Industries, offers "legal firepower." It "allows a 3-round burst from your AR-15...mounts in seconds" and fits "all makes" of AR-15 rifles. It sells for a "special introductory price" of only $34.95.[89]

- "The Ultimate" trigger activator derides its competitors as "the rapid fire plastic gizmo and the sheet metal device." With models available for the AR-15, Mini-14 and 30, M-1 Carbine, and AK models, The Ultimate allows the user to "fire individual rounds, 3 shot bursts or 50 round bursts at your instant discretion." The ad notes that "all federal laws (if any) will apply. The ATF has ruled this device is not regulated by federal law." It retails for $129.95.[90]

- The API Predator Laser Target Designator is equipped with "helium neon lasers" that "project an intense, narrow beam of red light" with "an effective range" of up to 500 meters. Laser sights give their users point-and-shoot assassination capability. "Generally, the only visible element of the laser beam is a spot on a solid object that reflects light back to the operator. The beam itself is invisible in clear air." Priced at $495, the API laser sight is only one of many laser sights on the market, with some costing hundreds of dollars less.[91]

- An ad for Kephart Publications offers plans for such exotic weapons as: hand, rifle, and shotgun grenades; L.A.W., RPG-7, Bazooka, Pod, Pocket, Shotgun, and T.O.W. rockets; claymore and land mines; flame throwers; and others. The ad guarantees "these plans are legal to own and make according to

BATF provisions" and promises that the "basic information is complete and all WILL work. All devices are simple to make and very inexpensive. Only common material and hand tools required. NO MACHINE SHOP WORK." The ad offers any 10 plans for $55.00.[92]

- The "Deadly Weapons--Firearms & Firepower" video tape advertisement features an assassination kit of a silenced MAC-10 in a briefcase. The ad asks, "Do you know which bullets will penetrate a car door? A windshield? Just how quiet is a real silencer? How effective is full auto fire?" Purchasers of the tape can "SEE & Learn the Answers to these questions and much more!" The tape sells for $49.95.[93]

- The "Ninety Rounder" is a circular "assault magazine" that can hold 90 rounds of ammunition "for people who want real firepower!" Offered by the MWG Company it promises "LMG [light machine gun] Type Firepower From a Semi Auto Rifle." It retails for 49.95.[94]

- For the leisure hours, "Rock N' Roll #3--Sexy Girls and Sexy Guns, The Video" offers "14 outrageous, southern California beauties...firing some of the sexiest machine guns ever produced. And you're probably wondering about the girls. What can I tell you? They're hot. 14 different girls in string bikinis and high heels blasting UZIs, MAC-10s, M-16s, MP-5s, AK-47s, M-14s and more. It's something you just have to see."[95]

PARAMILITARY TRAINING CAMPS AND COMBAT SCHOOLS

Those interested in assault weapons and combat techniques do not need to rely solely on book knowledge. Around the United States, training centers--from the paramilitary training camps of right-wing extremists to commercial combat schools--offer training in the use of weapons, explosives, and combat skills.

According to testimony offered before the Subcommittee on Security and Terrorism in September 1985, paramilitary/mercenary training camps can be broken down into three categories:

- Franchises or commercial establishments that offer training to law enforcement or security firms worldwide;

- Paramilitary and survivalist organizations that offer training in the use of small arms, map reading, and survival under extreme circumstances (those operated by the Covanent, Sword and Arm of the Lord, for example). According to the Anti-Defamation League of

B'nai B'rith, many of these camps also include an indoctrination of race hatred.

- Mercenary training camps, the goal of which is to offer the knowledge and skills necessary to be a soldier-for-hire.[96]

In 1984, paramilitary training camps garnered media attention when the FBI revealed that several Sikh students had attended a two-week session at the Merc School in Dolomite, Alabama, with the intention of using their new-found knowledge to assassinate Indian Prime Minister Rajiv Ghandi.[97]

At the time, the Merc School's owner, Frank Camper, stated that he operated strictly within the law and was merely training people to survive in combat situations.[98] Said Camper, "If someone were to train with me and to go away and perform an act of terrorism, then I'm not responsible for that person's actions. They are responsible for themselves."[99] (Camper, however, apparently did inform on the Sikh students to the FBI, helping lead to their arrest.)

Critics of the camps argue that those run by survivalist and paramilitary organizations are turning out terrorists. The ADL states in the fall issue of its <u>1986 Law Report</u>, "ADL Paramilitary Training Statute: A Response to Extremism," that in many camps, "'combat' training is interspersed with the indoctrination of hatred and totalitarianism in preparation for anticipated civil strife, the rationale being the vision of a 'coming race war.'"[100]

In 1980 such camps were uncovered in Alabama, California, Connecticut, Illinois, North Carolina, and Texas.[101] Daniel M. Hartnett, ATF Acting Deputy Associate Director, Law Enforcement, stated at the 1985 hearings that camps run by extremists have shown "a willingness to commit violent crimes to further their cause and support their movement."[102]

A 1985 raid conducted by law enforcement officials at a compound run by the Posse Comitatus outside of Rulo, Nebraska, yielded a cache of weapons that included assault rifles and 13 fully automatic pistols and rifles, including modified AR-15s.[103]

In 1986, the ADL formulated model state legislation that would ban paramilitary training "aimed at provoking civil disorder."[104] In drafting the model bill, the ADL specifically stated that the statute must not violate First Amendment freedoms of speech and association. Another objective was to draft the statute narrowly so that it would not prohibit legitimate lawful activities such as target shooting and other sporting events. This was important, the ADL stated, for "minimizing opposition to the bill by powerful special interest groups."[105] Laws based on the statute have passed in Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Michigan,

Missouri, Nebraska, New Jersey, North Carolina, Oregon, Pennsylvania, Rhode Island, Virginia, and West Virginia.[106]

In a statement opposing legislation restricting paramilitary training camps, America's leading pro-gun organization, the National Rifle Association (NRA), based in Washington, D.C., states that such "legislation is objectionable because it makes the mere possession of firearms a crime, therefore undermining the right to keep and bear arms" and that "the constitutionality of such legislation is questionable at best, and could not, in all probability, withstand a court challenge based on violation of First Amendment rights."[107]

The controversy has faded since the 1985 hearings, although camps and schools continue to operate. The FBI currently has no figures on the numbers of camps and schools operating in the United States. One such school, Brigade Security Forces, located in Mooreville, North Carolina, offers six-day courses in "commando tactics." It offers "absolutely the best firearms training available with numerous NATO and COMMUNIST firearms." One can also enroll in a special 30-day course "designed for the adventurer that demands it all in one course." Counter terrorist, sniper, and covert operations are some of the areas covered. Brigade also offers private instruction for "Individuals or Groups who desire Total Secrecy and Special Training. NO COMMUNISTS, GAYS, ATHIESTS [sic]!!!" are allowed, and one must be at least 16 years old to attend.[108]

**THE ASSAULT WEAPONS DEBATE**

Not surprisingly, the increasing number and subsequent misuse of assault weapons has resulted in a growing debate over their place in American society. The battle lines mirror those drawn over other such "gun control" issues as waiting periods for handgun purchases, bans on armor-piercing bullets, and restrictions on the sale of "plastic" firearms. On one side of the debate is America's gun lobby. The other side consists of handgun restriction advocates and various police organizations.

America's gun lobby--composed of pro-gun organizations, manufacturers, and various publications--staunchly opposes any restrictions on the sale or availability of assault weapons. The leading voice of dissent belongs to the NRA. With 2.7 million members and a budget of more than $71 million, the NRA is America's largest and most powerful pro-gun organization.[109] In 1987 the organization published a pamphlet entitled Semi-Auto Firearms--The Citizen's Choice. A year later the organization published Semi-Auto Rifles: Data and Comment, a collection of articles on semi-automatics that had appeared in the NRA's magazine, The American Rifleman.

In both the pamphlet and the book, the NRA presents the controversy over assault weapons as a broader attack on all semi-

automatic firearms, including hunting rifles with semi-automatic mechanisms. By framing the debate as one concerning all semi-autos, as opposed to a specific category of semi-auto, the NRA is able to present efforts to restrict assault weapons as a threat to hunters. The NRA recognizes the fact that it is far easier to mobilize its membership and non-NRA outdoorsmen with images of banning their trusted hunting rifles as opposed to UZIs or TEC-9s.

The cover of Semi-Auto Firearms--The Citizen's Choice features a duck hunter, duck call in mouth, silhouetted against a bright orange sunrise. In his hand he appears to hold a shotgun. On the first page of the pamphlet, the NRA offers its view of the debate: "The national media and organized 'gun control' groups have advanced from demanding prohibitions on certain handguns and ammunition, to calls for banning semi-automatic firearms. The pattern is obvious, and the strategy has long been clear--isolate certain types of firearms, label them as inherently 'evil' or 'crime prone,' and then try to segregate and drive a wedge between firearms owners...[110] Fully automatic and high-tech firearms often seen on television programs, and in popular yet violent movies, perpetuate the myth that 'semi-autos' are frequently used for criminal purposes...[111] Even to experts, admittedly, semi-automatic target or sporting rifles such as the AR15 and M1A look like the full-automatic military M16s and M14s. Why not? A civilian jeep looks like a military jeep, a civilian tent looks like a military tent and a civilian shooter at the national Matches at Camp Perry looks very much like his military counterpart."[112]

(The NRA's stand on assault weapons is not surprising considering the fact that it has labeled repeal of the 1986 federal ban on the future production of machine guns for civilian use a "high priority."[113] In outlining its position on machine guns, the organization states, "Sporting events involving automatic firearms are similar to those events such as silhouette shooting and other target-related endeavors and deserve the same respect and support."[114] The NRA promises that it "will take all necessary steps to educate the public on the sporting uses of automatic firearms"[115] and explains that "The Second Amendment is not limited by its language to the type of arms that the people have the right to own."[116] The organization supports "the right of any law abiding individuals to own any firearms, including automatic firearms."[117]) (Although the NRA was asked to answer questions regarding its stand on assault firearms, the appropriateness of Soldier of Fortune publisher Robert K. Brown being on its board of directors, paramilitary accessories, and paramilitary training camps, a spokesman, after reviewing the questions, stated that the NRA was "declining to provide information for this report.")

While the NRA struggles to turn the assault weapons debate into a semi-auto debate for public relations purposes, legislators and members of the press have been making it into one

inadvertently. Neither of America's national handgun restriction organizations has come out in favor of restricting or banning all semi-autos, and have only recently begun dealing with long guns (there is no national organization calling for restrictions on all guns). Yet in discussions of assault firearms, those urging restrictions on these weapons have used the terms assault, paramilitary, and semi-automatic weapon interchangeably. This misusage apparently stems from an unfamiliarity with weapons terminology and a lack of understanding of the wide range of weapons covered by the term semi-automatic. As the result of this lack of knowledge, and the difficulties in defining assault weapons in legal terms, laws have been proposed on the state level that would place waiting periods on all semi-auto weapons. In August 1988, The New York Times ran two editorials in favor of such a law on the federal level, as well as urging a ban on the sale of assault weapons.[118]

According to John Hosford, executive director of the Citizens Committee for the Right to Keep and Bear Arms (CCRKBA), a 500,000 member pro-gun organization located in Bellevue, Washington, the issue of paramilitary weapons will be addressed at the organization's board meeting in September 1988. Says Hosford, "It would be safe to say that we will take an aggressive position in support of these." Founded in 1971, the CCRKBA favors a repeal of the Gun Control Act of 1968 and has lobbied against gun control ordinances on the local, state, and federal level.[119]

The 100,000 plus-member Gun Owners of America (GOA), located in Springfield, Virginia, views the assault weapons debate as part of a long-range plan by handgun restriction advocates to disarm America. Says GOA Director of Government Affairs Craig Markva, "The goal was to target the machine guns first, then the semi-autos, and right along with the handguns. The whole premise [of handgun restriction organizations] has been based upon the fact that the Second Amendment is a hunting right." But Markva argues, "the whole idea of the Second Amendment is self-defense. The goal of the anti-gunner is to isolate different categories of firearms for control or banning, and them move on. The slippery slope is alive and well and continues rolling on."

America's handgun restriction movement has been cautious in its response to the assault weapons debate. Their reticence is understandable. By moving against a category of firearm that is not only a long gun, but difficult to define, they run the risk of appearing to prove the gun lobby right: that is, that handgun restrictions are merely the first step down the aforementioned slippery slope.

In the past, the "gun control" debate was easily defined. "Good" guns were long guns that were used for hunting and sporting purposes, while "bad" guns were easily concealable handguns that had limited sporting use and were prone to misuse.

Previously, the standard for restricting weapons involved concealability and a cost/benefit analysis: Is the harm done by a given category of firearm outweighed by any possible benefit? Yet, although assault weapons are frequently misused and many are more concealable than standard long guns, a new standard is emerging: For what purpose was this weapon designed?  The first application of this standard came in 1986, when Congress voted to outlaw the future production of machine guns for civilian use. The number of criminal incidents involving legally owned machine guns prior to the ban had been few.  Yet, Congress saw no reason for this category of weapon to remain in civilian hands.

Handgun Control Inc. (HCI), based in Washington, D.C., is America's leading handgun restriction organization.  The organization has more than 180,000 dues-paying members and an annual budget of more than $4 million.  Its vice-chair is Sarah Brady, wife of White House press secretary James Brady, who was injured in the March 1981 assassination attempt on President Reagan.  In its organization brochure, HCI calls for the "restriction on the sale of UZI-type assault weapons, the weapons of war like that used in the 1983 McDonald's massacre in California."  The organization adopted this stand in 1983. Recently, HCI has run newspaper ads calling for unspecified restrictions on assault weapons, labeling them "drug guns."  In addition, HCI came out in favor of banning the Striker-12 from import.  In addition to its stand on "UZI-type assault weapons," the organization favors a waiting period with background check for all handgun purchases, a ban on the sale of snub-nosed handguns, and a ban on the production and sale of plastic handguns.[120]

The National Coalition to Ban Handguns (NCBH), based in Washington, D.C., is a coalition of 31 national religious, professional, educational, and public health organizations that favors banning the sale and private possession of handguns in America.  Exceptions to this would include possession by police, military personnel on active duty, target shooters who keep and use their handguns at bona fide shooting clubs, and federally licensed collectors.  NCBH has approximately 20,000 members and an annual budget of $400,000.  Prior to 1985, the organization dealt only with handguns.  But in May of that year, its board voted to work to ban the sale and private possession of machine guns.  Currently, its board is considering whether to endorse banning the sale and private possession of assault weapons.  It is scheduled to reach a decision at its November 1988 meeting.[121]

The Law Enforcement Steering Committee is the leading voice of law enforcement on the gun control issue.  The Committee consists of:  the Federal Law Enforcement Officers Association; the International Association of Chiefs of Police; the Fraternal Order of Police; the International Brotherhood of Police Officers; the National Association of Police Organizations; the Police Executive Research Forum; the Police Management

Association; the Police Foundation; the Major Cities Chief Administrators; the National Organization of Black Law Enforcement Executives; and the National Troopers Coalition.[122] As of September 1988, none of the members of the Committee have adopted an official stand on assault weapons, although the topic is scheduled to be discussed in the future.[123]

On the federal level, no bills dealing with assault weapons have yet been introduced in Congress. It is expected that such a bill will be introduced sometime during 1989.

On the state level, the first proposed law restricting the availability of assault weapons was introduced by California State Representative Art Agnos (Dem., San Francisco) in 1985. (Agnos was elected mayor of San Francisco in 1987.) The law, which would have banned the sale and possession of specific assault weapons--such as the UZI, MAC, and AR-15--failed to pass. In 1988, Assemblyman Michael Roos (Dem., Los Angeles) introduced a measure that also would have banned specific assault weapons. The bill was later amended to require instead a 15-day waiting period with background check for all semi-automatic weapons. The amended version of the bill failed to pass. Roos expects to file a bill next year that would place a waiting period on specific assault weapons.[124]

In addition, product liability lawsuits have been filed against manufacturers of assault weapons. Such suits are based on the legal theory that the manufacturers of these weapons know that their products are inherently dangerous and prone to criminal misuse. Therefore, they should be held responsible for the resulting death and injury. One of the first product liability suits dealing with an assault weapon was filed on April 22, 1987, against Intratec USA, manufacturers of the TEC-9. The suit was filed by the estate of David L. Bengston of Connecticut. Bengston, a high school janitor, was fatally shot by an eighth grader on December 10, 1985, with a TEC-9 that belonged to the student's father. The student later held a classroom of children hostage until his father came and convinced him to turn over the weapon. In their complaint, attorneys for Bengston argued that the TEC-9 is in fact a super Saturday Night Special. The case is currently awaiting trial.[125]

The first victory for proponents of the legal theory that some handguns are inherently defective because of specific design characteristics occurred on October 3, 1985, when the Maryland Court of Appeals ruled in Kelley v. R. G. Industries that manufacturers of Saturday Night Specials could be held liable for their criminal misuse. The case stemmed from a March 1981 robbery in which the plaintiff, Olen J. Kelley, was shot in the chest with a Rohm handgun.[126] (As part of the law outlawing the sale of Saturday Night Specials passed in Maryland in 1988, the Maryland legislature--as part of a compromise with the gun lobby--added a component that would in effect nullify the Kelley decision.)

The signs are increasing of a growing awareness that America has an assault weapons "problem." At the end of its July 1988 documentary on handgun violence in America, "Guns, Guns, Guns," NBC reporter Connie Chung notes the increasing misuse of assault weapons like the UZI.[127] In his speech at the Democratic National Convention, Democratic presidential candidate Jesse Jackson, states of drug dealers, "They say, 'We don't have Saturday Night Specials any more.' They say, 'We buy AK-47s and UZIs, the latest lethal weapons. We buy them across the counter on Long Beach Boulevard.' You cannot fight a war on drugs unless and until you are going to challenge the bankers and the gun sellers...."[128]

## CONCLUSION

Assault weapons are increasingly being perceived by legislators, police organizations, handgun restriction advocates, and the press as a public health threat. As these weapons come to be associated with drug traffickers, paramilitary extremists, and survivalists, their television and movie glamour is losing its lustre to a violent reality.

Because of this fact, assault weapons are quickly becoming the leading topic of America's gun control debate and will most likely remain the leading gun control issue for the near future. Such a shift will not only damage America's gun lobby, but strengthen the handgun restriction lobby for the following reasons:

o <u>It will be a new topic in what has become to the press and public an "old" debate</u>.

Although handguns claim more than 20,000 lives year, the issue of handgun restriction consistently remains a non-issue with the vast majority of legislators, the press, and public. The reasons for this vary: the power of the gun lobby; the tendency of both sides of the issue to resort to sloganeering and pre-packaged arguments when discussing the issue; the fact that until an individual is affected by handgun violence he or she is unlikely to work for handgun restrictions; the view that handgun violence is an "unsolvable" problem; the inability of the handgun restriction movement to organize itself into an effective electoral threat; and the fact that until someone famous is shot, or something truly horrible happens, handgun restriction is simply not viewed as a priority. Assault weapons--just like armor-piercing bullets, machine guns, and plastic firearms--are a <u>new</u> topic. The weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons--anything that looks like a machine gun is assumed to be a machine gun--can only increase the chance of public support for restrictions on these weapons. In

addition, few people can envision a practical use for these weapons.

o Efforts to stop restrictions on assault weapons will only further alienate the police from the gun lobby.

Until recently, police organizations viewed the gun lobby in general, and the NRA in particular, as a reliable friend. This stemmed in part from the role the NRA played in training officers and its reputation regarding gun safety and hunter training. Yet, throughout the 1980s, the NRA has found itself increasingly on the opposite side of police on the gun control issue. Its opposition to legislation banning armor-piercing ammunition, plastic handguns, and machine guns, and its drafting of and support for the McClure/Volkmer handgun decontrol bill, burned many of the bridges the NRA had built throughout the past hundred years. As the result of this, the Law Enforcement Steering Committee was formed. The Committee now favors such restriction measures as waiting periods with background check for handgun purchases, and a ban on machine guns and plastic firearms. If police continue to call for assault weapons restrictions, and the NRA continues to fight such measures, the result can only be a further tarnishing of the NRA's image in the eyes of the public, the police, and NRA members. The organization will no longer be viewed as the defender of the sportsman, but as the defender of the drug dealer.

o Efforts to restrict assault weapons are more likely to succeed than those to restrict handguns.

Although the majority of Americans favor stricter handgun controls, and a consistent 40 percent of Americans favor banning the private sale and possession of handguns,[129] many Americans do believe that handguns are effective weapons for home self-defense and the majority of Americans mistakenly believe that the Second Amendment of the Constitution guarantees the individual right to keep and bear arms.[130] Yet, many who support the individual's right to own a handgun have second thoughts when the issue comes down to assault weapons. Assault weapons are often viewed the same way as machine guns and "plastic" firearms--a weapon that poses such a grave risk that it's worth compromising a perceived constitutional right.

Although the opportunity to restrict assault weapons exists, a question remains for the handgun restriction movement: How? Defining an assault weapon--in legal terms--is not easy. It's not merely a matter of going after guns that are "black and wicked looking." Although those involved in the debate know the weapons being discussed, it's extremely difficult to develop a

legal definition that restricts the availability of assault weapons without affecting legitimate semi-automatic guns.  Most likely, any definition would focus on magazine capacity, weapon configuration, muzzle velocity, the initial purpose for which the weapon (or its full-auto progenitor) was developed, convertibility, and possible sporting applications.  Any law based on this definition would, however, need to have a clause to excuse legitimate semi-automatic weapons that would inadvertently fall under it.  And although legislation could be passed that would ban specific weapons, the world's arms manufacturers are expert at producing weapons that follow the letter, but not the intent, of the law.  This often results in products that are virtually identical to the restricted weapon, yet different enough to remain on the market.

Yet, the framework for restricting assault weapons already exists.  On the federal level, ATF currently excludes from import handguns recognized as Saturday Night Specials.  This is done by application of criteria designed by the agency that takes into account such things as barrel length, caliber, quality of materials, safety devices, and other factors.  Any gun that does not meet the importation threshold cannot be sold in the United States.  Any manufacturer whose product is refused for import can challenge the decision in federal court.  Criteria to identify and categorize assault weapons could be developed by ATF and applied toward restricting the availability of both foreign- and domestically-produced assault weapons.

The state of Maryland has taken a similar approach in banning the sale of Saturday Night Specials.  The 1988 Maryland law established a nine-member board responsible for creating a roster of permitted handguns.  The nine members of the board include:  the superintendent of the state police; representatives of the Maryland States' Attorney's Association, Maryland Association of Chiefs of Police, Marylanders Against Handgun Abuse, the National Rifle Association, and a Maryland gun manufacturer; and three citizen board members to be determined by the governor.  After January 1, 1990, the law requires that no person in Maryland may:  manufacture a handgun not on the Handgun Roster, or sell or offer to sell any handgun not on the Handgun Roster that was manufactured after January 1, 1985.  In determining whether a handgun has a legitimate use and can therefore be placed on the roster, the board will consider: concealability; ballistic accuracy; weight; quality of materials; quality of manufacture; and reliability as to safety, caliber, and detectability by standard security devices used at airports and courthouses.[131]  States could develop similar rosters to ban the sale of assault weapons.

Since passage of the Maryland law, the NRA has collected enough signatures of Maryland residents to bring the measure to referendum on the November 1988 ballot.  The NRA's opposition to such a panel is not surprising.  The organization fears giving the government, at any level, the power to restrict the

availability of firearms--conjuring up images of a "gun czar."
And although such proposals would solve the definitional problems
posed by assault weapons, it would guarantee fierce opposition
from the gun lobby.

The success of any proposed legislation to restrict
assault weapons and their accessories depends not only on
whether the American public pays attention to the topic, but
agrees that these products are dangerous.  Obviously, some
aspects of America's fascination with assault weapons and their
accessories are here to stay.  Publications are clearly protected
under the First Amendment of the Constitution.  Yet the weapons
themselves, and accessories such as laser sights and grenades
requiring only the explosive charge, can be restricted and even
banned at the local, state, or federal level.  The fact that
assault weapons are increasingly being equated with America's
drug trade may play a major role in motivating the public to call
for their restriction.  Yet, recognizing the country's
fascination for exotic weaponry and the popular images and myths
associated with guns, it may require a crisis of a far greater
proportion before any action is taken.

**APPENDIX I**

According to law enforcement officials, federal agencies, and handgun control organizations, the assault weapons of choice appear to be the following (all models are semi-automatic versions):

AK-47--The Kalashnikov rifle, also known generally as the AK-47, was developed in the Soviet Union in 1947 by Mikhail T. Kalashnikov. Semi-automatic versions of a Chinese model--the Model 56--are currently imported into the United States, as are models developed by other countries. The Chinese AK-47 produced by POLY Technologies and distributed in the United States by PTK International, Inc., is 34 3/8 inches long. With a folding stock, the weapon has an overall length of 34 5/8 with the stock extended, and approximately 30 inches folded. The weapon can accept 20-, 30-, 40-, and 75-round magazines.[132] Semi-automatic versions of the AK-47 retail for as little as $300.[133]

AR-15A2--The AR-15A2, commonly known as the AR-15, is manufactured by Colt Industries of Hartford, Connecticut. It is the civilian version of the company's M-16 machine gun. The AR-15A2 rifle has an overall length of 39 inches. The Government Model Carbine comes with a folding stock. Its overall length with the stock folded is 35 inches, 32 closed. In 1987 the company introduced the Delta HBAR, a sniper rifle version of the rifle. The weapon comes with a 5-round magazine, but can accept a variety of high-capacity magazines.[134] The AR-15A2 retails for approximately $680.

MAC-10, MAC-11--The MAC-10 machine pistol was originally developed by Gordon Ingram at Military Armaments Corporation (MAC) in 1969. Soon thereafter, the MAC-11 was marketed and subsequently semi-auto versions of both were developed. MAC went bankrupt in 1978. Currently, the rights for the MAC-10 are owned by a Stephensville, Texas, company which took the Military Armaments Corporation name. Manufacturing rights for the MAC-11 now belong to various corporate entities operated by Sylvia and Wayne Daniels of Georgia.[135] An ad placed in Shotgun News for the semi-auto 9mm M11/9 produced by the Daniels, describes it as "The Gun That Made the '80's' Roar" and characterizes it as being as "American as God, Mom, and Apple Pie!"[136] The 9mm MAC-11 is 12.15 inches long. It comes with a 32-round magazine. The 9mm MAC-10 has a length of 10.5 inches with its stock folded and comes with a 32-round magazine. Both have threaded barrels for the attachment of silencers and barrel extensions.[137] The MAC-11 can retail for as little as $200.

RUGER MINI-14--The Ruger Mini 14 is manufactured by Sturm, Ruger & Company, Inc. of Southport, Connecticut, and was introduced into the civilian market in 1975. With a folding stock, the weapon has an overall length of 37.75 inches, 27.5 with the stock closed. The gun comes with a standard 5-round magazine, but magazines have been developed for it that can hold up to 40 rounds.[138] The Mini-14 retails for approximately $330.

TEC-9--The 9mm TEC-9 assault pistol was originally developed by Interdynamics AB of Sweden and produced in the U.S. by F.I.E. of Florida. The original version, the KG-9, was easily converted to full auto and was subsequently reclassified as a machine gun by ATF in 1982. Soon after, the weapon was redesigned to sell as a semi-auto and reclassified the KG-99. Subsequently, a Hong Kong company bought the rights to the weapon from Interdynamics AB and a new company, Intratec USA, was formed in the United States to manufacture the weapon, now dubbed the TEC-9. In November of 1987, Intratec USA reorganized to become Intratec. Twelve and a half inches long, the lightweight TEC-9 comes with a 36-round magazine. The TEC-9M, a smaller version of the weapon, is 10.5 inches long. Both have threaded barrels so that they can accept silencers and barrel extensions. High-impact plastic is used for the gun's receiver, magazine well, and pistol grip.[139] Promotional material for the guns describe them as being "high-spirited" and "weapons that are as tough as your toughest customers."[140] The TEC-9 retails for approximately $250.

UZI--Manufactured by Israeli Military Industries, the 9mm UZI was designed in the early 1950s by Army Major Uziel Gal. In 1979, a semi-automatic version was first imported to the United States for civilian sale by Action Arms of Philadelphia. The UZI semi-auto carbine has an overall length of 24.4 inches with its stock folded, 31.5 with the stock open, and comes with a standard 25-round magazine. In 1984, the company introduced the UZI pistol, which has an overall length of 9.45 inches. In 1987, Israeli Military Industries introduced the Mini-UZI carbine, which with its stock folded has an overall length of 26.1 inches, 35.75 with the stock unfolded.[141] A 1988 Action Arms ad for the UZI exclaims, "When the going gets tough...the tough get an UZI. Whether for a backwoods camp, RV or family home, don't trust anything less. The UZI Carbine is the perfect choice for the sportsman who wants unfailing reliability and top performance in a rugged, compact size." With a kit that will allow the weapon to use .22 ammunition, the gun becomes "an inexpensive plinker."[142] The UZI carbine retails for approximately $700, the pistol for $510.

**APPENDIX II**

Paramilitary weapons are just the latest topic in the ongoing debate over the role of specific categories of firearms in American society. Unfortunately, there is often confusion among the press and public--and even among handgun restriction advocates--regarding the various types of firearms. In an article published in the April 1987, American Rifleman, National Rifle Association staff member Paul Blackman writes, "When a reporter calls a semi-automatic rifle, pistol or shotgun a "submachine gun"...He may just not know any better." Blackman's right. He points out that The Associated Press Stylebook and Libel Manual incorrectly defines a "submachinegun" as "A lightweight automatic or semiautomatic gun firing small arms ammunition."[143]

Recognizing this, descriptions of the various categories of firearms are as follows:

Firearms refer to weapons that use a powder charge to fire a projectile. (Airguns such as BB and pellet guns use a burst of air to fire their projectiles and hence are not considered firearms, although they are capable of inflicting severe or fatal injuries.)

Firearms have been broken down into essentially two groups: long guns and handguns. Long guns are weapons designed to be fired from the shoulder. According to ATF standards, to qualify as a rifle, the shoulder-fired weapon must have a barrel length of 16 inches, 18 inches for a shotgun.[144] Handguns are firearms designed to be fired from a single hand and are usually defined as having an overall length of less than 18 inches.[145] Repeating firearms are those that allow the shooter, by operating a mechanism on the gun, to load another round into the gun after a shot has been fired. Manually operating the bolt, lever, pump, or other mechanism extracts and ejects the empty case after the cartridge has been fired. It then reloads a fresh shell or cartridge from the magazine into the chamber and cocks the gun. Semi-automatic guns do this automatically when they fire. With each squeeze of the trigger the semi-automatic repeats the process of firing, ejecting, and reloading.[146] Although a semi-automatic will fire only one cartridge per trigger pull, an automatic will continue to fire cartridges as long as the trigger is pulled. An automatic is also known as a machine gun. More than 119 million rifles and shotguns have been produced in the U.S. since 1899.[147] It is estimated that the majority of these weapons remain in circulation.

Handguns can be either revolvers or semi-automatic pistols. Revolvers have a round cylinder that is actually the magazine and acts as a chamber when properly aligned with the barrel. In double-action revolvers, each time the trigger is pulled the weapon fires and the cylinder advances to the next chamber. Single-action revolvers require that the hammer be

manually cocked before each shot.  A revolver's cylinder usually holds six cartridges.  Instead of a revolving cylinder, a semi-automatic handgun (also known as a pistol) carries its extra cartridges in a magazine usually located in the handle of the handgun.  Spring pressure forces the cartridges upward in the magazine.  Each time the weapon is fired, a new cartridge is moved up and is loaded into the chamber.  Pistol magazines usually hold between 14 and 17 cartridges.[148]  Pistols are often known as "automatics" although they do require a separate trigger pull for each shot.  Pistols that are fully-automatic, that is, that will continue to fire as long as the trigger is pulled, are known as machine pistols.

Handguns with barrel lengths of three inches or less are known as "snubbies."  Snubbies are preferred by criminals because of their increased concealability.  A subcategory of snubbies are Saturday Night Specials--inexpensive, inaccurate snubbies made of inferior materials.  Because of their low quality and inaccuracy, these weapons have no sporting purpose and are best suited for criminal use.  There are an estimated 35 to 40 million handguns in America.[149]

Assault firearms are semi-automatic (firing one bullet per trigger pull) and fully automatic (the weapon will keep on firing as long as the trigger is depressed) anti-personnel rifles, shotguns, and handguns that are designed primarily for military and law enforcement use.  With muzzle velocities that are often greater than standard long guns, and high-capacity ammunition magazines, assault weapons are built to kill large numbers of human beings quickly and efficiently.  Most assault weapons have no legitimate hunting or sporting use.  Assault rifles and shotguns often have pistol grips and folding stocks, and are typically lighter and more concealable than standard long guns.  Some assault pistols have threaded barrels for the easy attachment of silencers.  Many assault weapons are merely semi-automatic versions of military machine guns, making them easier to convert to fully automatic machine guns.

1. McNamara, Joseph D., "Developing a Rational, National Firearms Policy," The Police Chief, (March 1988), p. 26.

2. It was estimated by the National Coalition to Ban Handguns in 1985 that there were more than 500,000 assault weapons in civilian hands, an unknown number of which had been converted to fully automatic machine guns, a figure which the Bureau of Alcohol, Tobacco and Firearms concurred with. Recent estimates in the press (See footnote #5) have put the figure at between 650,000 and two million. Because of the fact that manufacturers are not required to release sales figures and there is no differentiation between standard long guns and assault weapons in reporting, there are no totally reliable figures on America's assault weapons population.

3. McNamara, p. 26.

4. "Virginia Man Held for Transporting Guns," The Washington Post, (January 30, 1988), p. A7.

5. "The Arms Race in Your Own Back Yard," U.S. News & World Report, (April 4, 1988), p. 24.

6. "Machine Gun U.S.A.," Newsweek, (October 14, 1985), p. 50.

7. "Three Officers Slain Serving Routine Warrant," United Press International, July 10, 1987. Additional information obtained from the Inkster, Michigan, police department, August 1988.

8. "11 Hostages Held at Virginia Shopping Mall," The Washington Post, (September 15, 1988) p. A22.

9. Coates, James, Armed and Dangerous: The Rise of the Survivalist Right, Hill and Wang, New York, (1987), p. 8.

10. Fox, James Alan and Levin, Jack, Mass Murder: America's Growing Menace, Plenum Press, New York and London, (1985), p. 63.

11. Interview with David W. Cooney, attorney for the estate of David Bengsten, August, 1988.

12. "Manassas Mourns 1st Officer Slain in 115 Years," The Washington Post, (July 26, 1988), p. A1, A9.

13. "Florida Gunman Charged With Killing 6," The New York Times, (April 25, 1987), p. A9.

14. "Seized Arsenal Tied to "Crack Dealers," The Washington Post, (March 8, 1988), p. A6. Additional information obtained from ATF New York office, September, 1988.

15. "Arms Race Escalates," The Washington Post, (February 23, 1988), p. B5.

16. Interview with ATF spokesperson Tom Hill, July 1988.

17. Interview with Detective Bohannon, July 1988.

18. Lawn, John C., "Drug Dealers' Sophisticated Weaponry Poses Continuing Threat," The Police Chief, (March 1988), p. 47.

19. "D.C. Police to Boost Drug War Firepower," The Washington Post, (February 10, 1988), p. A1, A12.

20. "Arms Race Escalates," p. B5.

21. Interview with ATF spokesperson Tom Hill, August 1988.

22. American Industries advertisement, Firepower, (September 1988), inside back cover.

23. Information obtained from American Industries, 405 East 19th Street, Bakersfield, California, August 1988.

24. Street Sweeper advertisement, Shotgun News, (January 20, 1988), p. 154, 155.

25. "The Arms Race in Your Own Back Yard," p. 24.

26. Interview with DEA spokesperson Maurice Hill, July 1988.

27. Interview with ATF spokesperson Tom Hill, July 1988.

28. McGuire, Phillip C., "Jamaican Posses: A Call for Cooperation Among Law Enforcement Agencies," The Police Chief, (January 1988), p. 22.

29. Coates, p. 136.

30. Coates, p. 143.

31. "Suspect Denies Having Role in Plot to Kill Jackson," Detroit Free Press, (May 19, 1988), p. 16A.

32. Information obtained from the National Coalition to Ban Handguns.

33. Information obtained from Bureau of Alcohol, Tobacco and Firearms.

34. Information obtained from the Bureau of Alcohol, Tobacco and Firearms.

35. Information obtained from the National Coalition to Ban Handguns.

36. Information obtained from the National Coalition to Ban Handguns.

37. "Militarism in America," The Defense Monitor, Volume XV, Number 3, p. 1.

38. Interview with Daniel Amundson, September 1988.

39. Interview with Daniel Amundson, July 1988.

40. Production figures obtained from the Bureau of Alcohol, Tobacco, and Firearms by the Educational Fund to End Handgun Violence under the Freedom of Information Act.

41. Information obtained from the National Coalition to Ban Handguns.

42. Colt Industries advertising flyer.

43. Heckler & Koch advertising flyer.

44. F.I.E. advertisement, Firepower, (September 1988), inside front cover.

45. Daisy 1986 Airguns, Ammo and Accessories Catalog. Obtained from Daisy Manufacturing Company, Inc., Rogers, Arkansas, 72757-0220.

46. Crosman Airguns 1987 catalog. Obtained from Crosman Airguns, Routes 5 & 20, East Bloomfield, New York, 14443.

47. Larc International advertisement, Shotgun News, (January 20, 1988), p. 114.

48. Command Post, Inc., Firepower, (September 1987), p. 63.

49. Daisy 1988 Toy Gun catalog. Obtained from Daisy Manufacturing Company, Inc., Rogers, Arkansas, 72757-0220.

50. Interview with IACP spokesperson Wendy Howe, July 1987.

51. Interview with Daisy spokesperson David Lewis, August 1988.

52. Interview with Everett Moore, July 1988.

53. American Survival Guide, (August 1988), p. 4.

54. American Survival Guide, p. 66.

55. Interview with American Survival Guide spokesperson, July 1988.

56. Adair, James B., "The Amazing Soft-Drink Silencer," Eagle, (October 1983), p. 14, 15.

57. Special Weapons, (1988 annual), inside front cover.

58. Special Weapons, p. 2.

59. Steele, David, "The Offensive Handgun," Special Weapons, (1988), p. 68.

60. Steele, p. 69.

61. Steele, p. 70.

62. Soldier of Fortune, (August 1988), p. 1.

63. Soldier of Fortune, p. 1.

64. "Soldier of Fortune Magazine is Sued Over Slaying," New York Times, (February 14, 1988), p. 27.

65. "Magazine is Ordered to Pay $9.4 Million," The New York Times, (March 4, 1988), p. A12.

66. New Breed, (July/August 1988), p. 5.

67. Haire, Chad A., "Shot Show 1988," New Breed, (July/August 1988), p. 16.

68. Information obtained from the National Coalition to Ban Handguns.

69. J. Bird Manufacturing advertisement, Shotgun News, (July 20, 1988), p. 78.

70. National Vanguard Books advertisement, Shotgun News, (January 20, 1988), p. 84.

71. Survival Systems book catalog, #701, (1988), p. 2. Obtained from Survival Systems, P.O. Box 30309, Phoenix, Arizona, 85046.

72. Survival Systems, p. 2.

73. Survival Systems, p. 12.

74. Survival Systems, p. 12.

75. Survival Systems, p. 19.

76.  Paladin Press catalog, Vol. 18, No. 1, p. 24.  Obtained from Paladin Press, P.O. Box 1307, Boulder, Colorado, 80306.

77.  Paladin Press, p. 20.

78.  Paladin Press, p. 23.

79.  Paladin Press, p. 26.

80.  Paladin Press, p. 34.

81.  Paladin Press, p. 14.

82.  Desert Publications advertisement, Firepower, (July 1987), p. 99.

83.  Interview with Everett Moore, July 1988.

84.  The Right Stuff, Phoenix Systems Inc., p. 14.  Catalog obtained from Phoenix Systems Inc., P.O. Box 3339, Evergreen, Colorado, 80439.

85.  The Right Stuff, p. 15.

86.  The Right Stuff, p. 18.

87.  The Right Stuff, p. 27.

88.  BMF Activator advertising literature.  Literature received from BMF Activator, P.O. Box 262364, Houston, Texas, 77207.

89.  Orpheus Industries advertising literature.  Literature received from Orpheus Industries, P.O. Box 1415, Montrose, Colorado, 81402.

90.  Firearms Systems and Design, Inc. advertisement, Shotgun News, (June 1, 1988), p. 97.

91.  API Marketing Inc. advertising literature.  Literature received from API Marketing Inc., 1600 Monrovia Avenue., Newport Beach, California, 92663.

92.  Kephart Publications advertisement, Shotgun News, (June 20, 1988), p. 166.

93.  The Anite Co. advertisement, Firepower, (January 1988), p. 91.

94.  MWG Company advertisement, Shotgun News, (June 1, 1988), p. 148.  Pricing information obtained from MWG Company, Miami, Florida, September, 1988.

95. Mail Order Video advertisement, Firepower, (January 1988), p. 3.

96. Gilbert, Wayne R., Deputy Assistant Director, Criminal Investigative Division, Federal Bureau of Investigation, opening statement before the Subcommittee on Security and Terrorism, Committee on the Judiciary, United States Senate, (October 2, 1985). Obtained from the Center for Defense Information, 1500 Massachusetts Ave., NW, Washington, D.C., 20036.

97. Denton, Jeremiah, U.S. Senator, statement before the Subcommittee on Security and Terrorism, Committee on the Judiciary, United States Senate, (October 2, 1985). Obtained from the Center for Defense Information, 1500 Massachusetts Ave., NW, Washington, D.C., 20036.

98. "Combat Schools Sprout in America's Backwoods," U.S. News & World Report, (October 14, 1985), p. 72.

99. "Combat Schools Sprout in America's Backwoods," p. 73.

100. "ADL Paramilitary Training Statute: A Response to Extremism," ADL Law Report, (Fall, 1986), p. 1. Obtained from the Anti-Defamation League of B'nai B'rith, 823 United Nations Plaza, New York, NY, 10017.

101. "ADL Paramilitary Training Statute: A Response to Extremism," p. 1.

102. Hartnett, Daniel M., Acting Deputy Associate Director, Law Enforcement, Bureau of Alcohol, Tobacco and Firearms, statement before Subcommittee on Security and Terrorism, Committee on the Judiciary, United States Senate, (October 2, 1985). Obtained from Center for Defense Information, 1500 Massachusetts Avenue, NW, Washington, DC, 20036.

103. "ADL Paramilitary Training Statute: A Response to Extremism," p. 3.

104. Press Release, Anti-Defamation League of B'nai B'rith, (October 30, 1986).

105. "ADL Paramilitary Training Statute: A Response to Extremism," p. 4.

106. "ADL Paramilitary Training Statute: A Response to Extremism," p. 7-12. Additional information obtained from ADL, July, 1987.

107. "Paramilitary Training Legislation" fact sheet, National Rifle Association, p. 1. Received from the National Rifle Association Institute for Legislative Action, 1600 Rhode Island Avenue, NW, Washington, D.C., 20036.

108. Brigade Security Forces pamphlet. Literature received from Brigade Security Forces, P.O. Box 1237, Mooresville, North Carolina, 28115.

109. Information obtained from the National Coalition to Ban Handguns.

110. Semi-Auto Arms--The Citizen's Choice, National Rifle Association Institute for Legislative Action, (June 1987), p. 1.

111. Semi-Auto Firearms--The Citizen's Choice, p. 11.

112. Semi-Auto Firearms--The Citizen's Choice, p. 17.

113. "NRA to Fight Machine Gun Ban," Monitor, Volume 13, Number 13, (August 15, 1986), p. 1. The Monitor is a publication of the National Rifle Association's Institute for Legislative Action.

114. "NRA to Fight Machine Gun Ban," p. 3.

115. "NRA to Fight Machine Gun Ban," p. 3.

116. "NRA to Fight Machine Gun Ban," p. 3.

117. "NRA to Fight Machine Gun Ban," p. 1.

118. "Drug Thugs and Rambo Guns," The New York Times, (August 1, 1988), p. A14; "War on Drugs, War on Guns," The New York Times, (August 28, 1988), p. 22.

119. Interview with Citizens Committee for the Right to Keep and Bear Arms Executive Director John Hosford, July 1988. Additional information obtained from staff member Jan Grant, September 1988.

120. Handgun Control Inc. organization brochure, obtained from Handgun Control Inc., 1225 I Street, NW, Suite 1100, 20005. Additional information obtained from HCI Communications Director Barbara Lautman.

121. Interview with National Coalition to Ban Handguns President Michael K. Beard, September, 1988.

122. Interviews with Arnetta Porter, Police Foundation, 1001 22nd Street, NW, Suite 200, 20037, August 1988, September 1988.

123. Interview with Martha Plotkin, Police Executive Research Forum, 2300 M Street, NW, Suite 910, Washington, D.C., 20037, August 1988.

124. Interview with Helen Mansfield, office of California Assemblyman Michael Roos, August 1988.

125. Interview with David Cooney, attorney for the estate of David Bengston, August 1988.

126. "Maryland Court Ruling Could Ban Handguns," The Banner, (1985), p. 1. The Banner is the newsletter of the National Coalition to Ban Handguns.

127. "Guns, Guns, Guns," NBC News documentary, July 5, 1988.

128. "Jackson Talks of Hope, Dreams As He Weaves 'Quilt of Unity,'" Congressional Quarterly, (July 23, 1988), p. 2059.

129. "Public Continues to Favor Stringent Curbs on Handguns," The Gallup Poll, (May 11, 1986).

130. Information obtained from the National Coalition to Ban Handguns.

131. "The Maryland Handgun Roster Law," press release, issued by the Office of the Attorney General, Baltimore, Maryland.

132. Long, Duncan, Assault Pistols, Rifles and Submachine Guns, Citadel Press, Secaucus, (1986), p. 89-98. Additional information obtained from PTK International, Inc., 2814 New Spring Road, Suite 340, P.O. Box 724827, Atlanta, Georgia, 30339.

133. All prices quoted are based on information received from Virginia and California gun stores.

134. Information obtained from Colt Industries, P.O. Box 1868, Hartford, CT, 06101.

135. Long, p. 21-24. Additional inform from firearms product liability attorney D. Michael Hancock, September 1988.

136. Cobray advertisement, Shotgun News, (July 1, 1988), p. 143.

137. Long, p. 21-24.

138. Information obtained from Sturm, Ruger & Company, Southport, Connecticut, 06490.

139. Long, p. 41-43. Additional information obtained from Intratec, 11990 S.W. 128 Street, Miami, Florida, 33186.

140.   Intratec advertising brochure.  Obtained from Intratec, 11990 S.W. 128 Street, Miami, Florida, 33186.

141.   Long, p. 48-51.  Additional information obtained from Action Arms, P.O. Box 9573, Philadelphia, Pennsylvania, 19124, August 1988.

142.   Action Arms advertisement, Gun World, (April 1988), p. 35.

143.   Blackman, Paul, "Mugged by the Media," American Rifleman, (April 1987), p. 34.

144.   Information obtained from Bureau of Alcohol, Tobacco and Firearms.

145.   Information obtained from the National Coalition to Ban Handguns.

146.   Hunting Safety and Conservation Program, National Rifle Association, (1973, revised 1976), p. 19.

147.   Information obtained from Bureau of Alcohol, Tobacco and Firearms.

148.   Hunter Safety and Conservation Program, p. 20.

149.   Information obtained from the National Coalition to Ban Handguns.

# EXHIBIT D

## to Expert Report of Professor Louis Klarevas

# BULLET HOSES
## SEMIAUTOMATIC ASSAULT WEAPONS



## What Are They? What's So Bad About Them?



Violence Policy Center

**The Violence Policy Center (VPC)** is a national non-profit educational organization that conducts research and public education on firearms violence and provides information and analysis to policymakers, journalists, advocates, and the general public   The Center examines the role of firearms in America, analyzes trends and patterns in firearms violence, and works to develop policies to reduce gun-related death and injury

This report was authored by VPC Senior Policy Analyst Tom Diaz and edited by VPC Publications Coordinator Aimée Stenzel

This study was funded in part with the support of The David Bohnett Foundation, The California Wellness Foundation, The George Gund Foundation, The Joyce Foundation, The John D  and Catherine T  MacArthur Foundation, and The Streisand Foundation   Past studies released by the VPC include

- *"Officer Down"—Assault Weapons and the War on Law Enforcement* (May 2003)
- *Firearms Production in America 2002 Edition—A Listing of Firearm Manufacturers in America with Production Histories Broken Out by Firearm Type and Caliber* (March 2003)
- *"Just Like Bird Hunting"—The Threat to Civil Aviation from 50 Caliber Sniper Rifles* (January 2003)
- *When Men Murder Women   An Analysis of 2000 Homicide Data* (October 2002)
- *No Deal   The Drop in Federally Licensed Firearms Dealers in America* (September 2002)
- *Sitting Ducks—The Threat to the Chemical and Refinery Industry from 50 Caliber Sniper Rifles* (August 2002)
- *License to Kill IV   More Guns, More Crime* (June 2002)
- *American Roulette   The Untold Story of Murder-Suicide in the United States* (April 2002)
- *The U S  Gun Industry and Others Unknown—Evidence Debunking the Gun Industry's Claim that Osama bin Laden Got His 50 Caliber Sniper Rifles from the U S  Afghan-Aid Program* (February 2002)
- *"A  22 for Christmas"—How the Gun Industry Designs and Markets Firearms for Children and Youth* (December 2001)
- *Kids in the Line of Fire   Children, Handguns, and Homicide* (November 2001)
- *Unintended Consequences   Pro-Handgun Experts Prove That Handguns Are a Dangerous Choice For Self-Defense* (November 2001)
- *Voting from the Rooftops   How the Gun Industry Armed Osama bin Laden, Other Foreign and Domestic Terrorists, and Common Criminals with 50 Caliber Sniper Rifles* (October 2001)
- *Shot Full of Holes   Deconstructing John Ashcroft's Second Amendment* (July 2001)
- *Hispanics and Firearms Violence* (May 2001)
- *Where'd They Get Their Guns?—An Analysis of the Firearms Used in High-Profile Shootings, 1963 to 2001* (April 2001)
- *A Deadly Myth   Women, Handguns, and Self-Defense* (January 2001)
- *Handgun Licensing and Registration   What it Can and Cannot Do* (September 2000)
- *Pocket Rockets   The Gun Industry's Sale of Increased Killing Power* (July 2000)
- *Gunland USA   A State-by-State Ranking of Gun Shows, Gun Retailers, Machine Guns, and Gun Manufacturers* (June 2000)
- *Guns For Felons   How the NRA Works to Rearm Criminals* (March 2000)
- *One Shot, One Kill   Civilian Sales of Military Sniper Rifles* (May 1999)
- *Cease Fire   A Comprehensive Strategy to Reduce Firearms Violence* (Revised, October 1997)

Violence Policy Center
1140 19th Street, NW, Suite 600
Washington, DC  20036
202-822-8200  phone
202-822-8205  fax
www vpc org web

©May 2003
Violence Policy Center

## TEN KEY POINTS ABOUT WHAT ASSAULT WEAPONS ARE AND WHY THEY ARE SO DEADLY

This study documents the following 10 important key points on the pages noted.

1. **Semiautomatic assault weapons (like AK and AR-15 assault rifles and UZI and MAC assault pistols) are civilian versions of military assault weapons.** There are virtually no significant differences between them (Page 1)

2. **Military assault weapons are "machine guns."** That is, they are capable of fully automatic fire. A machine gun will continue to fire as long as the trigger is held down until the ammunition magazine is empty. (Page 1)

3. **Civilian assault weapons are not machine guns.** They are semiautomatic weapons (Since 1986 federal law has banned the sale to civilians of new machine guns.) The trigger of a semiautomatic weapon must be pulled separately for each round fired. It is a mistake to call civilian assault weapons "automatic weapons" or "machine guns." (Page 1)

4. **However, *this is a distinction without a difference in terms of killing power.*** Civilian semiautomatic assault weapons incorporate all of the functional design features that make assault weapons so deadly They are arguably more deadly than military versions, because most experts agree that semiautomatic fire is more accurate—and thus more lethal—than automatic fire. (Pages 1, 5-6, 11-14)

5. **The distinctive "look" of assault weapons is not cosmetic. It is the visual result of specific functional design decisions.** Military assault weapons were designed and developed for a specific military purpose—*laying down a high volume of fire over a wide killing zone*, also known as "hosing down" an area (Pages 2-6)

6. **Civilian assault weapons keep the specific functional design features that make this deadly spray-firing easy.** These functional features also distinguish assault weapons from traditional sporting guns. (Pages 5-10)

7. **The most significant assault weapon functional design features are: (1) ability to accept a high-capacity ammunition magazine, (2) a rear pistol or thumb-hole grip, and, (3) a forward grip or barrel shroud.** Taken together, these are the design features that make possible the deadly and indiscriminate "spray-firing" for which assault weapons are designed. None of them are features of true hunting or sporting guns. (Pages 5-6)

8. **"Spray-firing" from the hip, a widely recognized technique for the use of assault weapons in certain combat situations, has no place in civil society.** Although assault weapon advocates claim that "spray-firing" and shooting from the hip with such weapons is never done, numerous sources (including photographs and diagrams)

show how the functional design features of assault weapons are used specifically for this purpose  (Pages 12-14)

9.  **Unfortunately, most of the design features listed in the 1994 federal ban—such as bayonet mounts, grenade launchers, threaded barrels, and flash suppressors—have nothing to do with why assault weapons are so deadly.** As a result, the gun industry has easily evaded the ban by simply tinkering with these "bells and whistles" while keeping the functional design features listed above. (Page 14)

10.  **Although the gun lobby today argues that there is no such thing as civilian assault weapons, the gun industry, the National Rifle Association, gun magazines, and others in the gun lobby enthusiastically described these civilian versions as "assault rifles," "assault pistols," "assault-type," and "military assault" weapons to boost civilian assault-weapon sales throughout the 1980s.** The industry and its allies only began to use the semantic argument that a "true" assault weapon is a machine gun after civilian assault weapons turned up in inordinate numbers in the hands of drug traffickers, criminal gangs, mass murderers, and other dangerous criminals (Pages 14-16)

## *WHAT IS A SEMIAUTOMATIC ASSAULT WEAPON?*

Semiautomatic assault weapons are civilian versions of automatic military assault rifles (like the AK-47 and the M-16) and automatic military assault pistols (like the UZI).

**Assault Weapons**

**Military AK-47 Assault Rifle**

**Civilian AK-47 Assault Rifle**

These guns look the same because they are virtually identical, save for one feature: military assault rifles (like the rifle on the left above) are machine guns. A machine gun fires continuously as long as its trigger is held back—until it runs out of ammunition. Civilian assault rifles (like the gun on the right) are *semi*-automatic weapons. The trigger of a semiautomatic weapon must be pulled back separately for each round fired

Because federal law has banned the sale of new machine guns to civilians since 1986,[a] and heavily regulates sales to civilians of older model machine guns, there is virtually no civilian market for military assault weapons The gun industry introduced semiautomatic versions of military assault weapons in order to create and exploit new civilian markets for these deadly weapons. The next section explains why civilian semiautomatic assault weapons are no less deadly than military automatic assault weapons. In fact, they are arguably even more deadly.

---

[a] See, 18 U S Code, Section 922(o)

## *WHAT'S SO BAD ABOUT SEMIAUTOMATIC ASSAULT WEAPONS?*

Assault weapons did not "just happen" They were developed to meet specific combat needs All assault weapons—military and civilian alike—incorporate specific features that were designed to provide a specific military combat function. That military function is *laying down a high volume of fire over a wide killing zone*, also known as "hosing down" an area. Civilian assault weapons keep the specific design features that make this deadly spray-firing easy. These features also distinguish assault weapons from traditional sporting firearms

### Assault Weapon Design Follows Specific Combat Function

Assault rifles are used for sustained fire action at relatively close range (under 100 meters being the norm) Here Russian troops engage targets with their AK 47/AKM assault rifles.

Illustration and caption from Chuck Taylor, *The Fighting Rifle A Complete Study of the Rifle in Combat* (Boulder, CO Paladin Press, 1984) 166

The distinctive "look" of assault weapons is not merely "cosmetic," as the gun lobby often argues—the assault weapon's appearance is the result of the design of the gun following its function A brief summary of how assault weapons came into being makes clear the reason for, and the nature of, their distinctive design features

***The problem of trench warfare.*** The roots of military assault weapons lie in the trench fighting of the First World War. The standard infantry weapon of that conflict was the long-range battle rifle. "Infantrymen in most armies were equipped with high-powered rifles: long, unwieldy, but accurate to ranges of 1,000 m (3,280 ft) or more. But a long weapon was a definite handicap in the close-quarter fighting of the trenches, and long-range capability was wasted when combat usually took place at ranges of tens of metres or less."[1]

**Right—Troops in a World War I trench, fixing bayonets on battle rifles. Below—Springfield Model 1903, the U.S. Army's main battle rifle in World War I.**

***Submachine guns—the intermediate step***. When armies bogged down in the World War I trenches, weapons designers looked for ways to break the bloody stalemate. Among them was the submachine gun, designed to be a "compact, fast-firing, short-range weapon" for use in the trenches and by highly mobile storm troops in new tactical formations.[2] According to the *Illustrated Book of Guns*, "A submachine gun (SMG) is a close-range, automatic weapon, firing pistol cartridges (e.g., 9mm Parabellum), and is compact, easy to carry, and light enough to be fired from either the shoulder or the hip."[3]

**Among some famous American submachine guns are the more finely machined Thompson, or "Tommy Gun," shown on the right in the hands of British Prime Minister Winston Churchill, and its successor, the mass-produced M3 "Grease Gun," shown below. Both are chambered in .45ACP, a pistol cartridge.**

***The final step—the first assault rifle.*** The last step in the evolution of the military assault rifle came during the Second World War. It grew out of the German military's pre-war interest in "obtaining a relatively high-power intermediate or mid-range cartridge *and corresponding weapon* for infantry application."[4] (Emphasis added). On the one hand, the submachine gun was useful in close-range fighting, but the pistol cartridge it fired (typically 9mm) lacked power and range. On the other, German military thinkers realized that the battle rifle was too much gun for modern combat scenarios: "Since most infantry action took place at ranges under 400 meters, the long-range potential of the standard cartridge and service rifle were actually wasted."[5] There were also logistical problems in supplying armies in the field with different kinds of rounds of ammunition: the larger rifle cartridges for the battle rifle and the smaller pistol cartridges for the submachine guns.[6]



**German MP-40 9mm submachine at left, and Mauser Karabiner 98k battle rifle below. Both guns shown in the field with French Nazi soldiers at right.**





The solution to these logistical and firepower problems practically suggested itself:

> Logically, it was inescapable that sooner or later someone would consider a compromise between the long range, powerful, rifle and the rapid fire, but short range, submachine gun. During their Operation Barbarossa (Russian) campaign and elsewhere, the Germans were continually reminded of the ever-increasing need for a rapid fire arm that was small enough to be convenient to hand carry, but at the same time possessed sufficient range and power to be adequate out to about 200 meters.[7]

The result of German research and development was that very compromise. It came in the form of the STG (*Sturmgewehr*) ("storm gun") 44, the "father of all assault rifles....After the war it was examined and dissected by almost every major gunmaking nation and led, in one way and another, to the present-day 5.56mm assault rifles."[8]

## *THE "FATHER OF ALL ASSAULT RIFLES"*

**Above, the Nazi army's Sturmgewehr (STG) 44, the first assault rifle. Below, the STG 44 in combat action.**

***Deadly designs.*** One thing leaps out from these pictures: the remarkable similarity of the first assault rifle to the assault rifles currently flooding America's streets. This family resemblance is not a coincidence. From the STG-44 "storm gun" to the Bushmaster XM-15, assault weapons have incorporated into their design *specific* features that enable shooters to spray ("hose down") a large number of bullets over a broad killing zone, without having to aim at each individual target. These features not only give assault weapons a distinctive appearance, they make it easy to simply point the gun while rapidly pulling the trigger—including firing from the hip, a procedure seldom used in hunting anything but human beings. The most important of these design features are:

- ***"High-capacity," detachable ammunition magazines*** (often called "clips") that hold as many as 75 rounds of ammunition. "This allows the high volume of fire critical to the 'storm gun' concept."[9]
- ***A rear pistol grip*** (handle), including so-called "thumb-hole stocks" and magazines that function like pistol grips.
- ***A forward grip or barrel shroud.*** Forward grips (located under the barrel or the forward stock) "give a shooter greater control over a weapon during recoil."[10] Forward grips and barrel shrouds also make it possible to hold the gun with the non-trigger hand, even through the barrel gets extremely hot from firing multiple rounds. In the case of assault pistols

(like the UZI, MAC, and Intratec TEC series) the forward grip often appears as an ammunition magazine or a barrel shroud, a vented tube surrounding the gun barrel.

For those who own the Uzi Carbine, E&L Manufacturing offers a light-weight aluminum shroud (shown here with forward pistol grip and E&L's brass catcher). (Photo courtesy of E&L Manufacturing.)

Barrel shrouds like the one on this gun do little ballistically, but they do provide a safe place to rest the off hand for those wishing to grip the barrel of the firearm during firing.

**Barrel shrouds make it possible to hold a hot barrel during firing (right). Forward pistol grips help control recoil (above). Images and captions from Duncan Long, *The Terrifying Three.*[11]**

**Military assault rifles, like this Heckler & Koch G41 invariably accept a high-capacity magazine ("clip") and have some form of pistol grip and fore-end grip.**

**Barrel shrouds, like the one on the right sold by Bushmaster Firearms for use on the UZI, are "ventilated all around for maximum heat dissipation."**

These design features create the ability to quickly lay down a high volume of fire, making semiautomatic assault weapons a particularly dangerous addition to the civilian gun market. They explain why assault weapons are favored by terrorists, mass killers, and violent criminals, and they distinguish such weapons from true hunting and target guns.

## MODERN DESCENDANTS OF THE STG-44 ON AMERICA'S STREETS

Most of the assault weapons sold on America's civilian market are semiautomatic descendants of the STG-44. Here are a few of the more popular and notorious.

***Kalashnikov AK-47 and its variants.*** The Soviet Army's AK-47 was derived from the STG-44 shortly after the Second World War, boosted by material and personnel that fell into Soviet hands when the Red Army overran German research and engineering facilities.[12] The AK-47 (in many variants, like the AKM) has become, since the 1940s, the most widely-distributed rifle in the world.[13] According to *The Gun Digest Book of Assault Weapons*:

"The AKM was the revolutionary weapon of the 1960s and '70s, used by everyone from the Viet Cong to the Palestine Liberation fighters. Its comparatively short length and light weight made war more available to Third World women and children, probably not an advance for civilization."[14]

**Above: AK-47, foreground, AKM, upper right background.**

China exported few guns to the United States before the 1980s. But, beginning in 1987, Chinese rifle imports—mostly semi-automatic versions of the AK-47—surged. The flood of Chinese rifles reached 64 percent of all rifles imported into the United States in 1993 and was only cut off by the administration of former President Bill Clinton. (See table at right.)[15]

China accounted for forty-two percent of all rifles imported into the U.S. civilian market between 1987 and 1994, the year in which President Clinton finally blocked the Chinese gun dumping (see Table 8).

**Table 8**

**Rifle Imports from China to the United States, 1987 - 1994**

| | *Total Rifles Imported* | *Chinese Rifles Imported* | *Percent Chinese* |
|---|---|---|---|
| 1987 | 452,059 | 100,897 | 22% |
| 1988 | 484,976 | 182,935 | 38% |
| 1989 | 350,012 | 141,182 | 40% |
| 1990 | 273,102 | 31,370 | 11% |
| 1991 | 339,966 | 115,902 | 34% |
| 1992 | 420,085 | 164,271 | 39% |
| 1993 | 764,498 | 490,399 | 64% |
| 1994 | 698,907 | 344,648 | 49% |
| Total | 3,783,605 | 1,571,804 | 42% |

Source, U.S. Census Bureau, Foreign Trade Division

***AR-15 Variant of the M-16.*** The U.S. Army's decision in the 1960s to replace its M-14 battle rifle with the M-16 assault rifle was based on reasoning similar to the German army's and highly revealing of the function of assault weapons. After studying over three million casualty reports from World Wars I and II, and data from the Korean War, the Army's Operations Research Office (ORO) found that, "in the overall picture, aimed fire did not seem to have any more important role in creating casualties than randomly fired shots. Marksmanship was not as important as volume. Fire was seldom effectively used beyond 300 meters due to terrain...and [ORO] discovered that most kills occur at 100 meters or less. From this data, ORO concluded that what the Army needed was a low recoil weapon firing a number of small projectiles....The [Armalite] AR-15 was chosen as the best small caliber weapon and it was adopted as the M16."[16]

**The U.S. Army adopted the M-16 assault rifle, right, in the 1960s. It saw extensive service during the Vietnam War.**

Another expert's explanation of the Army's reasoning sheds light on one of the principal dangers of assault weapons on civilian streets—"spray and pray" firing:

> The studies showed that...in spite of the huge amounts of money spent by the military services in training combat infantrymen to be marksmen, few were capable of firing effectively beyond ranges of 200 to 300 meters in the heat of battle. "Spray and pray" would come to be the practice on the future battlefields of Vietnam.[17]

**Books like these two illustrate that there is virtually no difference between the military M-16 and the civilian AR-15, the latter being only slightly modified for sale in the civilian market. The titles themselves show the popular equivalence.**

The gun industry was quick to begin churning out civilian versions of the M-16, labeling the semiautomatic models the "AR-15," not coincidentally the same name as the prototype version of the military assault rifle.

**Bushmaster's version of the AR-15, left, achieved new heights of notoriety in 2002 when it was revealed that one model was the weapon used by the infamous Washington, DC-area snipers.**

***Assault Pistols—UZI, Ingram, Intratec, and More.*** A particularly deadly variant in the gun industry's marketing program has been the sale of civilian assault pistols, which are for the most part simply semiautomatic versions of submachine guns. Firearms expert Duncan Long explained the marketing basis of this trend in his book *The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families*:

> As the militaries of the world increasingly rely on assault rifles to fill the submachine gun role, making money on a new submachine gun design becomes harder and harder. Consequently, a number of companies have tried to capture the police and civilian markets....Citizens purchasing firearms for everything from plinking to self-defense have provided a lucrative market, especially in the United States. Those weapons produced for the civilian market are generally semiauto versions of the automatic weapons, often modified slightly to conform to U.S. firearms laws.[18]





Lagging sales to the military spurred the gun industry to market to civilians semiautomatic versions of assault pistols such as the UZI and Ingram MAC series. Assault pistols like these quickly became the preferred weapon for criminal gangs, fringe groups like militias, and mass murderers.

44 *THE TERRIFYING THREE*

The size comparison between the TEC-9 and a regular 9mm pistol (shown here is the H&K P7M13) shows one reason why many people prefer guns such as those made by Intratec The slightly larger size provides better control of the firearm during recoil and the magazine holds more than twice as many rounds. Added to this is the submachine-gun look, which can be intimidating to those unfamiliar with such guns

Firearms expert Duncan Long has succinctly summarized the perverse attractions of semiautomatic assault pistols like the Intratec TEC-9 shown above. (Image and caption from Duncan Long, *The Terrifying Three.*)[19]

## THE GUN INDUSTRY'S LIES

The gun industry—aided by its apologists in the gun lobby, the NRA, and the gun press—has tried to divert attention from the inevitable consequences of its cynical marketing of these killing machines, and thwart regulation This has been done by inventing what can only be fairly described as a series of lies and deceptions about assault weapons and their effects. Some of the more prominent among them are discussed below.

***Is "automatic fire" an essential feature of a "real" assault weapon?*** The answer is, "absolutely not." But that hasn't kept the gun industry from using this line of argument to pretend that civilian assault weapons simply don't exist The red herring of the automatic fire "issue" was raised by the gun lobby only after civilian assault weapons were widely criticized This criticism came after mass murderers and drug traffickers began to "hose down" America's streets and schoolyards with civilian assault weapons

**Military assault weapons, like the M-16 shown above, have a "selective fire" switch to change the mode of fire from semiautomatic to automatic (machine gun).**

This argument is entirely semantic. By limiting the "definition" of assault weapon to military machine guns, the gun industry and its friends hope to define away the problem But, fully automatic fire has little to do with the killing power of assault weapons. As the leading pro-assault weapons expert Duncan Long wrote in his 1986 publication, *Assault Pistols, Rifles and Submachine Guns*:

> The next problem arises if you make a semiauto-only model of one of these selective-fire rifles. According to the purists, an assault rifle has to be selective fire Yet, if you think about it, it's a little hard to accept the idea that firearms with extended magazines, pistol grip stock, etc. cease to be assault rifles by changing a bit of metal [20]

Long's point is well taken because, in fact, military and civilian experts agree that semiautomatic fire is actually *more*—not less—likely to hit the target than is automatic fire, and is thus more deadly.[21] In fact, expert Long wrote about the semiautomatic UZI in another book, "One plus of the semiauto version is that it has a greater potential accuracy. .."[22] In any case, a person of moderate skill can fire a semiautomatic assault weapon at an extremely fast rate of fire.[23]

And even if automatic fire were more deadly, many semiautomatic assault weapons not only can be converted to automatic fire with home tools and modest skill, but readily available books and videos walk the would-be converter through the process.

**Easily obtained videos and books like these show how to convert semiautomatic assault rifles to fully automatic machine guns (even though semiautomatic fire is more accurate).**

***Do assault weapons really encourage "spray firing"?*** Gun industry apologists also disparage the use of such terms as "spray firing" and "shooting from the hip" to describe the deadly capabilities of assault weapons. But, as was explained earlier, "spray and pray" was exactly the point of developing assault weapons. And the following illustrations show graphically how specific assault weapons features allow a "point-and-shoot" grip and help control recoil so the shooter can "hose down" a wide area with a lethal "spray" of bullets.

## "Pray and Spray" Hip-Firing

130. Firing with the stock pressed to the body is conducted without halting. Press the stock to th right side with the right arm with the butt of the stock in the armpit or against the front part of the upper arm (Figure 73). If the stock is f lded press the rifle s receiv r and pistol g ip to the body with the right hand (Figure 56). Hold the rifle with the l ft hand at the fore end. Point the rifle at the target and continuing movement c mmence f ing

Figure 73 Fi ng o the n w

a with stock pressed to side (a i pit) b with st ck rest ng agai nst upper

131 Wh n f n on th mov rele l th r fle th st pp g n ement

*Our test 9mm AR-15 was found to be a natural pointer. Target acquisition was rapid, even in instinctual shooting from waist level.*

Deliberate, aimed fire from the shoulder may be more accurate than the kind of "pray

and spray" hip-firing illustrated on the prior page   But the mass murderers, criminal gangs, drug traffickers, and other violent criminals who are drawn to assault weapons are not after marksmanship medals   They want to kill or maim as many people as possible in as short a time as possible—the exact job for which the semiautomatic assault weapon was designed.

***But what about harmless bayonet mounts?***   Unfortunately, the 1994 federal assault weapons ban attempted to define assault weapons on the basis of parts usually associated with military weapons, such as grenade launchers, bayonet mounts, and threaded barrels for adding silencers and flash suppressors (to reduce flash from the weapon's muzzle at night)   The problem is that these features have virtually nothing to do with the functional design of the assault weapon   As a result, gun manufacturers have simply eliminated these "bells and whistles" from their civilian assault weapon designs, while keeping the lethal design factors—high-capacity magazines and pistol grips—that make assault weapons so deadly.  These cosmetic changes meet the letter of the federal law, but accomplish little else

***Don't gun experts say there is no such thing as a civilian "assault gun?"***   The NRA, the gun industry, the gun press, and other pro-gun "experts" today claim that there is no such thing as a civilian "assault weapon."   But before the guns came under fire, these same experts enthusiastically described exactly these civilian versions as "assault rifles," "assault pistols," and "military assault" weapons.

For example, in 1982, *Guns & Ammo* published a book titled *Assault Rifles*, advertising "complete data on the best semi-automatics "[24]  In 1984, *Guns & Ammo* advertised a similar publication, now titled *Assault Firearms* (see ad on right), "full of the hottest hardware available today. covers the field with  assault rifles from the armies of the world  .a new slant on .22s with 'Plinkers in Battle Dress '   And, if you are interested in survival tactics and personal defense, we'll give you a look at the newest civilianized versions of the semi-auto submachine gun."[25]



In 1988, *Guns & Ammo* handgun expert Jan Libourel defined an "assault pistol" simply as, "A high-capacity semi-automatic firearm styled like a submachine gun but having a pistol-length barrel and lacking a buttstock."[26]   This definition handily fit guns like the UZI and Intratec TEC-9 that were regularly advertised on the pages of *Guns & Ammo* during the 1980s as "assault pistols."   A 1989 ad in *Guns & Ammo* for the Intratec TEC-9 (a precursor to the one used in the 1999 Columbine high school shootings) flatly declared that "the TEC-9 series clearly stands out among high capacity 9mm assault-type pistols."[27]

***Guns & Ammo*, the leading gun magazine, regularly called civilian semiautomatic assault weapons "assault firearms," "assault rifles," and "assault pistols" until a series of tragic shootings caused the industry to deny there was such a thing as a civilian assault weapon.**

Gun magazines also specifically praised the spray-fire features of civilian assault weapons. For example, a 1989 *Guns & Ammo* review of the "Partisan Avenger .45 Assault Pistol" (right) noted that when the gun "is fired rapidly from the hip, its swivelling front grip makes for easy and comfortable control of the recoil" and that the "forward pistol grip extension of this powerful assault pistol not only helps point it instinctively at the target but goes a long way to controlling the effects of recoil...."[28] *Guns & Ammo* found hip-shooting "surprisingly easy" with the HK 94 9mm Carbine.[29] A 1990 review in the NRA's *American Rifleman* of the Sites Spectre HC Pistol stated: "A gun like the Spectre is primarily intended for hip-firing...."[30] The same magazine's 1993 review of the Steyr Mannlicher SPP Pistol reported: "Where the SPP really shines is in firing from the hip."[31] A cottage industry of accessory suppliers also sprang up, all of which targeted ads soliciting owners of civilian "assault weapons."[32]

The gun industry itself deliberately used the military character of semiautomatic "assault weapons" and the lethality-enhancing utility of their distinctive characteristics as selling points. The German company Heckler & Koch, for example, published ads calling their civilian guns "assault rifles" and stressing their military lineage. "The HK 91 Semi-Automatic Assault Rifle from Heckler & Koch .was derived directly from the G3," a German army weapon, said one full page ad (right).[33] Another described the HK 94 Carbine as "a direct offspring of HK's renowned family of MP5 submachine guns."[34] An Intratec ad said the company's TEC-9 "clearly stands out among high capacity assault-type pistols."[35] Magnum Research advertised that the Galil rifle system to which it had import rights "outperformed every other assault rifle "[36]

Early gun magazine reviews of assault guns also specifically noted their limited sporting value. For example, the NRA's *American Rifleman* reviewed the Calico M-100 rifle in 1987 and concluded, "The M-100 is certainly not a competition gun, hardly a hunting gun, and is difficult to visualize as a personal defense gun.[37] Similarly, a 1983 *Guns & Ammo* review of the Heckler & Koch HK 94 rifle reported that "you certainly aren't going to enter any serious, formal matches with it.. ."[38]

At the same time, the gun industry has actively promoted the intimidating looks of assault weapons to increase their sales. A 1989 *Guns & Ammo* review of the A.A. Arms AP9 praised the appeal of the gun's "wicked looks" to teenagers, noting "it is one mean-looking dude, considered cool and Ramboish by the teenage crowd ...Take a look at one And let your teen-age son tag along. Ask him what *he* thinks."[39] (Emphasis in original) *Guns & Ammo* expert Garry James noted in his review of Colt's 9mm AR-15 rifle that "the intimidation factor of a black, martial-looking carbine pointing in one's direction cannot be underestimated."[40] Howard French, of the same magazine, said of the HK 94 9mm Para Carbine that "you would not get much static from an intruder eyeballing its rather lethal appearance."[41] C.A. Inc advertisements for the Mark 45 and Mark 9 "Tommy-Gun" style carbines explicitly made the point that a "show of force can be stopping power worth having"[42]

**SUMMING UP**

The plain truth is that semiautomatic assault weapons look bad because they are bad. They were designed and developed to meet a specific military goal, which was killing and wounding as many people as possible at relatively short range as quickly as possible, without the need for carefully aimed fire. In short, they are ideal weapons for war, mass killers, drug gangs, and other violent criminals.

**TEC-DC9 in use, surveillance tape, Columbine High School.**

## Endnotes

1 Chris Bishop (ed ), *Guns in Combat* (Edison, N J.: Chartwell Books, 1998). 37

2. Ian V Hogg, *Submachine Guns* (Pennsylvania· Stackpole Books, 2001): 7.

3 David Miller (ed ), *The Illustrated Book of Guns* (London Salamander Books Ltd., 2000) 232.

4. Peter R. Senich, *The German Assault Rifle, 1935-1945* (Boulder, CO: Paladin Press, 1987). 1.

5. Peter R. Senich, *The German Assault Rifle, 1935-1945* (Boulder, CO Paladin Press, 1987): 1.

6 Chuck Taylor, *The Fighting Rifle: A Complete Study of the Rifle in Combat* (Boulder, Paladin Press, 1984), p 2

7. Chuck Taylor, *The Fighting Rifle: A Complete Study of the Rifle in Combat* (Boulder, CO Paladin Press, 1984). 2

8. Ian Hogg, *Jane's Guns Recognition Guide* (Glasgow: Harper Collins Publishers, 2000): 302

9. Chuck Taylor, *The Fighting Rifle· A Complete Study of the Rifle in Combat* (Boulder, CO Paladin Press, 1984). 5.

10. Duncan Long, *The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families* (Boulder, CO Paladin Press, 1989). 104

11. Duncan Long, *The Terrifying Three. Uzi, Ingram, and Intratec Weapons Families* (Boulder, CO: Paladin Press, 1989): 97

12. Chuck Taylor, *The Fighting Rifle· A Complete Study of the Rifle in Combat* (Boulder, CO. Paladin Press, 1984)· 4.

13. Chris Bishop (ed.), *Guns in Combat* (Edison, N J.. Chartwell Books, 1998): 72.

14. Jack Lewis and David E. Steele, *The Gun Digest Book of Assault Weapons*, 5th ed. (Iola, WI: Krause Publications, 2000): 75.

15. Tom Diaz, *Making a Killing: The Business of Guns in America* (New York The New Press, 1999): 73.

16. "History and Evolution of the M-16," *West Point Parents Club of Georgia Newsletter* 13 (March 1999). 8

17. Joe Poyer, *The M16/AR15 Rifle: A Shooter's and Collector's Guide* (Tustin, CA: North Cape Publications, 2000): 13

18. Duncan Long, *The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families* (Boulder, CO: Paladin Press, 1989): 3-4

19. Duncan Long, *The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families* (Boulder, CO: Paladin Press, 1989): 44

20 Duncan Long, *Assault Pistols, Rifles and Submachine Guns* (Boulder, CO: Paladin Press, 1986): 1.

21. See, "How Effective is Automatic Fire?," *American Rifleman*, May 1980, 30.

22. Duncan Long, *The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families* (Boulder, CO: Paladin Press, 1989) 11.

23. See, e.g., "Calico M-100 rifle," *American Rifleman*, January 1987, 60, 61 ("the full 100 rounds were sent downrange in 14 seconds by one flicker-fingered tester")

24. Advertisement, *Guns & Ammo*, July 1982, 20.

25 Advertisement, *Guns & Ammo*, July 1984, 16.

26. "Handgunner's Glossary," *Guns & Ammo*, August 1988, 42.

27. Advertisement, *Guns & Ammo*, January 1989, 77.

28 "Partisan Avenger .45 Assault Pistol," *Guns & Ammo Handgun Annual,* 1989, 26-30.

29. "H&K's 9mm Para Carbine," *Guns & Ammo*, November 1983, 44.

30 "Sites Spectre HC Pistol," *American Rifleman*, December 1990, 58

31. "Steyr Mannlicher SPP Pistol," *American Rifleman*, August 1993, 70, 72; see also, "Colt's 9mm AR-15," *Guns & Ammo*, July 1985, 35, 76 ("fired from the hip.. about as natural a pointer as you can get.")

32. See, e g , Assault Systems advertisements in *Guns & Ammo*, July 1981, 90 ("assault rifle case"), 92 ("lightweight assault bipod"); *Guns & Ammo*, November 1983, 101 ("assault rifle cases" and "padded Assault Rifle sling"), Beeman advertisement in *Guns & Ammo*, December 1982, 14 ("Beeman Short Scopes: New

for Assault Rifles to Airguns. .Use on assault rifles.. ."); Ventech Inc. advertisement for "Assault Weapon Accessories" in *Guns & Ammo*, February 1991, 96 ("Mini-14 ..10/22 ..AR-7").

33. Heckler & Koch advertisement in *Guns & Ammo*, July 1984, 9.

34. Heckler & Koch advertisement in *Guns & Ammo*, June 1984, back cover.

35. Intratec advertisement, *Guns & Ammo*, January 1989, 77

36 Magnum Research advertisement, *Guns & Ammo*, November 1982, 59 See also, e g , advertisement by Paragon S&S Inc. for AR 10, *Guns & Ammo*, July 1981, 90 ("Used world wide by military and LAW ENFORCEMENT officers. This famous assault rifle is now available in a semi-auto form!")

37 "Calico M-100 rifle," *American Rifleman*, January 1987, 60, 61.

38. "H&K's 9mm Para Carbine," *Guns & Ammo*, November 1983, 44.

39. "A A Arms AP9 Assault Pistol," *Guns & Ammo Handgun Annual*, 1989, 48, 51.

40 "Colt's 9mm AR-15," *Guns & Ammo*, July 1985, 35, 76.

41. "H&K's 9 mm Para Carbine," *Guns & Ammo*, November 1983, 42.

42. CA Inc. advertisement, *Guns & Ammo*, March 1981, 92.

## About the Violence Policy Center

The Violence Policy Center (VPC) is a national nonprofit educational organization working to reduce death and injury from firearms. As America's premier think tank on gun policy, the VPC studies current firearms issues and provides information to policymakers, journalists, public health professionals, and grassroots activists.

The virtually unrestricted distribution of firearms is more than a crime problem, it is a national health crisis. Unlike every other consumer product, firearms are exempt from federal health and safety laws. Guns—especially handguns and assault weapons—are inherently dangerous products, and the failure to regulate them like all other products costs thousands of lives and billions of dollars every year. By conducting research on key issues in firearms policy, the VPC counters the gun lobby's distortions and brings hard facts to the debate over firearms death and injury.

 **Violence Policy Center**       **www.vpc.org**

# EXHIBIT E

## to Expert Report of Professor Louis Klarevas

GUN DIGEST®
Buyer's Guide to
Assault Weapons
Phillip Peterson



© 2008 By Krause Publications

Published by

Gun Digest® Books
An imprint of F+W Publications
700 East State Street • Iola, WI 54990-0001
715 445-2214 • 888 457-2873
www.gundigestbooks.com

Our toll-free number to place an order or obtain a free catalog is (800) 258-0929.

All rights reserved. No portion of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher, except by a reviewer who may quote brief passages in a critical article or review to be printed in a magazine or newspaper, or electronically transmitted on radio, television, or the Internet.

Library of Congress Control Number: 2008925112

ISBN-13: 978-0-89689-680-2

ISBN-10: 0-89689-680-3

Designed by Marilyn McGrane

Edited by Dan Shideler

Printed in the United States of America

# Introduction: What's in a Name?

Assault Weapon.

Those words, on the cover of this book, are probably what drew you to pick it up. "Assault weapon" is a term that causes arguments within the pro-gun community. Any use of the terms "assault weapon" or "assault rifle" by media or politicians is attacked by some pro-gun writers, organizations and many firearm owners. Long wordy debates take place on internet message boards arguing the definitions and usage of terms.

Why is that?

The main reason seems to be that the term has gained use by the anti-gun movement and media. Whenever a crime is committed with a semi-automatic military pattern firearm, the mainstream media will quickly jump in with headlines like "assault weapon used in killing spree" or "drug sweep nets assault weapons." The only time many in the non-gun owning public are exposed to this class of firearms is through negative media exposure.

If you use the historically applied terminology, an assault weapon must be capable of full-automatic fire, i.e., a machine gun. The term assault rifle had its beginning with the Germans during WWII and was applied to a new class of firearm: the "SturmGewehr," or storm rifle, properly known as the MP-44.

This is generally considered to be the first true assault rifle. It was a select-fire rifle that used an intermediate-sized rifle cartridge called the 8x33mm Kurz (short).

The intermediate cartridge concept helps define an assault rifle in military circles. The intermediate cartridge is smaller than the rifle cartridges used in belt-fed machine guns and larger than the pistol cartridges used in submachine guns. Intermediate cartridges are what many semi-automatic assault weapons chamber. These include the 5.56mm (.223), 7.62x51mm (.308), 7.62x39mm, and 5.54x39mm.

What is an assault weapon? If one were to use a strict definition, it could be ANY object that is used against another individual to cause bodily harm. That can be a firearm, a rock or a feather poked in the eye. The military definition was discussed in the last paragraph. In the context of this book, however, "assault weapon" refers to a semi-automatic firearm that accepts high capacity magazines (10+ rounds) and is patterned after military issue select-fire weapons. This can mean an exact copy of an existing design, minus the components that allow full-automatic fire. Or it can be a new design that utilizes similar characteristics.

The popularly-held idea that the term "assault weapon" originated with anti-gun activists, media or politicians is wrong. The term was first adopted by the manufacturers, wholesalers, importers and dealers in the American firearms industry to stimulate sales of certain firearms that did not have an appearance that was familiar to many firearm owners. The manufacturers and gun writers of the day needed a catchy name to identify this new type of gun

The fact that some of the semi-automatic versions of the military-style firearms retained their bayonet lugs, extended pistol grips, high capacity magazines, folding stocks and even threading for muzzle brakes and grenade launchers has been used to erroneously define "assault weapons." But these design features were part of the attraction to this kind of firearm. All of these features are merely cosmetic and there is little if any evidence that their inclusion on a gun has been essential to some specific criminal use.

Look in many 1980s-era editions of *Gun Digest* and you will find listings of several makes and models of guns that were categorized as assault rifles or assault pistols  There were also some issues of a magazine called *The Complete Book of Assault Rifles* published in the 1980s. *Guns & Ammo* magazine published at least one issue of a magazine with the title *Assault Rifles: The New Breed of Sporting Arm*. And the truth is that many gun owners have used and still use the term in everyday conversations about firearms.

Some alternate monikers suggested by the never-call-them-assault-weapons crowd include paramilitary firearms, military pattern semi-automatics, homeland defense rifles, tactical firearms, sports

utility rifles, EBRs (Evil Black Rifles), or simply firearms. I tend to favor the term neat guns, but that could be just about any gun. There needs to be a commonly understood name for this type of firearm that does not require a drawn out definition. It really should not be that complicated.

Whatever arguments can be made about what terminology to use, the name assault weapon has been defined by law with the passage of several state and local AW laws and by the Federal Assault Weapon Ban, also known as the Crime Control and Law Enforcement Act of 1994. This law, and most of the others, regulate these firearms by model name and characteristics. (See the chapter on legal issues to read the exact wording of the currently expired Federal AW law.) By using the term "assault weapon" throughout the text of the law, they have forever added this name to the American dictionary.

# EXHIBIT F

## to Expert Report of Professor Louis Klarevas

Mass Shootings Resulting in Double-Digit Fatalities in American History (1776-2022)
Deaths per Incident
60
50
40
30
20
10
0
1776
1801
1825
1850
1875
1899
1924
1949
1973
1998
2022
Year

Mass Shootings Resulting in Double-Digit Fatalities in American History (1949-2022)
Deaths per Incident
0
10
20
30
40
50
60
1949
1955
1962
1969
1975
1982
1989
1996
2002
2009
2016
2022
Assault Weapons and Large-Capacity Magazines Involved
Large Capacity Magazine Involved (But Not Assault Weapon Involved)
No Large-Capacity Magazines or Assault Weapons Involved

# EXHIBIT G

## to Expert Report of Professor Louis Klarevas



LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS






Prometheus Books
59 John Glenn Drive
Amherst, New York 14228

in a class all by itself. No other advanced, Western democracy experiences the magnitude of gun violence that presently afflicts American society.[28] This is particularly true when it comes to mass shootings.[29]

The United States does little to regulate firearms, especially at the federal level.[30] While it goes to great lengths to restrict access to WMDs and IEDs, the same can't be said for its efforts to keep firearms out of the hands of high-risk individuals. Indeed, the American experience with gun control nationwide is so limited that it can actually be chronicled in a few bullet points:

- The National Firearms Act of 1934: Heavily regulated machine guns, short-barrel rifles and shotguns, and silencers.
- The Federal Firearms Act of 1938: Established a federal licensing system to regulate manufacturers, importers, and dealers of firearms.
- The Omnibus Crime Control and Safe Streets Act of 1968: Prohibited anyone under twenty-one years of age from purchasing a handgun.
- The Gun Control Act of 1968: Required that all interstate firearms transfers or sales be made through a federally licensed firearms dealer and prohibited certain categories of people—felons (indicted or convicted), fugitives, drug abusers, mentally ill persons (as determined by adjudication), illegal aliens, dishonorably discharged servicemen, US-citizenship renouncers, and domestic abusers—from possessing firearms.[31]
- The Firearm Owners Protection Act of 1986: Barred the purchase or transfer of automatic weapons without government approval.
- The Undetectable Firearms Act of 1988: Required that all firearms have at least 3.7 oz. of metal that can be detected by a metal detector.
- The Gun-Free School Zones Act of 1990: Criminalized possession or discharge of a firearm in a school zone.
- The Brady Handgun Violence Prevention Act of 1993: Required

that anyone attempting to purchase a firearm from a federally licensed dealer pass a background check[32]

- The Federal Assault Weapons Ban of 1994 Banned the sale and possession of semiautomatic assault weapons and extended-capacity magazines not grandfathered prior to the enactment of the law[33]

Of all of these measures, the National Firearms Act of 1934 and the Assault Weapons Ban of 1994 (AWB) were the only ones instituted primarily in an effort to reduce the carnage of mass shootings The former was passed in response to a series of bloody gangland executions, including the infamous 1929 St Valentine's Day massacre in Chicago[34] While there are still machine guns in circulation, the National Firearm Act, in conjunction with the Firearm Owners Protection Act of 1986, sharply cut the availability of machine guns, which likely explains the complete elimination of massacres perpetrated with such automatic-fire weapons

Like the National Firearms Act, the AWB was introduced following several high-profile mass shootings in the early 1990s the Luby's restaurant, 101 California Street office complex, and Long Island Railroad train car massacres[35] Signed into law by President Bill Clinton, the AWB went into effect on September 13, 1994 At the insistence of the gun-rights lobby, however, the bill contained a ten-year sunset provision As Congress never renewed the ban, it automatically expired on September 13, 2004

The decade the law was in effect nonetheless resulted in a unique experiment, allowing us to discern what impact, if any, the ban had on gun violence in general and mass shootings in particular As to the former, the academic consensus seems to be that the AWB had a minimal impact on reducing violent crime[36] This hardly comes as a surprise After all, most crimes don't involve assault weapons The real test should be Did it succeed in its intended purpose of reducing rampage violence? The answer is a resounding yes

Let's take a closer look

The best way to assess the impact of something is to conduct what, in social science, we commonly refer to as a time-series analysis Basically, that's a fancy name for a before-and-after test Figures 7 1



| | Pre 10 | Pre -9 | Pre -8 | Pre 7 | Pre -6 | Pre -5 | Pre -4 | Pre -3 | Pre 2 | Pre 1 |
|---|---|---|---|---|---|---|---|---|---|---|
| Incidents | 1 | 1 | 4 | 3 | 0 | 2 | 2 | 1 | 4 | 1 |
| Deaths | 6 | 14 | 25 | 20 | 0 | 17 | 16 | 23 | 28 | 6 |

| | Ban 1 | Ban 2 | Ban 3 | Ban 4 | Ban 5 | Ban 6 | Ban 7 | Ban 8 | Ban 9 | Ban 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Incidents | 0 | 0 | 0 | 0 | 3 | 2 | 2 | 1 | 3 | 1 |
| Deaths | 0 | 0 | 0 | 0 | 28 | 14 | 14 | 6 | 18 | 9 |

| | Post +1 | Post +2 | Post +3 | Post +4 | Post +5 | Post +6 | Post +7 | Post +8 | Post +9 | Post +10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Incidents | 3 | 3 | 2 | 5 | 5 | 3 | 3 | 5 | 3 | 2 |
| Deaths | 22 | 20 | 38 | 32 | 45 | 29 | 20 | 39 | 39 | 18 |

Fig 7 1 Gun Massacres Before During and After the Assault Weapons Ban of 1994.

Note The lines in the graph demarcate the start and end points of the Assault Weapons Ban which was in effect from September 13 1994 through September 12 2004 The data are drawn from Table 3 2

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 144 of 517

Fig. 7 2. Gun Massacres by Decade Before, During and After the Assault Weapons Ban of 1994.
Note The Assault Weapons Ban was in effect from September 13 1994 through September 12 2004
The data are drawn from Table 3.2.

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 145 of 517

and 7 2 provide a look at the before-and-after pictures In the decade prior to the enactment of the AWB, the United States experienced nineteen gun massacres that resulted in 155 cumulative deaths, for an average death toll of 8 2 fatalities per incident During the ten-year period that the AWB was in effect, the numbers declined substantially, with only twelve gun massacres, resulting in eighty-nine deaths, for an average of 7 4 fatalities per incident [37] What's particularly astounding about this time period is that during the first four and a half years of the ban, there wasn't a single gun massacre in the United States Not one This is unprecedented in modern American history [38] Since 1966, the longest streaks without a gun massacre prior to era of the AWB were two instances of consecutive years (1969–1970 and 1979–1980) [39] Then, all of a sudden, from September 1994 to April 1999, the country experienced a long calm As further evidence of the AWB's effectiveness, once it expired, rampages returned with a vengeance In the ten years after the ban, the number of gun massacres nearly tripled to thirty-four incidents, sending the total number of deaths skyrocketing to 302, for an average of 8 9 fatalities per incident [40] These numbers paint a clear picture America's experiment, while short-lived, was also extremely successful [41]

## ZEROING OUT GUN MASSACRES

The biggest takeaway from America's experience with a ban on assault weapons and extended-capacity magazines is that gun-control legislation can save lives But is there a way to get to zero? Is there a way to eliminate gun massacres once and for all? For that, we have to look overseas for insights

One of the biggest obstacles to successful gun control is the ability to transport firearms across open, contiguous borders In the United States, it's a problem that allows guns to flow freely from states with lax laws into states with strict laws A common complaint frequently leveled by elected officials in places like California, Illinois, Maryland, New York, and Massachusetts is that people just need to drive across a state line and they can readily obtain firearms that they can then easily—if perhaps illegally—bring back into their jurisdictions [42] That

# EXHIBIT H

## to Expert Report of Professor Louis Klarevas

# The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017

*Louis Klarevas, PhD, Andrew Conner, BS, David Hemenway, PhD*

*Objectives.* To evaluate the effect of large-capacity magazine (LCM) bans on the frequency and lethality of high-fatality mass shootings in the United States.

*Methods.* We analyzed state panel data of high-fatality mass shootings from 1990 to 2017. We first assessed the relationship between LCM bans overall, and then federal and state bans separately, on (1) the occurrence of high-fatality mass shootings (logit regression) and (2) the deaths resulting from such incidents (negative binomial analysis). We controlled for 10 independent variables, used state fixed effects with a continuous variable for year, and accounted for clustering.

*Results.* Between 1990 and 2017, there were 69 high-fatality mass shootings. Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non–LCM ban states was more than double the rate in LCM ban states; the annual number of deaths was more than 3 times higher. In multivariate analyses, states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents.

*Conclusions.* LCM bans appear to reduce both the incidence of, and number of people killed in, high-fatality mass shootings. (*Am J Public Health.* 2019;109:1754–1761. doi: 10.2105/AJPH.2019.305311)

The recent spate of gun massacres in the United States has re-energized the debate over how to prevent such tragedies.[1] A common response to high-profile acts of gun violence is the promotion of tighter gun legislation, and there is some evidence that laws imposing tighter restrictions on access to firearms have been associated with lower levels of mass shootings.[2] One proposal that has received renewed interest involves restricting the possession of large-capacity magazines (LCMs).[3–5] This raises an important question: what has been the impact of LCM bans on high-fatality mass shootings?

In an attempt to arrest an uptick in mass shooting violence in the early 1990s, Congress in 1994 enacted the federal assault weapons ban, which, among other things, restricted ownership of certain ammunition-feeding devices.[6,7] The law, which contained a sunset provision, was allowed to expire a decade later. Pursuant to that ban (18 USC §921(a) [1994]; repealed), it was illegal to possess LCMs—defined as any ammunition-feeding device holding more than 10 bullets—unless the magazines were manufactured before the enactment of the ban. LCM restrictions are arguably the most important component of assault weapons bans because they also apply to semiautomatic firearms without military-style features.[8,9]

Beginning with New Jersey in 1990, some states implemented their own regulations on LCMs. Today, 9 states and the District of Columbia restrict the possession of LCMs. The bans vary along many dimensions, including maximum bullet capacity of permissible magazines, grandfathering of existing LCMs, and applicable firearms. Moreover, overlaps sometimes exist between assault weapons bans and LCM bans, but not in all states. For example, California instituted a ban on assault weapons in 1989, but LCMs remained unregulated in the state until 1994, when the federal ban went into effect. In 2000, California's own statewide ban on LCMs took effect as a safeguard in the event the federal ban expired, which happened in 2004.[10,11]

LCMs provide a distinct advantage to active shooters intent on murdering numerous people: they increase the number of rounds that can be fired at potential victims before having to pause to reload or switch weapons. Evidence shows that victims struck by multiple rounds are more likely to die, with 2 studies finding that, when compared with the fatality rates of gunshot wound victims who were hit by only a single bullet, the fatality rates of those victims hit by more than 1 bullet were more than 60% higher.[12,13] Being able to strike human targets with more than 1 bullet increases shooters' chances of killing their victims. Analyses of gunshot wound victims at level I trauma centers have suggested that this multiple-impact capability is often attributable to the use of LCMs.[14,15]

In addition, LCMs provide active shooters with extended cover.[16] During an attack, perpetrators are either firing their guns or not firing their guns. While gunmen are firing, it is extremely difficult for those in the line of fire to take successful defensive maneuvers. But if gunmen run out of bullets, there are lulls in the shootings, as the perpetrators are forced to pause their attacks to reload or change weapons. These pauses provide opportunities for people to intervene and disrupt a shooting. Alternatively, they provide individuals in

**ABOUT THE AUTHORS**

*Louis Klarevas is with the Teachers College, Columbia University, New York, NY. Andrew Conner is with the Frank H. Netter, MD, School of Medicine, Quinnipiac University, North Haven, CT. David Hemenway is with the Harvard T. H. Chan School of Public Health, Harvard University, Boston, MA.*

*Correspondence should be sent to Louis Klarevas, Research Professor, Office of the Provost, Teachers College, Columbia University, 525 W 120th St, New York, NY 10027 (e-mail: ljk2149@tc.columbia.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted July 22, 2019.*
*doi: 10.2105/AJPH.2019.305311*

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 148 of 517

harm's way with a chance to flee or hide Legislative endeavors that restrict access to LCMs are implemented with the express objective of reducing an active shooter's multiple-impact capability and extended cover [10]

Although mass shootings have received extensive study, there has been little scholarly analysis of LCM bans [17 24] The studies undertaken that have broached the subject of ammunition capacity have primarily concentrated on the effect of LCM bans on violent crimes other than mass shootings or on the impact of the assault weapons bans on mass shootings [25 27]

Evidence suggests that firearms equipped with LCMs are involved in a disproportionate share of mass shootings [10 20 28] Proponents of LCM bans believe that without LCMs, fewer people will be killed in a mass shooting, other things equal In turn, fewer shootings will cross the threshold required to be classified as what we call a "high-fatality mass shooting" (≥ 6 victims shot to death) If LCM bans are effective, we should expect to find that high-fatality mass shootings occur at a lower incidence rate when LCM bans are in place, and fewer people are killed in such attacks But have LCM bans actually saved lives in practice? To our knowledge, the impact of LCM bans has never been systematically assessed This study fills that void

## METHODS

Mass shootings have been defined in a variety of ways, with some analyses setting the casualty threshold as low as 2 people wounded or killed and others requiring a minimum of 7 gunshot victims [18 22,29] We focused on high-fatality mass shootings—the deadliest and most disturbing of such incidents—which are defined as intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators [20 30,31] After an exhaustive search, we identified 69 such incidents in the United States between 1990 and 2017 We then discerned whether each high-fatality mass shooting involved a LCM —unless otherwise stated, defined consistent with the 1994 federal ban as a detachable ammunition-feeding device capable of holding more than 10 bullets (See Table 1 for a list of incidents and for additional details on the search and identification strategy we employed )

The first state to enact an LCM ban was New Jersey in 1990 Since then, another 8 states and the District of Columbia have enacted LCM bans (Table A, available as a supplement to the online version of this article at http //www ajph org) [10] With no LCM bans in effect before 1990, a priori we chose that year to begin our analysis to avoid inflating the impact of the bans Our data set extends 28 years, from 1990 through 2017 As a secondary analysis, we used a 13-year data set, beginning in 2005, the first full year after the federal assault weapons ban expired

Our primary outcome measures were the incidence of high-fatality mass shootings and the number of victims killed We distinguished between high-fatality mass shootings occurring with and without a ban in effect Because the federal ban was in effect nationwide from September 13, 1994, through September 12, 2004, we coded every state as being under an LCM ban during that 10-year timeframe

Our interest was in the effect of LCM bans We ran regression analyses to determine if any relationship between LCM bans and high-fatality mass shootings can be explained by other factors In our state–year panel multivariate analyses, the outcome variables were (1) whether an LCM-involved high-fatality mass shooting occurred, (2) whether any high-fatality mass shooting occurred, (3) the number of fatalities in an LCM-involved high-fatality mass shooting, and (4) the number of fatalities in any high-fatality mass shooting Our analyses first combined and then separated federal and state LCM bans

Consistent with the suggestions and practices of the literature on firearm homicides and mass shootings, our explanatory variables are population density, proportion of population aged 19 to 24 years, aged 25 to 34 years, that is Black, and with a college degree, real per-capita median income, unemployment rate, and per-capita prison population [2 26,27 32] We also added a variable for percentage of households with a firearm All regression models controlled for total state population When the dependent variable reflected occurrences of incidents (ordered choice data), we used logit regression, we ran probit regression as a sensitivity analysis We had multiple observations for individual states To control for this, we utilized cluster-robust standard errors to account for the clustering of observations When the dependent variable reflected deaths (count data), we used negative binomial regression, Gius used a Poisson regression, and we used that approach as a sensitivity analysis [26] We included state fixed effects We used a continuous variable for year because the rate of high-fatality mass shootings has increased over time For purposes of sensitivity analysis, we also replaced the linear yearly trend with a quadratic function We performed multivariate statistical analyses by using Stata/IC version 15 1 (StataCorp LP, College Station, TX)

Population data came from the US Census Bureau, unemployment data came from the Bureau of Labor Statistics, and imprisonment data came from the Bureau of Justice Statistics The percentage of households with a firearm was a validated proxy (the percentage of suicides that are firearm suicides) derived from Centers for Disease Control and Prevention National Vital Statistics Data [33]

## RESULTS

Between 1990 and 2017, there were 69 high-fatality mass shootings (≥ 6 victims shot to death) in the United States Of these, 44 (64%) involved LCMs, 16 did not (23%), and for 9 (13%) we could not determine whether LCMs were used (Table 1) The mean number of victims killed in the 44 LCM-involved high-fatality mass shootings was 11 8, including the unknowns resulted in that average falling to 11 0 (not shown) The mean number of victims killed in high-fatality mass shootings in which the perpetrator did not use an LCM was 7 3 (Table B, available as a supplement to the online version of this article at http //www ajph org), including the unknowns resulted in that average falling to 7 1 (not shown) When we excluded unknown cases, the data indicated that utilizing LCMs in high-fatality mass shootings resulted in a 62% increase in the mean death toll

Data sets of mass shooting fatalities by their nature involve truncated data, with the mode generally being the baseline number of fatalities required to be included in the data set (6 fatalities in the current study) Our data

TABLE 1—High-Fatality Mass Shootings in the United States, 1990–2017

| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
|---|---|---|---|---|---|---|---|
| 1 | Jun 18, 1990 | Jacksonville | FL | Y | 9 | N | N |
| 2 | Jan 26, 1991 | Chimayo | NM | N | 7 | N | N |
| 3 | Aug 9, 1991 | Waddell | AZ | N | 9 | N | N |
| 4 | Oct 16, 1991 | Killeen | TX | Y | 23 | N | N |
| 5 | Nov 7, 1992 | Morro Bay and Paso Robles | CA | N | 6 | N | N |
| 6 | Jan 8, 1993 | Palatine | IL | N | 7 | N | N |
| 7 | May 16, 1993 | Fresno | CA | Y | 7 | N | N |
| 8 | Jul 1, 1993 | San Francisco | CA | Y | 8 | N | N |
| 9 | Dec 7, 1993 | Garden City | NY | Y | 6 | N | N |
| 10 | Apr 20, 1999 | Littleton | CO | Y | 13 | Y | Y |
| 11 | Jul 12, 1999 | Atlanta | GA | U | 6 | Y | Y |
| 12 | Jul 29, 1999 | Atlanta | GA | Y | 9 | Y | Y |
| 13 | Sep 15, 1999 | Fort Worth | TX | Y | 7 | Y | Y |
| 14 | Nov 2, 1999 | Honolulu | HI | Y | 7 | Y | Y |
| 15 | Dec 26, 2000 | Wakefield | MA | Y | 7 | Y | Y |
| 16 | Dec 28, 2000 | Philadelphia | PA | Y | 7 | Y | Y |
| 17 | Aug 26, 2002 | Rutledge | AL | N | 6 | Y | Y |
| 18 | Jan 15, 2003 | Edinburg | TX | U | 6 | Y | Y |
| 19 | Jul 8, 2003 | Meridian | MS | N | 6 | Y | Y |
| 20 | Aug 27, 2003 | Chicago | IL | N | 6 | Y | Y |
| 21 | Mar 12, 2004 | Fresno | CA | N | 9 | Y | Y |
| 22 | Nov 21, 2004 | Birchwood | WI | Y | 6 | N | N |
| 23 | Mar 12, 2005 | Brookfield | WI | Y | 7 | N | N |
| 24 | Mar 21, 2005 | Red Lake | MN | Y | 9 | N | N |
| 25 | Jan 30, 2006 | Goleta | CA | Y | 7 | Y | N |
| 26 | Mar 25, 2006 | Seattle | WA | Y | 6 | N | N |
| 27 | Jun 1, 2006 | Indianapolis | IN | Y | 7 | N | N |
| 28 | Dec 16, 2006 | Kansas City | KS | N | 6 | N | N |
| 29 | Apr 16, 2007 | Blacksburg | VA | Y | 32 | N | N |
| 30 | Oct 7, 2007 | Crandon | WI | Y | 6 | N | N |
| 31 | Dec 5, 2007 | Omaha | NE | Y | 8 | N | N |
| 32 | Dec 24, 2007 | Carnation | WA | U | 6 | N | N |
| 33 | Feb 7, 2008 | Kirkwood | MO | Y | 6 | N | N |
| 34 | Sep 2, 2008 | Alger | WA | U | 6 | N | N |
| 35 | Dec 24, 2008 | Covina | CA | Y | 8 | Y | N |
| 36 | Jan 27, 2009 | Los Angeles | CA | N | 6 | Y | N |
| 37 | Mar 10, 2009 | Kinston, Samson, and Geneva | AL | Y | 10 | N | N |
| 38 | Mar 29, 2009 | Carthage | NC | N | 8 | N | N |
| 39 | Apr 3, 2009 | Binghamton | NY | Y | 13 | Y | N |
| 40 | Nov 5, 2009 | Fort Hood | TX | Y | 13 | N | N |
| 41 | Jan 19, 2010 | Appomattox | VA | Y | 8 | N | N |

*Continued*

TABLE 1—*Continued*

| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
|---|---|---|---|---|---|---|---|
| 42 | Aug 3, 2010 | Manchester | CT | Y | 8 | N | N |
| 43 | Jan 8, 2011 | Tucson | AZ | Y | 6 | N | N |
| 44 | Jul 7, 2011 | Grand Rapids | MI | Y | 7 | N | N |
| 45 | Aug 7, 2011 | Copley Township | OH | N | 7 | N | N |
| 46 | Oct 12, 2011 | Seal Beach | CA | N | 8 | Y | N |
| 47 | Dec 25, 2011 | Grapevine | TX | N | 6 | N | N |
| 48 | Apr 2, 2012 | Oakland | CA | N | 7 | Y | N |
| 49 | Jul 20, 2012 | Aurora | CO | Y | 12 | N | N |
| 50 | Aug 5, 2012 | Oak Creek | WI | Y | 6 | N | N |
| 51 | Sep 27, 2012 | Minneapolis | MN | Y | 6 | N | N |
| 52 | Dec 14, 2012 | Newtown | CT | Y | 27 | N | N |
| 53 | Jul 26, 2013 | Hialeah | FL | Y | 6 | N | N |
| 54 | Sep 16, 2013 | Washington | DC | N | 12 | Y | N |
| 55 | Jul 9, 2014 | Spring | TX | Y | 6 | N | N |
| 56 | Sep 18, 2014 | Bell | FL | U | 7 | N | N |
| 57 | Feb 26, 2015 | Tyrone | MO | U | 7 | N | N |
| 58 | May 17, 2015 | Waco | TX | Y | 9 | N | N |
| 59 | Jun 17, 2015 | Charleston | SC | Y | 9 | N | N |
| 60 | Aug 8, 2015 | Houston | TX | U | 8 | N | N |
| 61 | Oct 1, 2015 | Roseburg | OR | Y | 9 | N | N |
| 62 | Dec 2, 2015 | San Bernardino | CA | Y | 14 | Y | N |
| 63 | Feb 21, 2016 | Kalamazoo | MI | Y | 6 | N | N |
| 64 | Apr 22, 2016 | Piketon | OH | U | 8 | N | N |
| 65 | Jun 12, 2016 | Orlando | FL | Y | 49 | N | N |
| 66 | May 27, 2017 | Brookhaven | MS | U | 8 | N | N |
| 67 | Sep 10, 2017 | Plano | TX | Y | 8 | N | N |
| 68 | Oct 1, 2017 | Las Vegas | NV | Y | 58 | N | N |
| 69 | Nov 5, 2017 | Sutherland Springs | TX | Y | 25 | N | N |

*Note.* LCM = large-capacity magazine; N = no; U = unknown; Y = yes. From September 13, 1994, until and including September 12, 2004, each and every state, including the District of Columbia, was subject to a ban on LCMs pursuant to the federal assault weapons ban. To collect the data in Table 1, we searched the following news media resources for every shooting that resulted in 6 or more fatalities: America's Historical Newspapers, EBSCO, Factiva, Gannett Newsstand, Google News Archive, Lexis-Nexis, Newspaper Archive, Newspaper Source Plus, Newspapers.com, Newswires, ProQuest Historical Newspapers, and ProQuest Newsstand. We also reviewed mass shooting data sets maintained by *Mother Jones*, the *New York Times*, and *USA Today*. In addition to news media sources, we reviewed reports on mass shootings produced by think tank, policy advocacy, and governmental organizations, including the US Federal Bureau of Investigation Supplementary Homicide Reports, the crowdsourced Mass Shooting Tracker, and the open-source databases maintained by the Gun Violence Archive and the Stanford University Geospatial Center. Finally, when it was relevant, we also reviewed court records as well as police, forensic, and autopsy reports. As a general rule, when government sources were available, they were preferred over other sources. Furthermore, when media sources conflicted on the number of casualties or the weaponry involved, the later sources were privileged (as later reporting is often more accurate).

set of high-fatality mass shootings was no exception. As such, the median average number of fatalities for each subset of incidents—those involving and those not involving LCMs—was necessarily lower than the mean average. Nevertheless, like the mean average, the median average was higher when LCMs were employed—a median average of 8 fatalities per incident compared with 7 fatalities per incident for attacks not involving LCMs.

For the 60 incidents in which it was known if an LCM was used, in 44 the perpetrator used an LCM. Of the 44 incidents in which the perpetrators used LCMs, 77% (34/44) were in nonban states. In the 16 incidents in which the perpetrators did not use LCMs, 50% (8/16) were in nonban states (Table B, available as a supplement to the online version of this article at http://www.ajph.org). Stated differently, in nonban states, 81% (34/42) of high-fatality mass shooting perpetrators used LCMs; in LCM-ban states, only 55% (10/18) used LCMs.

The rate of high-fatality mass shootings increased considerably after September 2004 (when the federal assault weapons ban expired). In the 10 years the federal ban was in effect, there were 12 high-fatality mass shootings and 89 deaths (an average of 1.2 incidents and 8.9 deaths per year). Since then, through 2017, there have been 48 high-fatality mass shootings and 527 deaths (an average of 3.6 incidents and 39.6 deaths per year in these 13.3 years).

Of the 69 high-fatality mass shootings from 1990 to 2017, 49 occurred in states without an LCM ban in effect at the time and 20 in states with a ban in effect at the time. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 11.7 per billion population; the annual incidence rate for high-fatality mass shootings in states with an LCM ban was 5.1 per billion population. In that 28-year period, the rate of high-fatality mass shootings per capita was 2.3 times higher in states without an LCM ban (Table 2).

Non–LCM ban states had not only more incidents but also more deaths per incident (10.9 vs 8.2). The average annual number of high-fatality mass shooting deaths per billion population in the non–LCM ban states was 127.4. In the LCM ban states, it was 41.6 (Table 2).

For the time period beginning with the first full calendar year following the expiration of the federal assault weapons ban (January 1, 2005–December 31, 2017), there were 47 high-fatality mass shootings in the United States. Of these, 39 occurred in states where an LCM ban was not in effect, and 8 occurred in LCM ban locations. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 13.2 per billion population; for states with an LCM ban, it was 7.4 per billion population (Table 2). During this period, non–LCM ban states had not only more incidents but also more deaths per incident (11.4 vs 9.4). In terms of high-fatality mass shooting deaths per billion population, the annual number of deaths in the non-LCM ban states was 150.6; in the LCM ban states it was 69.2 (Table 2).

When we limited the analysis solely to high-fatality mass shootings that definitely involved LCMs, the differences between ban and nonban states became larger. For example, for the entire period of 1990 to 2017, of the 44 high-fatality mass shootings that involved LCMs, the annual incidence rate for LCM-involved high-fatality mass shootings in nonban states was 8.1 per billion population; in LCM-ban states it was 2.5 per billion population. The annual rate of high-fatality mass shooting deaths in the non–LCM ban states was 102.1 per billion population; in the LCM ban states it was 23.3. In terms of LCM-involved high-fatality mass shootings, we also found comparable wide differences in incidence and fatality rates between ban and nonban states for the post–federal assault weapons ban period (2005–2017; Table 2).

We found largely similar results in the multivariate analyses (1990–2017). States that did not ban LCMs were significantly more likely to experience LCM-involved high-fatality mass shootings as well as more likely to experience any high-fatality mass shootings (regardless of whether an LCM was involved). States that did not ban LCMs also experienced significantly more deaths from high-fatality mass shootings, operationalized as the absolute number of fatalities (Table 3).

When the LCM bans were separated into federal and state bans, both remained significantly related to the incidence of LCM-involved high-fatality mass shooting events and to the number of LCM-involved high-fatality mass shooting deaths. The associations between federal and state bans and

TABLE 2—High-Fatality Mass Shootings (≥6 Victims Shot to Death) by Whether LCM Bans Were in Effect: United States, 1990–2017

| | Average Annual Population, No. (Millions) | Total Incidents, No. | Annual Incidents per Billion Population, No. | Total Deaths, No. | Annual Deaths per Billion Population, No. | Deaths per Incident, No. |
|---|---|---|---|---|---|---|
| All high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non-LCM ban states | 149.7 | 49 | 11.7 | 534 | 127.4 | 10.9 |
| LCM ban states | 140.7 | 20 | 5.1 | 164 | 41.6 | 8.2 |
| All high-fatality mass shootings, 2005–2017 (13 y) | | | | | | |
| Non-LCM ban states | 227.8 | 39 | 13.2 | 446 | 150.6 | 11.4 |
| LCM ban states | 83.4 | 8 | 7.4 | 75 | 69.2 | 9.4 |
| LCM-involved high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non-LCM ban states | 149.7 | 34 | 8.1 | 428 | 102.1 | 12.6 |
| LCM ban states | 140.7 | 10 | 2.5 | 92 | 23.3 | 9.2 |
| LCM-involved high-fatality mass shootings, 2005–2017 (13 y) | | | | | | |
| Non-LCM ban states | 227.8 | 28 | 9.5 | 369 | 124.6 | 13.2 |
| LCM ban states | 83.4 | 4 | 3.7 | 42 | 38.7 | 10.5 |
| Non-LCM high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non-LCM ban states | 149.7 | 8 | 1.9 | 56 | 13.4 | 7.0 |
| LCM ban states | 140.7 | 8 | 2.0 | 60 | 15.2 | 7.5 |

*Note.* LCM = large-capacity magazine.

TABLE 3—Multivariate Results of the Relationship Between LCM Bans and High-Fatality Mass Shootings (≥6 Victims Shot to Death), 1990–2017 Combined Federal and State Large Capacity Magazine Bans: United States

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
|---|---|---|---|---|
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| All LCM bans (federal and state) | −2.217 (−3.493, −0.940) | −5.912 (−9.261, −2.563) | −1.283 (−2.147, −0.420) | −3.660 (−5.695, −1.624) |
| Population density | −0.011 (−0.052, 0.031) | 0.013 (−0.068, 0.095) | 0.001 (−0.003, 0.006) | 0.011 (−0.005, 0.026) |
| % aged 19–24 y | −0.480 (−1.689, 0.730) | −2.496 (−5.893, 0.901) | 0.283 (−0.599, 1.164) | −0.585 (−2.666, 1.495) |
| % aged 25–34 y | −0.801 (−1.512, −0.089) | −2.390 (−4.391, −0.388) | −0.337 (−0.871, 0.197) | −1.114 (−2.463, 0.235) |
| % Black | −0.227 (−1.062, 0.607) | −0.654 (−2.831, 1.522) | −0.163 (−0.703, 0.377) | −0.261 (−1.391, 0.870) |
| % with a bachelor's degree or higher | −0.009 (−0.492, 0.474) | −0.469 (−1.590, 0.652) | 0.143 (−0.214, 0.501) | 0.183 (−0.715, 1.081) |
| Percentage of households with a firearm (proxy) | −0.047 (−0.195, 0.101) | −0.147 (−0.546, 0.251) | −0.020 (−0.131, 0.091) | −0.084 (−0.368, 0.200) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | −0.072 (−0.293, 0.149) | −0.476 (−1.081, 0.129) | 0.041 (−0.135, 0.216) | −0.182 (−0.628, 0.263) |
| Imprisonment rate (per 100 000 population) | −0.006 (−0.012, 0.001) | −0.007 (−0.017, 0.004) | −0.001 (−0.006, 0.003) | −0.003 (−0.012, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.31 | 0.16 | 0.26 | 0.11 |

*Note.* CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.49.

[a]Logit regression.

[b]Negative binomial regression.

the overall incidence of all high-fatality mass shootings as well as the total number of victims in these events remained strongly negative but was only sometimes statistically significant (Table 4).

In terms of sensitivity analyses, using probit instead of logit gave us similar results (not shown). When the outcome variable was the number of high-fatality mass shooting deaths, we obtained largely similar results concerning the association between LCM bans and the outcome variables, regardless of whether we used Poisson or negative binominal regression (not shown). Moreover, replacing the linear yearly trend with a quadratic function did not change the major results of the analyses (not shown). Variance inflation factors for all the independent variables never exceeded 10.0, with the variance inflation factor for LCM ban variables always being less than 2.0, indicating that there were no significant multicollinearity issues (Tables 3 and 4).

## DISCUSSION

In the United States, LCMs are disproportionately used in high-fatality mass shootings (incidents in which ≥6 victims are shot to death). In at least 64% of the incidents since 1990, perpetrators used LCMs. (For 23%, we determined that they did not involve LCMs, and a determination could not be made for the remaining 13%.) Previous research has shown that LCM firearms are used in a high share of mass murders (typically defined as ≥4 homicides) and murders of police.[9]

We could not find reliable estimates of LCM firearms in the US gun stock. However, it is likely much lower than 64%, given that commonly owned firearms such as revolvers, bolt-action rifles, and shotguns are not typically designed to be LCM-capable. During the decade the federal assault weapons ban was in effect, no firearms were legally manufactured with LCMs for sale in the United States. In the postban era, semiautomatic firearms, especially pistols, are often sold with factory-issue LCMs, but firearms that are not semiautomatic are not sold with such magazines.

Why do we find LCMs so prominent among high-fatality mass shootings? We suspect there are 2 main reasons. The first is that perpetrators probably deliberately select LCMs because they facilitate the ability to fire many rounds without having to stop to reload. The second reason is that the ability of shooters to kill many victims—especially the 6 victims required to be included in our data set—may be reduced if LCMs are not available. In other words, the first explanation is that shooters perceive LCMs to be more effective at killing many people; the second explanation is that LCMs are indeed more effective at killing many people.

High-fatality mass shootings are not common, even in the United States. Between 1990 and 2017, there has been an average of 2.5 incidents per year, with an average of 25 people killed annually in such attacks. However, the number of incidents and the number of people killed per incident have been increasing since the end of the federal assault weapons ban.

In our study, we found that bans on LCMs were associated with both lower incidence of high-fatality mass shootings and lower fatality tolls per incident. The difference in incidence and overall number of fatalities between states, with and without bans, was even greater for LCM-involved high-fatality mass shootings.

The multivariate results are largely consistent with these bivariate associations. When we controlled for 10 independent variables often associated with overall crime rates, as well as state and year effects, states with LCM bans had lower rates of high-fatality mass shootings and fewer high-fatality mass shooting deaths. When we investigated federal and state bans separately in the multiple

**TABLE 4—Multivariate Results of the Relationship Between Large Caliber Magazine Bans and High-Fatality Mass Shootings (≥ 6 Victims Shot to Death), 1990–2017 Separate Federal and State Large Caliber Magazine Bans: United States**

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
|---|---|---|---|---|
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| Federal LCM ban | −1.434 (−2.622, −0.245) | −3.571 (−7.103, −0.038) | −0.895 (−1.806, 0.016) | −2.570 (−4.902, −0.238) |
| State LCM bans | −2.603 (−4.895, −0.311) | −8.048 (−15.172, −0.925) | −1.277 (−2.977, 0.422) | −3.082 (−7.227, 1.064) |
| Population density | −0.012 (−0.055, 0.030) | −0.001 (−0.085, 0.083) | 0.001 (−0.003, 0.006) | 0.009 (−0.007, 0.024) |
| % aged 19–24 y | −0.311 (−1.499, 0.878) | −2.589 (−6.057, 0.879) | 0.342 (−0.551, 1.236) | −0.531 (−2.759, 1.698) |
| % aged 25–34 y | −0.812 (−1.532, −0.093) | −2.660 (−4.848, −0.471) | −0.323 (−0.864, 0.217) | −0.848 (−2.236, 0.539) |
| % Black | −0.229 (−1.101, 0.643) | −0.770 (−3.232, 1.693) | −0.150 (−0.698, 0.398) | −0.154 (−1.321, 1.013) |
| % with a bachelor's degree or higher | −0.031 (−0.447, 0.509) | −0.479 (−1.577, 0.618) | 0.156 (−0.199, 0.511) | 0.269 (−0.567, 1.106) |
| Percentage of households with a firearm (proxy) | −0.055 (−0.210, 0.101) | −0.227 (−0.651, 0.196) | −0.019 (−0.133, 0.094) | −0.107 (−0.399, 0.186) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | −0.061 (−0.284, 0.162) | −0.420 (−1.041, 0.201) | 0.046 (−0.132, 0.224) | −0.157 (−0.619, 0.305) |
| Imprisonment rate (per 100 000 population) | −0.006 (−0.013, 0.000) | −0.012 (−0.026, 0.002) | −0.002 (−0.007, 0.003) | −0.003 (−0.014, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.30 | 0.15 | 0.26 | 0.11 |

*Note.* CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.45.

[a]Logit regression.

[b]Negative binomial regression.

regressions, both were significantly associated with the incidence of LCM-involved high-fatality mass shootings as well as the number of victims in LCM-involved attacks. The relationship between these bans, considered separately, and all high-fatality mass shooting incidence and deaths is often not statistically significant, although this may be attributable to lack of statistical power (number of observations) to find a statistically significant effect.

Our analysis provides answers to 4 important questions:

1. How often are LCMs used in high-fatality mass shootings? At minimum, 64% of high-fatality mass shootings perpetrated between 1990 and 2017 involved LCMs.
2. Are more people killed when LCMs are used? Yes, and the difference in our data set is substantial and statistically significant (11.8 vs 7.3). We should add that our results likely underestimate the difference because we have a truncated sample (we only examined incidents with at least 6 victim fatalities), compounded by the fact that the number of homicide incidents fell as the number of victims increased.
3. Do states with LCM bans experience high-fatality mass shootings involving LCMs at a lower rate and a lower fatality count than those states with no such bans in effect? Yes. In fact, the effect is more pronounced for high-fatality mass shootings involving LCMs than for those not involving LCMs.
4. Do states with LCM bans experience high-fatality mass shootings (regardless of whether they involve LCMs) at a lower rate and a lower fatality count than states with no such bans in effect? Yes.

## Limitations

Our study had various limitations. First, although we carefully searched for every high-fatality mass shooting, it is possible that we might have missed some. Nevertheless, we suspect that this is unlikely, because it would mean that others who compiled lists have also missed the same ones, for we checked our list against multiple sources.

Second, our definition of a high-fatality mass shooting is a shooting that results in 6 or more fatal victims. A different threshold criterion (e.g., 6 or more people shot; 5 or more victims killed), might lead to somewhat different results. We expect that as the number of victims in a shooting increases, the likelihood that the perpetrator used an LCM also increases. Indeed, of the 13 high-fatality mass shootings with 10 or more fatalities in our data set, 12 (92%) involved an LCM.

Third, although many high-fatality mass shootings tend to be highly publicized, in 13% of the incidents we reviewed, we could not determine whether an LCM was used. As a sensitivity analysis, we assessed the assumptions that all of the unknown cases first did, and then did not, involve LCMs. Neither assumption appreciably changed our main results (not shown).

Fourth, as a general rule, clustering standard errors is most appropriate when there is a large number of treated units. Although during the decade of the federal assault weapons bans all 50 states plus the District of Columbia regulated LCMs, during the remaining time periods under examination, only 8 jurisdictions regulated LCMs. As a result, there is the possibility that the standard errors were underestimated in our analyses.[34]

Fifth, there were only 69 events that met our criterion for a "high-fatality mass shooting." Although 69 is a horrific number of incidents, for statistical purposes, it is a relatively small number and limits the power to detect significant associations. For example, we did not have the statistical power (and thus did not even try) to determine whether

different aspects of the various LCM laws might have differential effects on the incidence of high-fatality mass shootings. Moreover, because of suboptimal statistical power, there is also the possibility that the magnitude of the effects detected was overestimated.[35]

## Public Health Implications

LCMs increase the ability to fire large numbers of bullets without having to pause to reload. Any measure that can force a pause in an active shooting—creating opportunities for those in the line of fire to flee, take cover, or physically confront a gunman—offers a possibility of reducing the number of victims in such an attack. To put it in different terms, if the only firearms available were 18th-century muskets, it is doubtful that mass shootings would be the social problem they are today.

The impact of individual state firearm laws is reduced by the fact that guns often move across state lines—occasionally purchased in locales with more permissive laws and taken to states with more restrictive laws. This is partly why efforts aimed at reducing the frequency and lethality of mass shootings must necessarily be multifaceted and multidisciplinary. Legal restrictions on firearms are merely a part of this broader, public health approach. That being said, the theory behind reducing the availability of LCMs to reduce the number of victims in mass shootings makes sense, and our empirical results, consistent with much of the limited literature on mass shootings, suggest that LCM bans have been effective in saving lives. AJPH

### CONTRIBUTORS

L. Klarevas and D. Hemenway designed the study, collected the data, and contributed equally to all parts of the study. A. Conner ran the statistical analyses and helped construct the tables that report the results of the multivariate analyses. All authors approved the final article as submitted.

### ACKNOWLEDGMENTS

The authors would like to thank John Berrigan, research assistant at the Harvard Injury Control Research Center, for his assistance with the undertaking of this study.

### CONFLICTS OF INTEREST

L. Klarevas has, in the past 2 years, served as an expert to the states of Colorado and California in civil litigation that involved the constitutionality of state restrictions on large-capacity magazines. The authors have no additional conflicts of interest to report.

### HUMAN PARTICIPANT PROTECTION

No protocol approval was needed because no human participants were involved in this study.

### REFERENCES

1. Wintemute GJ. How to stop mass shootings. *N Engl J Med*. 2018;379(13):1193–1196.

2. Reeping PM, Cerda M, Kalesan B, Wiebe DJ, Galea S, Branas CC. State gun laws, gun ownership, and mass shootings in the US: cross sectional time series. *BMJ*. 2019; 364(8190):1542–1548.

3. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times*. October 5, 2017. Available at: https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed June 10, 2019.

4. Kamerow D. Guns don't kill crowds, people with semi-automatics do. *BMJ*. 2011;342(1):d477.

5. Barry CL, Webster DW, Stone E, Crifasi CK, Vernick JS, McGinty EE. Public support for gun violence prevention policies among gun owners and non-gun owners in 2017. *Am J Public Health*. 2018;108(7): 878–881.

6. Lenett MG. Taking a bite out of violent crime. *Univ Dayton Law Rev*. 1995;20(2):573–617.

7. Muchnick JY. The assault weapons ban: saving lives. *Univ Dayton Law Rev*. 1995;20(2):641–651.

8. Koper CS, Roth JA. The impact of the 1994 federal assault weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001;17(1):33–74.

9. Koper CS, Johnson WD, Nicholas JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. *J Urban Health*. 2018;95(3):313–321.

10. Giffords Law Center to Prevent Gun Violence. Large capacity magazines. Available at: http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines. Accessed June 10, 2019.

11. Giffords Law Center to Prevent Gun Violence. Assault weapons. Available at: https://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons. Accessed June 10, 2019.

12. Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990. *Arch Surg*. 1992;127(6): 694–698.

13. Koper CS, Roth JA. A priori assertions versus empirical inquiry: a reply to Kleck. *J Quant Criminol*. 2001; 17(1):81–88.

14. Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. *J Trauma Acute Care Surg*. 2014;76(1):2–9.

15. Manley NR, Fabian TC, Sharpe JP, Magnotti LJ, Croce MA. Good news, bad news: an analysis of 11,294 gunshot wounds (GSWs) over two decades in a single center. *J Trauma Acute Care Surg*. 2017;84(1):58–65.

16. McCullough J. *The Ultimate Guide to US Army Combat Skills, Tactics and Techniques*. New York, NY: Skyhorse; 2012.

17. Fox JA, DeLateur MJ. Mass shootings in America: moving beyond Newtown. *Homicide Stud*. 2014;18(1): 125–145.

18. Krouse WJ, Richardson DJ. Mass murder with firearms: incidents and victims, 1999–2013. CRS Report R44126. Washington, DC: Congressional Research Service; 2015.

19. Wilson LC. *The Wiley Handbook of the Psychology of Mass Shootings*. Hoboken, NJ: Wiley; 2016.

20. Klarevas L. *Rampage Nation: Securing America From Mass Shootings*. Amherst, NY: Prometheus; 2016.

21. Schildkraut J, Elsass HJ. *Mass Shootings: Media, Myths, and Realities*. Denver, CO: Praeger; 2016.

22. Schildkraut J. *Mass Shootings in America: Understanding the Debates, Causes, and Responses*. Denver, CO: ABC-CLIO; 2018.

23. Rocque M, Duwe G. Rampage shootings: an historical, empirical, and theoretical overview. *Curr Opin Psychol*. 2018;19(1):28–33.

24. Phaneuf SW. Mass shootings: understanding the complexities. In: Hilinski-Rosick CM, Lee DR, eds. *Contemporary Issues in Victimology: Identifying Patterns and Trends*. New York, NY: Lexington; 2018.

25. Moody CE, Marvell TB. Clustering and standard error bias in fixed effects panel data regressions. *J Quant Crim*; 2018:1–23.

26. Gius M. The impact of state and federal assault weapons bans on public mass shootings. *Appl Econ Lett*. 2015;22(4):281–284.

27. Blau BM, Gorry DH, Wade C. Guns, laws and public shootings in the United States. *Appl Econ*. 2016;48(49): 4732–4746.

28. Follman M, Aronsen G, Pan D. A guide to mass shootings in America. *Mother Jones*. May 31, 2019. Available at: https://www.motherjones.com/politics/2012/07/mass-shootings-map. Accessed June 10, 2019.

29. Kleck G. Large-capacity magazines and the casualty counts in mass shootings: the plausibility of linkages. *Justice Res Policy*. 2016;17(1):28–47.

30. Webster DW, Donohue JJ, Klarevas L, et al. Firearms on college campuses: research evidence and policy implications. Report of the Johns Hopkins University Center for Gun Policy and Research. Baltimore, MD: Johns Hopkins Bloomberg School of Public Health; 2016.

31. Kleck G. *Targeting Guns: Firearms and Their Control*. Hawthorne, NY: Aldine de Gruyter; 1997.

32. Hemenway D. *Private Guns, Public Health*. Ann Arbor, MI: University of Michigan Press; 2017.

33. Azrael D, Cook PJ, Miller M. State and local prevalence of firearms ownership: measurement, structure and trends. *J Quant Criminol*. 2004;20(1):43–62.

34. Conley TG, Taber CR. Inference with "difference in differences" with a small number of policy changes. *Rev Econ Stat*. 2011;93(1):113–125.

35. Button KS, Ioannidis JPA, Mokrysz C, et al. Power failure: why small sample size undermines the reliability of neuroscience [erratum *Nat Rev Neurosci*. 2013;14(6):451]. *Nat Rev Neurosci*. 2013;14(5):365–376.

# EXHIBIT I

## to Expert Report of Professor Louis Klarevas

# Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data

**Charles DiMaggio, PhD, MPH, Jacob Avraham, MD, Cherisse Berry, MD, Marko Bukur, MD, Justin Feldman, ScD, Michael Klein, MD, Noor Shah, MD, Manish Tandon, MD,** *and* **Spiros Frangos, MD, MPH,** *New York, New York*

Downloaded from https://journals.lww.com/jtrauma by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IlQrHD3XGJJSDa6KLweJRC96i0OVnb8PQyb+Y2lWVHyiDSqYRY= on 01/07/2019

## AAST Continuing Medical Education Article

### Accreditation Statement

This activity has been planned and implemented in accordance with the Essential Areas and Policies of the Accreditation Council for Continuing Medical Education through the joint providership of the American College of Surgeons and the American Association for the Surgery of Trauma The American College Surgeons is accredited by the ACCME to provide continuing medical education for physicians

### *AMA PRA Category 1 Credits™*

The American College of Surgeons designates this journal based CME activity for a maximum of 1 *AMA PRA Category 1 Credit™* Physicians should claim only the credit commensurate with the extent of their participation in the activity

Of the *AMA PRA Category 1 Credit™* listed above a maximum of 1 credit meets the requirements for self assessment

### Credits can only be claimed online

AMERICAN COLLEGE OF SURGEONS

*Inspiring Quality·*
*Highest Standards, Better Outcomes*

*years*

### Objectives

After reading the featured articles published in the *Journal of Trauma and Acute Care Surgery* participants should be able to demonstrate increased understanding of the material specific to the article Objectives for each article are featured at the beginning of each article and online Test questions are at the end of the article with a critique and specific location in the article referencing the question topic

### Claiming Credit

To claim credit please visit the AAST website at http //www aast org/ and click on the e-Learning/MOC tab You must read the article successfully complete the post test and evaluation. Your CME certificate will be available immediately upon receiving a passing score of 75% or higher on the post test Post tests receiving a score of below 75% will require a retake of the test to receive credit

### Disclosure Information

In accordance with the ACCME Accreditation Criteria, the American College of Surgeons, as the accredited provider of this journal activity, must ensure that anyone in a position to control the content of *J Trauma Acute Care Surg* articles selected for CME credit has disclosed all relevant financial relationships with any commercial interest Disclosure forms are completed by the editorial staff, associate editors, reviewers, and all authors The ACCME defines a commercial interest as 'any entity producing, marketing, re-selling, or distributing health care goods or services consumed by or used on, patients Relevant financial relationships are those (in any amount) that may create a conflict of interest and occur within the 12 months preceding and during the time that the individual is engaged in writing the article All reported conflicts are thoroughly managed in order to ensure any potential bias within the content is eliminated. However if you perceive a bias within the article, please report the circumstances on the evaluation form.

Please note we have advised the authors that it is their responsibility to disclose within the article if they are describing the use of a device, product, or drug that is not FDA approved or the off label use of an approved device, product, or drug or unapproved usage

### Disclosures of Significant Relationships with Relevant Commercial Companies/Organizations by the Editorial Staff

Ernest E Moore Editor PI research support and shared U S patents Haemonetics PI, research support, Instrumentation Laboratory Inc Co founder Thrombo Therapeutics Associate Editors David Hoyt, Ronald V Maier and Steven Shackford have nothing to disclose Editorial staff and Angela Sauaia have nothing to disclose

### Author Disclosures

The authors have nothing to disclose.

### Reviewer Disclosures

The reviewers have nothing to disclose.

### Cost

For AAST members and *Journal of Trauma and Acute Care Surgery* subscribers there is no charge to participate in this activity For those who are not a member or subscriber the cost for each credit is $25

### System Requirements

The system requirements are as follows Adobe® Reader 7 0 or above installed Internet Explorer® 7 and above Firefox® 3 0 and above Chrome® 8 0 and above or Safari™ 4 0 and above

### Questions

If you have any questions please contact AAST at 800-789-4006 Paper test and evaluations will not be accepted.

From the Department of Surgery, Division of Trauma and Critical Care Surgery (C.D , J A , C B , M B , J F, M K., N S., M T , S.F), New York University School of Medicine, New York, New York

Address for reprints. Charles DiMaggio, PhD, MPH, Department of Surgery New York University School of Medicine, 462 First Ave, NBV 15, New York, NY 10016-9196, email Charles.DiMaggio@nyumc.org.

77th Annual Meeting of AAST and the World Trauma Congress, Sep 26 - 29, 2018, San Diego, California.

DOI 10 1097/TA 0000000000002060

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved

**BACKGROUND:** A federal assault weapons ban has been proposed as a way to reduce mass shootings in the United States. The Federal Assault Weapons Ban of 1994 made the manufacture and civilian use of a defined set of automatic and semiautomatic weapons and large capacity magazines illegal The ban expired in 2004 The period from 1994 to 2004 serves as a single-arm pre-post observational study to assess the effectiveness of this policy intervention.

**METHODS:** Mass shooting data for 1981 to 2017 were obtained from three well-documented, referenced, and open-source sets of data, based on media reports We calculated the yearly rates of mass shooting fatalities as a proportion of total firearm homicide deaths and per US population We compared the 1994 to 2004 federal ban period to non-ban periods, using simple linear regression models for rates and a Poison model for counts with a year variable to control for trend. The relative effects of the ban period were estimated with odds ratios

**RESULTS:** Assault rifles accounted for 430 or 85 8% of the total 501 mass-shooting fatalities reported (95% confidence interval, 82 8–88 9) in 44 mass-shooting incidents Mass shootings in the United States accounted for an increasing proportion of all firearm related homicides (coefficient for year, 0 7, $p = 0\ 0003$), with increment in year alone capturing over a third of the overall variance in the data (adjusted $R^2 = 0\ 3$) In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides ($p = 0\ 03$) Mass-shooting fatalities were 70% less likely to occur during the federal ban period (relative rate, 0 30, 95% confidence interval, 0 22–0.39)

**CONCLUSION.** Mass-shooting related homicides in the United States were reduced during the years of the federal assault weapons ban of 1994 to 2004 (*J Trauma Acute Care Surg* 2019,86 11–19 Copyright © 2018 American Association for the Surgery of Trauma.)

**LEVEL OF EVIDENCE:** Observational, level II/IV

**KEY WORDS:** Firearms, mass-shootings, assault weapons, epidemiology

Increases in firearm-related injuries, particularly mass-shooting related fatalities, in the United States have contributed to a polarizing and sometimes contentious debate over gun ownership and limiting weapons characterized as assault weapons [1,2] Despite the increasing sense that there is an epidemic of indiscriminate firearm violence in our schools and public spaces, there is a paucity of public health evidence on the topic Among a number of recommendations, a federal Assault Weapons Ban (AWB) has been proposed as a way to prevent and control mass shootings in the United States In this article, we assess evidence for the effectiveness of such a ban in preventing or controlling mass-shooting homicides in the United States

While mass shootings occur in other industrialized nations, the United States is particularly prone to these crimes In a recent 30-year period, the United States had double the number of mass-shooting incidents than the next 24 industrialized nations combined [3] Any public perception of recent increases in the number of these events is borne out by analysis of available data [4] By one measure, there have been more deaths due to mass shootings in the United States in the past 18 years than in the entire 20th century [5] While there is some debate about the role of mental illness in mass shootings,[6–8] many high-profile recent mass shootings (Aurora, CO, Roseburg, OR, San Bernadino, CA, Newtown, CT, Orlando, Las Vegas, Sutherland Springs, TX) have been characterized by the use of semiautomatic assault rifles,[9] leading some to advocate for restrictions on the manufacture and sale of these weapons

While survey results indicate that researchers in criminology, law and public health rank an assault weapons ban as one of the most effective measures to prevent mass shootings, and that 67% of the US general population support such a ban,[10] the existing evidence on banning assault weapons is scant and sometimes contradictory Most evidence is related to the Federal AWB of 1994, which made illegal the manufacture and use by civilians of a defined set of automatic and semiautomatic weapons and large capacity magazines Formally known as "The Public Safety and Recreational Firearms Use Protection Act", the AWB was part of the broader "Violent Crime Control and Law Enforcement Act of 1994 The ban lasted 10 years, expiring in 2004 when the US Congress declined to renew it

In a study soon following the implementation of the 1994 ban, researchers reported a 55% decrease in the recovery of assault weapons by the Baltimore City Police in the first 6 months of 1995, indicating a statistically significant 29 fewer such firearms in the population [11] In a 2009 study based on ICD9 external cause of injury codes for patients younger than 18 years in the United States, 11 states with assault and large-capacity magazine bans, as well as other firearm laws, were compared with 33 states without such restrictions The incidence of firearm injuries per 1,000 total traumatic injuries was significantly lower in states with restrictive laws, 2 2 compared with 5 9 [12] In contrast, a comprehensive 2001 evaluation of the AWB itself concluded that there was "no evidence of reductions in multiple-victim gun homicides or multiple-gunshot wound victimizations" The authors cautioned their results should be "interpreted cautiously" because of the short period since the ban's inception, and that future assessments were warranted [13] More recent studies, while not primarily addressing the US Federal AWB have found results generally consistent with its effectiveness in preventing mass-shooting fatalities [14,15]

We believe sufficient time has passed and enough data have accumulated to treat the period from 1994 to 2004 as a naturalistic pre-post observational comparison period for the association of the AWB with changes in mass-shootings in the United States Because there is no authoritative source or registry, or even a widely agreed upon definition for these incidents, we obtained data from three open source references and restricted our analyses to only those incidents confirmed by all three sources We assess evidence for the potential effectiveness of such a ban in preventing and controlling mass-shooting homicides in the United States We hypothesized that the implementation of the Federal AWB contributed to a reduction in mass shooting deaths as measured by the number and rate of mass shooting fatalities before, during, and after the federal AWB

## METHODS

Mass incident shooting data were obtained from three independent, well-documented and referenced online sources Mother Jones Magazine, the Los Angeles Times and Stanford

© 2018 American Association for the Surgery of Trauma

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved

University.[16–18] These sources have each been the basis for a number of previous studies.[19–26] Data from the three online open-source references were combined. Analyses were restricted to incidents reported by all three sources. Entries were further restricted to those for which four or more fatalities (not including the shooter) were reported, which meets the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Yearly homicide data were obtained from the US Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS) an online database of fatal and nonfatal injury.[29] Because 2017 data were not yet available in the WISQARS system, data for firearm-related homicide data for that year were obtained from a separate online source.[30]

A variable was created to indicate the 1994 to 2004 period as the federal ban period. We attempted to identify incidents involving assault weapons. An assault weapon has been defined as semiautomatic rifle that incorporates military-style features such as pistol grips, folding stocks, and high-capacity detachable magazines.[31] In this study, assault weapons were identified using the text search terms "AK," "AR," "MCX," "assault," "as-sault," or "semiautomatic" in a text field for weapon details. These terms were based on descriptions of the federal assault ban legislative language.[32] The total number of mass shooting fatalities and injuries were aggregated by year and merged with the yearly firearm homicide data.

The rate of mass shooting fatalities per 10,000 firearm homicide deaths was calculated. For the years covered by the data sources, we calculated (1) the total and yearly number of mass-shooting incidents that met the strictest criteria and were confirmed by all three sources, (2) the number of all weapon (assault and nonassault weapons) mass-shooting fatalities, and (3) the case-fatality ratio of all-weapon mass-shooting fatalities per 100 total mass-shooting fatalities and injuries. The yearly case-fatality ratio was plotted with overlying Loess line for trend and standard error limits. We also plotted the yearly rate of mass shooting fatalities per 10,000 firearm-related homicides with an overlying simple linear model with year as the predictor for (1) the total period, and (2) for preban, ban, and postban periods.

We evaluated assumptions of normality and linearity of the data using graphical methods such as density plots and Q-Q normal plots as well as summary statistics. We tested the hypothesis that the federal ban period was associated with a decrease in the number and rate of mass-shooting fatalities in the United States with a multiple linear regression model, with total homicide-based mass-shooting fatality rate as the outcome variable, a dichotomous indicator variable for the federal ban period as the predictor variable, and year as a control variable for trend over time. We calculated the relative risk of mass shooting fatalities during the federal ban period compared to nonban periods by using the "epitab" function of the R "epitools" package. This estimate is based on the ratio of the fatality rate during the ban period divided by the fatality rate during the nonban period. All results are presented with two-sided $p$ values with a significance level of 0.05 and/or 95% confidence intervals (CI). We conducted subgroup analysis with data restricted to incidents in which an assault-type weapon was explicitly noted.

We conducted analyses to test the sensitivity of our results to the choice of denominator with linear regression models controlling for trend with yearly rates based on (1) CDC WISQARS homicide data ending in 2016, (2) extrapolated CDC WISQARS homicide data for 2017, and (3) population denominator-based rates. We tested the robustness of our underlying modeling assumptions with an alternate mixed-effects generalized linear model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion.

The study was determined to be exempt as nonidentifiable data. The study data and analytic code are available for download at http://www.injuryepi.org/styled-2/.

## RESULTS

The three data sources listed incidents ranging in number from 51 (LA Times) to 335 (Stanford) and in dates from 1966 (Stanford) to 2018 (LA Times). There were a total of 51 reported cases of mass shootings between 1981 and 2017 confirmed by all three sources. Forty-four of these incidents met the strictest criteria for mass shootings (4 or more killed), totaling 501 all-weapon fatalities. In total 1,460 persons were injured or killed over the 37-year period, for a total case-fatality ratio of 34.3% (95% CI, 31.9–36.8). The overall rate of mass shooting fatalities per 10,000 firearm-related homicides was 10.2 (95% CI, 9.4–11.2). There was an increase in the all-weapon yearly number of mass-shooting fatalities in the United States during the study period, (Fig. 1) and evidence of a decrease in case fatality in the post-2010 period (Fig. 2). Incidents in which weapons were characterized as assault rifles accounted for 430 or 85.8% of mass-shooting fatalities (95% CI, 82.8–88.9). Weapons characterized as assault rifles accounted for *all* mass-shooting fatalities in 15 (62.5%) of the 24 (95% CI, 42.6–78.9) years for which a mass-shooting incident was reported, accounting for a total of 230 fatalities in those years.

Between 1981 and 2017, mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides, with increment in year accounting for nearly 32% of the overall variance in the data. During the years in which the AWB was in effect, this slope decreased, with an increase in the slope of yearly mass-shooting homicides in the postban period.

**Figure 1.** Mass shooting deaths. United States 1981–2017.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

**Figure 2.** Case fatality per 100 total mass-shooting injuries with loess smoothing line for trend and standard error bounds. United States 1981–2017.

(Fig. 3). A similar pattern was evident in data restricted to those incidents characterized as involving assault weapons (Fig. 4).

In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting–related deaths per 10,000 firearm homicides per year (Table 1). The model indicated that year and federal ban period alone accounted for nearly 40% of all the variation in the data (adjusted $R^2$ = 0.37). A subanalysis

**Figure 3.** Mass shooting deaths per 10,000 firearm-related homicides with linear trends for preban, ban, and postban periods. United States 1981–2017.

**Figure 4.** Mass-shooting shooting deaths per 10,000 firearm-related homicides restricted to incidents involving assault weapons with linear trends for preban, ban, and postban periods. United States 1981–2017.

restricted to just those incidents characterized by the use of an assault weapon indicated that seven preventable deaths during the ban period were due to assault weapons alone (Table 2).

The risk of mass shooting fatalities during the federal van period was 53 per 140,515 total firearm homicides compared with 448 per 348,528 during the nonban periods, for a risk ratio of 0.30 (95% CI, 0.22–0.39). The calculated risk ratio for the association of the federal ban period with mass-shooting fatalities as a proportion of all firearm-related homicides was 0.29 (95% CI, 0.22–0.29), indicating that mass shooting fatalities were 70% less likely to occur during the federal ban period.

The results of our sensitivity analyses were consistent with our main analyses for total mass shooting fatalities. In a linear regression analysis controlling for yearly trend and restricted to the period ending in 2016 using just CDC WISQARS homicide data as the denominator, the effect of ban period was associated with a statistically significant eight fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.0; $p = 0.05$). In a similar model using extrapolated CDC WISQARS homicide data for 2017 instead of Online Gun Violence Archive data as the denominator, the effect of ban

**TABLE 1.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | t | p |
|---|---|---|---|---|
| (Intercept) | −1409.4 | 333.0 | −4.2 | 0.0002 |
| Year | 0.7 | 0.2 | 4.3 | 0.0001 |
| Ban Period | −8.6 | 3.9 | −2.2 | 0.03 |

© 2018 American Association for the Surgery of Trauma.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

**TABLE 2.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths Characterized by Use of Assault Weapon per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | t | p |
|---|---|---|---|---|
| (Intercept) | −1219 7 | 333 9 | −3 7 | 0 0009 |
| Year | 0 6 | 0.2 | 3 7 | 0 0008 |
| Ban | −6 7 | 3 9 | −1 7 | 0 09 |

period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8 6, $p = 0\ 03$) A model based on the total yearly US population as the denominator, the effect of ban period was associated with a statistically significant 0 4 fewer mass shooting related deaths per 10,000,000 population (coefficient for ban period, 0 4, $p = 0\ 02$)

The results of a mixed-effects generalized linear Poisson model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion were very similar whether the offset variable was the number of total firearm deaths or the population size In either case, the assault weapons ban period was associated with an approximately 85% reduction in mass shooting fatalities (Table 3)

## DISCUSSION

Recently, 75% of members of the American College of Surgeons Committee on Trauma endorsed restrictions to "civilian access to assault rifles (magazine fed, semiautomatic, i e , AR-15),"[33] and 76% of the Board of Governors were in favor of a limit to " civilian access to ammunition designed for military or law enforcement use (that is, armor piercing, large magazine capacity) "[34] In 2015, the American College of Surgeons joined seven of the largest most prestigious professional health organizations in the United States and the American Bar Association to call for "restricting the manufacture and sale of military-style assault weapons and large-capacity magazines for civilian use "[35] This analysis adds evidence to support these recommendations

No observational epidemiologic study can answer the question whether the 1994 US federal assault ban was causally related to preventing mass-shooting homicides However, this study adds to the evidence by narrowly focusing our question on the potential effect of a national assault weapon ban on mass shootings as measured through the lens of case fatality While the data are amenable to a number of additional analyses, such as stratification by location (e g school vs nonschool) or by characterization of large-capacity magazines versus non large-capacity magazine, we chose to focus only on year of occurrence and total number of fatalities In this way, we relied on the least subjective aspects of the published reports We believe our results support the conclusion that the ban period was associated with fewer overall mass-shooting homicides These results are also consistent with a similar study of the effect of a 1996 ban on assault type weapons in Australia after which mass-shooting fatalities dropped to zero [36]

While the absolute effects of our regression analyses appears modest (7 to 9 fewer deaths per 10,000 firearm-homicides), it must be interpreted in the context of the overall number of such fatalities, which ranges from none to 60 in any given year in our data. However, if our linear regression estimate of 9 fewer mass shooting–related deaths per 10,000 homicides is correct, an assault weapons ban would have prevented 314 of the 448 or 70% of the mass shooting deaths during the nonban periods under study Notably, this estimate is roughly consistent with our odds ratio estimate and Poisson model results

Our results add to the documentation that mass shooting–related homicides are indeed increasing, most rapidly in the postban period, and that these incidents are frequently associated with weapons characterized as assault rifles by the language of the 1994 AWB We did not find an increase in the case fatality ratio of mass-shooting deaths to mass-shooting injuries This might at first seem counterintuitive and paradoxical The destructive effect of these weapons is unequivocal They are engineered to cause maximum tissue damage rapidly to the greatest number of targets However, it may be that the use of these kinds of weapons results in indiscriminate injury with additional rounds more likely to injure more people increasing the denominator in a case-fatality ratio By contrast, the use of nonassault weapons may result in more precise targeting of victims It is also possible that improvements in trauma care are driving down case fatality [37] Also, it is worth noting that in absolute terms, there were many more fatalities outside the ban period and that survivable injury comes with its own physical, emotional, and economic costs, which have been estimated at US $32,237 per hospital admission [38]

Despite US federal funding restrictions on firearm-related research dating to 1996,[39,40] there is a small but growing number of analyses of mass shooting violence in the United States Many articles have focused on the mental health aspects of these incidents,[41–43] or on social effects like increased firearm acquisition following mass shootings [44 45] However, fewer studies have taken a strictly public health or clinical approach Among these, an autopsy-based study of the incidence and severity of mass-shooting casualties concluded the wound patterns differed sufficiently from combat injuries to require new management strategies, indicating there is much to be learned from a systematic epidemiological perspective [46] Recently, there have been calls to remove such funding restrictions from both academics and elected officials from across the political spectrum [47 48]

Our choice of data and analytic approach may reasonably be debated We chose to base our analyses on the yearly rate of mass shooting fatalities per 10,000 overall firearm homicides This is not a population-based risk estimate, but is in fact a risk as commonly used in the epidemiologic literature which is essentially a probability statement, that is, the number of events

**TABLE 3.** Exponentiated Coefficients Generalized Linear Poisson Model

| | Homicide Offset | | Population Offset | |
|---|---|---|---|---|
| Variable | Estimate | 95% CI | Estimate | 95% CI |
| Year | 0 6 | 0 2 | 3 7 | 0 0008 |
| Ban | −6 7 | 3 9 | −1 7 | 0 09 |

Effect of 1994–2004 federal assault weapon ban on mass-shooting death counts. United States, 1981 20017

© 2018 American Association for the Surgery of Trauma

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved

that occurred over the number of times that event could occur It is the risk of a homicide occurring as a result of a mass shooting It may be considered a strong assumption to build mass shooting death rates based on the overall firearm homicide rate The demographics of most homicide victims may differ appreciably from those of mass shooting victims We selected this approach from among a number of imperfect potential denominators, believing that basing the rates on the number of firearm-homicides partly controls for secular trends in overall homicides and firearm availability Our sensitivity analyses indicate that our results were robust to most any choice of denominator We chose linear regression as our primary model because it was straightforward, accessible to most readers, accounted for linear trends in the data, and returned results in the metric in which we were most interested, that is, changes in the rate of fatalities Our comparative Poisson model results were essentially consistent with the primary model

These analyses are subject to a number of additional limitations and caveats, primary among which is that there is no authoritative source of data on mass shooting, and any one source may be biased and incomplete It was for this reason that we chose to combine three independent sources of data, each with its own strengths and weaknesses, and base our analyses only on those numbers that were verified by all three sources We further restricted our analyses to only the number of fatalities and the year in which the incident occurred, and to the strictest definition of mass shootings as defined by the Federal Bureau of Investigation[27,28] Even with this approach, the data remain imprecise and subject to differing definitions We attempted to compensate for this by framing our questions as precisely as possible, following the advice of the scientist and statistician John Tukey to pursue, " an approximate answer to the right question (rather) than the exact answer to the wrong question "

In this study, we failed to falsify the hypothesis that the AWB was associated with a decrease in mass shooting fatalities in the United States However, it is important to note that our model did not include important and potentially confounding factors like state-level and local differences in assault weapon laws following the sun downing of the federal AWB Additional analyses including such variables and using approaches like propensity score matching and regression discontinuity[49] with data further aggregated to state and local levels are necessary to test the strength and consistency of our results

Federally referenced denominator data were not available for the last year of the study We chose to use data from the Online Gun Violence Archive to account for firearm homicide in 2017 This resource is a nonpartisan not-for-profit group founded and maintained by a retired computer systems analyst and gun advocate[50] The alternative would have been to extrapolate from the CDC data, but the 15,593 firearm-related homicides reported by the Online Gun Violence Archive in 2017 was more consistent with the 14,415 reported by CDC in 2016 compared with the 11,599 predicted by an extrapolation and returned more conservative estimates of the increased rate of recent mass shootings We note there were many years in which the number of mass-shooting fatalities is listed as zero There were, in fact, fatalities and incidents in those years that could meet a definition of mass shooting, but they were not reported by all three sources, or did not meet the strict criteria we set for this analysis

An assault weapon ban is not a panacea, nor do our analyses indicate that an assault weapon ban will result in fewer overall firearm-related homicides It is important to recognize that suicides make up the majority of firearm-related deaths in the United States, accounting for 60 7% of 36,252 deaths from firearms in 2015[51] However, while this is a critically important issue in its own right, suicides differ fundamentally from mass-shootings, and are unlikely to be affected by an assault weapons ban Also, compared with the 501 mass-shooting fatalities we counted, there were 489,043 firearm-related homicides in the United States Public health efforts should be directed at reducing all gun violence and must be multipronged, including targeted initiatives to address mental illness and reducing access to weapons in those with a propensity for violence However, taken in the context of the increase in mass shootings in the United States, these results support the conclusion that the federal AWB of 1994 to 2004 was effective in reducing mass shooting–related homicides in the United States, and we believe our results support a re-institution of the 1994 federal assault weapons ban as a way to prevent and control mass shooting fatalities in the United States

## DISCLOSURE

The authors have no conflicts of interest to declare
There are no federal or nonfederal funding sources associated with this study

## REFERENCES

1 Wolchover N Why gun control is so contentious in the US *LiveScience* 20 July 2012 https //www livescience com/21741 gun control second amendment.html Accessed 10 August 2018

2 Bond S Students take the lead in US gun control debate. *Financial Times* 23 February 2018 https //www ft com/content/9341021e-1818-11e8 9376 4a6390addb44 Accessed 10 August 2018

3 Lemieux F 6 things to know about mass shootings in America *Scientific American* 13 June 2016 https //www scientificamerican com/article/6 things-to know-about-mass-shootings in-america/ Accessed 6 June 2018

4 Webster DW The true effect of mass shootings on Americans. *Annals of Internal Medicine* 16 May 2017 The http //annals org/aim/fullarticle/ 2624992/true-effect mass-shootings-americans Accessed 6 June 2018

5 Katsiyannis A, Whitford DK, Ennis RB Historical examination of United States intentional mass school shootings in the 20th and 21st centuries implications for students, schools, and society *Child Fam Stud* (19 April 2018) https.//doi org/10 1007/s10826-018 1096-2

6 Follman M Mass shootings maybe what we need is a better mental health policy *Mother Jones* 9 November 2012 https.//www motherjones com/ politics/2012/11/jared loughner mass-shootings-mental illness/ Accessed 11 August 2018

7 Carey B "Are mass murderers insane? Usually not, researchers say" *New York Times* 8 November 2017 https //www nytimes com/2017/11/08/ health/mass-murderers-mental illness html Accessed 11 August 2018

8 Duwe G, Rocque M Actually, there is a clear link between mass shootings and mental illness *Los Angeles Times* 23 February 2018 http //www latimes com/opinion/op ed/la-oe-duwe rocque-mass shootings mental-illness-20180223-story html Accessed 11 August 2018

9 Gillin J, Greenberg J, Jacobson L, Valverde M The facts on mass shootings in the United States *Politifact* 8 November 2017 http.//www politifact com/ truth-o meter/article/2017/nov/08/facts-mass-shootings-united-states/ Access 6 June 2018

10 Sanger Katz M, Bui Q How to reduce mass shooting deaths? Experts rank gun laws *New York Times* 5 October 2017 https //www nytimes com/ interactive/2017/10/05/upshot/how to reduce mass shooting deaths-experts-say-these-gun laws-could help html Accessed 6 June 2018

© 2018 American Association for the Surgery of Trauma

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved

11 Weıl DS, Knox RC. The Maryland ban on the sale of assault pıstols and hıgh-capacıty magazınes estımatıng the ımpact ın Baltımore *Am J Publıc Health* 1997,87(2) 297–298
12 Safavı A, Rhee P, Pandıt V, Kulvatunyou N, Tang A, Azız H, Green D, O'Keeffe T, Vercruysse G, Frıese RS, et al Chıldren are safer ın states wıth strıct fırearm laws a natıonal ınpatıent sample study *J Trauma Acute Care Surg* 2014;76(1) 146–150, dıscussıon 150–1
13 Koper CS, Roth JA. The ımpact of the 1994 Federal Assault Weapon ban on gun vıolence outcomes an assessment of multıple outcome measures and some lessons for polıcy evaluatıon *J Quant Crımınol* 2001, Vol 17, No 1
14 Gıus M The ımpact of state and federal assault weapons bans on publıc mass shootıngs *Applıed Economıcs Letters* 2015,22(4) 281–284
15 Lemıeux F, Brıcknell S, Prenzler T Mass shootıngs ın Australıa and the Unıted States, 1981-2013 *Journal of Crımınologıcal Research Polıcy and Practıce* 1(3) 131–142
16 Follman M, Aronsen G, Pan D, Caldwell M US mass shootıngs, 1982-2018 data from mother Jones' ınvestıgatıon *Mother Jones* 2012, https //www motherjones.com/polıtıcs/2012/12/mass shootıngs-mother jones-full-data/ Accessed 3 June 2018
17 The Los Angeles tımes staff "Deadlıest U S mass shootıngs", 1984-2017 *Los Angeles Tımes* Oct 1, 2017, tımelınes latımes com/deadlıest-shootıng-rampages/ Accessed 29 August 2018
18 Stanford mass shootıngs ın Amerıca, courtesy of the Stanford Geospatıal Center and Stanford lıbrarıes 2016 Avaılable at https //lıbrary stanford edu/projects/mass-shootıngs-amerıca. Accessed 29 August 2018
19 Fox JA, Levın J, Frıdel EE. *Extreme Kıllıng Understandıng Serıal and Mass Murder* Sage Publıcatıons, 2018
20 Dıllon L. *Mass Shootıngs ın the US An Exploratory Study of the Trends from 1982–2012* PhD thesıs, 2014
21 Lankford A Publıc mass shooters and fırearms a cross-natıonal study of 171 countrıes *Vıolence Vıct* 2016,31(2) 187
22 Lowe SR, Galea S The mental health consequences of mass shootıngs *Trauma Vıolence Abuse* 2017,18(1) 62–82
23 Fox JA, Frıdel EE. The tenuous connectıons ınvolvıng mass shootıngs, men tal ıllness, and gun laws *Vıolence Gend* 2016,3(1) 14–19
24 Luca M, Malhotra DK, Polıquın C The ımpact of mass shootıngs on gun pol ıcy *Harvard Busıness School NOM Unıt Workıng Paper No* 2016,1 16–126
25 Buchholtz LK. Command-dırected mental health evaluatıons and mental health related dıscharges from the U S mılıtary an argument for command authorıty *J Health Care Fınance* 2016
26 Bradley K Code blue the expandıng fıeld of tactıcal/battlefıeld medıcıne *J Law Enforcement* 2017,6(2)
27 Smart R Mass shootıngs defınıtıons and trends RAND Corporatıon https.//www rand org/research/gun polıcy/analysıs/supplementary/mass shootıngs html Accessed 2 June 2018
28 Krouse WJ, Rıchardson DJ *Mass Murder wıth Fırearms Incıdents and Vıctıms 1999–2013* Washıngton, D C Congressıonal Research Servıce, R44126 2015
29 Centers for Dısease Control and Preventıon CDC's WISQARS (web-based ınjury statıstıcs query and reportıng system) https //www cdc gov/ınjury/ wısqars/fatal html Accessed 12 February 2018
30 The onlıne gun vıolence archıve past summary ledgers http //www gunvıolencearchıve org/past tolls. Accessed 12 February 2018.
31 Studdert DM, Donohue JJ, Mello MM Testıng the ımmunıty of the fırearm ındustry to tort lıtıgatıon *JAMA Intern Med* 2017,177(1) 102–105
32 Publıc Safety and Recreatıonal Fırearms Act PL 103 322, Title XI 103rd Cong (1994)
33 Kuhls DA, Campbell BT, Burke PA, Allee L, Hınk A, Letton RW, Masıakos PT, Coburn M, Alvı M, Lerer TJ, et al Survey of Amerıcan Col lege of Surgeons Commıttee on trauma members on fırearm ınjury consensus and opportunıtıes *J Trauma Acute Care Surg* 2017,82(5) 877–886
34 Puls M, Kuhls D, Campbell B, Burke P, Mıchelassı F, Stewart R Survey of the Amerıcan College of Surgeons Board of governors on fırearm ınjury preventıon consensus and opportunıtıes *Bull Am Coll Surg* 2017, 102(10) 30–36
35 Weınberger SE, Hoyt DB, Lawrence HC 3rd, Levın S, Henley DE, Alden ER, Wılkerson D, Benjamın GC, Hubbard WC. Fırearm related ınjury and death ın the U S a call to actıon from 8 health professıonal organızatıons and the Amerıcan Bar Assocıatıon *Ann Intern Med* 2015,162(7) 513–516
36 Chapman S, Alpers P, Jones M Assocıatıon between gun law reforms and ıntentıonal fırearm deaths ın Australıa, 1979-2013 *JAMA* 2016,316(3) 291–299
37 DıMaggıo C, Ayoung-Chee P, Shınsekı M, Wılson C, Marshall G, Lee DC, Wall S, Maulana S, Leon Pachter H, Frangos S Traumatıc ınjury ın the U.S ın patıent epıdemıology 2000-2011 *Injury.* 2016,47(7) 1393–1403
38 Peek Asa C, Butcher B, Cavanaugh JE Cost of hospıtalızatıon for fırearm ınjurıes by fırearm type, ıntent, and payer ın the U.S *Inj Epıdemıol* 2017, 4(1) 20
39 Wexler L. "gun shy· how a lack of funds translates to ınadequate research on gun vıolence ın Amerıca" *Hopkıns Bloomberg Publıc Health Fall* 2017, https //magazıne jhsph edu/2017/fall/features/cassandra-crıfası hopkıns-moderate-gun-owner-gun polıcy researcher/how-the-dıckey-amendment-affects-gun vıolence-research html Access 5 June 2018
40 Greenberg J Spendıng bıll's gun research lıne does ıt nullıfy dıckey amend ment? *Polıtıfact* 27 March 2018 http.//www polıtıfact.com/truth-o meter/ artıcle/2018/mar/27/spendıng bılls-gun research lıne-does-ıt matter/ Accessed 6 June 2018
41 Pınals DA, Anacker L. Mental ıllness and fırearms legal context and clınıcal approaches *Psychıatr Clın North Am* 2016,39(4) 611–621
42 Leıner M, De la Vega I, Johansson B Deadly mass shootıngs, mental health, and polıcıes and regulatıons what we are oblıgated to do! *Front Pedıatr* 2018,6 99
43 Swartz MS, Bhattacharya S, Robertson AG, Swanson JW Involuntary outpa tıent commıtment and the elusıve pursuıt of vıolence preventıon *Can J Psychıatry* 2017,62(2) 102–108
44 Studdert DM, Zhang Y, Rodden JA, Hyndman RJ, Wıntemute GJ Handgun acquısıtıons ın Calıfornıa after two mass shootıngs *Ann Intern Med* 2017, 166(10) 698–706
45 Stroebe W, Leander NP, Kruglanskı AW The ımpact of the Orlando mass shootıng on fear of vıctımızatıon and gun purchasıng ıntentıons not what one mıght expect *PLoS One* 2017,12(8) e0182408
46 Smıth ER, Shapıro G, Saranı B The profıle of woundıng ın cıvılıan publıc mass shootıng fatalıtıes *J Trauma Acute Care Surg* 2016,81(1) 86–92
47 Behrman P, Reddıng CA, Raja S, Newton T, Beharıe N, Prıntz D Socıety of Behavıoral Medıcıne (SBM) posıtıon statement. restore CDC fundıng for fırearms and gun vıolence preventıon research *Transl Behav Med* 2018
48 Wong S "GOP chaırman. congress should rethınk CDC ban on gun vıolence research" *The Hıll* 15 February 2018 http.//thehıll com/homenews/house/ 374149 gop-chaırman-congress should rethınk-cdc-ban-on gun vıolence-research Accessed 5 June 2018
49 Basu S, Meghanı A, Sıddıqı A Evaluatıng the health ımpact of large-scale publıc polıcy changes classıcal and novel approaches. *Annu Rev Publıc Health* 2017,38 351–370
50 Drange M The Kentucky gun owner who developed hıs own count of gun vıolence ın the US *The Guardıan* 23 Aprıl 2016 https //www theguardıan com/world/2016/apr/23/kentucky gun-owner gun vıolence-archıve-mark bryant Accessed 5 June 2018
51 Murphy SL, Xu J, Kochanek KD, Curtın SA, Elızabeth Arıas E *National Vi tal Statıstıcs Reports* Volume 66, Number 6 November 27, 2017 Deaths Fı nal Data for 2015 Centers for Dısease Control and Preventıon.

## DISCUSSION

**Ernest E. "Gene" Moore, MD** (Denver, Colorado) Thank you, Dr Rotondo and Dr Reılly Can I please have the dıscussıon vıdeo [sounds of a gun shootıng] Well, that ıs the AR15 rıfle Lıterally, 30 potentıal lethal shots delıvered wıthın 10 seconds Is thıs safe to have ın our socıety?

I congratulate Dr DıMaggıo and hıs colleagues from NYU for theır superb presentatıon on a very tımely ıssue The AAST has had a long-term ınterest ın reducıng gun vıolence ın the Unıted States, and has recently publıshed our 14-poınt approach. Access to assault rıfles ıs one of them At a reductıonıst level, mass shootıngs are the net result of (1) a deranged person ıntendıng to kıll random ındıvıduals ın a populated area, and (2) the use of an assault rıfle Sınce we seem to be unable to ıdentıfy

© 2018 Amerıcan Assocıatıon for the Surgery of Trauma

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved

the active shooter preemptively, we are left with the alternative solution of eliminating the weapon

The presentation today provides evidence that a federal assault weapon ban can reduce mass shootings According to our recent national trauma surgeon surveys, three-fourths of us in the audience, including me, would like to believe the analysis, but I think we need to consider some of the potential limitations

Many of these issues relate to the fact that research support for gun violence control in the United States remains frustratingly suppressed and fundamentally inadequate The general lack of information, low quality of data, and need to merge data sets from diverse sources – medical, coroner, police, legal, and behavioral – compounded by scarce funding and public controversy, undermine research to inform policy and enlighten the public The fact that you had to compare three open-access databases to be certain that the reported mass shootings occurred underscores this deficiency

Furthermore, there is no definition of a mass shooting, although you employed perhaps the most acceptable at the moment – the FBI's definition Could you explain for us the rationale for this definition?

You present an analysis of 44 events with four or more deaths, including the shooter, from 1981 to 2017 – a 36-year period, whereas, others suggest a much higher incidence, such as Klaveras, who reported 69 shootings of six or more over the past 27 years

Identifying all known mass shootings per year during a study period would be useful to appreciate the overall trends, as your data somewhat understates the magnitude of mass shootings in the United States

You employed the Gun Violence Archive to estimate homicides in 2017 Why did you not use this source for mass shootings? The Archive has reported an alarming 261 mass shootings – defined as six or more shot – thus far in 2018 Nonetheless, in the sample you studied, assault rifles accounted for greater than 85 percent of the fatalities, and this is the key issue

You have evaluated the impact of the federal assault rifle ban by analyzing the rate of mass shootings per 10,000 firearm homicide deaths per year to adjust for confounders This would assume that the factors influencing mass shootings are the same as those for homicides, which seems very unlikely You have idicated that you analyzed mass-shooting fatalities per population per year, perhaps you could elaborate more about this analysis

Another confounder as acknowledged in the presentation is the impact of individual state limitations on magazine capacity The first state to enforce these limitations was New Jersey in 1990, and now at least eight states and Washington, D C , have these restrictions in effect How can we distinguish the effects of this policy? And could this be a potential bridge to ultimately reestablish a national assault rifle ban?

You have also calculated the case fatality of all weapons in mass shootings per 100 total shootings, finding a decrease since 2010 While you conjecture this may be due to indiscriminate injury from assault rifles or possibly attributed to better trauma care, I am uncertain how this is relevant to the issue of banning assault rifles The Las Vegas shooting is a cogent example of how these data may be misleading

Finally, there is the issue of so-called falsification that could be addressed by examining other causes of trauma mortality during this time period

In sum, this study adds to overwhelming evidence that assault rifles are an essential component in the dramatic escalation of mass shootings in the United States While the scientific data to support a federal ban on civilian assault rifles is imperfect due to inadequate research support, I submit collectively the existing information argues strongly for enactment of this measure, and compliment the authors for their timely contribution

**Sheldon H. Teperman, MD** (Bronx, New York) Dr DiMaggio, your home institution, Bellevue, plays a seminal role in the trauma center safety of our nation

In fact, right now, your trauma medical director is not present with us, but he is at home on guard for the U N General Assembly But in New York, we don't see long-gun injuries New York has the Safe Act, and there is an assault weapons ban So why is it so important to America's trauma center – Bellevue – that we see a national ban on assault rifles?

**Charles E. Lucas, MD** (Detroit, Michigan) Thank you for your nice presentation How many of these incidents occurred in an inner-city environment, where most of the victims that we treat have received multiple wounds which were purposely inflicted in order to compete competitively for the distribution of heroin and other drugs? Also, how many of the assailants were African-American?

**Martin A. Croce, MD** (Memphis, Tennessee) Thank you I want to commend the authors for an excellent study, and really, not so much to ask any questions but I rise to put out a plea to the membership that this issue is a public health problem

This is not a right versus left problem, this is not a Second Amendment problem This is a public health problem

And to quote Wayne Meredith at one of the recent Board meetings, "Our primary goal is to reduce the number of bullet holes in people" So I implore the Membership to correct this dearth of research that is going on about gun violence in order to promote a public health approach, so that we can reduce the number of bullet holes in people

**Deborah A. Kuhls, MD** (Las Vegas, Nevada) And to carry on that thought, I would urge the authors to incorporate the public health data from the CDC when it is available, because part of the methodological issues for this paper is that one data set was used for a certain period of time

But for the last year, the CDC data was not used because it was not available, so I would urge you to not only do that analysis, but I would also urge the Journal of Trauma to consider an update to that article when that is available Thank you

**Charles DiMaggio, MPH, PhD** (New York, New York) Thank you very much for all these comments and questions

Dr Moore, so with regard to your observation about the reductionist approach to looking at this particular issue, that puts me in the mind very much of the traditional epidemiologic triad of agent, host, and environment, and if you break one link in that connection, you can break the transmission In this case, we could call assault weapons one link, whether it's agent or host, we can decide

With regards to the rationale for the definition, I think it's reflective of the lack of research in this area

A case definition is an essential and critical first step in any epidemiologic investigation, and you can see that we are barely there I think the FBI definition makes sense, I think it's the oldest one, I think it's informed by expert consensus

© 2018 American Association for the Surgery of Trauma.

Copyright © 2018 Wolters Kluwer Health, Inc All rights reserved

And I think all the other definitions are based in some form on that, which is why we chose it. And I would urge that if we are going to be doing this research going forward, probably it would be best if we all had the consensus that that be the definition

Why did we not use the Gun Violence Archive to estimate some of these results, and why are our numbers so much smaller than some of the other numbers? I have to agree, our numbers are very much an under-count

We restricted our analysis to these three databases And so the limiting factor was the one database And I can tell you it was the LA Times – they had the fewest number And if it wasn't in the LA Times, then the other databases didn't contribute to this data set

We felt that the important aspect of this particular study was to demonstrate the relative effects, merits or associations with the assault weapon ban as opposed to documenting the absolute numbers

So the Gun Archive, for example, defines mass shootings as four or more deaths or injuries That really raises the number of deaths that can be included We didn't include it, but I think going forward we absolutely should

With regard to the analysis using population denominators, we agree, actually, that gun homicides are an imperfect denominator We also felt that population was an imperfect denominator And again, as we keep on circling around, it has to do with the data in this case

We did feel that gun homicides captured something about gun availability and criminality in the United States, although homicides themselves differ very much from these mass shooting fatalities

We do note that our population-based results essentially mirrored the gun homicide results, indicating that, at least for the relative effects and benefits of the assault weapons ban, the results are robust and invariant to the choice of denominator in this case

Can we distinguish local effects, and could this possibly be a bridge to reestablishing an assault rifle ban? The short answer is yes and yes We can distinguish local effects

We took a very broad approach on this particular study as a first pass on the data But, there are data sources (and even within the data sources we used) where you can tease out local, municipal and state policies

Also, we can link our data to other sources that have those variables There are statistical methods available that will not only account for those variables, but also allow us to measure or estimate in some way the contribution of local or regional variation in these policies to the overall effectiveness

The issue of the case fatality rate is very interesting and challenging I want to note that there was a paper in JAMA on September 11th – just a couple of weeks ago – looking at mass shooter fatalities, that came essentially to the same conclusion – that there has been this recent decrease

In our paper, in this write-up, we look at three potential explanations, and one of them is, first of all, it's just a matter of denominator These are indiscriminate weapons

You have someone shooting at a large group of people, and there are going to be more injuries and more casualties, and it just inflates the denominator in this case

The second thing is, the obverse of that, is single-fire weapons, guns, are very personal weapons They're usually characterized by someone who knows who they want to kill And finally, we feel that perhaps there may be some improvement by the folks in this room in treating these

I'm going to close at this point, given the time constraints

© 2018 American Association for the Surgery of Trauma

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved

# EXHIBIT J

## to Expert Report of Professor Louis Klarevas

Original Paper

# Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis

Lori Post[1], PhD; Maryann Mason[1], PhD; Lauren Nadya Singh[1], MPH; Nicholas P Wleklinski[2], MD; Charles B Moss[3], PhD; Hassan Mohammad[1]; Tariq Z Issa[2], BA; Adesuwa I Akhetuamhen[2], MD; Cynthia A Brandt[4], MD, MPH; Sarah B Welch[1], MPH; James Francis Oehmke[1], PhD

[1]Buehler Center for Health Policy and Economics, Feinberg School of Medicine, Northwestern University, Chicago, IL, United States

[2]Feinberg School of Medicine, Northwestern University, Chicago, IL, United States

[3]Institute of Food and Agricultural Sciences, University of Florida, Gainsville, FL, United States

[4]Yale Center for Medical Informatics, Yale School of Medicine, Yale University, New Haven, CT, United States

**Corresponding Author:**
Lori Post, PhD
Buehler Center for Health Policy and Economics
Feinberg School of Medicine
Northwestern University
420 E Superior
Chicago, IL, 60611
United States
Phone: 1 203 980 7107
Email: lori.post@northwestern.edu

## Abstract

**Background:** Public mass shootings are a significant public health problem that require ongoing systematic surveillance to test and inform policies that combat gun injuries. Although there is widespread agreement that something needs to be done to stop public mass shootings, opinions on exactly which policies that entails vary, such as the prohibition of assault weapons and large-capacity magazines.

**Objective:** The aim of this study was to determine if the Federal Assault Weapons Ban (FAWB) (1994-2004) reduced the number of public mass shootings while it was in place.

**Methods:** We extracted public mass shooting surveillance data from the Violence Project that matched our inclusion criteria of 4 or more fatalities in a public space during a single event. We performed regression discontinuity analysis, taking advantage of the imposition of the FAWB, which included a prohibition on large-capacity magazines in addition to assault weapons. We estimated a regression model of the 5-year moving average number of public mass shootings per year for the period of 1966 to 2019 controlling for population growth and homicides in general, introduced regression discontinuities in the intercept and a time trend for years coincident with the federal legislation (ie, 1994-2004), and also allowed for a differential effect of the homicide rate during this period. We introduced a second set of trend and intercept discontinuities for post-FAWB years to capture the effects of termination of the policy. We used the regression results to predict what would have happened from 1995 to 2019 had there been no FAWB and also to project what would have happened from 2005 onward had it remained in place.

**Results:** The FAWB resulted in a significant decrease in public mass shootings, number of gun deaths, and number of gun injuries. We estimate that the FAWB prevented 11 public mass shootings during the decade the ban was in place. A continuation of the FAWB would have prevented 30 public mass shootings that killed 339 people and injured an additional 1139 people.

**Conclusions:** This study demonstrates the utility of public health surveillance on gun violence. Surveillance informs policy on whether a ban on assault weapons and large-capacity magazines reduces public mass shootings. As society searches for effective policies to prevent the next mass shooting, we must consider the overwhelming evidence that bans on assault weapons and/or large-capacity magazines work.

***(JMIR Public Health Surveill 2021;7(4):e26042)*** doi: 10.2196/26042



**KEYWORDS**

firearm surveillance; assault weapons ban; large-capacity magazines; guns control policy; mass shootings; regression lines of discontinuity

## Introduction

### Background

Approximately 44,000 people are killed and an additional 100,000 people are injured by a gun each year in the United States [1,2]. Mass shooting fatalities, as a particular type of gun injury event, account for <1% of all gun deaths [3] and have largely been ignored until recently [4,5]; yet, mass shooting events occur multiple times per year [6]. This information is based on insights from firearm surveillance performed by a variety of researchers, and state and federal agencies on incidence, prevalence, risk factors, injuries, deaths, and precipitating events, similar to the surveillance of infectious diseases such as COVID-19 [7-21]. Teutch and Thacker [22] defined public health surveillance as

> *the ongoing systematic collection, analysis, and interpretation of health data, essential to the planning, implementation, and evaluation of public health practice, closely integrated to the dissemination of these data to those who need to know and linked to prevention and control.*

Not only do surveillance systems generate hypotheses to test but they also provide the data to test them.

The Federal Assault Weapons Ban (FAWB, also known as the Public Safety and Recreational Firearms Use Protection Act) included a ban on the manufacture for civilian use or sale of certain semiautomatic firearms defined as assault weapons as well as certain large-capacity magazines (LCMs). The Act was in effect for 10 years from 1994 until it sunsetted in 2004. Semiautomatic weapons (rapid fire) and assault weapons (second grip plus other features) are distinct; however, the two are often incorrectly conflated as similar [23-26]. Semiautomatic weapons are defined as weapons that automatically load another cartridge into a chamber, preparing the weapon for firing, but requiring the shooter to manually release and press the trigger for each round [23-26]. By contrast, automatic weapons are similarly self-loading, but allow for a shooter to hold the trigger for continuous fire [27]. Furthermore, the FAWB also prohibited certain ammunition magazines that were defined as "large-capacity" cartridges [28] containing more than 10 bullets [29]. These LCMs can feed ammunition to semiautomatic weapons that do not meet the criteria of being considered assault weapons. Furthermore, LCMs are considered one of the most important features of the FAWB as research has found a relationship between bans on LCMs and casualty counts at the state level [30-34]. The 10-year federal ban was signed into law by President Clinton on September 13, 1994 [28].

Firearm surveillance data have been used to test potential policy responses to prevent mass shootings, including the FAWB [32,34-39], Extreme Risk Protection Orders (also known as red flag laws) [40-45], and federal and state LCM bans [31,32,46]. In particular, it seems likely that the FAWB and LCM bans have potential to affect mass shootings because they regulate weapons and ammunition formats that are designed to enable rapid discharge, which is a key feature in mass shooting incidents [24,47]. Other types of gun deaths may not be responsive to the FAWB or LCM bans. As an example, Extreme Risk Protection Orders or "Red Flag" orders [43,48], which temporarily prohibit at-risk individuals from owning or purchasing firearms, may be effective for preventing firearm suicides or domestic violence homicides [49] but less effective for public mass shooters [50,51]. The prohibition of LCMs may have no impact on firearm suicide because suicide decedents only require one bullet to kill themselves [52].

Several studies during and after the FAWB attempted to determine if gun policy that restricts the production and sale of assault weapons and LCMs decreased gun deaths [53,54]. These initial studies make meaningful contributions to the literature because they describe what constitutes assault weapons, magazine capacity, ballistics, and loopholes in the FAWB legislation [3,53-57]. However, these studies have found little to no evidence that these policies have had any overall effect on firearm homicides, gun lethality, or overall crime [58-61]. Since deaths from public mass shootings comprise less than 1% of all homicides based on our definition, testing whether or not the FAWB/LCM ban has an impact on homicide would wash out the effect. Since the FAWB/LCM ban may be effective at specific types of gun deaths, sampling must be limited to specific types of shooters over overall gun deaths or tests for lethality [62,63]. Finally, the variation in research findings is related to differences in research design, sampling frame, and case definition of a public mass shooting [3,53-56,64,65].

Our study differs from other studies that evaluated the efficacy of the FAWB because we used economic methods and a different outcome variable. Specifically, we focused on whether the FAWB resulted in fewer public mass shooting "events," whereas other studies evaluated the number of gun injuries and deaths that occurred during the course of a mass shooting.

### Objective

The aim of this study was to test whether curbing *access to certain types of guns and magazines* will decrease mass shooting *events*. We sought to empirically answer if there was a relationship between the FAWB and a reduction in mass shooting events.

## Methods

### Data Source

We created a firearm surveillance system based on the National Institute of Justice–funded Violence Project dataset, which culled mass shooting events from 1966 to 2019 [6]. Consistent with earlier studies, we rely on the original Federal Bureau of Investigation (FBI) definition of a massacre, specifically where 4 or more people are killed within a single timeframe. We differentiate our mass shootings from others in that our inclusion criteria require the shootings to have occurred in a public setting.

XSL•FO
RenderX

We adapted this definition to only include massacres that involved gun deaths of 4 or more victims to isolate a particular type of mass shooter [66]. Many firearm surveillance systems that include mass shootings use a lower threshold of persons shot and many do not include deaths. An FBI report on active shooters in mass shooting events identified planning and preparation behaviors that are central to prevention [67]. This more narrow definition isolates premeditation, whereas broader definitions may include shooters that are more reactive [68]. Our case definition does not include family annihilators or felony killers because *familicides are defined by the victim-offender relationship, public massacres are defined by location, and felony killings are distinguished by motive* [69]. This differentiation is consistent with other mass shooting studies [70-72].

We examined the annual number of public mass shootings occurring between 1966 and 2019 that resulted in 4 or more fatalities. The hypothesis was that the FAWB reduced the number of public mass shootings per year during the period of the ban. We used regression discontinuity analysis to test the hypothesis. Regression discontinuity analysis is a standard economist tool used in policy analysis taking advantage of quasi-experimental designs [65,73].

### Analyses

Regression discontinuity analysis allows for discontinuities or shifts in both the intercept and the slope of the trend line at both the onset and sunset of the FAWB. That is, we introduced intercept shift parameters in 1995 and 2005, and trend shift parameters for the periods 1995-2004 and 2005-2019. A statistically significant shift in a parameter indicates a discontinuity (ie, a finding that the FAWB had a statistically significant effect on the number of public mass shootings). We tested for statistical significance of the intercept and trend shift parameters both independently and jointly. All statistical inference was based on a significance level set at .05. We used the Huber-White robust residuals, which attenuate problems of autocorrelation, heteroscedasticity, and some types of model misspecification [74].

We then used the estimated model for two types of counterfactual analysis. First, we used the model to predict the number of public mass shootings that would have occurred had the FAWB not been in place. The difference between this counterfactual prediction and the modeled number of incidents with the FAWB in place provided an estimate of the number of public mass shootings that the FAWB prevented.

Second, we projected forward the number of public mass shootings that would have occurred had the FAWB been permanent (ie, continued from 2004 through to the end of the sample period). We note that in some sense, this is an "out of sample" exercise because even though the sample extends to 2019, the FAWB ended in 2004; thus, this exercise would not pick up events in the past 15 years that would have augmented or compromised the effects of the FAWB. The difference between the modeled number of public mass shootings and the projected counterfactual number of public mass shootings could provide an estimate of the number of public mass shootings that the FAWB prevented.

We performed a regression of the 5-year moving average of public mass shootings on the US population in millions, the homicide rate, and discontinuity variables to capture both the effects of the FAWB and its discontinuation. We did not introduce a trend line for the entire sample period because it is highly collinear with the population variable. For the period of the FAWB's implementation, we originally introduced an intercept shift, time trend, and shift in the homicide rate; for the post-FAWB period, we introduced an intercept shift and a time trend. Due to collinearity, we retained only the trend shift in the final model for the FAWB period; for the post-FAWB period, we retained both the intercept and the trend shift.

## Results

We identified a total of 170 public mass shooting events, the primary outcome variable, with 4 or more fatalities between 1966 and 2019. The 5-year cumulative number of public mass shootings is shown in Figure 1, providing a visualization of the impacts of the FAWB on the number of shootings. The first mass shooting occurred in 1966; hence, the first data point for the cumulative number of shootings over the previous 5 years occurs in 1970. For 1966 and 1967, the cumulative number of public mass shootings was 3. This number then increased to 12 in 1993 and declined to 3 in 2004. After 2004, the cumulative number of public mass shootings increased to 81 in 2019. The last year of the ban, 2004, experienced the fewest public mass shootings through 2019.

The regression results showed excellent explanatory power ($R^2$=0.94). The coefficient on population was positive and statistically significant (.044, *P*<.001). This coefficient means that for every increase in population of 1 million people, there are an additional .044 public mass shooting events per year. The coefficient on the homicide rate was negative and statistically significant (–.249, *P*=.01). The coefficient on the time trend for the FAWB period captures the effect of the FAWB; this coefficient was negative and statistically significant (–.187, *P*=.001). Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. The intercept discontinuity for 2005-2019 was negative and statistically significant (–2.232, *P*=.001), and the trend coefficient was positive and statistically significant (.081, *P*=.001).

XSL•FO
RenderX

**Figure 1.** Public mass shooting trend line using five year moving averages (1966-2019).

These results are graphed in Figure 2 in which the black stars represent the actual data and the green line represents the predicted numbers of public mass shootings from the regression discontinuity model. A bending of the trend during the FAWB period to become downward sloping at the end of the period is apparent, as is the return of the upward trajectory upon expiration of the FAWB. The red squares represent the projected numbers of public mass shootings during the FAWB period had there been no FAWB. The difference between the red squares and the green lines represents the predicted number of public mass shootings averted by the FAWB. The model predicts that 11 public mass shootings were averted over the period of 1995-2004.

The blue diamonds represent the projected effects of a continuation of the FAWB through 2019 based on the observed trend from 1995 to 2004. This projection indicates that 30 public mass shootings would have been prevented from 2005 to 2019 had the FAWB been left in place.

**Figure 2.** Regression lines from discontinuity analysis of the federal assault weapons ban (1994-2004).

XSL•FO
RenderX

## Discussion

### Principal Findings

In total, 1225 people were killed in a mass shooting over the past 53 years with more than half occurring in the last decade, a function of increases in mass shootings and weapon lethality [62,63,75]. Public mass shooting fatalities and injuries far outpace population growth [75]. Between 1966 and 2019, the US population increased by 67% [76], whereas public mass shooting deaths increased by over 5-fold. The rise in public mass shootings throughout the sample period is in fact partially a function of population growth and homicide rate, along with the effects of the FAWB and its removal. An increase in the US population of 1 million people was associated with an increase of .040 ($P<.005$) public mass shootings per year. During the post-FAWB period, the increase in population from approximately 300 million in 2005 to 330 million in 2019 should be associated with an increase of 1.2 public mass shootings per year, compared to the actual increase of 4 public mass shootings per year in the data (5-year moving average). After controlling for population growth and homicide rate, a positive and statistically significant coefficient (.081, $P=.001$) on the 2005-2018 trend was seen. This further indicates a separate, nonpopulation trend of increasing violence operating during the post-FAWB period. The negative coefficient on the homicide rate invalidates the hypothesis that decreases in the numbers of public mass shootings are simply reflections of an overall decreasing homicide rate. The negative intercept discontinuity is consistent with an effect of the FAWB that persists somewhat beyond the immediate end of the ban. The positive trend coefficient is consistent with the hypothesis that the FAWB was associated with a decrease in the number of public mass shootings, as the expiration of the FAWB was associated with a shift from a downward trend to an upward trend in the number of public mass shootings per year.

The most striking finding from this study is that there was a reduction in the number of public mass shooting events while the FAWB was in place. Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. By projecting what would have happened if the FAWB remained in place, we found that there would have been significantly fewer public mass shootings if the FAWB had remained in place to 2019. Remarkably, although it is intuitive that the removal of assault weapons and magazine clips will reduce the lethality of a mass shooting, we observed an inverse relationship between weapons/ammunition and mass shooting events, meaning that mass shooters may be less likely to perpetrate a mass shooting without rapid fire military-style weapons. This is an independent effect, which indirectly leads to fewer injuries and deaths. DiMaggio et al [64] also found evidence of a decrease in public mass shootings during the ban; however, their study period was shorter and was restricted to 51 public mass shootings. Unlike our study, they implicitly modeled public mass shootings as a random instance of general gun homicides that had a high death count [64]. In contrast, our findings suggest that public mass shootings are a unique type of premeditated gun violence. We found that prior to enactment of the FAWB, the rate of public mass shootings was increasing. During enactment of the FAWB, there was a downward trend of mass shooting events. After the FAWB was lifted, public mass shootings increased dramatically. Firearm homicides in general follow no such patterns.

This effect was not found in the work of Koper, Roth, and colleagues [53-55]; however, their inclusion of all gun homicides masks the ban's effect on mass shootings. Even though Peterson and Densley's [77] work focused on perpetrator histories and not the FAWB, their findings that ease of gun access is characteristic of public mass shooters further supports our study. We restricted the inclusion criteria to public mass shootings to specifically test the effectiveness of the FAWB on public mass shooting events.

Regardless of the FAWB, bringing a semiautomatic rifle with high magazine capacity to a massacre significantly increases the number of fatalities and injuries. The increase in deaths is a function of rapid fire and increased ballistic energy. The increase in injuries is also a function of rapid fire and high-capacity magazines, enabling the shooter to shoot more people in crowded venues quickly before the crowd can disperse or hide. When controlling for the FAWB, the use of assault rifles decreased by half during implementation of the ban and tripled after the ban was lifted. This is a particularly important finding given that the FAWB had loopholes and that overall violent crime is decreasing [78]. First, all people with an assault weapon prior to the FAWB were allowed to retain their semiautomatic weapons [54,64]. Second, without a buyback program, semiautomatic weapons remained in the community [54,64]. Third, the ban did not target some military assault-like weapons [54,64]. Finally, a major loophole found in gun control legislation is that buyers can bypass background checks by purchasing their weapons and ammunition from gun shows, through illegal purchasing, or legally purchasing their guns and ammunition from another gun owner [57,63,79-87]. Even with these loopholes and issues, there was still a significant reduction in public mass shootings during the FAWB. These loopholes indicate that most people who purchase assault weapons do not become mass shooters; however, mass shooters require assault weapons and LCMs to carry out a mass shooting. Ban effectiveness might have improved if all assault weapons were included in the FAWB.

Some recent studies have specifically analyzed the effects of LCM bans on the incidence of public mass shootings. In a review of state legislation, Webster et al [88] found that bans of LCMs were associated with a significant reduction in the incidence of fatal public mass shootings. This study shows that the FAWB, which included a ban on LCMs, was associated with fewer fatalities and injuries during mass shootings in addition to fewer public mass shooting events. Koper et al [27] previously reported that 19% of public mass shootings resulting in 4 or more fatalities included the use of LCMs, while only 10% involved an assault weapon. Klarevas et al [29] found a similar pattern in shootings of 6 or more people, in which 67% of shooters utilized LCMs, whereas only 26% utilized an assault weapon. Because our study only looked at effects of the FAWB, which included an LCM ban, we were only able to determine the combined effects of limiting assault weapons and LCMs. To be clear, the reduction in the number of public mass

XSL•FO
RenderX

shootings, and resulting fatalities and injuries, may be a function of the ban on assault weapons, assault weapons plus LCMs, or only LCMs. We cannot separate out their independent effects at the national level.

Unlike our study, Webster et al [88] did not evaluate the incidence of assault weapons used in public mass shootings. Rather, they focused on fatalities from public mass shootings vs public mass shooting events. Although Webster et al [88] utilized the FBI Supplemental Homicide Report as their dataset, which is a voluntary reporting measurement system prone to errors in reporting, their findings are applicable to our analysis.

### Limitations

Although we found statistically significant decreases during the FAWB, we cannot isolate aspects of the policy that are attributed to the decline. Most notably, the FAWB also included LCMs during the ban. It may be that the type of gun and/or the type of magazine resulted in a decline. Indeed, assault weapons and LCMs provide the means to carry out a mass shooting; however, there are likely other factors beyond this study that partially explain the radical increase in public mass shootings in the post-FAWB period. For example, the FAWB was in place from 1994 to 2004, which is the same time period that the US population largely adopted the internet, along with associated social communication software and websites. This may have resulted in better tracking of public mass shootings or increased media coverage. Because our study specifically targeted the federal legislation, we omitted state-level gun policies such as state-level prohibitions on certain types of guns, LCMs, or more lethal types of bullets. It is likely that the internet serves as a contagion and as a guide to potential mass shooters, allowing them to access weapons and multiple stories about other mass shooters [62,67,89,90].

### Conclusions

In summary, public mass shootings are a unique and specific type of homicide by a gun. We found evidence that public mass shootings are qualitatively different from general homicides because after the FAWB expired, mass shooting events increased while general homicides decreased. The increase in public mass shootings was more dramatic in the final 10 years of the study period following the end of the FAWB. We suspect that these outcomes may be improved by removing existing semiautomatic weapons with large bullet capacity by creating a buyback program for all rapid-firing weapons. Moreover, the legislation would be strengthened if it closed loopholes that allow gun buyers to get around the background check legislation and other purchase prohibitions by exempting gun shows and internet or person-to-person purchases, which were exempted from the FAWB and LCM ban [87].

## Acknowledgments

The Violence Project Mass Shooter database generated data for our surveillance. This study was financially supported by the Buehler Endowment at Feinberg School of Medicine.

## Conflicts of Interest

None declared.

## References

1. Web-based Injury Statistics Query and Reporting System. Centers for Disease Control and Prevention, Injury Prevention and Control. 2020 Jul 01. URL: https://www.cdc.gov/injury/wisqars/index.html [accessed 2021-01-15]
2. Christensen AJ, Cunningham R, Delamater A, Hamilton N. Introduction to the special issue on gun violence: addressing a critical public health challenge. J Behav Med 2019 Aug;42(4):581-583. [doi: 10.1007/s10865-019-00075-8] [Medline: 31367923]
3. Drake B. Mass shootings rivet national attention, but are a small share of gun violence. Pew Research Center. 2013 Sep 17. URL: https://www.pewresearch.org/fact-tank/2013/09/17/mass-shootings-rivet-national-attention-but-are-a-small-share-of-gun-violence/ [accessed 2020-12-10]
4. Bowers TG, Holmes ES, Rhom A. The nature of mass murder and autogenic massacre. J Police Crim Psych 2009 Nov 7;25(2):59-66. [doi: 10.1007/s11896-009-9059-6]
5. Delisi M, Scherer AM. Multiple homicide offenders. Crim Justice Behav 2016 Jun 30;33(3):367-391. [doi: 10.1177/0093854806286193]
6. Mass shooter database. The Violence Project. 2020. URL: https://www.theviolenceproject.org/ [accessed 2021-01-14]
7. Shelby D. Association between adult alcohol misuse, adult mental health, and firearm storage practices in households with children: findings from the Behavioral Risk Factor Surveillance System (BRFSS). MPH Thesis. ScholarWorks @ Georgia State University. 2021 Dec 09. URL: https://scholarworks.gsu.edu/iph_theses/725 [accessed 2021-01-08]
8. Loder R, Mishra A, Atoa B, Young A. Spinal injury associated with firearm use. Cureus 2021 Mar 16;13(3):e13918 [FREE Full text] [doi: 10.7759/cureus.13918]
9. Mueller KL, Trolard A, Moran V, Landman JM, Foraker R. Positioning public health surveillance for observational studies and clinical trials: The St. Louis region-wide hospital-based violence intervention program data repository. Contemp Clin Trials Commun 2021 Mar;21:100683 [FREE Full text] [doi: 10.1016/j.conctc.2020.100683] [Medline: 33385095]



10. Horn DL, Butler EK, Stahl JL, Rowhani-Rahbar A, Littman AJ. A multi-state evaluation of the association between mental health and firearm storage practices. Prev Med 2021 Apr;145:106389. [doi: 10.1016/j.ypmed.2020.106389] [Medline: 33385422]
11. Gunn JF, Boxer P. Gun laws and youth gun carrying: results from the youth risk behavior surveillance system, 2005-2017. J Youth Adolesc 2021 Mar;50(3):446-458. [doi: 10.1007/s10964-020-01384-x] [Medline: 33420890]
12. Rozel J, Soliman L, Jain A. The gun talk: how to have effective conversations with patients and families about firearm injury prevention. In: Zun LS, Nordstrom K, Wilson MP, editors. Behavioral Emergencies for Healthcare Providers. Switzerland: Springer; Jan 05, 2021:465-473.
13. Keyes KM, Kandula S, Olfson M, Gould MS, Martínez-Alés G, Rutherford C, et al. Suicide and the agent–host–environment triad: leveraging surveillance sources to inform prevention. Psychol Med 2021 Mar 05;51(4):529-537. [doi: 10.1017/s003329172000536x]
14. Bluestein G, Hallerman T. Future directions for firearm injury intervention, policy, and research. In: Lee LK, Fleeger EW, editors. Pediatric Firearm Injuries and Fatalities: The Clinician's Guide to Policies and Approaches to Firearm Harm Prevention. Switzerland: Springer; Feb 06, 2021:223-234.
15. Oehmke J, Moss C, Singh L, Oehmke T, Post L. Dynamic panel surveillance of COVID-19 transmission in the United States to inform health policy: observational statistical study. J Med Internet Res 2020 Oct 05;22(10):e21955 [FREE Full text] [doi: 10.2196/21955] [Medline: 32924962]
16. Oehmke J, Oehmke T, Singh L, Post L. Dynamic panel estimate-based health surveillance of SARS-CoV-2 infection rates to inform public health policy: model development and validation. J Med Internet Res 2020 Sep 22;22(9):e20924 [FREE Full text] [doi: 10.2196/20924] [Medline: 32915762]
17. Post L, Benishay E, Moss C, Murphy R, Achenbach C, Ison M, et al. Surveillance metrics of SARS-CoV-2 transmission in central Asia: longitudinal trend analysis. J Med Internet Res 2021 Feb 03;23(2):e25799 [FREE Full text] [doi: 10.2196/25799] [Medline: 33475513]
18. Post LA, Issa TZ, Boctor MJ, Moss CB, Murphy RL, Ison MG, et al. Dynamic public health surveillance to track and mitigate the US COVID-19 epidemic: longitudinal trend analysis study. J Med Internet Res 2020 Dec 03;22(12):e24286 [FREE Full text] [doi: 10.2196/24286] [Medline: 33216726]
19. Post LA, Lin JS, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 wave two surveillance in East Asia and the Pacific: longitudinal trend analysis. J Med Internet Res 2021 Feb 01;23(2):e25454 [FREE Full text] [doi: 10.2196/25454] [Medline: 33464207]
20. Post L, Marogi E, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 surveillance in the Middle East and North Africa: longitudinal trend analysis. J Med Internet Res 2021 Jan 15;23(1):e25830 [FREE Full text] [doi: 10.2196/25830] [Medline: 33302252]
21. Post LA, Argaw ST, Jones C, Moss CB, Resnick D, Singh LN, et al. A SARS-CoV-2 surveillance system in Sub-Saharan Africa: modeling study for persistence and transmission to inform policy. J Med Internet Res 2020 Nov 19;22(11):e24248 [FREE Full text] [doi: 10.2196/24248] [Medline: 33211026]
22. Teutsch S, Thacker S. Planning a public health surveillance system. Epidemiol Bull 1995 Mar;16(1):1-6. [Medline: 7794696]
23. Jacobs J, Fuhr Z. The Safe Act: New York's ban on assault weapons and large capacity magazines. Crim Law Bull 2017 Jun 29;53(1):4 [FREE Full text]
24. Wallace EG. Assault weapon myths. South Ill Univ Law J 2018 Nov 18;43:193. [doi: 10.4135/9781452229300.n127]
25. Kopel D, Lowy J, Rostron A. Heller and "Assault Weapons". Campbell Law Rev 2018 Feb 02;40(2):461-480 [FREE Full text]
26. Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 20;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]
27. Koper CS, Johnson WD, Nichols JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. J Urban Health 2018 Jun;95(3):313-321 [FREE Full text] [doi: 10.1007/s11524-017-0205-7] [Medline: 28971349]
28. United States Congress House Committee on the Judiciary. Subcommittee on Crime and Criminal Justice. Public Safety and Recreational Firearms Use Protection Act. In: Hearing before the Subcommittee on Crime and Criminal Justice of the Committee on the Judiciary, House of Representatives, One Hundred Third Congress, second session, on H.R. 3527. Washington, DC: US Government; Apr 25, 1994.
29. Klarevas L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990–2017. Am J Public Health 2019 Dec;109(12):1754-1761. [doi: 10.2105/ajph.2019.305311]
30. Kleck G. Large-capacity magazines and the casualty counts in mass shootings. Justice Res Policy 2016 Jun 01;17(1):28-47. [doi: 10.1177/1525107116674926]
31. Abbasi J. Large-capacity magazine bans linked with fewer mass shootings, deaths. JAMA 2020 Jan 14;323(2):108-109. [doi: 10.1001/jama.2019.20457] [Medline: 31851333]
32. Koper CS. Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high - capacity semiautomatic firearms. Criminol Public Policy 2020 Jan 10;19(1):147-170. [doi: 10.1111/1745-9133.12485]



33. Towers S, Wallace D, Hemenway D. Temporal trends in public mass shootings: high-capacity magazines significantly increase fatality counts, and are becoming more prevalent. medRxiv preprint server. 2019 Dec 15. URL: https://www.medrxiv.org/content/10.1101/2019.12.12.19014738v1 [accessed 2021-04-17]
34. Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi: 10.1111/1745-9133.12487]
35. Lowy J. Comments on assault weapons, the right to arms, and the right to live. Harv J Law Public Policy 2020;43(2):375-386 [FREE Full text]
36. Kim A. United States gun policy and the effect on mass shootings. California State University Northridge Scholarworks Open Access Repository. Northridge, CA: CSU Northridge University Library; 2020 Aug 25. URL: http://hdl.handle.net/10211.3/217278 [accessed 2020-12-06]
37. Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 20;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]
38. Balakrishna M, Wilbur KC. How the Massachusetts Assault Weapons Ban Enforcement Notice changed firearm sales. SSRN J 2021 Feb 4:1-51 [FREE Full text] [doi: 10.2139/ssrn.3779510]
39. Soto L, Chheda S, Soto J. Reducing fatalities in mass attacks and the related matter of gun control policy following the El Paso August 2019 shooting. Tex Hisp J Law Policy 2020;26:85.
40. Nagin DS, Koper CS, Lum C. Policy recommendations for countering mass shootings in the United States. Criminol Public Policy 2020 Jan 10;19(1):9-15. [doi: 10.1111/1745-9133.12484]
41. Gay C. 'Red Flag' laws: how law enforcement's controversial new tool to reduce mass shootings fits within current Second Amendment jurisprudence. Boston Coll Law Rev 2020 Apr 30;61(4):1491-1533 [FREE Full text]
42. Nielsen D. Disarming dangerous persons: how Connecticut's Red Flag Law saves lives without jeopardizing constitutional protections. Quinnipiac Health Law J 2020;23(3):253.
43. Blocher J, Charles J. Firearms, extreme risk, and legal design: "Red Flag" laws and due process. Virginia Law Rev 2020 Oct 19;106(6):1285.
44. Kopel DB. Red Flag Laws: proceed with caution. Law Psychol Rev 2020 Jul 16:forthcoming [FREE Full text] [doi: 10.2139/ssrn.3653555]
45. Blodgett S. Dementia, guns, Red Flag laws: Can Indiana's Statute balance elders' constitutional rights and public safety? NAELA J 2020 Sep;16:1-22 [FREE Full text]
46. Kerr S. "What We Need Is Bullet Control": could regulation of bullets reduce mass shootings? In: Crews G, editor. Handbook of Research on Mass Shootings and Multiple Victim Violence. Hershey, PA: IGI Global; Oct 2019:432-446.
47. Moore EE. Another mass shooting: Time to ban the assault rifle. J Trauma Acute Care Surg 2018 Jun;84(6):1036. [doi: 10.1097/TA.0000000000001863] [Medline: 29799817]
48. Delaney GA, Charles JD. A double-filter provision for expanded Red Flag laws: a proposal for balancing rights and risks in preventing gun violence. J Law Med Ethics 2020 Dec;48(4_suppl):126-132. [doi: 10.1177/1073110520979412] [Medline: 33404308]
49. Honberg RS. Mental illness and gun violence: research and policy options. J Law Med Ethics 2020 Dec;48(4_suppl):137-141. [doi: 10.1177/1073110520979414] [Medline: 33404306]
50. Laqueur HS, Wintemute GJ. Identifying high - risk firearm owners to prevent mass violence. Criminol Public Policy 2019 Dec 16;19(1):109-127. [doi: 10.1111/1745-9133.12477]
51. Pallin R, Schleimer JP, Pear VA, Wintemute GJ. Assessment of extreme risk protection order use in California from 2016 to 2019. JAMA Netw Open 2020 Jun 01;3(6):e207735 [FREE Full text] [doi: 10.1001/jamanetworkopen.2020.7735] [Medline: 32556258]
52. Hurka S, Knill C. Does regulation matter? A cross - national analysis of the impact of gun policies on homicide and suicide rates. Regul Gov 2018 Dec 21;14(4):787-803. [doi: 10.1111/rego.12235]
53. Koper C, Roth J. The impact of the 1994 Federal Assault Weapon Ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. J Quant Criminol 2001 Mar;17(1):33-74.
54. Koper C, Woods D, Roth J. Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003. Report to the National Institute of Justice, United States Department of Justice. 2004 Jul. URL: https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf [accessed 2020-12-11]
55. Roth J, Koper C, Adams W, Johnson S, Marcotte J, McGready J, et al. Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 Final Report. Urban Institute. Washington, DC: The Urban Institute; 1997 Mar 13. URL: https://www.urban.org/research/publication/impact-evaluation-public-safety-and-recreational-firearms-use-protection-act-1994/view/full_report [accessed 2021-02-10]
56. Webster D, Vernick J, McGinty E, Alcorn T. Regulating Gun Sales: An Excerpt from Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press; 2013.
57. Jacobs J. Can Gun Control Work? (Studies in Crime and Public Policy). Oxford: Oxford University Press; Oct 14, 2004.

RenderX

58. Lee LK, Fleegler EW, Farrell C, Avakame E, Srinivasan S, Hemenway D, et al. Firearm laws and firearm homicides: a systematic review. JAMA Intern Med 2017 Jan 01;177(1):106-119. [doi: 10.1001/jamainternmed.2016.7051] [Medline: 27842178]
59. Gius M. An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. Appl Econ Lett 2013 Nov 26;21(4):265-267. [doi: 10.1080/13504851.2013.854294]
60. Cook P, Goss K. The Gun Debate: What Everyone Needs to Know. New York: Oxford University Press; May 01, 2014.
61. Cook P, Goss K. The Gun Debate: What Everyone Needs to Know, 2nd Edition. New York: Oxford University Press; Apr 16, 2020.
62. Lankford A, Silver J. Why have public mass shootings become more deadly? Criminol Public Policy 2019 Dec 16;19(1):37-60. [doi: 10.1111/1745-9133.12472]
63. Schiff M. IZA Discussion Paper 12784: Greater US gun ownership, lethality and murder rates: analysis and policy proposals. IZA Institute of Labor Economics. 2019 Nov 27. URL: https://www.iza.org/publications/dp/12784/greater-us-gun-ownership-lethality-and-murder-rates-analysis-and-policy-proposals [accessed 2021-04-17]
64. DiMaggio C, Avraham J, Berry C, Bukur M, Feldman J, Klein M, et al. Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data. J Trauma Acute Care Surg 2019 Jan;86(1):11-19. [doi: 10.1097/ta.0000000000002060]
65. World Telecommunication/ICT Indicators Database 2020 (24th Edition). International Telecommunications Union. Geneva: International Telecommunications Union; 2021 Jan. URL: https://www.itu.int/en/ITU-D/Statistics/Pages/publications/wtid.aspx [accessed 2021-04-17]
66. Lopez G. America's unique gun violence problem, explained in 17 maps and charts. Vox. 2021 Mar 23. URL: https://www.vox.com/policy-and-politics/2017/10/2/16399418/boulder-colorado-mass-shooting-gun-violence-statistics-charts [accessed 2021-03-29]
67. Silver J, Simons A, Craun S. A study of the pre-attack behaviors of active shooters in the United States between 2000 and 2013. FBI Documents. Washington, DC: US Department of Justice, Federal Bureau of Investigations; 2018. URL: https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view [accessed 2020-10-25]
68. DeFoster R, Swalve N. Guns, culture or mental health? Framing mass shootings as a public health crisis. Health Commun 2018 Oct;33(10):1211-1222. [doi: 10.1080/10410236.2017.1350907] [Medline: 28841045]
69. Fridel EE. A multivariate comparison of family, felony, and public mass murders in the United States. J Interpers Violence 2021 Feb;36(3-4):1092-1118. [doi: 10.1177/0886260517739286] [Medline: 29294976]
70. Duwe G. Mass murder in the United States: a history. Jefferson, NC: McFarland & Company; Jan 07, 2007.
71. Fox J, Levin J. Mass confusion concerning mass murder. Criminologist 2015;40(1):8-11 [FREE Full text] [doi: 10.4135/9781412950619.n277]
72. Fox JA, Levin J. Firing back: the growing threat of workplace homicide. An Am Acad Pol Soc Sci 2016 Sep 08;536(1):16-30. [doi: 10.1177/0002716294536001002]
73. Stevenson AJ, Flores-Vazquez IM, Allgeyer RL, Schenkkan P, Potter JE. Effect of removal of Planned Parenthood from the Texas Women's Health Program. N Engl J Med 2016 Mar 03;374(9):853-860. [doi: 10.1056/nejmsa1511902]
74. Freedman DA. On the so-called "Huber Sandwich Estimator" and "Robust Standard Errors". Am Statistician 2006 Nov;60(4):299-302. [doi: 10.1198/000313006x152207]
75. Duwe G. Mass shootings are getting deadlier, not more frequent. Politico Magazine. 2017 Oct 04. URL: https://www.politico.com/magazine/story/2017/10/04/mass-shootings-more-deadly-frequent-research-215678/ [accessed 2021-01-30]
76. Population Trends. United States Census Bureau. 2019. URL: https://www.census.gov/ [accessed 2019-08-26]
77. Peterson J, Densley J. We have studied every mass shooting since 1966. Here's what we've learned about the shooters. Los Angeles Times. 2019 Aug 04. URL: https://www.latimes.com/opinion/story/2019-08-04/el-paso-dayton-gilroy-mass-shooters-data [accessed 2020-02-01]
78. Klingner DE, Williams E. Topic: Public Safety. Public Integrity 2019 Mar 06;21(2):220-224. [doi: 10.1080/10999922.2019.1565268]
79. Hand C. Gun control and the Second Amendment. Minneapolis, MN: ABDO; Dec 15, 2016.
80. Popovits A. Dominican University of California Political Science & International Studies (Senior Thesis). 2020 May. URL: https://tinyurl.com/se3vrmd6 [accessed 2020-12-01]
81. Miller SV. What Americans think about gun control: evidence from the General Social Survey, 1972-2016. Soc Sci Quart 2018 Nov 18;100(1):272-288. [doi: 10.1111/ssqu.12555]
82. Kellner D. School shootings, societal violence and gun culture. In: Shapiro H, editor. The Wiley Handbook on Violence in Education: Forms, Factors, and Preventions. Medford, MA: John Wiley & Sons, Inc; 2018:53-68.
83. Schildkraut J. Assault weapons, mass shootings, and options for lawmakers. Rockefeller Institute of Government. 2019 Mar 22. URL: https://rockinst.org/issue-area/assault-weapons-mass-shootings-and-options-for-lawmakers/ [accessed 2021-02-11]
84. Jacobs J, Fuhr Z. The potential and limitations of universal background checking for gun purchasers. Wake Forest J Law Policy 2017;7(2):537-583.



85. Braga AA, Brunson RK, Cook PJ, Turchan B, Wade B. Underground gun markets and the flow of illegal guns into the Bronx and Brooklyn: a mixed methods analysis. J Urban Health 2020 Sep 04:online ahead of print. [doi: 10.1007/s11524-020-00477-z] [Medline: 32888157]
86. Chai C. Gun control: can we take a shot at it? AMASS 2019;24(2):34-36.
87. Goldberg J. The case for more guns (and more gun control). The Atlantic. 2012 Dec. URL: https://www.theatlantic.com/magazine/archive/2012/12/the-case-for-more-guns-and-more-gun-control/309161/ [accessed 2020-11-20]
88. Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi: 10.1111/1745-9133.12487]
89. Lankford A, Madfis E. Media coverage of mass killers: content, consequences, and solutions. Am Behav Sci 2018 Mar 20;62(2):151-162. [doi: 10.1177/0002764218763476]
90. Kien S, Begay T, Lee A, Stefanidis A. Social media during the school shooting contagion period. Violence Gender 2019 Dec 01;6(4):201-210. [doi: 10.1089/vio.2019.0043]

## Abbreviations

**FAWB:** Federal Assault Weapons Ban
**FBI:** Federal Bureau of Investigation
**LCM:** large-capacity magazine

*Edited by G Eysenbach, T Sanchez; submitted 19.02.21; peer-reviewed by T Alcorn; comments to author 12.03.21; revised version received 24.03.21; accepted 30.03.21; published 22.04.21*

*Please cite as:*
*Post L, Mason M, Singh LN, Wleklinski NP, Moss CB, Mohammad H, Issa TZ, Akhetuamhen AI, Brandt CA, Welch SB, Oehmke JF*
*Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*
*JMIR Public Health Surveill 2021;7(4):e26042*
*URL: https://publichealth.jmir.org/2021/4/e26042*
*doi: 10.2196/26042*
*PMID: 33783360*

©Lori Post, Maryann Mason, Lauren Nadya Singh, Nicholas P Wleklinski, Charles B Moss, Hassan Mohammad, Tariq Z Issa, Adesuwa I Akhetuamhen, Cynthia A Brandt, Sarah B Welch, James Francis Oehmke. Originally published in JMIR Public Health and Surveillance (https://publichealth.jmir.org), 22.04.2021. This is an open-access article distributed under the terms of the Creative Commons Attribution License (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work, first published in JMIR Public Health and Surveillance, is properly cited. The complete bibliographic information, a link to the original publication on https://publichealth.jmir.org, as well as this copyright and license information must be included.



# EXHIBIT K

## to Expert Report of Professor Louis Klarevas

VIEWPOINT

# Regulating Assault Weapons and Large-Capacity Magazines for Ammunition

**Philip J. Cook, PhD**
Duke University, Durham, North Carolina.

**John J. Donohue, PhD, JD**
Stanford University, Stanford, California.

Viewpoint pages 1177, 1179, 1181, 1183, 1185, 1187, 1189, 1193, 1195, and 1197 and Editorial page 1201

Supplemental content

**Corresponding Author:** Philip J. Cook, PhD, Sanford School of Public Policy, Duke University, PO Box 90545, Durham, NC 27708 (pcook@duke.edu).

**Mass public shootings in the US** account for a small fraction of all firearm-related homicides, but have an outsized role in stoking the public's concern with firearm violence. The vivid instances of attacks on people in churches, schools, and offices and at other public gathering places do vastly disproportionate damage to peace of mind by creating a sense of peril in places that should feel safe. These attacks have been increasing in frequency and deadliness in recent years. As reducing this particular type of firearm violence becomes more urgent, the case for a variety of prevention measures becomes even stronger.

This Viewpoint focuses on a measure that is highly specific to the gun violence problem—stringent regulation of assault weapons and large-capacity magazines (LCMs) for ammunition. Federal law banned the introduction of new LCMs and military-style semiautomatic firearms between 1994 and 2004, but that regulation ended in 2004 and Congress did not renew it. Now, years later, the nation is experiencing the dire effects of opening the door to the manufacture and import of these weapons; it is time to close that door.

## History and Current Status of Bans

The history of federal bans on weapons of mass destruction goes back to the 1934 National Firearms Act. Among other provisions, the Act required submachine guns and other firearms capable of fully automatic fire (ie, firing several shots with a single pull of the trigger) to be registered with the federal government.[1] All transactions involving such weapons were taxed at $200, a high confiscatory amount at the time. The registration and tax requirement remained in place, although inflation has substantially undercut the force of the transfer fee. The Act was expanded by Congress in 1986 to end the sale of new fully automatic weapons. There is every reason to believe that these restrictions have been effective. Even though the Thompson submachine gun was a notorious gangster weapon in the 1920s, fully automatic weapons of any kind are rarely used in crime in modern times or in mass public shootings.[1]

> Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.

The 1994 Federal Assault Weapons Ban extended the regulation of military-style weapons to include some semiautomatic firearms. These weapons fire 1 round of ammunition for each pull of the trigger, and are capable of firing at a rate of roughly 1 per second. The 1994 Assault Weapons Ban ended the legal manufacture and import of specified firearms, as well as ammunition-feeding devices (magazines) that held more than 10 rounds of ammunition. At the time, most prohibited assault weapons were equipped with detachable magazines that held 30 rounds and could accept magazines that could hold as many as 50 or 100 rounds, thus making it possible to fire dozens of rounds without pausing to reload.[2]

The 1994 federal ban on new assault weapons had gaping loopholes. First, the federal ban did not restrict possession or transactions of existing assault weapons and LCMs. Second, manufacturers found ways to slightly modify the design of some of the banned weapons so that they met the letter of the law while preserving the military appearance and the possibility of accepting LCMs and firing high-powered ammunition quickly. Still, there is evidence that the ban had some salutary effect on mass public shootings.

The LCM ban, also in effect during 1994 to 2004, was not subject to the redesign problem because it provided a bright line that was difficult for manufacturers to overcome. There were, however, an estimated 25 million LCMs in circulation when the ban was enacted, and those remained in circulation, but with no new additions.[2] It was not just assault weapons (as defined) that were designed to use LCMs, but a variety of other semiautomatic firearms as well, so the LCM ban had much broader scope.

When the law expired in 2004, manufacturing and importations of LCMs and previously banned weapons resumed, and a surge of sales followed. Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.[3] The industry initially advertised these weapons as "assault rifles," and continues to promote them with military allusions but has now rebranded this type of weapon as the "modern sporting rifle."

Seven states have some version of a ban or stringent restrictions on assault weapons: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York, as well as the District of Columbia.[4] These laws are being challenged in the courts as a violation of the Second Amendment, but have survived these challenges to date.

© 2022 American Medical Association. All rights reserved.

## Evidence of Potential Effectiveness of a National Ban

A review conducted by the RAND Corporation concluded that the handful of published studies on the effect of the ban on mass public shootings was "inconclusive" due in part to flaws in the analysis used by the 3 studies with positive findings.[4] But it is unlikely the surge in mass public shootings that involved assault weapons and LCMs that occurred after the ban would have happened if the ban had remained in place. The logic is straightforward. The sales of these weapons, which had declined during the ban, expanded greatly following its repeal, making them more widely available to everyone including would-be mass murderers.

To document recent trends in such mass public shootings requires a precise definition. One common definition for mass public shootings has several elements,[5,6] including: (1) a minimum of 4 homicides; (2) a public location; and (3) circumstance not attributable to robbery, other felonious activity, or commonplace conflict in families or among acquaintances. A comprehensive compilation of such events is the Violence Project's database of mass shootings in the US,[7] which includes the number of people killed and injured in each event and the type of weapon or weapons used.

Information from this database indicates that in the years following when the law expired in 2004, the number of mass shooting incidents greatly increased and the number of fatalities increased even more. During the period from 2015 to 2019, the number of incidents reached 33 (or 6.6 per year), which was almost twice the number during the decade the Federal Assault Weapons Ban was in effect (eFigure and eTable in the Supplement). The number of fatalities from shootings that involved banned weapons decreased during the second half of the ban (2000-2004) and then surged during subsequent periods, reaching a total of 271 during 2015 to 2019. It was during that 5-year interval from 2015 to 2019 that 5 of the top-10 deadliest mass public shootings in US history occurred, and all were committed with assault weapons.[8] The number of fatalities resulting from mass public shootings with other weapons has remained relatively flat.

## The Australian Ban on Rapid-Fire Weapons

The Australian experience has factored into the debate over reinstituting the assault weapons ban in the US. In Australia, the impetus for banning semiautomatic weapons was a 1996 mass public shooting in Port Arthur, Tasmania, in which a young man killed 35 people with a semiautomatic rifle. Swift action by the federal and state legislatures produced legislation that banned not only manufacture and import, but private possession of semiautomatic rifles. To ease the transition, a series of firearm buybacks were instituted, and 1 million weapons were ultimately relinquished, estimated to be one-third of all privately owned guns. Australia had 11 mass shootings during the decade prior to the ban,[9] and 1 since then (a family killing in 2018 that would not count as a mass public shooting by the US definition).

The Australian experience is illustrative as a proof of concept for other countries, including the US. Of note, the ban covered all semiautomatic rifles, not just those with the specific features suggestive of use in warfare as opposed to hunting. The ban on possession of existing guns rather than only on the introduction of new guns greatly accelerated its apparent effectiveness.

## Potential Next Steps

On July 29, 2022, the US House of Representatives passed the Assault Weapons Ban of 2022. To a large extent this bill reinstituted the 1994 ban, including the ban on the sale of new semiautomatic firearms deemed to be assault weapons, and of new LCMs holding more than 10 rounds. An important innovation is that for LCMs, the bill only allows continued possession and use of existing devices, but not transfer. However, given the reality that the US Senate will not enact this bill, it is useful to consider other approaches.

States could institute or expand assault weapon bans. Indeed, just a ban on LCMs would be a promising first step, impeding access to these products by individuals who could otherwise use them to fire multiple rounds of ammunition at large numbers of people before law enforcement can be mobilized to stop the killing.

## Conclusions

In 2017, the *New York Times* polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy"[10] to ask them what measures would be most effective in dealing with the mass shooting problem in the US, and an assault weapons ban was deemed overall by this panel to be the single most effective measure. The evidence in support of a ban has grown tragically stronger since then.[10]

ARTICLE INFORMATION

**Conflict of Interest Disclosures:** Dr Donohue reported serving as an expert witness for various government entities on matters related to assault weapons bans based on his research in this area.

REFERENCES

1. Cook PJ, Goss KA. *The Gun Debate: What Everyone Needs to Know*. 2nd ed. Oxford University Press; 2020.

2. Koper CS. An updated assessment of the federal assault weapons ban: impacts on gun markets and gun violence, 1994-2003. Accessed September 6, 2022. https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf

3. Bump P. Tallying America's fascination with AR-15-style rifles. Accessed September 6, 2022. https://www.washingtonpost.com/politics/2022/05/26/tallying-americas-fascination-with-ar-15-style-rifles/

4. Smart R, Morral AR, Smucker S, et al. *The Science of Gun Policy*. RAND; 2020.

5. Duwe G. Patterns and prevalence of lethal mass violence. *Criminol Public Policy*. 2020;19(1):17-35. doi:10.1111/1745-9133.12478

6. Smart R, Schell TL. Mass shootings in the United States. Accessed September 6, 2022. https://www.rand.org/research/gun-policy/analysis/essays/mass-shootings.html

7. Violence Project. Mass shooter database: version 5.0. Accessed August 30, 2022. https://www.theviolenceproject.org/mass-shooter-database/

8. Wikipedia. Mass shootings in the United States. Accessed August 31, 2022. https://en.wikipedia.org/wiki/Mass_shootings_in_the_United_States

9. Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA*. 2016;316(3):291-299. doi:10.1001/jama.2016.8752

10. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? experts rank gun laws. Published October 5, 2017. Accessed September 6, 2022. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html

© 2022 American Medical Association. All rights reserved.

# EXHIBIT L

## to Expert Report of Professor Louis Klarevas

*Philip J. Cook*

# Research in Criminal Deterrence: Laying the Groundwork for the Second Decade

ABSTRACT

Deterrence theory has been developed primarily by economists, who have viewed potential criminals as rational decision-makers faced with an array of illicit opportunities characterized by costs (time, possible adverse legal consequences, and so forth) and payoffs. The crime decision is thus characterized in a way that fits the well-developed theoretical framework of decision-making under uncertainty. Herbert Simon and others have questioned the descriptive accuracy of this theory, and are beginning to uncover systematic patterns in decision-making that violate the predictions of the economic theory. this work could usefully be incorporated into the crime choice framework. One of the most important issues for further research in this area is the way in which potential criminals acquire information about criminal opportunities and the effectiveness of the criminal justice system. A simple "realistic" model of threat communication can be outlined that yields deterrence-like effects, even though no one is well informed concerning the true effectiveness of the system. Three other questions that have been of great interest to deterrence theorists are discussed (1) what factors influence the rate at which active criminals commit crimes, (2) which dimension of the threat of punishment has a greater deterrent effect—likelihood or severity, and (3) what effect does the threat of punishment for one type of crime have on involvement in other criminal activities?

Philip J Cook is Associate Professor of Public Policy Studies and Economics, Duke University

Much of the recent empirical work on deterrence has used a fundamentally flawed approach to estimating the responsiveness of crime rates to sanction probability and severity. The flaw is that the measures of "probability of punishment" used in these studies reflect the choices made by criminals as well as the intrinsic effectiveness of the criminal justice system. Therefore, these measures do not serve as appropriate indices of criminal justice system effectiveness. The empirical approach that appears most productive is the evaluation of discrete changes in law and policy—"natural experiments," that can tell us a good deal about the deterrence process.

The core concern of deterrence research has been to develop a scientific understanding of the relationship between the crime rate and the threat of punishment generated by the criminal justice system. A decade ago, criminologists tended to view deterrence as an archaic theoretical construct associated with Bentham, Beccaria, and other somewhat naive scholars from the distant past. Deterrence research has enjoyed a revival during the 1970s, but so far has produced little more than a frame of reference, a variety of hypotheses and suppositions, and a scattering of empirical observations which are more anecdotal than systematic.

This essay serves in part as an introduction to modern research in criminal deterrence. My main concerns are to present a clear statement of the questions that have motivated social scientists working in this area, and a critical discussion of the methods used to answer these questions. This literature has already been summarized and critiqued by a number of scholars (e.g., Brier and Fienberg 1978; Carroll forthcoming; Chaiken 1978; Cook 1977; Ehrlich 1979; Gibbs 1975; Nagin 1978, Walker 1979; Zimring and Hawkins 1973). The most notable contribution of this sort is the recent report of the National Academy of Sciences Panel on Deterrence and Incapacitation (Blumstein, Cohen, and Nagin 1978), which offers a very well-documented assessment of the empirical literature. While this essay inevitably covers some of the same ground, it is more a complement than a substitute for the panel report; for example, I devote considerably more attention to discussing the theory of criminal choice, and organize

my discussion of the empirical literature in a way that I believe offers important new insights into the problems and prospects of this work.

For those who have not already acquired a taste for the theoretical and empirical investigation of criminal deterrence, some initial attempt to motivate the reader may be helpful. When criminologists assemble to exchange thoughts on crime control, a common observation is that the criminal justice system has little impact on crime rates; the big effects, so it is said, come from "root causes" such as demographic patterns, the influence of family and neighborhood, and the distribution of legitimate opportunities Yet consider the likely consequences if we disbanded the police and rewrote the criminal codes to eliminate sanctions, there would surely be a crime wave of unprecedented proportions. Evidence from police strikes and related incidents supports this prediction.[1] Furthermore, the inevitable response to mushrooming crime rates would be the widespread development of private alternatives to the criminal justice system—vigilante groups and vastly increased efforts at private protection.[2] My assessment is that the criminal justice system, ineffective though it may seem in many areas, has an overall crime deterrent effect of great magnitude, and would quickly be reinvented in some form by the private sector if government got out of the business of issuing threats of punishment to would-be criminals. If this assessment is correct, it would be fair to say that the deterrents generated by the justice system have a large civilizing influence which is by no means minor in comparison to the influence of "root causes" of crime.

The everyday debates in the criminal justice policy arena are

[1] Police strikes in Liverpool (1919) and Montreal (1956) and the mass arrest of the Copenhagen police force by the Nazis in 1944 are discussed by Johannes Andenaes (1974) The huge increase in crime rates that followed each of these events is persuasive evidence that the threat of punishment has a substantial inhibiting effect on crime

[2] Current private expenditures on protection against crime probably exceed total public expenditures on the criminal justice system. Bartel (1975) gives some empirical results on the demand for private protection, and both she and Clotfelter (1977) discuss the degree of substitutability between public and private expenditures.

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 183 of 517

not, of course, concerned with whether to stop punishing criminals entirely, but rather with questions of degree: how many tax dollars should be devoted to apprehending and punishing criminals, how severe a punishment is appropriate for each crime type, and so forth. The evaluation of these issues hinges in part on our assessment of the *marginal* deterrent effects of changes in the certainty and severity of punishment, a more problematic issue than assessing the overall deterrent effect of current threat levels. It is quite possible that mild penalties are almost as effective as severe penalties, or that a 50 percent change either way in the size of the typical big-city police department would have a much less than proportionate effect on crime. If there are sharply decreasing returns to scale in criminal justice system activities, then there is no contradiction between my assessment that the overall deterrent effect of the system is enormous, while the effect at the margin tends to be small or perhaps even zero in some instances. Estimating the magnitudes of marginal deterrent effects stemming from various criminal justice system activities is the ultimate task facing scholars in this area.

What is actually known about these magnitudes? The answer is "not much," if we exclude theoretical speculation, laboratory experiments, and results derived from badly flawed data and statistical methods What is left is a collection of anecdotes—case studies—that suggest only one generalization: a wide range of criminal activity is subject to the influence of legal threats. A sample of recent findings supports this generalization. (1) Large increases in police patrol activity were effective in reducing robberies in New York City subways (Chaiken, Lawless, and Stevenson 1974) and outdoor felonies in the Twentieth Precinct of New York (Press 1971). (2) The increase in the perceived probability and severity of punishment for drunk driving resulting from the British Road Safety Act was initially very effective in reducing this crime and alcohol-related accident rates (Ross 1973, 1977). A reduction in the legal minimum drinking age from twenty-one to eighteen in Michigan, Wisconsin, and Ontario caused a small increase in alcohol-related accidents for this age group (Williams et al. 1975). (3) Draft evasion rates

during the Vietnam war era were responsive to conviction rates (Nagin and Blumstein 1977). (4) The increase in the likelihood of arrest for attempted airline hijacking that resulted from the airport security measures adopted in 1973 virtually eliminated this crime (Landes 1978). (5) The increase in the statutory punishment for carrying a gun illegally in Massachusetts (the Bartley-Fox Amendment) apparently reduced the use of guns in violent crime (Pierce and Bowers 1979).

These studies suggest that there exist feasible actions on the part of the criminal justice system that may be effective in deterring crimes committed by drunks (driving under the influence) and desperate men (hijacking); crimes that are widespread and not considered immoral (carrying a concealed weapon, underage drinking); crimes that are, for some at least, a matter of conscience (draft evasion); and common crimes of theft and violence. These studies do *not* demonstrate that all types of crimes are potentially deterrable, and certainly they provide little help in predicting the effects of any specific governmental action.

What about the various hypotheses and suppositions that constitute the conventional wisdom concerning deterrence? Are crime rates more responsive to changes in the probability of punishment than to equivalent changes in the severity of punishment? Are juveniles less deterrable than adults? Are "crimes of passion" deterrable at all? These and related questions may be answered by "common sense" or theoretical considerations, but relevant empirical evidence is weak or nonexistent. The first decade of social science research in criminal deterrence has generated many interesting questions but few answers.

This essay is organized as follows. Section I explains the model of individual rational choice, which is the centerpiece of deterrence theory, with an eye to answering the objections of those who find the model silly or implausible. I include a discussion of three questions of great interest to deterrence theorists. (1) What factors determine the rate at which an active criminal commits crimes? (2) Which dimension of the threat of criminal punishment has a greater deterrent effect—probability or severi-

ty? (3) What effect does the threat of punishment for one type of crime have on involvement in other criminal activities? Section II describes, analyzes, and rejects the "Ehrlich paradigm," the approach to estimating the deterrence effects that has dominated the literature during the last decade. Section III then summarizes and assesses the policy evaluation literature, with greater focus on technique than on specific findings. The final section proposes a partial research agenda for deterrence research in the 1980s.

## I. The Crime Decision: Theoretical Perspectives on the Deterrence Process

The role of theory in the study of criminal deterrence, as in other scientific inquiries, is to generate interesting, testable hypotheses and provide a framework for interpreting empirical observations. A "good" theory explains known facts in a parsimonious way and generates accurate predictions. There are two main issues to be considered in a complete theory of criminal deterrence: first, the influence of the threat of criminal sanctions on the choices made by individuals regarding their participation in criminal activity; and second, the effectiveness of various criminal justice system activities in producing threats. This section is limited to the first issue; the threat production process is discussed briefly in section II.

### *A. The Rational Potential Criminal*

An increase in the probability or severity of punishment for a particular type of crime, or both, will reduce the rate at which that crime is committed, other things being equal. This assertion is not an assumption but, rather, is derived from a theoretical argument, developed primarily by economists in recent years.[3] Observed crime rates are viewed as the aggregate result of choices made by rational individuals. Potential criminals weigh the possible consequences of their actions, both positive and negative, and take advantage of a criminal opportunity only if

[3] See Heineke (1978a) for a recent review Gary Becker (1968) gave the first statement of this theory in modern times, his work was extended by Ehrlich (1973), Block and Lind (1975), Block and Heineke (1975), and others.

it is in their self-interest to do so. Jeremy Bentham expressed the point this way: "[T]he profit of the crime is the force which urges a man to delinquency: the pain of the punishment is the force employed to restrain him from it. If the first of these forces is the greater the crime will be committed: if the second, the crime will not be committed" (quoted in Zimring and Hawkins 1973, p. 75).

A satisfactory characterization of the "rational potential criminal" must elaborate on Bentham's proposition to take into account the subjectivity of "profit" and "pain," as well as individual differences in objective circumstances. Individuals respond differently to equivalent criminal opportunities, for reasons that include the following:

1. Individuals differ in their willingness to accept risks. The consequences of committing a crime are uncertain. Arrest and conviction are always less than certain, and for some common crimes the probabilities are small indeed. The consequences of conviction are also uncertain, given the wide discretionary power of judges in sentencing. Potential criminals will differ in their assessment of the probability of "losing" the gamble offered by a particular criminal opportunity, and also differ in the degree to which they are risk-averse.

2. Individuals differ with respect to "honesty preference"—the strength of their preference for behaving in a law-abiding manner. How much net "profit" is required to persuade an individual to overcome his ethical concern for staying within the law? Furthermore, for crimes that are *malum in se*, the individual's ethical concern may extend to the criminal act itself.

3. Individuals differ with respect to their evaluation of the "profit" to be gained from a crime. These differences are largest for crimes for which the payoff is not money (which most everyone values) but rather is "in kind"—consider, for example, crimes of violence, vandalism, draft evasion, and double parking.

4. Individuals differ in their objective circumstances: their income, the value they place on their time, their skills in committing crimes successfully and evading capture, and their reputation in the community. An arrest for shoplifting, followed by a

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 187 of 517

dismissal of charges, may be of little consequence for an unemployed teenager but may ruin the life of a college professor. An individual's circumstances also influence the nature of criminal opportunities available to him—few of us are in a position to embezzle money, fix prices, or commit treason.

Thus, the "profit" and "pain" associated with equivalent criminal opportunities will be evaluated differently by different individuals. Some may find it very worthwhile, others will be close to indifferent, while a third group will view it as highly unattractive. The key point is that a change in either the probability or average severity of punishment will cause some people to change their minds about whether the opportunity is, on balance, attractive, and thereby change their behavior. A small change will affect only those who were previously close to indifference (perceived "profit" and "pain" about equal); changing the behavior of others will require a larger change in probability or severity.

Most discussions of the deterrence mechanism distinguish between "general" and "special" deterrence. The latter concept refers to the deterrent effect of punishment on those who have been punished. This notion is a bit vague (Walker 1979). It is possible that those who have suffered a criminal sanction once will be more likely to be deterred by the threat of punishment thereafter, but there is no evidence to support this notion.

The threat of punishment may play a grander role than simply acting as a debit in the potential criminal's cost-benefit analysis of a crime opportunity. Cook (1977) discusses its role as a socializing and moralizing force.

Punishment in the form of incarceration reduces crime by incapacitating inmates (Cohen 1978). Correctional treatments may also reduce crime by rehabilitating some convicts, although existing programs appear to be largely ineffective (Lipton, Martinson, and Wilks 1975).

### B. *Objections to the Theory*

The economists' theory of criminal deterrence, as characterized above, has been useful in developing the implications of a long neglected notion in the criminology literature—that criminals can

be viewed as rational decision makers intent on furthering their personal welfare in an environment that provides crime opportunities coupled with sanction threats. However, some critics find this assumption of rationality in the decision to commit a crime highly implausible and inconsistent with descriptive evidence on criminal behavior. Herbert Jacob (1979) succinctly states the two major objections with that assumption:

> (a) It implies that people who contemplate committing a crime have a realistic perception of the probabilities of being sanctioned and of the severity of the sanction. The little evidence we have on perceptions of legal sanctions by the general public indicates that these perceptions are incorrect and variable. . . . (b) It implies that people who commit crimes act after rational calculation rather than on impulse. We have much reason to believe that many crimes are committed on impulse, either under the influence of alcohol or simply as the result of opportunity and need intersecting. (p. 584)

Jacob's arguments are persuasive, and lead many criminologists to conclude that common appropriative crimes and much violence are not very responsive to the threat of punishment. But this conclusion does not follow from his argument. The existence of a strong deterrent effect does not require that potential criminals be fully informed or fully rational in their crime decisions. A theoretical model which postulates full rationality on the part of criminals is clearly "unrealistic" but may nonetheless generate valid predictions because it contains essential elements of truth. The assumptions of a rational choice/full information model can be relaxed without undermining the prediction that an increase in the threat of punishment will reduce crime. I deal with Jacob's objections in reverse order, since the second point is more fundamental.

*1. Limits on rational calculation.* It may be true, as Jacob suggests, that many criminals do not consider the consequences of their acts, other than those consequences which are obvious, certain, and immediate. This impulsiveness is often thought to be particularly characteristic of youths and of people who are in-

toxicated, in a state of high emotional arousal, deviant, or emotionally disturbed. These groups constitute a large percentage of the perpetrators of some types of crime. Are these crimes deterrable? Two affirmative arguments are worth mentioning.

Deterrence theory is concerned with making predictions about aggregate behavior. The accuracy of such predictions does not require that every individual act predictably. The prediction that crime is deterrable follows just as readily from an assumption that 10 percent of criminals are capable of rational decision-making, as from an assumption that *all* potential criminals have this ability; assuming, that is, that the remaining 90 percent do not respond to a change in the threat level in a systematically perverse fashion.

The deterrence mechanism does not require that each crime opportunity be evaluated separately or fully. Herbert Simon (1957) and his followers (Payne 1980) have developed the notion of "limited rationality" as a descriptively more accurate alternative to the "full rationality" notion propounded by economic theorists (see Carroll 1978 for a discussion of this issue in the context of the crime decision). Limited rationality models of decision-making incorporate observed limitations on people's capacity to acquire and process information. In particular, it is thought that people tend to economize on this scarce capacity by adopting rules of thumb, or "standing decisions," which eliminate the need completely to analyze every new decision. A person whose judgment is impaired by emotion or inebriation may still be guided by his personal standing decisions, which in turn may reflect concern with the threat of punishment. Most of us have long ago adopted standing decisions to refrain from robbery and assault, no matter what the circumstances An increase in the threat of punishment may have the effect of persuading more people to adopt such decisions, thus inhibiting them from acting "on impulse" when next an attractive crime opportunity arises.[4]

[4] John Conklin's interviews (1972) with convicted robbers in Boston yield some anecdotal evidence on impulse control "A few offenders stated that they could not trust themselves with loaded firearms, fearing that in a confrontation with a resisting victim they might 'lose their head' and shoot" (p 111) Conklin reported that these robbers carried unloaded or partially unloaded guns

This defense of the rational choice model is not entirely satisfactory. The remaining concern is that those potential criminals who are sufficiently thoughtful and aware to respond to changes in the threat of punishment will, under some circumstances, violate the norms of rational decision-making in some systematic and predictable fashion If so, then it would be possible to gain improved predictive power from a theory which took these systematic deviations from rationality into account. For example, extensive experimentation by psychologists using human subjects demonstrates that people tend to make certain predictable errors in decision-making tasks involving choices between lotteries.[5] An example is the tendency of experimental subjects to ignore low-probability events entirely—a tendency which is confirmed by the failure of most residents of flood plains to buy heavily subsidized flood insurance policies (Kunreuther and Slovic 1978). In circumstances where people do take low-probability events into account (e.g., shark attack), there is a tendency to place an inappropriately large weight on these low-probability outcomes. Most of this experimental work has not employed criminal choice problems, although the analogy should be clear. An exception is Carroll's recent report (1978) of experimental findings involving crime choice with convicted criminals as subjects, which may prove the entering wedge to further research of this sort. Carroll's perspective is worth quoting "The proposed approach thus offers a new model of how the person decides about crime opportunities. He or she is not viewed as the 'economic person' making exhaustive and complex calculations leading to an optimal choice. Rather, it is the 'psychological person,' who makes a few simple and concrete examinations of his or her opportunities and

[5] Two interpretative summaries of this literature are provided by Kahneman and Tversky (forthcoming) and Tversky and Kahneman (1974)

Some crimes, such as robbery, are usually committed by two or more perpetrators working together. The crime decision in this case must involve some sort of group process Social psychologists have studied group decision-making in the face of risky choices, and documented a fascinating effect known as "risky shift", the reference is to the tendency of a group discussion to shift the preferences of members of the group toward more risky choices than they would have selected before the discussion This effect is observed only if the individuals who make up the group are already inclined to a relatively risky choice before the discussion. See Myers and Lamm (1976) for a review of this and other "group polarization" effects

makes guesses that can be far short of optimal" (p. 1513). The challenge to deterrence theorists is to find predictable ways in which the "psychological person" deviates from the "economic person."

2. *Threat communication.* Jacob's first objection to the rational choice model of criminal behavior concerns the reliability of the threat communication process. Rational choice models provide a framework for analyzing the effect of the individual's *perception* of the legal sanction threat on his participation in illegal activities. This relationship is of theoretical interest but is not directly policy relevant: what policy-makers need is information on the effect of *actual* (rather than perceived) criminal justice system activities on crime rates. If perceptions were sufficiently accurate, there would be no need to distinguish between, say, the actual probability of arrest for a particular criminal act and this probability as perceived by various potential criminals. If the link between actual and perceived is weak, then one can question the claim that increased enforcement efforts will deter crime. A third possibility is that public perceptions are not accurate, but do tend to be systematically related to criminal justice system activities. This possibility serves as the basis for a response to Jacob's first criticism of rational choice models of criminal behavior.

What are the important channels by which information on the certainty and severity of punishment is communicated to potential criminals? Three channels are discussed below: the media, visible presence of enforcers, and personal experience and observation. Although these channels do not provide potential criminals with accurate information, the information they do provide is systematically related to the truth. That systematic relationship is sufficient to generate predicted deterrent effects.

*The media.* The threats generated by criminal justice system activities are "advertised" in the media, primarily through news reporting of legislative actions, newsworthy crimes and criminal court cases, introduction of new programs and policies, etc. Occasionally, officials will launch an effort to publicize a particular law enforcement effort, such as a crackdown on speeding. A

dramatic example of the possibilities for a media "advertising" campaign is the intensive publicity given the British Road Safety Act of 1967—most of the British public was aware of the provisions of this act by the time it was implemented (Ross 1973).[6] But such success is surely rare.

Verbal messages concerning specific provisions of the law, the likelihood of being caught, or both, are communicated through a variety of other means: bumper strips remind us of the 55 mph speed limit; roadside signs inform us that there are penalties for littering, that the local traffic enforcement unit employs radar, and that a residential area is protected by a neighborhood watch organization, official documents announce the legal penalties for supplying false information; and residences and stores post warning signs—"Shoplifters will be prosecuted," "Operation Identification," and so on.

The use of such official verbal communications is like other forms of advertising. The effectiveness of such messages might well be enhanced by a systematic application of the technology of using the media to inform and persuade, but Madison Avenue has not yet entered the crime control business.

*Visible presence of enforcers.* The proximity of police emits a potent signal that the probability of arrest for a crime committed in the immediate vicinity is high. A police cruiser eliminates driving infractions in its immediate area—an effect which is extended by CB radio communication Private guards in stores, airports, and other public locations produce an analogous signal for would-be robbers, hijackers, and shoplifters.

The resources devoted to routine patrol activity by police would presumably be hard to justify unless this visible police presence had an effect beyond the immediate vicinity. If the police are seen frequently in an area, potential criminals may be persuaded that there is a high likelihood of arrest in that area due to presumed low police response time and the chance that

[6] The British Road Safety Act creates a precise scientific standard by which to judge whether a driver is legally "under the influence" of alcohol (viz., blood alcohol content in excess of .08 percent) and it establishes a mandatory one-year suspension of driving privileges for drivers who are convicted of violating this standard.

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 193 of 517

they will happen on the scene while the crime is in progress. While the relation between police visibility and public perceptions of their effectiveness has not been studied directly, there are a number of studies of the deterrence effect of the density of police patrol. These studies are reviewed in section IV.

*Personal experience and observation.* Active criminals accumulate personal experience during the course of their criminal careers; this experience surely has a powerful effect on perceptions of criminal justice system effectiveness among the group which is of greatest importance in the crime picture. If active criminals find that they are rarely arrested, unlikely to be convicted if arrested, and unlikely to be sentenced to prison terms if convicted, then they may acquire a justified sense of invulnerability. The effect of arrest and subsequent proceedings on the criminal's perception of the system's effectiveness is the key issue in the study of "special deterrence"—the deterrent effect of the punishment threat on an individual who has been convicted. An arrest can push the criminal's overall perception of the risk of punishment for crime up or down, depending on whether the consequences of arrest are more or less unpleasant than he expected. Probation and parole dispositions are interesting in this context when viewed as an effort to persuade the convict that he will be closely watched and is very likely to be imprisoned if rearrested.

Victims, witnesses, and jurors also acquire personal experience with the effectiveness of the system, and this experience may influence their perception of whether "crime pays." Furthermore, an active criminal's friends and associates may be somewhat aware of his criminal activities and their legal consequences. Thus, each arrest, court proceeding, and sentence may have a large influence on the perceptions of a relatively few people. On the other hand, the public at large is not likely to know about or be influenced by any one case, unless it is highly newsworthy.

This communication mechanism suggests that the deterrence process may often operate in a strikingly different fashion than is typically assumed in the rational choice models of criminal behavior. These models implicitly assume that each potential criminal in some fashion monitors the overall probability of appre-

hension and punishment for each crime type. By this assumption, each arrest and criminal disposition has some marginal (infinitesimal) effect on the perceptions of all potential criminals. This assumption seems highly unrealistic, given that even criminologists working with volumes of statistics have difficulty in measuring changes in these probabilities accurately (although the first two communication channels discussed above may provide potential criminals with some vague sense of the overall performance of the system). The alternative possibility, suggested here, can be stated as follows:

> Each arrest and disposition has a relatively large effect on the perceptions of a small number of potential criminals (including the arrestee himself), and goes essentially unnoticed by all others.

I have developed a model (Cook 1979d) which simulates the criminal behavior of a population of robbers, incorporating this assumption. The main features of this model are:

(a) At any time, a robber's perception of arrest and punishment is influenced by his own recent experience and that of a few "friends." Perceptions differ widely among robbers, because each observes only a small fraction of the actions taken by the system.

(b) Even if the true effectiveness of the system remains constant, there is considerable turnover among active robbers: robbers are deterred and "undeterred" according to their own experiences and those of their friends.

(c) An increase in the true effectiveness of the system results in a corresponding increase in the mean of robbers' perceptions of effectiveness, and an increase in the number of robbers who are deterred. These changes do not occur because the robbers observe that the system has become more effective, but rather because the likelihood that a robber will observe one or more friends apprehended is increased when the overall effectiveness of the system increases.

This model is abstract, and can be criticized for its simple, mechanistic assumptions concerning the complex phenomena of perception, communication, and criminal behavior. It does serve to demonstrate, however, that the deterrence process does not require that criminals' perceptions of the risk of punishment be accurate or that they be derived from observations of the overall performance of the criminal justice system. It may also serve the useful purpose of provoking further research into the communications processes which link official activity to individual perceptions of the threat of punishment.

The three communication channels discussed above do not exhaust the possibilities. In some instances, direct word-of-mouth communication among criminals with similar interests may be important; rumors concerning police and judicial activities circulate and at times have considerable potency. Another possibility is that potential criminals make judgments on the basis of direct observation of the extent of criminal activity in the area: if "everyone" is doing it, it must pay. A familiar example to many of us is the judgment of how much it is "safe" to exceed the speed limit, if the traffic is averaging 70 mph, then it seems safe to assume that the probability of being ticketed for driving 70 is very low.

In general, it is reasonable to assume that the relative importance of each of the several channels of information on criminal justice system effectiveness differs with the type of crime, the degree to which the potential criminal associates with criminally active people, and other factors. The link between official activities and the public's perception of them constitutes half of the deterrence story. Better understanding of this link could be exploited to the advantage of crime control efforts. Two examples are worth noting:

> The initial publicity given the British Road Safety Act apparently succeeded in giving the British public a greatly exaggerated impression of the true likelihood of being caught. While this impression evidently was corrected

after several years of experience, many lives were saved in the interim (Ross 1973).

Intensive police manning of the New York subways during high crime hours of the day initially caused a deterrent effect not only during these times but also during the rest of the day (when police manning levels were not changed). It has been suggested that this "phantom effect" could have been sustained by random changes in police assignments (Chaiken, Lawless, and Stevenson 1974).

Jacob's observations that potential criminals are poorly informed, and in some cases act impulsively, are valid but not sufficient to negate the predictions of deterrence theory. These predictions do not depend on every criminal being fully informed and rational. Limited rationality on the part of some fraction of potential criminals, combined with an information transmission mechanism that is systematic if not completely accurate, is sufficient to generate deterrent effects. Indeed, there is a great deal of evidence that criminals, like other people, respond to objective changes in their opportunities as if they were rational. It would be unfortunate to reject the claims of deterrence theory on the a priori grounds of implausibility.

On the other hand, careful descriptive studies and laboratory experiments to investigate the way in which individuals acquire information and evaluate opportunities may well yield some insights into criminal decision-making, insights that will help refine the predictions of rational choice models and even suggest means of increasing the effectiveness of the system in deterring crime.

The preceding discussion developed a basic perspective on the deterrence process, focusing on information processing and decision-making by the potential criminal. Three specific issues are discussed below from this perspective: the determinants of the extent to which an individual participates in criminal activity; the relative importance of the probability and severity of punishment in deterring crime; and the influence of sanction threats

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 197 of 517

for one type of crime on the relative attractiveness of other types of crime.

### *C. Degree of Involvement in Crime*

Previous sections have discussed the deterrence phenomenon as if criminal activity were an all-or-nothing decision. Yet criminals differ widely in their degree of involvement in crime. The number of, say, robberies committed in a year is the product of the number of active robbers and the average number of robberies committed by each. The deterrence process may influence both factors: the *rate* at which active robbers commit crimes, as well as the decision whether to "enter" the robbery "business" at all.

The basic question with respect to intensity of criminal activity is this: what limits are there on the extent of participation in illicit activity of a potential criminal who decides that it is worthwhile to commit his first offense? The discussion focuses on property crimes and three mechanisms that may act to limit the activity level of an active burglar, robber, shoplifter, or other economic criminal.

I suspect that a large proportion of the population is "opportunistic" with respect to property crimes Without special effort, many people occasionally encounter an extraordinarily good opportunity to steal, and take advantage of it. Examples include taking towels from a hotel, walking out of a shop without paying because the checkout lines are momentarily left unattended, and so forth. We can imagine each person having a standard rule of thumb by which he judges whether such opportunities are worthwhile; the more stringent one's standards (in terms of legal risks and payoff), the less frequently will one encounter suitable opportunities in the normal course of daily activities. An increase in the effectiveness of the criminal justice system or in the severity of punishment will reduce the number of suitable opportunities for those who are opportunists, with a resulting reduction in their individual theft rates.

A more active involvement in theft would be characteristic of people we ordinarily would think of as "robbers," "burglars,"

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 198 of 517

"shoplifters," etc. Instead of a series of yes-or-no decisions on opportunities supplied by the individual's environment, more active thieves would be concerned with searching out and developing opportunities, and would make explicit decisions about the intensity of their illicit activity. Two limiting factors for such people are the opportunity cost of time, and the effects of increased income on the willingness to take risks.

The latter effect seems relevant to understanding employee theft and embezzlement, income tax evasion, and other economic crimes for which time is not an important input (see Allingham and Sandmo 1972 for a formal model of this sort). Given that the magnitude of the offense is positively correlated with the risk of detection and punishment (and also the severity of punishment, perhaps) the miscreant can be viewed as choosing a risk-payoff combination from a continuum of possibilities. An increase in the effectiveness of the system for detecting and punishing criminals in these cases will make this type of crime less attractive and persuade some to "drop out" completely. For those who remain active, it is not obvious whether the augmented risk of punishment will cause an increase or decrease in the rate of offending. A perverse result of increased effectiveness may occur, for example, if the increase in effectiveness is concentrated at the low end of the theft spectrum, those who do not drop out may move up the continuum, given that the difference in risk for large and small thefts has been reduced.

For crimes which require a substantial time input, such as fencing, running numbers, and prostitution, the opportunity cost of time may be an important limiting factor in the extent of involvement. The legitimate wage rate would then influence both the entry decision and the decision with respect to degree of involvement. (Ehrlich 1973 develops a model of this sort, which is criticized by Heinecke 1978a. See also Block and Heinecke 1975.) Once again there is a theoretical possibility that an increased probability of apprehension will *increase* criminal activity levels for those who do not drop out. For example, if police start arresting prostitutes more frequently, some may increase their efforts in order to maintain their standard of living

while meeting the additional costs of bail, legal fees, and fines. This result is analogous to the theoretical possibility of a "backward bending labor supply curve"; there is nothing intrinsically irrational about people choosing to work harder in response to a reduction in the net rate of return to their efforts.

While these models of participation in illicit economic activities permit a theoretical possibility that an increase in the likelihood of detection will increase the overall crime rate, the actual importance of this possibility is doubtful. It seems more plausible that if more effective measures are taken against a particular type of criminal activity, the dominant effect will be to cause criminals to act with greater caution or to switch into other illicit or licit activities.

### D. *Certainty versus Severity of Punishment*

One of the more intriguing issues in the deterrence literature is whether crime rates are more responsive to changes in the likelihood or the severity of punishment. The importance of this issue is suggested by two relevant policy dilemmas. First, sentencing authorities must allocate scarce prison capacity among felony convicts; one consideration is whether prison sentences should be relatively common but short, or relatively uncommon but long. Second, prosecutors have to decide whether to use their scarce resources to produce a high conviction rate with relatively low-quality convictions (through generous offers in plea bargaining), or to concentrate their resources on gaining high-quality convictions of a relatively few defendants while dismissing the remaining cases. The first alternative in each case is compatible with the commonly held view that the likelihood of punishment has a greater deterrent impact on crime rates than does the severity of punishment.

A precise illustrative statement of this hypothesis can be expressed as follows

> A 10 percent increase in the average severity of punishment for a crime will have a smaller deterrent effect than a 10 percent increase in the likelihood of punishment.

For example, if the only form of punishment for convicted robbers is imprisonment, an increase in average sentence from three years to 3.3 years will have less deterrent effect than an increase in likelihood of imprisonment from .050 to .055.

The usual assumptions made in economic analysis of decision-making under uncertainty support this claim when the punishment is in the form of imprisonment, but support the opposite conclusion when the punishment is a fine. The argument behind these conclusions can be illustrated by the following two "lotteries" involving prison sentences. In the first lottery, there is a 10 percent chance of receiving a one-year prison sentence; the second lottery offers a 5 percent chance of a two-year prison sentence. These two lotteries have the same expected value (one-tenth of a year in prison), but most people would not view them as equally threatening; if two years in prison is not viewed as being twice as bad as one year, then the second lottery would be preferred. If so, then the first lottery would have a greater deterrent value. In general, we expect that increases in the probability of imprisonment, coupled with proportionate reductions in the prison term, will increase the deterrent value of the threat of punishment.

The second example involves punishment in the form of a fine. Suppose now that the prison terms in the two lotteries specified above are replaced with fines of $1,000 and $2,000 respectively. Once again the two lotteries have the same expected value ($100). If people are risk-averse, a common assumption in economic theory, they will prefer the first lottery (a $2,000 loss is subjectively more than twice as bad as a $1,000 loss to a risk-averse person). However, Tversky and Kahneman (1974) report that in laboratory experiments most subjects are *not* risk-averse with respect to financial losses, and would in fact choose the smaller probability of a proportionately larger fine. Once again, then, the first lottery should have greater deterrent value, and the conventional wisdom (among criminologists, not necessarily economists), regarding certainty and severity of punishment is reaffirmed. While this sort of theoretical analysis and laboratory experimentation seems rather remote from criminal behavior, it

is interesting to observe that this type of evidence does support the conventional wisdom.

The claim that certain punishment is a more effective deterrent than severe punishment is often buttressed by an assertion that crime rates are unresponsive to variations in severity. If true, the sentencing authorities could reduce average sentences a great deal without noticeable effect on the crime rate. The most compelling issue, and the one given the greatest scholarly attention, is whether capital punishment is a greater deterrent to murder than a long prison term. At the other end of the spectrum are questions concerning the potential loss of deterrent effect resulting from the increased use of diversion programs, suspended sentences, and fines in the place of incarceration.

It is commonly acknowledged that the threat of a more severe penalty will cause defendants to put more effort and resources into their defense. Indeed, one of the social costs of capital punishment, mandatory sentencing provisions, and related efforts to increase the severity of punishment is that these cases take up an increased portion of court resources through appeals and other defense efforts to resist conviction. It seems implausible that the severity of punishment should be highly salient to the criminal after arrest but not before.

While we would expect a rational criminal to respond in some degree to increases in the severity of punishment, it is certainly plausible that the marginal deterrent effect of increasing prison sentences declines rapidly as the length of the sentence increases, due to the tendency of people to discount the future. A simple mathematical model may be helpful in illustrating this point.[7] Suppose that an individual assigns one unit of "disutility" to a

[7] The model postulates that the individual's subjective evaluation of the prison terms is equal to the sum of the disutilities discounted to the present. If the disutility of one year in prison is denoted $d$, and the discounted present value of $n$ years in prison is denoted $D_n$, then

$$D_n = \sum_{t=1}^{n} d\left(\frac{1}{1.15}\right)^{t-1}.$$

The value chosen for $d$ does not influence the value of the ratios reported in the text, and was set equal to 1.

year in prison, and has a time discount rate of 15 percent per annum. It would then be true, in present value terms, that a two-year prison term has about 87 percent greater disutility than a one-year term. However, under these assumptions a twenty-year term has only 25 percent greater disutility than a ten-year term. It is plausible, then, that increasing the severity of punishment when punishment is mild may have a much greater deterrent effect (even proportionately speaking) than increasing severity when punishment is already severe.

*E. Substitutes and Complements*

Establishing a rational sentencing policy, and appropriate priorities in prosecution and police investigation, is complicated by the possibility that variations in the threat of punishment for one type of crime may affect the incidence of other crime types, via two mechanisms. First, given limited police, court, and corrections resources, increasing the priority given to one type of crime necessarily entails a reduction in the priority given one or more other crime types. Second, in deciding whether to commit one type of crime, criminals will be influenced by the legal threat not only to that crime type but also to related types of crime. The latter mechanism must be given consideration in any complete characterization of the deterrence process. An analogy from the economic theory of consumer demand provides insight and useful terminology for discussing this mechanism. Suppose the price of gasoline increases 50 percent due to a change in policy by the OPEC cartel. The primary effect would be to reduce the quantity of gasoline purchased. Secondary effects include an increase in the demands for public transportation, fuel-efficient autos, and central city housing, and a decrease in demand for luxury autos and suburban housing. Commodities which become more desirable when the price of gasoline increases are known as "substitutes" for gasoline; those which become less desirable are "complements." While the analogy is by no means perfect, I will use these terms to discuss the secondary effects of a change in the threat level to a particular type of crime.

*1. Substitutes.* Various types of property crime are presumably

substitutes for each other. Recidivism data demonstrate that there is a great deal of crime switching among active criminals; for example, 22 percent of men arrested for burglary in the District of Columbia in 1973 were subsequently arrested for robbery within three years (compared with 33 percent who were rearrested for burglary) (Cook and Nagin 1979). The Rand study of self-reported crime by a sample of forty-nine incarcerated robbers found that they admitted having collectively committed 1,492 auto thefts, 2,331 burglaries, 855 robberies, and 1,018 other serious thefts during their criminal careers (Petersilia, Greenwood, and Lavin 1978). Given this sort of versatility, one would expect that an increase in the relative law enforcement effectiveness against robbery would result in an increase in other types of theft crimes. Variations in other sorts of crime-specific deterrents would be predicted to have the same effect: if shopkeepers arm themselves, then thieves may switch from commercial robbery to commercial burglary; increased use of burglar alarms would have the opposite effect.

A second dimension to the substitution phenomenon is geographic displacement. A large increase in the number of police assigned to one precinct in a city may result in some increase in crimes committed in neighboring precincts. A houseowner who posts an Operation Identification sticker increases the burglary risk to his stickerless neighbor. Intensive police manning of the subway system may cause an increase in taxicab and bus robberies. Exact fare systems on buses may increase the robbery risk to convenience stores. I know of no studies of crime displacement across state lines or between distant metropolitan areas, but it is likely that some buyers of illicit merchandise (drugs, machine guns, stolen goods) travel some distance in order to take advantage of more lax enforcement in another jurisdiction. Organized crime operations would be expected to locate their activities so as to minimize legal risks, to the extent that other considerations permit; an example in this context would be the decision of where to land illicit drug shipments smuggled in from South America or Mexico.

A very important aspect of the substitution phenomenon fre-

quently arises in the design of criminal sentencing policy. It is thought that the structure of criminal sentences must include a strong marginal deterrent to the use of threat or violence to reduce the likelihood of violent resistance to arrest. If the typical sentence for robbery without violence is a long term of imprisonment, robbers may be more inclined to kill their victims and other witnesses. Defendants who are faced with the likelihood of conviction and severe punishment will be more tempted than others to jump bail and intimidate witnesses, knowing that even if they are caught there is little more that the system can do to them; this is, of course, the reasoning behind denying defendants the right to bail in capital cases.

Zimring and Hawkins (1973) discuss this aspect of sentencing policy in terms of the "fortress" and the "stepladder." The "fortress" approach is to erect a high and more or less uniform "barrier" around the domain of criminal activity. The "stepladder" approach adjusts the punishment to the seriousness of the crime, in the hope that if the potential criminal *does* decide to act, the penal code will provide an adequate incentive to limit the seriousness of his crimes If the preceding discussion of the deterrent effect of changes in the length of prison term is correct, the bottom "rungs" of the stepladder must be kept low in order to allow "room" for effective differences in sentencing between robbery, robbery with victim injury, and robbery murder; the usual sentence for robbery should not be more than a year or two in prison. This type of policy must be evaluated in the context of priority-setting by police and prosecutors—if sentences are relatively uniform, then a greater burden is placed on officials to create a stepladder effect through gradations in the likelihood of arrest and conviction.

2. *Complements.* Complementarity arguments have been extremely important in motivating criminal justice policy in the area of heroin and handguns. A key argument for vigorous law enforcement efforts to interdict the flow of heroin and other illicit drugs is that an increase in the "effective price"[8] of such drugs resulting from law enforcement efforts will reduce the

[8] A term coined by Mark Moore (1973), and discussed in his article

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 205 of 517

incidence of property crimes. Similarly, the crimes of illegal acquisition, possession, and carrying of handguns are thought to be complementary to robbery and murder. Both these claims of complementarity are highly controversial, of course, and even if there is such a relation it must be demonstrated that these roundabout techniques for reducing property crimes or murder are the most effective use of resources against these crimes.

There are some very interesting sorts of interrelations within market-oriented complexes of criminal activity. Typically illegal commodities markets will involve suppliers, middlemen, and customers. In prostitution, they are, respectively, the prostitutes, pimps, and johns; in heroin, they are the poppy growers and heroin processors, the importers and retailers, and the users; in burglary they are the burglars, the fences, and the purchasers of stolen merchandise. In each case, we would expect that law enforcement efforts directed at any one of the three types of actors would reduce the amount of criminal activity by the other two types of actors. For example, a crackdown on fencing would lower the price that fences pay to burglars and make fences generally more cautious in dealing with both burglars and customers. The result would be to reduce the rate of return to burglary, thereby causing a reduction in the number of burglaries and ultimately a reduction in the illegal purchase of stolen merchandise.[9]

The question for law enforcement officials is what strategy will be most effective in disrupting the market which supports each of these activities. In the case of burglary, for example, prosecutors can bargain with burglary defendants to gain convictions of fences, or vice versa. Undercover police can pose as fences to identify and collect evidence against burglars, or al-

[9] Strictly speaking, burglary and fencing are not "complementary" activities in the sense this term is used in economic theory. An increased legal threat to fencing does not *directly* cause a reduction in burglary, as would be true if they were complementary crimes The reduction in burglary is an indirect effect of the crackdown on fencing, the direct cause being the reduction in the price paid by the fence.

Recent literature on prospects for combating fencing include Blakey and Goldsmith (1976) and Walsh (1976) Klockars (1974) provides a fascinating description of fencing activities.

ternatively pose as burglars to facilitate arrests against fences. Similar strategic choices are available in illicit drugs and prostitution. The correct strategy should be dictated by the consideration of which of the roles in these illicit markets are most vulnerable to available techniques of law enforcement.

## II. Empirical Study of the Deterrence Process

The discussion of theoretical issues in deterrence research presented above suggests a wide-ranging agenda for empirical work, including basic research on decision-making under uncertainty, on communications processes, and on the structure of illicit markets. The great bulk of the empirical deterrence literature, however, has been concerned with deriving estimates of the impact of criminal justice system activities on crime rates, and it is this body of applied research that I review here and in section III.

Measuring deterrence effects outside of the laboratory requires data on criminal opportunities and criminal behavior for a number of units of observation. Almost all studies have used some geographic entity as the unit of observation—precincts, cities, states, or the entire nation. The empirical study of deterrence has thus been concerned with aggregate rather than individual behavior. Practical problems of collecting data on individuals have prevented field studies of microbehavior.

There are two basic approaches to the empirical study of the deterrence process, which I label "criminal opportunity" and "policy impact." This distinction can be explained with the aid of a simple diagram

actions (policy) —A→ criminal opportunities —B→ crime rates

In the diagram, the causal connection between crime rates and crime control policy (broadly construed to include the criminal law, resource levels, priorities, and so forth) is broken down into two links. Link A represents the effect of policy on the quality of criminal opportunities; this can be viewed as a production process in which criminal justice system inputs "produce" threats of punishment. The probability and severity of

punishment associated with each criminal opportunity thus constitute the vector of outputs of the system. Link B represents the deterrence effect of threats of punishment on crime rates. The criminal opportunity studies attempt to estimate the strength of this deterrence relationship for a variety of crime types. In many cases these studies also include a separate estimate of the production relationship (link A), so that it is possible by combining the two relationships to derive an estimate of policy on crime. Policy impact studies, on the other hand, estimate the effect of policy on crime directly, without considering the intervening variables characterizing the quality of criminal opportunities.

It would seem that the criminal opportunity studies are the more informative of the two categories, especially if the objective is to learn about the deterrence process rather than about policy impacts. However, these studies, unlike the policy impact studies, require the use of an index of the quality of criminal opportunities, or "threat level." I argue below that the measures of threat level actually used in these studies are not valid, and furthermore that the data necessary to calculate a valid measure are not usually available. In short, this approach appears to be a dead end, in spite of the numerous studies of this sort which have appeared in the economics and sociology literature during the last decade. Before justifying this rather extreme claim, I first give a more complete description of the approach and its intellectual history. A review of the policy impact literature is left for section III.

*A. A Decade of "Criminal Opportunity" Studies*

Jack Gibbs published the first article reporting a statistical analysis of this sort in 1968. Gibbs simply related (by a contingency table method) the murder rate with a variable intended to measure the probability of punishment—namely, the number of convicts sent to prison for murder divided by the number of murders—using cross-section data by state for 1959–61. He also related the state murder rates with the average prison terms served by incarcerated murder convicts in each state. He interpreted his results as evidence that murder is indeed deterrable.

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 208 of 517

Gibbs's technique was very primitive by reigning standards for the statistical analysis of nonexperimental data, since it did not attempt to control for other variables which influence murder, and took no account of the possibility that the causal relation between crime and punishment may go in both directions. The first state-of-the-art study was incorporated in Isaac Ehrlich's thesis in 1970, subsequently published in 1973—the same year as Sjoquist, and Carr-Hill and Stern, published very similar studies. These studies, while much more sophisticated than Gibbs's, used measures of the probability and severity of punishment similar to his. A paradigm was established by this work which has been employed since by a number of economists and sociologists. These studies have employed a variety of data sets, including state-level data for recent census years, data on large cities, data on precincts of New York and counties in California, and similar data sets for Canada and the United Kingdom.[10] The results of these studies have for the most part been favorable to the deterrence doctrine, seemingly documenting a statistically significant and often rather large effect of the "probability of punishment" as measured on each of the seven FBI index crimes. The results for the deterrent effect of punishment severity have generally been weaker and less consistently significant. However, Ehrlich's (1975) subsequent and highly sophisticated study of the marginal deterrent effect of capital punishment on murder estimated a deterrent effect so large that only the most confirmed abolitionist could claim it to be irrelevant—one way of summarizing his result is that each execution saves eight lives. This study received widespread attention, and was submitted to the Supreme Court as part of the solicitor general's brief in *Gregg v. Georgia*, 428 U.S. 153 (1976).[11]

The great potential importance of this work, and particularly the intense controversy engendered by Ehrlich's study of capital punishment, culminated in the formation of the National Research Council's Panel on Research on Deterrent and Incapacitative Effects. This panel performed a thorough review of all the

[10] Nagin (1978) includes a very useful table which summarizes these studies

[11] Bailey (1978) has a brief history of the use of this and other such studies.

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 209 of 517

major reports published at that time, including replications of Ehrlich's work and a highly technical critique of the problems with the econometric paradigm employed in this literature. The panel's conclusion was decidedly negative. "The major challenge for future research is to estimate the magnitude of the effects of different sanctions on various crime types, an issue on which none of the evidence available thus far provides very useful guidance" (Blumstein, Cohen, and Nagin 1978, p. 7). The panel did not choose to reject the basic approach, however, but instead encouraged scholars to develop better data sets and seek methods for eliminating certain biases which they consider damaging to the validity of the results (pp. 46–50).

It is easy to criticize any nonexperimental statistical technique which employs error-ridden data to assess some aspect of a complex and poorly understood process. Much more difficult is to judge whether the criticisms are sufficiently important and damaging to warrant rejection of available findings, or even abandonment of the entire approach. If there is no practical alternative for studying the phenomenon, the relevant question is whether the statistical technique in question can generate results which are more reliable than intuition alone. In this case I accept the panel's conclusion as cited, but would go even farther than they in discouraging future use of the Ehrlich paradigm. My conclusion is influenced by the numerous problems discussed in the panel report and elsewhere,[12] but stems primarily from apparently insuperable difficulties with measuring the quality of criminal opportunities.

*B. Measuring the Quality of Criminal Opportunities*

Since the primary motivation for criminal opportunity studies is to estimate the response of crime rates to the probability and

[12] Studies of the deterrent effect that use cross-section or times series data on jurisdictions, such as those that fit the Ehrlich paradigm, suffer from a variety of statistical problems, including (1) the poor quality of the data on crime, (2) the difficulty of distinguishing between the effect of punishment on crime rates, and the effect of crime rates on the likelihood and severity of punishment, (3) the difficulty in controlling for the variety of factors that influence crime rates These problems are discussed below in section III, and are developed in detail in Blumstein, Cohen, and Nagin (1978), Cook (1977), and Brier and Fienberg (1978) among other places

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 210 of 517

severity of punishment, obtaining valid measures of these variables is crucial to the whole enterprise. In practice, the measure of probability used in this literature is some type of clearance rate, most commonly the arrest rate or the ratio of prison admissions to crimes reported to the police. While these clearance rates may *look* like probability measures (they usually lie between zero and one), they cannot be literally interpreted as such. After all, the individual crimes reflected in these measures are not homogeneous but, rather, differ widely with respect to a number of factors. For example, the 1960 ratio of prison admissions for murder to murders committed in New York was .54 (see Vandaele 1978a, p. 331), but the probabilities of punishment for the hundreds of murders reflected in this ratio ranged from near zero (in the case of some skillfully planned gangland executions) to near one (for, say, murders of family members). If the clearance rate is not a measure of a single probability of punishment, then what does it measure? At best, it can be viewed as a measure of the *average* probability of punishment for crimes committed.[13] Is it appropriate to use the average probability as a sort of index of the overall effectiveness of the criminal justice system?

In fact, the clearance rate fails even as an index of overall effectiveness, because the clearance rate reflects not only criminal justice system activities but also the many factors (including the system's effectiveness) which influence the care and judgment exercised by criminals. (The argument here was first made in Cook 1979a and elaborated in Cook 1979c.) For example, robbers would be expected to adapt to an increase in the potential effectiveness of the system in solving robbery cases and gaining convictions of robbery defendants, if, under the new more effective regime, robbers tend to be more selective in choosing vic-

[13] The major source of inaccuracy in the clearance rate is in the denominator —the number of crimes. Cook (1977, p 189) compares clearance rates for burglary using two measures of the number of burglaries committed. the "burglaries known to the police" in the Uniform Crime Reports, and the burglary rate estimates derived from the crime surveys in twenty-six cities sponsored by the Law Enforcement Assistance Administration. The differences tend to be large and variable.

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 211 of 517

tims and more cautious in their modus operandi, the observed change in the clearance rate may be misleadingly small.

Consider the following artificial example. Suppose that Crime City makes arrests and convictions in 10 percent of its street robberies and 20 percent of its commercial robberies in 1980. In 1981, the Crime City police organize a hidden camera program to combat commercial robberies, which is successful in increasing the probability of arrest and conviction for such robberies to 30 percent. This increase in effectiveness has a strong deterrent effect on commercial robberies, with some displacement effect to street robberies. Suppose the relevant numbers look like the data in table 1.

Usually the available data would not be detailed enough to permit separate analysis of commercial and street robbery. A statistician may therefore conclude that the hidden camera program had no effect—after all, the overall clearance rate did not change. The problem here is not that the clearance rate is inaccurately measured (although that too is usually a problem in practice)—the problem is that the clearance rate is not a valid index of the true effectiveness of the criminal justice system. In this example, the true increase in effectiveness had no effect on the clearance rate. If other numbers had been used, the observed clearance rate could have gone up—or even down.

Economists have studied this type of index number problem rather extensively (Fisher and Shell 1972). One conceptually simple solution is to construct a Laspeyres index. The Consumer Price Index is of this sort In my numerical example, a Laspeyres

TABLE 1

| | 1980 | | 1981 | |
|---|---|---|---|---|
| | # of Robberies | Clearance Rate | # of Robberies | Clearance Rate |
| Commercial | 100 | 20 | 50 | 30 |
| Street | 100 | 10 | 135 | 10 |
| Total | 200 | 15 | 185 | 15 |

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 212 of 517

index for the clearance rate would use the 1980 mix of crimes as weights in calculating clearance indexes for both 1980 and 1981. This index would be .15 in 1980 and .20 in 1981, the increase reflecting the actual increase in the effectiveness of the police. But there is little hope for the forseeable future that the detailed data necessary to construct such an index will become available.[14]

The only promising prospect for criminal opportunity studies that I can see involves "target-specific" analyses of victimization rates. We can imagine a study of bank robbery within a jurisdiction, for example, which characterized the robbery opportunities provided by each bank in terms of an assortment of attributes including presence of a guard, ease of escaping from the scene, use of hidden cameras, and average amount of loot available from cashiers. The extent to which these variables explain differences in victimization rates is a measure of the deterrent effect of these dimensions of the quality of bank robbery opportunities. Similar studies could be conducted of robbery and burglary victimization rates for other types of commercial targets, of shoplifting where the quality and display of the merchandise were the key measures, and of location-specific traffic violations as a function of the characteristics of the location. Such studies would yield useful information on the deterrence process.

## III Lessons from Policy Innovations

Major changes in criminal law and policy, if properly evaluated, can serve as object lessons concerning criminal behavior and the performance of the system. In particular, policy innovations which are intended to change the threat level can teach us about the process of threat production and the responsiveness of criminals to changes in the threat level. A number of such evaluations have been published during the last decade. These studies represent the beginnings of an empirical basis for deterrence-oriented policy formation.

Policy innovations which have been evaluated in terms of their

[14] A more complete discussion of the "endogeneity" problem in the use of the clearance rate is in Cook (1979a) Manski (1978) discusses some closely related technical issues

deterrent effects include changes in the substantive law (legalization of abortions, change in the speed limit, reduction of legal drinking age), changes in resource allocation (increased preventive patrol, career criminals prosecution units), and changes in the severity of criminal sentencing provisions. (Zimring 1978 provides a summary of several of these studies.) Evaluations of these innovations have much in common with evaluations of innovations in other areas of social policy, and my review draws on this larger context to some extent.

*A. Comparison with the Criminal Opportunity Studies*

The main objective of the criminal opportunity studies, the deterrence research fitting the Ehrlich paradigm, is to isolate and measure the effect of the threat level on crime rates. Absent a valid index of the threat level, this objective is beyond reach. The alternative, incorporated in the policy impact studies, is to analyze the deterrence effects of factors which are thought to determine the threat level—the criminal code, the quality and quantity of committed resources, the organization of these resources, the quality of civilian cooperation, and so on Whatever deterrent effect is generated by changes in these factors can be assumed to stem from the induced change in the threat level, but the magnitude of this change is unknown.

An example serves to illustrate this limitation of the policy impact evaluations. In 1966, the New York Police Department increased the number of patrolmen assigned to the Twentieth Precinct by about 40 percent. S. J. Press (1971) conducted a thorough and sophisticated evaluation of the impact of this increase, and concluded that it reduced "inside" felonies (those which are invisible from the street) by 5 percent and outside felonies 36 percent during the year following the change. These estimates are certainly interesting and relevant to evaluating the worth of the increase in police manpower. However, there is no way of measuring the change in the threat levels to inside and outside felonies, so it is not possible to derive an estimate of the responsiveness of crime to the threat level from this report. (Press does report the changes in the arrest rates for inside and outside

felonies, but, as explained above, the arrest rate is not a valid indicator for the threat level.) Given the large reduction in the number of outside felonies, we can conclude that the extra police were very productive in terms of augmenting the threat level, that the outside felony rate is highly responsive to changes in the threat level, or some combination of the two. This ambiguity frustrates the search for evidence on the degree to which crime is deterrable in the abstract sense formulated in the Ehrlich paradigm.

*B. Three Approaches to Policy Evaluation*

Three basic approaches to policy evaluation are distinguished by the type of data being used: (1) cross-section comparisons of jurisdictions which differ with respect to some dimension of criminal justice policy (e.g., police per capita, use of capital punishment for murder), (2) time series analysis of crime in a single jurisdiction before and after the adoption of some policy innovation; and (3) analysis of experimental field trials, involving random assignment of units to different "treatments" to test the efficacy of some policy innovation. Not all evaluations fit neatly into one of these three categories, but this partition is an adequate framework for discussing the relevant methodological issues.

The cross-section analyses involve correlating crime rates with "input" levels across jurisdictions. Several studies have analyzed interstate differences in crime rates as a function of the number of police per capita and other factors in order to measure the marginal deterrent effect of additional policy resources (see, e.g., Greenwood and Wadycki 1973 and Swimmer 1974). Several other studies have attempted to measure the impact of particular criminal code provisions (e.g., gun control ordinances, capital punishment) by systematic comparison of jurisdictions governed by these provisions with those which lack them (see, e.g., Maggadino n.d. on gun control).

The most frequently used approach is the "before and after" analysis of a policy innovation in a single jurisdiction. A partial listing of such studies published since 1970 is given in table 2. Some of these innovations were adopted as an experiment, in-

TABLE 2
Policy Impact Studies

| Source | Intervention | Process Measures | Outcome Measures | Controls | Evidence of Deterrent Effect? |
|---|---|---|---|---|---|
| Williams et al (1975) | Reduction in legal minimum drinking age from 21 to 18 in Michigan, Wisconsin, and Ontario | None | Drivers under 21 involved in fatal motor vehicle crashes total, night time only, single-vehicle crash only | Corresponding numbers for neighboring states | Yes, but small. |
| Ross (1973) | The British Road Safety Act of 1967 creates "scientific" measures of drunkenness (08% alcohol in blood) and mandates that suspect drivers submit to breathalyzer tests Massive publicity campaign preceded implementation Sanctions for conviction include a one year mandatory license suspension | 1 Survey of public knowledge of new law.<br>2 Number of breath tests administered.<br>3 Number of drivers charged under this and related laws<br>4. Alcoholic beverage sales | 1 Total road casualties and fatalities<br>2. Fatalities and serious injuries during peak drinking hours<br>3. Fraction of drivers killed in accidents who were drunk. | 1 Time series prior to enactment<br>2. (a) Time series prior to enactment on same measure. (b) Fatalities and serious injuries for other times of the week<br>3. Average for same measure prior to enactment. | Yes, strong initially |

TABLE 2 (*Continued*)

| Source | Intervention | Process Measures | Outcome Measures | Controls | Evidence of Deterrent Effect? |
|---|---|---|---|---|---|
| Ross (1977) | Chief constable's order for stricter enforcement of British Road Safety Act in Cheshire, September 1975. | Number of breath-alyzer tests | 1. Fatalities and serious injuries.<br>2 Total crashes during drinking hours | 1. Time series before and after intervention<br>2 (a) Time series before and after intervention. (b) Time series on total crashes during other times. | Yes |
| Robertson, Rich, and Ross (1973) | Supervising judge's order to Chicago magistrates to sentence drunk drivers to 7-day jail terms, December 1970 to June 1971 | 1 Numbers of arrests for DWI<br>2 Conviction rates for DWI.<br>3. Number of 7-day jail sentences for all traffic-related offenses. | 1 Auto fatality rate by month.<br>2 Pedestrian fatality rate. | 1 Time series on both Chicago and Milwaukee<br>2. Time series on both Chicago and Milwaukee. | No. |
| Landes (1978) | Mandatory pre-board screening of airline passengers and carry-on luggage in U.S., 1973 | Proportion of offenders apprehended within 12 months | Number of domestic hijackings | 1. Time series of domestic hijackings.<br>2. Hijackings in other countries. | Yes. |

TABLE 2 (*Continued*)

| Source | Intervention | Process Measures | Outcome Measures | Controls | Evidence of Deterrent Effect? |
|---|---|---|---|---|---|
| Chaiken, Lawless, and Stevenson (1974) | Tripling of N.Y.C Transit Police force in 1975, with the additional men placed in stations and on trains from 8 pm to 4 am | 1 Police manning levels<br>2 Arrest rates | 1. Total felonies, total robberies, etc<br>2 Felonies, robberies during 8 pm to 4 am period. | 1. Time series prior to intervention<br>2. Felonies, robberies during 4 am to 8 pm period | Yes. |
| Beha (1977) | The Bartley-Fox Amendment creating a mandatory one year minimum prison sentence for carrying a firearm without a permit in Massachusetts. Implemented April 1975. | Various measures of arrests and dispositions of gun-related cases | 1. Number of FID cards and carrying licenses issued.<br>2. Fractions of aggravated assaults, homicides, and robberies involving firearms. | 1 Time series prior to amendment.<br>2. Time series prior to amendment. | Yes. |
| Joint Committee on New York Drug Law Evaluation (1978) | The "Rockefeller" Drug Laws 1973, lengthening prescribed minimum prison sentences and creating a one year mandatory minimum sentence for heroin dealers. | Various measures of arrests and dispositions of heroin-related offenses in New York City. | 1 Serum hepatitis cases and narcotics related deaths, N.Y.C.<br>2. Admissions to detoxification program and methadone maintenance in N.Y.C. | 1. Time series, and corresponding series for Baltimore, Washington, D.C., and Philadelphia.<br>2. Time series. | No. |

TABLE 2 (*Continued*)

| Source | Intervention | Process Measures | Outcome Measures | Controls | Evidence of Deterrent Effect? |
|---|---|---|---|---|---|
| Press (1971) | Experimental increase of police manpower in New York City's 20th Precinct by 40 percent in October 1966. | Arrests for felonies and misdemeanors. | The differences in reported number of crimes between a previous "low manpower" and a "high manpower" period, weekly average seasonally adjusted. Calculated for 10 crime categories | Corresponding differences calculated for groups of similar precincts. The precincts included in the control groups differ according to crime category. | Yes, for outdoor crimes. |
| Zimring (1972) | Decriminalization of abortion in Hawaii, 1970. | Number of legal abortions and ratio of abortions to live births, 1970–71. | 1. Change in number of live births between 1969 and 1970.<br>2 Change in ratio of illegitimate to legitimate births, 1969 to 1970.<br>3. Change in number of live births by ethnic group. | 1. Corresponding change in Oregon and California. | No. |
| Schwartz and Clarren (1977) | Experimental adoption of team policing in one district of Cincinnati, 1973. | Arrest data, measures of police-community relations. | 1. Crime rates, measured by survey and by crimes reported by police | 1. Time series.<br>2 Crime rates in other districts of Cincinnati. | Yes, for burglary only. |

cluding the team policing study in Cincinnati (Schwartz and Clarren 1977), the field interrogation study in San Diego (Boydstun 1975), and the increase in the Twentieth Precinct police force in New York (Press 1971). But these "experiments" lack most of the features of a complete experimental design, which would have to involve many geographic units sorted randomly between an experimental group (in which the policy innovation is implemented) and a control group.

A controlled experimental design with random assignment is generally viewed as the most reliable source of information about the effects of social innovations, and has been used on a large scale on subjects as diverse as the Salk vaccine tests and the negative income tax experiments. The use of this technique in criminal justice research has largely been limited to correctional programming studies, focused on rehabilitation effects. A partial (and famous) exception in the deterrence research is the Kansas City Preventive Patrol experiment (Kelling and Pate 1974).

### C. *Methodological Issues*

The three approaches to policy impact evaluation share certain methodological concerns. A discussion of these issues serves as a more useful review of this literature than a summary of results, because policy impact evaluation has more promise than past. My discussion here focuses on problems of measurement and causation.

1. *Measurement of outcomes.* The first and often most difficult problem in outcomes measurement is obtaining *reliable* measures of target variables. The outcomes measures in the evaluation of a deterrence-oriented policy innovation are usually crime rates of some sort. A majority of relatively serious common law crimes are reported to the police, and these crime reports ordinarily are the most readily available data for measuring the impact of policy innovation. Problems arise with reliance on reported crime as a measure because reporting rates differ across jurisdictions and over time, and because the crime count is subject to manipulation by officials. For example, Chaiken (1978) discovered that the official records on subway crime in New York were

counterfeit to some extent, due to a police official's zeal to demonstrate the effectiveness of intensive police manning in reducing subway crime. Even without conscious manipulation of the data, large changes in police presence in an area may cause systematic biases in the data, due to the possibility that police visibility may influence reporting rates by citizens. For this reason some of the more careful studies have supplemented police data with victimization surveys (e.g., Schwartz and Clarren's 1977 report on the Cincinnati Team Policing Experiment; see table 2).

Victimless crimes pose a still greater measurement problem because they only become known to authorities by accident or by dint of police undercover work. A number of the studies listed in table 2 have resolved this problem by using available data on proxy variables thought to be highly correlated with the incidence of the crime in question. The three studies of drunk driving crackdowns and the study of changes in the minimum legal drinking age all used readily available data on traffic accidents and casualties. Beha's study (1977) of the Bartley-Fox Amendment employed robbery, assault, and murder data; he argues that if the crime defined in the amendment (carrying a gun without a license) were reduced by the harsh penalties it stipulated, the rate of violent crime would also be reduced. Zimring's study (1972) of the legalization of abortion in Hawaii employed data on the live birth rate as the basis for inferring the number of illegal abortions before legalization.

These proxies are plausible indirect measures of the victimless crimes targeted by these policy innovations. The real virtue of these proxies, however, is that they are of direct policy interest in themselves. Indeed, preventing serious traffic accidents is the raison d'être of drunk driving statutes, and preventing violent crimes was certainly the main purpose of the Bartley-Fox Amendment.

A second important issue in the measurement of outcomes is specificity. The usual categories in which crimes are counted are often too crude to provide sensitive indicators of policy impact. Several important examples come to mind. First, a change in statutory sentencing severity, as in the Rockefeller drug laws or

the Bartley-Fox Amendment, usually exempts juveniles. The measure of severity used in most studies fitting the Ehrlich paradigm, average prison sentence, is applicable only to adults and the rare juvenile defendant who is waived to adult court. Given that a large percentage of serious crimes is committed by juveniles, an outcome measure which does not distinguish between juveniles and adults will tend to be an insensitive and "noisy" indicator of the effect of the policy.

Studies of the deterrent effect of capital punishment[15] almost always use some aggregate criminal homicide measure as the indicator of impact, even though the capital sanction is ordinarily reserved for felony murderers and other relatively small subsets of homicide defendants, and would not be expected to deter the sorts of homicide which constitute the majority in these statistics.

The importance of using as specific a crime measure as possible is that most policy innovations have a small effect at best,[16] and this effect can easily be submerged and lost in the normal fluctuations of an insensitive indicator. Part of the persuasiveness of Ross's evaluation (1973) of the British Road Safety Act results from his use of highly sensitive indicators. Instead of limiting his study to the gross accident rate, he distinguishes between fatalities, casualties, and minor accidents (accidents associated with drunk driving are more serious on the average than others), further, he distinguishes between accident rates during common drinking hours and accident rates on weekdays. Press (1971) expected (correctly) that the increase in police manning of the Twentieth Precinct would have a greater effect on outdoor, visible felonies than on indoor felonies, and analyzed these two crime types separately. Zimring (1972) distinguishes between illegitimate and legitimate birth rates in his study of abortion. Beha (1977) missed a good bet in failing to distinguish between firearms assaults committed at home, and those committed away from home. The latter necessitated carrying a gun in violation

15 Sellin's studies of capital punishment are critiqued in Ehrlich (1975), Cook (1977), and Klein, Forst, and Filatov (1978).

16 This generalization is documented and discussed in Gilbert, Light, and Mosteller (1975).

of Bartley-Fox, and so the rate of such assaults should be the more sensitive to the new law.

The third important issue in outcomes measurement is *inclusiveness*. A complete evaluation of a policy innovation requires inclusion of all likely outcomes which are of concern to deterrence theorists or policy makers. The most common issue here is displacement—a policy innovation targeted on one geographic area or one type of crime will, in addition to a possible deterrent effect, displace criminals to other areas or crime types. Press studied crime rates in precincts bordering the twentieth; Williams et al. (1975) studied accident rates for youthful drivers in regions bordering states which had lowered their legal minimum drinking age; Chaiken, Lawless, and Stevenson (1974) studied the effects of nighttime intensive police manning on the New York subways on daytime subway crime rates and on robbery rates for buses and taxis. Obvious substitution possibilities resulting from Bartley-Fox include an increase in nongun violent crime, a substitution of more vulnerable targets for commercial targets in robbery, and a substitution of burglary for robbery. In general, predicting the sorts of displacement effects that are worth studying requires insight into criminal behavior and criminal opportunities.

2. *Measurement of inputs*. A change in law or policy, however important it looks in theory, may be undermined or transformed during its implementation. It is important to study the implementation of a policy innovation to facilitate interpretation of measured outcomes. In some cases a careful analysis of implementation has revealed that the criminal justice system has absorbed an apparently important innovation with hardly a trace, thus explaining the lack of effect on crime.

The Kansas City Preventive Patrol Experiment (Kelling and Pate 1974) is a case in point. In this experiment, fifteen contiguous beats were divided into three groups; five beats were to receive intensive preventive patrol, in five a normal level of preventive patrol prevailed, and in the remaining five preventive patrol was eliminated. While this experimental design suggests that visible police presence would differ widely among the three groups

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 223 of 517

of beats, Larson (1975) has argued that this was not so in practice. Police made it a point to patrol the perimeter of the "no patrol" beats, and to respond to calls in a highly visible fashion in these beats. A further indication of the lack of effect is that police response time to calls did not differ among the three experimental groups.

The Rockefeller drug laws, which increased statutory penalties for dealing in heroin and other drugs, had little effect on actual sentencing: the percentage of such defendants convicted and sentenced as felons was the same (11 percent) in 1976 as in 1973. Despite considerable advance advertising to the contrary, the British Road Safety Act of 1967 had little effect on the propensity of police to make arrests or issue citations in drunk driving cases. Similarly, the crackdown on drunk driving in Chicago, studied by Robertson, Rich, and Ross (1973), found there had been no significant change in arrest or conviction rates for drunk driving.

Of course, the innovation does not always get lost during implementation. Beha (1977) was impressed by the degree to which prosecutors and judges were carrying out the intent of the Bartley-Fox Amendment to impose one year minimum prison sentences on those guilty of carrying a gun without a license. None could argue that airport security measures introduced in 1973 were undermined during implementation—indeed, Landes (1978) reports that all hijackers since that time in the United States have been either killed or imprisoned. The team policing experiment in Cincinnati was successfully implemented for the first eighteen months, but undermined later by changes in policy. In any event, it is not safe to take any new policy at face value, and an investigation of its actual effects on the behavior of officials is an important feature of a complete evaluation.

In cross-section studies involving analysis of crime in jurisdictions which differ according to criminal code provisions or input levels, a common failing is to ignore differences in enforcement intensity. Maggadino (undated) compares states which differ with respect to gun control ordinances without analyzing enforcement procedures for these ordinances. A variety of studies

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 224 of 517



of the deterrent effect of capital punishment have simply compared murder rates of retentionist and abolitionist states, without considering the *frequency* of executions in retentionist states. Wilson and Boland (1976) argue persuasively that the number of police employed in a city is not a good measure of police activity, since police departments differ widely with respect to prevention programs and to the percentage of the force which is actually on the streets at any one time. Much of the information we would like to obtain from a policy innovation is lost if implementation of the policy is ignored. While it may not be possible to measure the change in the threat level, it is usually possible to obtain some empirical notion of the degree to which the new policy influenced activity levels and decision-making. Such information aids in interpretation of findings on the crime impact of the policy. In particular, if the innovation is found to have no significant effect on crime, input measures may help distinguish between two very different interpretations: "this type of crime is not deterrable" versus "this crime was not deterred because the actual performance of the system changed little or not at all."

3. *Causation and control*. Specifying the causal process which generated nonexperimental data requires that assumptions be made about how the different parts of the system being studied fit together. These assumptions are usually controversial and sometimes wrong. Indeed, Gilbert, Light, and Mosteller (1975) find in their wide-ranging review of social policy innovation studies that nonexperimental studies have reported misleading findings on a number of occasions, as demonstrated later by a controlled experiment. The two major challenges to the validity of a nonexperimental finding are the possibility of reverse causation, and the possibility that factors other than the policy innovation caused the observed effect.

In checking for the possibility of reverse causation, the key question is why the innovation was adopted at a particular place and time. The innovation may have been motivated by some feature of the level or trend in crime in that jurisdiction. For example, an unusual increase in traffic fatalities may motivate a

crackdown on speeding, which in turn is followed by a natural "regression" in fatality rates to the trend line.[17] The reduction in fatalities follows the crackdown but is not caused by it.[18]

Cross-section studies are particularly vulnerable to the reverse causation problem. Anyone who has correlated the number of police per capita with crime rates across cities understands this problem. This correlation is positive for most samples, simply because whatever deterrent effect extra police may yield is swamped by the reverse process: relatively high crime rates "cause" relatively large police forces, presumably due to the effect of crime on the public's demand for police protection. (See Cook 1977 for a discussion and display of these data.) The same effect must be expected in studies of interstate differences in gun control ordinances, capital punishment provisions, minimum legal drinking age provisions, and so forth—these laws are not adopted in a vacuum but, rather, are influenced by the public's concern with crime.

The reverse causation problem is not insurmountable. At least in principle, statistical techniques are available which permit estimation of a model that specifies equations characterizing both the deterrent effect of policy and the influence of crime on policy. The technical difficulties with these statistical techniques are a major topic of the National Academy of Sciences Panel's report (see Fisher and Nagin 1978).

Other than the problem of causal ordering, the most important challenge to the validity of a finding is the difficulty in controlling for factors, other than the policy innovation, which also influence crime rates. There are two basic approaches to controlling for other criminogenic factors. The first is to develop a model which explicitly specifies these other factors and uses a multivariate statistical technique which accounts for a number

17 A regression effect of this sort was documented by Campbell and Ross (1968)

18 The beauty of the imposition of the national 55 mile per hour speed limit in 1974, from an evaluator's viewpoint, is that it was clearly motivated by a consideration (the oil embargo) which had nothing to do with traffic safety The unusually large reduction in fatalities in 1974 can be safely interpreted as a result of the new speed limit.

of these variables simultaneously. The second approach involves comparison of the crime trends for the group directly influenced by the policy innovation, with corresponding trends for similar groups not subject to the innovations. In either case, the objective is to predict what the crime rate *would have been* in the absence of the innovation, as a basis for comparison with the actual crime rate. The difference is, of course, a measure of the policy's impact on crime.

The multivariate approach is most often used in cross-section comparison studies. Crime rates differ among jurisdictions because of differences in criminal opportunities and the demographic, cultural, and socioeconomic characteristics of the populations. Only after accounting for these factors is it possible to partial out the specific effects of interjurisdiction differences in enforcement policy. One of the most important underlying differences among geographic units may be a complex of attitudes which can be labeled "public-spiritedness" or perhaps "respect for authority." In neighborhoods or cities characterized by a high degree of respect for authority, the crime rate will be relatively low due to effective citizen cooperation with police and prosecutors. (See Bayley 1976, Cook and Fischer 1976.) This attitude is also likely to be reflected in official policy, resulting in a systematic relationship between policy and crime rates across jurisdictions which adds to the direct effects of differences in policy. The difficulty in controlling for this complex of attitudes is in knowing exactly how it should be defined and measured. However, short-term policy impact studies in a single jurisdiction are immune to this problem if, as seems reasonable, attitudes toward authority change slowly.

Evaluations of individual policy innovations must control for criminogenic variables which tend to fluctuate over the period under consideration. Crime varies with the time of day, the day of the week, the season of the year, and a host of other factors. Controlling for these variables can be attempted through a multivariate model, estimated from historical data for the jurisdiction. More commonly, evaluation studies have used interrupted time

series analysis or comparisons with trends in crime rates for groups similar to the group that is directly affected by the innovation. The interrupted time series analysis is most persuasive when the implementation of the policy has an immediate "slam bang" effect on crime—a change in the crime rate which is much larger than would be expected from historical fluctuations in the crime rate. Ross (1973), for example, reported a 60 percent drop in the "drinking hours" auto fatality rate immediately after implementation of the British Road Safety Act. Landes (1978) reports that there was only one domestic airline hijacking during the first year of intensive airport security measures, compared with twenty-seven the preceding year. The possibility of documenting a large effect of this sort is enhanced by use of a specific and sensitive measure of crime, but slam bang effects are rare. Gilbert, Light, and Mosteller (1975) document this point for policy interventions generally; crime is no exception.

The choice of control groups for a nonexperimental innovation is more an art than a science. The criterion is that crime rates in the control groups should be subject to the same influences (except for the innovation itself), and respond to them in roughly the same fashion, as the target group. Zimring (1972) chose California and Oregon as controls in his abortion legalization study in Hawaii; Williams et al. (1975) also used neighboring states in their study of the minimum drinking age. Proximity as a basis for choice of controls is not limited to geography: Ross (1973) used auto fatality rates during nondrinking hours, and Chaiken, Lawless, and Stevenson (1974) used subway crime rates during daytime hours. In some cases different age groups can serve as a basis of comparison—Williams et al., for example, could have used the auto fatality rate for drivers aged 21–24 as a control for his study of underage drinking.

An alternative to proximity as the basis for choice of control group is similarity. Press (1971) did not use precincts neighboring the twentieth as his controls, but rather chose groups of precincts (different for each crime type) which were similar to the twentieth in terms of population and crime rate. Beha (1977)

compared violent crime in Boston with other large cities in the Northeast in his study of Bartley-Fox.[19]

*4. Generalizations.* Valid generalizations from the policy impact studies are few, and leave us far short of being able to answer the many questions posed by the theoretical discussion of deterrence in section I. Perhaps the only general statements worth making are: (1) a wide variety of crimes are deterrable, and there are no types of crime which have been demonstrated to be undeterrable; (2) the criminal justice system has considerable inertia, with seemingly large policy innovations often resulting in small change in the behavior of officials; and (3) given the difficulty of evaluating policy impacts, the fine points of deterrence theory will have to be checked out in the laboratory rather than the field. But the gradual accumulation of data from the field will certainly enhance our feeling for what works, and under what circumstances.

## IV. Notes on a Research Agenda

Research relevant to understanding and managing the criminal deterrence process includes a wide range of topics and research methods. The five topics discussed below strike me as deserving greater attention by criminologists and research funding agencies than they have received in the recent past.

*1. Comparative studies of risky decision-making.* Laboratory experiments in decision-making under uncertainty can provide information on how decisions are influenced by the threat of adverse consequences of varying probability and severity. Extrapolating from the artificial laboratory setting to the "real world" is difficult, of course, but some questions are hard to investigate in a natural setting. One such question is the extent to which such factors as age, emotional arousal, and inebriation are related to "deterrability." One illustrative issue here is whether people tend to be more willing to risk adverse consequences when drunk

19 Whatever the reasoning behind the choice of controls, it is important to validate the choice by correlating the crime rate for the control units with that of the target unit, preferably over a substantial period of time prior to the innovation. Omission of this validity check is a common failing of this literature.

than sober; a more important issue is whether this willingness to risk adverse consequences is less responsive to changes in the threat level when the subject is drunk than sober.

2. *Threat communication.* The extent to which the threat of punishment deters crime depends to some extent on how this threat is "marketed." Several lines of research may prove useful in this regard:

—An analysis of research findings on commercial advertising, dissemination of information on new products, etc., as a source of hypotheses concerning threat communication.

—Interviews with active and potential criminals to determine what sorts of information they regularly acquire on the effectiveness of law enforcement activities.

—Studies of the criminal's response to specific environmental cues related to the likelihood of arrest and punishment, including visible police patrol, signs posted to warn would-be violators ("shoplifters will be prosecuted"), and so forth.

3. *Complements and substitutes.* As explained in section IE above, the incidence of one type of crime will be influenced by the effectiveness of law enforcement efforts against closely related types of crime. A crackdown on fencing may reduce the burglary rate; a crackdown on carrying concealed weapons may reduce the rates of armed assault and robbery; an increase in the severity of sentencing for selling heroin may increase the rates at which defendants jump bail and attempt to intimidate witnesses before trial. Research on such interconnections among crime types should aid in targetting law enforcement resources.

4. *Private protection activities.* Expenditures on private protection against crime have been growing faster than public expenditures, and the total private and public expenditures are now of the same order of magnitude. Some types of investments in private security—guards, burglar alarms, hidden cameras—increase the probability of arrest and conviction for crimes against targets that are so protected. We would expect private efforts to enhance the overall effectiveness of the system, while at the same

time increasing the victimization rate of targets that remain unprotected. These effects may be quite large, and should be given greater attention by social scientists.

5. *Other preventive effects of punishment.* Deterrence effects have almost been ignored in discussions of the other preventive effects of punishment. This sort of compartmentalized thinking is dangerous for policy prescription and costly to the scientific development of criminology. If the threat level influences the *rate* at which active criminals commit crimes, as well as the *number* of criminals who are active, then the measurement of incapacitation effects cannot ignore the deterrence phenomenon (Cook 1979d). Similarly, the outcome measures almost always used in studies of correctional rehabilitation—some sort of recidivism rate—will be influenced via deterrence by the threat environment facing the released convict. A related concern is the possibility that a correctional program will have a large enough effect on the severity of punishment to undermine the deterrent effect of punishment—a finding of reduced recidivism is insufficient to demonstrate that the rehabilitation program reduced crime.

Together, these five research topics would substantially expand the range of deterrence research, and they by no means exhaust the list of interesting possibilities. But to an important extent, productive research projects cannot be identified deductively—there should be a large element of opportunism in the choice of projects. The richest source of the "raw material" for deterrence research has always been dramatic changes in criminal justice policy in state and local jurisdictions, and that will continue to be true. The keys to exploiting this raw material are early involvement and special data collection efforts.

Franklin Zimring (1978) has written an excellent analysis of the research implications of recent policy experiments in deterrence. He concludes that a great deal of useful information which could have been extracted from recent innovations was lost because of poor planning. A full evaluation of an innovation usually requires special data collection efforts. Measuring sensitive outcome variables and controls, and gathering information on implementation, require careful planning, an early start, and access

to official records—all of which have frequently been lacking with respect to major policy innovations. The problems in evaluating policy impacts for deterrence effects have much in common with policy evaluations in other areas of social policy. The greatest challenges to any such evaluation are measuring what are often small (but possibly important) effects, and measuring long-term effects.

The first decade of deterrence research has had some false starts and some successes. The successes in empirical field research have, for the most part, involved careful studies of specific policy changes. The major false start has been what I have called the "Ehrlich paradigm," though Isaac Ehrlich is only one of many who have utilized this approach. The appeal of this approach lies in the seeming generality of its empirical results. I believe there is a moral here: the quest for a single set of universally applicable estimates of deterrence effects is hopeless, given the nature of available data and the complexity of the underlying process which generates crime rates and sanction threats. It may pay deterrence researchers of the next decade to be modest. Sound generalizations will gradually emerge from the accumulation of carefully tested evidence on the deterrence process.

## REFERENCES

Allingham, Michael G., and Agnar Sandmo. 1972. "Income Tax Evasion: A Theoretical Analysis," *Journal of Public Economics* 1:323–38.

Andenaes, Johannes. 1974. *Punishment and Deterrence*. Ann Arbor: University of Michigan Press.

Bailey, William C. 1978. *Deterrence and the Celerity of the Death Penalty: A Neglected Question in Deterrence Research*. Madison: Institute for Research on Poverty, University of Wisconsin.

Bartel, Ann. 1975. "An Analysis of Firm Demand for Protection Against Crime," *Journal of Legal Studies* 4:443–78.

Bayley, David H. 1976. "Learning About Crime—the Japanese Experience," *The Public Interest* 44:55–68.

Becker, G. 1968. "Crime and Punishment: An Economic Approach," *Journal of Political Economy* 78:526–36.

Beha, James A., II. 1977. "And *Nobody* Can Get You Out," *Boston University Law Review* 57·96–146 and 289–333.

Beyleveld, D. 1978. *The Effectiveness of General Deterrents against Crime: An Annotated Bibliography of Evaluative Research.* Cambridge, England· Institute of Criminology (in microfiche).

Blakey, G Robert, and Michael Goldsmith. 1976. "Criminal Redistribution of Stolen Property The Need for Law Reform," *Michigan Law Review* 74 1512–1626.

Block, Michael K., and John M. Heineke. 1975. "A Labor Theoretic Analysis of the Criminal Choice," *American Economic Review* 65·314–25.

Block, Michael K., and Robert C. Lind. 1975. "An Economic Analysis of Crimes Punishable by Imprisonment," *Journal of Legal Studies* 4·479–92.

Blumstein, Alfred, Jacquelin Cohen, and Daniel Nagin, eds. 1978. *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates.* Washington, D.C. National Academy of Sciences.

Blumstein, Alfred, and Daniel Nagin. 1977. "The Deterrent Effect of Legal Sanctions on Draft Evasion," *Stanford Law Review* 28 241–75.

Boydstun, J. E. 1975. *San Diego Field Interrogation: Final Report.* Washington, D.C. Police Foundation.

Brier, Stephen S., and Stephen E. Fienberg. 1978. *Recent Econometric Modelling of Crime and Punishment: Support for the Deterrence Hypothesis?* School of Statistics, University of Minnesota.

Campbell, Donald T., and H. Laurence Ross. 1968. "The Connecticut Crackdown on Speeding," *Law and Society Review* 3·33–53.

Carr-Hill, R. A., and N. H. Stern. 1973. "An Econometric Model of the Supply and Control of Recorded Offences in England and Wales," *Journal of Public Economics* 2·289–318.

Carroll, John S. 1978. "A Psychological Approach to Deterrence· The Evaluation of Crime Opportunities," *Journal of Personality and Social Psychology* 36 1512–20.

——. (forthcoming). "Committing a Crime· The Offender's Decision." In *Social-Psychological Analysis of Legal Processes*, ed. V. J. Konecni and E. G. Ebbesen San Francisco Freeman.

Chaiken, Jan M. 1978. "What Is Known about Deterrent Effects of Police Activities." In *Preventing Crime*, ed. James A. Cramer. Beverly Hills Sage Publications.

Chaiken, Jan M., Michael W. Lawless, and Keith A. Stevenson. 1974. "The Impact of Police Activity on Subway Crime," *Urban Analysis* 3·173–205.

Clotfelter, Charles. 1977. "Public Services, Private Substitutes, and the Demand for Protection against Crime," *American Economic Review* 67·867–77.

Cohen, Jacquelin. 1978. "The Incapacitating Effect of Imprisonment. A Critical Review of the Literature." In Blumstein, Cohen, and Nagin (1978).

Conklin, J. 1972. *Robbery and the Criminal Justice System.* New York. Lippincott.

Cook, Philip J. 1977. "Punishment and Crime A Critique of Current Findings Concerning the Preventive Effects of Punishment," *Law and Contemporary Problems* 41 164–204.

——. 1979a. "The Clearance Rate as a Measure of Criminal Justice System Effectiveness," *Journal of Public Economics* 11:135–42.

——. 1979b. "The Effect of Gun Availability on Robbery and Robbery Murder." In *Policy Studies Review Annual*, Vol. 3, ed. R. H. Haveman and B. B. Zellner. Beverly Hills· Sage Publications.

——. 1979c. "The Implications of Deterrence and Incapacitation Research for Policy Evaluation." In *An Anatomy of Criminal Justice*, ed. Cleon Foust and D. Robert Webster. Lexington, Mass.: Lexington Books.

——. 1979d. "A Unified Treatment of Deterrence, Incapacitation, and Rehabilitation A Simulation Study." Durham, N.C.· Institute of Policy Sciences and Public Affairs, Duke University.

——. 1980. "Reducing Injury and Death Rates in Robbery," *Policy Analysis* 6:21–45.

Cook, P. J., and Gregory W. Fischer. 1976. "Citizen Cooperation with the Criminal Justice System." Durham, N.C · Institute of Policy Sciences and Public Affairs, Duke University.

Cook, P. J., and Daniel Nagin. 1979. *Does the Weapon Matter?* Washington, D.C.· Institute for Law and Social Research.

Ehrlich, Isaac. 1970. *Participation in Illegitimate Activities: An Economic Analysis.* Ph.D. dissertation, Columbia University.

——. 1972. "The Deterrent Effect of Criminal Law Enforcement," *Journal of Legal Studies* 1:259–76.

——. 1973. "Participation in Illegitimate Activities· A Theoretical and Empirical Investigation," *Journal of Political Economy* 81.521–65.

——. 1975 "The Deterrent Effect of Capital Punishment: A Question of Life and Death," *American Economic Review* 65·397–417.

——. 1979. "The Economic Approach to Crime· A Preliminary Assessment." In *Criminology Review Yearbook*, ed. Sheldon Messinger and Egon Bittner. Beverly Hills Sage Publications.

Ehrlich, Isaac, and Mark Randall. 1977. "Fear of Deterrence: A Critical Evaluation of the 'Report of the Panel on Research on Deterrent and Incapacitative Effects,'" *Journal of Legal Studies* 6:293–316.

Erickson, Maynard L., and Jack P. Gibbs. 1979. "On the Perceived Severity of Legal Penalties," *Journal of Criminal Law and Criminology* 70:102–16.

Fisher, Franklin M., and Karl Shell. 1972. *The Economic Theory of Price Indices*. New York: Academic Press.

Fisher, Franklin M., and Daniel Nagin. 1978. "On the Feasibility of Identifying the Crime Function in a Simultaneous Model of Crime Rates and Sanction Levels." In Blumstein, Cohen, and Nagin (1978).

Forst, Brian. 1976. "Participation in Illegitimate Activities: Further Empirical Findings," *Policy Analysis* 2:477–92.

Friedland, Nehemia, John Thibaut, and Laurens Walker. 1973. "Some Determinants of the Violation of Rules," *Journal of Applied Social Psychology* 3:103–18.

Geerken, Michael R., and Walter R. Gove. 1975. "Deterrence: Some Theoretical Considerations," *Law and Society Review* 9.497–513.

Gibbs, Jack P. 1968. "Crime, Punishment, and Deterrence," *Southwestern Social Science Quarterly* 48:515–30.

——. 1975. *Crime, Punishment, and Deterrence*. New York Elsevier.

Gilbert, John P, Richard J. Light, and Frederick Mosteller. 1975. "Assessing Social Innovations: An Empirical Base for Policy" In *Benefit-Cost and Policy Analysis, 1974*. Chicago· Aldine.

Greenwood, Michael J., and W. J. Wadycki. 1973. "Crime Rates and Public Expenditures for Police Protection· Their Interaction," *Review of Social Economy* 31:138–51.

Heineke, John M. 1978a. "Economic Models of Criminal Behavior. An Overview." In *Economic Models of Criminal Behavior*, ed. J. M Heineke. New York· North-Holland Publishing Company.

——. 1978b "Substitution among Crime and the Question of Deterrence. An Indirect Utility Function Approach to the Supply of Legal and Illegal Activity." In *Economic Models of Criminal Behavior*, ed. J. M. Heineke. New York· North-Holland Publishing Company.

Jacob, Herbert. 1979. "Rationality and Criminality," *Social Science Quarterly* 59:584–85.

Johnston, James M. 1972. "Punishment of Human Behavior," *American Psychologist* 27:1033–54.

Joint Committee on New York Drug Law Enforcement. 1978. *The Nation's Toughest Drug Law: Evaluating the New York Experience*. Washington, D.C. U.S. Government Printing Office.

Kahneman, Daniel, and Amos Tversky (forthcoming). "Prospect Theory An Analysis of Decision under Risk," *Econometrica*.

Kelling, G., and A. Pate. 1974. *The Kansas City Preventive Patrol Experiment*. Washington, D.C. The Police Foundation.

Klein, Lawrence R., Brian Forst, and Victor Filatov. 1978. "The Deterrent Effect of Capital Punishment· An Assessment of the Evidence." In Blumstein, Cohen, and Nagin (1978).

Klockars, Carl B. 1974. *The Professional Fence*. New York· Free Press.

Kunreuther, Howard, and Paul Slovic. 1978. "Economics, Psychology, and Protective Behavior," *American Economic Review* 68:64–69.

Landes, William M. 1978. "An Economic Study of U.S. Aircraft Hijacking, 1961–1976," *The Journal of Law and Economics* 21·1–32.

Larson, Richard C. 1975. "What Happened to Patrol Operations in Kansas City? A Review of the Kansas City Preventive Patrol Experiment," *Journal of Criminal Justice* 3:267–97.

Lipton, D., R. Martinson, and J. Wilks. 1975. *The Effectiveness of Correctional Treatment: A Survey of Treatment Evaluation Studies*. New York Praeger.

Maggadino, J P. n.d. "Towards an Economic Evaluation of State Gun Control Laws." Long Beach, Calif.· California State University.

Manski, Charles. 1978. "Prospects for Inference on Deterrence through Empirical Analysis of Individual Criminal Behavior." In Blumstein, Cohen, and Nagin (1978).

Moore, Mark. 1973. "Policies to Achieve Discrimination on the Effective Price of Heroin," *American Economic Review* 63·270–77.

Myers, David G., and Helmut Lamm. 1976 "The Group Polarization Phenomenon," *Psychological Bulletin* 83:602–27.

Nagin, Daniel. 1978. "General Deterrence· A Review of the Empirical Evidence." In Blumstein, Cohen, and Nagin (1978).

Packer, Herbert L. 1968. *The Limits of the Criminal Sanction*. Stanford Stanford University Press.

Payne, John. 1980. "Information Processing Theory. Some Concepts and Methods Applied to Decision Research." In *Cognitive Processes in Choice and Decision Behavior*, ed. T. Wallsten. Hillsdale, N.J.· Lawrence Elrbaum.

Petersilia, Joan, Peter W. Greenwood, and M. Lavin. 1978. *Criminal*

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 236 of 517

*Careers of Habitual Felons*. Santa Monica, Calif.· Rand Corporation.

Pierce, Glenn, and William Bowers. 1979. "The Impact of the Bartley-Fox Gun Law on Crime in Massachusetts." Boston· Center for Applied Social Research, Northeastern University.

Plattner, Mark F. 1976. "The Rehabilitation of Punishment," *The Public Interest* 44· 104–14.

Press, S. James. 1971. *Some Effects of an Increase in Police Manpower in the 20th Precinct of New York City* New York· Rand Institute.

Robertson, Leon, Robert F. Rich, and H. Laurence Ross. 1973. "Jail Sentences for Driving While Intoxicated in Chicago· A Judicial Policy That Failed," *Law and Society Review* 8·55–68.

Ross, H. Laurence. 1973. "Law, Science, and Accidents· The British Road Safety Act of 1967," *Journal of Legal Studies* 2:1–78.

——. 1977. "Deterrence Regained The Cheshire Constabulary's 'Breathalyser Blitz,'" *Journal of Legal Studies* 6·241–92.

Schwartz, Alfred I., and Sumner Clarren. 1977. *The Cincinnati Team Policing Experiment: A Summary Report* Washington, D.C.· Police Foundation.

Sellin, T., ed. 1967. *Capital Punishment*. New York· Harper & Row.

Simon, Herbert A. 1957. *Models of Man*. New York. Wiley.

Sjoquist, D. 1973. "Property Crime and Economic Behavior Some Empirical Results," *American Economic Review* 63.439–46.

Swimmer, E. 1974. "Measurement of the Effectiveness of Urban Law Enforcement· A Simultaneous Approach," *Southern Economic Review* 40 618–30.

Tullock, Gordon. 1974. "Does Punishment Deter Crime?," *The Public Interest* 36 103–11.

Tversky, Amos, and Daniel Kahneman. 1974. "Judgment under Uncertainty· Heuristics and Biases," *Science* 185 1124–31.

Vandaele, Walter. 1978a. "Participation in Illegitimate Activities. Ehrlich Revisited." In Blumstein, Cohen, and Nagin (1978).

—— 1978b. "An Econometric Model of Auto Theft in the United States." In *Economic Models of Criminal Behavior*, ed J. Heineke. New York North Holland Publishing Company.

von Hirsch, Andrew. 1976. *Doing Justice*. New York· Hill and Wang.

Walker, Nigel. 1979. "The Efficacy and Morality of Deterrents," *Criminal Law Review*, pp. 129–44.

Walsh, Marilyn. 1976. *Strategies for Combatting the Criminal Re-*

*ceiver (Fence) of Stolen Goods*. Washington, D.C. U.S. Government Printing Office.

Williams, Allan F., et al. 1975. "The Legal Minimum Drinking Age and Fatal Motor Vehicle Crashes," *Journal of Legal Studies* 4.219–39.

Wilson, James Q., and Barbara Boland. 1976. "Crime." In *The Urban Predicament*, ed. W. Gorham and N. Glazer. Washington, D.C.: The Urban Institute.

Witte, Ann. 1980. "Estimating the Economic Model of Crime with Individual Data," *Quarterly Journal of Economics* 97:57–84.

Zimring, Franklin E. 1972. "Of Doctors, Deterrence, and the Dark Figure of Crime—A Note on Abortion in Hawaii," *University of Chicago Law Review* 39:699–721.

——. 1978. "Policy Experiments in General Deterrence: 1970–1975." In Blumstein, Cohen, and Nagin (1978).

Zimring, Franklin E., and Gordon J. Hawkins. 1973. *Deterrence*. Chicago University of Chicago Press.

# EXHIBIT M

## to Expert Report of Professor Louis Klarevas

*Daniel S. Nagin*

# Deterrence in the Twenty-First Century

ABSTRACT

The evidence in support of the deterrent effect of the certainty of punishment is far more consistent than that for the severity of punishment. However, the evidence in support of certainty's effect pertains almost exclusively to apprehension probability. Consequently, the more precise statement is that certainty of apprehension, not the severity of the ensuing legal consequence, is the more effective deterrent. This conclusion has important policy implications among which are that lengthy prison sentences and mandatory minimum sentencing cannot be justified on deterrence. There are four major research gaps. The first concerns the mechanism by which police affect perceptions of the probability of apprehension. The second concerns the inextricable link between the deterrent effect of the threat of punishment and the potentially criminogenic effect of the experience of punishment. The third concerns the concept of a sanction regime defined by the sanctions legally available and how that legal authority is administered. Theories of deterrence conceive of sanctions in the singular, not the plural, and do not provide a conceptual basis for considering the differential deterrent effects of different components of the sanction regime. The fourth involves sanction risk perceptions. Establishing the link between risk perceptions and sanction regimes is imperative; unless perceptions adjust, however crudely, to changes in the sanction regime, desired deterrent effects will not be achieved.

Three enduring questions have occupied centuries of scholarship on crime and punishment. Does punishment prevent crime? How does punishment prevent crime? And should punishment be used to prevent crime? This essay is concerned with the first two of these questions.

Daniel S. Nagin is the Teresa and H. John Heinz III University Professor of Public Policy and Statistics at Carnegie Mellon University.

© 2013 by The University of Chicago. All rights reserved.
0192-3234/2013/4201-0004$10.00

The criminal justice system dispenses justice by apprehending, prosecuting, and punishing individuals who break the law These activities may prevent crime by three distinct mechanisms incapacitation, specific deterrence, and general deterrence Convicted offenders are sometimes punished with imprisonment Incapacitation concerns crimes averted by their physical isolation during the period of their incarceration Specific and general deterrence involve possible behavioral responses General deterrence refers to the crime prevention effects of the threat of punishment Specific deterrence concerns the aftermath of the failure of general deterrence—the effect on reoffending, if any, that results from the experience of actually being punished

In this essay, I consider the theoretical and evidentiary basis for general deterrence In another recent *Crime and Justice* essay (Nagin, Cullen, and Jonson 2009), I surveyed the evidence on the specific deterrence effects of imprisonment Here, I draw heavily from recent and prior deterrence reviews by me and others

My aim is to provide a succinct summary of the current state of theoretical and empirical knowledge about deterrence in support of several interrelated objectives The first is to provide a selective intellectual history of deterrence research that identifies important recurring themes I highlight both what has been learned and persistent flaws that should be addressed in future research

The second objective concerns the framing of discourse on deterrence, which often takes the same pattern, particularly in policy discussions one group arguing that sanction threats always deter and another group arguing that sanction threats never deter When deterrence effects are unpacked, it is clear that sanction threats are not universally efficacious magnitudes of deterrent effects range from none to seemingly very large Thus, another primary objective is to move discourse about deterrence away from the equally indefensible positions that deterrence effects are always or never present to a more nuanced and useful inquiry into the basis for variation in the existence and size of deterrent effects

The third objective is policy related Prison populations have been rising in the United States for four decades Only recently have there been signs that the increase is abating In 2009 and 2010, state-level prison population declined but federal-level population continued to increase (Bureau of Justice Statistice 2012) Less well recognized is that prison populations have risen elsewhere in the world, for example, in

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 241 of 517

the Netherlands since 1975 and more recently in England and Wales, Portugal, Spain, and New Zealand An incarceration-based sanction policy that reduces crime solely by incapacitation will necessarily increase the rate of imprisonment In contrast, if the crime control policy also prevents crime by deterrence, it may be possible to reduce both imprisonment and crime, successful prevention by any mechanism, whether by deterrence or otherwise, has the virtue of averting not only crime but also the punishment of perpetrators Hence, it is important to identify policies that increase imprisonment but have only negligible effects on crime rates

My main conclusions are as follows First, there is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs Such severity-based deterrence measures include "three strikes, you're out," life without the possibility of parole, and other laws that mandate lengthy prison sentences

Second, on the basis of the earlier noted *Crime and Justice* review (Nagin, Cullen, and Jonson 2009), I have concluded that there is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation Instead, the evidence suggests that that reoffending is either unaffected or increased

Third, there is substantial evidence that increasing the visibility of the police by hiring more officers and allocating existing officers in ways that materially heighten the perceived risk of apprehension can deter crimes This evidence is consistent with the perceptual deterrence literature that surveys individuals on sanction risk perceptions and relates these perceptions to their actual or intended offending behavior This literature finds that perceived certainty of punishment is associated with reduced self-reported or intended offending

Thus, I conclude, as have many prior reviews of deterrence research, that evidence in support of the deterrent effect of various measures of the certainty of punishment is far more convincing and consistent than for the severity of punishment However, the certainty of punishment is conceptually and mathematically the product of a series of conditional probabilities the probability of apprehension given commission of a crime, the probability of prosecution given apprehension, the probability of conviction given prosecution, and the probability of sanction given conviction The evidence in support of certainty's de-

terrent effect pertains almost exclusively to apprehension probability Consequently, the conclusion that certainty, not severity, is the more effective deterrent is more precisely stated as *certainty of apprehension* and not the severity of the legal consequence ensuing from apprehension is the more effective deterrent This more precise statement has important policy implications, the empirical evidence from the policing and perceptual deterrence literature is silent on the deterrent effectiveness of policies that mandate incarceration after apprehension These include policies such as mandatory minimum sentencing laws or sentencing guidelines that mandate incarceration Thus, this revised conclusion about the deterrent effect of punishment certainty should not be construed as implying that policies mandating severe legal consequences have been demonstrated to achieve deterrent effects

Together these conclusions have a range of policy implications, particularly as they relate to the United States (Durlauf and Nagin 2011*b*) First, it is clear that lengthy prison sentences cannot be justified on a deterrence-based, crime prevention basis Thus, the case for crime prevention benefits of measures requiring lengthy prison sentences such as California's three-strikes law must rest on incapacitation Another implication is that crime prevention would be enhanced by shifting resources from imprisonment to policing or, in periods of declining criminal justice system budgets, that policing should get a larger share of a smaller overall budget

While accumulation of knowledge about deterrence in the past four decades has been impressive, much remains to be learned There are four major theoretical and related empirical gaps The first concerns the deterrent effect of the certainty of apprehension There are two distinct mechanisms by which the police may deter crime One stems from their effectiveness in apprehending perpetrators of crimes, by definition this activity involves occurrences in which deterrence has failed Thus, police effectiveness in successfully apprehending criminal perpetrators can have a deterrent effect only on others or on the perpetrator's future behavior The second mechanism involves the effect of the intensity of police presence in creating a perception that apprehension risk is sufficiently high that no crime is committed in the first place I speculate that this second mechanism is the primary source of police effectiveness in deterring crime whereas the first role primarily prevents crime by capturing and incapacitating crime-prone individuals The research gap involves developing rigorous empirical tests of

this contention and developing improved theoretical models of how police presence and tactics can reduce the attractiveness of criminal opportunities by increasing the perceived risk of apprehension

The second gap concerns the distinction between specific and general deterrence The two are inextricably linked because the experience of punishment is a consequence of the failure of the threat of punishment to deter crime, yet no theory of deterrence explicitly addresses how the experience of punishment influences the deterrent effect of the threat of punishment Relevant issues include how the experience of punishment affects the proclivity to commit crime due to potential stigma effects, sustained contacts with criminals in a prison setting, or participation in rehabilitative programs as well as the effect of the experience of punishment on perceptions of the certainty and severity of sanctions Analysis of these and other related issues will require longitudinal data on individuals who do and do not have the experience of punishment

The third theoretical gap concerns the concept of a sanction regime A sanction regime defines the sanctions that are legally available for the punishment of various types of crime and how that legal authority is administered Depending on the crime and characteristics of the offenders, such as age or prior record, available sanctions range in severity from verbal reprimands to fines and different forms of community service to lengthy terms of imprisonment and execution How the legal authority is administered determines the relative frequency with which the available sanction options are used and also the swiftness of their application Thus, both dimensions of the sanction regime—the legal authority for different types of sanctions and how that authority is administered—combine to determine the certainty, severity, and celerity of sanctioning options available for punishment of a specific type of crime

Theories of deterrence, however, specify sanction threats in the singular, not the plural For example, a sizable number of studies examine the question whether capital punishment deters murder Yet properly understood, the relevant question is the differential or marginal deterrent effect of execution over the deterrent effect of other available or commonly used penalties In this case the alternative penalty would be a lengthy prison sentence—sometimes life without the possibility of parole Yet none of the capital punishment studies take account of differences across states and over time in the severity of noncapital pun-

ishments for murder (Nagin and Pepper 2012) Theories of deterrence that conceive of sanctions in the singular do not provide a conceptual basis for considering the differential deterrent effect of different types of sanction options The empirical companion to this theoretical expansion involves assembling the data required to measure sanction regimes At least in the United States, such data are largely unavailable

The fourth theoretical and empirical gap involves sanction risk perceptions, an issue that I emphasized in an earlier review of the deterrence literature (Nagin 1998) Deterrence is the behavioral response to the perception of sanction threats Establishing the link between risk perceptions and sanction regimes is imperative, the conclusion that crime decisions are affected by sanction risk perceptions is not sufficient to conclude that policy can deter crime Policy cannot directly manipulate perceptions It can affect only the variety and severity of sanctions legally available in the sanction regime and the manner of their administration Unless perceptions adjust, however crudely, to changes in the sanction regime, the desired deterrent effect will not be achieved

Since the publication of Nagin (1998), valuable headway has been made in how the experience of apprehension or not following commission of a crime affects sanction risk perceptions This research is valuable for specification of a theory that combines the concepts of general and specific deterrence However, it does not address how perceptions are formed about the two key dimensions of a sanction regime the legal authority for different types of sanctions and how that authority is administered Numerous surveys have been conducted of the general public's knowledge of sanction regimes, especially concerning the legal authority for different types of sanctions (Apel 2013) Not surprisingly, the surveys find that knowledge of sanction regimes is poor However, the fundamental flaw with these surveys is that knowledge of the potential legal consequences of lawbreaking is unnecessary for most people, their decisions to refrain from crime are based on the mere knowledge that the behavior is legally prohibited or for other nonlegal considerations such as morality or fear of social censure (Packer 1968, Zimring and Hawkins 1973, Andenaes 1974, Wikstrom et al 2012) That said, for individuals for whom sanction threats might affect their behavior, it is preposterous to assume that their perceptions conform to the realities of the legally available sanction options and their administration More than a decade after my

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 245 of 517

earlier review, it remains the case that little is known about how individuals form perceptions of the sanction regimes they confront

This essay is organized in the following sections Key concepts of deterrence are discussed in Section I, where I also set out a simplified model of deterrence that is referred to throughout the essay Section II provides a brief summary of the themes, conclusions, and flaws of research on the deterrent effects of prison and the police up to about 1990 In Section III, I summarize the evidence on the deterrent effects of capital punishment I discuss the capital punishment literature separately because of its distinctive features and salience I then examine in Section IV post-1990 studies of the crime prevention effects of imprisonment and in Section V post-1990s studies of the police effects on crime Section VI discusses the survey-based literature on the accuracy of sanction risk perceptions, their formation, and their relationship to self-reported criminality. Section VII offers conclusions

## I Key Concepts

Deterrence is a theory of choice in which would-be offenders balance the benefits and costs of crime Benefits may be pecuniary, as in the case of property crime, but may also involve intangible benefits such as defending one's honor, expressing outrage, demonstrating dominance, cementing a reputation, or seeking a thrill The potential costs of crime are comparably varied Crime can entail personal risk if the victim resists It may also invoke pangs of conscience or shame (Braithwaite 1989) I am mainly concerned with offender responses to the costs that attend the imposition of official sanctions such as arrest, imprisonment, execution, fines, and other restrictions on freedom and liberty such as mandated drug testing or electronic monitoring

The origins of most modern theories of deterrence can be traced to the work of the Enlightenment-era legal philosophers (Beccaria 1764, Bentham 1789) The motivation for their work was their mutual abhorrence of the administration of punishment without constructive purpose For them the constructive purpose was preventing crime As Beccaria observed, "it is better to prevent crimes than punish them" ([1764] 1986, p 93) Beccaria and Bentham argued that there are three key ingredients to the deterrence process the severity, certainty, and celerity of punishment These concepts, particularly the certainty and severity of punishment, form the foundation of nearly all contemporary

theories of deterrence The enduring impact of their thinking is remarkable testimony to their innovation

The theory of deterrence is predicated on the idea that if state-imposed sanction costs are sufficiently severe, criminal activity will be discouraged, at least for some Thus, one of the key concepts of deterrence is the severity of punishment Severity alone, however, cannot deter There must also be some possibility that the sanction will be incurred if the crime is committed Indeed the argument that the probability of punishment, not severity, is the more potent component of the deterrence process goes back to Beccaria, who observed that "one of the greatest curbs on crime is not the cruelty of punishments, but their infallibility The certainty of punishment even if moderate will always make a stronger impression" ([1764] 1986, p 58)

In the lifetimes of Beccaria and Bentham there was no criminal justice system as we know it Punishment for lawbreaking was almost certainly less regular and more haphazard than it is today Punishment in contemporary society, however, also still remains far from guaranteed In order for a formal sanction—whether moderate or severe—to be imposed, the offender must first be apprehended, usually by the police [1] He must next be charged and successfully prosecuted and, finally, sentenced by the judge Successful passage through all of these stages is far from certain The most important set of actors affecting certainty is the police without detection and apprehension, there is no possibility of conviction or punishment For this reason special attention is given to discussing what is known about the deterrent effect of police activities and presence

The third conceptual component of the theory of deterrence advanced by Bentham and Beccaria is the swiftness of punishment, which Bentham referred to as celerity Celerity is the least studied of the conceptual troika underlying deterrence theory The theoretical basis for its effect on deterrence is ambiguous, as is the empirical evidence on its effectiveness Even Beccaria seemed to base his case for celerity more on normative considerations of just punishment than on deterrence effectiveness He observed that "the more promptly and the more closely punishment follows upon the commission of a crime, the more just and useful will it be I say more just, because the criminal is

[1] Crime may also be sanctioned entirely outside of the criminal justice system through retaliation by the victim or by others on his or her behalf (Jacobs and Wright 2006)

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 247 of 517

thereby spared the useless and cruel torments of uncertainty, which increase with the vigor of imagination and with the sense of personal weakness" (Beccaria [1764] 1986, p 36)

In 1968 economist Gary Becker published the first modern formalization of the Beccaria-Bentham conception of the deterrence process (Becker 1968) Since then, other formalizations have appeared in economics, criminology, law, and sociology—some in the form of mathematical models and others in the form of nonmathematical conceptual theories (Cornish and Clarke 1986)

For the purposes of this essay still another formalization is provided I have two purposes One is to provide a conceptual structure for framing results that are well established in the literature The second is more ambitious I earlier indicated that the seemingly greater deterrent effect of certainty rather than severity of punishment reflected a response to the certainty of apprehension In this regard, I distinguished two distinct functions of the police apprehending the perpetrators of crime and serving in a sentinel function that deters crime from happening in the first place The second purpose is to formalize this distinction In so doing I link situational crime prevention theory with deterrence theory

Bentham's conception of criminal choice involved the would-be offender balancing the potential pains of punishment against the pleasures of the offense In this spirit the model formalizes the decision of a would-be offender to victimize a potential criminal opportunity, whether that opportunity is a person in the form of a potential robbery victim or property that might be stolen or vandalized

The choice model is depicted in figure 1 It distinguishes four possible outcomes if the target is victimized the criminal act is successfully completed, the act is not successfully completed and the perpetrator is not apprehended, the act is not successfully completed and the perpetrator is apprehended but not convicted, and the act is not successfully completed and the perpetrator is both apprehended and convicted The probability of each of these outcomes is determined by the following probabilities

*Perceived Probability of Successful Completion of the Act* This probability, which is denoted by $P_s$, measures the would-be offender's perception of the chances the target can be successfully victimized This perception will be affected by how effectively the opportunity is protected For property targets, the level of protection is determined by

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 248 of 517

FIG 1—The decision to victimize a target

technological safeguards such as alarm and surveillance systems and use of physical protection such as locked showcases For human targets, the protection level is affected by the care with which valuable property is secured, for example, by keeping it out of sight Protection may also be provided by what Cohen and Felson (1979) call capable guardians such as security guards, vigilant employees, or onlookers who are willing to intervene Importantly, the police may also serve as a guardian I refer to police as acting as sentinels when acting in this role An idling police car outside a liquor store greatly reduces the chance, probably to zero, that the store can be successfully robbed This brings me to the risk of apprehension

*Perceived Probability of Apprehension Given Noncompletion* Police perform another crime control function that is distinct from their role as official guardians They apprehend those offenders who chose to act on a criminal opportunity When acting in this role, police are described as "apprehension agents " The sentinel and apprehension roles of the police are conceptually linked but distinct They are conceptually linked because both roles are based on the legal authority of the police to arrest persons suspected of committing a crime Because a contributing factor to $P_s$ is the risk of apprehension, arrest authority is one source of police influence on $P_s$ in their sentinel role However, the sentinel role of police is distinct from their apprehension role because the latter comes into play only when deterrence has failed and a

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 249 of 517

would-be offender becomes an actual offender. Thus, at one moment police can be functioning as a sentinel and in the next moment they can be acting as an apprehension agent. The would-be offender's perception of the probability of apprehension given commission of the crime is denoted by $P_a$.

In this model I assume that the risk of apprehension is limited to acts that are not successfully completed. I make this assumption for several reasons. First, it is useful for clarifying the distinction between police acting as sentinels and police acting as apprehension agents. Second, it conforms to the seeming reality that most offenders are apprehended at the scene of the crime or soon thereafter. I say seeming because I have been able to identify only two studies (Greenwood, Chaiken, and Petersilia 1977; Blake and Coupe 2001) that report relevant data. Data reported in both support this assumption.

*Perceived Probability of Conviction Given Apprehension.* The offender's perception of the probability that apprehension will actually result in conviction is denoted by $P_{c|a}$.

Under this setup, the probability of successful completion is $P_s$, the probability of nonsuccessful completion but with apprehension avoidance is $(1 - P_s)(1 - P_a)$, the probability of nonsuccessful completion followed by apprehension but not conviction is $(1 - P_s)(P_a)(1 - P_{c|a})$, and the probability of nonsuccessful completion followed by apprehension and conviction is $(1 - P_s)(P_a)(P_{c|a})$.

The benefits and costs of each of these outcomes are assumed to be determined by the following factors:

- *Rewards.* Rewards measures the total benefits of victimizing a target. For a crime with a property motive, the value of the property to the perpetrator likely accounts for all or a major share of the total reward. However, the thrill of offending or—in the case of violent crimes without a property motive—the satisfaction of humiliating, physically hurting, or killing the victim may also be relevant to the reward value of a target.
- *Crime commission cost.* Crime commission cost measures the total cost of committing the crime separate from the sanction cost defined below. Commission cost includes time searching for the opportunity, planning time, if any, and the effort required to commit the crime itself. Importantly, it also includes the potential costs to the perpetrator of victim retaliation or resistance. Finally, commission cost includes Raskolnikov-like feelings of guilt or shame that

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 250 of 517

may affect the perpetrator, whether or not he is apprehended and sanctioned

- *Perceived formal sanction cost* Perceived sanction cost measures the would-be perpetrator's assessment of the formal sanction cost that might be imposed if convicted These costs include the loss of freedom if imprisoned and the unpleasantness of other restrictions on freedom due to conditions of parole or probations and fines
- *Perceived informal sanction cost* The imposition of formal sanctions may also trigger informal sanctions by family, friends, and the community at large, which for some offenders may be even more costly than the formal sanctions Informal sanction cost may also involve large economic costs due to job loss
- *Perceived cost of apprehension* Apprehension imposes costs that are distinct from formal and informal sanction costs These include the unpleasantness of the apprehension itself, possible loss of liberty due to pretrial detention, and legal fees Perceived cost of apprehension also includes the social and economic costs triggered by arrest, even without conviction, such as disapproval of family, friends, and the community at large, as well as job loss

At the end of each branch, figure 1 shows the costs that attend the various forms of an unsuccessful attempt or the benefit of a successful attempt If the individual chooses to act on a criminal opportunity, the benefits and costs of the four possible outcomes and their attendant probabilities are as follows

1 The offender successfully completes the criminal act This occurs with probability $P_s$, and the net benefit to the offender is reward less commission cost Thus, the expected benefit of victimization is $P_s$(Reward − Commission Cost), which is denoted as $P_s(R - CC)$
2 The offender is not successful and is not apprehended This occurs with probability $(1 - P_s)(1 - P_a)$ The cost to the offender is that much, or all, of the commission cost is incurred but with no reward For simplicity it is assumed that all of the commission cost is incurred Thus, the contribution of this outcome to expected cost is $(1 - P_s)(1 - P_a)$(Commission Cost), which is denoted as $(1 - P_s)(1 - P_a)CC$
3 The offender is not successful and is apprehended but is not convicted and formally sanctioned This occurs with probability

$(1 - P_s)(P_a)(1 - P_{a|c})$ In this case the cost to the offender is commission cost plus apprehension cost Thus the contribution of this outcome to expected cost is $(1 - P_s)(P_a)(1 - P_{c|a})$(Commission Cost + Apprehension Cost), which is denoted as $(1 - P_s)(P_a)(1 - P_{c|a})(CC + AC)$ Because, as already noted, most apprehensions occur at the scene of the crime or shortly thereafter, it is assumed that the perpetrator does not have the opportunity to enjoy the rewards provided by the act

4 The offender is not successful but is apprehended, convicted, and formally sanctioned This occurs with probability $(1 - P_s)(P_a)(P_{c|a})$ In this case the cost to the offender is commission cost plus apprehension cost plus formal and informal sanction cost Thus, the contribution of this outcome to expected cost, again assuming that the rewards are not enjoyed, is $(1 - P_s)(P_a)[P_{c|a}$(Commission Cost + Apprehension Cost + Formal Sanction + Informal Sanction Cost)], which is denoted as $(1 - P_s)(P_a)(P_{c|a})(CC + AC + FS + ISC)$ [2]

An arrow at the top of figure 1 highlights that the possible events depicted occur over time Success or failure at completion is typically immediate, whereas the down tree events occur later, often months after the criminal event in the case of conviction and sentencing I return to this observation in the discussion of the celerity of punishment

It is assumed that the crime will be committed if the expected benefits from a successful completion exceed the expected cost of an unsuccessful attempt, namely, if

$$P_s(R - CC) > (1 - P_s)(1 - P_a)CC + (1 - P_s)(P_a)(1 - P_{c|a})(CC + AC) + (1 - P_s)(P_a)(P_{c|a})(CC + AC + FS + ISC) \quad (1)$$

An equivalent form of this relationship moves $P_s$ on the left-hand side to the right-hand side, in which case the crime will be committed if

$$(R - CC) > \left(\frac{1 - P_s}{P_s}\right)[(1 - P_a)CC + (P_a)(1 - P_{c|a})(CC + AC) + (P_a)(P_{c|a})(CC + AC + FS + ISC)] \quad (2)$$

The left-hand side of equation (2) measures the net benefits of com-

[2] This model assumes that success precludes the possibility of subsequent apprehension and the attendant risk of formal sanction

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 252 of 517

mitting the crime and the right-hand side measures the costs Several observations about this relationship are relevant to the remainder of the discussion

First, unless the net benefit of crime commission is positive (i e , $R - C > 0$),[3] the offense will not be committed regardless of the formal and informal sanction costs specified on the right-hand side of equation (2) Particularly if commission cost is understood to include the shame of committing an act that involves taking another person's property or doing violence to that person, for most people sanction costs are irrelevant to the decision to refrain from crime For example, Bachman, Paternoster, and Ward (1992) found in a study of sexual assault that sanction risk perceptions were relevant to self-reported intentions to offend only for the least morally committed The absence of an effect for those with higher levels of moral commitment, however, should not be construed as their being impervious to incentives but to their moral commitment being a sufficient basis for refraining from sexual assault[4] This elementary but fundamental point has been made repeatedly in the discussion about to the degree to which sanction threats affect behavior among different individuals See, for example, Zimring and Hawkins (1973) and more recently Piquero et al (2011) and Wikstrom et al (2012) I return to this point in the discussion of sanction risk perceptions and their influence on behavior in Section VI

Second, the bottom three branches of the tree pertain to the consequences of failure to complete the crime Commission cost contributes to the total cost of all three of these branches, apprehension cost contributes to two of the three branches—apprehension with and without conviction—and informal and formal sanction costs contribute only to the final branch, apprehension with conviction This implies that increases in perceived commission cost will have a greater deterrent effect than equal increases in either perceived apprehension cost or perceived formal and informal sanction costs In turn the structure of the tree implies that increases in apprehension cost will have a greater deterrent effect than equal increases in either formal or informal sanction cost This observation helps to explain the longstanding conclusion from the perceptual deterrence literature that shame, a key component of commission cost and apprehension cost, plays a more

[3] Rewards and commission cost may also be affected by risk preferences

[4] Knowledge of potential punishment may also reinforce a normative sense of wrongfulness

decisive role in the deterrence process than sanction cost This issue is discussed further in Section III It also explains the seeming effectiveness of situational crime prevention tactics, a topic I allude to in Section V.

Third, the structure of the tree also implies that decreases in $P_s$ will have larger deterrent effects than equal-sized increases in either $P_a$ or $P_{s|a}$ and that increases in $P_a$ will have a bigger deterrent impact than an equal increase in $P_{s|a}$ This observation is consistent with the longstanding belief dating back to Beccaria that the certainty of punishment is a more effective deterrent than the severity of punishment However, I earlier noted that the evidence suggests that a more precise statement of the certainty conclusion pertains to the certainty of apprehension The decision model laid out here provides a still more precise statement of that conclusion Decreases in $P_s$ provide more effective deterrence than equal increases in $P_a$ Concerning the distinction between police serving as sentinels or as apprehension agents, when serving in their role as sentinels, they affect $P_s$, whereas when serving as apprehension agents, they affect $P_a$ This implies that the sentinel role of policing is more effective in deterring crime than their apprehension agent role This observation is relevant to the discussion in Section V of the varying findings on police effectiveness in preventing crime

## II Deterrence Research to the 1990s

Empirically based deterrence research began in earnest in the late 1960s There were three major instigators One was technological the growing availability of computers and statistical software for analyzing crime data, which were also growing in availability The second was social the steady growth of crime rates during the 1960s The third was intellectual, especially within economics, with the publication in 1968 of Becker's seminal article "Crime and Punishment An Economic Approach"

Deterrence studies up to the 1990s are usefully grouped into three categories experimental and quasi-experimental studies, aggregate studies, and perceptual deterrence studies My 1998 *Crime and Justice* review provided an extended discussion of the three types of studies (Nagin 1998) This section summarizes conclusions of the experimental and quasi-experimental studies and aggregate studies of this research era that are most relevant to this review Because of the persistence of

themes in the pre- and post-1990s perceptual deterrence research and the continuity of the research methods used, I discuss this body of research without reference to era in Section VI

*A Experimental and Quasi-Experimental Studies*

This category of studies examines the effect of targeted policy interventions such as police crackdowns or implementation of statutes changing penalties In the experimental studies the intervention and control treatments are randomly assigned A classic example is the Minneapolis Domestic Violence Experiment (Sherman and Berk 1984) in which police responded to misdemeanor incidents of domestic violence with one of three randomly chosen responses The arrest response was found to be most effective in preventing recidivism, but as discussed in Section V, this finding was not consistent across replications of the experiment in other localities

True experiments, however, compose only a small fraction of the studies in this category Most are quasi experiments The best-designed quasi-experimental studies attempt to incorporate important features of a true experiment a well-defined treatment regime, measurement of response before and after treatment, and a control group Two classic studies of this genre are Ross's studies of the effects on drunk driving of the British Road Safety Act (Ross 1973) and of Scandinavian-style drunk driving laws Most studies in this group examine the effects of police crackdowns on drug markets, disorderly behavior, and drunk driving Excellent reviews of these studies are available in Sherman (1990) and Ross (1982) Both Sherman and Ross conclude that the interventions were generally successful in generating an initial deterrent effect For instance, in drunk-driving interventions, this was evidenced by a reduction in fatalities in which the driver was intoxicated or in drug market crackdowns by reduced dealing However, they also concluded that the effect was generally only transitory the initial deterrent effect typically began decaying even while the intervention was in effect One exception to this finding of at least initial deterrent effectiveness concerned studies of increases in sentence severity Ross (1982) discusses the ineffectiveness of severity enhancements in three very different places Finland, Chicago, and New South Wales, Australia Evidence even of an initial effect is less consistent than in studies of interventions that increased the certainty of apprehension

I take away three important lessons from this literature First, the

generally more consistent findings of initial effectiveness in the apprehension-based interventions, compared to the severity-based interventions, provide more evidence in support for my modified version of the certainty effect, namely, that certainty of apprehension is a more effective deterrent than the severity of the ensuing legal consequences, but with an important proviso  Ross (1982) attributed the ineffectiveness of severity-enhancing policies to the fact that they trigger a system response that reduced certainty of punishment  He pointed out that if judges or juries believed the penalties too harsh, they may have responded by refusing to convict guilty defendants  Police and prosecutors may respond similarly  Thus, any potential deterrent effect of the severity enhancement may be canceled by the reduction in certainty  This result is a reminder not only of the difficulty of enforcing penalties that are deemed unjust but also that certainty and severity do not operate independently—they interact  Tonry (2009) forcefully elaborates on many of these points

Second, Sherman (1990) offers useful nomenclature for describing the finding of only transitory effects  He uses the term "initial deterrence decay" to describe the decline in the deterrent response as "potential offenders learn through trial and error that they had overestimated the certainty of getting caught at the beginning of the crackdown" and "residual deterrence," which is a crime suppression effect that extends beyond the intervention until offenders learn by experience or word of mouth that "it is once again 'safe' to offend" (p 10)  Sherman's observations are a reminder that deterrence is a perceptual phenomenon  In Sherman (1990) and Nagin (1998), we both discuss the decay of initial deterrence as a possible response to what behavioral economists call ambiguity aversion  People consistently prefer gambles in which the risks are clearly comprehensible compared to equivalent gambles in which the risks are less transparent  Initial deterrence may be a response to perceptions of uncertainty about true risk rather than to any change in the true risk of apprehension  Thus, unless policy can affect perceptions, there will be no behavioral response  It is also a reminder that perceptions may be updated in response to cues from the environment and therefore will not necessarily be stable  I return to this important issue in the discussion of the perceptions studies in Section VI

Third, the findings from these studies have stood the test of time  In my judgment, well-conducted experimental and quasi-experimental

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 256 of 517

studies of deterrence provide the most convincing evidence of the circumstances under which deterrence is and is not effective This holds for both the post-1990s and the pre-1990s literatures

*B Aggregate Studies*

The pre-1990s aggregate studies generally analyzed the association of crime rates across geographic units, usually states, with measures of the certainty and severity of punishment The most basic form of these analyses involved bivariate correlations across states of crimes rates for the crime categories composing the FBI part I crime index (e g , murder and nonnegligent homicide, robbery, burglary) with certainty of punishment, measured by prison admissions per reported crime, and severity of punishment, measured by median time served More elaborate analyses were conducted in a regression format These analyses added various state characteristics known to be correlated with crime (e g , age and racial composition, urbanization) to the base regression model relating crime rate to the certainty and severity measures Negative and significant associations were generally found between the crime rate and the certainty of imprisonment ratio The association of time served with the crime rate was generally insignificant

Reviews of these studies, including a high-visibility National Research Council (NRC) report (Blumstein, Cohen, and Nagin 1978), concluded that the aggregate studies suffered from such grave flaws that they did not provide a basis for valid inference about deterrent effects Two flaws are particularly noteworthy because they remain relevant to the interpretation of a successor strand of post-1990 aggregate studies discussed in Section IV The first is that the associations do not distinguish the behavioral response to sanction threats, deterrence, from incapacitation The second is more fundamental—distinguishing cause from effect. All forms of nonexperimental data are vulnerable to the criticism that the outcome of interest, in this case the crime rate, is the cause of the predictor of interest, in this case sanctions, and not vice versa High crime rates, for example, might prompt a police crackdown followed by crime rates declining for other reasons Cross-polity studies of natural variations in crime rates and sanction levels are particularly vulnerable to this concern because there is generally no basis for assessing whether the variations in sanction levels are the result of factors independent of the crime rate By contrast, for quasi-experi-

mental studies, institutional research can reveal whether the intervention was prompted by rising crime rates

## III Capital Punishment

Studies of the deterrent effect of capital punishment have been and continue to be the source of bitter contention Isaac Ehrlich's 1975 study, in which he concluded that each execution averted seven to eight homicides, is undoubtedly the most-cited study of this kind The 1978 NRC report (Blumstein, Cohen, and Nagin 1978) and an accompanying commissioned paper (Klein, Forst, and Filatov 1978) laid out a lengthy list of criticisms of the Ehrlich analysis The NRC report concluded that "available studies [including Ehrlich's] provide no useful evidence on the deterrent effect of capital punishment" (p 9)

Coincidentally, that report was issued shortly after the 1976 Supreme Court decision *Gregg v Georgia* ended the moratorium on execution in the United States In the 35 years since publication of the 1978 report, and more especially in recent years, a considerable number of post-*Gregg* studies have attempted to estimate the effect of the legal status or the actual implementation of the death penalty on homicide rates These studies have reached widely varying conclusions and have resulted in often bitter disagreement about their interpretation

This more recent literature has been the subject of still another NRC report titled *Deterrence and the Death Penalty*, which I coedited (Nagin and Pepper 2012), as well as two reviews of the literature commissioned by the NRC committee (Chalfin, Haviland, and Raphael 2013, Charles and Durlauf 2013) and two valuable reviews by Donohue and Wolfers (2005, 2009) The NRC report and all of the reviews are highly critical of the post-*Gregg* research The report concluded, "Research to date on the effect of capital punishment on homicide is not informative about whether capital punishment decreases, increases, or has no effect on homicide rates Therefore, the Committee recommends that these studies not be used to inform deliberations requiring judgments about the effect of the death penalty on homicide Consequently, claims that research demonstrates that capital punishment decreases or increases the homicide rate by a specified amount or has no effect on the homicide rate should not influence policy judgments about capital punishment" (Nagin and Pepper 2012, p 3)

The NRC report leveled two key criticisms of the post-*Gregg* capital

punishment deterrence research that transcend the high-profile but still narrow issue of the deterrent effect of capital punishment. They also apply to studies of the deterrent effect of other forms of sanction—prison, fines, and community control—that form the backbone of contemporary sanction policy in the United States and most other countries

One criticism concerned the incomplete specification of the sanction regime for homicide Even for capital-eligible convictions for homicide, only a minority of cases result in a sentence of death, let alone an execution (Nagin and Pepper 2012) This is true even for states such as Texas and Virginia that make the most intense use of capital punishment Instead, most homicides result in a lengthy prison sentence, sometimes life without parole A study by Cook (2009) illustrates this point Of 274 cases prosecuted as capital cases, only 11 resulted in a death sentence Another 42 resulted in dismissal or a verdict of not guilty, which left 221 cases resulting in conviction and sentences to a noncapital sanction

None of the post-*Gregg* studies take into account the noncapital component of the sanction regime As discussed in Nagin and Pepper (2012) and Chalfin, Haviland, and Raphael (2013), there are sound reasons for expecting that the severity of the noncapital sanctions for homicide varies systematically with the availability and the intensity of use of capital punishment For example, the political culture of a state may affect the frequency of use of capital punishment and also the severity of noncapital sanctions for homicide Thus, any effect that these noncapital sanctions have on homicide may contaminate the estimated effect of capital punishment on homicide In capital punishment studies the potential for such bias is particularly strong because, as noted, noncapital sanctions remain the dominant sanction response to capital-eligible murders, even in states that make the most intense use of capital punishment

Homicide is not the only criminal offense punishable by a range of qualitatively different sanction alternatives Indeed the sanction regimes for most other criminal offenses, even felonies, include more than one sanction option for their punishment This point is returned to in Section IV

A second key criticism elaborated in the NRC report concerned the specification of perceptions of the capital punishment component of the sanction regime Studies typically suppose that people who are con-

templating murder perceive sanction risks as subjective probabilities of arrest, conviction, and execution Lacking data on these subjective probabilities, researchers presume that they are somehow based on the observable frequencies of arrest, conviction, and execution

The report concluded that several factors made the attempts by the panel studies to specify the capital component of state sanction regimes uninterpretable First, the findings are very sensitive to the way in which the risk of execution is specified For example, because of delays between the imposition of a death sentence and its being carried out, if ever, researchers routinely computed ratios in which the numerator was the number of executions in a given state and year divided by the number of death sentences imposed in that state in some prior year Results are very sensitive to how that ratio is computed (Chalfin, Haviland, and Raphael 2013), and there is no logical basis for resolving disagreements about how the true risk of execution should be measured Among the difficulties is that only 15 percent of those sentenced to death in the United States since 1977 have been executed, with close to 40 percent leaving death row for other reasons (vacated sentences or convictions, commutations, a successful appeal, or death by other causes) and 45 percent still awaiting execution (Snell 2010) Available information for calculating the risk depends on the size of the state for large states such as Texas and California, there are far more data for calibrating risk than for small states such as Delaware and Montana Further complicating matters, policies can change as a result of court decisions and administrative decrees of elected officials This unpredictability calls into question the usefulness of prior data on the death penalty when calculating present and future risk Because none of the measures used has any clear relationship with the correct measure, there is no reasoned basis for arbitrating competing claims about which study provides the better estimate of the deterrent effect of the death penalty

Even if it were possible to judge which measure more closely corresponds to true risk, there is no evidence that the perceptions of potential murderers correspond to this risk The above discussion concerns only one aspect of sanction regime, the risk of execution given conviction Other relevant dimensions of the sanction regime are the risk of conviction given commission of a murder and the certainty and severity of the noncapital component alternatives to the death penalty The assumption that potential murderers have accurate perceptions of

these risks and consequences is not credible indeed it is preposterous I return to the issue of sanction risk perceptions in Section VI.

## IV Imprisonment and Crime

There have been two distinct waves of aggregate studies of the relationship between imprisonment and crime Studies in the 1960s and 1970s described in Section II examined associations of state-level crime rates to state-level certainty of punishment, measured by the ratio of prison admissions to reported crimes, and to state-level severity of punishment as measured by median time served These studies suffered from fundamental deficiencies laid out in the 1978 NRC report (Blumstein, Cohen, and Nagin 1978) and elsewhere As a consequence, aggregate-level deterrence research went largely "silent" for more than a decade

### *A Post-1990s Aggregate Studies*

By the mid-1990s, a second generation of studies emerged Unlike the first-generation studies, which primarily involved cross-sectional analyses of states, second-generation studies had a longitudinal component in which data were analyzed across states and over time Another important difference in the second-generation studies is that they did not attempt to estimate certainty and severity effects separately Instead they examined the relationship between the crime rate and the rate of imprisonment as measured by prisoners per capita

A review by Donohue (2009) identifies six studies of the relationship of crime rates to imprisonment rates All find statistically significant negative associations between imprisonment rates and crime rates, implying a crime prevention effect for imprisonment However, the magnitude of the estimate varied widely from nil for a study that allowed for the possibility that prevention effects decline as the scale of imprisonment increases (Liedka, Piehl, and Useem 2006) to −0 4 percent for each 1 percent increase in the imprisonment rate (Spelman 2000)

Apel and Nagin (2009), Donohue (2009), and Durlauf and Nagin (2011*a*, 2011*b*) discuss important flaws in these studies One is that they are necessarily measuring the combined effect of deterrence and incapacitation on crime rates and thus cannot be interpreted as measuring the deterrent effect of imprisonment At best they can be said to estimate the upper bound of that effect

Other shortcomings are even more fundamental One concerns the same fundamental flaw of the first-generation studies—distinguishing cause from effect While imprisonment prevents crime through a combination of deterrence and incapacitation, crime also generates the prison population The object of interest is the effect of the imprisonment rate on the crime rate, but data available for estimation of that effect also reflect the effect of the crime rate on the imprisonment rate Thus, statistical isolation of the crime prevention effect requires properly accounting for the effect of crime on imprisonment

The shortcomings in the statistical strategies used in these studies to identify the crime prevention effect of imprisonment are discussed at length in Durlauf and Nagin (2011*a*, 2011*b*). To summarize, with the exception of Levitt (1996) and Johnson and Raphael (2012), the conclusions of the studies rest on a form of statistical analysis pioneered by the Nobel laureate Clive Granger (1969) Granger's method is often mistakenly interpreted as providing estimates with a causal interpretation, which in the context of the aggregate imprisonment studies would be the expected change in the crime rate resulting from a policy that changes the imprisonment rate by a specified amount In fact, the results are not in general amenable to this interpretation Instead, application of Granger's method provides only a basis for forecasting future changes in the crime rate as a function of prior changes in the imprisonment rate and the crime rate While valid forecasts can be based on correlations alone, valid causal interpretation requires more than establishing correlation

Figure 2 illustrates the problem Panel *A* depicts hypothetical crime and imprisonment functions The crime function $C(I)$ describes the crime rate as a function of the imprisonment rate, $I$, and the imprisonment function $I(C)$ measures the imprisonment rate as a function of the crime rate, $C$ The function $C(I)$ is shown to be downward sloping in $I$ to reflect the crime reduction effects of imprisonment via some combination of deterrence and incapacitation Studies of the relationship of the crime rate to the imprisonment rate aim to measure whether this line is in fact downward sloping and, if so, by how much The function $I(C)$ is depicted as upward sloping because for any fixed set of policies determining the certainty and severity of punishment, imprisonment rates will be a rising function of the crime



FIG 2—The challenge of identifying the effect of the imprisonment rate on the crime rate

rate[5] The intersection of the $C(I)$ and $I(C)$ functions at $I_0$ and $C_0$ measures the observed level of crime and imprisonment

Crime rates and imprisonment rates are, of course, affected by a multitude of other factors beyond their mutual interaction as depicted in panel *A* The key to estimating $C(I)$ is identifying some factor, called an instrumental variable (IV), that is thought to affect the imprisonment rate but that affects the crime rate only via its effect on shifting the location of imprisonment rate function Suppose that such an IV were identified and denoted by $z$ Panel *B* demonstrates how changing values of $z$ from $z_1$ to $z_2$ to $z_3$ shifts the $I(C)$ function and, in so doing, traces out the $C(I)$ function Connecting the points $(I_1, C_1)$, $(I_2, C_2)$, and $(I_3, C_3)$ estimates $C(I)$ In this fashion, IV regression models can be said to identify $C(I)$ and thereby the crime reduction effect of the imprisonment rate on the crime rate However, the key to IV regression successfully isolating this effect is that $C(I)$ is not directly affected by $z$ Panel *C* illustrates the failure of this assumption If $z$ also shifts $C(I)$, the changing equilibrium values of the imprisonment rate and crime rate no longer trace out the $C(I)$ function

Only Levitt (1996) and Johnson and Raphael (2012) use an IV regression approach to identify the causal effect of imprisonment on crime Levitt uses court-ordered prison releases to form a set of IVs He argues that such court orders meet the test for providing a valid estimate of the effect of the imprisonment rate on the crime rate the orders have no direct effect on the crime rate and affect it only insofar as the court orders affect the imprisonment rate, which in turn affects the crime rate

Even if one accepts this argument, the estimated effect has only limited policy value By its construction, it is likely measuring the effect on crime of the early release of selected prisoners, probably those nearing the end of their sentenced terms It may also be reflecting the effect of diversion of individuals convicted of less serious crimes either to local jails or to community supervision In either case, the estimates are not informative about the crime prevention effects, whether by deterrence or incapacitation, of sentence enhancements related to the

[5] As in the entire imprisonment and crime literature, I too assume that sanction policies are unaffected by either the crime rate or the imprisonment rate This is not a tenable assumption However, all the points I make in the ensuing discussion would continue to hold if the model were generalized to allow sanction policy to be affected by crime rates and imprisonment rates

manner in which a crime is committed (e g , weapon use), the characteristics of the perpetrator (e g , prior record), or policies affecting the likelihood of incarceration More generally, the uncertainty about what is actually being measured inherently limits the value of the estimated effects for both policy and social science

A more recent study by Johnson and Raphael (2012) is based on a technically complex IV regression model Identification is based on the assumption that prison populations do not change instantaneously in response to changes in the size of the criminal population Similarly to the non-IV-based analysis of Liedka, Piehl, and Useem (2006), Johnson and Raphael conclude that the crime prevention effect of imprisonment has diminished with the scale of imprisonment, which was rising steadily over the period of their analysis, 1978–2004

One explanation for the Johnson and Raphael finding is that the states and the federal government over this period collectively implemented policies with steadily declining average deterrent effectiveness Given that knowledge of the deterrent effectiveness of alternative sanction policies is so limited, this explanation is not credible An alternative explanation involving incapacitation is more credible If the crime reduction effect of incarceration primarily stems from incapacitation, the Johnson and Raphael finding is consistent with the concept of "stochastic selectivity" (Canela-Cacho, Blumstein, and Cohen 1997), whereby high-rate offenders are more likely to be apprehended and incarcerated than low-rate offenders Thus, as the scale of imprisonment increases, higher-rate offenders will be less likely to be at large committing crimes Johnson and Raphael's finding is replicated by Vollaard (2013) in an analysis of the Netherlands' Habitual Offender Law Vollaard attributes the entirety of the crime prevention effect that he estimates to incapacitation Also of note, Owens (2009) in her analysis of 2003 data from Maryland finds modest incapacitation effects

The incapacitation interpretation of the Johnson and Raphael finding of decreasing crime prevention returns with the scale of imprisonment is more credible than the deterrence interpretation This interpretation also implies that the study is not useful for learning about deterrence However, even the incapacitation interpretation is cast in doubt by the aging of the US prison population Between 1991 and 2010, the percentage of prisoners in state and federal prisons over 45 years old has nearly tripled from 10 6 percent to 27 4 percent (Bureau of Justice Statistics 1999, 2011) Thus, the seeming decline in the in-

capacitative effectiveness of prison with scale may be reflecting only the aging of the prison population, which coincides with rising imprisonment rates Further complicating the decreasing returns interpretation is the changing composition of the prison population in terms of the composition of prisoner conviction offense Over the past four decades, the percentage of prisoners incarcerated for non–part I FBI index crimes has increased substantially (Blumstein and Beck 1999, 2005) Thus, the reduction in crime prevention effectiveness may be due to the types of prisoners incarcerated, not to scale effects

All of these studies, whether IV based or not, also suffer from an important conceptual flaw that limits their usefulness in understanding deterrence and devising crime control policy Prison population is not a policy variable per se, rather, it is an outcome of sanction policies dictating who goes to prison and for how long, namely, the certainty and severity of punishment In all incentive-based theories of criminal behavior, in the tradition of Bentham and Beccaria, the deterrence response to sanction threats is posed in terms of the certainty and severity of punishment, not in terms of the imprisonment rate Therefore, to predict how changes in certainty and severity might affect the crime rate requires knowledge of the relationship of the crime rate to certainty and severity as separate entities, which is not provided by the literature that analyzes the relationship of the crime rate to the imprisonment rate

The studies are also conducted at a too-global level In Nagin (1998), I describe the two-dimensional taxonomy of sanction policies affecting the scale of imprisonment One dimension labeled "type" distinguishes three broad categories policies regulating certainty of punishment such as laws requiring mandatory imprisonment, policies influencing sentence length such as determinate sentencing laws, and policies regulating parole powers The second dimension of the taxonomy, "scope," distinguishes policies that cast a wide net, such as a general escalation of penalties for broad categories of crime, compared to policies that focus on targeted offenses (e g , drug dealing) or offenders (e g , three-strikes laws)

The nearly 500 percent growth in prison population over the last two decades is attributable to a combination of policies belonging to all cells of this matrix Parole powers have been greatly curtailed, sentence lengths increased, both in general and for particular crimes (e g , drug dealing), and judicial discretion to impose nonincarcerative sanc-

tions has been reduced (Tonry 1996, Blumstein and Beck 1999, 2005, Raphael and Stoll 2009) Consequently, any effect on the crime rate of the increase in prison population reflects the effects of an amalgam of potentially interacting treatments

There are good reasons for predicting differences in the crime reduction effects of different types of sanctions (e g , mandatory minimums for repeat offenders vs prison diversion programs for first-time offenders) Obvious sources of heterogeneity in offender response include factors such as prior contact with the criminal justice system, demographic characteristics, and the mechanism by which sanction threats are communicated to their intended audience Indeed, available evidence on the deterrent effect of sentence enhancements, the next topic of discussion, demonstrates such heterogeneity

*B Policy Evaluation Studies of Sentence Enhancements*

There have been comparatively few studies of the deterrent effects of sentence enhancements, judged relative to their importance in contemporary crime control policy The earliest post-1970s attempts to measure severity effects analyzed the deterrent impact of sentence enhancements for gun crimes In a series of studies, Loftin, McDowell, and colleagues (Loftin and McDowall 1981, 1984, Loftin, Heumann, and McDowall 1983) examined whether sentence enhancements for gun use in committing another type of crime such as robbery deter gun use in the commission of crime While the findings are mixed, this body of research has generally failed to uncover evidence of a deterrent effect (but see McDowall, Loftin, and Wiersema 1992)

However, one important caveat remains with respect to extrapolating these studies to understanding the link between deterrence and severity The same literature that found that gun penalty enhancements were ineffective also found that these laws generally failed to increase the sentences actually received in gun-related crime prosecutions Thus, gun-using criminals may not have responded because the real incentives were not changed This again is a reminder of Tonry's (2009) commentary on the highly inconsistent administration of mandatory minimum sentencing

Kessler and Levitt (1999) examine the deterrent impact of another California sentence enhancement law, Proposition 8, passed in 1982 Proposition 8 anticipated the three-strikes laws passed by many states in the 1990s They estimate a 4 percent decline in crime attributable

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 267 of 517

to deterrence in the first year after enactment Within 5–7 years, the effect grows to a 20 percent reduction As acknowledged by Kessler and Levitt, the longer term estimate includes incapacitation effects

Webster, Doob, and Zimring (2006) challenged the basic finding of any preventive effects Kessler and Levitt examine data from every other year When all annual data are used, Webster, Doob, and Zimring find that the decline in crime rates in the affected categories begins before Proposition 8's enactment, and the slope of this trend remains constant through implementation But see Levitt (2006) for a response and commentary supporting Webster et al by Raphael (2006)

One exception to the scarcity of studies on the crime prevention effects of sentence enhancements concerns analyses of the deterrent effect of California's "three strikes, you're out" law, which mandated a minimum sentence of 25 years upon conviction for a third-strike offense Zimring, Hawkins, and Kamin (2001) concluded that the law reduced the felony crime rate by at most 2 percent They also conclude that only those individuals with two convictions for two offenses qualifying as "strikes" showed any indication of reduced offending Other studies by Stolzenberg and D'Alessio (1997) and Greenwood and Hawken (2002), who like Zimring, Hawkins, and Kamin (2001) examine before and after trends, conclude that the crime prevention effects were negligible

I turn now to six studies that in my judgment report particularly convincing evidence on the deterrent effect of incarceration They also nicely illustrate heterogeneity in the deterrence response to the threat of imprisonment[6] Weisburd, Einat, and Kowalski (2008) and Hawken and Kleiman (2009) study the use of imprisonment to enforce fine payment and conditions of probation, respectively, and find substantial deterrent effects, Helland and Tabarrok (2007) analyze the deterrent effect of California's third-strike provision and find a modest deterrent effect, Raphael and Ludwig (2003) examine the deterrent effect of prison sentence enhancements for gun crimes and find no effect, and Hjalmarsson (2009) and Lee and McCrary (2009) examine the heightened threat of imprisonment that attends coming under the jurisdiction of the adult courts at the age of majority and find no deterrent effect

Weisburd, Einat, and Kowalski (2008) report on a randomized field

[6] For further discussion of heterogeneity in deterrence response, see Paternoster (2010) and Piquero et al (2011)

trial of alternative strategies for incentivizing the payment of court-ordered fines The most salient finding involves the "miracle of the cells," namely, that the imminent threat of incarceration provides a powerful incentive to pay delinquent fines, even when the incarceration is for only a short period The miracle of the cells provides a valuable perspective on the conclusion that the certainty, rather than the severity, of punishment is the more powerful deterrent Consistent with the "certainty principle," the common feature of treatment conditions involving incarceration is a high certainty of imprisonment for failure to pay the fine However, that Weisburd et al label the response the "miracle of the cells" and not the "miracle of certainty" is telling Their choice of label is a reminder that certainty must result in a distasteful consequence in order for it to be a deterrent The consequences need not be draconian, just sufficiently costly, to deter the proscribed behavior

The deterrence strategy of certain but nondraconian sanctions has been applied with apparently great success in Project HOPE, an intervention heralded in Hawken and Kleiman (2009), Kleiman (2009), and Hawken (2010) Project HOPE is a Hawaii-based probation enforcement program In a randomized experiment, probationers assigned to Project HOPE had much lower rates of positive drug tests and missed appointments and—most importantly—were significantly less likely to be arrested and imprisoned The cornerstone of the HOPE intervention was regular drug testing, including random tests, and certain but short punishment periods of confinement (e g , 1–2 days) for positive drug tests or other violation of conditions of probation Thus, both the Weisburd, Einat, and Kowalski (2008) fine experiment and Project HOPE show that highly certain punishment can be an effective deterrent in cases in which deterrence has previously been ineffective in averting crime

Helland and Tabarrok (2007) examine whether California's "three strikes, you're out" law deters offending among individuals previously convicted of strike-eligible offenses The future offending of individuals convicted of two previous eligible offenses was compared with that of individuals who had been convicted of only one eligible offense but who, in addition, had been tried for a second eligible offense but were ultimately convicted of a noneligible offense The two groups of individuals were comparable on many characteristics such as age, race, and time in prison Even so, Helland and Tabarrok find that arrest

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 269 of 517

rates were about 20 percent lower for the group with convictions for two eligible offenses The authors attribute this to the greatly enhanced sentence that would have accompanied conviction for a third eligible offense

Raphael and Ludwig (2003) examine the deterrent effect of sentence enhancements for gun crimes that formed the basis for a much publicized Richmond, Virginia, federal program called Project Exile Perpetrators of gun crimes, with a particular emphasis on those with a felony record, were the targets of federal prosecution that provided for far more severe sanctions for weapon use than were provided by Virginia state law In a careful and thorough analysis involving comparisons of adult homicide arrest rates with juvenile homicide arrest rates within Richmond and comparisons of gun homicide rates between Richmond and other cities with comparable pre-intervention homicide rates, Raphael and Ludwig conclude that the threat of an enhanced sentence had no apparent deterrent effect

For most crimes, the certainty and severity of punishment increase discontinuously upon reaching the age of majority, when jurisdiction for criminal wrongdoing shifts from the juvenile to the adult court In an extraordinarily careful analysis of individual-level crime histories from Florida, Lee and McCrary (2009) attempt to identify a discontinuous decline in offending at age 18, the age of majority in Florida Their point estimate of the discontinuous change is negative as predicted but is minute in magnitude and not even remotely close to achieving statistical significance [7]

Another analysis of the effect, if any, of moving from the jurisdiction of the juvenile to adult courts by Hjalmarsson (2009) uses the 1997

[7] The finding that the young fail to respond to changes in penalties associated with the age of majority is not uniform across studies An earlier analysis by Levitt (1998) finds a large drop in the offending of young adults when they reach the age of jurisdiction for adult courts For several reasons, Durlauf and Nagin (2011*a*, 2011*b*) judge the null effect finding of Lee and McCrary (2009) more persuasive in terms of understanding deterrence First, Levitt focuses on differences in age measured at annual frequencies, whereas Lee and McCrary measure age in days or weeks At annual frequencies, the estimated effect is more likely to reflect both deterrence and incapacitation, hence Levitt's results may be driven by incapacitation effects rather than by deterrence per se Second, the Lee and McCrary analysis is based on individual level data and so avoids problems that can arise because of aggregation (Durlauf, Navarro, and Rivers 2008, Durlauf and Nagin 2011*a*) On their own terms, the individual-level data studied by Lee and McCrary are unusually informative since they also contain information on the exact age of arrestees, which allows for the calculation of very short run effects of the discontinuity in sentence severity, e g , effects within 30 days of turning 18

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 270 of 517

National Longitudinal Survey of Youth to examine whether young males' perception of incarceration risk changed at the age of criminal majority Youths were asked, "Suppose you were arrested for stealing a car, what is the percent chance that you would serve time in jail?" She found that subjective probabilities of being sent to jail increased discontinuously on average by 5 2 percentage points when youths reached the age of majority in their state of residence While youths perceived an increase in incarceration risk, she found no convincing evidence of an effect on their self-reported criminal behavior

*C Summary*

In combination, these six studies demonstrate that debates on the effectiveness of deterrence are poorly conceived Instead, the discussion should be framed in terms argued by Beccaria and Bentham more than two centuries ago Does the specific sanction deter or not, and if it does, are the crime reduction benefits sufficient to justify the costs of imposing the sanction? Helland and Tabarrok's (2007) study is an exemplar of this type of analysis They conclude that California's third-strike provision does indeed have a deterrent effect, a point even conceded by Zimring, Hawkins, and Kamin (2001) However, Helland and Tabarrok also conclude, on the basis of a cost-benefit analysis, that the crime-saving benefits are so much smaller than the increased costs of incarceration that the lengthy prison sentences mandated by the third-strike provision cannot be justified by means of a cost-benefit criterion

The six exemplar studies suggest several important sources of the heterogeneity of the deterrent effect of imprisonment One concerns the length of the sentence itself Figure 3 depicts two alternative forms of the response function relating crime rate to sentence length Both are downward sloping, which captures the idea that increases in severity deter crime At the status quo sentence length, $S_1$, the crime rate, $C_1$, is the same for both curves The curves are drawn so that they predict the same crime rate for a zero sanction level Thus, the absolute deterrent effect of the status quo sanction level is the same for both curves But because the two curves have different shapes, they also imply different responses to an incremental increase in sentence level to $S_2$ The linear curve ($A$) is meant to depict a response function in which there is a material deterrent effect accompanying the increase to $S_2$, whereas the nonlinear curve ($B$) is meant to depict a small crime



FIG 3 —Marginal versus absolute deterrent effects

reduction response due to diminishing deterrent returns to increasing sentence length

My reading of the evidence on the deterrent effect of sentence length is that it implies that the relationship between crime rate and sentence length more closely conforms to curve *B* than to curve *A* Raphael and Ludwig (2003) find no evidence that gun crime enhancement deters, Hjalmarsson (2009) and Lee and McCrary (2009) find no evidence that the greater penalties that attend moving from the juvenile to the adult justice systems deter, and Helland and Tabarrok (2007) find only a small deterrent effect from California's third strike As a consequence, the deterrent return to increasing an already long sentence is small, possibly zero  This interpretation forms the basis for my conclusion that mandatory minimum sentencing is unlikely to have a material deterrent effect

The fine payment and Project HOPE experiments also suggest that curve *B*, not curve *A*, more closely resembles what in medical jargon would be described as the dose-response relationship between crime and sentence length  While neither of these studies is directed at the deterrence of criminal behavior, both suggest that, unlike increments in long sentences, increments in short sentences do have a material deterrent effect on a crime-prone population

Notwithstanding their strengths, these six exemplar studies do not

address several important aspects of the offender response, if any, to the sanction regime Except for the most trivial offenses, the question at hand is not the deterrent effect of some particular sanction compared to no sanction whatsoever Instead, it is the deterrent effectiveness of a specified sanction relative to alternative sanction options In the case of the death penalty, the alternative is a very lengthy prison sentence. For less serious crimes, sanction options to incarceration include fines and various forms of community supervision, or some combination that may also include a period of incarceration In 2006, for example, 10 percent of felony defendants were diverted to programs such as mandatory drug treatment prior to adjudication Of those convicted, 29 percent did not receive a jail or prison sentence (Bureau of Justice Statistics 2010) but instead were sentenced to some form of community control, paid a fine, or both

Theories of deterrence need to be generalized to specify how offenders perceive and respond to the multiplicity of sanction options available for the punishment of most crimes The theories also need to account for the possibility that offender perceptions of the severity of sanction options may differ For example, some may view the possibility of life without parole as worse than execution, and still others may view strict community supervision as more onerous than a short period of incarceration (Wood and May 2003) The multiplicity of sanction options and heterogeneity in the response to these options greatly complicate the specification of a deterrence model, but both features are essential to the deterrence phenomenon

I also note that testing such generalized models of deterrence will require a major expansion of the criminal justice data collection infrastructure at least in the United States It is currently not possible to measure the availability and frequency of use of sanction alternatives at the state level because the required data are not available Available data include those from the Bureau of Justice Statistics, which publishes nationwide statistics on sentences for prison admissions and time served for prison releases, based on data collected as part of the National Corrections Reporting Program initiated in the early 1980s More than 40 states now report annual data on sentences for admissions and time served for releases Individual-level demographic characteristics are also reported In principle, these data could be used to measure the administration of the legally authorized dimensions of most state sanction regimes by type of crime The difficulty is that the

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 273 of 517

data are often extremely incomplete In some years, some states fail to report any data, and the data that are sent to the bureau are often so incomplete that it is impossible to construct valid state-level measures of the administration of the sanction regime

## V Police and Crime

The police may prevent crime through many possible mechanisms Apprehension of active offenders is a necessary first step for their conviction and punishment If the sanction involves imprisonment, crime may be prevented by the incapacitation of the apprehended offender The apprehension of active offenders may also deter would-be criminals by increasing their perception of the risk of apprehension Many police tactics, such as rapid response to calls for service at crime scenes or postcrime investigation, are intended not only to capture the offender but to deter others by projecting a tangible threat of apprehension Police may, however, deter without actually apprehending criminals their very presence may deter a motivated offender from carrying out a contemplated criminal act

Research on the deterrent effect of police has evolved in two distinct literatures One has focused on the deterrent effect of the level of police numbers or resources, for example, by examining the relationship between police per capita and crime rates The other has focused on the crime prevention effectiveness of different strategies for deploying police

### *A Studies of Levels of Police Numbers and Resources*

Studies of the effect of police numbers and resources come in two forms One is an analogue of the imprisonment rate and crime rate studies described in the preceding section These studies are based on panel data sets, usually of US cities over the period circa 1970–2000 They relate crime rates to the resources committed to policing as measured by police per capita or police expenditures per capita The second form of study is more targeted These studies analyze the effect on crime from abrupt changes in the level of policing due, for example, to terror alerts

1 *Panel Studies* Panel studies include Marvell and Moody (1994), Levitt (1997, 2002), McCrary (2002), and Evans and Owens (2007) With the exception of McCrary's study, these studies consistently find

evidence that larger resource commitments to policing are associated with lower crime rates [8]

The studies use different statistical strategies for estimating the effect of police resource levels on crime For example, Marvell and Moody (1996) analyze two panel data sets and apply Granger-causality type statistical models to these data Levitt (1997, 2002) uses IV-type regression models In Levitt (1997), election cycles are used as an IV to untangle the cause-effect relationship between crime rates and police manpower Levitt (2002) uses the number of firefighters and civil service workers as IVs for the same purpose

The panel studies consistently find evidence that higher levels of police resources are associated with lower crime rates Durlauf and Nagin (2011*a*, 2011*b*) discuss important qualifications to the interpretation and validity of this form of analysis One is that the police panel studies, like the studies of imprisonment and crime, do not distinguish between incapacitation and deterrent effects The negative associations between police numbers and crime rates identified in these studies may reflect increased effectiveness in apprehending and incarcerating active offenders rather than in deterring crime More importantly, an underappreciated limitation of these analyses is the assumption that the effect of police levels on crime rates is the same across place and time As the discussion of studies of the effects of police deployment strategies on crime makes clear, this assumption is not tenable Nevertheless, the findings of these studies are consistent with those of studies of abrupt changes in police presence that police numbers do matter

2 *Abrupt Change Studies* Studies of this type, which are sometimes called "interrupted time series" or "regression discontinuity" studies, examine the effects of abrupt changes in police presence If the change in police presence is attributable to an event unrelated to the crime rate, studies of this type can provide particularly convincing evidence of deterrence For example, in September 1944, German soldiers occupying Denmark arrested the entire Danish police force According to an account by Andenaes (1974), crime rates rose immediately but not uniformly The frequency of street crimes such as robbery, whose

[8] McCrary identified an error in the computation of standard errors in Levitt (1997) that when corrected nullified the finding of a crime prevention effect of police numbers Levitt (2002) argues that McCrary's findings do not overturn his general claim that increased numbers of police reduce crime rates and presents new evidence to that effect

control depends heavily on visible police presence, rose sharply By contrast, crimes such as fraud were less affected See Sherman and Eck (2002) and Sherman (in this volume) for other examples of crime increases following a collapse of police presence

The Andenaes anecdote illustrates several important points It provides a useful reminder of the difference between absolute and marginal deterrence As shown in figure 3, absolute deterrence refers to the difference in the crime rate between the status quo level of sanction threat, $S_1$, and a complete (or near) absence of sanction threat, $S_0$ The Andenaes anecdote is a compelling demonstration that the absolute deterrent effect is large However, from a policy perspective, the issue is not the absolute deterrent effect posed by police presence The question is whether, on the margin, crime can be prevented by incremental increases in police numbers or by changes in the way police are deployed Also, the anecdote is another useful reminder that deterrent effects are heterogeneous sanction threats (or the absence thereof) do not uniformly affect all types of crime or, more generally, all types of people

Contemporary tests of the police-crime relationship based on abrupt decreases in police presence investigate the effect on the crime rate of reductions in police presence and productivity as a result of large budget cuts or lawsuits following racial profiling scandals Such studies have examined the Cincinnati Police Department (Shi 2009), the New Jersey State Police (Heaton 2010), and the Oregon State Police (DeAngelo and Hansen 2008) Each concludes that decreases in police presence and activity substantially increase crime Shi (2009) studies the fallout from an incident in Cincinnati in which a white police officer shot and killed an unarmed African American suspect The incident was followed by 3 days of rioting, heavy media attention, the filing of a class action lawsuit, a federal civil rights investigation, and the indictment of the officer in question These events created an unofficial incentive for officers from the Cincinnati Police Department to curtail their use of arrest for misdemeanor crimes, especially in communities with higher proportional representation of African Americans, out of concern for allegations of racial profiling Shi finds measurable declines in police productivity in the aftermath of the riot and also documents a substantial increase in criminal activity The estimated elasticities of crime to policing based on her approach were −0 5 for violent crime and −0 3 for property crime

The ongoing threat of terrorism has also provided a number of unique opportunities to study the effect of police resource allocation in cities around the world, including the District of Columbia (Klick and Tabarrok 2005), Buenos Aires (Di Tella and Schargrodsky 2004), Stockholm (Poutvaara and Priks 2006), and London (Draca, Machin, and Witt 2008) The Klick and Tabarrok (2005) study examines the effect on crime of the color-coded alert system devised by the US Department of Homeland Security in the aftermath of the September 11, 2001, terrorist attack Its purpose was to signal federal, state, and local law enforcement agencies to occasions when it might be prudent to divert resources to sensitive locations Klick and Tabarrok use daily police reports of crime collected by the district's Metropolitan Police Department for the period March 2002 to July 2003, when the terrorism alert level rose from "elevated" (yellow) to "high" (orange) and back down to "elevated" on four occasions During high alerts, anecdotal evidence suggested that police presence increased by 50 percent The authors estimate that each 1 percent increase in number of police during the terror alert reduced total crime by 0 3 percent

To summarize, studies of police presence conducted since the mid-1990s consistently find that putting more police officers on the street—either by hiring new officers or by reallocating existing officers to put them on the street in larger numbers or for longer periods of time—has a substantial deterrent effect on serious crime There is also consistency with respect to the size of the effect Most estimates reveal that a 10 percent increase in police presence yields a reduction in total crime of about 3 percent Yet these police manpower studies speak only to the number and allocation of police officers and not to what police officers actually do on the street beyond making arrests

*B Police Deployment and Crime*

Much research has examined the crime prevention effectiveness of alternative strategies for deploying police resources This research has mostly been conducted by criminologists and sociologists Among this group of researchers, the preferred research designs are quasi experiments involving before-and-after studies of the effect of targeted interventions as well as true randomized experiments The discussion that follows draws heavily on two excellent reviews of this research by Weisburd and Eck (2004) and Braga (2008)

For the most part, deployment strategies affect the certainty of pun-

ishment through their effect on the probability of apprehension. One way to increase apprehension risk is to mobilize police in a fashion that increases the probability that an offender is arrested after committing a crime. Strong evidence of a deterrent as opposed to an incapacitation effect resulting from the apprehension of criminals is limited. Studies of the effect of rapid response to calls for service (Kansas City Police Department 1977; Spelman and Brown 1981) do not directly test for deterrence but found no evidence of improved apprehension effectiveness. The reason may be that most calls for service occur well after the crime event, with the result that the perpetrator has fled the scene. Thus, it is doubtful that rapid response materially affects crime. Similarly, apprehension risk is probably not materially affected by improved investigations. Eck concluded that "it is unlikely that improvements in the way investigations are conducted or managed have a dramatic effect on crime or criminal justice" (1992, p. 33). The reason is that most crimes are solved either by the offender being apprehended at the scene or by eyewitness identification of the perpetrator (Greenwood, Chaiken, and Petersilia 1977). Modern forensic methods may ultimately improve the effectiveness of postcrime investigations, but as Braga et al. (2011) note, clearance rates have remained stubbornly stable over the period 1970–2007.

The second source of deterrence from police activities involves averting crime in the first place. In this circumstance, there is no apprehension because there was no offense. In my view, this is the primary source of deterrence from the presence of police. Thus, measures of apprehension risk based only on enforcement actions and crimes that actually occur, such as arrests per reported crime, are not valid measures of the apprehension risk represented by criminal opportunities not acted on because the risk was deemed too high (Cook 1979).

One example of a police deployment strategy for which there is good evidence of effectiveness is "hot spots" policing. The idea of hot spots policing stems from a striking empirical regularity uncovered by Sherman and colleagues. Sherman, Gartin, and Buerger (1989) found that only 3 percent of addresses and intersections ("places," as they were called) in Minneapolis produced 50 percent of all calls to the police. Weisburd and Green (1995) found that 20 percent of all disorder crime and 14 percent of crimes against persons in Jersey City, New Jersey, arose from 56 drug-related crime hot spots. Twenty-five years later in a study of Seattle, Weisburd et al. (2004) reported that between 4 and

5 percent of street segments in the city accounted for 50 percent of crime incidents for each year over a 14-year period Other, more recent studies finding comparable crime concentrations include Brantingham and Brantingham (1999), Eck, Gersh, and Taylor (2000), and Roncek (2000)

The rationale for concentrating police in crime hot spots is to create a prohibitively high risk of apprehension The first test of the efficacy of concentrating police resources on crime hot spots was conducted by Sherman and Weisburd (1995) In this randomized experiment, hot spots in the experimental group were subjected to, on average, a doubling of police patrol intensity compared with hot spots in the control group Declines in total crime calls ranged from 6 to 13 percent In another randomized experiment, Weisburd and Green (1995) found that hot spots policing was similarly effective in suppressing drug markets

Braga's (2008) informative review of hot spots policing summarizes the findings from nine experimental or quasi-experimental evaluations The studies were conducted in five large US cities and one suburb of Australia All but two found evidence of significant reductions in crime Further, no evidence was found of material crime displacement to immediately surrounding locations On the contrary, some studies found evidence of crime reductions, not increases, in the surrounding locations but a "diffusion of crime-control benefits" to nontargeted locales Note also that the findings from the previously described econometric studies of focused police actions—for example, in response to terror alert level—buttress the conclusion that the strategic targeting of police resources can be very effective in reducing crime

Another example of a police deployment strategy for which there is credible evidence of effectiveness, albeit less consistent than for hot spots policing, is problem-oriented policing One of the most visible instances of problem-oriented policing is Boston's Operation Ceasefire (Kennedy et al 2001) The objective of the collaborative operation was to prevent intergang gun violence using two deterrence-based strategies The first strategy was to target enforcement against weapons traffickers who were supplying weapons to Boston's violent youth gangs The second involved a more novel approach The youth gangs themselves were assembled by the police on multiple occasions in order to send the message that the law enforcement response to any instance of serious violence would be "pulling every lever" legally available to

punish gang members collectively This included a salient severity-related dimension vigorous prosecution for unrelated, nonviolent crimes such as drug dealing Thus, the aim of Operation Ceasefire was to deter violent crime by increasing the certainty and severity of punishment, but only in targeted circumstances—specifically, if the gang members committed a violent crime

Since Operation Ceasefire, the strategy of "pulling every lever" has been the centerpiece of field interventions in many large and small US cities including Richmond, Virginia, Chicago, Stockton, California, High Point, North Carolina, and Pittsburgh See Kennedy (2009), one of the architects of the pulling every lever strategy, for an extended description of these interventions and the philosophy behind them Independent evaluations have also been conducted of many of these interventions [9] As part of the Campbell Collaboration review process, Braga and Weisburd (2012) identified 10 studies of pulling levers focused policing strategies that met their criteria of rigor and relevance to be included in the review Nine of these studies reported statistically significant reductions in crime They concluded that "pulling levers focused deterrence strategies are associated with an overall statistically-significant, medium-sized crime reduction effect" (p 7) However, they caution that focused deterrence has yet to be tested with a randomized control trial Their caution is also shared by others In Cook's (2012) commentary on the High Point focused deterrence intervention, he observes that initial conclusions of eye-catchingly large effects have been replaced with far more modest assessments of effect sizes and cautions about the generalizability of the results Reuter and Pollack (2012) wonder whether a successful intervention in a small urban area such as High Point can be replicated in a large city such as Chicago Ferrier and Ludwig (2011) point out the difficulty in understanding the mechanism that underlies a seemingly successful intervention that pulls many levers Despite concerns, these interventions illustrate the potential for combining elements of both certainty and severity enhancements to generate a targeted deterrent effect Additional evaluations of the efficacy of these multipronged strategies should be a high priority, with the proviso that any designs implemented be amenable to rigorous evaluation as emphasized by commentators For a useful

[9] For Boston, see Cook and Ludwig (2006), for Richmond, see Raphael and Ludwig (2003), for Chicago, see Papachristos, Meares, and Fagan (2007), for Pittsburgh, see Wilson and Chermak (2011), and for High Point, see Corsaro et al (2012)

discussion of the importance of understanding mechanisms, see Ludwig, Kling, and Mullainathan (2011) The theory behind focused deterrence interventions includes attention to, among other things, deterrence, police legitimacy, informal social control, police/community relations, the provision of social services, and addressing situational factors Existing evaluations do not address either the contribution (if any) of individual elements or their likely interplay

*C Summary*

The evidence is clear that large changes in police presence do affect crime rates The change in presence may be the result of an unplanned event, such as a terror alert that triggers a large increase in police officers in public spaces, or it may be a strategic response to a known crime problem, such as in hot spots policing deployments In either case, crime rates are reduced in places where police presence has been materially increased While far from definitive, there is no evidence of displacement of crime to places contiguous to the heightened police presence, at least in the short run Indeed, there is some evidence of crime reductions in the areas immediately surrounding the heightened presence By contrast, there is no evidence that the rapidity of the response to crime or the thoroughness of the postcrime investigation has a material influence on crime rates Combined, these two sets of findings suggest that how police are deployed is as important as the number of police deployed in their influence on crime rates

Notwithstanding these important findings, some additional issues about police presence remain unresolved The finding from the hot spots policing evaluations that crime is not displaced to adjacent places may not hold up in the long run The seeming diffusion of crime control benefits may evaporate as offenders become aware that the heightened patrol activity is not present in adjacent places More fundamentally, the hot spot itself may be displaced to some new location, for example, to a bar that had not previously been a crime hot spot A longer-term perspective on the effectiveness of hot spots policing is required

While the evaluations of hot spots policing provide important evidence that police presence can be a deterrent, overall crime control policy cannot be built around such a narrowly formulated tactic Evaluations of problem-oriented policing suggest police effectiveness in a wider set of circumstances than intensive patrol of high crime micro-

places However, these evaluations do not reveal the mechanism by which prevention is achieved

The introduction distinguished two distinct crime prevention functions of the police their role as apprehension agents following the commission of a crime and their role as sentinels In their sentinel role the police are acting, in the parlance of Cohen and Felson (1979), as "capable guardians" Capable guardians are persons whose presence discourages a motivated offender from victimizing a criminal opportunity Capable guardians include persons with no official crime control authority who nonetheless are personally willing to intervene or to summon those with the authority to intervene The police themselves also serve as capable guardians in their conventional patrol and monitoring functions

For many reasons the apprehension agent role is the most scrutinized and recognized crime control function of the police The apprehension agent function has been and continues to be glamorized by television in long-running programs such as *Dragnet* in the 1950s and 1960s, *Hawaii Five-0* in the 1970s, *Hill Street Blues* in the 1980s, *Homicide Life on the Streets* in the 1990s, and *CSI* and *Law and Order* in the present The apprehension role is also salient because it involves the police response to real victims of sometimes horrendous crimes and the ensuing efforts to bring the perpetrators to justice From a technocratic perspective, police effectiveness in this role can be measured with statistics like the clearance rate From a crime control perspective, the apprehension agent function protects public safety by capturing and incapacitating sometimes dangerous and repetitive offenders However, as yet there is no evidence that the apprehension agent role results in a material deterrent effect By contrast, the evidence on police presence suggests that in their sentinel role police can have a very large deterrent effect While the differential deterrent effect of the police in their apprehension and sentinel roles has not been demonstrated, there is sufficient evidence to characterize it as a hypothesis with sufficient empirical support to make it credible

What then is the explanation for the differential deterrent effectiveness of the sentinel/guardian and apprehension roles of the police? The model of the decision to victimize a criminal opportunity laid out in the introduction, I believe, provides useful perspective on the answer The model distinguishes two key probabilities the probability that the opportunity can be successfully completed, $P_s$, and the probability of

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 282 of 517

apprehension conditional on the victimization of the target, $P_a$. In this model, activities that enhance police visibility, such as concentration of police at crime hot spots, affect $P_s$, whereas actions such as rapid response to calls for service or improved investigation methods affect $P_a$. The sentinel role of police is distinct from the apprehension role because the latter comes into play only when deterrence has failed and a would-be offender becomes an actual offender Thus, at one moment police can function as sentinels and in the next as apprehension agents

The depiction of the decision to victimize a criminal opportunity in figure 1 provides an explanation for the greater deterrent effectiveness of the police in their sentinel role than in their apprehension role The police in their sentinel role influence $P_s$ and thereby the probability of all four outcome branches In particular, improved guardianship reduces the probability that the target can be successfully victimized and increases the probability of the three outcomes that represent failure from the offender's perspective In contrast, improved effectiveness in the apprehension agent role comes into play only after a crime is committed and can affect only the three branches of the tree related to failure Thus, innovations that make police more effective sentinels will tend to be more influential in the decision process characterized by this model than innovations in apprehension effectiveness

The model is also useful in clarifying the basis for the effectiveness of situational crime prevention (Clarke 1995), many forms of which can be construed as reducing $P_s$ Just as police in their sentinel role reduce the attractiveness of a criminal opportunity, situational crime prevention works by affecting all four branches of the tree

## VI Perceptual Deterrence and Sanction Risk Perceptions Studies

Analyses of perceptual deterrence examine the association between perceptions of sanction risk, whatever their source, and self-reported illegal behavior or intent to engage in illegal behavior Analyses of sanction risk perceptions examine the relationship of an individual's perceptions with experience (e g., being arrested as well as factors external to the individual such as statutorily defined penalties) Some studies address both topics, but most emphasize one or the other

*A Perceptual Deterrence*

The perceptual deterrence literature was spawned by a cadre of researchers (Meier and Johnson 1977, Minor 1977, Tittle 1977, 1980, Grasmick and Bryjak 1980) interested in probing the perceptual underpinnings of the deterrence process

Perceptual deterrence studies have been based on three types of data cross-sectional survey studies, panel survey studies, and scenario-based studies In cross-sectional survey studies, individuals are questioned about their perceptions of the certainty and severity of sanctions and about either their prior offending behavior or their future intentions to offend For example, Grasmick and Bryjak (1980) queried a sample of city residents about their perceptions of the risk of arrest for offenses such as a petty theft, drunk driving, and tax cheating They also asked respondents whether they thought they would commit any of these acts in the future In panel survey studies the sample is repeatedly surveyed on risk perceptions and criminal behavior For example, Paternoster et al (1982) followed a sample of students through their 3 years in high school and surveyed them on the frequency with which they engaged in various delinquent acts and their perceptions of the risks and consequences of being caught In scenario-based studies, individuals are questioned about their perception of the risks of committing a crime that is described to them in detail They are also asked about their own behavior should they find themselves in that situation Bachman, Paternoster, and Ward (1992), for instance, constructed a scenario describing the circumstances of a date rape They then surveyed a sample of college males about their perceptions of the risk of the scenario male being arrested for sexual assault and what they themselves would do in the same circumstance

Perceptional deterrence research has been faulted with some justification on a number of grounds One is that the sampled populations are typically high school or college students who do not, by and large, engage in serious crime and delinquency Other concerns are related to the veracity of the data collected How well can respondents actually calibrate sanction risks? Do the ways in which questions about perceptions of morality and sanction cost are structured prime responses about actual or projected offending? Despite these questions, in my judgment this class of studies has provided enduring contributions to our understanding of deterrence processes

One contribution is that, with the exception of the early panel stud-

ies, perception studies consistently find that actual or projected offending is negatively related to perceptions of sanction certainty Findings of a deterrence-like relationship of self-reported offending with perceptions of sanction severity are less consistent When combined, these two findings provide still further support for the "certainty" principal, but with a proviso that certainty results in a negative but not necessarily draconian consequence Grasmick and Bryjak (1980) show that when respondents' assessments of the personal costs of the sanction are incorporated into the analysis, perceptions of severity are negatively associated with self-reported behavior

A second contribution of the perceptual deterrence literature, which may also be its most important, does not involve the evidence it has amassed on deterrence effects per se Rather it has focused its attention on the links between formal and informal sources of social control Recognition of this connection predates the perceptual deterrence literature Zimring and Hawkins (1973) observe that "official *actions* can set off societal *reactions* that may provide potential offenders with more reason to avoid conviction than the officially imposed unpleasantness of punishment" (p 174, emphasis in original) See also Andenaes (1974), Gibbs (1975), Blumstein and Nagin (1976), and Williams and Hawkins (1986) for this same argument Perceptual deterrence research has consistently found that individuals who report higher stakes in conventionality are more deterred by perceived risk of public exposure for lawbreaking

A salient finding in this regard concerns my own research on tax evasion Enforcement actions by tax authorities are private matters Criminal prosecutions, however, are the exception to this rule They necessarily involve public exposure Thus, from the taxpayer's perspective, civil enforcement actions jeopardize money but not reputation whereas criminal prosecution jeopardizes both In Klepper and Nagin (1989*a*, 1989*b*), we found that if respondents perceived no risk of criminal prosecution, a majority of respondents reported a material probability of taking advantage of noncompliance opportunities However, the perception of a nonzero risk of criminal prosecution was sufficient to deter most of the middle-class respondents to the survey Stated differently, if the tax evasion gamble also involved putting reputation and community standing at risk, the middle-class respondents to the survey were less likely to consider taking the gamble

While my tax evasion research does not pin down the specific

sources of these costs, other research on the effects of a criminal record on access to legal labor markets suggests a real basis for the fear of stigmatization (Freeman 1991, Bushway 1996) Freeman estimates that a record of incarceration depresses probability of work by 15–30 percent, Waldfogel (1994) estimates that conviction for fraud reduces income by as much as 40 percent, and Bushway (1996) concludes that even an arrest for a minor offense impairs access to legal labor markets, at least in the short run

The findings from the perceptual deterrence studies directly relate to two of the main themes of this essay The first concerns the source of the "certainty" effect In laying out the implications of the model of the decision to victimize a target, it was pointed out that the cost of apprehension appeared in two of the terms on the right-hand side of equation (2) This side of the equation measures the potential cost of offending the term measuring the cost of apprehension without conviction and the term measuring the cost of apprehension with conviction Formal and informal sanction costs appeared only in the second of these terms Stated differently, apprehension cost is incurred regardless of whether a conviction ensues, whereas sanction costs can be incurred only if apprehension is followed by conviction This structure formalizes the argument of Williams and Hawkins (1986) that what they call "fear of arrest" serves as a greater deterrent than formal sanction cost It is also consistent with the conclusion of my own research with coauthors Paternoster (Nagin and Paternoster 1993, 1994) and Pogarsky (Nagin and Pogarsky 2001, 2003) that individuals with the greatest stakes in conformity were the most deterred by informal sanction costs

The fourth branch of figure 3 is the total cost of formal and informal sanctions The perceptions research combined with the criminal record research suggests that, for people without a criminal record, informal sanction cost makes a large contribution to this total That contribution may be substantially reduced once an individual has had contact with the criminal justice system and obtains a criminal record This observation relates back to a point I emphasized in Nagin (1998) If fear of stigma is a key component of the deterrence mechanism, punishment must be a relatively rare event Just as the stigma of Hester Prynne's scarlet "A" depended on adultery being uncommon in Puritan America, a criminal record cannot be socially and economically isolating if it is commonplace For that reason, policies that work well in

the short term may erode their effectiveness over the long run if they increase the proportion of the population who are stigmatized

This observation is also germane to the recommendation that future empirical research and theorizing should take account of whether and how the experience of punishment (which in my view is inappropriately referred to as specific deterrence) affects the response to the threat of punishment, or general deterrence The experience of punishment may affect general deterrence in two distinct ways First, it may affect perceptions of sanction risks Second, it may affect the basic proclivity for offending Proclivity could be reduced by effective rehabilitation programs or an individual's conclusion that prison is not an experience to be repeated However, proclivity could also be increased by stigmatization, erosion of human capital during a spell of incarceration, or the social influence of close contact with a mostly crime-prone population Nagin, Cullen, and Jonson (2009) provide a detailed discussion of this issue

*B Sanction Risk Perceptions Studies*

Studies of sanction risk perception come in three primary forms surveys of the general public's knowledge of the sanction regime, studies of the effect of apprehension (or nonapprehension) on risk perceptions and subsequent behavior, and scenario-based studies in which respondents are questioned about their perceptions of the risk of apprehension and punishment in specific circumstances [10]

1 *General Population Surveys* Apel (2013) identifies only two surveys of the general public's knowledge of the statutory penalties for the types of crime that compose the FBI's crime index (e g , murder, robbery) Both are dated A survey of Tucson, Arizona, residents conducted in the 1970s suggests generally good knowledge of the types of sanctions (e g , fine, prison) available for the punishment of the 14 types of crime surveyed (Williams, Gibbs, and Erickson 1980) Erickson and Gibbs (1979) also find that respondents were reasonably well calibrated on the relative severity of punishments across types of crime (e g , punishment for robbery is generally more severe than for larceny) However, a 1960s study commissioned by the California Assembly Committee on Criminal Procedure (1968) found that the general

[10] For an exhaustive and thoughtful review, on which this discussion draws heavily, see Apel (2013)

public's knowledge of the statutorily prescribed level of punishment was poor Only about a quarter of the sample correctly identified the maximum prison sentence available for the punishment of the various crimes included in the survey However, 62 percent of incarcerated adults correctly identified the maximum I return to the large difference in knowledge between the incarcerated and not-incarcerated samples below

There have also been general population surveys of sanction perceptions for two types of crimes—marijuana use and drunk driving—that are far more prevalent in the general population than crimes such as robbery or burglary The surveys suggest far better, although hardly perfect, knowledge of the legally available sanctions for these two offenses MacCoun et al (2009) describe a study by Johnston Lloyd, O'Malley, and Bachman (1981) of student knowledge of punishment for marijuana possession In states that decriminalized possession between 1976 and 1980, the percentage reporting a possible jail sentence declined from 58 percent to 18 percent Corresponding changes for students living in states that did not decriminalize were not as large This finding suggests that for populations in which there is greater need-to-know of sanction risks, knowledge of the risks is better but still crude For example, MacCoun et al (2009) also report that knowledge of the maximum penalties for marijuana use was not good Surveys of knowledge among adults of drunk-driving penalties by Ross (1973) and Grube and Kearney (1983) also suggest greater awareness of the drunk-driving sanctions and available enforcement tools (e g , Breathalyzers) than corresponding knowledge for street-type crimes

The Tucson-based survey and more recent surveys by Kleck and colleagues (Kleck et al 2005, Kleck and Barnes, forthcoming) attempt to assess the accuracy of sanction risk perceptions Kleck et al (2005), for example, survey adults residing in 54 large urban counties For crimes such as homicide and robbery, they correlate respondent estimates of quantities such as arrests per crime and convictions per crime with ratios based on the actual data They find that the correlation is close to zero

The results of the surveys by Kleck and colleagues are not surprising on several counts First, for the reasons elaborated long ago by Beccaria and Bentham and most recently by Wikstrom et al (2012) and Apel (2013), most of the general public has no intention of committing the

types of crime surveyed in these studies [11] Thus, there is no reason for them to be aware of the sanction regime for these types of crime Consequently, their ignorance of the sanction regime is not informative about whether people who have a potential need-to-know of the sanction regime obtain that knowledge, however crudely, and take it into account in the decision whether or not to offend Second, the ratios calculated by Kleck and colleagues pertain only to criminal opportunities that have actually been acted on As first pointed out by Cook (1979), the ratio of arrest per crime is not a valid measure of the risk of apprehension for criminal opportunities that are not acted on Third, statistics such as arrests per crime are calculated at the county or city level and may be very poor indicators of risk at the specific locations where would-be offenders are plying their trade (Apel 2013)

2 *Studies of the Effect of Experience on Perceptions* Salient findings of the early panel perceptual deterrence studies include considerable instability in sanction risk perceptions and that nonoffenders and novice offenders have higher sanction risk perceptions than experienced offenders Paternoster and colleagues (Paternoster et al 1982, Paternoster 1983) called this an experiential effect whereby delinquent youths learned that sanction risks were lower than initially anticipated

An important study by Horney and Marshall (1992) of serious offenders finds that subjects who had higher arrest ratios, that is, self-reported arrests to self-reported crime, reported higher risk perception Since that time a large number of studies have used longitudinal data to analyze whether the effect of success or failure in avoiding apprehension influences sanction risk perceptions The analytical strategy involves relating experience with success or failure in prior survey waves with perceptions of apprehension risk in later survey waves Studies of this type by criminologists were prompted by an influential article by Stafford and Warr (1993), who distinguished between two sources of information on sanction risk one's own experience and the experience of peers A parallel literature has also appeared in economics based on the concept of "Bayesian updating"

The Bayesian updating model and the arguments of Stafford and Warr are complementary Bayesian updating formalizes their arguments The Bayesian updating model is designed to describe the pro-

[11] In the context of the decision model laid out in Sec I, these are individuals for whom the net reward of committing a crime is negative even without consideration of sanction costs

cess by which people update their perceptions of a phenomenon of interest on the basis of new information about that phenomenon. In this case, individuals would update their perceptions of sanction risk with new information regarding success or failure of themselves or their peers in avoiding apprehension. The predictions of the model depend on the specifics of its mathematical specification, but models of this type make predictions about the updating process that are intuitively sensible. The models predict that people generally do not entirely abandon prior beliefs as a result of new information. Most commonly, they only incrementally adjust them.[12]

In the case of perception of apprehension risk, this implies that the experience of apprehension will result in an incremental upward shift in risk perception, and experience of what Stafford and Warr (1993) call "apprehension avoidance" will result in an incremental reduction in risk. A second prediction of the Bayesian updating model is that the magnitude of the change will depend on the depth of prior knowledge. Individuals with more prior knowledge will tend to adjust less to new information than individuals with less prior knowledge. In the context of sanction risk perceptions, this implies that individuals with more experience with offending will make smaller adjustments in their risk perceptions based on current experience with apprehension than will individuals with less experience. Both of these predictions are supported by studies of risk perception updating.

Concerning the first prediction, numerous studies find that increases (or decreases) in perceived apprehension risk are associated with failure (success) in avoiding apprehension (Bridges and Stone 1986; Piliavin et al. 1986; Paternoster and Piquero 1995; Pogarsky, Piquero, and Paternoster 2004; Pogarsky, Kim, and Paternoster 2005; Matsueda, Kreager, and Huizinga 2006; Lochner 2007; Hjalmarsson 2008). There are, however, exceptions to this finding. Apospori and Alpert (1993) and Pogarsky and Piquero (2003) report evidence that is the reverse of this prediction. Pogarsky and Piquero attribute this to a variant of what is called the "gambler's fallacy" whereby offenders believe that bad luck is not followed by bad luck. This is an interesting possibility, but the evidence is overwhelmingly consistent with the Bayesian updating model.

[12] Prior history may be ignored if a regime change (e.g., the occupying German army arresting the Danish police force) makes it irrelevant.

Evidence consistent with the second prediction is reported in Pogarsky, Piquero, and Paternoster (2004), Matsueda, Kreager, and Huizinga (2006), and Anwar and Loughran (2011) Anwar and Loughran conducted a particularly thorough test of this prediction They analyzed a sample composed of about 1,300 adjudicated/convicted youths from Arizona and Pennsylvania enrolled in the Pathways to Desistance study who were interviewed eight times in 5 years (Mulvey 2011) Being arrested significantly increased subjective probabilities (prediction 1), but the magnitude of the change was less for more experienced offenders (prediction 2) Specifically, they showed that experienced offenders placed relatively more weight on their prior subjective probabilities and therefore updated less in response to new arrests Inexperienced offenders, by contrast, updated more by placing more weight on their current arrest ratios and less weight on their prior subjective probabilities It is also noteworthy that they concluded that the effect of arrest on subjective probabilities was specific within classes of criminal behaviors youths arrested for aggressive crimes did not update their subjective probabilities concerning income-generating crimes This finding implies that there are not spillover effects across classes of crime

3 *Studies of Situational Effects on Risk Perceptions* This grouping of studies examines the effect of situational factors on risk perceptions Particularly important in this regard are situational factors that can be manipulated by policy, such as official sanctions and police presence

As already noted, knowledge of official sanctions seems to be strongly affected by the need-to-know principle Knowledge is better, but hardly perfect, among populations with the greatest involvement in the illegal activity On the basis of the California assembly study, for example, knowledge of maximum penalties for various FBI index-type crimes was far better for incarcerated sample members than for not-incarcerated sample members

Other interesting evidence of awareness of official sanctions is the previously discussed study by Hjalmarsson (2009) of the effect of reaching the age of majority on perceptions of the risk of incarceration for auto theft She found that male respondents in the 1997 National Longitudinal Survey of Youth increased that risk by 5 2 percentage points upon reaching their age of majority The increase, however, had no statistically significant effect on behavior

Evidence on how police presence affects perceptions of apprehension risk is scant In my own work with Paternoster, we constructed sce-

narios and examined how respondent perceptions of sanction risks were affected by scenario conditions (Nagin and Paternoster 1993) We found that respondent perceptions of sanction cost in a drunk-driving scenario were higher in the scenario condition involving a police crack-down on drunk driving versus a scenario condition described as involving state police cutbacks In addition, perceptions of sanction cost were lower if surveillance could be avoided by driving on back roads In scenarios concerning peer provocation, Wikstrom et al (2012) found that adolescents reported a lower likelihood of violent response in scenario conditions in which adult monitors were present Evidence from ethnographic studies suggests that offenders are very conscious of police presence when selecting targets Wright and Decker (1994) report that burglars avoid neighborhoods with a heavy police presence and that robbers prefer to target individuals unlikely to report the crime to the police, such as drug dealers

### C *Summary*

Perceptual deterrence research has established that self-reported offending or intention to do so is linked to sanction risk perceptions The outstanding question is whether those perceptions are grounded in reality If they are not, behavior is beyond the reach of public policy The evidence on the sources of sanction risk perceptions suggests that risk perceptions are affected by an individual's own experience with success or failure at averting apprehension The link between perception and the legally authorized sanctions is less compelling but does indicate that there is at least a rough awareness among individuals in a need-to-know scenario The other key component of the sanction regime is the intensity of application of the legally authorized sanctions Research on this topic is based on general population studies of the correlations of perceptions of quantities of the ratio of arrest to crimes with estimates of these ratios calculated from official statistics For reasons discussed above, in my judgment these studies are not informative about whether perceptions of intensity among the population with need-to-know sanction risks are affected by the actual intensity of application of legally authorized sanctions

Pogarsky (2007) offers a useful taxonomy of responsiveness to legal threats for considering the implications of these summary observations The taxonomy distinguishes three groups acute conformists, deterrables, and incorrigibles In the context of the decision model laid out

in Section I, conformists are individuals for whom reward minus commission cost is negative  For reasons I have already discussed, they have no need to gain knowledge of sanction risks because there is no profit in crime even without potential sanction costs  Deterrables are individuals for whom reward minus commission cost is positive and who are attentive to sanction threats  For such individuals the issue is whether the net benefit of successful commission exceeds the potential costs attending failure  The incorrigible group is also composed of individuals for whom crime is profitable but who for whatever reason are not attentive to sanction threats  The relative sizes of the incorrigible and deterrable groups and the specific form of the sanction regime will determine the effectiveness of criminal justice public policy in preventing crime via deterrence and thereby avoiding the sanction costs of incapacitation

Future research on sanction risk perceptions needs to target Pogarsky's deterrables and incorrigibles to gain better knowledge of their awareness of the two key elements of the sanction regime  the legally authorized sanctions and the intensity of their application  For the types of crime in the FBI index this will require abandoning surveys of the general population and instead sampling populations with a large representation of deterrables and incorrigibles  An example of such a survey is the Pathways to Desistance project used in the Anwar and Loughran (2011) analysis, which sampled juveniles adjudicated for felony offenses in Philadelphia and Phoenix

Surveys targeting deterrables and incorrigibles should also include batteries of questions designed to learn how the actions of the police and other guardians affect perceptions of the probability of success, which, for the reasons described in Section V, is likely to be particularly decisive in the deterrence process

## VII  Conclusions

Over the past four decades, much has been learned about the foundations of deterrence that were laid out more than two centuries ago by Cesare Beccaria and Jeremy Bentham  We now know that deterrence is ubiquitous but that the effects are heterogeneous, ranging in size from seemingly null to very large  There is little evidence that increasing already long prison sentences has a material deterrence effect  Evidence on the deterrent effect of the certainty of punishment

is more consistent, but the source of the effect is less clear In this essay I have argued that the certainty effect stems primarily from police functioning in their official guardian role rather than in their apprehension agent role

These conclusions have important policy implications that are developed in detail in Durlauf and Nagin (2011*b*) They suggest that lengthy prison sentences cannot be justified on deterrent grounds, but rather must be justified either on crime prevention through incapacitation or on retributive grounds The crime prevention efficiency of incapacitating aged criminals is dubious, and thus the case for lengthy prison sentences must rest on retributive considerations The conclusions also suggest that crime control effectiveness would be improved by shifting resources from corrections to policing methods that enhance the effectiveness of police in their official guardian role

While much progress has been made in understanding sources of deterrence and the circumstances in which deterrence is and is not effective, much remains to be learned Theory needs to be generalized to combine the response to the threat of punishments, known as general deterrence in criminology, and the response to the experience of punishment, which I have argued is inappropriately labeled specific deterrence A second theoretical and empirical gap concerns the concept of a sanction regime and its two dimensions the legal authority for different types of sanctions and the way in which authority is administered These two dimensions combine to determine the certainty, severity, and celerity of sanction options available for punishment of a specific type of crime Theories of deterrence, however, specify sanction threats in the singular, not in the plural Theories of deterrence that conceive of sanctions in the singular do not provide the conceptual basis for considering the differential deterrent effect of different types of sanction options The empirical companion to this theoretical expansion involves assembling the data required to measure sanction regimes

A third theoretical and empirical gap involves sanction risk perceptions Deterrence is the behavioral response to the perception of sanction threats Establishing the link between risk perceptions and actual sanction regimes is imperative because policy cannot directly manipulate perceptions Unless perceptions adjust, however crudely, to changes in the sanction regime, the desired deterrent effect will not be achieved More research on the sources of sanction risk perceptions in

crime-prone populations is likely to pay large dividends for theory and policy.

The fourth major gap in theory and empirical knowledge involves a thorough testing of my contention that the guardian role, not the apprehension role, of the police is the most important source of their effectiveness in crime prevention. This theory also needs to be expanded to account for how the police and other guardians affect the distribution of criminal opportunities.

REFERENCES

Andenaes, Johannes. 1974. *Punishment and Deterrence*. Ann Arbor: University of Michigan Press.

Anwar, Shamena, and Thomas A. Loughran. 2011. "Testing a Bayesian Learning Theory of Deterrence among Serious Juvenile Offenders." *Criminology* 49:667–98.

Apel, Robert. 2013. "Sanctions, Perceptions, and Crime: Implications for Criminal Deterrence." *Journal of Quantitative Criminology* 29(1):87–101.

Apel, Robert, and Daniel S. Nagin. 2009. "Deterrence." In *Crime*, edited by James Q. Wilson and Joan Petersilia. Oxford: Oxford University Press.

Apospori, Eleni, and Geoffrey Alpert. 1993. "Research Note: The Role of Differential Experience with the Criminal Justice System in Changes in Perceptions of Severity of Legal Sanctions over Time." *Journal of Research in Crime and Delinquency* 39:184–94.

Assembly Committee on Criminal Procedure. 1968. *Deterrent Effects of Criminal Sanctions*. Sacramento: Assembly of the State of California.

Bachman, Ronet, Raymond Paternoster, and Sally Ward. 1992. "The Rationality of Sexual Offending: Testing a Deterrence/Rational Choice Conception of Sexual Assault." *Law and Society Review* 26(2):343–72.

Beccaria, Cesare. 1986. *On Crimes and Punishments*. Translated by Henry Paolucci. New York: Macmillan. (Originally published 1764.)

Becker, Gary S. 1968. "Crime and Punishment: An Economic Approach." *Journal of Political Economy* 76(2):169–217.

Bentham, Jeremy. 1988. *An Introduction to the Principles of Morals and Legislation*. Amherst, NY: Prometheus Books. (Originally published 1789.)

Blake, L., and R. T. Coupe. 2001. "The Impact of Single and Two-Officer Patrols on Catching Burglars in the Act." *British Journal of Criminology* 41:381–96.

Blumstein, Alfred, and Allen J. Beck. 1999. "Population Growth in the U.S. Prisons, 1980–1996." In *Prisons*, edited by Michael Tonry and Joan Petersilia. Vol. 26 of *Crime and Justice: A Review of Research*, edited by Michael Tonry. Chicago: University of Chicago Press.

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 295 of 517

——— 2005 "Reentry as a Transient State between Liberty and Recommitment" In *Prisoner Reentry and Crime in America*, edited by Jeremy Travis and Christy Visher Cambridge Cambridge University Press

Blumstein, Alfred, Jacqueline Cohen, and Daniel Nagin, eds 1978 *Deterrence and Incapacitation Estimating the Effects of Criminal Sanctions on Crime Rates* Washington, DC National Academies Press

Blumstein, Alfred, and Daniel Nagin 1976 "The Deterrent Effect of Legal Sanctions on Draft Evasion" *Stanford Law Review* 29(2) 241–75

Braga, Anthony A. 2008 *Police Enforcement Strategies to Prevent Crime in Hot Spot Areas* Edited by Office of Community Oriented Policing Washington, DC US Department of Justice

Braga, Anthony A , Edward A Flynn, George L Kelling, and Christine M Cole 2011 "Moving the Work of Criminal Investigators towards Crime Control" *New Perspectives in Policing* Washington, DC US Department of Justice, National Institute of Justice

Braga, Anthonly A , and David L Weisburd 2012 "The Effects of 'Pulling Levers' Focussed Deterrence Strategies on Crime" Campbell Systematic Reviews http //campbellcollaboration org/lib/project/96/

Braithwaite, John 1989 *Crime, Shame, and Reintegration* Cambridge Cambridge University Press

Brantingham, Patricia L , and Paul J Brantingham 1999 "Theoretical Model of Crime Hot Spot Generation" *Studies on Crime and Crime Prevention* 8 7–26

Bridges, George S , and James A Stone 1986 "Effects of Criminal Punishment on Perceived Threat of Punishment Toward an Understanding of Specific Deterrence" *Journal of Research in Crime and Delinquency* 23 207–39

Bureau of Justice Statistics 1999 *Prisoners in 1998* Edited by Allen J Beck and Christopher J Mumola Washington, DC Bureau of Justice Statistics

——— 2010 *Felony Defendants in Large Urban Counties, 2006* Edited by Thomas H Cohen and Tracey Kyckelhahn Washington, DC Bureau of Justice Statistics

——— 2011 *Prisoners in 2010 (Revised)* Edited by Paul Guerino, Paige M Harrison, and William J Sabol Washington, DC Bureau of Justice Statistics

——— 2012 *Correctional Populations in the United States, 2011* Edited by Lauren E Glaze and Erika Parks Washington, DC Bureau of Justice Statistics

Bushway, Shawn 1996 "The Impact of a Criminal History Record on Access to Legitimate Employment" PhD dissertation, Carnegie Mellon University

Canela-Cacho, Jose A , Alfred Blumstein, and Jacqueline Cohen 1997 "Relationship between the Offending Frequency of Imprisoned and Free Offenders" *Criminology* 35(1) 133–76

Chalfin, Aaron, Amelia M Haviland, and Steven Raphael 2013 "What Do Panel Studies Tell Us about a Deterrent Effect of Capital Punishment? A Critique of the Literature" *Journal of Quantitative Criminology* 29(1) 5–43

Charles, Kerwin K , and Steven N Durlauf 2013 "Pitfalls in the Use of Time

Series Methods to Study Deterrence and Capital Punishment" *Journal of Quantitative Criminology* 29(1) 45–66

Clarke, Ronald V 1995 "Situational Crime Prevention" In *Building a Safer Society Strategic Approaches to Crime Prevention*, edited by Michael Tonry and David P Farrington Vol 19 of *Crime and Justice A Review of Research*, edited by Michael Tonry Chicago University of Chicago Press

Cohen, Lawrence E, and Marcus Felson 1979 "Social Change and Crime Rate Trends A Routine Activity Approach" *American Sociological Review* 44(4) 588–608

Cook, Philip J 1979 "The Clearance Rate as a Measure of Criminal Justice System Effectiveness" *Journal of Public Economics* 11 135–42

——— 2009 "Potential Savings from Abolition of the Death Penalty in North Carolina" *American Law and Economics Review* 11(2) 498–529

——— 2012 "The Impact of Drug Market Pulling Levers Policing on Neighborhood Violence An Evaluation of the High Point Drug Market Intervention" *Criminology and Public Policy* 11(2) 161–64

Cook, Philip J, and Jens Ludwig 2006 "Aiming for Evidence-Based Gun Policy" *Journal of Policy Analysis and Management* 48 691–735

Cornish, Derek B, and Ronald V Clarke 1986 *The Reasoning Criminal. Rational Choice Perspectives on Offending* Secausus, NJ Springer-Verlag

Corsaro, N, E D Hunt, N K Hipple, and E F McGarrell 2012 "The Impact of Drug Market Pulling Levers Policing on Neighborhood Violence" *Criminology and Public Policy* 11 167–99

DeAngelo, Greg, and Benjamin Hansen 2008 "Life and Death in the Fast Lane Police Enforcement and Roadway Safety" Unpublished manuscript University of California, Santa Barbara, Department of Economics

Di Tella, Rafael, and Ernesto Schargrodsky 2004 "Do Police Reduce Crime? Estimates Using the Allocation of Police Forces after a Terrorist Attack" *American Economic Review* 94 115–33

Donohue, John J 2009 "Assessing the Relative Benefits of Incarceration The Overall Change over the Previous Decades and the Benefits on the Margin" In *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom*, edited by Steven Raphael and Michael A. Stoll New York Sage

Donohue, John J, and Justin Wolfers 2005 "Uses and Abuses of Empirical Evidence in the Death Penalty Debate" *Stanford Law Review* 58 791–846

——— 2009 "Estimating the Impact of the Death Penalty on Murder" *American Law and Economic Review* 11(2) 249–309

Draca, Mirko, Stephen Machin, and Robert Witt 2008 *Panic on the Streets of London Police, Crime, and the July 2005 Terror Attacks* Bonn Institute for the Study of Labor

Durlauf, Steven N, and Daniel S Nagin 2011*a* "The Deterrent Effect of Imprisonment" In *Controlling Crime Strategies and Tradeoffs*, edited by Philip J Cook, Jens Ludwig, and Justin McCrary Chicago University of Chicago Press

——— 2011*b* "Imprisonment and Crime Can Both Be Reduced?" *Criminology and Public Policy* 10 9–54

Durlauf, Steven, S Navarro, and D Rivers 2008 "On the Interpretation of Aggregate Crime Regressions" In *Crime Trends*, edited by A Goldberger and R Rosenfeld Washington DC National Academy of Sciences Press

Eck, John E 1992 "Criminal Investigation" In *What Works in Policing? Operations and Administrations Examined*, edited by Gary W Cordner and Donna C Hale Cincinnati Anderson

Eck, John E, Jeffrey S Gersh, and Charlene Taylor 2000 "Finding Crime Hot Spots through Repeat Address Mapping" In *Analyzing Crime Patterns Frontiers of Practice*, edited by Victor Goldsmith, Philip G McGuire, John H Mollenkopf, and Timothy A Ross Thousand Oaks, CA. Sage

Ehrlich, Isaac 1975 "The Deterrent Effect of Capital Punishment A Question of Life and Death" *American Economic Review* 65(3) 397–417

Erickson, Maynard L, and Jack P Gibbs 1979 "On the Perceived Severity of Legal Penalties" *Journal of Criminal Law, Criminology, and Police Science* 70 102–16

Evans, William N, and Emily G Owens 2007 "COPS and Crime" *Journal of Public Economics* 91 181–201

Ferrier, M, and Jens Ludwig 2011 "Crime Policy and Informal Social Control" *Criminology and Public Policy* 10 1029–36

Freeman, Richard B 1991 *Crime and the Employment of Disadvantaged Youths* Cambridge, MA National Bureau of Economic Research

Gibbs, Jack P 1975 *Crime, Punishment, and Deterrence* New York Elsevier

Granger, C W J 1969 "Investigating Causal Relations by Econometric Models and Cross-Spectral Methods" *Econometrica* 37 424–38

Grasmick, Harold, and George Bryjak 1980 "The Deterrent Effect of Perceived Severity of Punishment" *Social Forces* 59(2) 471–91

Greenwood, Peter, Jan Chaiken, and Joan Petersilia 1977 *The Investigation Process* Lexington, MA Lexington

Greenwood, Peter, and Angela Hawken 2002 *An Assessment of the Effect of California's Three-Strikes Law* Toronto Greenwood Associates

Grube, Joel W, and Kathleen A Kearney 1983 "A 'Mandatory' Jail Sentence for Drinking and Driving" *Evaluation Review* 7 235–46

Hawken, Angela 2010 "Behavioral Triage A New Model for Identifying and Treating Substance-Abusing Offenders" *Journal of Drug Policy Analysis* 3 1–5

Hawken, Angela, and Mark Kleiman 2009 *Managing Drug-Involved Probationers with Swift and Certain Sanctions Evaluating Hawaii's HOPE* Washington, DC National Institute of Justice

Heaton, Paul 2010 "Understanding the Effects of Antiprofiling Policies" *Journal of Law and Economics* 53(1) 29–64

Helland, E, and A Tabarrok 2007 "Does Three Strikes Deter? A Nonparametric Estimation" *Journal of Human Resources* 42(2) 309–30

Hjalmarsson, Randi 2008 "Criminal Justice Involvement and High School Completion" *Journal of Urban Economics* 63 613–30

——— 2009 "Crime and Expected Punishment Changes in Perceptions at

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 298 of 517

the Age of Criminal Majority" *American Law and Economics Review* 7 209–48

Horney, Julie, and Ineke Haen Marshall 1992 "Risk Perceptions among Serious Offenders The Role of Crime and Punishment" *Criminology* 30 575–93

Jacobs, Bruce A., and Richard Wright 2006 *Street Justice Retaliation in the Criminal Underworld* New York Cambridge University Press

Johnson, Rucker, and Steven Raphael 2012 "How Much Crime Reduction Does the Marginal Prisoner Buy?" *Journal of Law and Economics* 55(2) 275–310

Johnston Lloyd, D , Patrick M O'Malley, and Jerald G Bachman 1981 "Cannabis Decriminalization The Impact on Youth 1975–1980" In *Monitoring the Future Occasional Paper* Ann Arbor, MI Institute for Social Research

Kansas City Police Department, eds 1977 *Response Time Analysis* Kansas City Kansas City Police Department

Kennedy, David M 2009 *Deterrence and Crime Prevention Reconsidering the Prospect of Sanction.* New York Routledge

Kennedy, David M , Anthony A Braga, Anne Morrison Piehl, and Elin J Waring 2001 *Reducing Gun Violence The Boston Gun Project's Operation Ceasefire* Washington, DC US National Institute of Justice

Kessler, Daniel, and Steven Levitt 1999 "Using Sentence Enhancements to Distinguish between Deterrence and Incapacitation" *Journal of Law and Economics* 42 348–63

Kleck, Gary, and J C Barnes Forthcoming "Do More Police Lead to More Crime Deterrence?" *Crime and Delinquency* doi 10 1177/0011128710382263

Kleck, Gary, Brion Sever, Spencer Li, and Marc Gertz 2005 "The Missing Link in General Deterrence Research" *Criminology* 46 623–59

Kleiman, Mark. 2009 *When Brute Force Fails, How to Have Less Crime and Less Punishment* Princton, NJ Princeton University Press

Klein, Lawrence R , Brian Forst, and Victor Filatov 1978 "The Deterrent Effect of Capital Punishment An Assessment of the Estimates" In *Deterrence and Incapacitation Estimating the Effects of Criminal Sanctions on Crime Rates*, edited by Alfred Blumstein, Jacqueline Cohen, and Daniel S Nagin Washington, DC National Academy of Sciences

Klepper, Steven, and Daniel Nagin 1989*a* "The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited" *Criminology* 27(4) 721-46

——— 1989*b* "Tax Compliance and Perceptions of the Risks of Detection and Criminal Prosecution" *Law and Society Review* 23 209–40

Klick, Jonathan, and Alexander Tabarrok. 2005 "Using Terror Alert Levels to Estimate the Effect of Police on Crime" *Journal of Law and Economics* 46 267–79

Lee, David S , and Justin McCrary 2009 *The Deterrent Effect of Prison Dynamic Theory and Evidence* Princeton, NJ University of Princeton, Industrial Relations Section

Levitt, Steven D 1996 "The Effect of Prison Population Size on Crime Rates

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 299 of 517

Evidence from Prison Overcrowding Legislation " *Quarterly Journal of Economics* 111 319–52

——— 1997 "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime " *American Economic Review* 87 270–90

——— 1998 "Juvenile Crime and Punishment " *Journal of Political Economy* 106 1156–85

——— 2002 "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime Reply " *American Economic Review* 92 1244–50

——— 2006 "The Case of the Critics Who Missed the Point A Reply to Webster et al " *Criminology and Public Policy* 5 449–60

Liedka, Raymond V, Anne Morrison Piehl, and Bert Useem 2006 "The Crime-Control Effect of Incarceration Does Scale Matter?" *Criminology and Public Policy* 5 245–76

Lochner, Lance 2007 "Individual Perceptions of the Criminal Justice System " *American Economic Review* 97 444–60

Loftin, Colin, Milton Heumann, and David McDowall 1983 "Mandatory Sentencing and Firearms Violence Evaluating an Alternative to Gun Control " *Law and Society Review* 17 287–318

Loftin, Colin, and David McDowall 1981 "'One with a Gun Gets You Two' Mandatory Sentencing and Firearms Violence in Detroit " *Annals of the American Academy of Political and Social Science* 455(1) 150–67

——— 1984 "The Deterrent Effects of the Florida Felony Firearm Law " *Journal of Criminal Law and Criminology* 75 250–59

Ludwig, Jens, Jeffrey R Kling, and Sendhil Mullainathan 2011 "Mechanism Experiments and Policy Evaluations " *Journal of Economic Perspectives* 25(3) 17–38

MacCoun, Robert, Rosalie Liccardo Pacula, Jamie Chriqui, Katherine Harris, and Peter Reuter 2009 "Do Citizens Know Whether Their State Has Decriminalized Marijuana? Assessing the Perceptual Component of Deterrence Theory " *Review of Law and Economics* 5 347–71

Marvell, Thomas B , and C Moody Jr 1994 "Prison Population Growth and Crime Reduction " *Journal of Quantitative Criminology* 10 109–40

——— 1996 "Specification Problems, Police Levels, and Crime Rates " *Criminology* 34 609–46

Matsueda, Ross L , D A Kreager, and D Huizinga 2006 "Deterring Delinquents A Rational Choice Model of Theft and Violence " *American Sociological Review* 71 95–122

McCrary, Justin 2002 "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime Comment " *American Economic Review* 92 1236–43

McDowall, D , C Loftin, and B Wiersema 1992 "A Comparative Study of the Preventive Effects of Mandatory Sentencing Laws for Gun Crimes " *Journal of Criminal Law and Criminology* 83 378–94

Meier, R F , and W T Johnson 1977 "Deterrence as Social Control The Legal and Extralegal Production of Conformity " *American Sociological Review* 42 292–304

Minor, W W 1977 "A Deterrence-Control Theory of Crime " In *Theory of Criminology*, edited by R F Meier Beverly Hills, CA. Sage

Mulvey, E P 2011 *Highlights from Pathways to Desistance A Longitudinal Study of Serious Adolescent Offenders* Juvenile Justice Fact Sheet Washington, DC Department of Justice

Nagin, Daniel S 1998 "Criminal Deterrence Research at the Outset of the Twenty-First Century " In *Crime and Justice A Review of Research*, vol 23, edited by Michael Tonry Chicago University of Chicago Press

Nagin, Daniel S , Francis T Cullen, and Cheryl Lero Jonson 2009 "Imprisonment and Reoffending " In *Crime and Justice A Review of Research*, vol 38, edited by Michael Tonry Chicago University of Chicago Press

Nagin, Daniel S , and Raymond Paternoster 1993 "Enduring Individual Differences and Rational Choice Theories of Crime " *Law and Society Review* 27 467–99

——— 1994 "Personal Capital and Social Control The Deterrence Implications of Individual Differences in Criminal Offending " *Criminology* 32 581–606

Nagin, Daniel S , and John V Pepper, eds 2012 *Deterrence and the Death Penalty* Washington, DC National Academies Press

Nagin, Daniel S , and Greg Pogarsky 2001 "Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence Theory and Evidence " *Criminology* 39 865–92

——— 2003 "An Experimental Investigation of Deterrence Cheating, Self-Serving Bias, and Impulsivity " *Criminology* 41 167–93

Owens, Emily G 2009 "More Time, Less Crime? Estimating the Incapacitative Effects of Sentence Enhancements " *Journal of Labor Economics* 53(3) 551–79

Packer, H L 1968 *The Limits of the Criminal Sanction* Stanford, CA. Stanford University Press

Papachristos, Andrew V, Tracey L Meares, and Jeffrey Fagan 2007 "Attention Felons Evaluating Project Safe Neighborhoods in Chicago " *Journal of Empirical Legal Studies* 4 223–72

Paternoster, Raymond 1983 "Estimating Perceptual Stability and Deterrent Effects The Role of Perceived Legal Punishment in the Inhibition of Criminal Involvement " *Journal of Criminal Law and Criminology* 74 210–97

——— 2010 "How Much Do We Really Know about Criminal Deterrence?" *Journal of Criminal Law and Criminology* 10(3) 765–823

Paternoster, Raymond, and Alex Piquero 1995 "Reconceptualizing Deterrence An Empirical Test of Personal and Vicarious Experiences " *Journal of Research in Crime and Delinquency* 32 251–86

Paternoster, Raymond, Linda E Saltzman, Theodore G Chiricos, and Gordon P Waldo 1982 "Perceived Risk and Deterrence Methodological Artifacts in Perceptual Deterrence Research " *Journal of Criminal Law and Criminology* 73 1238–58

Piliavin, Irving, Craig Thornton, Rosemary Gartner, and Ross L Matsueda

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 301 of 517

1986 "Crime, Deterrence, and Rational Choice" *American Sociological Review* 51 101–19

Piquero, Alex, Raymond Paternoster, Greg Pogarsky, and Thomas A Loughran 2011 "Elaborating the Individual Difference Component in Deterrence Theory" *Annual Review of Law and Social Science* 7 355–60

Pogarsky, Greg 2007 "Deterrence and Individual Differences among Convicted Offenders" *Quantitative Criminology* 23(1) 59–74

Pogarsky, Greg, KiDuek Kim, and Raymond Paternoster 2005 "Perceptual Change in the National Youth Survey: Lessons for Deterrence Theory and Offender Decision-Making" *Justice Quarterly* 22 1–29

Pogarsky, Greg, and Alex R Piquero 2003 "Can Punishment Encourage Offending? Investigating the 'Resetting' Effect" *Journal of Research in Crime and Delinquency* 40 95–120

Pogarsky, Greg, Alex R Piquero, and Raymond Paternoster 2004 "Modeling Change in Perceptions about Sanction Threats The Neglected Link in Deterrence Theory" *Journal of Quantitative Criminology* 20 343–69

Poutvaara, Panu, and Mikael Priks 2006 "Hooliganism in the Shadow of a Terrorist Attack and the Tsunami Do Police Reduce Group Violence?" Working Paper no 1882 Munich Center for Economic Studies and Ifo Institute for Economic Research

Raphael, Steven 2006 "The Deterrent Effects of California's Proposition 8 Weighing the Evidence" *Criminology and Public Policy* 5 471–78

Raphael, Steven, and Jens Ludwig 2003 "Prison Sentence Enhancements The Case of Project Exile" In *Evaluating Gun Policy Effects on Crime and Violence*, edited by Jens Ludwig and Philip J Cook. Washington, DC Brookings Institution Press

Raphael, Steven, and Michael A. Stoll 2009 "Why Are So Many Americans in Prison?" In *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom*, edited by Steven Raphael and Michael A Stoll New York Sage

Reuter, Peter, and Howard Pollack 2012 "Good Markets Make Bad Neighbors Regulating Open-Air Drug Markets" *Criminology and Public Policy* 11(2) 211–20

Roncek, Dennis W 2000 "Schools and Crime" In *Analyzing Crime Patterns Frontiers of Practice*, edited by Victor Goldsmith, Philip G McGuire, John H Mollenkopf, and Timothy A Ross Thousand Oaks, CA. Sage

Ross, H Laurence 1973 "Law, Science, and Accidents The British Road Safety Act of 1967" *Journal of Legal Studies* 2 1–78

——— 1982 *Deterring the Drinking Driver Legal Policy and Social Control* Lexington, MA Lexington

Sherman, Lawrence W 1990 "Police Crackdowns Initial and Residual Deterrence" In *Crime and Justice A Review of Research*, vol 12, edited by Michael Tonry and Norval Morris Chicago University of Chicago Press

——— In this volume "The Rise of Evidence-Based Policing Targeting, Testing, and Tracking"

Sherman, Lawrence W, and Richard A Berk 1984 "The Specific Deterrent

Effects of Arrest for Domestic Assault " *American Sociological Review* 49 261–72

Sherman, Lawrence W, and John E Eck. 2002 "Policing for Prevention " In *Evidence Based Crime Prevention*, edited by Lawrence W Sherman, David Farrington, and Brandon Welsh New York Routledge

Sherman, Lawrence W, Patrick Gartin, and Michael Buerger 1989 "Hot Spots of Predatory Crime Routine Activities and the Criminology of Place " *Criminology* 27 27–55

Sherman, Lawrence, and David Weisburd 1995 "General Deterrent Effects of Police Patrol in Crime 'Hot Spots' A Randomized Study" *Justice Quarterly* 12 625–48

Shi, Lan 2009 "The Limits of Oversight in Policing Evidence from the 2001 Cincinnati Riot " *Journal of Public Economics* 93 99–113

Snell, T L 2010 *Capital Punishment 2009—Statistical Tables* Washington, DC US Department of Justice

Spelman, William 2000 "What Recent Studies Do (and Don't) Tell Us about Imprisonment and Crime " In *Crime and Justice A Review of Research*, vol 27, edited by Michael Tonry Chicago University of Chicago Press

Spelman, William, and Dale K. Brown 1981 *Calling the Police A Replication of the Citizen Reporting Component of the Kansas City Response Time Analysis* Washington, DC Police Executive Research Forum

Stafford, Mark C, and Mark Warr 1993 "A Reconceptualization of General and Specific Deterrence " *Journal of Research in Crime and Delinquency* 30 123–35

Stolzenberg, Lisa, and Stewart J D'Alessio 1997 "'Three Strikes and You're Out' The Impact of California's New Mandatory Sentencing Law on Serious Crime Rates " *Crime and Delinquency* 43(4) 457–69

Tittle, Charles 1977 "Sanction Fear and the Maintenance of Social Order " *Social Forces* 55 579–96

——— 1980 *Sanctions and Social Deviance The Question of Deterrence* New York. Praeger

Tonry, Michael 1996 *Sentencing Matters* Oxford Oxford University Press

——— 2009 "The Mostly Unintended Effects of Mandatory Penalties Two Centuries of Consistent Findings " In *Crime and Justice A Review of Research*, vol 38, edited by Michael Tonry Chicago University of Chicago Press

Vollaard, Ben 2013 "Preventing Crime through Selective Incapacitation " *Economic Journal* 123(567) 262–84

Waldfogel, Joel 1994 "The Effect of Criminal Conviction on Income and the Trust 'Reposed in the Workmen'" *Journal of Human Resources* 29 62–81

Webster, Cheryl Marie, Anthony Doob, and Franklin Zimring 2006 "Proposition 8 and Crime Rates in California The Case of the Disappearing Deterrent " *Criminology and Public Policy* 5 417–48

Weisburd, David, Shawn Bushway, Cynthia Lum, and Su-Ming Yang 2004 "Trajectories of Crime at Places A Longitudinal Study of Street Segments in the City of Seattle " *Criminology* 42 238–320

Weisburd, David, and John Eck 2004 "What Can Police Do to Reduce

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 303 of 517

Crime, Disorder, and Fear?" *Annals of the American Academy of Political and Social Science* 593 42–65

Weisburd, David, Tomar Einat, and Matt Kowalski 2008 "The Miracle of the Cells An Experimental Study of Interventions to Increase Payment of Court-Ordered Financial Obligations" *Criminology and Public Policy* 7 9–36

Weisburd, David, and Lorraine Green 1995 "Policing Drug Hot Spots The Jersey City Drug Market Analysis Experiment" *Justice Quarterly* 12 711–35

Wikstrom, Per-Olof H, D Oberwittler, K. Treiber, and B Hardie 2012 *Breaking Rules The Social and Situational Dynamics of Young People's Urban Crime* Oxford Oxford University Press

Williams, Kirk R, Jack P Gibbs, and Maynard L Erickson 1980 "Public Knowledge of Statutory Penalties The Extent and Basis of Accurate Perception" *Sociological Review* 23 105–28

Williams, Kirk R, and Richard Hawkins 1986 "Perceptual Research on General Deterrence A Critical Overview" *Law and Society Review* 20 545–72

Wilson, J M, and S Chermak 2011 "Community-Driven Violence Reduction Programs" *Criminology and Public Policy* 10 993–1027

Wood, Peter B, and David C May 2003 "Racial Differences in Perceptions of Severity of Sanctions A Comparison of Prison with Alternatives" *Justice Quarterly* 20(3) 605–31

Wright, Richard T, and Scott H Decker 1994 *Burglars on the Job Streetlife and Residential Break-ins* Boston Northeastern University Press

Zimring, Franklin, and Gordon Hawkins 1973 *Deterrence The Legal Threat in Crime Control* Chicago University of Chicago Press

Zimring, Franklin E, Gordon Hawkins, and Sam Kamin 2001 *Punishment and Democracy Three Strikes and You're Out in California* New York Oxford University Press

# EXHIBIT N

## to Expert Report of Professor Louis Klarevas

Journal of Economic Psychology 47 (2015) 1–16

Contents lists available at ScienceDirect

Journal of Economic Psychology

journal homepage: www.elsevier.com/locate/joep

Review

# Like ripples on a pond: Behavioral spillovers and their implications for research and policy

Paul Dolan, Matteo M. Galizzi *

*Department of Social Policy, Behavioral Research Lab, London School of Economics, UK*
*Centre for the Study of Incentives in Health, Institute of Psychiatry, King's College London, UK*

ARTICLE INFO

*Article history:*
Received 30 March 2014
Received in revised form 15 December 2014
Accepted 18 December 2014
Available online 5 January 2015

*JEL classification:*
C18
C91
C93
D03

*PsycINFO classification:*
2260
2346
2360
3040

*Keywords:*
Behavioral spillovers
Policy-making
Nudges
Crowding in/out

ABSTRACT

No behavior sits in a vacuum, and one behavior can greatly affect what happens next. We propose a conceptual frame within which a broad range of behavioral spillovers can be accounted for when applying behavioral science to policy challenges. We consider behaviors which take place sequentially and are linked, at a conscious or unconscious level, by some underlying motive. The first behavior leads to another behavior which can either work in the same direction as the first (*promoting* spillover), or push back against it (*permitting* or *purging* spillover). Looking through this conceptual lens at the existing evidence, we find pervasive evidence for all kinds of spillover effects across a variety of fields and domains. As a result, behavioral scientists, especially those seeking to inform policy, should try to capture all the ripples from one behavior to the next when a pebble of intervention is thrown in the pond, and not just at the immediate behavioral splash it makes.
© 2014 The Authors. Published by Elsevier B.V. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

**Contents**

1. Introduction ........ 2
2. Behavioral spillovers ........ 2
3. Promoting spillovers ........ 6
4. Permitting spillovers ........ 7
5. Purging spillovers........ 8
6. Facilitating conditions for promoting, permitting, and purging spillovers ........ 8

* Corresponding author at: Department of Social Policy, Behavioral Research Lab, LSE Health, London School of Economics, Houghton Street, G09 Cowdray House, WC2A2AE London, UK. Tel.: +44 020 7955 5386.
*E-mail address:* m.m.galizzi@lse.ac.uk (M.M. Galizzi).

http://dx.doi.org/10.1016/j.joep.2014.12.003
0167-4870/© 2014 The Authors. Published by Elsevier B.V.
This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

7. Future directions and challenges. . . . . . . . . . 10
Acknowledgments . . . . . . . . . . 11
References . . . . . . . . . . 11

## 1. Introduction

Policymakers have begun taking seriously the results of behavioral research (Camerer, 1999; Camerer, Issacharoff, Loewenstein, O'Donoghue, & Rabin, 2003; Congdon, Kling, & Mullainathan, 2011; Dolan et al., 2011; Shafir, 2012; Sunstein, 2011; Thaler & Sunstein, 2003). This trend is to be welcomed but the various discussions of the evidence are typically made in 'behavioral silos', focusing on one specific behavioral response at a time (Thøgersen, 1999a). Yet no behavior sits in a vacuum and we need to consider the possible spillover effects from one behavioral response to the next.

Imagine an intervention that successfully reduces energy consumption in the home, e.g. by installing LED light bulbs, but that has the spillover effect of increasing energy use elsewhere, e.g. through leaving more lights on at work. Some or all of the benefits from the reduction in $CO_2$ emissions could be lost (Gillingham, Kotchen, Rapson, & Wagner, 2013; Jacobsen, Kotchen, & Vandenbergh, 2012; Thøgersen & Crompton, 2009; Tiefenbeck, Staake, Roth, & Sachs, 2013). To inform policy, we should ideally capture all ripples of behavior when a pebble of intervention is thrown in the pond. The '*mapping of these ripples is now one of the most exciting pursuits in psychological research*' (Kahneman, 2011, p.53).

## 2. Behavioral spillovers

We propose a conceptual frame within which a broad range of 'behavioral spillovers' (Thøgersen, 1999a) can be systematically interpreted when applying behavioral science to policy challenges. Our framework is based on three building blocks.

First, we begin by assuming that two *different* behaviors take place sequentially: *behavior 1* is followed by *behavior 2*. This differentiates the analysis of behavioral spillovers from the long-established, distinct, literature on *adaptive learning*, which typically focuses on the repetition of the *same* behavior over time (e.g. learning in repeated games, as opposed to playing one-shot games, Fudenberg & Levine, 1998; Goeree & Holt, 2001; Vega-Redondo, 1996).

The typical situation we have in mind is a sequence of two different behaviors where *behavior 1* is the target of an intervention. An intervention is defined broadly here: it could be a policy intervention by a public decision-maker, or an experimental manipulation by a researcher. Implicitly, the following discussion is conducted on the presumption that we can compare a 'treatment' case where *behavior 1* is targeted by an intervention with a 'control' group where there is no intervention. What we would like to emphasize, however, is that the key focus of our interest here is what happens to *behavior 2* as the consequence of the intervention.

It is not uncommon, in fact, to find studies in the economics and psychology literatures where it is looked at when and how a policy intervention could '*backfire*' in the sense of having unintended compensatory or offsetting effects with respect to the ones originally envisaged by the decision-maker (e.g. Schultz, Nolan, Cialdini, Goldstein, & Griskevicius, 2007). For instance, for interventions in the context of risk and safety (e.g. seat belts in cars), the theories of *risk compensation*, *risk homeostasis*, or *behavioral adaptation* have since long argued that people can adjust their behavior in response to the perceived level of risk (Asch, Levy, Shea, & Bodenhorn, 1991; Bhattacharyya & Layton, 1979; Cohen & Einav, 2003; Evans & Graham, 1991; Garbacz, 1990a, 1990b, 1991, 1992; Peltzman, 1975; Rudin-Brown & Jamson, 2013; Schoemaker, 1993; Viscusi & Cavallo, 1994; Wilde, 1982a, 1982b, 1998; Wilde, Robertson, & Pless, 2002). This is an interesting but distinct question, the difference with our focus here being that those analyses typically look at the impact of the intervention on the *same* behavior originally targeted, not at what happens to *another* behavior occurring later on.

To narrow further down the scope of our analysis, we exclude from our remit two types of 'interventions' that deserve separate investigation. The first one refers to all those situations where *behavior 1* is not conceptually distinguishable from the intervention itself. Some archetypical examples of these situations refer to the literature on *priming* (Bargh, 1990; Gollwitzer, Heckhausen, & Steller, 1990). Priming occurs unconsciously when '*the passive activation of trait categories in one situational context carried over to influence social judgments in subsequent, ostensibly unrelated contexts*' (Bargh, 2006, p.148). Among the many examples, more self-sufficient behavior was prompted by the mere presence of a pile of Monopoly notes or a screensaver with various denominations of currency (Vohs, Mead, & Goode, 2006), whereas more cooperative, or competitive, behavior was prompted by the mere presence of a backpack, or a briefcase, respectively (Kay, Wheeler, Bargh, & Ross, 2004). As another 'ideomotor' example, subjects shown pictures of a library spoke more quietly thereafter than subjects shown pictures of a railway station (Aarts & Dijksterhuis, 2003).

While in all these priming situations, the intervention clearly affects a subsequent behavior, it is also clear that '*behavior 1*' consists of the mere exposure to the priming manipulation itself which, more often than not, is a subliminal presentation of words or images. In other words, rather than a triplet '*intervention – behavior 1 – behavior 2*' most priming situations consist of a manipulation and *a single* behavior.

The second area excluded from our analysis pertains to *price mechanisms* and financial incentives. For instance, the overall use of energy can increase in response to an environmental policy intervention that results in lower costs of the energy. We

do not see this effect as a 'behavioral spillover', though: it is merely a market adjustment to a relative price change, similarly to many other 'rebound' effects commonly referred to as '*Jevons paradoxes*' (Alcott, 2005; Jevons, 1866).

Analogously, the economic and psychology literature on *financial incentives* has since long highlighted the '*hidden costs*' of incentives (Fehr & List, 2004), including crowding out of intrinsic motivation (Deci, Koestner, & Ryan, 1999; Frey & Oberholzer-Gee, 1997); changing social norms or individual beliefs about social norms (Gneezy & Rustichini, 2000a, 2000b; Heyman & Ariely, 2004); interacting in unpredictable ways with reciprocity, reputation, and social comparison concerns (Ariely, Bracha, & Meier, 2009; Dur, Non, & Roelfsema, 2010; Fehr & Gachter, 1997; Gachter & Thoni, 2010; Greiner, Ockenfels, & Werner, 2011; Rigdon, 2009); and 'choking' due to the anxiety aroused by relating payment to performance (Ariely, Gneezy, Loewenstein, & Mazar, 2009). In such cases, incentives may '*backfire*', in that they result in the opposite effects to the ones originally envisaged (Bénabou & Tirole, 2003, 2006; Fehr & Falk, 2002; Kamenica, 2012). The focus of such 'unintended consequences' of financial incentives, however, has mainly been on the *same* behavior originally targeted by the incentive. With few exceptions (e.g. Al-Ubaydli, Andersen, Gneezy, & List, in press; Dolan & Galizzi, 2014), this stream of literature has not looked at the spillover effects that incentives may have on behaviors *other* than the one directly targeted. For the same reasons highlighted above about the studies on risk compensation and price adjustments, we thus exclude the literature on financial incentives from our analysis, and reiterate that our core interest here is on what happens to *behavior 2* after the intervention.

The second building block of our conceptual framework is that we assume that the two subsequent behaviors are linked, at a conscious or unconscious level, by some underlying *motive*. With motives here we mean a broadly intended range of factors that drive behavior (Bargh & Barndollar, 1996). When behaviors occur under conscious deliberation and individuals are fully aware of their *preferences*, the motive can be represented as the argument of a standard utility function, as typically postulated in traditional economics models.

More generally, motives can also be conceptualized as *deep preferences*, '*self-defining*' or '*identity goals*' (Wicklund & Gollwitzer, 1981, 1982), or '*long-term goals, major affiliations, and basic values*' (Baumeister, 1986): individuals may at times be uncertain over these motives, may not consciously attend to them, or may even be unaware of them, because, for instance, of imperfect recall, or because distracted by other more salient or tempting options (Aarts & Dijksterhuis, 2000; Akerlof & Kranton, 2000; Bargh & Barndollar, 1996; Bargh, Gollwitzer, Lee-Chai, Barndollar, & Trotschel, 2001; Bénabou & Tirole, 2006, 2011; Chartrand & Bargh, 1996; DellaVigna, 2009; Dijksterhuis & Bargh, 2001; Dijksterhuis, Bos, Nordgren, & van Baaren, 2006; Dijksterhuis & Nordgren, 2006; Gneezy, Gneezy, Riener, & Nelson, 2012; Gneezy, Imas, Brown, Nelson, & Norton, 2012; Gollwitzer, 1990; Kahneman, 2003; Kruglanski et al., 2002; Norton, 2012; Novemsky & Dhar, 2005; Trope & Fishbach, 2000).

To visualize this most general case, what we have in mind is an analytical framework such as the prominent '*Beliefs As Assets*' model for moral behavior by Bénabou and Tirole (2011), to which we refer for a full theoretical analysis. For the sake of illustration only, we report here a simplified variant of the Bénabou and Tirole (2011) model inspired to the '*general satisfaction*' idea by Frijters (2000) and Van Praag, Frijters, and Ferrer-i-Carbonell (2003), and to its extension in terms of the *Adaptive Global Utility Model* (*AGUM*) by Bradford and Dolan (2010).

In our setting, we imagine that an individual derives satisfaction from $k = 1,\ldots,K$ primitive life-satisfaction 'accounts': for instance, wealth, health, career, family, morality, friendship, pleasure, purpose, political engagement, the environment, and so on. In this setting, *motives* correspond to those life satisfaction accounts, the '*deep preferences*' driving individual choices and actions. The multiplicity of motives reflects the fact that, in reality, we may hold different, possibly conflicting, identity goals simultaneously (Baumeister & Vohs, 2007; Carver, 2003; Carver & Scheier, 1998; Dhar & Simonson, 1999; Fishbach & Dhar, 2005; Kruglanski et al., 2002; Louro, Pieters, & Zeelenberg, 2007; Simon, 1967; Stroebe, Mensink, Aarts, Schut, & Kruglanski, 2008; Susewind & Hoelzl, 2014), and corresponds to the case of '*multidimentional identity*' in Bénabou and Tirole (2011).

We next imagine that $X^N$ represents the space of all possible *behavioral outcomes*. For instance, think at an outcome as a consumption bundle, an allocation of money across different destinations, or a distribution of time or effort among different activities. A specific behavioral outcome $x_i \in X^N$ is thus an observable metrics: the amount of money spent in a luxury good or donated to a charity; the hours in a day spent working, exercising, or volunteering; the number of $CO_2$ emissions. Individuals are assumed to have a, conscious or unconscious, single preference relation, $\geqslant$, which supports a one-dimensional ranking across all pair-wise comparisons of possible outcomes $(x_i, x_j) \in X^N$ where $(x_i, x_j)$ represent $N$-dimensional vectors of specific points in the overall behavioral outcomes space $X^N$.

What is more, we assume that there exists a *profile* of preference relations

$$P \equiv (\geqslant_1, \geqslant_2, \ldots, \geqslant_k) \quad (1)$$

which maps the possible outcomes $(x_i, x_j) \in X^N$ onto rankings defined over each of the $k = 1,\ldots,K$ primitive life-satisfaction 'accounts' for a specific individual. Thus, for instance, one behavioral outcome can be preferred to an alternative over a motive (e.g. pleasure, career) but not over another one (e.g. health, family).

As in the *AGUM* model, one can visualize each preference relation using functional relationships $v^k(x_i) : X^N \to R^+, \quad \forall\, k = 1, \ldots, k$, such that $v^k(x_i) \geqslant v^k(x_j)$ if and only if $x_i \geqslant_k x_j$. These functions can be rationalized as value functions of the *direct* satisfaction from a behavioral outcome for each of the $k = 1,\ldots,K$ primitive accounts, such that the single vector of outcomes $x_i$ simultaneously generates $K$ measures of direct life satisfaction. This reflects the idea that the same behavior or mean can serve more than one identity goal ('*multifinality*' in Shah, Friedman, and Kruglanski (2002)).

Importantly, besides direct satisfaction from a behavioral outcome, each motive's life satisfaction also includes indirect utility from *self-perception* or *self-image* $I^k(\cdot)$ over that same account. This reflects the idea that we may derive satisfaction not just from tangible behavioral outcomes, but also from the accumulation of signals and beliefs about our own identities (Bénabou & Tirole, 2011; Gomez-Minambres, 2012; Mazar, Amir, & Ariely, 2008; Nisan & Horenczyk, 1990; Tesser, 1988; Wicklund & Gollwitzer, 1981). For instance, in the prominent context of donations, one can derive direct utility from contributing to a public good ('*pure altruism*') but also indirectly from feeling good about the act of giving itself (e.g. the '*warm-glow*' in Andreoni (1990)). In line with the '*self-inference*' process described by Bénabou and Tirole (2011), in fact, individuals derive indirect satisfaction from signals because they may have no conscious access to their deep preferences, or because they recall their true motives and identities only imperfectly. The indirect satisfaction from self-image signals, moreover, is a key channel through which the various self-regulation mechanisms based on entitlement and justification take place (De Witt Huberts, Evers, & De Ridder, 2014; Hsee, 1995; Kivetz & Simonson, 2002; Kivetz & Zheng, 2006; Merritt, Effron, & Monin, 2010; Mukhopadhyay & Johar, 2009).

Alike in Bénabou and Tirole (2011) we imagine that the accumulation of *self-image* follows a dynamic process, where the levels of $I^k(\cdot)$ at $t = 2$ typically depends on the outcomes of behavior 1 and on the initial level of self-image in that account, that is: $I^k_{t=2} = I^k(x^k_{t=1}; I^k_{t=1})$ where $t = 1, 2$ refers to the time when behavior 1 and 2 take place respectively. This reflects the idea that self-beliefs are, to some extent, '*malleable through actions*' (Bénabou & Tirole, 2011). In what follows we assume that there are no links between self-images across different motives (e.g. '*being healthy*' and '*being green*'), but we will return to this point in Section 7.

We further imagine that the account value functions can be combined into an ultimate '*global life-satisfaction*' function as in Frijters (2000) and Van Praag et al. (2003). Alike in the *AGUM* model, one way to do it is by attaching increasing and quasi-concave weights $\omega_k(\cdot)$ to each particular life account, and, for instance, taking a linear generalized utilitarian form for the global satisfaction such as

$$U(x) = \sum_k \omega_k(\cdot) V(v^k(x), I^k(\cdot)) \tag{2}$$

The weight attached, consciously or unconsciously, to a specific life satisfaction account reflects the facts that the value of a given motive can be known only at a subconscious level (Bodner & Prelec, 2003; Fishbach, Friedman, & Kruglanski, 2003; Simon, 1967), and that at times people may even be unaware of the existence of some accounts (e.g. one may be unaware of career or family motives before getting a job, or meeting the significant other, respectively). This also reflects the idea of '*multidimentional identity*' in Bénabou and Tirole (2011), where people tradeoff between different dimensions of identity '*linked by uncertainty over their relative value*' (p.815). Equivalently, the weights attached to each life satisfaction account can be interpreted in terms of *attention* (Chabris & Simons, 2011; Dolan, 2014; Kahneman, 1973; Moskowitz, 2002), or as indicators of the cognitive '*accessibility*' of each specific construct: the higher is the weight, the more accessible is the motive (Forster, Liberman, & Higgins, 2005; Goschke & Kuhl, 1993; Higgins & King, 1981; Kruglanski, 1996; Kruglanski & Webster, 1996; Shah & Kruglanski, 2002, 2003; Srull & Wyer, 1979; Zeigarnik, 1927).

Finally, alike in the *AGUM* model, we imagine that the weights attached to each account can also change over time following a dynamic process similar to the one imagined for the self-images. In particular, the weight of motive $k$ at time $t = 2$, $\omega_k(\cdot)$ typically depends on the initial level of the weight at $t = 1$, and on the outcomes of behavior 1, that is $\omega^k_{t=2} = \omega^k(x^k_{t=1}; \omega^k_{t=1})$ where $t = 1, 2$ refers to the time when behavior 1 and 2 take place respectively. Here too we imagine that there are no cross-motives effects on the weights. Such a dynamics of weights readjustment does not necessarily need to be conscious or deliberate, though. Weights attached to different motives can shift as result of an unconscious reprioritization process where an unattended goal 'demands' a higher priority by '*intruding on awareness*' (Carver, 2003; Simon, 1967). For instance, not only intrusive thoughts, rumination, and dreams, but also moods, affects, and emotions can often manifest themselves as calls for reprioritizing weights across identity motives (Carver, 2003; Forster et al., 2005; Fredrickson, 1998; Isen, 1987, 2000; Isen & Simmonds, 1978; Lewin, 1951; Martin & Tesser, 1996; Simon, 1967; Tesser, Crepaz, Collins, Cornell, & Beach, 2000; Trope & Neter, 1994; Trope & Pomerantz, 1998).

In our setting, thus, having a high *motive* is the amalgamation of three main factors: enjoying direct satisfaction from the behavioral outcome ('*I have just donated £10 to a good cause*'); benefitting from the associated self-inference ('*I am a good person*'); and, consciously or unconsciously, attaching a high weight to that motive in terms of life satisfaction ('*Being a good person makes me happy*').

This conceptualization of the motives naturally lends itself to introduce the last building block of our framework, the link between behavior 1 and 2. In our framework, in fact, the first behavior leads to a subsequent behavior which, as the motive is concerned, can either work in the same direction as the first, or push back against it.

Consider the initial motive to reduce $CO_2$ emissions by cycling or car-sharing to work (Evans et al., 2013). This could lead to another behavior which also reduces emissions, e.g. by using the train instead of the airplane for domestic travel. We refer to this sequence of behaviors with concordant sign as a *promoting* spillover: the initial push to the motive promotes a further increase later on.

The same first behavior, however, might instead lead to another behavior which increases emissions, e.g. using the car more with our family. We refer to this as a *permitting* spillover: the initially increased motive permits a subsequent disengagement from the same. There is then a final class of spillovers, which we call *purging*, where the second behavior is motivated out of a, conscious or unconscious, desire to undo some of the damage caused by the first behavior. For example, we

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 309 of 517

might use the train for holidays in response to using long-haul flights for work, so that the 'environmental' motive is first undermined and then restored.

In practice, the sequence of concordant or discordant signs can be visualized referring to the observable *behavioral outcome*, while the motive's *self-image* and *weight* mainly illustrate the mechanisms linking the two behaviors. Consider these further examples.

Wearing a charity's pin today (*behavior 1*) can have a number of effects on tomorrow's charitable giving (*behavior 2*). On the one hand, it can highlight an underlying 'pro-sociality' motive of which we were previously unsure or even unaware, leading us to attach a higher weight to that account tomorrow. This more accessible motive, in turn, may lead us to deliberately maximize the direct utility from donating to a charity tomorrow, thus triggering a *promoting* behavioral spillover. Similarly, signing at the top of a tax return form before filling it out, can lead to unconsciously highlight a previously unattended 'morality' account, with the result of cheating less in the subsequent tax declaration (Shu, Mazar, Gino, Ariely, & Bazerman, 2012).

On the other hand, if the 'pro-sociality' motive has already some positive weight attached to it, today's wearing of the charity's pin can boost our self-image of 'being a do-gooder'. In turn, this can lead to *permitting* spillovers through two channels. If the utility from self-image is a, perfect or imperfect, substitute for the direct satisfaction from donating money, we can end up donating *less* to a charity tomorrow. Alternatively, or concurrently, having already accomplished, or attended to, the 'pro-sociality' motive today means that resources can be, consciously or unconsciously, redirected toward other accounts tomorrow, with a consequent reprioritization of weights that also leads to donate *less* to the charity tomorrow.

On the other hand, a small lie today when claiming a welfare benefit (*behavior 1*) can have various effects on tomorrow's 'moral' behavior (*behavior 2*). For instance, as long as the 'morality' motive is already accessible, today's lying can depress our self-image of 'being a good person'. In turn, this can lead to *purging* spillovers through two channels. If the disutility from a depressed self-image is a, perfect or imperfect, substitute for the direct satisfaction from paying taxes, we can cheat *less* in our tax declaration tomorrow in order to restore our satisfaction in that account. Alternatively, or concurrently, depressed self-image leads to a weight reprioritization that increases the accessibility of the 'morality' motive tomorrow. This heightened accessibility, in turn, may also lead us to cheat *less* in our tax declaration tomorrow.

Finally, one can also imagine cases of *all-negative promoting* spillovers. For instance, lying to claim a welfare benefit today can compress or temporarily 'shut down' the underlying 'morality' motive, leading us to no longer attach any weight to that account of life satisfaction tomorrow. This reduced accessibility, in turn, may lead us to cheat *more* in the tax declaration tomorrow under the presumption that our moral identity 'has already gone', thus triggering a 'downward spiral' all-negative promoting spillover.

Fig. 1 illustrates some further possible examples of promoting, permitting, and purging spillovers in the context of *health* behavior.

Our tri-partition of behavioral spillovers is thus in line with the well-established distinctions in psychology between *consistency* (assimilation) and *contrast* (compensatory) behavior (Bargh et al., 2001; Bem, 1972; Cialdini, Trost, & Newsom, 1995; Conway & Peetz, 2012; Cooper & Fazio, 1984; Dijksterhuis & Bargh, 2001; Dijksterhuis et al., 1998; Festinger, 1957; Gneezy, Imas et al., 2012; Liberman, Forster, & Higgins, 2007; Mussweiler, 2003; Norton, 2012; Schwarz & Bless, 2005); and between *reinforcing* (highlighting) and *compensating* (balancing) self-regulatory dynamics (Baumeister, Heatherton, & Tice, 1994; Carver, 2003; Carver & Scheier, 1981, 1998; Dhar & Simonson, 1999; Fishbach & Choi, 2012; Fishbach & Dhar, 2005; Fishbach, Koo, & Finkelstein, in press; Fishbach & Zhang, 2008; Fishbach, Zhang, & Koo, 2009). In economics, our tri-partition echoes the distinctions between motivation *crowding-in* and *crowding-out*; *complement* and *substitution* effects; and *positive* and *negative externalities* (Bénabou & Tirole, 2003, 2006; Frey & Oberholzer-Gee, 1997; Gneezy & Rustichini, 2000a, 2000b).

Also, our tri-partition openly reckons that, when it comes to compensatory or contrast behavior, the order of discordant signs really matters (Forster, Grant, Idson, & Higgins, 2001; Truelove, Carrico, Weber, Raimi, & Vandenbergh, 2014). The psychological drivers beyond *permitting* and *purging* spillovers, in fact, are conceptually and practically very distinct. The permitting versus purging distinction, for instance, is closely in line with '*self-completion theory*' (Wicklund & Gollwitzer, 1981, 1982), which postulates that, upon achieving an identity-relevant goal, we can feel 'complete' and thus 'temper' our future identity goal strivings. Conversely, upon experiencing a failure in pursuing an identity goal, we can feel 'incomplete' and step up our goal striving. The distinction is also in line with the closely connected '*cybernetic control*', '*feedback-loop*', or '*cruise control*' model (Carver, 2003; Carver & Scheier, 1981, 1982, 1990, 1998): while after feeling a failure we

| | | Behavior 2 | |
|---|---|---|---|
| | | Eat healthy | Eat Less Healthy |
| Behavior 1 | A run after work | **Promoting**<br>*I ran an hour, let's keep up the good work* | **Permitting**<br>*I ran an hour, I deserve a big slice of cake* |
| | Sofa-sitting after work | **Purging**<br>*I've been lazy today, best not eat so much tonight* | **Promoting**<br>*I've been lazy today, so what the heck, let's have a big slice of cake* |

**Fig. 1.** Examples of promoting, permitting, and purging behavioral spillovers in health behavior.

**Fig. 2.** Main types of promoting, permitting, and purging behavioral spillovers documented in the behavioral science literatures.

typically try harder in an attempt to catch up, after experiencing a progress in excess of our envisaged target we are likely to '*coast*' a little, '*not necessarily stop, but ease back*' (Carver, 2003, p. 246). In our setting, this temporary 'pull back' dynamics is one of the mechanisms explaining how 'freed up' resources can lead to reprioritize weights across motives.

All the above conceptualizations in psychology and economics have insofar proceeded along parallel streams, and our framework attempts to bring them closer together. Looking at the evidence from behavioral science through our conceptual lens, we can see that spillovers are documented extensively across a variety of fields and domains: Fig. 2 summarizes the main types of promoting, permitting, and purging spillovers.

## 3. Promoting spillovers

The two archetypical promoting spillovers are the *cognitive dissonance* (Bem, 1972; Festinger, 1957; Festinger & Carlsmith, 1959) and the *foot-in-the-door* effects (Burger, 1999; Freedman & Fraser, 1966; Pliner, Hart, Kohl, & Saari, 1974). What they have in common is that both essentially posit a *preference for consistency* (Alberracin & Wyler, 2000; Cialdini, 1984; Cialdini et al., 1995): we tend to behave consistently with our prior actions and beliefs. So, for instance, if we have already agreed to a relatively costless request (e.g. signing a petition in favor of '*Keeping California Beautiful*'), we are more likely to agree to another more costly request (e.g. displaying a large signboard in the front lawn supporting safe driving) (Burger, 1999; Freedman & Fraser, 1966). In an all-negative analogy, if we have already rejected a highly demanding initial request, we are less willing to grant a smaller request later on (DeJong, 1979).

In some ways analogous to von Heisenberg's *uncertainty principle* in physics, the *intention-behavior effect* posits that the mere measurement of intention can have an influence on subsequent behavior (Morwitz & Fitzsimons, 2004; Morwitz, Johnson, & Schmittlein, 1993). Simply asking people whether they intended to vote increased their actual participation in the following day's elections, whereas merely measuring purchasing intention led to higher purchases of PCs or cars (Fitzsimons & Morwitz, 1996).

Similarly, in *question-behavior* and *survey effects*, the mere fact of answering hypothetical questions or being surveyed can remind subjects of a motive not previously attended to (Fitzsimons & Moore, 2008; Fitzsimons & Shiv, 2001; Fitzsimons & Williams, 2000; Levav & Fitzsimons, 2006; Moore, Neal, Fitzsimons, & Shiv, 2012). Households assigned to more frequent health surveys, one year later had higher levels of chlorine in their stored drinking water, or were more likely to take up health insurance (Zwane & et al., 2011). Consumers who, during a door-to-door survey, were asked to imagine themselves subscribing to cable TV, few months later were more likely to actually subscribe to it than neighbors who just received information about the service (Gregory, Cialdini, & Carpenter, 1982).

*Rationality crossovers* promote the use of economic rationality from a behavior occurring in market-like settings (e.g. a choice between two lotteries in presence of arbitrage), to a subsequent behavior taking place in the absence of financial incentives (e.g. non-market valuation of willingness to pay) (Cherry, Crocker, & Shogren, 2003; Cherry & Shogren, 2007). Similar forms of *extrapolation* have been documented by experimental economists looking at the links between the lab and the field (Harrison & List, 2004; Levitt & List, 2007a, 2007b; Levitt, List, & Reiley, 2010). Successful skills and heuristics evolved in some familiar situations carryover to other similar field or lab settings: for instance, experienced sports-cards dealers did not fall prey to the typical winner's curse in a lab auction (Harrison & List, 2008), whereas professional football players played more equilibrium strategies than students in laboratory coordination games (Palacios-Huerta & Volji, 2008). These

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 311 of 517

rationality crossovers are conceptually close to some of the *semantic* or *procedural priming* effects documented in the psychology literature (Forster, Liberman, & Friedman, 2007; Gollwitzer et al., 1990; Kruglanski et al., 2002; Neely, 1977).

Experiments in game theory have found that playing a sequence of two different strategic games is not the same of playing one of the games in isolation (Knez & Camerer, 2000). Two distinct *cross-games spillovers* can occur, both of which are essentially promoting spillovers (Bednar, Chen, Liu, & Page, 2012). First, players can learn about the structural properties of a game and transfer this knowledge to another game, e.g. whether the game is a coordination game (*structural learning, cross-games learning*: Cooper & Kagel, 2003; Huck, Jehiel, & Rutter, 2011; Mengel & Sciubba, 2010). Second, when playing a game, subjects can resort to cognitive or behavioral heuristics developed while playing *another* game (Bednar et al., 2012). If subjects had previously bid more aggressively in an auction, they next tended to contribute less in a subsequent public good game (Cason & Gangadharan, 2013; Cason, Savikhin, & Sheremeta, 2012; Savikhin & Sheremeta, 2013). Low donors to a charity cooperated less in a subsequent, unrelated, prisoners' dilemma game (Albert, Guth, Kirchler, & Maciejkovsy, 2007). Players managed to coordinate their moves more efficiently in a game if they had previously played another game in which they had experienced efficient coordination (*precedent*: Knez & Camerer, 2000) (Ahn, Ostrom, Schmidt, Shupp, & Walker, 2001; Devetag, 2005; Knez & Camerer, 2000). If subjects had played a structurally similar (different) game before, they were quicker (slower) to achieve equilibrium in another game (Grimm & Mengel, 2012).

*Carryover effects of emotions* and *self-herding* suggest that incidental emotions not only directly affect decisions at an unconscious level, but also indirectly spillover on other subsequent choices and actions taking place long after the initial emotional experience (Harlé & Sanfey, 2007; Lerner, Small, & Loewenstein, 2004). This is because, when we look back to our initial behavior, we tend to misattribute it to some of our deep preferences rather than to a fleeting emotion, and we choose our subsequent actions to follow suit the same inferred path (Andrade & Ariely, 2009). For instance, subjects who first watched a video that induced anger were not only more likely to reject unfair offers in a following, unrelated, ultimatum game than subjects who watched a happy video; but also made fairer offers to their partners in a subsequent dictator game, and even in a second ultimatum game where they acted as proposers (Andrade & Ariely, 2009). Conceptually similar is the already discussed *self-signaling* or *self-inference* tendency (Bénabou & Tirole, 2011; Gneezy, Gneezy et al., 2012). For instance, wearing counterfeit sunglasses can send a self-signal that we are cheaters, which can then lead us to actually cheat more when reporting our performance in a math puzzle task (Gino, Norton, & Ariely, 2010).

According to the *what-the-hell* effect, another all-negative promoting spillover, once individuals decide upon a course of behavior that is inconsistent with a motive (a diet), they are less likely to take the middle ground (low fat cookie) and more likely to exacerbate their failure to behave in line with the motive (eating the whole bag of cookies) (Herman & Mack, 1975; Herman & Polivy, 2010; Urbszat, Herman, & Polivy, 2002). Similar *abstinence violation* effects have been documented among alcoholics (Collins & Lapp, 1991), smokers (Shiffman et al., 1996), and drug users (Stephens & Curtin, 1994).

## 4. Permitting spillovers

*Ego depletion* is perhaps the 'classic' case of *permitting* spillovers: after having exerted high levels of self-control or effort in the first behavior, the same subject exerts lower levels of effort or self-control in the second behavior. Having resisted the temptation of indulging in sweets, or stifled emotions in emotion-arousing movies, subjects gave up earlier in impossible-to-solve puzzles (Baumeister, Bratslavsky, Muraven, & Tice, 1998). Having completed a difficult puzzle, subjects were more likely to cheat on their performance in an ostensibly unrelated task (Mead, Baumeister, Gino, Schweitzer, & Ariely, 2009). Ego depletion has physiological roots, in that to exert self-control we draw from a limited pool of mental energy: physical, but also mental activities consume energy that is converted from glucose into neurotransmitters (Baumeister & Vohs, 2007; Baumeister, Vohs, & Tice, 2007; Gailliot et al., 2007).

*Moral licensing* is a *permitting* spillover where, after having done 'well' in behavior 1, we act as if we have earned the moral entitlement to reward ourselves in behavior 2. Using the metaphor of a 'moral bank account', good deeds establish moral credits that can be withdrawn to purchase the right to undertake 'bad' actions. Subjects who, in a hypothetical choice to appoint a manifestly better candidate for a job, had the chance to establish they were not racist or sexist, were more likely to make prejudiced choices in a subsequent harder hiring decision (Monin & Miller, 2001). Subjects who said they were endorsing Obama in political elections, then allocated money to a charity fighting poverty in a white rather than in a black neighborhood (Effron, Cameron, & Monin, 2009). Advisors who disclosed their conflict of interest to advisees provided more biased advices (Cain, Loewenstein, & Moore, 2005). Subjects who first imagined teaching homeless children were less likely to donate to a local charity part of the experimental earnings, and made more frivolous purchases afterwards (Khan & Dhar, 2006; Strahilevitz & Myers, 1998).

Other related 'permitting' spillovers are the *resting on laurels effect*, by which seeing a progress as a sub-goal makes us spending less effort toward the final goal (Amir & Ariely, 2008); the *single-action bias*, by which an initial motive-directed action induces the impression that no further action is needed, even when is actually beneficial (Weber, 1997); the *reverse foot-in-the-door* effect, by which having said 'yes' to a request (e.g. signing a petition in favor of greater government aid for the homeless) leads to say 'no' to another request later on (e.g. volunteering to help at a canned food drive for the homeless) (Guadagno, Asher, Demaine, & Cialdini, 2001); and the already mentioned '*coasting*' tendency, by which after having exceeded our target rate of progress, we typically 'ease back' subsequent effort for the same motive (Carver, 2003).

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 312 of 517

## 5. Purging spillovers

*Moral cleansing* (or '*Lady Macbeth effect*') is the reverse of licensing: a *purging* spillover where, after having done 'badly', we act as if we need to restore our integrity. Subjects who hand-copied a story describing in the first person an unethical act, manifested higher desirability of cleansing products over neutral items, and, when offered the choice between an antiseptic wipe and a pencil, were more likely to take the antiseptic wipe (Zhong & Liljenquist, 2006). Participants who recalled a past unethical deed but also had cleansed their hands with an antiseptic wipe volunteered less to help out a colleague (Zhong & Liljenquist, 2006). Subjects who first hand-wrote a story using words for negative traits gave more to a local charity (Sachdeva, Iliev, & Medin, 2009), while participants who were induced to lie to a fictitious person on the phone, preferred mouthwash over soap, whereas the opposite held for subjects induced to lie in an email (Lee & Schwarz, 2010).

Similarly, the *conscience accounting* effect posits that people who have earned a given payoff by lying or stealing are more likely to donate to a charity than subjects who have earned the same amount without deceiving: anticipating this, subjects lied more when they knew that there would be an opportunity to donate immediately afterwards (Gneezy, Imas, & Madarasz, in press).

Other 'purging' spillovers related to moral cleansing are the *transgression-compliance* effect and the *negative state relief* by which, after that our personal values or moods (respectively) are affected by a negative state, we tend to act more altruistically in the attempt to restore them (Carlsmith & Gross, 1969; Manucia, Baumann, & Cialdini, 1984). Subjects led to believe that they had harmed someone else, were then more likely to comply with a request or to help a third person when given the opportunity (Manucia et al., 1984). Subjects with artificially 'lowered' mood but who also received an unexpected gratifying praise, however, no longer had to act altruistically to restore their mood (Manucia et al., 1984).

The *moral balancing* and *self-concept maintenance* effects share the same 'compensatory ethics' idea of both moral licensing and cleansing (Zhong, Ku, Lount, & Murnighan, 2010), and posit that people who think highly of themselves in terms of honesty behave dishonestly only to the extent to which they can retain their positive views of themselves (Mazar et al., 2008; Nisan & Horenczyk, 1990): when given the possibility to cheat on their payments with no consequences, subjects cheated only about 20 percent of the maximal possible amount they could get away with (Mazar et al., 2008).

## 6. Facilitating conditions for promoting, permitting, and purging spillovers

Spillovers from one behavior to the next could thus lead to either amplify or offset the initial intervention effect on the motive. From both the research and the policy perspective it seems imperative to explore under which conditions behavioral spillovers are more likely to manifest themselves as promoting, permitting, or purging: when is an initial nudge likely to feed into a further push to the motive, and when instead into a push-back?

There is, surprisingly, relatively little systematic research on this key point (Fishbach et al., in press; Susewind & Hoelzl, 2014). Mazar and Zhong (2010), for instance, explicitly compare *priming* and *licensing* effects. Subjects who previously were merely exposed to a store selling green items, then, in an ostensibly unrelated dictator game, shared more money than those who were exposed to a conventional store. This pattern, however, completely reversed when subjects selected products to purchase: participants who had purchased in the green store shared *less* money in the dictator game than those who had purchased in the conventional store.

Looking more broadly at the various literatures in the behavioral science, it is possible to identify at least five main streams of research that have looked at the boundary conditions that facilitate the occurrence of promoting, permitting, and purging spillovers. They focus, respectively, on: (i) the relative costs of behavior 1; (ii) the completeness of behavior 1 and its interaction with the focus of attention; (iii) the concreteness and the (temporal or spatial) proximity of behaviors 1 and 2; (iv) the trade-offs between different motives, or between a motive and a resource; and, finally, (v) the cognitive mindset during the two behaviors. In what follows we try to distill and summarize the state-of-the-art evidence from those streams of literature.

On (i), Gneezy, Imas et al. (2012) explicitly investigate the role of different costs of behavior 1 on the type of spillover. They find that subjects who donated part of their own earnings to a charity were less likely to deceive their counterpart in a subsequent sender–receiver game, while subjects who participated into a costless charitable donation were *more* likely to lie. This suggests that permitting spillovers are more likely over promoting when the costs of behavior 1 are low. High costs, in fact, self-signal the commitment toward the motive in question. Dolan and Galizzi (2014) link these findings to the distinct literature on financial incentives in health: they focus on whether incentives targeting one health behavior (physical exercise) spillover to another non-targeted health behavior (healthy eating), and find that spillovers are more likely to manifest themselves as permitting when the incentives associated to behavior 1 significantly outdo its costs. Relatedly, and in line with *counter-attitudinal advocacy*, promoting spillovers are less likely to occur when we can attribute our behavior 1 to an external cause, such as being paid or coerced to do something (Pittman, 1975; Zanna & Cooper, 1974). The different overall costs of behavior 1 can also explain why in some situations encountering and resisting a temptation can automatically activate the weight attached to a motive and thus lead to promoting spillovers, as postulated by *counteractive control theory* (Fishbach et al., 2003; Kroese, Evers, & De Ridder, 2009, 2011), while in other occasions it can trigger permitting spillovers through the activation of *justification* and *entitlement* feelings (De Witt Huberts et al., 2014; Hsee, 1995; Kivetz & Simonson, 2002; Kivetz & Zheng, 2006; Merritt et al., 2010; Mukhopadhyay & Johar, 2009). The literatures on justification

and entitlement, in fact, show that what matters for self-regulatory dynamics are *perceived* costs and efforts, rather than their actual levels (Clarkson, Hirt, Jia, & Alexander, 2010; De Witt Huberts, Evers, & De Ridder, 2012; Kivetz & Zheng, 2006; Werle, Wansink, & Payne, 2011).

On (ii), Fishbach et al. (in press) argue that permitting spillovers are more likely over promoting when, while pursuing a goal, individuals focus on completed, rather than missing, actions. This is because, generally, missing actions increase motivation by self-signaling a need for progress. This, however, depends on the underlying motive and focus of attention (Marsh, Hicks, & Bink, 1998). Similarly to what discussed above, Fishbach and Dhar (2005) argue that what really matters is the *perception* of progress rather than its objective level. Attention to completed actions, in fact, signals personal commitment and increases motivation when we are not yet committed to our goals, while attention to missing actions signals a need to progress and increases motivation when we are already committed.

Fishbach et al. (in press) observe that this combines with the so-called '*goal-gradient hypothesis*': regardless of the focus of attention, motivation increases with proximity to a goal's end state (Brown, 1948; Forster, Higgins, & Idson, 1998; Hull, 1932; Kivetz, Urminsky, & Zheng, 2006). For instance, consumers in a coffee-shop's '*buy 10, get 1 free*' program (a song-rating website) accelerate their purchases (site visits) as they get closer to the final reward (Kivetz et al., 2006). A simple psychophysical explanation of the *goal-gradient* effect is that '*the last action accomplishes 100% of the remaining progress, which is twice the impact of the second-to-last action*' (Fishbach et al., in press, p. 39). Using a similar psychophysical argument, Fishbach et al. (in press) observe that, when striving toward a goal, we are more motivated when we focus on whichever is smaller in size between the completed and the missing actions. According to this '*small-area hypothesis*', at the beginning of goal pursuit, when our commitment is typically low, the focus on completed actions increases motivation by signaling commitment, while later on, beyond the midpoint, the focus on remaining actions increases motivation by self-signaling need to progress (Fishbach et al., in press). This potential mechanism for promoting spillovers would also explain why motivation is typically lower in the middle of goal pursuit, a phenomenon known as '*stuck in the middle*' (Bonezzi, Brendl, & De Angelis, 2011).

On (iii), Conway and Peetz (2012) find that permitting spillovers are more likely over promoting when we visualize behavior 1 in a concrete and tangible fashion. This is because abstract construals tend to activate self-identity considerations, while concrete constructs may activate self-regulatory or compensatory mindsets (Trope & Liberman, 2003). For instance, subjects who were asked to describe how they would perform a '*fair, friendly, generous*' behavior donated less money to a charity than subjects who described how they would perform an '*unfair, unfriendly, greedy*' behavior, whereas no difference was found for subjects discussing what those traits would mean for their personality. Similarly, subjects who were asked to make concrete plans to exercise later that day, consumed more sweet snacks in a subsequent tasting test than control subjects who only wrote abstract statements (Kronick & Knauper, 2010). Coherently with the idea that distal events are perceived in a more abstract way, while temporally proximate events are perceived more concretely (Liberman, Sagristano, & Trope, 2002; Trope & Liberman, 2003), the same pattern emerged when concreteness was manipulated in terms of recalling deeds '*within the past week*' (concrete), as opposed to '*over one year ago*' (abstract). Similarly, Fishbach and Zhang (2005) find that permitting spillovers are more likely over promoting when in each behavior the two options (e.g. healthy and unhealthy food items) are physically presented together, and they seem to complement each other. Conversely, promoting spillovers are more likely to occur when the two options appear spatially apart, and seem to compete against each other.

On (iv), Dhar and Simonson (1999) propose that promoting spillovers are more likely in situations where each behavior involves a trade-off between a motive (e.g. pleasure) and a resource (e.g. money): for instance, after having chosen a tasty, expensive entrée over a less tasty, less expensive entrée, we are more likely to choose a tasty, expensive main course over a less tasty, less expensive one. Permitting spillovers, however, are more likely to occur in situations where each behavior involves a trade-off between two motives (e.g. pleasure and health): for instance, after having chosen a healthy entrée over a tasty one, we are more likely to prefer a tasty, over a healthy, main course.

On (v), Cornelissen, Bashshur, Rode, and Le Menestrel (2013) argue that permitting spillovers are more likely over promoting when we are in an outcome-based mindset rather than a rule-based mindset. The reason is that in an outcome-based (consequentialist) mindset we appraise the consequences of each behavioral alternative both for ourselves and for the others involved, allowing us to be relatively flexible when trading off different motives. Moral rules, at the contrary, do not naturally lend themselves to such trade-offs, because 'a rule is a rule'. They find that subjects who recalled a past episode that they thought was ethical '*because it benefitted other people*' (outcome-based mindset) cheated more in their payments than subjects who recalled a past episode that was unethical '*because it hurt other people*'. In contrast, subjects asked to recall a past episode that was ethical because they did their '*duty to follow an ethical norm or principle*' (rule-based mindset) cheated less in their payments than subjects who recalled a past episode that was unethical because they did not their duty.

More broadly, it should be noted that exploring under which conditions spillovers are most likely to be promoting, permitting, or purging, is a necessary but not a sufficient condition to be able to draw conclusions on the overall effect of a sequence of behaviors. Both researchers and policy-makers, in fact, would typically be interested also in quantifying the relative magnitude of behavioral spillovers. There is virtually no evidence at date, in the lab nor in the field, from systematically testing head-to-head two or more types of spillovers, with the objective of measuring their relative strength, magnitude, and persistence over time. Quantifying the magnitude of permitting and purging spillovers, in particular, is imperative in order to disentangle 'rebound' from 'backfire' (or 'boomerang') effects (Gillingham et al., 2013; Goeschl & Perino, 2009; Jacobsen et al., 2012; Jenkins, Nordhaus, & Shellenberger, 2011): although the two terms are often used interchangeably, from a policy

perspective it is crucial to conceptually distinguish when the net effect of the two behaviors results in an overall increase or decrease in the behavioral outcome (Tiefenbeck et al., 2013).

## 7. Future directions and challenges

Lab and field experiments across all the behavioral sciences thus show that behaviors are history-dependent and that spillovers are pervasive. From the methodological perspective, this reinstates the importance of the current best practices by lab researchers of counter-balancing sequences of tasks and explicitly controlling for order effects. It is encouraging to see that field and online experiments increasingly adhere to such practices even in settings which are naturally less controllable than the lab.

Evidence shows that spillovers occur through deliberation and also unconsciously. This confirms the importance of considering a broad operational definition of behaviors and motives, consistent with the recognition of the major role of automatic, involuntary, and unconscious processes in human decisions and behavior (Aarts & Dijksterhuis, 2000; Bargh & Chartrand, 1999; Chaiken & Trope, 1999; Chartrand & Bargh, 2002; Chartrand, Huber, Shiv, & Tanner, 2008; Dijksterhuis & Nordgren, 2006; Fitzsimons et al., 2002; Kahneman, 2003, 2011; Wilson & Schooler, 1991). Our framework can be used to consider the ripple effects of sequences of behavior and not just the initial splash from the first behavioral response. As such, it provides the glue that can help to hold together our understanding of the conscious and unconscious spillovers from one behavior to the next. It also provides a useful lexicon for researchers and policy decision-makers from different fields and perspectives.

From a research and policy perspective, we should abandon 'behavioral silos' and 'sector-thinking' (Thøgersen, 1999a). The impact of a policy intervention can be greatly enhanced in presence of promoting spillovers, but it can also be severely hindered, or completely jeopardized, by the occurrence of permitting effects. And this is to further disregard the possible role of purging spillovers as potential levers to trigger envisaged changes in behavior.

There are a number of outstanding issues. Most of the evidence to date documents the occurrence of spillovers within short temporal horizons. We know very little about the longevity of spillovers beyond the time frame typically considered in lab experiments (Fitzsimons & Morwitz, 1996; Gregory et al., 1982; Tiefenbeck et al., 2013; Zwane et al., 2011). The design of field experiments in naturalistic settings is practically challenging if one really wants to map all possible ramifications of a behavior. This gap in the evidence calls for a further integration of longitudinal surveys and experimental methods in behavioral science, and for higher efforts to link experiments, administrative records, and 'big data' that are already available (Dolan & Galizzi, in press).

Future efforts should also be directed toward understanding the contexts and domains under which spillovers are most likely to take place. Most of the evidence at date, in fact, considers spillovers occurring within the same domain, such as environmental behavior (Evans et al., 2013; Jacobsen et al., 2012; Lanzini & Thøgersen, 2014; Poortinga, Whitmarsh, & Suffolk, 2013; Thøgersen, 1999a, 1999b; Thøgersen & Crompton, 2009; Thøgersen & Olander, 2003; Tiefenbeck et al., 2013); prosocial behavior (Brañas-Garza, Bucheli, Espinosa, & Garcia-Muñoz, 2013; Cornelissen et al., 2013; Effron, Miller, & Monin, 2012; Gneezy, Imas et al., 2012; Gneezy et al., in press; Jordan, Mullen, & Murnighan, 2011; Merritt et al., 2010, 2012; Norton, 2012; Ploner & Regner, 2013; Zhong & Liljenquist, 2006); or health behavior (Chiou, Wan, Wu, & Lee, 2011; Chiou, Yang, & Wan, 2011; De Witt Huberts et al., 2012; Dolan & Galizzi, in press; Effron, Monin, & Miller, 2013; Epstein, Dearing, Roba, & Finkelstein, 2010; Kroese et al., 2009, 2011; Van Kleef, Shimizu, & Wansink, 2011; Werle, Wansink, & Payne, 2010; Wilcox, Vallen, Block, & Fitzsimons, 2009; Wisdom, Downs, & Loewenstein, 2010).

There is little evidence on whether spillovers can occur across different domains, and whether such cross-domains spillovers are most likely to be promoting, permitting, or purging (Baird, Garfein, McIntosh, & Özler, 2012; Khan & Dhar, 2006; Mazar & Zhong, 2010; Sachdeva et al., 2009). Conceptually, such spillovers can be visualized as cross-motives links between self-images ('*I am healthy and environment-friendly*'), accounts weights ('*what makes me happy is working hard and being a good father*') or both. From the policy perspective, a comprehensive mapping of the links between behaviors, contexts, and domains will illuminate not only *which* areas to target to induce behavior change, but also *where* to start from (Thøgersen, 1999a). For example, does more responsible behavior at school feed into healthier choices, or what happens if we start by 'nudging' healthy behavior instead?

Evidence is also missing on whether behavioral spillovers are only related to specific contexts, domains, and situations, or whether they are also explained by differences across people, such as personality, cognitive skills, and socio-economic conditions (Borghans, Duckworth, Heckman, & ter Weel, 2008; Heckman, 2007a, 2007b; Heckman & Rubistein, 2001).

We should finally seek to better understand the neuro-physiological roots of behavioral spillovers. Research in neuroscience has substantially advanced our current understanding of the neural correlates of human decision-making and behavior (Camerer, Loewenstein, & Prelec, 2005; Glimcher, Fehr, Camerer, & Poldrack, 2008). The forthcoming efforts to thoroughly map the human brain will provide precious insights on how the numerous ripples documented here might spread through the complex network of our mind.

Notwithstanding these open questions, the time seems ripe to explicitly account for the pervasive impact of behavioral spillovers. Behavioral scientists, especially those seeking to inform policy, should try to capture all the ripples when a pebble of intervention is thrown in the pond, and not just the immediate splash it makes.

## Acknowledgments

The project was funded by the Centre for the Study of Incentives in Health (CSIH), from a strategic award from the Wellcome Trust Biomedical Ethics Programme (PI Marteau: 086031/Z/08/Z). We gratefully acknowledge this funding. We thank the Editor and two anonymous referees for excellent comments and suggestions that have substantially improved the article. We also thank our colleagues at CSIH, Alex Imas, Heather Kappes, Natasha Perkins, and the participants to seminars at Aberdeen, Cologne, and LSE for helpful comments and suggestions.

## References

Aarts, H., & Dijksterhuis, A. (2000). Habits as knowledge structures: Automatic in goal-directed behavior. *Journal of Personality and Social Psychology, 78*, 53.
Aarts, H., & Dijksterhuis, A. (2003). The silence of the library: Environment, situational norm, and social behavior. *Journal of Personality and Social Psychology, 84*, 18–28.
Ahn, T. K., Ostrom, E., Schmidt, D., Shupp, R., & Walker, J. (2001). Cooperation in PD games: Fear, greed, and history of play. *Public Choice, 106*, 137–155.
Akerlof, G. A., & Kranton, R. A. (2000). Economics and identity. *Quarterly Journal of Economics, 105*, 715–753.
Alberracin, D., & Wyler, R. S. (2000). The cognitive impact of past behavior: Influences on beliefs, attitudes, and future behavioral decisions. *Journal of Personality and Social Psychology, 79*(1), 5–22.
Albert, M., Guth, W., Kirchler, E., & Maciejkovsy, B. (2007). Are we nicer to nicer people? An experimental analysis. *Experimental Economics, 10*, 53–69.
Alcott, B. (2005). Jevon's paradox. *Ecological Economics, 54*(1), 9–21.
Al-Ubaydli, O., Andersen, S., Gneezy, U., & List, J. A. (in press). Carrots that look like sticks: Toward an understanding of multitasking incentive schemes. *Southern Economic Journal*.
Amir, O., & Ariely, D. (2008). Resting on laurels: The effects of discrete progress markers as subgoals on task performance and preferences. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 34*(5), 1158–1171.
Andrade, E. B., & Ariely, D. (2009). The enduring impact of transient emotions on decision making. *Organizational Behavior and Human Decision Processes, 109*, 1–8.
Andreoni, J. (1990). Impure altruism and donations to public goods: A theory of warming glow giving? *Economic Journal, 100*(401), 464–477.
Ariely, D., Bracha, A., & Meier, S. (2009a). Doing good or doing well? Image motivation and monetary incentives in behaving prosocially. *American Economic Review, 99*, 544–555.
Ariely, D., Gneezy, U., Loewenstein, G., & Mazar, N. (2009b). Large stakes and big mistakes. *Review of Economic Studies, 76*, 451–469.
Asch, P., Levy, D. T., Shea, D., & Bodenhorn, H. (1991). Risk compensation and the effectiveness of safety belt use laws: A case study of New Jersey. *Policy Sciences, 24*(2), 181–197.
Baird, S. J., Garfein, R. S., McIntosh, C. T., & Özler, B. (2012). Effect of a cash transfer programme for schooling on prevalence of HIV and herpes simplex type 2 in Malawi: A cluster randomised trial. *The Lancet, 379*, 1320–1329.
Bargh, J. A. (1990). Auto-motives: Preconscious determinants of thought and behavior. In E. T. Higgins & R. M. Sorrentino (Eds.). *Handbook of motivation and cognition: Foundations of social behavior* (Vol. 2, pp. 93–130). New York: Guildford.
Bargh, J. (2006). Agenda 2006: What have we been priming all these years? On the development, mechanisms, and ecology of nonconscious social behavior. *European Journal of Social Psychology, 36*, 147–168.
Bargh, J., & Barndollar, K. (1996). Automaticity in action: The unconscious as repository of chronic goals and motives. In P. M. Gollwitzer & J. A. Bargh (Eds.), *The psychology of action: Linking cognition and motivation to behavior* (pp. 457–481). New York: Guildford Press.
Bargh, J., & Chartrand, T. L. (1999). The unbearable automaticity of being. *American Psychologist, 54*(7), 462–479.
Bargh, J. A., Gollwitzer, P. M., Lee-Chai, A., Barndollar, K., & Trotschel, R. (2001). The automated will: Non-conscious activation and pursuit of behavioral goals. *Journal of Personality and Social Psychology, 81*, 1014–1027.
Baumeister, R. F. (1986). *Identity: Cultural change and the struggle for self.* Oxford: Oxford University Press.
Baumeister, R. F., Bratslavsky, E., Muraven, M., & Tice, D. M. (1998). Ego depletion: Is the active self a limited resource? *Journal of Personality and Social Psychology, 74*(5), 1252–1265.
Baumeister, R. F., Heatherton, T. F., & Tice, D. M. (1994). *Losing control: How and why people fail at self-regulation.* San Diego, CA: Academic Press.
Baumeister, R. F., & Vohs, K. D. (2007). Self-regulation, ego-depletion, and motivation. *Social and Personality Psychology Compass, 1*(1), 115–128.
Baumeister, R. F., Vohs, K. D., & Tice, D. M. (2007). The strength model of self-control. *Current Directions in Psychological Science, 16*, 351–355.
Bednar, J., Chen, Y., Liu, T. X., & Page, S. (2012). Behavioral spillover and cognitive load in multiple games: Experimental results. *Games and Economic Behavior, 74*, 12–31.
Bem, D. J. (1972). Self-perception theory. In L. Berkowitz (Ed.). *Advances in experimental social psychology* (Vol. 6, pp. 1–62). New York: Academic Press.
Bénabou, R., & Tirole, J. (2003). Intrinsic and extrinsic motivation. *Review of Economic Studies, 70*(3), 489–520.
Bénabou, R., & Tirole, J. (2006). Incentives and prosocial behaviour. *American Economic Review, 96*(5), 1652–1678.
Bénabou, R., & Tirole, J. (2011). Identity, morals, and taboos: Beliefs as assets. *Quarterly Journal of Economics, 126*, 805–855.
Bhattacharyya, M. N., & Layton, A. P. (1979). Effectiveness of seat belt legislation on the Queensland road toll: An Australian case study in intervention analysis. *Journal of the American Statistical Association, 74*(367), 596–603.
Bodner, R., & Prelec, D. (2003). Self-signaling and diagnostic utility in everyday decision-making. In I. Brocas & J. Carillo (Eds.). *The psychology of economic decisions* (Vol. 1, pp. 105–124). Oxford: Oxford University Press.
Bonezzi, A., Brendl, C. M., & De Angelis, M. (2011). Stuck in the middle: The psychophysics of goal pursuit. *Psychological Science, 22*(5), 607–612.
Borghans, L., Duckworth, A. L., Heckman, J. J., & ter Weel, B. (2008). The economics and psychology of personality traits. *Journal of Human Resources, 43*(4), 972–1059.
Bradford, W. D., & Dolan, P. (2010). Getting used to it: The adaptive global utility model. *Journal of Health Economics, 29*(6), 811–820.
Brañas-Garza, P., Bucheli, M., Espinosa, M. P., & Garcia-Muñoz, T. (2013). Moral cleansing and moral licensing: Experimental evidence. *Economics and Philosophy, 29*, 199–212.
Brown, J. S. (1948). Gradients of approach and avoidance responses and their relation to level of motivation. *Journal of Comparative and Physiological Psychology, 41*(6), 450–465.
Burger, J. M. (1999). The foot-in-the-door compliance procedure: A multiple-process analysis and review. *Personality and Social Psychology Review, 3*, 303–325.
Cain, D. M., Loewenstein, G., & Moore, D. A. (2005). The dirt on coming clean: Perverse effects of disclosing conflicts of interest. *Journal of Legal Studies, 34*, 1–25.
Camerer, C. (1999). Behavioral economics: Reunifying psychology and economics. *Proceedings of the National Academy of Sciences United States of America, 96*(19), 10575–10577.
Camerer, C. F., Issacharoff, S., Loewenstein, G., O'Donoghue, T., & Rabin, M. (2003). Regulation for conservatives: Behavioral economics and the case for asymmetric paternalism. *University of Pennsylvania Law Review, 1151*, 1211–1254.
Camerer, C., Loewenstein, G., & Prelec, D. (2005). Neuroeconomics: How neuroscience can inform economics. *Journal of Economic Literature, 18*, 9–64.
Carlsmith, J. M., & Gross, A. E. (1969). Some effects of guilt on compliance. *Journal of Personality and Social Psychology, 11*, 232–239.

Carver, C. S. (2003). Pleasure as a sign you can attend to something else: Placing positive feelings within a general model of affect. *Cognition and Emotion, 17*, 241–261.
Carver, C. S., & Scheier, M. F. (1981). *Attention and self-regulation: A control theory approach to human behavior*. New York: Springer-Verlag.
Carver, C. S., & Scheier, M. F. (1982). Control theory: A useful conceptual framework for personality, social, clinical, and health psychology. *Psychological Bulletin, 92*, 111–135.
Carver, C. S., & Scheier, M. F. (1990). Origins and functions of positive and negative affect: A control-process view. *Psychology Review, 97*(1), 19–35.
Carver, C. S., & Scheier, M. F. (1998). *On the self-regulation of behavior*. New York: Cambridge University Press.
Cason, T. M., & Gangadharan, L. (2013). Cooperation spillovers and price competition in experimental markets. *Economic Inquiry, 51*(3), 1715–1730.
Cason, T., Savikhin, A. C., & Sheremeta, R. M. (2012). Behavioral spillovers in coordination games. *European Economics Review, 56*, 233–245.
Chabris, C., & Simons, D. (2011). *The invisible gorilla: How our intuitions deceive us*. London: Harmony.
Chaiken, S., & Trope, Y. (1999). *Dual-process theories in social psychology*. New York: Guildford Press.
Chartrand, T. J., & Bargh, J. A. (1996). Automaticity of impression formation and memorization goals. *Journal of Personality and Social Psychology, 71*, 464–478.
Chartrand, T. L., & Bargh, J. (2002). Non-conscious motivations: Their activation, operation and consequences. In A. Tesser, D. Stapel, & J. Wood (Eds.). *Self-motivation: Emerging psychological perspectives* (Vol. 2, pp. 13–41). New York: American Psychological Association Press.
Chartrand, T., Huber, J., Shiv, B., & Tanner, R. (2008). Non-conscious goals and consumer choice. *Journal of Consumer Research, 35*, 189–201.
Cherry, T. L., Crocker, T. D., & Shogren, J. F. (2003). Rationality spillovers. *Journal of Environmental Economics and Management, 45*, 63–84.
Cherry, T. L., & Shogren, J. F. (2007). Rationality crossovers. *Journal of Economic Psychology, 28*, 261–277.
Chiou, W. B., Wan, C. S., Wu, W. H., & Lee, K. T. (2011a). A randomized experiment to examine unintended consequences of dietary supplement use among daily smokers: Taking supplements reduces self-regulation of smoking. *Addiction, 106*(12), 2221–2228.
Chiou, W. B., Yang, C. C., & Wan, C. S. (2011b). Ironic effects of dietary supplementation: Illusory invulnerability created by taking dietary supplements licenses health-risk behaviors. *Psychological Science, 22*, 1081–1086.
Cialdini, R. B. (1984). *Influence: How and why people agree to things*. New York: Morrow.
Cialdini, R. B., Trost, M. R., & Newsom, J. T. (1995). Preference for consistency: The development of a valid measure and the discovery of surprising behavioral implications. *Journal of Personality and Social Psychology, 69*, 318–328.
Clarkson, J., Hirt, E., Jia, L., & Alexander, M. (2010). When perception is more than reality: The effects of perceived versus actual resource depletion on self-regulatory behavior. *Journal of Personality and Social Psychology, 98*, 29–46.
Cohen, A., & Einav, L. (2003). The effects of mandatory seat belt laws on driving behavior and traffic fatalities. *Review of Economics and Statistics, 85*(4), 828–843.
Collins, L. R., & Lapp, W. M. (1991). Restraint and attributions: Evidence of the abstinence violation effect in alcohol consumption. *Cognitive Therapy and Research, 15*, 68–94.
Congdon, W. J., Kling, J. R., & Mullainathan, S. (2011). *Policy and choice: Public finance through the lens of behavioural economics*. New York: Brookings.
Conway, P., & Peetz, J. (2012). When does feeling moral actually make you a better person? Conceptual abstraction moderates whether past moral deeds motivate consistency or compensatory behavior. *Personality and Social Psychology Bulletin, 38*(7), 907–919.
Cooper, J., & Fazio, R. H. (1984). A new look at dissonance theory. *Advances in Experimental Social Psychology, 17*, 229–266.
Cooper, D., & Kagel, J. H. (2003). Lessons learned: Generalizing learning across games. *American Economic Review, 93*(2), 202–207.
Cornelissen, G., Bashshur, M. R., Rode, J., & Le Menestrel, M. (2013). Rules or consequences? The role of ethical mindsets in moral dynamics. *Psychological Science*.
De Witt Huberts, J. C., Evers, C., & De Ridder, D. T. D. (2012). License to sin: Self-licensing as a mechanism underlying hedonic consumption. *European Journal of Social Psychology, 42*, 490–496.
De Witt Huberts, J. C., Evers, C., & De Ridder, D. T. D. (2014). 'Because I Am Worth It': A theoretical framework and empirical review of a justification-based account if self-regulation failure. *Personality and Social Psychology Review, 18*(2), 119–138.
Deci, E. L., Koestner, R. M., & Ryan, R. (1999). A meta-analytic review of experiments examining the effect of extrinsic rewards on intrinsic motivation. *Psychological Bulletin, 125*, 627–668.
DeJong, W. (1979). An examination of self-perception mediation in the foot-in-the-door effect. *Journal of Personality and Social Psychology, 37*, 2221–2239.
DellaVigna, S. (2009). Psychology and economics: Evidence from the field. *Journal of Economic Literature, 47*, 315–372.
Devetag, G. (2005). Precedent transfer in coordination games: An experiment. *Economics Letters, 89*, 227–232.
Dhar, R., & Simonson, I. (1999). Making complementary choices in consumption episodes: Highlighting versus balancing. *Journal of Marketing Research, 36*, 29–44.
Dijksterhuis, A., & Bargh, J. A. (2001). The perception–behavior expressway: Automatic effects of social perception on social behavior. In M. Zanna (Ed.). *Advances in experimental social psychology* (Vol. 33, pp. 1–40). San Diego, CA: Academic Press.
Dijksterhuis, A., Bos, M. W., Nordgren, L. F., & van Baaren, R. B. (2006). On making the right choice: The deliberation-without-attention effect. *Science, 311*, 1005–1007.
Dijksterhuis, A., & Nordgren, L. F. (2006). A theory of unconscious thought. *Perspectives on Psychological Science, 1*, 95–109.
Dijksterhuis, A., Spears, R., Postmes, T., Stapel, D., Koomen, W., Knippenberg, A. V., et al (1998). Seeing one thing and doing another: Contrast effects in automatic behavior. *Journal of Personality and Social Psychology, 75*, 862–871.
Dolan, P. (2014). *Happiness by design: Change what you do, not what you think*. London: Hudson Street Press.
Dolan, P., & Galizzi, M. M. (2014). Because I'm worth it. A lab-field experiment on the spillover effects of incentives in health. LSE CEP discussion paper CEPDP 1286.
Dolan, P., & Galizzi, M. M. (in press). Getting policy-makers to listen to field experiments. *Oxford Review of Economic Policy, 30*(4).
Dolan, P., Hallsworth, M., Halpern, D., King, D., Metcalfe, R., & Vlaev, I. (2011). Influencing behavior: The mindspace way. *Journal of Economic Psychology, 33*, 264–277.
Dur, R., Non, A., & Roelfsema, H. (2010). Reciprocity and incentive pay in the workplace. *Journal of Economic Psychology, 31*, 676–686.
Effron, D. A., Cameron, J. S., & Monin, B. (2009). Endorsing Obama licenses favoring whites. *Journal of Experimental Social Psychology, 45*, 590–593.
Effron, D. A., Miller, D. T., & Monin, B. (2012). Inventing racist roads not taken: The licensing effect of immoral counterfactual behaviors. *Journal of Personality and Social Psychology, 103*, 916–932.
Effron, D. A., Monin, B., & Miller, D. T. (2013). The unhealthy road not taken: Licensing indulgence by exaggerating counterfactual sins. *Journal of Experimental Social Psychology, 49*, 573–578.
Epstein, L. H., Dearing, K. K., Roba, L. G., & Finkelstein, E. (2010). The influence of taxes and subsidies on energy purchased in an experimental purchasing study. *Psychological Science*, 1–9.
Evans, W. N., & Graham, J. D. (1991). Risk reduction or risk compensation? The case of mandatory safety-belt use laws. *Journal of Risk and Uncertainty, 4*(1), 61–73.
Evans, L., Maio, G. R., Corner, A., Hodgetts, C. J., Ahmed, S., & Hahn, U. (2013). Self-interest and pro-environmental behavior. *Nature Climate Change, 3*, 122–125.
Fehr, E., & Falk, A. (2002). Psychological foundations of incentives. *European Economic Review, 46*, 687–724.
Fehr, E., & Gachter, S. (1997). Reciprocity as a contract enforcement device: Experimental evidence. *Econometrica, 65*, 833–860.
Fehr, E., & List, J. (2004). The hidden costs and returns of incentives: Trust and trustworthiness among CEOs. *Journal of the European Economic Association, 2*(5), 743–771.
Festinger, L. (1957). *A theory of cognitive dissonance*. Stanford, CA: Stanford University Press.
Festinger, L., & Carlsmith, J. M. (1959). Cognitive consequences of forced compliance. *Journal of Abnormal and Social Psychology, 58*(2), 203–210.

Fishbach, A., & Choi, J. (2012). When thinking bout goals undermines goal pursuit. *Organizational Behavior and Human Decision Processes, 118*, 99–107.
Fishbach, A., & Dhar, R. (2005). Goals as excuses or guides: The liberating effect of perceived goal progress on choice. *Journal of Consumer Research, 32*, 370–377.
Fishbach, A., Koo, M., & Finkelstein, S. R. (in press). Motivation resulting from completed and missing actions. In Olson, J., & Zanna, M. P. (Eds.). *Advances in experimental social psychology* (Vol. 50).
Fishbach, A., Friedman, R. S., & Kruglanski, A. W. (2003). Leading us not into temptation: Momentary allurements elicit overriding goal activation. *Journal of Personality and Social Psychology, 84*, 296–309.
Fishbach, A., & Zhang, Y. (2008). Together or apart: When goals and temptations complement versus compete. *Journal of Personality and Social Psychology, 94*, 547–559.
Fishbach, A., Zhang, Y., & Koo, M. (2009). The dynamics of self-regulation. *European Review of Social Psychology, 20*, 315–344.
Fitzsimons, G., Hutchinson, J. W., Williams, P., Alba, J. W., Chartrand, T. L., Huber, J., et al (2002). Non-conscious influences on consumer choice. *Marketing Letters, 13*(3), 269–279.
Fitzsimons, G., & Moore, S. (2008). Should I ask our children about sex, drugs and Rock'n'Roll? Potentially harmful effects of asking questions about risky behaviours. *Journal of Consumer Psychology, 18*, 82–95.
Fitzsimons, G. J., & Morwitz, V. (1996). The effect of measuring intent on brand-level purchasing behavior. *Journal of Consumer Research, 23*, 1–11.
Fitzsimons, G. J., & Shiv, B. (2001). Non-conscious and contaminative effects of hypothetical questions on subsequent decision-making. *Journal of Consumer Research, 334*, 782–791.
Fitzsimons, G., & Williams, P. (2000). Asking questions can change choice behaviour. Does it do so automatically or effortfully? *Journal of Experimental Psychology: Applied, 6*, 195–206.
Forster, J., Grant, H., Idson, L. C., & Higgins, E. T. (2001). Success/failure, feedback, expectancies, and approach/avoidance motivation: How regulatory focus moderates classic relations. *Journal of Experimental Social Psychology, 37*(3), 253–260.
Forster, J., Higgins, E. T., & Idson, L. C. (1998). Approach and avoidance strength during goal attainment: Regulatory focus and the 'Goal Looms Larger' effect. *Journal of Personality and Social Psychology, 75*(5), 1115–1131.
Forster, J., Liberman, N., & Friedman, R. S. (2007). Seven principles of goal activation: a systematic approach to distinguishing goal priming from priming of non-goal constructs. *Personality and Social Psychology Review, 11*(3), 211–233.
Forster, J., Liberman, N., & Higgins, E. T. (2005). Accessibility from active and fulfilled goals. *Journal of Experimental Social Psychology, 41*, 220–239.
Fredrickson, B. L. (1998). What good are positive emotions? *Review of General Psychology, 2*, 300–319.
Freedman, J. L., & Fraser, S. C. (1966). Compliance without pressure: The foot-in-the-door technique. *Journal of Personality and Social Psychology, 4*, 195–202.
Frey, B. S., & Oberholzer-Gee, F. (1997). The cost of price incentives: An empirical analysis of motivation crowding-out. *American Economic Review, 87*(4), 746–755.
Frijters, P. (2000). Do individuals try to maximize general satisfaction? *Journal of Economic Psychology, 21*(3), 281–304.
Fudenberg, D., & Levine, D. K. (1998). *The theory of learning in games*. Cambridge, MA: MIT Press.
Gachter, S., & Thoni, C. (2010). Social comparison and performance: Experimental evidence on the fair wage-effort hypothesis. *Journal of Economic Behavior & Organization, 76*, 531–543.
Gailliot, M. T., Baumeister, R. F., DeWall, C. N., Maner, J. K., Plant, E. A., Tice, D. M., et al (2007). Self-control relies on glucose as a limited energy source: Willpower is more than a metaphor. *Journal of Personality and Social Psychology, 92*, 325–336.
Garbacz, C. (1990a). Estimating seat belt effectiveness with seat belt usage data from the Centre for Disease Control. *Economics Letters, 34*, 83–88.
Garbacz, C. (1990b). How effective is automobile safety legislation? *Applied Economics, 22*, 1705–1714.
Garbacz, C. (1991). Impact of the New Zealand seat belt law. *Economic Inquiry, 29*, 310–316.
Garbacz, C. (1992). More evidence on the effectiveness of seat belt laws. *Applied Economics, 24*, 313–315.
Gillingham, K., Kotchen, M. J., Rapson, D. S., & Wagner, G. (2013). Energy policy: The rebound effect is overplayed. *Nature, 493*, 475–476.
Gino, F., Norton, M. I., & Ariely, D. (2010). The counterfeit self. *Psychological Science, 21*(5), 712–720.
Glimcher, P. W., Fehr, E., Camerer, C., & Poldrack, R. A. (2008). *Neuroeconomics: Decision-making and the brain*. New York: Academic Press.
Gneezy, U., Imas, A., & Madarasz, K. (in press). Conscience accounting: Emotion dynamics and social behavior. *Management Science*.
Gneezy, A., Gneezy, U., Riener, G., & Nelson, L. D. (2012). Pay-what-you-want, identity, and self-signaling in markets. *Proceedings of the National Academy of Sciences United States of America, 109*(19), 7236–7240.
Gneezy, A., Imas, A., Brown, A., Nelson, L. D., & Norton, M. I. (2012). Paying to be nice: Consistency and costly prosocial behavior. *Management Science, 58*(1), 179–187.
Gneezy, U., & Rustichini, A. (2000a). Pay enough or don't pay at all. *Quarterly Journal of Economics, 115*(3), 791–810.
Gneezy, U., & Rustichini, A. (2000b). A fine is a price. *Journal of Legal Studies, 29*(1).
Goeree, J., & Holt, C. (2001). Ten little treasures of game theory and ten intuitive contradictions. *American Economic Review, 91*(5), 1402–1422.
Goeschl, T., & Perino, G. (2009). On backstops and boomerangs: Environmental R&D under technological uncertainty. *Energy Economics, 31*(5), 800–809.
Gollwitzer, P. M. (1990). Action phases and mindsets. In E. T. Higgins & R. M. Sorrentino (Eds.). *Handbook of motivation and cognition: Foundations of social behavior* (Vol. 2, pp. 53–92). New York: Guildford.
Gollwitzer, P. M., Heckhausen, H., & Steller, B. (1990). Deliberative and implemental mindsets: Cognitive tuning towards congruous thoughts and information. *Journal of Personality and Social Psychology, 59*, 1119–1127.
Gomez-Minambres, J. (2012). Motivation through goal setting. *Journal of Economic Psychology, 33*(6), 1223–1239.
Goschke, T., & Kuhl, J. (1993). Representation of intentions: Persisting activation in memory. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 19*, 1211–1226.
Gregory, W. L., Cialdini, R. B., & Carpenter, K. M. (1982). Self-relevant scenarios as mediators of likelihood estimates and compliance: Does imagining make it so? *Journal of Personality and Social Psychology, 43*, 89–99.
Greiner, B., Ockenfels, A., & Werner, P. (2011). Wage transparency and performance: A real-effort experiment. *Economics Letters, 111*, 236–238.
Grimm, V., & Mengel, F. (2012). An experiment on learning in a multiple games environment. *Journal of Economic Theory, 147*(6), 2220–2259.
Guadagno, R. E., Asher, T., Demaine, L. J., & Cialdini, R. B. (2001). When saying yes leads to saying no: Preference for consistency and the reverse foot-in-the-door effect. *Personality and Social Psychology Bulletin, 27*(7), 859–867.
Harlé, K. M., & Sanfey, A. G. (2007). Incidental sadness biases social economic decisions in the ultimatum game. *Emotion, 7*, 876–881.
Harrison, G. W., & List, J. A. (2004). Field experiments. *Journal of Economic Literature, 42*(4), 1009–1055.
Harrison, G. W., & List, J. A. (2008). Naturally occurring markets and exogenous laboratory experiments. A case study of the winner's curse. *The Economic Journal, 118*(528), 822–843.
Heckman, J. J. (2007a). The economics, technology, and neuroscience of human capability formation. *Proceedings of the National Academy of Sciences United States of America, 104*(33), 13250–13255.
Heckman, J. J. (2007b). The technology, and neuroscience of capacity formation. *Proceedings of the National Academy of Sciences United States of America, 104*(3), 13250–13255.
Heckman, J. J., & Rubistein, Y. (2001). The importance of noncognitive skills: Lessons from the Ged testing program. *American Economic Review, 91*(2), 145–149.
Herman, P. C., & Mack, D. (1975). Restrained and unrestrained eating. *Journal of Personality, 43*, 647–660.
Herman, P. C., & Polivy, J. (2010). The self regulation of eating: Theoretical practical problems. In R. F. Baumeister & K. D. Vohs (Eds.), *Handbook of self-regulation: Research, theory, and applications* (2nd ed., pp. 522–536). New York: Guildford.
Heyman, J., & Ariely, D. (2004). Effort for payment: A tale of two markets. *Psychological Science, 15*(11), 787–793.

Higgins, E. T., & King, G. (1981). Accessibility of social constructs: Information processing consequences of individual and contextual variability. In N. Cantor & J. Kihlstrom (Eds.), *Personality, cognition, and social interaction* (pp. 69–121). Hillsdale, Nj: Erlbaum.

Hsee, C. K. (1995). Elastic justification: How tempting but task-irrelevant factors influence decisions. *Organizational Behavior and Human Decision Processes, 62*, 330–337.

Huck, S., Jehiel, P., & Rutter, T. (2011). Feedback spillover and analogy-based expectations: A multi-game experiment. *Games and Economic Behaviour, 71*(2), 351–365.

Hull, C. L. (1932). The goal-gradient hypothesis and maze learning. *Psychological Review, 39*(1), 25–43.

Isen, A. M. (1987). Positive affect, cognitive processes, and social behavior. In L. Berkowitz (Ed.). *Advances in experimental social psychology* (Vol. 20, pp. 203–252). San Diego, CA: Academic Press.

Isen, A. M. (2000). Positive affect and decision-making. In M. Lewis & J. M. Haviland-Jones (Eds.), *Handbook of emotions* (2nd ed., pp. 417–435). New York: Guildford Press.

Isen, A. M., & Simmonds, S. F. (1978). The effect of feeling good on a helping task that is incompatible with good mood. *Social Psychology Quarterly, 41*, 345–349.

Jacobsen, G. D., Kotchen, M. J., & Vandenbergh, M. P. (2012). The behavioral response to voluntary provision of an environmental public good: Evidence from residential electricity demand. *European Economic Review, 56*, 946–960.

Jenkins, J., Nordhaus, T., & Shellenberger, M. (2011). *Energy emergence: Rebound and backfire as emergent phenomena: A review of the literature*. Oakland, CA: Breakthrough Institute. February.

Jevons, W. S. (1866). *The coal question*. London: MacMillan and Company.

Jordan, J., Mullen, E., & Murnighan, J. K. (2011). Striving for the moral self: The effects of recalling past moral actions on future moral behavior. *Personality and Social Psychology Bulletin, 37*(5), 701–713.

Kahneman, D. (1973). *Attention and effort*. Englewood Cliffs, NJ: Prentice Hall.

Kahneman, D. (2003). Maps of bounded rationality: Psychology for behavioral economics. *American Economics Review, 93*, 1449–1475.

Kahneman, D. (2011). *Thinking, fast and slow*. London: Penguin, p. 53.

Kamenica, E. (2012). Behavioural economics and psychology of incentives. *Annual Review of Economics, 4*(13), 1–26.

Kay, A. C., Wheeler, S. C., Bargh, J., & Ross, L. (2004). Material priming: The influence of mundane physical objects on situational constructs and competitive behavioral choice. *Organizational Behavior and Human Decision Processes, 95*, 83–96.

Khan, U., & Dhar, R. (2006). Licensing effect in consumer choice. *Journal of Marketing Research, 43*, 259–266.

Kivetz, R., & Simonson, K. (2002). Earning the right to indulge: Effort as a determinant of customer preferences toward frequency program rewards. *Journal of Marketing Research, 39*, 155–170.

Kivetz, R., Urminsky, O., & Zheng, Y. (2006). The goal-gradient hypothesis resurrected: Purchase acceleration, illusionary goal progress, and customer retention. *Journal of Marketing Research, 43*, 38–58.

Kivetz, R., & Zheng, Y. (2006). Determinants of justification and self-control. *Journal of Experimental Psychology: General, 135*, 572–587.

Knez, M., & Camerer, C. F. (2000). Increasing cooperation in Prisoners' Dilemma by establishing a precedent of efficiency in coordination games. *Organizational Behavior and Human Decision Processes, 82*, 194–216.

Kroese, F. M., Evers, C., & De Ridder, D. T. D. (2009). How chocolate keeps you slim: The effect of food temptations on weight watching goal importance, intentions, and eating behavior. *Appetite, 53*, 430–433.

Kroese, F. M., Evers, C., & De Ridder, D. T. D. (2011). Tricky treats: Paradoxical effects of temptation strength on self-regulation processes. *European Journal of Social Psychology, 41*, 281–288.

Kronick, I., & Knauper, B. (2010). Temptations elicit compensatory intentions. *Appetite, 54*, 398–401.

Kruglanski, A. W. (1996). Goals as knowledge structures. In P. M. Gollwitzer & J. A. Bargh (Eds.), *The psychology of action: Linking cognition and motivation to behavior* (pp. 599–618). New York: Guildford.

Kruglanski, A. W., Shah, J. Y., Fishbach, A., Friedman, R., Chun, W., & Sleeth-Keppler, D. (2002). A theory of goal systems. In M. P. Zanna (Ed.). *Advances in experimental social psychology* (Vol. 34, pp. 331–378). San Diego, CA: Academic Press.

Kruglanski, A. W., & Webster, D. M. (1996). Motivated closing of the mind: "seizing" and "freezing". *Psychological Review, 103*, 263–283.

Lanzini, P., & Thøgersen, J. (2014). Behavioral spillover in environmental domain: An intervention study. *Journal of Environmental Psychology, 40*, 381–390.

Lee, S., & Schwarz, N. (2010). Dirty hands and dirty mouths: Embodiment of the moral-purity metaphor is specific to the motor modality involved in moral transgression. *Psychological Science, 21*, 1423–1425.

Lerner, J. S., Small, D. A., & Loewenstein, G. (2004). Heart strings and purse strings: Carryover effects of emotions on economic decisions. *Psychological Science, 15*, 337–341.

Levav, J., & Fitzsimons, G. (2006). When questions change behaviour: The role of ease of representation. *Psychological Science, 17*, 207–213.

Levitt, S., & List, J. (2007a). What do laboratory experiments measuring social preferences reveal about the real world? *Journal of Economic Perspectives, 21*(2), 153–174.

Levitt, S., & List, J. (2007b). On the generalizability of lab behaviour in the field. *Canadian Journal of Economics, 40*(2), 343–370.

Levitt, S., List, J., & Reiley, D. (2010). What happens in the field stays in the field: Exploring whether professionals play minimax in laboratory experiments. *Econometrica, 78*(4), 1413–1434.

Lewin, K. (1951). *Field theory in social science: Selected theoretical papers*. New York: Harper & Row.

Liberman, N., Forster, J., & Higgins, E. T. (2007). Set/reset or inhibition after goal fulfillment? A fair test between two mechanisms producing assimilation and contrast. *Journal of Experimental Social Psychology, 43*, 258–264.

Liberman, N., Sagristano, M. D., & Trope, Y. (2002). The effect of temporal distance on level of mental construal. *Journal of Experimental Social Psychology, 38*(6), 523–534.

Louro, M. J. S., Pieters, R., & Zeelenberg, M. (2007). Dynamics of multiple goal pursuit. *Journal of Personality and Social Psychology, 93*, 174–193.

Manucia, G. K., Baumann, D. J., & Cialdini, R. B. (1984). Mood influences on helping: Direct effects or side effects? *Journal of Personality and Social Psychology, 46*(2), 357–364.

Marsh, R. L., Hicks, J. L., & Bink, M. L. (1998). Activation of completed, uncompleted, and partially completed intentions. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 24*, 350–361.

Martin, L. L., & Tesser, A. (1996). Some ruminative thoughts. In R. S. Wyer (Ed.). *Advances in social cognition* (Vol. 9, pp. 1–47). Hillsdale, NJ: Lawrence Erlbaum.

Mazar, N., Amir, O., & Ariely, D. (2008). The dishonesty of honest people: A theory of self-concept maintenance. *Journal of Marketing Research, 45*(6), 633–644.

Mazar, N., & Zhong, C. B. (2010). Do green products make us better people? *Psychological Science, 21*(4), 494–498.

Mead, N. L., Baumeister, R. F., Gino, F., Schweitzer, M. E., & Ariely, D. (2009). Too tired to tell the truth: Self-control resource depletion and dishonesty. *Journal of Experimental Social Psychology, 45*, 594–597.

Mengel, F., & Sciubba, E. (2010). Extrapolation and structural learning in games. Maastricht University Working Papers.

Merritt, A. C., Effron, D. A., Fein, S., Savitsky, K. K., Tuller, D. M., & Monin, B. (2012). The strategic pursuit of moral credentials. *Journal of Experimental Social Psychology, 48*, 774–777.

Merritt, A. C., Effron, D., & Monin, B. (2010). Moral self-licensing: When being good frees us to be bad. *Social and Personality Psychology Compass, 4*(5), 344–357.

Monin, B., & Miller, D. T. (2001). Moral credentials and the expression of prejudice. *Journal of Personality and Social Psychology, 81*, 33–43.

Moore, S. G., Neal, D. T., Fitzsimons, G. J., & Shiv, B. (2012). Wolves in sheep's clothing: How and when hypothetical questions influence behavior. *Organizational Behavior and Human Decision Processes, 117*, 168–178.
Morwitz, V., & Fitzsimons, G. (2004). The mere measurement effect: Why does measuring intentions change actual behaviour? *Journal of Consumer Psychology, 14*, 64–74.
Morwitz, V., Johnson, E., & Schmittlein, D. (1993). Does measuring intent change behavior? *Journal of Consumer Research, 20*, 46–61.
Moskowitz, G. B. (2002). Preconscious effects of temporary goals on attention. *Journal of Experimental Social Psychology, 38*, 397–404.
Mukhopadhyay, A., & Johar, G. V. (2009). Indulgence as self-reward for prior shopping restraint: A justification-based mechanism. *Journal of Consumer Psychology, 19*, 334–345.
Mussweiler, T. (2003). Comparison processes in social judgment: Mechanisms and consequences. *Psychological Review, 110*, 472–489.
Neely, J. H. (1977). Semantic priming and retrieval from lexical memory: Roles of inhibition less spreading activation and limited-capacity attention. *Journal of Experimental Social Psychology: General, 106*, 226–254.
Nisan, M., & Horenczyk, G. (1990). Moral balance: The effect of prior behaviour on decision in moral conflict. *British Journal of Social Psychology, 29*(1), 29–42.
Norton, E. (2012). Shame on the rich. *Science now*. Posted on news.sciencemag.org, February 27.
Novemsky, N., & Dhar, R. (2005). Goal fulfillment and goal targets in sequential choice. *Journal of Consumer Research, 32*, 396–404.
Palacios-Huerta, I., & Volji, O. (2008). Experiencia docet: Professionals play minimax in laboratory experiments. *Econometrica, 76*(1), 71–115.
Peltzman, S. (1975). The effects of automobile safety regulation. *Journal of Political Economy, 83*, 667–725.
Pittman, T. S. (1975). Attribution of arousal as a mediator in dissonance reduction. *Journal of Experimental Social Psychology, 11*(1), 53–63.
Pliner, P., Hart, H., Kohl, J., & Saari, D. (1974). Compliance without pressure: Some further data on the foot-in-the-door technique. *Journal of Experimental Social Psychology, 10*, 17–22.
Ploner, M., & Regner, T. (2013). Self-image and moral balancing: an experimental analysis. *Journal of Economic Behavior & Organization, 93*, 374–383.
Poortinga, W., Whitmarsh, L., & Suffolk, C. (2013). The introduction of a single-use carrier bag charge in Wales: Attitude change and behavioral spillover effects. *Journal of Environmental Psychology, 36*, 240–247.
Rigdon, M. (2009). Trust and reciprocity in incentive contracting. *Journal of Economic Behavior & Organization, 70*, 93–105.
Rudin-Brown, C., & Jamson, S. (2013). *Behavioural adaptation and road safety: Theory, evidence, and action*. London: CRC Press.
Sachdeva, S., Iliev, R., & Medin, D. L. (2009). Sinning saints and saintly sinners: The paradox of moral self-regulation. *Psychological Science, 20*(4), 523–528.
Savikhin, A. C., & Sheremeta, R. M. (2013). Simultaneous decision-making in competitive and cooperative environments. *Economic Inquiry, 51*(2), 1311–1323.
Schoemaker, P. J. H. (1993). Determinants of risk-taking: Behavioral and economic views. *Journal of Risk and Uncertainty, 6*, 49–73.
Schultz, P. W., Nolan, J. M., Cialdini, R. B., Goldstein, N. J., & Griskevicius, V. (2007). The constructive, destructive, and reconstructive power of social norms. *Psychological Science, 18*(5), 429–434.
Schwarz, N., & Bless, H. (2005). Mental construal processes: The inclusion/exclusion model. In D. Stapel & J. Suls (Eds.), *Assimilation and contrast in social psychology* (pp. 119–141). Philadelphia: Psychology Press.
Shafir, E. (2012). *The behavioral foundations of public policy*. Princeton: Princeton University Press.
Shah, J. Y., Friedman, R. S., & Kruglanski, A. W. (2002). Forgetting all else: On the antecedents and consequences of goal shielding. *Journal of Personality and Social Psychology, 83*, 1261–1280.
Shah, J. Y., & Kruglanski, A. W. (2002). Priming against your will: How goal pursuit is affected by accessible alternatives. *Journal of Experimental Social Psychology, 38*, 368–383.
Shah, J. Y., & Kruglanski, A. W. (2003). When opportunity knocks: Bottom-up priming of goals by means and its effects on self-regulation. *Journal of Personality and Social Psychology, 84*, 1109–1122.
Shiffman, S., Hickcox, M., Paty, J., Gnys, M., Kassel, J. D., & Richards, T. J. (1996). First lapses to smoking: Within-subjects analysis of real-time reports. *Journal of Consulting and Clinical Psychology, 64*, 993–1002.
Shu, L. L., Mazar, N., Gino, F., Ariely, D., & Bazerman, M. H. (2012). Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end. *Proceedings of the National Academy of Sciences United States of America, 109*(38), 15197–15200.
Simon, H. (1967). Motivational and emotional controls of cognition. *Psychology Review, 74*, 29–39.
Srull, T. K., & Wyer, R. S. Jr., (1979). The role of category accessibility in the interpretation of information about persons: Some determinants and implications. *Journal of Personality and Social Psychology, 37*, 1660–1672.
Stephens, R. S., & Curtin, L. (1994). Testing the abstinence violation effect construct with marijuana cessation. *Addictive Behaviors, 19*, 23–32.
Strahilevitz, M., & Myers, J. (1998). Promised donations to charity as purchase incentives: How well they work may depend on what you're trying to sell. *Journal of Consumer Research, 24*(4), 434–446.
Stroebe, W., Mensink, W., Aarts, H., Schut, H., & Kruglanski, A. W. (2008). Why dieters fail: Testing the goal conflict model of eating. *Journal of Experimental Social Psychology, 44*, 25–36.
Sunstein, C. R. (2011). Empirically informed regulation. *University of Chicago Law Review, 78*, 1349–1429.
Susewind, M., & Hoelzl, E. (2014). A matter of perspective: Why past moral behavior can sometimes encourage and other times discourage future moral striving. *Journal of Applied Social Psychology, 44*(3), 201–209.
Tesser, A. (1988). Toward a self-evaluation maintenance model of social behavior. In L. Berkowitz (Ed.). *Advances in experimental social psychology* (Vol. 21, pp. 181–227). San Diego, CA: Academic Press.
Tesser, A., Crepaz, N., Collins, J. C., Cornell, D., & Beach, S. R. H. (2000). Confluence of self-esteem regulation mechanisms: On integrating the self-zoo. *Personality and Social Psychology Bulletin, 26*, 1476–1489.
Thaler, R. H., & Sunstein, C. R. (2003). Libertarian paternalism. *American Economics Review, 93*(2), 175–179.
Thøgersen, J. (1999a). Spillover processes in the development of a sustainable consumption pattern. *Journal of Economic Psychology, 20*, 53–81.
Thøgersen, J. (1999b). The ethical consumer: Moral norms and packaging choice. *Journal of Consumer Policy, 22*, 439–460.
Thøgersen, J., & Crompton, T. (2009). Simple and painless? The limitations of spillover in environmental campaigning. *Journal of Consumer Policy, 32*, 141–163.
Thøgersen, J., & Olander, F. (2003). Spillover of environment-friendly consumer behavior. *Journal of Environmental Psychology, 32*, 141–163.
Tiefenbeck, V., Staake, T., Roth, K., & Sachs, O. (2013). For better or for worse? Empirical evidence of moral licensing in a behavioral energy conservation campaign. *Energy Policy, 57*, 160–171.
Trope, Y., & Fishbach, A. (2000). Counteractive self-control in overcoming temptations. *Journal of Personality and Social Psychology, 79*(4), 493–506.
Trope, Y., & Liberman, N. (2003). Temporal construal. *Psychological Review, 110*, 403–421.
Trope, Y., & Neter, E. (1994). Reconciling competing motives in self-evaluation: The role of self-control in feedback seeking. *Journal of Personality and Social Psychology, 66*, 646–657.
Trope, Y., & Pomerantz, E. M. (1998). Resolving conflicts among self-evaluative motives: Positive experiences as a resource for overcoming defensiveness. *Motivation and Emotion, 22*, 53–72.
Truelove, H. B., Carrico, A. R., Weber, E. U., Raimi, K. T., & Vandenbergh, M. P. (2014). Positive and negative spillover of pro-environmental behavior: An integrative review and theoretical framework. *Global Environmental Change, 29*, 127–138.
Urbszat, D., Herman, C. P., & Polivy, J. (2002). Eat, drink, and be merry, for tomorrow we diet: Effects of anticipated deprivation on food intake in restrained and unrestrained eaters. *Journal of Abnormal Psychology, 111*, 396–401.
Van Kleef, E., Shimizu, M., & Wansink, B. (2011). Food compensation: Do exercise ads change food intake? *International Journal of Behavioral Nutrition and Physical Activity, 8*(6), 661–664.

Van Praag, B. M. S., Frijters, P., & Ferrer-i-Carbonell, A. (2003). The anatomy of subjective well-being. *Journal of Economic Behavior & Organization, 51*(1), 29–49.

Vega-Redondo, F. (1996). *Evolution, games, and economic behaviour*. Oxford: Oxford University Press.

Viscusi, P., & Cavallo, G. O. (1994). The effect of product safety regulation on safety precautions. *Risk Analysis, 14*(6), 917–930.

Vohs, K., Mead, N. L., & Goode, M. R. (2006). The psychological consequences of money. *Science, 314*, 1154–1156.

Weber, E. U. (1997). Perception and expectation of climate change. In M. H. Bazerman (Ed.), *Environment, ethics, and behavior: The psychology of environmental valuation* (pp. 314–341). New York: Lexington Books.

Werle, C., Wansink, B., & Payne, C. (2010). Just thinking about exercise makes me serve more food. Physical activity and calorie compensation. *Appetite, 56*(2), 332–335.

Werle, C. O. C., Wansink, B., & Payne, C. R. (2011). 'Just thinking about exercise makes me serve more food': Physical activity and calorie compensation. *Appetite, 56*(2), 332–335.

Wicklund, R. A., & Gollwitzer, P. M. (1981). Symbolic self-completion, attempted influence, and self-deprecation. *Basic and Applied Social Psychology, 2*(2), 89–114.

Wicklund, R. A., & Gollwitzer, P. M. (1982). *Symbolic self-completion*. Hillsdale, NJ: Erlbaum.

Wilcox, K., Vallen, B., Block, L., & Fitzsimons, G. J. (2009). Vicarious goal fulfillment: when the mere presence of a healthy option leads to an ironically indulgent decision. *Journal of Consumer Research, 36*(3), 380–393.

Wilde, G. J. S. (1982a). The theory of risk homeostasis: Implications for safety and health. *Risk Analysis, 2*, 209–225.

Wilde, G. J. S. (1982b). Critical issues risk homeostasis theory: A reply. *Risk Analysis, 2*, 249–258.

Wilde, G. J. S. (1998). Risk homeostasis theory: An overview. *Injury Prevention, 4*, 89–91.

Wilde, G. J. S., Robertson, L. S., & Pless, I. B. (2002). For and against: Does risk homeostasis theory have implications for road safety? *British Medical Journal, 324*, 1149–1152.

Wilson, T. D., & Schooler, J. W. (1991). Thinking too much: Introspection can reduce the quality of preferences and decisions. *Journal of Personality and Social Psychology, 60*, 181–192.

Wisdom, J., Downs, J. S., & Loewenstein, G. (2010). Promoting healthy choices: Information versus convenience. *American Economic Journal: Applied Economics, 2*, 164–178.

Zanna, M. P., & Cooper, J. (1974). Dissonance and the pill: An attribution approach to studying the arousal properties of dissonance. *Journal of Personality and Social Psychology, 29*(5), 703–709.

Zeigarnik, B. (1927). Das Behalten erledigter und unerledigter Handlugen [The memory of completed and uncompleted actions]. *Psychologische Forschung, 9*, 1–85.

Zhong, C. B., Ku, G., Lount, R. B., & Murnighan, J. K. (2010). Compensatory ethics. *Journal of Business Ethics, 92*, 323–339.

Zhong, C. B., & Liljenquist, K. (2006). Washing away your sins: Threatened morality and physical cleansing. *Science, 313*, 1451–1452.

Zwane, A. P. et al (2011). Being surveyed can change later behavior and related parameter estimates. *Proceedings of the National Academy of Sciences United States of America, 108*(5), 1821–1826.

# EXHIBIT O

## to Expert Report of Professor Louis Klarevas

Methodology

*For reprint orders, please contact: reprints@futuremedicine.com*

# Analyzing the concept of spillover effects for expanded inclusion in health economics research

Journal of **Comparative Effectiveness Research**

K Jane Muir*,[1] & Jessica Keim-Malpass[1]

[1]Department of Acute and Specialty Care, University of Virginia School of Nursing, Charlottesville, VA 22903, USA

*Author for correspondence: kjm5xw@virginia.edu

**Background:** The incorporation of spillover effects in health economic research is recognized by regulatory agencies as useful for valuing health interventions and technologies. To date, spillover effects are not universally used within economic evaluations and conceptual definitions of spillover effects are vague within the context of health economics research. **Materials & methods:** In an effort to enhance awareness of spillover effects for health economic evaluations, a concept analysis using Walker and Avant's approach was performed to elucidate the key attributes, definitions, antecedents and consequences of spillover effects across a range of disciplines. **Results:** Key attributes included lack of intention, positive and negative impacts, and two entity/domain involvement. Antecedents included an initial action and desired outcome. Consequences involved spillovers across industries, work life to personal life domains, patient to family member domains and across healthcare markets. **Conclusion:** The analysis provides greater clarification around the dimensions of spillover effects and reveals opportunities to enhance methodological approaches to assessing spillovers.

First draft submitted: 1 April 2020; Accepted for publication: 1 June 2020; Published online: 17 June 2020

**Keywords:** concept analysis • economic evaluations • health economics • spillover effects

Health economic evaluations have been indicated to facilitate decision-making around medical interventions, technological advancement, pharmaceutical innovation, healthcare professional workforce projections and other healthcare-related topics [1–3]. Given rising US healthcare spending, information gleaned from economic evaluations can lead to the appropriate allocation of resources needed to improve patient outcomes, healthcare systems, health policy and other healthcare-related decisions [3].

Economic evaluations are commonly classified as cost–effectiveness analyses, cost–utility analyses and cost–benefit analyses [4]. The various economic evaluation techniques similarly compare costs in the form of monetary units and differ with regards to measuring consequences [4,5]. For example, cost–effectiveness analyses, as described by Drummond and colleagues [4], measure a single consequence in the form of a natural unit, such as blood sugar reduction, life years gained or averted missed work days. Cost–utility analyses can measure outcomes of interventions based on preferences or utility weights. Cost–utility analyses are considered a broader type of cost–effectiveness analysis. A common cost–utility measurement is the quality-adjusted life year [4]. Cost–benefit analyses focus on a single cost and benefit measurement in the form of a monetary unit alone [4,5]. The availability of multiple economic evaluation techniques is beneficial for evaluating health programs and interventions, as well as resource allocation decision making where value judgments may vary by research question or approach [4,5].

An important concept discussed in the health economics literature is spillover effects, known as the health impacts and costs that extend beyond a health intervention or program's targeted recipient (the patient) to unintentionally impact other recipients either in a positive or negative way [6,7]. Health economic studies have predominantly assessed spillover effects within the family unit, where a patient's health status spills over to impact the quality of life of a family member [6]. Despite acknowledgement by the Second US Panel on Cost–Effectiveness in Health and Medicine that spillover effects are needed to enhance cost and benefit estimates of health interventions, a gap exists

Future
Medicine

Table 1. Spillover effect concept characteristics.

| Attributes | Antecedents | Consequences |
|---|---|---|
| • Unintentional<br>• Positive or negative impacts<br>• Two entity/domain involvement | • Initial action<br>• Desired outcome | • Unintentional impact from one entity to a second entity<br>• Cross-industry, interpersonal, professional life to personal life domain |

in health economics research regarding universal inclusion of such effects [8]. A potential cause of such spillover effect exclusion could be uncertainty around the concept of spillover effects, given the existing focus in health economics on the family caregiver spillover domain [9,10].

The purpose of this analysis was to examine the concept of spillover effects in order to identify defining attributes, antecedents and consequences across a variety of academic disciplines. An expanded analysis of the concept across multiple disciplines can inform increased integration of spillovers within health economic evaluations. Additionally, an analysis of the concept may expand the types of spillovers evaluated in health economic studies. The concept analysis consists of an eight-step process outlined in subsequent paragraphs, followed by implications for health economics research.

### Concept analysis of spillover effects

In analyzing the concept of 'spillover effects', a systematic eight-step procedure was conducted using Walker and Avant's concept analysis process [9]. The Walker and Avant [9] concept analysis process consists of: selecting a concept, determining the purpose(s) of the analysis, identifying uses of the concept, defining attributes, identifying a model case, identifying contrary cases, identifying antecedents and consequences and defining empirical referents. The first two steps of Walker and Avant's approach (concept selection and purpose development) are addressed in the introduction; the remaining steps are discussed in the following sections [9].

## Materials & methods

The concept of interest for the analysis was spillover effects, which is identified in a variety of terms in the literature as 'spillovers', 'spillover effects' and 'externalities' among a wide range of academic disciplines. These terms were all considered related to the identified concept of spillover effects. For the analysis, the literature search was restricted to health economics, psychology, sociology and business. A comprehensive search of the literature was conducted using PubMed, Google Scholar and Ovid Medline to understand the range of definitions and uses of spillovers. The primary search terms and Medical Subject Headings terms used either in combination or alone were 'spillover', 'spillover effects', 'externalities', 'economic', 'economic evaluation', 'economic modeling', 'Markov', 'cost–effectiveness', 'health', 'nurse', 'nursing', 'physician', 'caregiver', 'psychology', 'sociology' and 'business'. The search was filtered such that keywords were identified in the title and abstract of the articles. The article inclusion criteria included: articles or white papers that included the words 'spillovers' or 'externalities' written in English language within the past 15 years. Papers published in non-peer-reviewed journals, as well as gray literature and editorials were included.

A total of 50 articles that met the inclusion criteria were initially reviewed. A total of 34 articles were selected [10–41,44,45]. A total of 21 articles were from the health economics discipline, six from psychology, four from sociology and three from business. The majority of excluded articles discussed mathematical modeling of spillover effects, which was not relevant to the current research topic. The identified literature was reviewed and analyzed to identify attributes, antecedents and consequences of spillover effects (Table 1).

### Identifying uses of the concept

The initial step of the analysis involved examining the definition of 'spillovers' in the dictionary and uses in the relevant published literature. According to Merriam-Webster [42], 'spillover' refers to 'an extension of something, especially when an excess exists'. Use of the term 'spillover effects' are discussed in the following sections within the domains of health economics, psychology, sociology and business. A total of 23 of the articles explicitly described a definition of spillover effects, while the remaining articles described examples without clear definitions.

*Uses in health economics*

Spillover effects were examined within the academic discipline of health economics and were discussed as either 'spillovers', 'spillover effects' or 'externalities'. Within the health economics field, spillovers were most commonly discussed in relation to a health intervention, scientific advancement or technological development. Gold [7], discusses spillovers, synonymous with externalities, as a positive or negative market exchange impacting individuals or groups who are not direct participants in such exchanges (p. 66). In a case study discussion on measuring spillover effects of patients with meningitis, Bhaduri and colleagues [22], refer to spillovers as 'wider health benefits' impacting patients in addition to individuals who are close to the patient (p. 1). Lakdawalla and colleagues [26], defined spillovers within the concept of scientific spillovers as the benefit of a scientific advancement imparted upon future knowledge development. Scientific spillovers occur when one advancement is made and other scientists, researchers or innovators expand on the given idea or advancement over time.

Much of the health economics literature studied spillovers in the context of the family caregiver or informal carer. Caregiver spillover effects, first introduced by Basu and Meltzer [6], refer to the various conditions, treatments and contacts that impact the welfare of family members. Spillovers manifest as the caregiver health effects and/or informal care time costs resulting from the health status/condition of a family member or close individual [13]. Spillovers have also been explored in terms of their impact on healthcare markets and provider practice patterns. A study by Johnson and colleagues [27], posited that decreases in fee-for-service traditional Medicare spending resulted from the spillover effect of increased Medicare Advantage penetration within states. Baicker and Robbins [16], found that a 10% increase in Medicare Advantage state penetration was associated with an approximate US$250 reduction in fee-for-service traditional Medicare resource use per patient. Cost-controlling measures within Medicare Advantage, such as the presence of health maintenance organizations, resulted in decreased costly inpatient hospitalizations and more cost-reducing outpatient service use. Overall, the health economics literature considered spillovers the impacts that extend beyond a patient and impact individuals or groups within a social network of a patient.

*Uses in psychology*

Within the psychology discipline, spillovers were discussed as an attitudinal or behavioral transfer from one life to domain to another [30,32]. In studying shift work among nurses with families, Kunst and colleagues referred to spillovers as "*. . . transfers of mood, energy and skills from one sphere to another*" [30]. Spillovers were described in psychology as bidirectional in movement, occurring between work and family life domains [30]. Behavioral spillovers were a particular domain of spillovers in the psychology literature defined as a secondary process that can lead to larger-scale societal and scientific consequences [33]. Nash and colleagues described behavioral spillover theory as, "*a way to catalyze broad lifestyle change from one behavior to another in ways that generate greater impacts than piecemeal interventions*" [34]. Behavioral spillovers have been contextualized within environmental impacts within countries, where the concept of a conscious spillover can be cultivated in countries that value pro-environmental behavior [34]. Additional behavioral spillovers have evaluated exercise and healthy eating practices [34]. Overall, spillovers in psychology emphasized behaviors and the transfer of emotional or behavioral influences from one life or societal domain to another.

*Uses in sociology*

Uses of spillover effects in the sociology literature shed light on intersections between individual disparities, institutions and social outcomes. Timmermans and colleagues situated their qualitative study on lack of health insurance spillovers based on neoclassical economic underpinnings [37]. Within this study, spillovers were discussed as 'collateral effects' and 'externalities' that are costs or benefits resulting from activities impacting "*an otherwise uninvolved party who did not choose to incur that cost or benefit*" [37]. Spillovers were further described as a tool to examine the effects of activities between entities that are unrelated but seemingly impacted by one another [37]. In studying the spillover effects of deterrence strategies to reduce crime, Braga and colleagues did not explicitly define spillover effects, but reference them as synonymous with indirect effects [38]. Hagan and Foster [36], assessed spillovers in the context of incarcerated mothers and the associated 'social costs' incarceration can have on children's education. Thus, the identified sociology literature referred to spillovers as the unintentional impacts of a policy, process, or phenomenon on societal institutions and outcomes.

#### *Uses in business*

In the business literature, spillovers were discussed in the context of innovation and idea expansion between groups. Frischmann and Lemley [39], define spillovers as the, "*uncompensated benefits that one person's activity provides to another*". Grillitsch and Nillson [41], examined knowledge spillovers in Swedish firms that are located within industrial 'clusters' or regions of high local knowledge density versus firms that are located within a knowledge 'periphery'. The study found that innovative firms in the knowledge periphery collaborate with external firms to compensate for the lack of knowledge spillovers that are gained by firms located within the knowledge/industrial cluster [41].

In a business advertising context, Sahni analyzed the impact of online advertisements on advertiser competition [40]. The findings from the randomized field experiments from a restaurant-search website suggested that spillovers were significant when advertising efforts were of the lowest frequency, while minimal spillovers occurred with high-intensity advertising techniques. Thus, the stronger intensity advertising techniques saturated consumer interest in the main advertiser, which offset spillovers toward other competitors [40]. Business spillover effects in the identified literature referenced spillovers in the context of innovation, marketing influences and consumer activities.

### Defining attributes

The determination of defining attributes is central to identify and define characteristics central to the concept under study. Based on the relevant review of the literature, three common attributes of spillover effects were noted: lack of intention, positive or negative impacts and two entity/domain involvement.

#### *Lack of intention (unintentional)*

The majority of the literature examined described spillovers as unintentional in nature. Frischmann and colleagues [38], described spillovers as never planned nor calculated from the outset of an activity, process, intervention, or phenomenon. Thus, the receiving individual or third party is not privy to a transaction or compensations [19,22,39]. Sahni discusses the unintentional nature of advertisement techniques that invoke consumer memory recall of associated brands or products [40]. The literature described advertising techniques as having an unintentional consequence of priming a consumer to recall a non-advertised option in addition to the primary product/service advertised [40]. Health economics spillover effects around health interventions were described as an unintended effect on informal caregivers, family members, or other individuals within the social network of a patient. The majority of the identified spillover literature in the psychology and sociology disciplines discussed spillovers within the frame of being unintentional. One domain of psychology with a greater level of intentionality described was within behavioral spillovers specifically within environmental research. For example, Nash and colleagues [34] described behavioral spillovers as strongly influenced by "*behavioral interventions, changes in awareness, availability of infrastructure and resources and technological advances and policy change.*" Across the identified literature, spillovers were not intentionality imparted upon the indirect recipient.

#### *Positive or negative impacts*

Each of the disciplines characterized spillovers as capable of causing positive or negative effects. Within the realm of business and innovation, spillovers were cited as a social benefit that expands the influence of ideas to wider groups [39,40]. The social benefit of such a spillover is viewed as the advancement of an idea or innovation for the benefit of an industry. Furthermore, ideas cultivated in one industrial field were considered to commonly spill over into other fields – considered an interindustry spillover – in which case the benefit of these spillovers are accrued by both fields [39]. Frischmann and Lemley [39] attributed, in part, the 1980s computer boom to positive spillovers effects due to knowledge spillovers moving freely within Silicon Valley. Similarly, Grillitsch and Nillson's examination of knowledge spillovers between firms further supports the notion of positive innovation spillovers within regional clusters [41]. The study demonstrated that innovative spillovers between firms is positive, valuable and firms will strive to obtain these spillovers either through geographical means (internal access) or through collaborations externally [41]. Sahni discussed spillovers within advertising as positive or negative, based on the advertising effort companies implement [40]. Lower frequency advertising strategies resulted in positive spillovers for the advertising company's competitors, while higher frequency techniques resulted in positive spillovers for the advertising company.

In the discipline of psychology, spillovers have been described as both positive and negative within the work–family life spheres. Amstad and Semmer [32] describe work as a positive spillover where workers can develop

beneficial time management and efficiency habits that benefit productivity and communication within the family unit. Conversely, work is described as a negative spillover when stress transfers from the work domain to the home life domain [32]. Negative spillovers manifest as the undue stress imparted to family members by an employee ruminating at work within the family setting [31].

Much of the literature on spillover effects within health economics described the negative spillovers from a patient illness to a family member or individual close to the patient. Caregiver spillover effects, first introduced by Basu and Meltzer [6], refer to the various conditions, treatments and contacts that impact the welfare of family members. Such spillovers manifest as caregiver health effects and/or informal care time costs resulting from the health status/condition of a family member or close individual [13]. Al-Janabi and colleagues [22], describe family caregiver spillovers as the psychological, physical, financial and emotional burden that family caregivers experience while caring for a sick family member. Family caregiver spillovers have been studied among parents of children with medical complexity and autism, as well as spouses of adult patients; such effects include increased parent absenteeism, physical injury, depression and anxiety [10,12]. Bhadhuri and colleagues assessed meningitis family spillovers and found that long-term morbidity for meningitis survivors caused negative spillovers in the form of family member health losses [23]. Thus, negative spillover health impacts toward family members/caregivers predominated the health economics literature.

### *Two entity/domain involvement*

A unifying theme across the spillover effect literature was the involvement of two entities or domains impacted by an action or process. Specifically, spillovers were described to have a direct impact on a targeted entity (or domain), as well as a second entity unintentionally. This common characteristic manifested within the business literature as innovation spillovers from one entity, or industry, to another. Within one sociology study, one family entity, an incarcerated mother, had an unintentional impact on her child's performance in the school domain [36]. An additional sociology perspective assessed the impact of a health insurance domain on societal institutions (schools and churches) [37]. Among the identified literature, there were noted similarities between psychology and health economics in that family members were the two entities frequently impacted by spillovers [10–13,30–32]. As mentioned previously, spillover effects studied within the psychology discipline assessed professional life spillovers to the home and family setting [30,32]. Within the health economics literature, spillover effects were most commonly referenced as well-being impacts on family members of patients. Further health economic studies referenced changes in innovation from a present scientific to future scientific domain [26].

## Identifying a model case & contrary case

### *Model case*

Model case construction is the fifth step of Walker and Avant's [9] concept analysis and consists of including the identified attributes in a model case based on literature or invention by the author. The following case was created by the author and discusses the spillover impacts of a healthcare unit systems-level intervention on patient outcomes.

Elkwood Hospital Emergency Department (ED) provides adult, pediatric and women's health services. It has a triage section, a main ED treatment area and a pediatric treatment area. Recently, the ED has experienced a surge in patient volumes due to local population growth. The department decides to implement a new triage workflow configuration for patients after identifying that 70% of all presenting ED patients are low acuity and do not need to be seen in the main ED treatment area. Thus, the department initiates a 'triage quick assessment' process facilitating quick assessment and treatment of low-acuity patients in order to free up bed and clinician resources for high-acuity patients and to reduce patient wait times.

In order to increase efficiency in the new triage center, patients are initially brought into a triage room after patient registration where vital signs, initial assessments and labs are taken by a nurse. After this process, the patient is returned to the waiting room where they wait to be called back into the triage room for a physician assessment. As the first patient waits in the waiting room, new low-acuity patients are brought into the triage room to go through the same process by the nurse.

The new triage configuration is efficient in that it facilitates a quick assessment of every patient, where a nurse can identify if a patient is truly stable (or not) and return patients to the waiting room until their physician assessment. The additional benefit of the quick assessment process is that it allows for continuous bed availability should a high-acuity patient present in need of immediate stability and subsequent transfer to a permanent room.

Over time, the ED observes significant drops in patient wait times due to this new configuration. However, although the process has benefited overall patient time metrics in the ED, the process has been detrimental to patient satisfaction ratings. Patients have reported negative feedback regarding the constant transport between the triage room and the waiting room and report perceived fragmented care imparted by the staff. Additionally, the department has observed a 10% increase in clinician turnover since implementation of the new triage configuration. Nurses on the unit cite increased moral distress due to the rising time pressures and increased time constraints related to quickly completing patient registration, assessments and labs. The physicians have reported missed nursing care on common tasks, such as incomplete vital signs and delayed medication administration. Upon closer evaluation, the director of the ED has noted rising patient re-admissions to the ED. Despite quick evaluations among these low-acuity patients, approximately 30% are returning within one week to the ED again.

This case addresses the defining attributes of spillover effects wherein the intervention resulted in unintentional impacts such as decreased patient satisfaction, clinician turnover, nurse moral distress, patient adverse events and increased patient re-admissions. The department did not intend from the outset for a systemic intervention to cause clinician moral distress impacting clinician performance and patient outcomes. The resulting spillovers of increased efficiency in one arena (reducing wait times) included increased clinician error detrimentally impacted patient outcomes and/or reduced patient satisfaction impacting patient utilization.

The case results in negative spillovers, evidenced by increased patient utilization, clinician error, moral distress and patient dissatisfaction. Though the same entities are involved (patients, clinicians and the emergency department), different domains, or 'arenas' as mentioned in the psychology literature base, are impacted. Overall, the primary intention of the intervention was to increase patient efficiency (domain 1), while a variety of secondary domains were unintentionally impacted through spillovers (patient satisfaction, quality of care delivery, clinician turnover, patient health status, patient utilization).

### *Model case: methods expansion*

This case additionally highlights the need for close examination of the methods used to measure the identified spillovers. A mixed-methods approach could be used to elucidate such effects mentioned within the case, particularly within an economic evaluation [43,44]. For example, a cost–benefit analysis could be conducted to quantify the impact of the new triage intervention, with spillover effects evaluated through increased patient re-admission costs and clinician turnover-rate costs. Furthermore, qualitative methodologies could be used to elucidate the systemic impacts on clinician challenges linked to fulfilling the identified workflow. Mixed-methods approaches could be employed to assess the quantifiable aspects of these spillovers, with qualitative methods informing the moral distress, intention to leave the workplace and patient dissatisfaction [43,44]. Thus, a variety of measurement strategies could be employed to best understand spillovers in the context of a health system intervention.

### *Contrary case*

An ED creates a triage configuration to rapidly assess patients. Upon evaluating performance metrics, ED identifies that on a daily basis, 70% of the total patients seen in the ED who are low-acuity patients are successfully being treated and discharged from this new triage configuration. The physicians and nurses who work in the main section of the ED have noticed that the time to treat patients who are high acuity has decreased, meaning clinicians are seeing the sickest patients faster than before the intervention. This is a contrary case to a spillover because the implementation of the new triage configuration is intended to increase efficiency for low- and high-acuity patients. The ED aimed to treat 70% of the patients through a rapid assessment configuration in order to increase time to treat efficiency for high-acuity patients. Only one domain is impacted in this case – patient efficiency – given that it is the ED's intent to reduce wait times for all patients due to a workflow change. Thus, this case lacks the attributes of two entities and being unintentional in nature.

## Identifying antecedents

Antecedent identification helps to understand the characteristics of attributes of spillover effects that exist prior to fulfillment of the concept [9]. There are two antecedents of spillovers: an intentional first action and a desired outcome. The intentional first action is the act of delivering or implementing a primary process. The desired outcome is inherently linked to the first action. A first action would be considered, for example, the development of a new healthcare technology to help patients with chronic pain. The desired outcome of technological advancement would be to reduce a patient's perceived or pathophysiologic suffering from pain. An initial action and desired

outcome are an antecedent because it determines the first entity or domain impacted in the spillover effect cascade. The secondary aspect, or consequences of the spillover effect involves impacts to secondary entities. Consequences are discussed in subsequent paragraphs.

## Identifying consequences

Consequences are resulting events or phenomena that emerge from the identified concept [9]. As previously described, consequences of spillovers are considered the unintentional impacts resulting from an intentional first action and can have positive or negative impacts. The magnitude of the spillover effect consequences varied among the disciplines reviewed and provided rich perspectives on micro- and macro-level impacts among various entities under study. For example, the business literature predominantly described spillover effects as having a large-scale impact as various industries were involved [39–41]. Geographic context strongly influenced the transference of knowledge and innovation spillovers [39,41].

Similarly, health economic spillovers were discussed in the context of scientific innovation, however the majority of studies discussed spillover impacts between individuals [26]. Specifically, individuals with illnesses and their social networks were the focus of health economic spillover effect research [19,20]. Health economic studies, therefore focused mostly on individual versus industry spillovers. A noted methodological consequence of measuring spillovers relates to the issue of double-counting [25]. An example is in the case of a patient experiencing depression or anxiety related to watching a family or clinician caregiver provide challenging care. This situation poses a methodological risk of double counting, in which the quality of life decrement is 'counted' as a utility for the patient when it could already be 'counted' in the utility of the caregivers [25].

The discipline of psychology also discussed smaller magnitude spillovers within the family unit, however behavioral spillover literature addressed environmental spillovers on a national level of larger magnitude [32,33]. Finally, spillovers within the sociology context assessed broader societal impacts of policies, processes, or access challenges [35–37]. Though individual family unit spillovers were assessed, a broader spillover focus was on societal impacts. The analyzed literature expressed a variety of spillover effect impacts that are important to consider in developing research around spillovers.

## Identifying empirical referents

The final stage of Walker and Avant's approach [9] is identifying empirical referents, specifically how the concept is measured. The measurement of spillover effects was identified as highly variable across the various disciplines. Although definitions of spillovers across the disciplines overlap, there existed noted differences in the measurement of spillovers among the examined literature.

Spillovers evaluated within the fields of psychology, sociology and business have used both qualitative, quantitative and mixed-methods approaches to assess spillover effects. In the sociology context, Timmermans and colleagues [37] evaluated how lack of health insurance affects religious institutions and school (kindergarten–12th grade) functioning. Using in-depth, qualitative interviewing methods, the authors found negative education spillovers relevant to increased student absenteeism, as well as increased ED utilization rates and 'waiting illnesses out' (p. 367) [37]. In examining spillover crime impacts, Braga and colleagues [38] used a quasi-experimental design and regression analysis to examine gang shooting trends. During data collection for the study, the team employed qualitative interviewing to gain insight into shooting events, relationships between gang victims and other contextual information relevant to gun-related gang activity [38]. Spillover inclusion in the examined business literature has predominantly included quantitative regression analyses of market impacts or consumer behaviors [39,40].

Within the health economic literature, quantitative approaches to assess spillovers have dominated over qualitative approaches. Health economic studies have assessed spillovers using state-preference valuation techniques, such as surveys like the EuroQoL-5 Dimension (EQ-5D-3L) and the Short Form-6 Dimension (SF-6D) to assess individuals' health status [45,46]. Such surveys ask participants to rate their health within a wide range of dimensions such as sleep quality, anxiety/depression, pain/discomfort and more. Data from these surveys are then quantitatively evaluated using regression-based or correlational analyses to understand associations between patient health quality and caregiver quality to determine potential spillovers [23].

Additional spillover assessments in economic evaluations include discrete choice experiments, where caregivers are given a set of scenarios and are asked to select their preferences of variables/choices within specific scenarios [15]. Such assessments are useful in determining willingness-to-accept values regarding caregiver informal care payment [20,28].

Other spillover assessments include accounting for displaced time due to caregiving through opportunity costs in economic models and recording caregiver tasks in diary logs [13].

Qualitative approaches have been used sparsely in health economic studies [47]. One identified study by Canaway and colleagues [19] used in-depth interviewing and hierarchical mapping to identify the social networks of end-of-life (EOL) patients [19]. The authors found that EOL patient caregiving network size was dependent on disease trajectory; EOL patients had an average of eight close family members/and or caregivers. Information gleaned from the interviews can be used by economists to assess the emotional and personal connectedness spillover effects of EOL caregiving within a network [19].

Despite the use of mixed-methods and qualitative approaches in the fields of psychology and sociology, qualitative methodologies are less prominent in health economics literature. No general consensus existed among the selected literature on how to universally assess spillovers. The implications of the identified diverse approaches to assessing spillover effects is discussed in subsequent paragraphs.

## Implications for health economics & comparative effectiveness research

Implications from this concept analysis include expanding the types of spillover effects assessed in economic evaluations, as well as the methods used to assess spillovers. First, this concept analysis demonstrates an opportunity to expand spillover effect analyses to include entities beyond family caregivers or scientific innovation advancement in the future. Health economic studies have evaluated spillovers between healthcare markets in a similar manner to inter-industry spillovers in the business literature. However, increased opportunity exists in quantifying spillovers beyond the patient social network to include frontline caregivers, systems-level spillovers of health interventions (i.e., increased outpatient clinic visits, ED re-admissions) and health intervention spillovers to manufacturing industries [19]. Additionally, there is a gap in understanding the existence of and potential impact of multiple spillovers occurring at the same time. Future research is needed to understand multidimensional spillovers, where, for example, an entity experiences multiple spillover effects at once. Family caregivers, for example, may experience health spillovers while informally caring for a sick loved one while simultaneously experiencing financial spillovers from a new medication for the patient's symptom relief.

Second, the examined methods used to assess spillover effects (empirical referents) from the examined literature can be applied to health economic studies to further elaborate on spillover effects comprehensively. Qualitative methodologies, for example, can be used to best elaborate on spillover effects that may be challenging to quantify in traditional spillover effect measures such as regression analyses, choice experiments or surveys. Dopp and colleagues [44] suggest that qualitative perspectives can facilitate mixed-method approaches in economic evaluations to fill a 'qualitative residual' where stakeholder and contextual information is traditionally absent (p. 2). The mixed approaches to assessing spillovers, for example in the sociology literature, where qualitative methods were used, suggests that spillovers may employ rich, descriptive contextual perspectives that are well-suited to compare health interventions [18,37]. Qualitative methodologies are well suited to assess spillovers due to inherent epistemological underpinnings in thick, contextual descriptions, emic–etic (insider, outsider) perspectives and observational data on drivers and mechanisms of topics under study [48–50,53]. Inclusion of qualitative methods to assess spillovers in economic studies may result in the investment of healthcare resources that are appropriately allocated to targeted populations. The subsequent section addresses factors to consider when integrating spillover effect assessments into health economic research.

### Expanding spillover effect inclusion in health economic studies

Figure 1 can be used as a framework to guide spillover effect inclusion in health economic evaluations. Adapted from Galizzi and Whitmarsh's [29], methodological recommendations for behavioral spillovers, relevant questions to consider about spillover effect inclusion based on Figure 1 factors are listed below.

Context: What is the setting where the spillover effect(s) takes place?

Entities: What are the entities, domains and/or populations involved? What is the intended (directed) and unintended impact? What are any targeted interventions targeting directed outcomes?

Magnitude: What are the potential outcomes from the intended outcome? What is the breadth and depth of the impacts?

Methods: Can these spillovers best be elucidated through experimental or non-experimental approaches? Are there opportunities for qualitative or mixed-method approaches?



Figure 1. Framework for spillover effect research inclusion.

The highlighted factors are gleaned from the concept analysis and were developed after assessing relevant attributes, antecedents, definitions and overall characteristics of spillover effects. The first relevant factor–context describes the need to identify the environment where the spillover effect takes place. Such settings could include a hospital, a patient/family home, a healthcare corporation, or an academic evaluation of a healthcare market. The second important factor to consider is entities and domains. This factor aims to identify what/who is the entity intended to be impacted and which entity is receiving a potential spillover impact. Subsequently, the third domain is the magnitude or overall impact of spillovers. Magnitude can be considered a geographic, interpersonal or interindustry impact. Estimating the potential magnitude can aid in understanding the extent to which the spillover needs to be studied. A final consideration is the methods approach. Finally, methods selection should be guided by the contextual, entity and magnitude considerations. Such evaluation of important factors driving spillover effects, as determined from this concept analysis, can guide spillover effect integration in health economic studies.

## Conclusion

This concept analysis expands definitions and characteristics of spillover effects for consideration in health economic studies. Few health economic studies to date adequately incorporate spillover effects and when incorporated, most evaluations focus on family spillovers evaluated quantitatively [20]. Spillover effects serve a role in enhancing the societal perspective of a study, given that they reveal contexts and unintended effects of a strategy or intervention on various groups or entities that have been traditionally overlooked in a traditional economic model [25,51]. This concept analysis used a multidisciplinary lens to identify defining characteristics of spillover effects to expand considerations of spillover effects for use in health economic evaluations.

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 331 of 517

## Summary points

- Within health economics research, spillover effects are traditionally considered the health impacts of an intervention unintentionally imparted upon the family member of an ill individual. Broader considerations of spillover effects can enhance economic evaluations.
- A concept analysis was conducted across academic disciplines. Key attributes included: lack of intention (unintentional), positive or negative impacts and two entity/domain involvement. An initial action and targeted outcome were identified antecedents of spillover effects. Consequences varied in terms of magnitude and domain of impact across industries, life domains and interpersonal relationships.
- Expanded conceptualizations of spillover effects can strengthen economic evaluations. Economic evaluations assessing spillovers should consider the context, entities and magnitude of spillovers to inform method selection.

### Author contributions

KJ Muir contributed substantially to manuscript conception and design, literature review and drafting of manuscript work. J Keim-Malpass contributed substantially to manuscript conception and design, drafting of manuscript work and revisions of drafts. Both authors agree to be accountable for all aspects of the work, inclusive of manuscript integrity.

### Financial & competing interests disclosure

The authors have no relevant affiliations or financial involvement with any organization or entity with a financial interest in or financial conflict with the subject matter or materials discussed in the manuscript. This includes employment, consultancies, honoraria, stock ownership or options, expert testimony, grants or patents received or pending, or royalties.

No writing assistance was utilized in the production of this manuscript.

## References

Papers of special note have been highlighted as: • of interest

1 Kamal AH, Wolf SP, Troy J *et al.* Policy changes key to promoting sustainability and growth of the specialty palliative care workforce. *Health Aff.* 38(6), 910–918 (2019).

2 Dowd B, Nyman JA. cost–effectiveness analysis in the context of us commercial health insurance. *Pharmacoeconomics* 37(6), 743–744 (2019).

3 Ward MJ, Bonomo JB, Adeoye O *et al.* cost–effectiveness of diagnostic strategies for evaluation of suspected subarachnoid hemorrhage in the emergency department. *Acad. Emerg. Med.* 19(10), 1134–1144 (2012).

4 Drummond MF, Sculpher MJ, Claxton K, Stoddart GL, Torrance GW. *Methods for the Economic Evaluation of Health Care Programmes.* NY, USA, USA (2015).

5 Sanders GD, Neumann J, Basu A *et al.* Recommendations for conduct, methodological practices and reporting of cost–effectiveness analyses: second panel on cost–effectiveness in health and medicine. *JAMA* 316(10), 1093–1103 (2016).

6 Basu A, Meltzer D. Implications of spillover effects within the family for medical cost–effectiveness analysis. *J. Health Econ.* 24(4), 751–773 (2005).

7 Gold M. Panel on cost–effectiveness in health and medicine. *Med. Care* 34(12), DS197–DS199 (1996).

8 Sanders GD, Neumann PJ, Basu A *et al.* Recommendations for conduct, methodological practices and reporting of cost–effectiveness analyses: second panel on cost–effectiveness in health and medicine. *JAMA* 316(10), 1093–1103 (2016).

9 Walker LO, Avant KC. *Strategies for Theory Construction in Nursing. (4th Edition).* Pearson Education, NJ, USA (2004).

10 Lin PJ, D'Cruz B, Leech AA *et al.* 2019. Family and caregiver spillover effects in cost-utility analyses of Alzheimer's disease interventions. *Pharmacoeconomics* 37(4), 597–608 (2019).

11 Tubeuf S, Saloniki EC, Cottrell D. Parental health spillover in cost–effectiveness analysis: evidence from self-harming adolescents in England. *Pharmacoeconomics* 37(4), 513–530 (2019).

• **Used data from a randomized, controlled trial comparing two interventions for self-harming adolescents, family therapy with treatment as usual. Findings suggested that parents' utility values increased throughout the duration of the trial and were positively associated with their adolescent's health status, measured by utility values.**

12 Wittenberg E, James LP, Prosser LA. Spillover effects on caregivers' and family members' utility: a systematic review of the literature. *Pharmacoeconomics* 37(4), 475–499 (2019).

13 Grosse SD, Pike J, Soelaeman R, Tilford JM. Quantifying family spillover effects in economic evaluations: measurement and valuation of informal care time. *Pharmacoeconomics* 37(4), 461–473 (2019).

14 Jacobs JC, Van Houtven CH, Tanielian T, Ramchand R. Economic spillover effects of intensive unpaid caregiving. *Pharmacoeconomics* 37(4), 553–562 (2019). 

15 Hurley J, Mentzakis E. Health-related externalities: evidence from a choice experiment. *J. Health Econ.* 32(4), 671–681 (2013).

16 Baicker K, Robbins JA. Medicare payments and system-level health-care use: the spillover effects of Medicare managed care. *Am. J. Health Econ.* 1(4), 399–431 (2015).

17 Brown CC, Tilford JM, Payakachat N *et al.* Measuring health spillover effects in caregivers of children with autism spectrum disorder: a comparison of the eq-5d-3l and sf-6d. *Pharmacoeconomics* 37(4), 609–620 (2019).

18 Campbell JA, Ezzy D, Neil A *et al.* A qualitative investigation of the health economic impacts of bariatric surgery for obesity and implications for improved practice in health economics. *Health Econ.* 27(8), 1300–1318 (2018).

- **Cost–effectiveness analysis on bariatric surgery; authors finds positive human capital spillovers from patients reflecting positive self-worth into their productivity as an employee in the workplace after bariatric surgery.**

19 Canaway A, Al-Janabi H, Kinghorn P *et al.* Close-person spill-overs in end-of-life care: using hierarchical mapping to identify whose outcomes to include in economic evaluations. *Pharmacoeconomics* 37(4), 573–583 (2019).

20 Hoefman RJ, van Exel J, Brouwer WBF. The monetary value of informal care: obtaining pure time valuations using a discrete choice experiment. *Pharmacoeconomics* 37(4), 531–540 (2019).

21 McCabe C. Expanding the scope of costs and benefits for economic evaluations in health: some words of caution. *Pharmacoeconomics* 37(4), 457–460 (2019).

22 Al-Janabi H, McLoughlin C, Oyebode J *et al.* Six mechanisms behind carer wellbeing effects: a qualitative study of healthcare delivery. *Soc. Sci. Med.* 235, 112382 (2019).

23 Bhadhuri A, Jowett S, Jolly K *et al.* A comparison of the validity and responsiveness of the EQ-5D-5L and SF-6D for measuring health spillovers: a study of the family impact of meningitis. *Med. Decis. Mak.* 37(8), 882–893 (2017).

24 Miller C, Pender J, Hertz T. *Employment Spillover Effects of Rural Inpatient Healthcare Facilities.* (Economic Research Report No. (ERR-241)) (2017). https://www.ers.usda.gov/publications/pub-details/?pubid=86253

25 Brouwer WBF. The inclusion of spillover effects in economic evaluations: not an optional extra. *Pharmacoeconomics* 37(4), 451–456 (2019).

26 Lakdawalla DN, Doshi JA, Garrison LP Jr, Phelps CE, Basu A, Danzon PM. Defining elements of value in health care – a health economics approach: an ISPOR Special Task Force Report. *Value Health* 21(2), 131–139 (2018).

27 Johnson G, Figueroa JF, Zhou X, Orav EJ, Jha AK. Recent growth in Medicare Advantage enrollment associated with decreased fee-for-service spending in certain US counties. *Health Affairs* 35(9), 1707–1715 (2016).

28 Arora S, Goodall S, Viney R *et al.* Using discrete-choice experiment methods to estimate the value of informal care: the case of children with intellectual disability. *Pharmacoeconomics* 37(4), 501–511 (2019).

29 Galizzi MM, Whitmarsh L. How to measure behavioral spillovers: a methodological review and checklist. *Front. Psychol.* 10, 342 (2019).

30 Kunst JR, Løset GK, Hosøy D *et al.* The relationship between shift work schedules and spillover in a sample of nurses. *Int. J. Occup. Saf. Ergon.* 20(1), 139–147 (2014).

31 Zhou ZE, Meier LL, Spector PE. The spillover effects of coworker, supervisor and outsider workplace incivility on work-to-family conflict: a weekly diary design. *J. Organizational Behav.* 40(9–10), 1000–1012 (2019).

32 Amstad FT, Semmer NK. Spillover and crossover of work-and family-related negative emotions in couples. *Psychol. Everyday Activity* 4(1), 43–55 (2011).

33 Jones CR, Whitmarsh LE, Byrka K *et al.* Methodological, theoretical and applied advances in behavioural spillover. *Front. Psychol.* 10, 2701 (2019).

34 Nash N, Whitmarsh L, Capstick S *et al.* Climate-relevant behavioral spillover and the potential contribution of social practice theory. *WIREs Clim. Change* 8, e481 (2017).

35 Aranda E, Menjívar C, Donato KM. The spillover consequences of an enforcement-first u.s. immigration regime. *Am. Behav. Sci.* 1687–1695 (2014).

36 Hagan J, Foster H. Children of the american prison generation: student and school spillover effects of incarcerating mothers. *Law Soc. Rev.* 46(1), 37–69 (2012).

37 Timmermans S, Orrico LA, Smith J. Spillover effects of an uninsured population. *J. Health Soc. Behav.* 55(3), 360–374 (2014).

- **Uses open-interviewing, qualitative methods to elucidate the effects of a lack of insurance on two institutions, churches and schools. Negative spillover effects noted with increased absenteeism within schools, while less spillovers were noted in religious institutions.**

38 Braga AA, Zimmerman G, Barao L, Farrell C, Brunson RK, Papachristos AV. Street gangs, gun violence and focused deterrence: comparing place-based and group-based evaluation methods to estimate direct and spillover deterrent effects. *J. Res. Crime Delinquency* 56(4), 524–562 (2019).

39 Frischmann BM, Lemley MA. Spillovers. *Colum. L. Rev.* 107, 257 (2007).

40 Sahni NS. Advertising spillovers: evidence from online field experiments and implications for returns on advertising. *J. Marketing Res.* 53(4), 459–478 (2016).

41 Grillitsch M, Nilsson M. Innovation in peripheral regions: do collaborations compensate for a lack of local knowledge spillovers? *Ann. Reg. Sci.* 54(1), 299–321 (2015).

42 Merriam-Webster. *Merriam-Webster Online* (2020). https://www.merriam-webster.com/dictionary/spillover?utm_campaign=sd&utm_medium=serp&utm_source=jsonld

43 Jemna LM. Qualitative and mixed research methods in economics: the added value when using qualitative research methods. *J. Public Admin. Finance Law* 154–67 (2016).

44 Dopp AR, Mundey P, Beasley LO *et al.* Mixed-method approaches to strengthen economic evaluations in implementation research. *Implement. Sci.* 14(1), 1–9 (2019).

- **Overview of qualitative methodological integration into mixed methods research. Asserts that elucidation of patient preferences can be overlooked when qualitative investigations are omitted from economic evaluations.**

45 Brazier J, Roberts J, Tsuchiya A. A comparison of the EQ-5D and SF-6D across seven patient groups. *Health Econ.* 13(9), 873–884 (2004).

46 Brooks R, Group E. EuroQol: the current state of play. *Health Pol.* 37(1), 53–72 (1996).

47 Husbands S, Jowett S, Barton P *et al.* How qualitative methods can be used to inform model development. *Pharmacoeconomics* 35(6), 607–612 (2017).

48 Kauffman KS. The insider/outsider dilemma: field experience of a white researcher “getting in” a poor black community. *Nursing Res.* 43(3), 179–183 (1994).

49 Wolcott HF. On ethnographic intent. *Educat. Admin. Q* 21(3), 187–203 (1985).

50 Lincoln YS, Guba EG. *Naturalistic Inquiry.* Sage Publications Inc., CA, USA (1985).

51 Siebert U, Alagoz O, Bayoumi AM *et al.* Conceptualizing a model: a report of the ispor-smdm modeling good research practices task force-2 mark. *Med. Decis. Mak.* 32(5), 678–689 (2012).

52 Coast J. Qualitative methods for health economics. Rowman & Littlefield, MD, USA, 261–270 (2009).

- **Systematic review article evaluates the use of economic evaluations for decision making on a national and local (within hospitals or among providers) level. Institutional, methodological and cultural factors influences the use of economic evaluations for decision-making.**

# EXHIBIT P

## to Expert Report of Professor Louis Klarevas

ANNALS, AAPSS, 455, May 1981

# The Effect of Gun Availability on Violent Crime Patterns

By PHILIP J. COOK

ABSTRACT: Social scientists have started to find answers to some of the questions raised in the ongoing debate over gun control. The basic factual issue in this debate concerns the effect of gun availability on the distribution, seriousness, and number of violent crimes. Some evidence is available on each of these dimensions of the violent crime problem. The distribution of violent crimes among different types of victims is governed in part by the "vulnerability pattern" in weapon choice. The seriousness of robbery and assault incidents is influenced by weapon type, as indicated by the objective dangerousness and instrumental violence pattern. A reduction in gun availability would cause some weapon substitution and probably little change in overall robbery and assault rates—but the homicide rate would be reduced.

---

*Philip J Cook is an associate professor of public policy studies and economics, Duke University His research has focused primarily on the criminal justice system and other aspects of social regulation He has collaborated with Mark H Moore on a series of studies relating to gun control*

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 336 of 517

THE DEBATE over the appropriate degree of governmental regulation of firearms has been a prominent feature of the political landscape for the last two decades The claims and counterclaims for various gun control strategies have been bruited in congressional and state legislative hearings, political campaigns, editorials, and bumper strips. The issues are by this time familiar to even disinterested bystanders. the proper interpretation of the Second Amendment, the value of guns as a means of defense against burglars, or foreign invaders, or local tyrants, the difficulty of depriving criminals of guns without depriving the rest of us of basic rights, and so forth This "great American gun war"[1] clearly involves both value questions and questions of fact, and the latter have been the subject of numerous statistical skirmishes Strangely, however, the relevant factual questions have not attracted much attention from scholars until very recently The role of guns—and other types of weapons—in violent crime is a fit and important subject for scientific inquiry No etiological theory of violent crime is complete without due consideration of the technology of violent crime This would be true even in the absence of political interest in gun control.

Each of the major categories of violent crime—criminal homicide, aggravated assault, robbery, and rape—is committed with a variety of weapons Guns are used in a minority of violent crimes, but are of special concern because they are used in almost two thirds of the most serious events, criminal homicides, and because, unlike most other commonly used weapons (hands, kitchen knives, and baseball bats), it is conceivable that we might reduce the availability of guns without imposing unacceptable costs on the public. The principal factual question in the gun control debate is whether reducing gun availability would reduce the amount and/or seriousness of violent crime Can potential violent criminals be deterred from obtaining guns, carrying guns, and using guns in crime? If so, will this reduction in gun use make any difference, or will criminals simply substitute other weapons to equal effect? The answers to these questions are crucial to policy evaluation Our ability to answer these questions—to make accurate predictions about the effects of legal interventions in this area—is one measure of our scientific understanding of the role of weapons in violent crime

At the sacrifice of some dramatic tension, I provide a preview of my results here The type of weapon used in a violent crime is in part determined by the nature of the victim, guns are most likely to be used against the least vulnerable victims in robbery and homicide. The type of weapon used in a violent crime influences the outcome of the crime: gun robberies, when compared with other types of robbery, are more likely to be successful, less likely to result in injury to the victim, and more likely to result in the victim's death, gun assaults are more likely to result in the victim's death than knife assaults, *ceteris paribus* A general increase in gun availability would probably have little effect on the overall robbery rate, but would increase the homicide rate, including the rate of robbery murder, and possibly reduce

1 A phrase coined by B Bruce-Briggs, "The Great American Gun War," *The Public Interest*, 45 1–26 (fall 1976)

the number of aggravated assaults These and other predictions emerge from the empirical results presented here My overall conclusion is that the technology of violent crime matters a great deal in a number of dimensions, with important implications for the gun control debate

## THE BASIC ISSUES

Gun control measures come in a variety of forms, but most share the objective of reducing the availability of guns for use in violent crime Most federal and state gun regulations in the United States are moderate interventions intended to reduce criminal use while preserving the majority's access to guns for legitimate uses.[2] Washington, D C , and New York City have adopted a much broader attack on the handgun problem, with a ban on sales to all but a few people Whether the regulations are moderate or extreme, some opponents of gun control insist that a regulatory approach will be ineffective in reducing criminal violence Their position is summarized in two bumper strips. "When guns are outlawed, only outlaws will have guns," and "Guns don't kill people—people kill people." The former suggests that "outlaws" will acquire guns, despite whatever steps are taken to stop them, that is, that criminals will continue to do what is necessary to obtain guns, even if the price, hassle, and legal threats associated with obtaining a gun are increased substantially. The latter bumper strip apparently is meant to suggest that people who decide to kill will find a way even if they do not have access to guns. This is one aspect of a more general issue, the degree of "substitutibility" between guns and other weapons in homicide and other violent crimes. In short, does the type of weapon matter?

Supposing that we were somehow successful in discouraging some violent people from obtaining guns and using them in crime, how might violent crime patterns change? Three dimensions of the violent crime problem are important. (1) the *distribution* of robberies, aggravated assaults, rapes, and homicides across different types of victims, for example, commercial versus noncommercial robbery, (2) the *seriousness* of robberies, rapes, and aggravated assaults, and (3) the overall *rates* of each of these crimes These three dimensions are considered in turn in the next three sections.[3]

## DISTRIBUTION: THE VULNERABILITY PATTERN

People who attempt robbery or homicide are more likely to succeed with a gun than with other commonly used weapons A gun is particularly valuable against victims who are physically strong, armed, or otherwise relatively invulnerable—the gun is "the great equalizer." The patterns of weapon use in criminal homicide and robbery demonstrate that perpetrators are most likely to use guns against victims who would have the best chance of defending themselves against other weapons, that is, the likelihood of a gun being chosen by a robber or killer increases with the value of a gun in effecting a successful completion of the crime. These observations suggest that a program that is successful in re-

2 For a summary of federal and state gun control measures, see my article, with James Blose, in this issue

3 I am indebted to Mark Moore for this approach to carving up the violent crime problem In the review that follows I omit any discussion of rape, since relevant empirical studies are lacking for this crime

ducing the rate of gun ownership by potential robbers or killers will change the relative distribution of these crimes among different types of victims. The evidence and implications of the vulnerability pattern are presented in the following sections, beginning with criminal homicide.

*Criminal homicide*

A decision to kill is easier and safer to implement with a gun than with other commonly available weapons—there is less danger of effective victim resistance during the attack, and the killing can be accomplished more quickly and impersonally, with less sustained effort than is usually required with a knife or blunt object A gun has greatest value against relatively invulnerable victims, and the vulnerability of the victim appears to be an important factor in determining the probability that a gun will be used as the murder weapon

The least vulnerable victims are those who are guarded or armed All presidential assassinations in U S. history were committed with a handgun or rifle. Almost all law enforcement officers who have been murdered in recent years were shot: in 1978, 91 of 93 murdered officers were killed by guns.[4]

Physical size and strength are also components of vulnerability. In 1977, 68.5 percent of male homicide victims were shot, compared with only 51.0 percent of female homicide victims.[5] The victims' age pattern of gun use also reflects the vulnerability pattern about 70 percent of victims aged 20–44 are shot, but this fraction drops off rapidly for younger and older—that is, more vulnerable—victims.[6]

Vulnerability is of course a relative matter. We would expect that the lethality of the murder weapons would be directly related to the difference in physical strength between the victim and killer, other things being equal. To investigate this hypothesis, I used FBI data coded from the supplemental homicide reports submitted for 1976 and 1977 by police departments in 50 large cities. These data include the demographic characteristics of the victim and, where known, the offender, as well as the murder weapon, immediate circumstances, and apparent motive of the crime The results calculated from these data tend to confirm the relative vulnerability hypothesis. First, women tend to use more lethal weapons to kill their spouses than do men. 97 percent of the women, but only 78 percent of the men, used a gun or knife The gun fractions in spouse killings are 67 percent and 62 percent, respectively—not a large difference, but one that is notable, since women typically have less experience than men in handling guns and are less likely to think of any guns kept in the home as their personal property. It is also true that women who kill their "boyfriends" are more likely to use a gun than men who kill their "girlfriends."

Table 1 focuses on killings resulting from arguments and brawls in which both the killer and the victim were males The gun fraction increases with the age of the killer and is inversely related to the age

4 FBI, *Crime in the United States, 1978* (Washington, DC U S Government Printing Office)

5 U S Department of Commerce, Bureau of the Census, *Statistical Abstract of the U S , 1978* (Washington, DC U S Government Printing Office)

6 FBI

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 339 of 517

TABLE 1

GUN USE IN MURDERS AND NONNEGLIGENT HOMICIDES RESULTING FROM ARGUMENTS OR BRAWLS, MALE VICTIM AND MALE OFFENDER

| VICTIM S AGE | OFFENDER S AGE | | |
|---|---|---|---|
| | 18–39 | 40–59 | 60+ |
| 18–39 (in percentage) | 68 0 | 79 6 | 87 2 |
| N* | 1906 | 368 | 47 |
| 40–59 (in percentage) | 54 5 | 64 1 | 66 7 |
| N | 398 | 245 | 57 |
| 60+ (in percentage) | 48 3 | 49 2 | 63 3 |
| N | 58 | 61 | 30 |

SOURCE FBI Supplemental Homicide Reports, 50 large cities, 1976 and 1977 combined (unpublished)
* N = the sample size that is, the denominator of the fraction Cases in which the age of the killer is not known are excluded

of the victim. the highest gun fraction—87 percent—involves elderly killers and youthful victims, the lowest gun fraction—48 percent—involves youthful killers and elderly victims. Since age is highly correlated with strength and robustness, these results offer strong support for the relative vulnerability hypothesis.

Why are less vulnerable murder victims more likely to be shot than relatively vulnerable victims? A natural interpretation of this result is that intended victims who are physically strong or armed in some fashion are better able to defend themselves against homicidal assault than more vulnerable victims—unless the assailant uses a gun, the "great equalizer." The "vulnerability pattern" can then be explained as resulting from some combination of three mechanisms. (1) Homicidal attacks are more likely to fail against strong victims than weak ones, and the difference in the likelihood of failure is greater for nongun attacks than attacks with a gun. (2) The likelihood that an individual will act on a homicidal impulse depends in part on the perceived probability of success The intended victim's ability to defend himself acts as a deterrent to would-be killers—but this deterrent is much weaker if the killer has a gun than otherwise. (3) In the case of a planned murder, the killer will have the opportunity to equip himself with a tool that is adequate for the task. Against well-defended victims, the tool chosen will almost certainly be a gun, if one can be obtained without too much difficulty.

Each of these mechanisms is compatible with the prediction that a reduction in gun availability will cause a reduction in homicide, a reduction that will be concentrated on killings that involve a victim who is physically stronger than the killer. A number of specific hypotheses are suggested by this observation, including the following: a reduction in gun availability will reduce the male:female victimization ratio in killings of spouses and other intimates, reduce the fraction of homicide victims who are youthful males, and reduce the fraction of killers who are elderly.

*Robbery*

Robbery is defined as theft or attempted theft by means of force or

the threat of violence.[7] The robber's essential task is to overcome through intimidation or force the victim's natural tendency to resist parting with his valuables A variety of techniques for accomplishing this task are used in robbery, including actual attack—as in "muggings" and "yokings"—and the threatening display of a weapon such as a gun, knife, or club. Whatever the means employed, the objective is to quickly gain the victim's compliance or to render him helpless, thereby preventing the victim from escaping, summoning help, or struggling The amount of what could be called "power"—capability of generating lethal force—the robber needs to achieve these objectives with high probability depends on the characteristics of the robbery target—victim—and in particular on the vulnerability of the target The most vulnerable targets are people who are young, elderly, or otherwise physically weak or disabled—for example, by alcohol—who are alone and without ready means of escape The least vulnerable targets are commercial places, especially where there are several customers and clerks and possibly even armed guards—a bank being one extreme example

A gun is the most effective tool for enhancing the robber's power. Unlike other common weapons, a gun gives a robber the capacity to threaten deadly harm from a distance, thus allowing him to maintain a buffer zone between himself and the victim and to control several victims simultaneously A gun serves to preempt any rational victim's inclination to flee or resist [8] Wesley Skogan documented the effectiveness of a gun in forestalling victim resistance in his analysis of a national sample of victim-reported robberies.[9] only 8 percent of gun robbery victims resisted physically in noncommercial robberies, compared with about 15 percent of victims in noncommercial robberies involving other weapons [10] Other types of resistance—arguing, screaming, and fleeing—were also less common in gun robbery than in robbery involving other weapons.

It seems reasonable to assume that, from the robber's viewpoint, the value of employing a gun tends to be inversely related to the vulnerability of the target A gun will cause a greater increase in the likeli-

7 The perspective of this section was first developed in John Conklin's seminal work on robbery in Boston *Robbery and the Criminal Justice System* (Philadelphia J B Lippincott, 1972)

8 Ibid, pp 110–11, Conklin analyzes a gun's usefulness in terms of the ability it provides the robber to (1) maintain a buffer zone, (2) intimidate the victim, (3) make good the threat, if necessary, and (4) ensure escape

9 Wesley Skogan, "Weapon Use in Robbery Patterns and Policy Implications," unpublished manuscript (Northwestern University Center for Urban Affairs, 1978) He used the robbery incident reports collected from the National Crime Panel, which occurred during calendar year 1973 It should be noted that any analysis of victim survey data relies on the victim's impression of the nature of the weapon that was employed in the robbery In some cases the "gun" may be a toy, or simulated, Floyd Feeney and Adrianne Weir [*The Prevention and Control of Robbery A Summary*," unpublished manuscript (University of California, Davis Center on Admin of Criminal Justice, 1974] report that of 58 "gun" robbers interviewed in Oakland, 3 claimed to have used toys and 4 to have simulated the possession of a gun

10 Richard Block [*Violent Crime* (Lexington, MA Lexington Books, 1977)] found from studying robbery police reports in Chicago that victims who resisted with physical force typically (68 percent) did so in response to the robber's use of force Other types of resistance typically (70 percent) preceded the robber's use of force

hood of success against well-defended targets than against more vulnerable targets. A strong-arm technique will be adequate against an elderly woman walking alone on the street—a gun would be redundant with such a victim—but a gun is virtually a requirement of successful bank robbery. Skogan provides evidence supporting this claim he finds little relationship between robbery success rates and weapon type for personal robbery, but a very strong relationship for commercial robbery He reports that success rates in commercial robbery were 94 percent with a gun, 65 percent with a knife, and 48 percent with other weapons [11]

In economic terms, we can characterize robbery as a production process with weapons, robbers, and a target as "inputs"[12] The "output" of the production process can be defined as the probability of success This probability increases with the number and skill of the robbers, the vulnerability of the target, and the lethal effect of the weapons For given robber and target characteristics, the "marginal product" of a gun can be defined as the increase in probability of success if the robber(s) substitute a gun for, say, a knife The evidence presented in the preceding paragraphs suggests that the marginal product of a gun is small against vulnerable targets and is relatively large against well-defended targets We can go one step further and define the "value of a gun's marginal product" as its marginal product (increase in success probability) multiplied by the amount of loot if the robbery is successful Since for obvious reasons, targets with greater potential loot tend to be better defended against robbery,[13] the *value* of the gun's marginal product is even more strongly related to target vulnerability than is the marginal product of the gun The conclusion can be put in the form of a proposition.

> The economic value of a gun in robbery tends to be greatest against commercial targets and other well-defended targets, and least against highly vulnerable targets.

It makes good economic sense, then, for gun use in robbery to be closely related to target vulnerability This is indeed the case, as demonstrated in Table 2, which is based on tabulating results of more than 12,000 robbery reports taken from victim survey data gathered in 26 large cities

From Table 2, we see that 55 percent of gun robberies committed by adults, but only 13 percent of other adult armed robberies, involve commercial targets. Those relatively few gun robberies that were committed against people on the street are concentrated on relatively invulnerable targets—groups of two or more victims or prime-age males—while street robbery with other weapons was more likely to involve women, children, and elderly victims Skogan

11 Skogan

12 This perspective is further developed in Philip J Cook, "The Effect of Gun Availability on Robbery and Robbery Murder A Cross Section Study of Fifty Cities," in *Policy Studies Review Annual*, eds Robert H Haveman and B Bruce Zellner, Vol 3 (Beverly Hills, CA Sage, 1979), pp 752–53 (hereafter cited as "The Effect of Gun Availability")

13 It is obvious that commerical targets tend to be more lucrative than noncommercial and that a group of two or more victims will be more lucrative on the average than a single victim Feeney and Weir (p 24) report the not-so-obvious result that robberies of male victims resulted in a much higher median take ($50) than robberies of female victims (less than $20)

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 342 of 517

TABLE 2

DISTRIBUTION OF ROBBERIES (IN PERCENTAGE)

ALL ROBBERIES ACROSS LOCATIONS

| | GUN | KNIFE OR OTHER WEAPON | UNARMED |
|---|---|---|---|
| Commercial | 55 1 | 13 3 | 19 1 |
| Residence | 6 4 | 10 4 | 8 5 |
| Street, vehicle, and so forth | 38 5 | 76 3 | 72 4 |
| Total | 100 0 | 100 0 | 100 0 |

STREET ROBBERIES BY VICTIM CHARACTERISTICS

| | GUN | KNIFE OR OTHER WEAPON | UNARMED |
|---|---|---|---|
| Male victim age 16–54 | 59 8 | 53 8 | 41 1 |
| Two or more victims | 10 5 | 5 8 | 3 7 |
| All others (young, elderly, and/or female victim) | 29 7 | 40 4 | 55 2 |
| Total | 100 0 | 100 0 | 100 0 |

SOURCE Adapted from Philip J Cook, ' Reducing Injury and Death Rates in Robbery, p 43 © 1980 by The Regents of the University of California. Reprinted from *Policy Analysis*, Volume 6, No 1 (Winter 1980), by permission of The Regents The distributions are calculated from National Crime Panel victimization survey data of 26 cities

NOTE All incidents involved at least one male robber age 18 or over Entries in the table reflect survey sampling weights

provides further detail for commercial robberies, reporting that the likelihood that a gun is present in such robberies is only 44 percent for commercial places that have only one employee, but 68 percent for commercial places with two or more employees.[14]

What is the causal process that produces these patterns in gun robbery? There are two plausible explanations, both compatible with the evidence presented in the preceding paragraphs: (1) robbers who aspire to well-defended, lucrative targets equip themselves with a gun in order to increase their chance of success or (2) robbers who happen to have a gun are more tempted to rob lucrative, well-defended targets than robbers who lack this tool In short, the question is whether the weapon is chosen to suit the task or, rather, the available weapon helps define the task. There is doubtless some truth in both explanations.

The first explanation suggests that the observed relationship between gun use and target choice is the result of differences between the kinds of people that rob lucrative targets and those who commit relatively petty street robberies—a difference reminiscent of John Conklin's distinction between "professionals" and "opportunists."[15] Victim survey evidence does suggest that gun robbers as a group have more of the earmarks of professionalism than other armed robbers: besides the fact that they make bigger "scores," gun robbers are older, less likely to rob acquaintances, and less likely to work in large groups of three or more. The factors that determine a robber's choice of weapon have some tendency to persist. a cohort of adult

14 Ibid , calculated from figures in his Table 3

15 Ibid

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 343 of 517

men arrested for gun robbery in the District of Columbia showed a greater propensity to use guns in subsequent robberies than the corresponding cohort of nongun robbery arrestees [16]

It seems reasonable to hypothesize, then, that robbers who engage in planning and who seek out big scores will take pains to equip themselves with the appropriate weapon —usually some type of firearm. The frequency with which other less professional robbers use guns, and hence the kinds of targets they choose, may be more sensitive to the extent to which such people have access to guns and are in the habit of carrying them, for whatever reason. Increased availability of guns may then result in some target switching by this group—substitution of more lucrative, better-defended targets for more vulnerable targets Increased gun availability may also result in weapon substitution for a given type of target, implying an increase in the fraction of street robberies committed with a gun, that is, guns will be put to less valuable uses, as guns become "cheaper" These hypotheses can be stated more precisely as follows:

> An increase in gun availability in a city will (1) increase the fraction of noncommercial robberies committed with a gun and (2) increase the fraction of robberies committed against commercial and other well-defended targets.

In an earlier study of robbery patterns across 50 cities,[17] I found some confirmation for the first of these two predictions, controlling for other robbery-related variables, the fraction of robberies committed with a gun increases with the density of gun ownership in a city A 10 percent increase in the fraction of households that owns guns is associated with approximately a 5 percent increase in the rate of gun robbery

*Conclusions*

The preceding evidence demonstrates the existence of an important vulnerability pattern in weapon choice in homicide and robbery. Guns give assailants the power to succeed in killing or robbing relatively invulnerable victims who would have a good chance of fending off attack with a less lethal weapon If some potential killers were deprived of guns, the criminal homicide rate would be reduced The reduction would be concentrated among the least vulnerable types of potential victims—law enforcement officers, people with bodyguards, husbands of homicidal women, youthful men, and so forth. If robbers were deprived of guns, there would be a reduction in robberies against commercial places and other well-defended victims. In general, a reduction in gun availability would change the distribution of violent crimes, with greater concentration on vulnerable victims.

16 Philip J Cook and Daniel Nagin, *Does the Weapon Matter?* (Washington, DC Institute for Law and Social Research, 1979) The results cited here are based on 541 adult male gun robbery arrestees and 761 nongun robbery arrestees This cohort, which was arrested in 1973, was tracked through 1976 through Prosecutor's Management Information System (PROMIS) The robbery re-arrest rate for the gun cohort was 43 percent, of which 58 percent were gun robberies The robbery re-arrest rate for the nongun cohort was 45 percent, of which 40 percent were gun robberies The two cohorts had the same re-arrest rate for burglary (13 percent), but the nongun cohort was much more likely to be re-arrested for assaultive crimes (22 percent, as opposed to 13 percent for the gun cohort), see Table 9 of Cook and Nagin

17 Cook "The Effect of Gun Availability"

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 344 of 517

## SERIOUSNESS THE OBJECTIVE DANGEROUSNESS PATTERN

Recall that I am concerned with three dimensions of violent crime. the distribution, the seriousness, and the number of incidents. The vulnerability pattern suggests that gun availability will in certain respects influence the distribution of robberies and homicides across different categories of victims. I now turn to the seriousness dimension of violent crime. "Seriousness" in this discussion will be defined as the degree of injury to the victim A violent or potentially violent confrontation, as in robbery, rape, or assault, can result in a range of possible outcomes, from no physical harm up to serious injury or death of the victim The likelihood that the victim will be killed is influenced by the lethal effects of the weapon used by the perpetrator The evidence on this "objective dangerousness" pattern is presented first for serious assaults, and subsequently for robbery

### *Serious assaults*

The fraction of serious gun assaults that result in the victim's death is much higher than for assaults with other weapons. Richard Block, for example, found that of all aggravated assaults resulting in injury to the victim—and reported to the Chicago Police—14 percent of the gun cases, but only 4 percent of the knife cases, resulted in the victim's death [18] In part, this difference is the result of differences between gun and knife attacks in intent and capability. An assailant who intends to kill his victim, and who has some chance to prepare, is more likely to equip himself with a gun than an assailant who merely intends to hurt his victim. Furthermore, an attack that is intended to kill is more likely to be successful if perpetrated with a gun than with a knife or other weapon —especially against victims who are capable of defending themselves But differences in intent and capability are not the whole story

Franklin Zimring has demonstrated that a large proportion of murders are similar to serious assaults in that the attacks are unsustained[19]—the assailant does not administer the coup de grace, the blow that would ensure the death of his victim Indeed, the victim was shot only once in about two thirds of the gun homicides in Zimring's Chicago samples These cases differ very little from serious assaults for every death resulting from a single wound in the head or chest, Zimring found 1 8 victims with the same type of wound who did not die[20]—victims who were clearly not saved by any differences in the gunman's intent or capability, but rather just by good luck with respect to the precise location of the wound.

Evidently, some proportion of gun murders are not the result of a clear intent to kill, given that the majority of murders are the immediate result of altercations, often involving alcohol and rarely much thought, it seems unlikely that many killers have any clearly formulated "intent" at the time of their attack. The assailant's mental state is characterized by an impulse—to punish, avenge an insult, or stop a verbal or physical attack—backed by more or less

18 Ibid , p 33

19 Franklin Zimring, "The Medium is the Message Firearm Calibre as a Determinant of Death from Assault," *J Legal Studies*, 1(1) 97-124 (Jan 1972), and idem, "Is Gun Control Likely to Reduce Violent Killings?" *Univ Chicago Law Review*, 35 721-37 (1967)

20 Ibid , computed from Table 7, p 104

cathexis The immediate availability of a gun makes these circumstances more dangerous than would a less lethal weapon because an unsustained attack with a gun—a single shot—is more likely to kill than an unsustained attack with another weapon.

Zimring buttressed the conclusions from his first study, which compared knife and gun attacks, with a later study comparing large and small caliber gun attacks Even after controlling for the number and location of wounds, he found that 38 caliber attacks were more than twice as likely to kill as 22 caliber attacks [21] It appears, then, that weapon dangerousness has a substantial independent impact on the death rate from serious assaults

Zimring's seminal work in this area supports several important propositions, including

1. A restrictive gun control policy that causes knives and clubs to be substituted for guns will reduce the death rate in serious assault

2 A gun control policy that focuses on handguns may increase the death rate from gun assault if shotguns and rifles are substituted for handguns as a result [22]

3 In setting prosecution and sentencing priorities for aggravated assault cases, gun assaults should be viewed as more serious than assaults with other weapons, *ceteris paribus*, since there is a higher probability of the victim's dying in the gun assaults This is Zimring's "objective dangerousness" doctrine [23]

21 Ibid , 1972

22 This implication has been pointed out by Gary Kleck, "The Assumptions of Gun Control" (Florida State University, 1980) (unpublished)

23 "In the generality of cases, how likely is it that conduct such as that engaged in by the offender will lead to death?' Zimring, p 114

Richard Block extended Zimring's work on instrumentality by comparing death rates in aggravated assault and robbery cases. He concludes that "the relative fatality of different weapons in violent crime may be a technological invariant— . the probability of death given injury and a particular weapon remains relatively constant and unrelated to the type of crime committed "[24]

The notion that the number of deaths per 100 injuries is a "technical" constant, largely determined by the lethality of the weapon, is not supportable, however. Zimring demonstrated that the type of weapon was one important determinant of the outcome of serious attacks, but did not claim it was the only determinant Presumably the weapon-specific death rates in such attacks will differ across jurisdictions and vary over time depending on the mix of circumstances, the quality of medical care, and so forth Arthur Swersey presents an interesting case in point [25]

Swersey reports that the number of assaultive—as opposed to felony—gun homicides in Harlem increased from 19 in 1968 to 70 in 1973, and then fell back to 46 in 1974 Much of the change between 1968 and 1973 was from an increase in intentional killings resulting from disputes involving narcotics activities. The importance of changes in the intent of violent perpetrators during this period is indicated by the fact that the death rate in gun attacks doubled between 1968 and 1973, and then fell back in 1974 Swersey concludes that more than 80 percent

24 Block, p 32

25 "A Greater Intent to Kill The Changing Pattern of Homicide in Harlem and New York City" (Yale School of Organization and Management, 1980) (unpublished)

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 346 of 517

TABLE 3

LIKELIHOOD OF PHYSICAL ATTACK AND INJURY IN ROBBERY (IN PERCENTAGE)

| | GUN* | KNIFE† | OTHER WEAPON | UNARMED |
|---|---|---|---|---|
| Noncommercial robbery** | | | | |
| Victim attacked | 22 1 | 39 4 | 60 4 | 73 5 |
| Victim required medical treatment† | 7 2 | 10 9 | 15 5 | 11 1 |
| Victim hospitalized overnight | 2 0 | 2 6 | 2 7 | 1 6 |
| Number of cases (not in percentage) | 892 | 841 | 1060 | 1259 |
| Commercial robbery | | | | |
| Victim required medical treatment | 4 8 | 10 8 | 17 9 | 5 1 |
| Victim hospitalized overnight | 1 5 | 3 5 | 6 0 | 0 4 |
| Number of cases (not in percentage) | 2307 | 288 | 117 | 570 |

SOURCE National Crime Panel victimization surveys of 26 cities This table is excerpted from Philip J Cook Reducing Injury and Death Rates in Robbery Table 2 © 1980 by The Regents of the University of California. Reprinted from *Policy Analysis* Volume 6 No 1 (Winter 1980) by permission of The Regents

NOTE All incidents included in this table involved at least one male robber age 18 or over Entries in the table do not reflect the survey sampling weights which differed widely among the 26 cities

* Many robberies involve more than one type of weapon Incidents of that sort were classified according to the most lethal weapon used

** Robberies occurring on the street in a vehicle or near the victim s home

† Only about one third of the injured gun robbery victims were actually shot Two thirds of the injured knife robbery victims were stabbed

of the rise and fall in Harlem homicides was due to changes in the number of deliberate murders He finds a similar pattern for the rest of New York City [26]

Swersey's findings do not undermine Zimring's position Zimring did not deny that some killings were unambiguously motivated, or that the importance of intent in murder was subject to change over time, or that it might be more important in Harlem than in Chicago. In any event, Swersey's results are useful in documenting these possibilities

My conclusions can be briefly stated The likelihood of death from a serious assault is determined, *inter alia*, by the assailant's intent and the lethal nature of the weapon he uses The type of weapon is especially important when the intent is ambiguous The fraction of homicides that can be viewed as deliberate—unambiguously intended—varies over time and space, but is probably fairly small as a rule The fraction of gun assaults that results in the death of the victim is one indication of the relative prevalence of deliberate gun murders

*Robbery*

The principal role of a weapon in robbery is to aid the robber in coercing the victim—either by force or threat—to part with his valuables If the threat is sufficiently convincing, physical force is not necessary For this reason, it is hardly surprising that the use of force is closely related to the weapon type in robbery, being very common in unarmed robbery and rare in gun robbery Table 3 documents this pattern for both commercial and noncommercial robberies committed by adult males As shown in this table, gun robberies are less likely than other armed robberies to involve

26 Swersey also notes several other indications of an increasing fraction of deliberate murders in the homicide statistics for New York City as a whole During the 1970s, the clearance rate declined for homicide, as did the fraction of homicides occurring on the weekend and the fraction involving family members

physical violence and, furthermore, are less likely to injure the victim.[27] These patterns are compatible with the notion that violence plays an instrumental role in robbery—that it is employed when the robber believes it is needed to overcome or forestall victim resistance and that this need is less likely to arise when the robber uses a gun than otherwise.

There is evidence, however, that this "instrumental violence" pattern can account for only a fraction of the injuries and deaths that result from robbery. Three observations are relevant in this respect First, over two thirds of victims injured in noncommercial gun robberies do not resist in any way—even after the attack,[28] similarly, 20 out of 30 victims killed in gun robberies in Dade County between 1974 and 1976 did not resist the robber. Second, the likelihood that the victim will be injured in an armed robbery is much higher if the robbery is committed by a gang of three or more than otherwise, since victims are less likely to offer resistance to a group of three or four robbers than to a lone robber, this result is clearly incompatible with the "instrumental violence" hypothesis. Third, judging from re-arrest statistics for a large cohort of adult robbery arrestees in Washington, D.C., it appears that robbers who injure their victims tend to be more violence prone than other robbers.[29]

These findings are different aspects of an "excess violence" pattern: much of the violence in robbery is not "necessary," in the sense of being an instrumental response to anticipated or actual resistance by the victim. Rather, it is motivated by objectives or impulses that have little to do with ensuring successful completion of the theft In particular, the high incidence of violence in street robberies committed by larger groups—which typically have a low "take"—is best viewed as a form of recreation, and the gratuitous violence against the victim may be just part of the fun

Given these findings, it is useful to attempt a distinction between "robbery with intent to injure" or kill and robbery without such intent—in which violence would only be used to overcome victim resistance The latter form of robbery dominates the statistics—most victims are not in fact injured, and the likelihood of injury is less with guns than with other weapons. However, the more violent strain of robbery, involving an intent to injure, apparently accounts for a high percentage of the serious injuries and deaths that do occur in the robbery context. Furthermore, the incidence of excess violence in robbery is subject to change over time, as Zimring demonstrated in his study of robbery murder in Detroit [30] He found a sharp discontinuity in 1972 in the fraction of victims killed in armed robbery· after 10 years of stable weapon-specific death rates, this fraction doubled between 1971 and 1973 for gun robberies and increased even more during this period for other armed robberies

27 Other sources on this pattern include Conklin, Skogan, and Philip J Cook, "A Strategic Choice Analysis of Robbery" in *Sample Surveys of the Victims of Crimes*, ed Wesley Skogan (Cambridge, MA Ballinger, 1976) (hereafter cited as "A Strategic Choice Analysis of Robbery")

28 Philip J Cook, "Policies to Reduce Injury and Death Rates in Robbery," *Policy Analysis*, 6(1) 36 (winter 1980) (hereafter cited as "Policies to Reduce Injury and Death Rates")

29 Cook and Nagin, p 39

30 Franklin Zimring, "Determinants of the Death Rate from Robbery A Detroit Time Study,' *J Legal Studies*, 6(2) 317–32 (June 1977)

Are gun robberies more dangerous than other armed robberies, in the sense of being more likely to result in the victim's death? Victims are killed in a higher fraction of gun robberies than others: based on victim surveys and homicide data in eight cities, I calculated that there are 9.0 victim fatalities for every 1000 gun robberies, compared with 1.7 victim fatalities per 1000 nongun armed robberies.[31] Furthermore, it appears that the type of weapon plays an independent role in determining the likelihood of robbery murder, in a cross-sectional analysis of 50 cities, I found that the fraction of robberies resulting in the victim's death is closely related to the fraction of robberies that involve firearms.[32] Thus the objective dangerousness pattern applies to robbery as well as assault, for reasons that remain a bit obscure.

Why does the presence of a loaded, authentic gun in robbery increase the probability of the victim's death? My studies of robbery murder in Atlanta and Dade County[33] indicated that in at least half of the cases the killing was deliberate for example, the victim was tied and then executed, or shot several times from close range. But insofar as intent could be ascertained from police reports, it appears that these intentional killings were not premeditated, but rather decided on during the course of the robbery. Perhaps the explanation for why these spontaneous decisions are more likely to occur when the robber is holding a gun is related to Marvin Wolfgang's suggestion. "The offender's physical repugnance to engaging in direct physical assault by cutting or stabbing his adversary, may mean that in the absence of a firearm no homicide occurs."[34]

Two conclusions can be inferred from the preceding discussion.

1. A reduction in gun availability will increase the robbery injury rate,[35] but reduce the robbery murder rate.

2. Given the excess violence pattern in robbery, the robbery cases in which the victim is injured should be allocated special emphasis in establishing criminal prosecution and sentencing priorities.[36] In a high proportion of these crimes, the attack that caused the injury was not instrumental to the robbery, but

31. Cook, "Policies to Reduce Injury and Death Rates," p. 39.

32. Cook, "The Effect of Gun Availability," p. 775. The regression equation is as follows

$$\frac{\text{Robbery murders}}{\text{1000 robberies}} = \underset{(1.16)}{1.52} + \underset{(2.38)}{5.68}\,\frac{\text{Gun robberies}}{\text{Robberies}}$$

A closely related result uses the per capita, rather than "per robbery," murder rate

$$\frac{\text{Rob. murders}}{100{,}000} = \underset{(.232)}{-.284} + \underset{(.089)}{.907}\,\frac{\text{Gun robs}}{1000} + \underset{(.072)}{.136}\,\frac{\text{Nongun robs}}{1000}$$

(Numbers in parentheses are the standard errors of the ordinary least squares regression coefficients.) The data for 50 cities are 1975–76 averages. The second equation has an $R^2 = .82$, suggesting that robbery murder is very closely linked to robbery. Inclusion of the assaultive murder rate in this equation as an independent variable does not affect the other coefficients much—and the coefficient on the murder variable is not statistically significant. I conclude that robbery murder is more robbery than murder.

33. Cook, "Policies to Reduce Injury and Death Rates."

34. Marvin Wolfgang, *Patterns in Criminal Homicide* (Philadelphia: University of Pennsylvania, 1958), p. 79.

35. See Skogan.

36. Cook, "Policies to Reduce Injury and Death Rates."

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 349 of 517

rather was a distinct act A relatively severe judicial response to such cases might act as a deterrent to excess violence in robbery.

*Coercion and assault*

Does the instrumental violence pattern in robbery have any parallel in assault? I suspect the answer is yes, but I know of no empirical evidence

Some unknown fraction of assault cases are similar to robbery in that the assailant's objective is to coerce the victim's compliance—the assailant wants the victim to stop attacking him, physically or verbally, or stop dancing with his girlfriend, or get off his favorite barstool, or turn down the stereo. And, as in the case of robbery, the probability of a physical attack in such cases may be less if the assailant has a gun than otherwise because the victim will be less inclined to ignore or resist a threat enforced by the display of a gun It may also be true that the assailant would be more hesitant to use a gun than another weapon to make good his threat. If this reasoning is correct, than a general increase in gun availability may reduce the number of assault-related injuries

## INCIDENCE THE SUBSTITUTION PATTERN

The preceding evidence suggests that gun availability has a substantial effect on the distribution and seriousness of violent crime The third dimension of the violent crime problem is incidence—the number of violent confrontations and attacks For each of the crimes under consideration—assault, robbery, and homicide—a reduction in gun availability to criminals would presumably cause a reduction in the number of incidents involving guns. But for each crime there is a real possibility that the number of incidents involving weapons other than guns would increase as a result of the reduction in gun availability. If this weapon substitution does occur, the net effect of reduced gun availability on crime rates could be either positive or negative

First, consider the crime of assault In an environment in which a high percentage of the violence-prone people carry guns, it is possible that a sort of mutual deterrent is created, whereby a rational person would think twice before picking a fight A protagonist that is foolish enough to start a fight in such an environment may be persuaded to back off if his intended victim pulls a gun When physical attacks do occur, they are likely to be perpetrated with a gun and to be serious. This line of argument may explain why the Bartley-Fox Amendment in Massachusetts—an anticarrying law that was apparently quite effective—may have resulted in an increase in the rate of aggravated assaults—the gun assault rate went down substantially following implementation, but the non-gun assault rate increased even more [37] A legal intervention that is successful in getting guns off the streets may encourage relatively harmless fights with fists and broken bottles. Definitive results in this area are hard to come by, in part due to the difficulty in measuring the assault rate in a consistent manner over time or across jurisdictions.

My cross-sectional analysis of robbery in 50 cities found that one measure of gun availability—the

37 Glenn L Pierce and William J Bowers, "The Impact of the Bartley-Fox Gun Law on Crime in Massachusetts," unpublished manuscript (Northeastern University Center for Applied Social Research, 1979)

density of gun ownership—was statistically unrelated to the overall robbery rate when other causal factors were taken into account.[38] By way of illustration, the two cities with the highest robbery rates—Detroit and Boston—differed markedly in gun ownership. Boston was one of the lowest, and Detroit was above average The same study demonstrated that the fraction of robberies committed with a gun was closely related to the density of gun ownership in the city. Apparently robbers tend to substitute guns for other weapons as guns become readily available, but with little or no change in their rate of commission.

If guns were less widely available, the criminal homicide rate would fall. This prediction is justified by three distinct arguments developed in this article. (1) knives and clubs are not close substitutes for guns for implementing a decision to kill, especially when the intended victim is relatively invulnerable, (2) Zimring's "objective dangerousness" results demonstrate that a reduction in gun use in serious—but ambiguously motivated—assaults will reduce the homicide rate, and (3) my results on robbery murder in the 50-cities study indicate that the fraction of robberies that result in the victim's death is closely related to the fraction of robberies involving guns A final bit of evidence comes from evaluations of the Bartley-Fox Amendment, which suggest that it reduced the criminal homicide rate in Massachusetts [39] The tough new handgun law in the District of Columbia has also apparently been effective in this regard.[40] It should be noted that a crackdown focused on the least lethal type of gun—small caliber handguns—might not have the desired effect on criminal homicide if perpetrators substituted large caliber handguns or longguns.

My conclusion is that effective gun control measures are unlikely to reduce the total number of violent confrontations and attacks, but may well reduce the criminal homicide rate

## CONCLUSIONS

The type of weapon matters in violent crime, both in terms of its seriousness and its distribution If robbers could be deprived of guns, the robbery murder rate would fall, the robbery injury rate would rise, and robberies would be redistributed to some extent from less to more vulnerable targets The assaultive murder rate would decline, with the greatest reductions involving the least vulnerable victims The overall assault rate might well increase. These predictions are based on common sense and a variety of empirical observations. None of this evidence is conclusive, but it is the best that is currently available.

Is it reasonable to suppose that moderate gun control measures have the potential to discourage some violent criminals—potential or active—from obtaining guns? No doubt there are some active criminals and other violence-prone people who have the incentive and resources required to acquire a gun even in the face of substantial legal barriers. But such determined people do not figure importantly in the violent crime statistics—indeed, most assaults and robberies do not even involve guns now, despite the fact that guns are readily available in most

38 Cook, "The Effect of Gun Availability "

39 See the article by Pierce and Bowers in this issue

40 See Jones's article in this issue

Case 3:22-cv-01118-JBA Document 37-3 Filed 01/31/23 Page 351 of 517

jurisdictions A gun control measure that increases the average cost and hassle of a youthful urban male acquiring his first handgun may at least delay acquisition for a year or two—with noticeable effect on the gun crime rate A vigorous crackdown on carrying concealed weapons may have a similar beneficial effect.

Not all of the predicted effects on violent crime of a reduction in gun availability are attractive None of these predictions can be made with a high degree of certainty. But it is not unreasonable to suggest that a moderate, vigorously enforced program for regulating the sale and use of guns would save a substantial number of lives Gun control is not "the solution" to America's violent crime problem, but perhaps it should be one aspect of the effort to find a solution

# EXHIBIT Q

## to Expert Report of Professor Louis Klarevas



*Annual Review of Criminology*

# Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?

Anthony A. Braga,[1] Elizabeth Griffiths,[2] Keller Sheppard,[1] and Stephen Douglas[1]

[1] School of Criminology and Criminal Justice, Northeastern University, Boston, Massachusetts 02115, USA; email: a.braga@northeastern.edu

[2] School of Criminal Justice, Rutgers University, Newark, New Jersey 07102, USA

Annu. Rev. Criminol. 2021. 4:147–64

First published as a Review in Advance on September 14, 2020

The *Annual Review of Criminology* is online at criminol.annualreviews.org

https://doi.org/10.1146/annurev-criminol-061020-021528

Copyright © 2021 by Annual Reviews. All rights reserved

ANNUAL REVIEWS CONNECT

www.annualreviews.org

- Download figures
- Navigate cited references
- Keyword search
- Explore related articles
- Share via email or social media

## Keywords

firearm, gun, gun policy, gun violence, firearm instrumentality, homicide

## Abstract

One of the central debates animating the interpretation of gun research for public policy is the question of whether the presence of firearms independently makes violent situations more lethal, known as an instrumentality effect, or whether determined offenders will simply substitute other weapons to affect fatalities in the absence of guns. The latter position assumes sufficient intentionality among homicide assailants to kill their victims, irrespective of the tools available to do so. Studies on the lethality of guns, the likelihood of injury by weapon type, offender intent, and firearm availability provide considerable evidence that guns contribute to fatalities that would otherwise have been nonfatal assaults. The increasing lethality of guns, based on size and technology, and identifiable gaps in existing gun control policies mean that new and innovative policy interventions are required to reduce firearm fatalities and to alleviate the substantial economic and social costs associated with gun violence.

## INTRODUCTION

Weapon instrumentality is based on the straightforward idea that the type of weapon deployed in an assault influences the mortality of the victim. Logically, guns are regarded as more lethal instruments than knives, knives more lethal than blunt instruments, and so on. Yet the National Rifle Association and other progun activists often invoke the familiar slogan "guns don't kill people, people kill people" to support their arguments for more-permissive gun controls (Henigan 2016). This perspective suggests that an attacker who has a very strong determination to kill will take the necessary steps to be successful regardless of available weapons (Cook 1991, Cook et al. 2011). As such, the assailant's will to kill is reliably measured by whether the victim survives or perishes (Braga & Cook 2018, Zimring 1972). This perspective is reified in criminal law, wherein murderers are subjected to the harshest sanctions, including life without the possibility of parole or even death (Vernick & Hepburn 2003). The "people kill people" perspective further suggests that gun control is futile in reducing homicides because determined killers will simply find another way (Kleck 1997, Wolfgang 1958, Wright et al. 1983). If guns are not available, assailants will substitute knives, blunt instruments, or other means.

The alternate view is that "guns do kill people" and gun control advocates suggest that reducing firearm availability to violent people will save lives even if determined killers select other weapons instead (Cook 1991, Cook et al. 2011, Henigan 2016). Injuries in assaultive violence are often inflicted by whatever means are most available to the attacker, most commonly fists or feet followed by other objects that are close at hand (Hedeboe et al. 1985). Although a person who is determined to kill will sometimes acquire a lethal weapon, gun-inflicted deaths often ensue from varying kinds of impromptu arguments or fights (Spitzer 1995, Zimring & Hawkins 1997). Gun control advocates suggest that many of these deaths would be replaced by nonfatal injuries if guns were not available; in essence, they suggest that a more refined slogan would be "people without guns injure people; guns kill them" (Baker 1985, p. 588).

The purported strong will to kill as the key determinant of mortality is challenged by the noteworthy similarity in the characteristics and circumstances of fatal and nonfatal gun-assault incidents (Cook et al. 2019). Mortality in many gun attacks seems to be influenced by chance events, such as the number and placement of wounds, the availability and quality of medical help, and other factors (Braga & Cook 2018). The considerable overlap between fatal and nonfatal shootings is well captured by the observation of a Boston police investigator that the difference between the two events "is often only a matter of inches and luck—a lot of times a nonfatal shooting is just a failed homicide" (Braga et al. 2014, p. 119). In her in-depth examination of South Los Angeles homicides, investigative reporter Jill Leovy (2015, p. 49) notes that there were approximately five nonfatal injury shootings for every one gun homicide and, given the similarity between the events, detectives called these nonfatal shootings "*almoscides*, for 'almost homicides.'" Research on fatal and nonfatal gun assaults further suggests that mortality is influenced by the type of gun used in the attack, and the selection of the gun in these events is largely independent of other indicators of the assailant's intent (Braga & Cook 2018, Zimring 1972). As such, the types of guns deployed in assaults dramatically influence whether the intended victim lives or dies beyond the determination of the assailant to commit murder.

Firearm instrumentality is controversial among academics who study gun control policy issues. The controversy stems from disagreement over an assailant's purported intention to kill and whether a would-be killer would merely substitute other means to complete the act if guns were not available. In their recent survey of gun policy experts, the RAND Corporation discovered two distinct groups of scholars: those who favored more-restrictive gun regulations and those who favored more-permissive gun regulations (Morral et al. 2018). According to this research, "a

striking result of the survey concerns the wide disparity between estimates made by the two expert groups about means substitution. . . . That is, they disagree about the extent to which any reductions of firearm. . .homicides attributable to a policy are undermined because individuals simply use other means to achieve those ends" (Morral et al. 2018, p. xii). The average survey participant who favored more-permissive gun controls responded that if a policy successfully reduced a state's firearm homicides, 90% of the prevented homicides would still end as a homicide by some other means. In contrast, the average survey participant who preferred more-restrictive gun controls indicated that only 20% would still end in homicide. As such, gun policy experts with preferences for more-permissive gun regulations view legislative efforts to reduce gun homicides as futile since they believe would-be killers will complete their murderous acts through other means.

Firearm instrumentality is clearly a foundational issue in the great American gun control debate. Broader arguments that seek to limit the availability of guns to violence-prone individuals through the adoption of more-restrictive gun controls are based on the idea that lives would ultimately be saved (Cook et al. 2011). In this review, we examine the available scientific evidence on whether guns make situations more lethal. The review begins by examining extensive research on the lethality of gun assaults, focusing on a range of studies that attempt to determine the existence of instrumentality effects in violent gun and non-gun crimes. Extended coverage is given to two comprehensive studies that estimate whether gun caliber, killer intent, and other chance elements in gun assaults determine the likelihood of death for victims. We find strong support for gun instrumentality effects in our review of the literature. The final sections consider the policy implications of these findings and offer recommendations for further research in this area.

## THE LETHALITY OF GUNS

Guns are obviously designed to be lethal instruments. And although guns in civilian hands are used for sport shooting, hunting, and dealing with animal pests, they can also be deployed against people for legal self-defense or criminal purposes. In 2018, guns were used in more than 10,000 murders, 38,000 rapes/sexual assaults, 42,000 aggravated assaults with injury, and 96,000 robberies (Bur. Justice Stat. 2019, FBI 2018). However, it is important to note that most serious violent crime victimizations do not involve guns. The 2018 US Bureau of Justice Statistics National Crime Victimization Survey (NCVS) reveals that only 5% of rapes/sexual assault, 11% of aggravated assault with injury, and 17% of robbery victimization incidents involved a firearm (**Figure 1**). When used in violent crime, guns are usually not fired; more than three-quarters of nonfatal gun crime victims do not suffer gunshot wounds (Planty & Truman 2013). Instead, as is discussed further below, guns are typically deployed by criminals to gain compliance or threaten victims rather than to injure them. Most gun crimes involve handguns, which are used in roughly two-thirds of gun homicides and 90% of nonfatal gun violence (Planty & Truman 2013).

Among those violent gun incidents that do generate injuries, whether the victim lives or dies is often dependent upon the technology (i.e., type and characteristics) of the guns used in the assaults (for an excellent overview from a public health perspective, see Karlson & Hargarten 1997). The kinetic energy of a bullet is determined by its mass and velocity when fired from a gun. In general, the larger the caliber, the more mass the bullet will have. Larger-caliber bullets (such as .40, .44, and .45) generate more tissue damage than smaller-caliber bullets (such as .22, .25, and .32) when they strike the same body parts (Hargarten et al. 1996). Jacketed bullets tend to cause perforating wounds with less tissue damage relative to bullets designed to fragment and/or mushroom (Fackler et al. 1988). Cartridge cases can vary in the amount of explosive gun powder they hold, with larger cartridges generating higher bullet velocities when fired. Rifles are considered more lethal than handguns given the higher bullet velocities generated by the larger cartridges and the increased



Figure 1

Personal violent victimization with and without guns, 2018. Data taken from Bureau of Justice Statistics (2019).

accuracy of the longer barrel lengths (which also contribute to increased bullet velocity). Shotguns generally fire shells filled with multiple small pellets (gauges represent pellet sizes with 10 and 12 gauge being the most common; shotguns can also fire a single rifled "slug") that can be quite lethal at close range because of the extensive tissue damage generated by a concentration of pellets and much less lethal at distance because of the dispersion of pellets after firing (Karlson & Hargarten 1997).

The number and location of gunshot wounds also influence the mortality of the victim in gun-assault incidents. Holding other factors constant, injuries to the head and upper spinal cord are considered the most lethal gunshot wounds followed by injuries to the chest and abdomen (depending on whether vital organs are hit) and to extremities such as arms and legs (Karlson & Hargarten 1997, Kellermann et al. 1991). The number of gunshot wounds involved in a gun assault also elevates victim mortality, as each wound represents additional traumatic tissue injury (D'Alessio 1999, Hargarten et al. 1996). Other factors, such as the availability of quality trauma care to save injured victims (Coupet et al. 2019) and the speed at which first responders locate gunshot victims also influence the lethality of gun attacks. By one estimate, almost three-fourths of gun homicide victims die before they reach the hospital (Karlson & Hargarten 1997).

Empirical evidence suggests that guns are becoming more lethal over time with larger shares featuring higher-capacity magazines and using larger-caliber bullets (D'Alessio 1999, Kellermann et al. 1991, McGonigal et al. 1993, Webster et al. 1992, Wintemute 1996). For instance, in Boston, higher-capacity semiautomatic pistols capable of shooting more bullets replaced revolvers as the most frequently recovered type of handgun beginning in the 1990s (Braga 2017). As a consequence, the share of smaller-caliber handguns among crime gun recoveries decreased over the 2000s as the prominence of larger-caliber handguns increased. According to **Table 1**, the share of semiautomatic pistols recovered by the Boston Police Department increased from only 34.6% of total handguns recovered between 1981 and 1985 to a peak of 75.7% between 2001 and 2005, before dropping to 66.6% between 2011 and 2015. **Table 1** shows that large-caliber handguns

Table 1 Types and calibers of recovered handguns in Boston, 1981–2015

| Period | *N* | Percent semiauto | Percent .22, .25, .32 | Percent .38, .357 | Percent .380, 9mm | Percent .40, .44, .45 |
|---|---|---|---|---|---|---|
| 1981–1985 | 3,134 | 34.6 | 44.9 | 38.6 | 7.5 | 4.3 |
| 1986–1990 | 3,114 | 41.6 | 44.2 | 33.2 | 14 | 5.1 |
| 1991–1995 | 3,449 | 60.9 | 38.3 | 23.3 | 30.2 | 4.8 |
| 1996–2000 | 2,008 | 74.2 | 38.9 | 23.9 | 27.5 | 6.8 |
| 2001–2005 | 2,905 | 75.7 | 29.2 | 20.9 | 29.7 | 12.9 |
| 2006–2010 | 2,195 | 65.7 | 26.4 | 20.6 | 33.4 | 18 |
| 2011–2015 | 2,352 | 66.6 | 26.7 | 20.7 | 31.7 | 19.9 |

Table adapted from Braga (2017).

(.40, .44, and .45) increased almost fivefold from 4.3% of total handguns recovered between 1981 and 1985 to almost 20% of total handguns recovered between 2011 and 2015. Equally important, **Table 1** also documents the noteworthy shift away from medium-caliber bullets often used in revolvers (.38, .357) toward medium-caliber bullets typically used in semiautomatic pistols (.380, 9mm). The transition from revolvers to semiautomatic pistols and from smaller to larger-caliber handguns mirrors national trends in handgun production in the United States between the 1980s and 1990s (Wintemute 2010).

The increased killing power of handguns recovered by law enforcement agencies in the United States seems to have increased the lethality and number of wounds that gunshot victims experience over time. In epidemiology, the case-fatality rate is generally defined as the proportion of deaths (i.e., gun homicides) within a designated population of cases (total gunshot injury victims) (see Efron et al. 2006). For gun-assault victimizations, the case-fatality rate is roughly 1 in 6, wherein approximately 17% of gun-assault victims with injuries die from their wounds (Cook 1985). Furthermore, this rate has remained fairly stable since the 1980s, leading Cook and colleagues (2017) to conclude that national declines in gun homicide rates were better explained by decreases in the number of gun assaults rather than improvements in trauma care for firearm injuries. City-level studies, however, show that local case-fatality rates can diverge markedly from national trends and these differing patterns may be linked to changes in the technology of guns used in assaults. For instance, an analysis of gunshot wound patients treated in a Denver trauma center between 2000 and 2013 suggests that case-fatality rates increased over time as gunshot patients suffered more severe wounds and an increased number of serious wounds per patient (Sauaia et al. 2016). A similar study of 6,322 gunshot wound patients treated at the New Jersey Trauma Center at University Hospital in Newark reported significant increases in patients with three or more wounds from 13% to 22%, with a corresponding increase in mortality from 9% to 14%, between 2000 and 2011 (Livingston et al. 2014).

Criminological studies have shown that case-fatality rates can vary over the course of gun violence epidemics. For instance, in a classic study of the influence of the heroin epidemic on serious violence in New York City, the RAND Corporation found that the rapid increase in homicide in Harlem between 1968 and 1974 was driven by an increase in the case-fatality rate of gun assaults rather than an increase in the number of gun assaults (Swersey & Enloe 1975). More recently, Braga (2003) analyzed youth gun assaults in one police district located in a mostly black disadvantaged neighborhood in Boston between 1987 and 1995, representing the years before and during a gun violence epidemic initiated by the emergence of crack cocaine in the city. He found that the nature of youth gun assaults changed over time in several noteworthy ways: Larger-caliber semiautomatic pistols were more likely to be fired in gun attacks, incidents were likely to occur in public

places, a larger share of youth gun assaults resulted in a wound, and, for those assaults that involved a wound, a larger share involved multiple gunshot injuries. Most importantly, although the absolute number of youth gun assaults in 1995 was essentially the same as 1987, the case-fatality rate in this high-risk policing district tripled over the study period. Braga (2003) identified changes in both firearm instrumentality effects, as indicated by increased use of more powerful handguns with higher-capacity magazines, and shooters' intent to kill, as indicated by the increased number of wounds on youth gun-assault victims.

The empirical evidence reviewed above shows that there are several factors associated with the lethality of guns deployed in criminal assaults. In sum, it is not controversial in public health and medical research that mortality increases with the power of the gun deployed in assaults. As such, this research suggests the existence of firearm instrumentality effects. However, some observers argue that the selection of the firearm used in gun attacks is simply a reflection of the shooters' intent to kill and determined killers will complete their acts by substituting other deadly means if guns are unavailable. The next section considers findings of the criminological research on firearm instrumentality, intentionality, and the lethality of possible weapon substitution effects.

## Intention Versus Instrumentality

There is considerable evidence that the risk of death is elevated when a violent incident involves a gun. In particular, Cook (2018) found that crime victims who suffered gunshot wounds were more than seven times as likely to die when compared to knife attack victims who were seriously injured. In the case of robbery, the greatest difference between fatal and nonfatal robberies was the perpetrator's choice of weapon, wherein the likelihood of victim death in gun robberies (0.41% or approximately 1 in 250) was three times higher than knife robberies (0.13% or approximately 1 in 750) and 10 times higher than robberies committed with other weapons (0.04% or approximately 1 in 2,500), such as blunt instruments (Cook 1987). The likelihood of death in an unarmed robbery was approximately 1 in 5,000 (or 0.02%). Given that only 17% of total robberies involve firearms, but 65% of robbery murders are committed with a gun, the choice of weapon appears to have a significant and independent effect on the likelihood of victim fatality (Cook 1987). Cook (1987) found further evidence of firearm instrumentality effects in his panel analysis of changes in crime rates across 43 US cities; in this case, an additional 100 gun robberies increased the robbery-murder rate by three times as much as an additional 100 non-gun robberies. Cook (2018) observed that the 3:1 ratio was congruent with the difference in case-fatality rates for robbery and suggested a possible causal impact where robbery-murder was a by-product of robbery that occurred with a likelihood determined by the intrinsic lethality of the weapon deployed.

Using data from the National Incident-Based Reporting System (NIBRS), Libby & Corzine (2007) investigated the impact of weapon type on the lethality of violent interpersonal encounters. Controlling for incident circumstance, the relationship between the offender and victim, and their respective characteristics, firearms were found to have the strongest effect on the lethality of violent encounters, with handguns and shotguns representing the most lethal weapons overall (Libby & Corzine 2007). Similarly, Weaver et al. (2004) found that incidents involving firearms were 11 times more likely to result in victim homicide compared to unarmed assaults, whereas the use of knives was only approximately 2.5 times more likely to result in victim homicide. These findings support previous research in demonstrating independent weapon instrumentality effects, even when controlling for approximate measures of offender motive and intent (Wells & Horney 2002).

Weapon type has also been shown to influence victim mortality in family and intimate assaults. Research by Saltzman et al. (1992) showed that firearm assaults were three times as likely to result

in death as assaults involving knives or other cutting weapons, and approximately 23 times as likely to result in death as assaults involving other weapons or bodily force Overall, family and intimate assaults with a firearm were 12 times more likely to result in death than non-firearm assaults Additionally, approximately 50% of assaults with firearms resulted in a nonfatal injury, compared to 66% of assaults with knives, indicating that firearm attacks were less likely to result in nonfatal injuries than were knife attacks (Saltzman et al 1992)

These findings reinforce other research in demonstrating that gun assaults are particularly lethal For example, Felson & Messner (1996) found that offenders who used a gun were more than 40 times more likely to kill the victim than offenders who did not use a weapon, comparatively, offenders who used a knife were only 4 4 times more likely to kill the victim than offenders without weapons Additionally, guns were more strongly associated with homicides when the initiating offense was an assault compared to a robbery, suggesting that guns facilitate homicide for offenders with a determination to kill, as offenders engaging in assault are more likely than offenders engaging in robbery to harbor lethal intent (Felson & Messner 1996)

This question of intent motivated some of the earliest studies related to firearm instrumentality Wolfgang's (1958) seminal study of homicide in Philadelphia posited that few homicides would be prevented solely by eliminating the presence of firearms, as determined offenders would likely substitute other weapons to achieve the same result. Wright et al (1983) concur with this observation and suggest that firearms simply make the act of killing easier If no guns were available and the assailant was committed to completing the act, they would find another method of achieving it But it was roughly 50 years ago that Zimring (1968, 1972) offered the first critical tests of the extent of overlap between fatal and nonfatal attacks in an effort to disentangle whether instrumentality or intentionality distinguished homicides from serious assaults (either with guns or with other weapons) Although he could not directly measure intentionality with existing official data, he suggested that it could be inferred if firearm homicides exhibit different features—such as victim–offender relationship, motive, location of wounds, number of wounds, etc —from nonfatal attacks Contrary to Wolfgang (1958), Zimring (1968, p 722) believed that at least some homicides may be ambiguously motivated rather than "deliberate and determined," and "if the probable substitute for firearms in these situations is less likely to lead to death, then the elimination of guns would reduce the number of homicides " His research showed substantial similarities between the profiles of homicides and serious assaults, implying an ambiguity in intent to kill and leading him to conclude that what distinguishes a homicide from an assault is simply that the victim does not survive the attack

As noted earlier, intentionality may be evaluated even more directly on the basis of the location of the wound (Braga & Cook 2018, Zimring 1968, 1972) Those determined to commit homicide should target vital organs or areas of the body, including the trunk of the body or the head, rather than extremities, like arms or legs Yet Zimring (1968) found that nearly half of all gun attacks (44%) in Chicago resulted in wounds to nonvital parts of the victim's body, whereas a majority of knife attacks known to police resulted in wounds to the head, neck, chest, or back This means that attackers with a gun appear to no more intend a fatal outcome than do attackers using other weapons, and because "the rate of knife deaths per 100 reported knife attacks was less than 1/5 the rate of gun deaths per 100 reported gun attacks" (Zimring 1968, p 728), substituting knife attacks for gun attacks should drive the homicide rate down by a large margin If intention is relatively even across attacks that end in fatalities and those that do not, then the major factor distinguishing homicides from assaults is the dangerousness of the weapon This is particularly problematic, as guns can be fired from longer ranges, more easily, and with less skill than can other weapons of choice for assailants

Even among only those attacks committed with a gun, if larger-caliber guns produce a greater proportion of homicides versus assaults under similar circumstances, then the dangerousness of the weapon can be said to independently contribute to fatalities Excluding shotguns and large-caliber rifles, Zimring's (1972, p 105) analyses showed that 38 caliber attacks to the head and chest, in particular, but also the abdomen, back, and neck were "more than twice as deadly as 22 caliber attacks" to the same areas, providing additional support for an instrumentality argument Based on these two influential studies, Zimring (1972, p 110) concluded that patterns in fatal and nonfatal gun attacks are highly similar in "structure, intention, and motivational background" and, furthermore, that intent to kill is largely ambiguous across gun homicides and serious but nonfatal gun assaults The results of this early work and later replications (Sarvesvaran & Jayewardene 1985, Vinson 1974) provide direct support for the instrumentality effect, wherein guns influence the lethality of attacks primarily as a function of their dangerousness (see also Braga & Cook 2018, Cook 1991, Cook & Ludwig 2000, Cook et al 2019, Zimring & Hawkins 1997)

In a more recent and comprehensive study on weapon instrumentality and intentionality, Braga & Cook (2018) demonstrated that, compared to smaller-caliber firearms, larger-caliber guns produce substantially more fatalities among shooting victims in Boston Their research showed that the circumstances, neighborhood, prior criminal history, and demographic characteristics of fatal and nonfatal shootings are indistinguishable Given the substantial overlap in the features of gun homicides and nonfatal shootings, and mirroring the findings in Zimring's 1970s Chicago studies, Braga & Cook (2018) argued that there was little evidence to support the contention that fatal and nonfatal shootings are qualitatively distinct They then examined a subset of those cases in which the caliber of the weapon used in the shooting was known to police Compared to nonfatal shootings, gun homicides were found to be significantly more likely to involve large-caliber handguns, to be characterized by a greater number of shots fired, to result in multiple gunshot wounds to victims, and to wound the victim in the head or neck relative to peripheral parts of the body (Braga & Cook 2018)

If the selection of a more powerful, larger-caliber handgun were dependent on the attacker's intention to kill, however, then the characteristics of shootings involving small caliber handguns should differ from the features of shootings involving medium- and large-caliber handguns respectively Yet Braga & Cook's (2018, p 1) research illustrated that "caliber was not significantly correlated with other observable characteristics of the assault, including indicators of intent and determination to kill," such as the number of wounds, the location of wounds, and victim characteristics In effect, there was no evidence that sex, race, age, criminal history, circumstances of the shooting, the skill and determination of the shooter, or other features of incidents were associated with the caliber of the handgun used in the attack Consequently, shooters do not appear to be selecting a more powerful handgun according to their intent to kill This "lack of systematic association is what would be expected if caliber were assigned at random, as in an experiment" (Braga & Cook 2018, p 6)

The overlap in profiles of fatal and nonfatal shootings combined with the failure of incident-specific characteristics to distinguish shootings involving small versus large-caliber guns enables a strict test of weapons instrumentality That is, if the size and power of the handgun used in a shooting influence the likelihood of death independent of other features of the violence, and there is no direct effect of those features on the selection of the type of handgun, then the argument for instrumentality is considerably stronger In a model predicting fatal versus nonfatal shootings, Braga & Cook (2018) found that victims of attackers who use a medium-caliber handgun are more than twice as likely to die as a consequence of the shooting as those who are shot with a small-caliber handgun, and those odds double for victims shot with large caliber handguns They conclude that "if the medium- and large-caliber guns had been replaced with small-caliber (assuming everything

else unchanged), the result would have been a 39.5% reduction in gun homicides" (Braga & Cook 2018, p. 7). Importantly, then, gun fatalities are substantially elevated in the context of attacks with more powerful firearms, holding other features of the shooting constant.

Collectively, the studies that most directly focus on intentionality and instrumentality in gun violence point to a relatively clear conclusion: the dangerousness of the instrument used in violent attacks plays a critical role in producing fatal outcomes. Attackers using larger-caliber guns conduct attacks that bear striking similarities to those who use smaller-caliber guns in circumstance, accuracy, number of shots fired, and the location of wounds to victims (Braga & Cook 2018; Zimring 1968, 1972). Yet the likelihood of death increases with the power of the firearm used in the attack; larger-caliber weapons are increasingly likely to produce lethal consequences. Ultimately, then, "whether the victim of a serious assault lives or dies is to a large extent a matter of chance, rather than a question of the assailant's intent. The probability of death is connected to the intrinsic power and lethality of the weapon" (Braga & Cook 2018, p. 8). From a public health perspective, reducing the objective dangerousness of gun violence could be accomplished more readily by controlling the size and power of firearms available to the public than by assuming intentionality on the part of the offender on the basis of what amount to chance outcomes in shooting incidents.

## Offender Firearm Use, Victim Compliance, and Injury Incidence Rates

Weapon instrumentality effects also appear to influence the likelihood that violent incidents result in any injury to victims. Using data from the 1979–1985 NCVS and the FBI's 1982 Supplementary Homicide Report, Kleck & McElrath (1991) assessed the impact of various weapon types on the likelihood that a threatening situation escalated into a physical attack, whether the attack resulted in an injury, and whether the injury resulted in the death of the victim. Regarding the likelihood of injurious attacks on victims, the study suggested that the net effect of the presence of deadly weapons—firearms and, to a lesser extent, knives—in threatening situations is to reduce the probability that the possessors of the weapons attack. As the lethality of the weapon present increases, the probability of a physical and injurious attack decreases (Kleck & McElrath 1991). In effect, the threat alone is sufficient to subdue the victim. Libby (2009) attempted to replicate these findings using National Incident-Based Reporting System (NIBRS) data for 2003–2005 and generally confirmed the results of Kleck & McElrath (1991). His analysis indicated that the chances of nonlethal victim injury decreased by approximately 80% in incidents featuring a firearm. However, when firearms were used in the commission of a crime, the likelihood of death was substantially greater (Libby 2009).

Research suggests the source of these more nuanced instrumentality effects of guns on injury incidence may be rooted in offender decision-making processes and victim resistance in violent attacks. Criminal offenders may use firearms to facilitate the successful commission of their intended crimes (Jacobs 2000, Kleck & McElrath 1991, Wright & Decker 1997, Wright & Rossi 1994). Guns also tend to be used when offenders are planning robberies that involve larger amounts of cash and/or more expensive items (Cook 2009). Robbers report their desire to use the overwhelming force made possible through firearms to secure victim compliance via the threat of serious injury and death (Feeney 1986, Jacobs 2000, Wright & Decker 1997). In noncommercial robbery cases, the standard technique is to threaten victims and take their valuables without actually attacking them [78% of gun robberies and 64% of knife robberies (Cook 1980)]. In contrast, 74% of unarmed noncommercial robberies and 60% of blunt instrument noncommercial robberies involved physical attacks on victims followed by attempts to take their valuables by force (Cook 1980). The likelihood of injury followed the same pattern, ranging from only 11% of gun

robberies to 36% of robberies with blunt instruments (Cook 1980). As described earlier, when guns are present and fired, victim injuries are far more likely to be lethal.

Although less developed than the empirical evidence on weapon use in robbery, qualitative interviews with sexual assault offenders similarly show that they use weapons like guns to control their victims, discourage resistance, and secure compliance (Beauregard & Leclerc 2007, Reid & Beauregard 2017). As one serial sex offender noted, "It was better to threaten a victim with a gun when she was further away; she knew I could shoot her from that distance, which isn't the case with a knife" (Beauregard & Leclerc 2007, p. 123). Offender views on the subduing power of guns seem to be well supported, as victims were less likely to resist and offenders were more likely to complete the robbery or sexual assault successfully when a firearm was present (Cook 1980, 2009; Kleck & DeLone 1993; Libby 2009; Tillyer & Tillyer 2014).

Physical assaults sometimes serve as an inappropriate outlet for negative emotions or deep frustrations held by violent offenders (Langhinrichsen-Rohling et al. 2012). Kleck & McElrath (1991) considered a broad spectrum of assaults ranging from mere threats to homicides at multiple stages of the incident to explore this hypothesis. They suggest that offenders can successfully threaten or intimidate their intended target with the mere presence of a firearm, whereas they may need to objectively demonstrate their power through actual physical harm if in possession of another weapon type. Using event history analysis, Wells & Horney (2002) extended this line of inquiry by assessing how possession of a weapon influenced the likelihood of an attack and subsequent injury while controlling for offender intent. Their results indicated that persons armed with a firearm were more likely to confront a victim than those armed with another type of weapon; however, incidents featuring firearms were substantially less likely to result in any injury to victims.

Despite some contradictory evidence (Tark & Kleck 2004), the available research generally suggests that the mere threat of gun injury assists offenders in achieving their aims and often nullifies the need to use deadly force. As such, offenders do not typically employ firearms in an effort to inflict maximum harm against their victims (Zimring 1968) but rather to avoid potential confrontation and injury through implicit assertions of dominance. However, in cases in which the victim is attacked and injured, the likelihood of death in violent gun crimes is far higher than with knives or blunt objects, which accounts for the relatively high case-fatality rate for incidents featuring guns.

## POLICY IMPLICATIONS

The most important implication of instrumentality effects is that policies that decrease gun use in violent crime should reduce the homicide rate even if the overall volume of violent crime was unchanged (Cook et al. 2011). A variety of law enforcement approaches attempt to reduce gun violence by incapacitating those who have been convicted of gun crimes and deterring future gun crimes. Others suggest that policies designed to deprive potentially violent people of guns could save lives (Cook et al. 2011). This is a central element of the argument to restrict gun availability. In this section, we first discuss criminal justice approaches to reduce gun use by violent criminals, briefly review the existing evidence on the relationship between gun availability and violent crime, and summarize the impacts of gun control legislation designed to reduce gun availability on violence.

Firearm sentence-enhancement laws require minimum mandatory sentences or additional time in prison for gun felonies. To many observers, gun use in robberies and assaults deserves harsher punishments because of the increased chance that victims are killed (Cook & Nagin 1979). Sentencing enhancements are intended to reduce gun use in violence, encourage desistance from violent gun crimes, and induce prospective gun offenders to substitute less-lethal weapons. What

is more, stiffer prison penalties for gun crimes do not impact the ability of law-abiding citizens to own guns for recreational and self-defense purposes. As such, this approach is supported by gun control and gun rights advocates alike. Although there is some evidence to the contrary (e.g., Marvell & Moody 1995), the available research evidence suggests firearm sentence-enhancement laws generally seem to work in reducing gun violence (see, e.g., McDowall et al. 1992, Pierce & Bowers 1981). In a careful analysis of state-level firearms sentence enhancements, Abrams (2012) found that the introduction of these laws in several states reduced gun robberies by 5% without any discernible impact on non-gun robberies.

A more controversial approach to reducing gun violence involves focusing local law enforcement agencies on deterring illegal gun possession and carrying in public spaces. Police departments need to ensure that such approaches safeguard against illegal searches and seizures and do not devolve into harassment of citizens, especially young minority men, lawfully present in public places (Moore 1980). However, the available empirical evidence suggests gun-oriented patrols can reduce gun violence (Cohen & Ludwig 2002, McGarrell et al. 2001, Sherman 2000). Gun violence tends to concentrate in very small hot-spot locations in urban environments (Braga et al. 2010). Hot-spots policing programs designed to increase gun seizures have been shown to generate significant reductions in gun violence without causing negative externalities such as crime displacement or police-community relations problems (Braga et al. 2019, Sherman & Rogan 1995).

Another criminal justice–led intervention attempts to deter groups of high rate offenders from using guns to settle ongoing disputes with other criminally active groups. Focused deterrence, sometimes called pulling-levers policing, follows an action research model that tailors the strategy to specific gun violence problems and builds upon local operational capacities to deliver sanctions and mobilize support to control those high-rate offenders who drive persistent gun violence (Braga et al. 2001, Kennedy 2011). Focused deterrence attempts to prevent gang and group-involved violence by making group members believe that gun use by any one member of the group would result in legal problems for all members. The intent is to create an incentive for group members to discourage each other from gunplay, thus reversing the usual group norm in support of violence. A key element of the strategy involves the delivery of a direct and explicit "retail deterrence" message to a relatively small target audience regarding what kind of behavior would provoke a special law enforcement response and detailing what that response would be. Social services are provided to gang and criminally active group members who want to change their life trajectories. The deterrence message is delivered by talking to gang members on the street, handing out fliers in the hot-spot areas explaining the enforcement actions, and organizing forums between violent group members and representatives (Kennedy 2011). A growing body of rigorous program evaluation evidence suggests focused deterrence programs are effective in reducing gang and group-involved gun violence problems (Braga et al. 2018).

Reducing firearm availability can make violent events less lethal. The difficulty and legal risks associated with obtaining and using guns influence offender decisions on what weapon to use when committing a crime (Wright & Rossi 1994). Reducing firearm availability should, in turn, reduce the prevalence of guns used in violent crimes. However, to some observers, widespread access to guns induces a deterrent effect on criminal behavior as offenders' fear of confronting potentially armed victims should dissuade them from crime (Kates & Mauser 2006, Lott 2010). The proposed negative relationship between firearm availability and crime reduction (or "more guns, less crime") has been generally unsubstantiated when sound measurement and methodological strategies are utilized (Cook & Ludwig 2006a, Kleck 2015). And although guns certainly give some law-abiding citizens the opportunity to escape injury at the hands of violent criminals, it remains unclear how often guns are actually used in self-protection. Definitional issues about what constitutes defensive

gun use make it difficult to develop reliable and valid estimates of the annual frequency of such events (Cook et al 2011, Natl Res Counc 2005)

Attempts to analyze the relationship between firearm availability and violent crime are characterized by substantial variation in the methodological approaches used by analysts The current state-of-the-art considers how temporal and spatial differences in community gun ownership affect the extent and nature of violent crime The United States exhibits the highest rate of civilian gun ownership in the world with more than 350 million guns in private hands (Inst Med & Natl Res Counc 2013) However, gun prevalence varies markedly across communities—e g , states, counties, and cities—and over time (Cook et al 2011) Comparisons across place, time, or both afford researchers insight into the relationship between community gun availability and violent crime However, such analyses are often complicated by unreliable measures of community firearm prevalence Although a precise measure of gun prevalence proves elusive due to the lack of centralized administrative data on gun ownership, the proportion of suicides that involve a firearm [firearm suicides/total suicides (FS/S)] is generally regarded as a well-validated proxy measure (for a discussion, see Natl Res Counc 2005) Analyses of survey data generally find that FS/S is highly correlated with gun ownership rates and, furthermore, these data can be used to reliably track trends in gun prevalence over both space and time (Azrael et al 2004, Cook et al 2011, Kleck 2004)

The preponderance of empirical evidence indicates that higher levels of firearm ownership do not have any effect or, at best, only modest effects on overall violent crime rates (Cook & Ludwig 2006b, Cook & Pollack 2017, Duggan 2001) Firearms do not necessarily intensify the prevalence of violent crime, as rates of assaults and robberies appear largely unaffected by the availability of guns However, examining the effects of gun availability on homicides demonstrates their critical role in shaping the outcomes of violent encounters Whereas the connection between firearms and the general incidence of violence appears weak, strong and positive associations between community gun ownership rates and homicide rates indicate that guns do increase the intensity and lethality of violence These positive associations are observable across regions (Miller et al 2002), states (Siegel et al 2013), counties (Duggan 2001), and cities (Cook 1979) Furthermore, studies using longitudinal methods and appropriate measures of gun prevalence suggest that this increase in lethality is restricted to just the firearm homicide rate, as non firearm homicides, like general levels of nonlethal crime, appear unrelated (Cook & Ludwig 2006b, Miller et al 2002, Siegel et al 2013) Consistent with the instrumentality hypothesis, firearms alter the quality and lethality of violence but not its quantity

Recent studies indicate that high levels of community gun ownership may extend to other forms of lethal violence such as police use of deadly force and the homicide of on-duty police officers The majority of persons shot at and/or killed by the police were in possession of a firearm at the time of the incident and the majority of felonious killings of police officers are committed with a firearm (Klinger et al 2016, Zimring 2017) State-level analyses document significant and positive associations between state gun ownership rates and both rates of fatal police-involved shootings and homicides of law enforcement officers, independent of other contextual factors (Hemenway et al 2019, Swedler et al 2015) In the case of police use of deadly force, gun prevalence was positively associated with the shooting rate of citizens armed with guns and, to a lesser degree, citizens armed with other types of weapons Nagin (2020) similarly found positive associations between firearm ownership and the prevalence of fatal police shootings, demonstrating that this relationship was observed across race

Finally, some studies have also examined this issue by evaluating the impacts of gun control legislation and gun ownership levels on violent crime rates For instance, a cross sectional analysis of 170 cities with a 1980 population of 100,000 residents or greater found that gun prevalence

levels generally had no net positive effect on total violence rates; homicide, gun-assault, and rape rates increased gun prevalence; gun control restrictions had no net effect on gun prevalence levels; and most gun control restrictions generally had no net effect on violence rates (Kleck & Patterson 1993). These findings provide some support to the notion that more-restrictive gun laws merely force offenders to shift from guns to other weapons in their criminal pursuits while failing to reduce overall homicide or crime rates (Kleck & Patterson 1993). Relatedly, Kleck (1984) suggests that criminals might substitute rifles and shotguns in response to handgun control policies, and the use of more powerful firearms could ultimately serve to increase the death rate.

Other research, however, supports the use of policies that are aimed at restricting the accessibility of handguns to high-risk individuals (Cook et al. 2011). For instance, Wright et al. (1999) assessed whether denial of handgun purchase can influence an individual's subsequent risk for crimes involving guns or violence. Specifically, individuals with a prior felony conviction who were denied the purchase of a handgun were compared over a 3-year period to individuals with prior felony arrests who purchased handguns. The results indicate that the denial of handgun purchase was associated with a 20% to 30% reduction of risk for new crimes involving guns or violence (Wright et al. 1999), supporting the findings of other research (Wintemute et al. 1999). Indeed, much of the gun violence problem is concentrated among prohibited possessors and other high-risk individuals and gun control policies designed to keep firearms out of the wrong hands could be used to good effect in reducing serious violence (Braga & Cook 2018, Cook et al. 2005).

## CONCLUSION

The potential lethality of gun violence has motivated vigorous debate about the utility of gun control for reducing fatalities. From a dangerousness perspective, if the weapons used in assaults were less deadly (hands, knives, etc.), fewer people would die. But this premise rests on the assumption that there is nothing distinctive about gun violence vis-à-vis non-gun violence, save for the weapon of choice. That is, those intent on committing assault may be more likely to cause fatal injuries to the victim if they attack with a gun; however, their intent to injure is no different than had they opted for a knife or stick or any other available weapon. The outcome may vary, but the goal does not. Consequently, the instrumentality of firearms, or their heightened potential for causing fatal injury relative to other kinds of weapons, elevates the chances of death (Braga & Cook 2018; Cook et al. 2019; Zimring 1968, 1972). Alternatively, if gun violence represents a clear intent to kill that is absent in other types of assault or attack, the features of assaults with guns versus assaults with other weapons should be distinctive. In this latter scenario, intentionality drives the attack; fatal outcomes are more likely not because guns are more dangerous but rather because the attacker chooses a more dangerous weapon to achieve the result they intend.

Our review of the available scientific evidence suggests that guns do indeed make violent situations more lethal. It is important to note that the type of weapon used in violent situations matters in several ways. Guns are usually not fired and the victims of most gun assaults and gun robberies are not injured. Criminals deploy guns to control violent encounters and intimidate their victims without actually firing bullets and generating gunshot wounds. Victims are much more likely to resist attackers who use knives, blunt instruments, and other means. As such, victims in non-gun assaults are more likely to suffer injuries. However, when gun assaults and gun robberies result in injuries, victims are much more likely to die. Many factors influence mortality in injurious gun assaults; the number and placement of gunshot wounds on victims significantly influence the lethality of gun attacks, as do factors such as how quickly first responders provide initial aid and the proximity of high-quality trauma care centers. Finally, the technology of the guns deployed

in injurious assaults influences mortality, wherein firearms with higher-capacity magazines and larger-caliber bullets are more deadly than guns without these features

The guns used in violent crime are becoming more deadly over time, with the police recovering increasing shares of higher-capacity, large-caliber semiautomatic pistols Yet case-fatality rates have stabilized, despite the more lethal technology of contemporary firearms, at roughly one gun homicide for every six victims with nonfatal gunshot injuries Some evidence suggests that improved trauma care may be offsetting the increased lethality of handguns available to violence-prone individuals Unfortunately, one-third of roughly 74,000 annual emergency department admissions for gunshot injuries are treated in community hospitals that do not have high-quality trauma centers (Coupet et al 2019) Increasing the number of hospitals that can provide life-saving care for traumatic gunshot injuries may save lives and decrease case-fatality rates in underserved areas It is also tempting to consider increasing the use of new technologies, such as Shotspotter acoustic gunshot detection systems, that get first responders to life-threatening gun assault scenes quickly so short-term care can be administered immediately and patients can be transported to trauma centers more rapidly

The available program evaluation evidence suggests that criminal justice interventions designed to change offender decisions to use guns in violent crimes, such as firearm sentencing enhancements and proactive policing efforts, are effective in reducing gun violence Another policy issue that undergirds consideration of firearm instrumentality effects, however, is whether interventions that reduce the availability of guns to potentially violent people reduce the homicide rate To gun rights advocates, gun controls are futile, as determined killers will simply complete their acts via the substitution of other means Research highlighted here appears to provide a strong counter to this enduring argument made by gun rights activists by challenging the notion that gun-assault outcomes are determined by the intent of the shooter Zimring's (1968, 1972) seminal studies and the Braga & Cook (2018) update indicate enhanced gun controls could indeed reduce homicide These studies suggest that gun homicides and nonfatal gun assaults with injury are very similar in terms of incident circumstances and the characteristics of offenders and victims Furthermore, mortality in gun assaults seems to be strongly influenced by chance events rather than indicators of assailant intent to kill Importantly, the research finds that the likelihood of death was systematically associated with the caliber of the gun deployed in the attack More powerful handguns were more likely to result in the death of the gunshot victim The selection of gun caliber in these violent events was not correlated with available indicators of shooter determination to kill, such as the location and number of wounds In sum, reducing the lethality of the weapons available to would-be killers may result in fewer fatalities in gun-assault events

The existence of firearm instrumentality effects supports a wide range of gun control efforts to reduce the availability of firearms to high-risk people (Cook et al 2011) These policy interventions include tax initiatives to raise the price of guns and ammunition to dissuade violence-prone individuals from making purchases (Cook & Leitzel 1996), screening out high-risk purchasers via background checks (Ludwig & Cook 2000, Wintemute et al 1999), regulating secondary firearms markets (Cook et al 1995), and reducing illegal gun trafficking (Braga et al 2012) Unfortunately, we do not currently have much guidance on what works in reducing the availability of guns to high-risk individuals (Inst. Med & Natl Res Counc 2013, Natl Res Counc 2005) Like others, we think that it is time to experiment with alternative gun control measures in an effort to develop more effective interventions than the current array of policies and programs And, in doing so, we should be mindful of potential substitution effects in which prohibited persons acquire guns through other mechanisms For instance, a longitudinal study found that the passage of the Brady Handgun Violence Prevention Act of 1994, intended to screen out prohibited handgun purchasers through mandatory criminal history background checks at licensed gun dealers, had a negligible

effect on homicide rates (Ludwig & Cook 2000). However, the study authors suggested the homicide reduction impact of the Brady Act may have been undermined by continued criminal access to firearms through unregulated transactions made by unlicensed private sellers.

The potential impacts of developing such a portfolio of evidence-based gun control interventions could be quite large. One estimate suggests gun violence in the United States costs roughly US$100 billion per year (Cook & Ludwig 2006b). In their simulation of the impacts of the effects of replacing medium- and large-caliber handguns with small-caliber handguns on gun-assault outcomes, Braga & Cook (2018) estimate a near 40% homicide reduction if all shootings were committed with small-caliber handguns rather than the existing mix of large-, medium-, and small-caliber handguns. The RAND Corporation estimates that each murder costs some US$8.6 million and each aggravated assault costs roughly US$87,000 (RAND 2010). In 2018, there were approximately 10,265 gun murders in the United States (FBI 2018). If we were able to achieve a 40% reduction in gun deaths, the monetary savings would be in the range of US$35 billion. And, more importantly, such an intervention would spare families and friends the devastation of losing loved ones to senseless gun violence. As such, expenditures to test new interventions could ultimately prove to be highly cost-effective and reduce the tragic human costs perpetuated by ongoing gun violence in the United States.

## DISCLOSURE STATEMENT

The authors are not aware of any affiliations, memberships, funding, or financial holdings that might be perceived as affecting the objectivity of this review.

## LITERATURE CITED

Abrams D. 2012. Estimating the deterrent effect of incarceration using sentencing enhancements. *Am. Econ. J. Appl. Econ.* 4(4):32–56

Azrael D, Cook PJ, Miller M. 2004. State and local prevalence of firearms ownership measurement, structure, and trends. *J. Quant. Criminol.* 20:43–62

Baker SP. 1985. Without guns, do people kill people? *Am. J. Public Health* 75:587–88

Beauregard E, Leclerc B. 2007. An application of the rational choice approach to the offending process of sex offenders: a closer look at the decision-making. *Sex. Abuse* 19:115–33

Braga AA. 2003. Serious youth gun offenders and the epidemic of youth violence in Boston. *J. Quant. Criminol.* 19:33–54

Braga AA. 2017. Long-term trends in the sources of Boston crime guns. *Russell Sage Found. J. Soc. Sci.* 3:76–95

Braga AA, Cook PJ. 2018. The association of firearm caliber with likelihood of death from gunshot injury in criminal assaults. *JAMA Netw. Open* 1:e180833

Braga AA, Hureau DM, Papachristos AV. 2014. Deterring gang-involved gun violence: measuring the impact of Boston's Operation Ceasefire on street gang behavior. *J. Quant. Criminol.* 30:113–39

Braga AA, Kennedy DM, Waring EJ, Piehl AM. 2001. Problem-oriented policing, deterrence, and youth violence: an evaluation of Boston's Operation Ceasefire. *J. Res. Crime Delinq.* 38:195–225

Braga AA, Papachristos AV, Hureau DM. 2010. The concentration and stability of gun violence at micro-places in Boston, 1980–2008. *J. Quant. Criminol.* 26:33–53

Braga AA, Turchan BS, Hureau DM, Papachristos AV. 2019. Hot spots policing and crime reduction: an update of an ongoing systematic review and meta-analysis. *J. Exp. Criminol.* 15:289–311

Braga AA, Weisburd DL, Turchan BS. 2018. Focused deterrence strategies and crime control: an updated systematic review and meta-analysis of the empirical evidence. *Criminol. Public Policy* 17:205–50

Braga AA, Wintemute GJ, Pierce GL, Cook PJ, Ridgeway G. 2012. Interpreting the empirical evidence on illegal gun market dynamics. *J. Urban Health* 89:779–93

Bur. Justice Stat. 2019. NCVS Victimization Analysis Tool (NVAT). *Bureau of Justice Statistics*. **https://www.bjs.gov/index.cfm?ty=nvat**

Cohen J, Ludwig J 2002 Policing crime guns In *Evaluating Gun Policy Effects on Crime and Violence*, ed J Ludwig, P Cook, pp 217–39 Washington DC Brookings Inst Press
Cook PJ 1979 The effect of gun availability on robbery and robbery murder a cross section study of fifty cities *Policy Stud. Rev Annu* 3 743–81
Cook PJ 1980 Reducing injury and death rates in robbery *Policy Anal* 6 21–45
Cook PJ 1985 The case of the missing victims gunshot woundings in the National Crime Survey *J Quant Criminol* 1 91–102
Cook PJ 1987 Robbery violence *J Crim Law Criminol.* 78 357–76
Cook PJ 1991 The technology of personal violence *Crime Justice* 14 1–71
Cook PJ 2009 Robbery In *The Oxford Handbook of Crime and Public Policy*, ed M Tonry, pp 102–14 New York Oxford Univ Press
Cook PJ 2018 Gun markets *Annu Rev Criminol* 1 359–77
Cook PJ, Braga AA, Moore MH 2011 Gun control In *Crime and Public Policy*, ed JQ Wilson, J Petersilia, pp 257–92 New York Oxford Univ Press
Cook PJ, Braga AA, Turchan BS, Barao LM 2019 Why do gun murders have a higher clearance rate than gunshot assaults? *Criminol. Public Policy* 18 525–51
Cook PJ, Leitzel JA. 1996 Perversity, futility, jeopardy an economic analysis of the attack on gun control *Law Contemp Probl* 59 91–118
Cook PJ, Ludwig J 2000 *Gun Violence The Real Costs* New York Oxford Univ Press
Cook PJ, Ludwig J 2006a Aiming for evidence based gun policy *J Policy Anal Manag* 25 691–735
Cook PJ, Ludwig J 2006b The social costs of gun ownership *J Public Econ* 90 379–91
Cook PJ, Ludwig J, Braga AA 2005 Criminal records of homicide offenders *JAMA* 294 598–601
Cook PJ, Molliconi S, Cole TB 1995 Regulating gun markets *J Crim Law Criminol.* 86 59–92
Cook PJ, Nagin D 1979 *Does the Weapon Matter? An Evaluation of a Weapons-Emphasis Policy in the Prosecution of Violent Offenders* Washington, DC INSLAW
Cook PJ, Pollack HA. 2017 Reducing access to guns by violent offenders *Russell Sage Found J Soc Sci* 3 2–36
Cook PJ, Rivera Aguirre AE, Cerda M, Wintemute G 2017 Constant lethality of gunshot injuries from firearm assault United States, 2003–2012 *Am J Public Health* 107 1324–28
Coupet E Jr., Huang Y, Delgado MK 2019 US emergency department encounters for firearm injuries according to presentation at trauma versus nontrauma centers *JAMA Surg* 154 360–62
D'Alessio JG 1999 Gunshot wounds Bullet caliber is increasing *J Trauma* 47 992–93
Duggan M 2001 More guns, more crime *J Political Econ* 109 1086–114
Efron DT, Haider A, Chang D, Haut ER, Brooke B, Cornwell EE III 2006 Alarming surge in nonsurvivable urban trauma and the case for violence prevention *Arch Surg* 141 800–5
Fackler ML, Bellamy RF, Malinowski JA. 1988 The wound profile illustration of the missile tissue interaction *J Trauma* 28 S21–29
FBI (Fed Bur Investig ) 2018 *Murder victims by weapon, 2014–2018* Rep , Dep Justice, Washington, DC
Feeney F 1986 Robbers as decision makers In *The Reasoning Criminal Rational Choice Perspectives on Offending*, ed DB Cornish, RV Clarke, pp 53–71 New Brunswick, NJ Transaction Publ
Felson RB, Messner SF 1996 To kill or not to kill? Lethal outcomes in injurious attacks *Criminology* 34 519–45
Hargarten SW, Karlson TA, O'Brien M, Hancock J, Quebbeman F 1996 Characteristics of firearms involved in fatalities *JAMA* 275 42–45
Hedeboe J, Charles AV, Nielsen J, Grymer F, Møller BN, et al 1985 Interpersonal violence patterns in a Danish community *Am J Public Health* 75 651–53
Hemenway D, Azrael D, Conner A, Miller M 2019 Variation in rates of fatal police shootings across US states the role of firearm availability *J Urban Health* 96 63–73
Henigan DA 2016 *"Guns Don't Kill People, People Kill People" And Other Myths About Guns and Gun Control* Boston Beacon Press
Inst Med , Natl Res Counc 2013 *Priorities for Research to Reduce the Threat of Firearm Related Violence* Washington, DC Natl Acad Press
Jacobs BA 2000 *Robbing Drug Dealers: Violence Beyond the Law* New York. Transaction Publ
Karlson TA, Hargarten SW 1997 *Reducing Firearm Injury and Death A Public Health Sourcebook on Guns* New Brunswick, NJ Rutgers Univ Press

Kates DB, Mauser G 2006 Would banning firearms reduce murder and suicide? A review of international and some domestic evidence *Harv J Law Public Policy* 30 649–94

Kellermann AL, Lee RK, Mercy JA, Banton J 1991 The epidemiologic basis for the prevention of firearm injuries *Annu Rev Public Health* 12 17–40

Kennedy DM 2011 *Don't Shoot* New York Bloomsbury

Kleck G 1984 Handgun only control a policy disaster in the making In *Firearms and Violence Issues of Public Policy*, ed DB Kates, pp 167–99 Cambridge, MA. Ballinger

Kleck G 1997 *Point Blank Guns and Gun Violence in America* Hawthorn, NY Aldine de Gruyter

Kleck G 2004 Measures of gun ownership levels for macro level crime and violence research *J Res Crime Delinq* 41 3–36

Kleck G 2015 The impact of gun ownership rates on crime rates a methodological review of the evidence *J Crim Justice* 43 40–48

Kleck G, DeLone MA 1993 Victim resistance and offender weapon effects in robbery *J Quant Criminol* 9 55–81

Kleck G, McElrath K. 1991 The effects of weaponry on human violence *Soc Forces* 69 669–92

Kleck G, Patterson EB 1993 The impact of gun control and gun ownership levels on violence rates *J Quant Criminol* 9 249–87

Klinger DA, Rosenfeld R, Isom D, Deckard M 2016 Race, crime, and the micro-ecology of deadly force *Criminol Public Policy* 15 193–222

Langhinrichsen Rohling J, McCullars A, Misra TA 2012 Motivations for men and women's intimate partner violence perpetration a comprehensive review *Partner Abuse* 3 429–68

Leovy J 2015 *Ghettoside A True Story of Murder in America* New York Spiegel & Grau

Libby NE 2009 *Predictors of firearm use and effects of weaponry on victim injury in violent crime a criminal events approach* PhD Thesis, Univ Cent Fla , Orlando 137 pp

Libby NE, Corzine J 2007 Lethal weapons effects of firearm types on the outcome of violent encounters *Justice Res Policy* 9 113–37

Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR 2014 Unrelenting violence an analysis of 6,322 gunshot wound patients at a Level I trauma center *Trauma Acute Care Surg* 76 2–11

Lott JR 2010 *More Guns, Less Crime Understanding Crime and Gun Control Laws* Chicago Univ Chicago Press

Ludwig J, Cook PJ 2000 Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act *JAMA* 284 585–91

Marvell T, Moody C 1995 The impact of enhanced prison terms for felonies committed with guns *Criminology* 33 247–81

McDowall D, Loftin C, Wiersema B 1992 A comparative study of the preventive effects of mandatory sentencing laws for gun crimes *J Crim Law Criminol* 83 378–94

McGarrell E, Chermak S, Weiss A, Wilson J 2001 Reducing firearms violence through directed police patrol *Criminol Public Policy* 1 119–148

McGonigal MD, Cole J, Schwab CW, Kauder DR, Rotondo MF, Angood PB 1993 Urban firearm deaths a five year perspective *J Trauma* 35 532–37

Miller M, Azrael D, Hemenway D 2002 Rates of household firearm ownership and homicide across US regions and states, 1988–1997 *Am. J Public Health* 92 1988–93

Moore MH 1980 Police and weapons offenses *Ann. Am Acad Political Soc Sci* 452 22–32

Morral AR, Schell TL, Tankard M 2018 *The magnitude and sources of disagreement among gun policy experts* Rep 1977400302, Rand Corp , Santa Monica, CA

Nagin DS 2020 Firearm availability and fatal police shootings *Ann Am Acad Political Soc Sci* 687 49–57

Natl Res Counc 2005 *Firearms and Violence A Critical Review* Washington, DC Natl Acad Press

Pierce GL, Bowers WJ 1981 The Bartley Fox gun law's short term impact on crime in Boston *Ann Am Acad Political Soc Sci* 455 120–37

Planty M, Truman JL 2013 *Firearm violence, 1993–2011* Bur Justice Stat Rep NCJ 241730, Dep Justice, Washington, DC

RAND 2010 Cost of crime calculator *RAND* **https.//www rand org/well-being/justice-policy/centers/quality-policing/cost-of-crime html**

Reid JA, Beauregard E 2017 A mixed methods exploratory examination of victim injury and death effect of weapon type and victim resistance during sexual assaults by strangers *Vict. Offenders* 12 253–76

Saltzman LE, Mercy JA, O'Carroll PW, Rosenberg ML, Rhodes PH 1992 Weapon involvement and injury outcomes in family and intimate assaults *JAMA* 267 3043–47

Sarvesvaran R, Jayewardene C 1985 The role of the weapon in the homicide drama *Med. Law* 4 315–26

Sauaia A, Gonzalez E, Moore HB, Bol K, Moore EE 2016 Fatality and severity of firearm injuries in a Denver trauma center, 2000–2013 *JAMA* 315 2465–67

Sherman L 2000 Gun carrying and homicide prevention *JAMA* 283 1193–95

Sherman L, Rogan D 1995 Effects of gun seizures on gun violence hot spots patrol in Kansas City *Justice Q* 12 673–94

Siegel M, Ross CS, King C III 2013 The relationship between gun ownership and firearm homicide rates in the United States, 1981–2010 *Am J Public Health* 103 2098–105

Spitzer RJ 1995 *The Politics of Gun Control* Chatham, NJ Chatham House

Swedler DI, Simmons MM, Dominici F, Hemenway D 2015 Firearm prevalence and homicides of law enforcement officers in the United States *Am. J Public Health* 105 2042–48

Swersey A, Enloe E 1975 *Homicide in Harlem* New York Rand Institute

Tark J, Kleck G 2004 Resisting crime the effects of victim action on the outcomes of crimes *Criminology* 42 861–910

Tillyer MS, Tillyer R 2014 Violence in context a multilevel analysis of victim injury in robbery incidents *Justice Q* 31 767–91

Vernick JS, Hepburn LM 2003 State and federal gun laws trends for 1970–99 In *Evaluating Gun Policy Effects on Crime and Violence*, ed J Ludwig, PJ Cook, pp 392–95 Washington, DC Brookings Inst Press

Vinson T 1974 Gun and knife attacks *Aust J Forensic Sci* 7 76–83

Weaver GS, Wittekind JEC, Huff Corzine L, Corzine J, Petee TA, Jarvis JP 2004 Violent encounters a criminal event analysis of lethal and nonlethal outcomes *J Contemp Crim Justice* 20 348–68

Webster DW, Champion HR, Gainer PS, Sykes L 1992 Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990 *Arch Surg* 127 694–98

Wells W, Horney J 2002 Weapon effects and individual intent to do harm influences on the excalation of violence *Criminology* 40 265–96

Wintemute GJ 1996 The relationship between firearm design and firearm violence handguns in the 1990s *JAMA* 275 1749–53

Wintemute GJ 2010 Guns and gun violence In *The Crime Drop in America*, ed A Blumstein, J Wallman, pp 45–96 New York Cambridge Univ Press

Wintemute GJ, Wright MA, Parham CA, Drake CM, Beaumont JJ 1999 Denial of handgun purchase a description of the affected population and a controlled study of their handgun preferences *J Crim Justice* 27 21–31

Wolfgang ME 1958 *Patterns in Criminal Homicide* Philadelphia Univ Pa Press

Wright JD, Rossi PH 1994 *Armed and Considered Dangerous: A Survey of Felons and Their Firearms* New York Aldine de Gruyter

Wright JD, Rossi PH, Daly K 1983 *Under the Gun Weapons, Crime, and Violence in America* Hawthorne, NY Aldine de Gruyter

Wright MA, Wintemute GJ, Rivara FP 1999 Effectiveness of denial of handgun purchase to persons believed to be at high risk for firearm violence *Am J Public Health* 89 88–90

Wright RT, Decker SH 1997 *Armed Robbers in Action Stickups and Street Culture* Lebanon, NH Univ Press N Engl

Zimring FE 1968 Is gun control likely to reduce violent killings? *Univ Chicago Law Rev* 35 721–37

Zimring FE 1972 The medium is the message firearm caliber as a determinant of death from assault *J Leg Stud.* 1 97–123

Zimring FE 2017 *When Police Kill* Cambridge, MA Harv Univ Press

Zimring FE, Hawkins G 1997 *Crime Is Not the Problem Lethal Violence in America* Oxford, UK Oxford Univ Press



Annual Review of Criminology

Volume 4, 2021

# Contents

**The Discipline**

On Becoming "A Teacher or Something": An Autobiographical Review
*Ruth D. Peterson* .......... 1

**Perspectives**

Perspectives on Policing: Cynthia Lum
*Cynthia Lum* .......... 19

Perspectives on Policing: Phillip Atiba Goff
*Phillip Atiba Goff* .......... 27

**Theory and Method in Criminology**

Toward a Criminology of Sexual Harassment
*Christopher Uggen, Ráchael A. Powers, Heather McLaughlin, and Amy Blackstone* .......... 33

The Causes and Consequences of Urban Riot and Unrest
*Tim Newburn* .......... 53

Genocide, Mass Atrocity, and Theories of Crime: Unlocking Criminology's Potential
*Susanne Karstedt, Hollie Nyseth Brehm, and Laura C. Frizzell* .......... 75

Human Mobility and Crime: Theoretical Approaches and Novel Data Collection Strategies
*Christopher R. Browning, Nicolo P. Pinchak, and Catherine A. Calder* .......... 99

Where Is This Story Going? A Critical Analysis of the Emerging Field of Narrative Criminology
*Shadd Maruna and Marieke Liem* .......... 125

Firearms Instrumentality: Do Guns Make Violent Situations More Lethal?
*Anthony A. Braga, Elizabeth Griffiths, Keller Sheppard, and Stephen Douglas* .......... 147

**Uses and Abuses of Criminal Records**

A Policy Review of Employers' Open Access to Conviction Records
*Shawn D Bushway and Nidhi Kalra*      165

The Intended and Unintended Consequences of Ban the Box
*Steven Raphael*      191

Artificial Intelligence, Predictive Policing, and Risk Assessment for
Law Enforcement
*Richard A Berk*      209

**Criminalization and Criminal Legal Institutions**

Decarceration Problems and Prospects
*Todd R Clear*      239

The Mass Criminalization of Black Americans A Historical Overview
*Elizabeth Hinton and DeAnza Cook*      261

Life Sentences and Perpetual Confinement
*Christopher Seeds*      287

Local Government Dependence on Criminal Justice Revenue and
Emerging Constraints
*Shannon R Graham and Michael D Makowsky*      311

Models of Prosecutor-Led Diversion Programs in the
United States and Beyond
*Ronald F Wright and Kay L Levine*      331

Opioids and the Criminal Justice System New Challenges Posed by
the Modern Opioid Epidemic
*Jonathan P Caulkins, Anne Gould, Bryce Pardo, Peter Reuter,
and Bradley D Stein*      353

Plea Bargaining, Conviction Without Trial, and the Global
Administratization of Criminal Convictions
*Maximo Langer*      377

**Errata**

An online log of corrections to *Annual Review of Criminology* articles may be found at
http //www annualreviews org/errata/criminol

# EXHIBIT R

## to Expert Report of Professor Louis Klarevas

**PA 13-3, SB 1160**

Senate Session Transcript for 04/03/2013

SENATOR LOONEY:

Thank you, Madam President.

Having adopted the three Agendas, would ask the Clerk to immediately proceed to call the single item appearing on Senate Agenda Number 3, which is Emergency Certified Bill 1160, if the Clerk would please call that item.

THE CHAIR:

Mr. Clerk.

THE CLERK:

Emergency Certified Bill Number 1160, AN ACT CONCERNING GUN VIOLENCE PREVENTION AND CHILDREN'S SAFETY, LCO Number 5428 [sic], introduced by Senator Williams and Representative Sharkey.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I move adoption and passage of the Emergency Certified Bill and seek leave to summarize.

THE CHAIR:

The request is on passage. Will you reply (inaudible).

SENATOR WILLIAMS:

Thank you, Madam President.

I would like to take us back to December 14, 2012. Here at the State Capitol, leaders, Democrats and Republicans, were involved

in negotiations concerning the budget of the State of
Connecticut. We were working through the morning when word came
to us that there had been a shooting at an elementary school in
our state. Initially, that's all we knew about it. A little
later, we heard that there was a possible fatality, an
administrator, perhaps the principal.

We continued our work. We left to go to the press quarters here,
where they were having their annual Christmas party and
luncheon. As we spoke with reporters, the TV monitors were on in
the background. All at once, there was a report that as many as
20 children had been killed, together with a number of teachers
and administrators.

For a few seconds, it was hard to breathe. I looked around at my
colleagues, as we recoiled at the horror of what we were
learning at that moment. The center of the world's attention was
Newtown, Connecticut, and the Sandy Hook Elementary School.

I remember thinking this could not be happening in our state. It
could not be happening in our country and to our children.
Senator McKinney went directly to be with his constituents in
Newtown. Later, Governor Malloy joined the parents and the first
responders.

At the end of that unimaginable day, we learned that we had lost
20 elementary school children and 6 teachers and administrators.
They were killed with a weapon of war, a semi-automatic assault
rifle, the platform of which was -- was originally designed for
the battlefield and for mass killings. That was 110 days ago.

As we take action today, and as stunned as we are at the events
of Newtown, we must also acknowledge this is not the first time
in the history of the United States, most importantly the recent
history of the United States, that we have confronted horrific
gun violence. Think of Columbine High School; a nursing class at
a college in Oakland, California; an Amish school, in
Pennsylvania; Virginia Tech University; a shopping mall, in
Nebraska; Fort Hood, Texas; a parking lot, in Tucson, where
Congresswoman Gabby Giffords was meeting with her constituents;
a Sikh temple, in Wisconsin; a Baptist Church, in Fort Worth; a
movie theater, in Aurora; and, workplace shootings in every
state in America, including a beer distribution center in
Manchester, Connecticut, and the Connecticut State Lottery
Offices. And those are just a few of the mass killings that
receives tremendous attention. Every day in America, children
are killed in our cities, without the attendant publicity. Every

day in America, urban gun crime claims the lives of tomorrow's Americans.

We are obligated as leaders of this state to do all we can to protect our communities and our children. I remember the father of one of the slain children at Newtown, at a public hearing that we held in Newtown, who reminded us that his child deserved the rights of life, of liberty, and the pursuit of happiness.

Madam President, the tragedy in Newton demands a powerful response. It demands a response that transcends politics. Today, we have before us legislation that is the culmination of a bipartisan effort in the Connecticut State Legislature. It's the product of a task force of Democrats and Republicans, of public input at an unprecedented four public hearings, and a fifth public hearing conducted by the Public Safety Committee.

This bill addresses gun violence prevention, school security, and mental health services. It is the strongest and most comprehensive bill in the country.

I am going to now recount some of the main points of this bill. Then, Madam President, I will yield to Senators Looney, Harp, Boucher, Bye, and Stillman, for a more detailed review of those provisions of the bill, and then I will accept questions, Madam President.

But at this time I would like to say as to gun violence prevention, the bill includes a first-in-the-nation dangerous weapon offender registry. It requires criminal background checks for the purchase of all firearms. It expands and strengthens Connecticut's assault weapon ban and requires permits for existing weapons.

It bans the sale or purchase of high-capacity magazines, magazines containing more than ten rounds and requires a declaration of existing magazines. It requires a criminal background check for the purchase of ammunition.

It increases penalties for firearms' trafficking and illegal possession.

It amends the earned risk reduction program to ensure that gun offender felons and other violent criminals serve at least 85 percent of their sentences.

It bans the sale of armor-piercing ammunition.

In terms of mental health issues, it prohibits the possession of a firearm by a person who has been involuntarily committed to a hospital for persons with psychiatric disabilities; it expands the prohibition period from one year to five years. It prohibits the possession of a firearm by a person who is voluntarily committed to a hospital for persons with psychiatric disabilities, and that prohibition period is six months after release.

It requires the Department of Mental Health and Addiction Services to work with the Department of Education to provide mental health training for teachers and school employees, that they might catch cases earlier and obtain counseling and programs for our children.

It requires the Department of Mental Health and Addiction Services to create three additional, assertive community treatment programs designed to provide recovery oriented treatment and support services.

It requires the Department of Children and Families to implement a behavioral health consultant program to provide care coordination for primary care providers, that they can turn to experts in the field of mental health as they serve our children.

And it requires the Insurance Department to determine compliance with state and federal mental health parity laws.

As to school security, we are creating a fund so that schools may access the resources necessary to strengthen the -- the security at all of our schools. It also requires that an audit be conducted at our schools to pinpoint any particular safety problems. And it also requires that our teachers and administrators have heightened awareness, and in some cases receive training, so that they can detect issues resulting from behavioral problems or mental health issues and ensure that children get the attention and care that they need.

Madam President, at this time for the discussion of additional details regarding gun violence prevention, I would yield to Senator Marty Looney.

THE CHAIR:

Senator Looney, will you accept the yield, sir?

SENATOR LOONEY:

Thank you, Madam President; I do.

I wanted to thank Senator Williams for the yield, but in
particular I wanted to thank him for his superb leadership in
every way leading up to today's vote on this bill. Beginning on
that tragic day of December 14th and through every twist and
turn of our process leading up to today, his leadership has been
magnificent.

It was my great honor to be the Co-chair of the Gun Violence
Prevention Working Group, which was part of the -- the Task
Force on Gun Violence Prevention, School Security, and Mental
Health issues that was set up in January in the wake of the --
the Newtown tragedy.

As Senator Williams said, we had a lengthy pubic hearing of
that, of that working group, followed by a second, follow-up
hearing. The other working groups also had public hearings.
There was a hearing of the entire task force that was held in --
in Newtown, at Newtown High School, on the evening of -- of
January 30th, and in -- in addition to that, another lengthy,
marathon hearing in the Public Safety Committee recently so that
all of the concepts considered in this bill had been the subject
of public comment in public hearings.

Would like to, as Senator Williams said, highlight some of the
additional items related to the gun violence prevention section
in more -- more detail. Obviously, one of the -- the key
components is that now we establish our permitting process to go
beyond pistols and revolvers to cover, to cover long guns, also
a certificate of eligibility for the, for the possession, the
legal possession of ammunition.

One of the great flaws in our law up until now is that someone
who was in illegal possession of a gun, because he was a
convicted criminal or one of the other reasons for -- for legal
disability under our statutes, was able to -- to go in and
legally buy ammunition for the gun which he was unable to
possess legally. We are closing that loophole in our law with a
provision in this, in this current bill. So we have the
significant expansion of our, of our permitting and our -- our
background checks, which is something that will put us, I think,
in a much better position in terms of protecting public safety.

And also, Madam President, clearly there is, there is nothing in
this bill that should be seen as -- as improperly infringing
upon the rights of legitimate gun owners under either the Second
Amendment, either under the Second Amendment of the Constitution
or the corresponding provisions of our own, of our own State
Constitution.

One of the things I would like to -- to point out is a key
provision in this bill is something that a number of us who
represent urban areas in the state have been advocating for, for
several years, and that is for the establishment of a deadly
weapon offender registry. And that is addressed in Sections 18
to 22 of the bill, and it highlights a problem that has been
brought to us by many of our police chiefs, especially in urban
areas. And that is the fact that in some cases, violent
offenders, those who committed their -- their crimes with --
with deadly weapons, often come out of prison under no
supervision at all because they have been, in effect, hard-core
offenders who have not been able to earn any -- any reduction in
their sentence, serve their maximum time, and come out into our
communities, once again, without any additional restriction. So
the irony, of course, is that some of these, the people who are
the ones in -- in most need of -- of supervision get the least
of it.

But under this bill, they will be required to -- to register
with the department, with -- with DESPP, Department of Emergency
Services and -- and Public Protection for a period of five years
and be required to report in annually to their local police
department as to their residence and their, and their current
status. This is the way, I think, to -- to have these offenders
given a cautionary warning by their local police department that
where they are is known to the police and that they are, in
effect, on a watch list.

This is, in -- in a way, somewhat analogous to the -- the
Megan's Law registry for -- for sexual offenders, although this
list is not one that would be accessible to the general public
but for law enforcement purposes only, so that this is a -- a
significant advance, I think, in -- in helping to put additional
restrictions on those who have already demonstrated a propensity
for violence by conviction of many violent offenses using guns
and other weapons; so that is a -- one key section of the, of
the bill.

As Senator Williams mentioned, of course, the bill also expands
our -- our definition of assault weapons. We first passed an

assault weapons ban in 1993, here in Connecticut, a year before the -- the federal ban went into effect, that was in effect for a ten-year period, until it expired.

We are expanding that in -- in this bill and also addressing the issue of -- of large-capacity magazines, as Senator Williams said, that after, on or after January 1, 2014, anyone who possesses a large-capacity magazine obtained before the bill's effective date would be guilty of an infraction punishable by a $ 90 fine and a class D penalty for any subsequent offense. So we will have a -- a relation and a prospective prohibition on the purchase of large-capacity magazines under the provisions of -- of this bill. It is a very significant component that there was a great deal of interest in.

As we said, we have an expansive definition of what constitutes an assault weapon, that those who possess them currently would have to register them and -- and banning future purchase of those, of those weapons.

So we have in addition, Madam President, as we said, one of the other things that was requested and that we included in this bill, the Connecticut Police Chiefs Association had asked that we expand our definition of armor-piercing bullets. Under current law, only . 50 caliber armor-piercing bullets were prohibited under

-- in Connecticut. This bill will expand that definition to include ammunition of other calibers, other than . 50 caliber, that are designated as "armor-piercing bullets. " This has been, again, at the request of our police departments around the state.

In addition, Madam President, while current law allows for the -- the seizure of weapons that police officers under limited circumstances can secure warrants to seize guns from anyone who poses an imminent risk of injuring himself or herself or someone else or has a -- a criminal conviction or restraining order against that person, the bill expands that legal-seizure provision to also include ammunition, as it could, because as we all know, without the ammunition, a gun is only a club. And so the -- the bill confronts -- conforms the law to current practice, by allowing an ammunition seizure by the police as well.

We also provide an expansion in funding for the state-wide trafficking task force, and another very significant section of

the bill. Throughout the bill, we have in Sections 42 to 43, 46 to 50, and 52 and 53, increased criminal penalties for gun trafficking and other gun-related offenses, a very important provision of the bill, that many of these crimes that previously were perhaps class D felonies are now being raised to class C felonies or class C felonies being raised to class B felonies, and also establishing substantial fines, as well, for people who have the capacity and financial resources to pay a fine. And the fines will be required unless the court makes a specific finding on the record to remit or reduce the fine and find inability to pay.

So, for instance, the crime of trafficking in firearms, under Section 53-202 of our statutes, that currently is a class C felony if the transfer is less than five firearms, that are class B felony, if more than five firearms. Now we make it a class B felony for all and also creating a minimum mandatory three-year prison term and a $ 10,000 fine.

The crime of stealing a firearm, which currently is a class D felony is going to be elevated to a class C felony, with a mandatory minimum two-year prison term and a $ 5000 fine.

The -- the crime of transferring a pistol or revolver to a prohibited person or violating transfer procedures, which is currently a class D felony, will be elevated to a class C felony, with a mandatory minimum two-year prisons term and $ 5000 fine.

And then the crime of transferring a pistol or revolver to a prohibited person or violating transfer procedures knowing the transferred weapon is stolen or has an altered identification mark, which is currently a class B felony, will continue to be a class B felony but now will also have with it a mandatory three-year prison term and $ 10,000 fine.

So one of the -- the areas of concern in this bill was that we also needed to try to find ways to address urban crime, which is also often committed with -- with handguns and illegally transferred handguns through straw purchasers and other things. And those concerns are addressed in this bill as well. So we have the -- the crime of an ineligible person soliciting a firearm through a straw man, which is currently a class B misdemeanor. That is be -- going to be elevated to a class D felony in this bill, with a mandatory minimum one-year prison term and a $ 3000 fine. An ineligible person obtaining a firearm from a straw man, class -- it will now be a class C felony.

So we have, throughout our criminal penalty statutes, enhanced penalties and mandatory provisions added to this bill that did not exist previously. So there, this is almost every element of gun-related crimes for possession or sale has an enhanced penalty under this bill.

Another provision, Madam President, that's an expansion upon existing law, is the safe-storage requirement. Under our law currently we have a provision that anyone who is in legal possession of a weapon but is in a household where there is someone under the age of 16 has to have the safe-storage provisions in our law that the weapons be kept secured and under lock and key. We are expanding that under this bill in two ways.

First of all, the -- the safe-storage requirement will be imposed on people who if they know or should know that a resident of the premises, one, is ineligible to possess the firearms under state or federal law; so, for instance, anyone, if anyone in the household has any legal disability because of a prior criminal conviction or -- or mental health commitment, that would also impose the safe-storage requirement rather than just the age requirement under current law.

And, also, anyone who poses a risk of imminent personal injury to himself -- himself or others, if that is known by the, by the owner, that also would invoke the safe-storage requirement, so that's also a significant expansion of our, of our existing law.

So there are -- we also in the bill make a -- a couple of changes to the Board of Firearm Permit Examiners, expand that board from seven to nine by adding one, retired, Superior Court judge to be appointed by the Chief Court Administrator and Department of Mental Health and Addiction Services' nominee to be appointed by the, by the Governor.

In addition, Madam President, we have a -- a provision that will prevent forum shopping for -- for pistol permits, by requiring that someone who is seeking a permit would only be to -- able to file one application per year and also would only be able to file in the town of residence rather than in the town where someone is employed. And we have seen some cases where people tried to perhaps forum shop, in that category. They will no longer be able to do that.

So there are a number of provisions, Madam President, that -- that address the concern about -- about excessively dangerous weapons but also, as we said, enhancing penalties, where

penalties exist under -- under current law, and trying to address the -- the concerns that arose in the wake of the terrible tragedy in Newtown but also the concerns that have existed in many of our urban areas for so many years.

So I am pleased to support this bill and all of its particulars, Madam President and would, at this point, yield to Senator Toni Harp to address the -- the mental health components of the bill.

THE CHAIR:

Thank you.

Senator Harp, will you accept the yield?

SENATOR HARP:

Yes, I will. Thank you, very much --

THE CHAIR:

Thank you, Senator.

SENATOR HARP:

-- Madam President.

I, too, want to thank Senator Williams for his leadership in this issue, and I also want to thank him for appointing me Co-chair of the Mental Health Working Group. And I'm going to thank a -- a hunch of people, because this is really the first time that we have worked in a bipartisan way. So, with that, I want to thank Senator McKinney as well.

I want to thank my Co-chair, Representative Terrie Wood; she was a joy to work with. I also want to thank the members of the Bipartisan Mental Health Working Group. The Mental Health Working Group had one of the best-attended -- by Legislators -- public hearings this year. All members stayed throughout the over-12-hour hearing. I want to thank them for their participation throughout this process.

I also want to thank caucus staff members who helped our working group, Ellen Scalettar, Katie Duggan, Mary Cyriac, Cara Passaro, Michael Goodwine, and Jason Stark.

This part of the bill requires the Department of Mental Health and Addiction Services, in consultation with the State Department of Education, to administer a mental health first aid training program that teaches educators and related staff to recognize the signs of mental disorders in children and young adults and helps them connect those children and young adults needing services to services.

Mental health's first aid is an established, evidence-based approach that has proved to be effective in helping participants learn to recognize and respond to individuals showing signs of mental illness. The bill creates a task force to conduct a comprehensive study of Connecticut's mental health delivery system, with a special focus on vulnerable 16 through 25-year-olds in our population.

The research topics include early intervention, the mental health work force, mental health professional's reporting responsibilities, intervention services available in our state and provided in our schools, behavioral health screening, involuntary outpatient commitment, and reducing mental health stigma, among other things. The behavioral health task force is charged to report to the General Assembly by February 1, 2014.

The bill also expands the Department of Mental Health and Addiction Services assertive community treatment program to three additional locations. The assertive community treatment program or "ACT teams," as they are called, are mobile, multi-disciplinary teams that provide recovery oriented treatment and support to those who have severe and persistent mental illness.

The bill adds, as well, more case management and coordination slots to assist people with mental illness who are involved with the probate system. And we heard from a program called "Melissa's Project" which is currently in the state, that we hope will be expanded through this authorization.

As well, the bill establishes an access mental health program, modelled after the Massachusetts Child Psychiatry Access Project and similar programs in 26 other states. The program will provide training, support, and professional consultations for pediatricians to help them intervene with children who have a mental health condition.

The bill also makes various changes to insurance statutes to improve the operation of the state's mental health parity statute, based upon the recommendations of the Program Review

and Investigations Committee. This legislation responds to
concerns that patients with mental health and substance abuse
treatment needs have faced barriers when attempting to utilize
private health insurance to access needed services. In some
cases, the costs of these uncovered treatments are borne by the
state, either through the Department of Children and Families
voluntary Behavioral Health Services for children program or
through the Department of Mental Health -- Department of Mental
Health Services for the services that they provide to adults.

There has also been confusion about the rationale behind the
carriers' decisions about what services are medically necessary.
These provisions seek to increase transparency and consistency
in that decision-making process.

And with that, I urge adoption, Madam President, but yield to
Senator Boucher.

THE CHAIR:

Senator Boucher, will you accept the yield, ma'am?

SENATOR BOUCHER:

Yes. Thank you, very much, Madam President.

Madam President, when a child is sent to school, their parents
expect them to be safe. The Sandy Hook Elementary School
shooting rampage was a parent's, school system and community,
and the nation's worst nightmare. Newtown teachers, first
responders, town leaders, first selectwoman, and the community
response was heroic, and we couldn't be more prouder of them.

I also would like to take this opportunity to thank my Co-chair
from the House, Representative Fleischmann, and the wonderful
members of the committee, who many were Chairs of various
relevant committees of the Legislature in their own right and
added valuable expertise and consensus recommendations to the
task force.

On behalf of the very conscientious and hardworking, Bipartisan
School Security and Safety Subcommittee members, we thank the
staff and the over 200 individuals that supplied written
testimony and over the 100 individuals who testified in person
on this very critical issue.

To guide our consensus recommendations, the School Security
Working Group held two informational forums. The first included
the Connecticut Association of School Superintendents; CAS, the
Connecticut Association of Schools; Connecticut Association of
School Business Officers; the State Department of Education
commissioner; the Police Chiefs Association; Fire Chiefs
Association; the Board of Regents; the UConn Security Police
chief, who was very instrumental in more than one meeting, I
might add; the CEA; the AFT; the Connecticut Association of
School Administrators; the Connecticut Association of School
Psychologists; CCM; and the -- also, COST.

The second meeting that we had included two recognized threat
assessment and forensic psychology experts, as well as an
additional meeting with state police, the State Department of
Education school construction personnel, and SROs.

Our public hearings, as I have just mentioned a minute ago, had
a hundred in-person testimony and over 222 written testimonies,
and we participated also in another meeting where we all met
together as combined subcommittees in Newtown, itself.

It's very important to note that the committee was able to
proceed expeditiously and with great efficiency in consensus, by
taking two very controversial proposals off the table; the
first, not creating costly mandates for our towns and cities by
requiring either ratios or quotas for added personnel; the
second, not arming or training teachers for school shootouts, as
80 to 90 percent of all stakeholders that contacted us, that
provided testimony, opposed this action as well as our law
enforcement community.

It was believed that the potential for collateral damage is too
risky when the safety of children and staff is at stake. In
fact, there was general consensus, even, that school security
guards or armed SROs should also be POST-Certified, and I think
that came across in some of the material we provided.

As far as our school security and safety plans, in our first
meeting we reviewed current law regarding school safety, and
what we learned is that there is no real, current, specific
state statute that requires school boards to establish an
emergency management plan. While we do not think that yet we
have the final police report on this particular tragedy, it is
pretty safe to assume that the emergency policies and procedures
that were employed by the brave staff and students at Sandy Hook
saved lives. We wanted to ensure that not only do we require

that every school have a school safety and security plan but that we should give municipalities the guidance and tools necessary to develop and implement these plans.

It was also of prime concern to our school communities that came before us and asked for guidance and best practices so that they can use them as they develop their own, local procedures. And they asked for this assistance. Section 86 of the bill requires our DESPP or Department of Emergency Services and Public Protection, along with the Department of Education to develop standard and state-wide school security and safety plans.

There are currently some really great plans that are being utilized by schools in Connecticut and in different municipalities, Westport being one that it was often cited as a good model. We wanted to give, however, the communities flexibility to develop and implement their own plans but also have state-wide standards that had to be met.

The standards developed by DESPP and the State Department of Education must include some of the following, as recommended by our working group: An all-hazards approach; the involvement of local officials, including the chief executive officer of the municipality; the superintendent of schools; law enforcement; fire; public health; emergency management, and emergency medical services; a command center organizational standard; a requirement that a School Security and Safety Committee be established at each school; crisis management procedures; a requirement that local law enforcement and other local safety officials evaluate, score, and provide feedback on fire drills and crisis response drills and annually submit this report to the DESPP regarding such fire drills and crisis response drills; procedures for managing various types of emergencies, because as we all know, there are many others, and that's why an all-hazards approach was recommended strongly; a requirement that each local and regional board of education conduct a security and vulnerability assessment for each school under the jurisdiction of such board, every two years, and develop a school security and safety plan for each such school; a requirement that the school's Safe Climate Committee, which is the bullying committee, collect and evaluate information relating to the incidences of disturbing and threatening behavior that may not meet the current definition of bullying; a requirement that school security and safety plan for each school provide an orientation on such school security and safety plan to each school employee at such school and provide violence

prevention training in a manner prescribed in such school
security and safety plan.

Now, under this bill, the DESPP and the State Department of
Education must develop these standards, by next January. In
researching these issues nationwide, we found many states with
excellent school safety programs, so it is our hope that our
agencies don't try to reinvent the wheel but rather use existing
or proven records and methods.

Section 87 -- 87 of the bill requires local and regional boards
of education to develop and implement a school security and
safety plan based on the new standards being provided, by July
2014. And they should review and submit these plans on an annual
basis.

Section 87 also will -- requires the establishment of a School
Safety and Security Committee at each school to assist in the
development of safety and security plans. The committee must
include in those particular committees a local police officer, a
first responder, a teacher and administrator employed at the
school, and a mental health professional. The board of education
has the ability to name others to this particular group if they
wish, such as, perhaps, a custodian or a paraprofessional. We
all know the custodians know everything about the school, for
sure.

The subcommittee heard compelling testimony regarding the free
flow of information on potentially disturbing behavior in
schools. Experts told us that following a school shooting, in
interviewing those who had contact with the shooter prior to the
incident, many had information that, when seen in isolation may
not have seen like a problem at first, but when taken together,
may have given a clue as to the mental state of the individual.

Maybe a student drew something disturbing in art class or wrote
a disturbing essay in English or perhaps withdrew from sports or
other extracurricular activities. We need a mechanism for
someone to connect all the dots and evaluate and report this
information. The bill utilizes an already existing model, as was
mentioned, to accomplish this goal, as the school Safe Climate
Committee, which is Connecticut's bullying statute.

Under this bill, this committee would be the repository of
disturbing and threatening behaviors that do not meet the
already established definition of bullying. The idea is not to
investigate every instance of disturbing and threatening

behavior, rather to look at the information in total and report as necessary to the district school safe school climate coordinator and the School Security and Safety Committee.

In Section 90, we require Mental Health and Addiction Services, with the State Department of Education, to administer a mental health first aid training program and require the district -- a district-wide safe school climate coordinator to participate in this particular program.

Of course, on everybody's mind right at first is infrastructure, the infrastructure of a school. The subcommittee discussed this physical infrastructure and received valuable, very valuable public testimony on methods to harden our schools without making them prisons. It is very important to maintain a proper learning environment while balancing safety, and that was heard time and again.

In Section 80 of the bill, we establish a School Safety Infrastructure Council consisting of experts in school and buildings security. The council must develop school building safety standards, by next January.

In the bill, we ask the council to develop standards based on some of the recommendations we learned through the subcommittee process including: Entryways to school buildings and classrooms, such as reenforcement of entry ways' ballistic glass, solid-core doors -- that was mentioned time and again as the most effective and least costly -- double-door access; computer-controlled electronic locks; remote locks on all entrances and exists; and a buzzer system; the use of cameras throughout the school building and all entrances and exits, including the use of close-circuit television monitoring; penetration-resistance vestibules; and, other security infrastructure improvements and devices as they become industry standards.

After January 2014, all new school construction projects must comply with these standards, which will be reimbursable through the regular school construction process, and these requirements are contained in Sections 81 through 82 of the bill.

But we didn't want to wait until 2014 to assist our municipalities with the expense of school security infrastructure, so in Section 84, you'll find that we resurrected the 2007, school security competitive grant program to reimburse towns for certain expenses incurred in the development and the improvement of school security.

The DESPP, along with Construction Services, and the State Department of Ed, will jointly administer this program, and towns are eligible for a grant percentage equal to the same percentage used in our school construction process. Once the program is up and running, funds should be made available immediately, if anyone asks about that in your local community in Section 85, we authorize bonds in the amount of 15 million for this particular competitive grant.

I'm going to end with the area of higher education. While the subcommittee on school security focused on K-12, and most of this bill does deal with that, we believe that a safety component for our colleges and universities should be raised and was raised by the Higher Education Committee for a public hearing, as the leadership of this committee were also represented on our subcommittee.

And in yielding to the distinguished Chairwoman of the Higher Education Committee, Senator Bye, who will proceed to outline the -- the content of this portion of the bill, I wanted to end with -- by saying that it was truly a privilege to serve as your Co-chair on the School Security Subcommittee and very proud to report that our recommendations were developed in a bipartisan and fully consensus manner. The members of this committee were grateful to see that the school security language contained in this bill substantially matches the spirit of the subcommittee recommendations.

And I would also like to thank, very much, the President of our Senate, Senator Williams; Majority Leader, Senator Looney; Minority Leader, John McKinney, who's a great mentor and a wonderful friend to all of us on our side of the aisle; and, also, to Speaker Sharkey, for their guidance and leadership throughout this very difficult but very vital process.

Thank you, very much. And I yield, again, to my wonderful Co-chair, Senator Bye.

THE CHAIR:

Senator Bye, will you accept the yield, ma'am?

SENATOR BYE:

Yes. Thank you, Madam President.

And through you, Madam President, thank you, Senator Boucher for that summary of the school safety. And I just want to join you, while you've just finished in thanking our leaders for their work on this bill and their incredible leadership. I think it's a very proud day for the state, and your leadership made that happen. And you were also very supportive of our subcommittee work, as Senator Boucher said.

Let me start, as many have, by thanking Senator Boucher, who's always there on Higher Ed asking tough questions and pushing important policies and making policies better, also, our -- our House Ranking Member, Representative LeGeyt, was very helpful with this bill and my Co-chair, Representative Willis, has such a deep understanding of higher education and our system in Connecticut, and that helped this process as well.

I'm sure that members of this body know that, as Senator Williams referenced, there have been mass shootings on campuses. Our campuses house adolescents and we all know that a lot of times when people have mental health challenges, it's that early adolescence when that happens. And so we really believed that a part of this education security provisions and safety should be extended to higher education, and we worked with the Education Co-chairs, Senator Boucher, and Representative Fleischmann to develop these, but it was a very collaborative process.

And I must thank the police officers at our CSUs, community colleges, and UConn, who are such a source of knowledge and understanding about adolescents and about what their campuses need to make sure that our students are safe on those campuses. And our independent colleges were also a part of this work and real team players.

So the higher education portion of this bill asks that state and independent colleges submit a security plan to the Department of Emergency Services and Public Protection. One thing that Sandy Hook showed us is how important it is that everybody understands, if you will, the lay of the land. And it's important to have a state and a local component, and so this bill will have those plans for all our public and private colleges.

It also requires a security and vulnerability assessment of campuses every two years, and each campus will be required to develop a threat assessment team that brings in input from many different sources. It also requires a board of regents for

higher education to study the creation of a police department at our community colleges and when that might be appropriate.

We all remember, just several weeks ago, the scare that happened on Manchester Community College campus. Senator Cassano has been a real champion for doing this study and having a set of policies about police officers on campus.

It also requires that there are security audits of the state universities and community colleges, that are performed by the Department of Emergency Services and Public Protection.

That summarizes the broad points, Madam President. I'll be happy to entertain questions, but at this point I would like to yield to the fabulous Co-chair of the Education Committee, Representative [sic] Stillman.

THE CHAIR:

Representative Stillman, will you accept --

A VOICE:

No, it's Senator.

SENATOR BYE:

Senator Stillman.

THE CHAIR:

What are you doing to me? Senator Stillman, will you accept the yield, please?

SENATOR STILLMAN:

Yes, thank you, Madam President, I do accept the yield.

And thank you, Senator Bye, for that lovely introduction; I appreciate it.

I -- I, too, as -- as a member of the School Security Subcommittee and -- and a member of the task force, itself, was honored to play a role in developing policy, a new policy for the state; specifically in my, in my role as the Senate Chair of the Education Committee, that was really my focus. And I want to thank Senator Boucher for her leadership on that subcommittee

and for her very clear and synopsis of what is in this particular bill in reference to school security and outlining the steps that it took to develop these policies that are in front of us today.

I, too, would like to thank Senator Williams and Senator Looney for their leadership, and Senator McKinney on -- in terms of make -- continuing to make this a true bipartisan bill and a bipartisan effort to address an issue in the state which was -- was so overwhelming for so many of us, as we wrapped -- grappled with the events that happened at the Sandy Hook School.

You know, for the parents and families that send their children to school every day, this was a real wake up call for them, in terms of the fact that, as parents and members of families who -- who send our children to schools, there's that very long day that we -- we are not in control of our children's activities and we rely on our schools to keep our children safe and secure and -- and feel comfortable in their respective school settings. And it's so for those reasons we really did need to address enhanced safety measures at our schools.

And Senator Boucher did, as I said, a very good job outlining the concerns that were raised and what do we do about it. I -- I will tell you that the subcommittee, itself, worked very hard, and all the members of the subcommittee, I -- I thank them, actually members of every single subcommittee, for the extra hours that they put in, in this Legislative Session to craft a bill that is before us today.

You know, I think it's important to remember, though, that even though the state is going to develop some standards through the new School Safety Infrastructure Council, that these will still be standards that when they are developed will be an opportunity for our schools to determine if they are appropriate for their -- their school buildings. This bill really focused more on the infrastructure, as -- as opposed to some other issues that came before us that many felt were more appropriate to the Mental Health Subcommittee. And I -- I thank them for addressing some of the concerns that were raised in our subcommittee.

One thing that we established when the bullying bill was passed, a couple of years ago, were the Safe School Climate Committees. And I think the fact that we had put that in place really allowed us to enhance their value in our schools. And that's what these recommendations are doing; that's another part of the recommendations, to enhance how this -- those School Safety

Climate Committees, who are dealing, some of them with bullying issues -- can also be a new resource, a new opportunity, too, for people, for kids, especially in the schools or for teachers to go and have someone to talk to and say, You know, I'm concerned about what I saw or I'm concerned about a certain child; I'd like to bring it to your attention or -- or I don't like what I heard.

And so I -- I think the fact that we had advanced such a comprehensive school bullying bill, I -- is really helpful to this process as we make our schools even more safe and secure. And so when we do send our children to school every day, we can, we can feel as though they are in -- in the safe place that we've always hoped they -- they would be in every single day, because if they don't, if the children don't feel safe in their schools, they're not going to learn. And the teachers aren't going to be able to teach as

-- as well as they do, so it's, so I'm very pleased that the provisions are in this bill.

And, again, I want to thank the leadership for leading us to this point of a comprehensive bill on a bipartisan basis, one that I'm proud to support and certainly hope that my colleagues here in the Circle will do the same. I believe that this bill is a great opportunity for Connecticut to set a framework for other states to follow.

And with that, I will, if I may, Madam President, I would like to yield back to Senator Williams.

THE CHAIR:

Senator Williams, will you accept the yield, sir?

SENATOR WILLIAMS:

Thank you, Madam President. Yes, I accept the yield.

I, too, would like the thank my fellow Senators, particularly those who just spoke, Senator looney, Senator Harp, Senator Boucher, Senator Bye, Senator Stillman. I also want to thank all of the Senators and Representatives who served on the Bipartisan Task Force addressing Gun Violence and Children's Safety. And, in particular, Speaker Sharkey; Minority Leader in the House, Larry Cafero; but, especially my friend and colleague, Minority

Senate Leader John McKinney, all have provided tremendous leadership on this issue.

And, Madam President, as a process clarification, I do want to underscore the fact that Connecticut is doing something that no other state has done. It's addressing this issue not in a partisan way, not in a political way, but in a bipartisan way with Democrats and Republicans working together. After the tragedy in Newtown, I -- I spoke with Senator McKinney; I spoke with Speaker Sharkey, and we decided to approach it in that way. We have been criticized by folks on both sides for that approach, but we have done something fundamentally different in the State of Connecticut. And the legislation that is before us is a better product for it.

Thank you, Madam President.

THE CHAIR:

Thank you.

Will you remark?

Senator Kissel.

SENATOR KISSEL:

Thank you, very much, Madam President.

December 14, 2012, for our family, was holiday time. It's a Friday. Many of us who have children drove them to school, kissed them good-bye. My friends and colleagues here in the Circle are well aware that I have two sons that I am extremely proud of, my son Nathaniel, who's 17, but my little guy, Tristan, who just happens to be born on December 15th. So on that Friday, not only was our family looking forward to the Christmas holidays but we were very much looking forward to that Saturday when we would celebrate Tristan's 9th birthday.

And as I drove home that Friday and listened to all the accounts on the radio and was completely overwhelmed that what I saw at the beginning of day, while physically it had not changed, emotionally it had clanged because of the events that we were being told had enfolded in Newtown. There was a pall not only over Connecticut but our entire nation and to those that were following the story from throughout the world.

And when I got home, my little guy was there, and as all moms
and dads did that night and probably have reassured themselves
to do every day, is I gave Tristan in particular a hug and a
kiss. And I said, Did you know what happened today? And he did.
Not in any great detail, but they had explained it at his
school. And we went over and we chatted a little bit. Was he
afraid? And he actually wasn't.

He actually confided that he was more disturbed by the fact of
what took place in Colorado, because as a little 9-year-old or
8-year-old, going on 9, he was a huge Dark Knight, Batman fan.
And it's almost as if he understood that there weren't -- might
be rigors in a school environment, but a movie theater, that's
where magic was supposed to happen. You're supposed to be safe
and transported into a different world. Wow. So I would
acknowledge that these events do have an impact on us as well as
our children. And to the extent we make efforts to try to stop
these events, those efforts are worthwhile.

We had an enormously long public hearing on the 28th of January;
I've had longer in Judiciary, when we would start at ten and end
at quarter-to-three. We had panels in the morning, and the
public didn't begin testifying until one. But, again, it was one
of those marathon hearings where we didn't end until about
quarter-to-three.

And then on that Wednesday, everybody who was honored enough to
serve on the General Task Force was invited to go to Newtown
High School, and it was an unusually warm January 30th, but
still overcast. And I arrived in Newtown, a town I had passed
through probably dozens of times but hadn't really spent an
awful lot of time in the town. And our hearing was to begin at
six, and I got there an hour early, and I and I just wanted to
drive around and get a feel for the community. And I drove by
the front of Sandy Hook Elementary School and saw probably four
cones blocking the entrance, and where that fire department is.
And clearly no one was going down that -- that roadway.

I just wanted to drive around the neighborhood, and I saw houses
with -- with tributes on their front of their houses. And I just
sort of followed the roads, and I followed a road up a hill. And
lo and behold, to my right I saw a beautiful park, and I just
decided to go in there. And there was only one vehicle in there;
it was a commercial trucker, just finishing up his paperwork.
And as I parked, he drove out, and now I'm in a park up on a
hill in Newtown, in the Sandy Hook section of town, just looking
about, trying to get a feel for that community.

I think the school is close to that park. I got a sense that that was the case. It was a beautiful park; it still is. I haven't been back to Newtown since that day, January 30th, but I remember walking. There was an area, pool area, soccer fields, picnic pavilion, and up near the edge of a hill, that little playscape area where you know little kindergartners and first-graders and second-graders would like to play.

And I walked near that area. And in that park it sort of falls down, and there's deep woods and paths. And it was too muddy to -- to even travel down there, but I had a sense that near that park was that school. And I almost had a sense that perhaps some of the souls of those little children, administrators, and teachers -- I like to believe that one goes up to Heaven -- but if they were going to come down as angels and visit, that would be familiar territory and friendly territory, a happy memory.

What do those moms and dads feel? They testified before us on that Monday. They came to Newtown High School and testified again. I have told my constituents, I said, as a dad, if that happened to my children, I don't know what I would fight for or not fight for, because to lose a child before yourself and to lose a child in that kind of situation has got to be every parent's worse nightmare.

So I spent a good half-hour in that park, just trying to get a sense of where I was, wondering if maybe down that hill, in those woods was that school. But I wanted to be up where the playscape was, trying to hope that there were still some of those good sentiments. And before I left, a young woman with an English accent -- I don't know if she was the mom or the nanny -- but two little kids on little bikes with little training wheels, and it was nice. They were just -- I mean, when in January 30th do you get to go to a park? And they got to go to a park.

And I go, lucky day for these guys. And she goes, yes. I go, what's the name of this park? And -- and I thought she said "Dreadwell," and that seemed sort of -- she goes, "No, Treadwell" -- maybe that was a Freudian slip. But that was the park. That was the place. I will always remember that place because I think there's something special there. There's something special in that community, and they will struggle with this for the rest of their lives, but to the parents and the first responders and everybody that came and testified, I have got to give them huge respect.

Now, very briefly, I want to bring you back 30-odd years to when I was a student, an undergrad student, at the University of Connecticut, and it was a beautiful, late-September, early-October day. It was a Saturday or Sunday and I just decided to -- I was a freshman -- I wanted to explore the territory. I didn't, you know, you know where you are. You have your dorm; it was the Northwest Quadrangle. I wanted to take a walk, and it may have been North Eagle Hill Road -- I'm not exactly sure -- but I walked by myself, just enjoying the autumn leaves. And I stumbled upon what could only be a colonial graveyard, and I read some of the tombstones over on the right-hand side. And they were really incredible, and I actually wrote, wanted to write one down, use it for myself.

Sort of being a little -- and I wouldn't -- necessarily adventurous, but I like to explore, I walked into this colonial graveyard that didn't really have a formal gate opening or anything; it was just tucked away from the woods, and I went to the back of it. And I was startled by what I saw -- 18-year-old kid, new to a territory, a State of Connecticut -- and over in the distance I saw something that was so strange, it was like out of a movie.

And it was a set of buildings, stark, and someone was in a caged area with someone standing not too far away, maybe holding a baton or holding the keys to the, to the caged area. And this person was, like, just kept, like, shaking spiders off themselves or something like that; it was, it was very odd. I couldn't actually, I mean, part of it is you watch that and then you skedaddle out of there as fast as you humanly can.

Well, turns out, lo and behold, I had stumbled into one of the back areas of Mansfield Training School, and back in those days, people with severe mental illness were housed in these institutions. And folks got it in their heads that, you know what, this is not a humane way to treat people with mental disabilities.

And so we went about as a society in the last 30 years or so deinstitutionalizing individuals, and those that are severely disabled, we still make sure have appropriate housing and care. But for so many with mental disabilities, there is not the appropriate medical attention. There is not the appropriate housing. There is not the appropriate care as a society, whether they are new Veterans returning back from war, whether they are the homeless, whether they are young people spotted in schools, even at the earliest ages, we don't do a good job in that area.

We did a good job letting folks out of the institutional climate, but we haven't really done the other part of it. And there are good things in this bill regarding mental health parity, the recommendations of the Program Review and Investigations Committee. In fact, in the bill that we have before us, there's a lot of good things.

But then I get to my other point, because we had the litany of experiences that people have pointed to and said look at this horrific event and look at that honorific event. And I say look at it in the totality of circumstances in our country. And while in many instances guns are involved, the thing that I see as the common thread is the mental health issue. And while the bill before us this afternoon touches that and creates a task force to study it further and is very ambitious in its laudable goals, to my mind, that's where we need to look first.

And, unfortunately, what I have seen over the years, whether one disagrees with me or agrees with me, is that we turn to guns first. It's like that movie "Casablanca," where the French police chief goes, bring in the usual suspects. Well, anybody involved in law enforcement knows you match the evidence to the suspect; you don't bring in the usual suspects.

There are people that will be against certain guns, no matter what. I do not state that any of my colleagues whom I care for in the Circle feel that way, but there are folks out there that have no use for the Second Amendment, whatsoever. And so the first thing they look to is how do we regulate guns even further; how do we regulate ammunition? How do we make it more difficult?

And I say that's okay to discuss; it's worthwhile. We owe it to the parents and the loved ones and the sisters and the brothers and the husbands, the moms and the dads, we owe them that discussion. But at the end of the day, making it more onerous, more cumbersome, more burdensome on law-abiding citizens in our state is not the solution.

Please don't. Please don't.

THE CHAIR:

Excuse me, Senator.

SENATOR KISSEL:

You -- you --

THE CHAIR:

Excuse --

SENATOR KISSEL:

You are --

THE CHAIR:

-- me, Senate -- Senator --

SENATOR KISSEL:

You are not --

THE CHAIR:

Excuse me.

SENATOR KISSEL:

-- helping my argument.

THE CHAIR:

Excuse me, a minute, Senator.

Ladies and gentlemen, I asked before, I ask you again, please
hold your applause or your boos. This is not the time. I have
been told and asked by the -- the state police, the Capitol
Police to -- if you continue this, they are going to remove you.
I ask you not to do that, because we really do think you should
be in this Chamber.

Thank you, very much --

SENATOR KISSEL:

Thank --

THE CHAIR:

-- Senator.

SENATOR KISSEL:

Thank you, Madam President.

And it's not an easy decision. I can tell you right here and right now, I didn't sleep at all Monday night because I had the images of little kids in my face, in my dreams, the 20, little, first-year, first-graders.

So I have my public policy views. I have what I believe in, that I've stood for, for over 20 years. But I will say this to everyone in the State of Connecticut, this is not an easy vote for any of us. If any one of us had the magic solution, we would be done. Nothing could make me happier than if this bill solved all of these issues. But in my heart of hearts, I don't believe that to be the case.

I respect those that brought this bill before us. I can state unequivocally that if it were not for Senator McKinney, Representative Cafero, and others in that room negotiating this bill, it would be far more onerous on law-abiding gun owners, hunters, sportsmen, competitors, those that just want to collect firearms. But at the end of the day, I have to weigh all the good things -- and there's lots of good things in here -- versus those steps that I feel that go too far in maybe not necessarily demonizing law-abiding gun owners but making their lives much more difficult.

Some people have said have you changed your position, because you've got the bill here and you're going through it. This isn't the bill. This isn't the bill. This is five years old, District of Columbia v. Heller; this is the United States Supreme Court decision, that finally was handed down, that stated succinctly that that prefatory clause in the Second Amendment does not limit the substantive clause that people have a right to bear arms. And you don't have a right to bear arms in the United States because you need to join a militia; you have a right to bear arms because you can protect yourself. That has been the multi-centuries' history of folks blazing a way through the wilderness and protecting themselves through all sort of hazards in the United States.

I have heard there will be legal challenges to the bill before us this afternoon. I do not know if this will be grounds to overturn any of the portions in the bill before us, but I will say this -- and I will conclude with these sentiments -- our founding fathers knew exactly what they were doing.

And I stumbled upon something in the last couple of months, purely be chance -- hard winter, cold -- cold now -- it's April; it's cold -- I was listening to an audio book, going to and from work, to and for -- from session, sometimes just taking half-hour walks in my neighborhood, just trying to get out of that house, because it's winter and you get cabin fever. And the book I selected, a long one, was the Biography of John Adams. I was fascinated. I'm a New Englander; he's a New Englander. I always thought he got a little short shrift, being boxed in between Washington and Jefferson, and it was fascinating. My love and respect for that man, that president, went up astronomically with the rendition of his story of his life.

One of the things I liked the most is he doesn't view life as a ladder, where you're trying to always get ahead; he viewed it as a journey, where you need to try to learn something all along the way. But buried in there, as I'm listening, six, seven, eight weeks ago, on March 14, 1776, the Continental Congress -- not the bad guys, the good guys -- as they voted on all issues at that time, knowing that they were about to go to war with Britain, in revolution -- obviously behind closed doors, because you don't want to be accused of defying your nation -- on March 14, 1776, they voted to take away all the firearms of every Colonial citizen that was leaning towards or supportive of the British, any Tory, approximately one-third of the colonists. They don't teach us that in school, but that's what they voted on. John Adams, Ben Franklin, our heroes. They knew war was on the horizon and they said, well, better get the guns away from these folks so that we don't have to watch behind our back as we're fighting the British in front of us.

Well, doesn't then it make sense, they knew how powerful a weapon that was, that later on, as the Constitution is being formed and they amend the Constitution, right to keep and bear arms shall not be infringed. That makes sense, because guess what? Most of those folks were the same. They were certainly informed about the same events. And they said to themselves, wow, we were able to go do that. Granted it was the anticipation of war, but you know what? We got to make sure that never happens to us. So going forward, we're going to make sure that we have that right so that never can happen to us, because we -- that's a scary thing.

Is it something legitimate that I'm concerned about happening a year from now or two years from now or three years from now? I don't know. I would not suspect it to be so. But for those individuals that are concerned about their Second Amendment

rights, incrementalism is a real concern. And having all the information in one area is a real concern, because while this year people are grandfathered, there clearly are individuals that would not go that far and would say, you know what, these magazines should be gone now. And you know what? We're not going to compensate you for them. And you know what? These hundred guns should be gone now. And you know what? We're not going to compensate you for them, and if you don't like us, like it, sue us.

And then maybe the Supreme Court would decide it five or six or seven years down the line, because my constituents in north-central Connecticut and many other places that I've heard from understand incrementalism. They understand big government. They have a slight suspicion. Oh, you only want to go this far today but tomorrow you might go a little farther. And I can't blame them for that concern when I hear that we have this great compromise in the bill -- the bill before you -- but at the same time both Governor Malloy and advocates for further gun control say it doesn't go far enough but it's -- it's a good first step.

How can I turn to my constituents that are concerned about incrementalism and losing their Second Amendment rights? How can I turn to them and say they're not being reasonable when at the very same time this bill is before us, folks that want further control are saying it's just a good first step. That's their proof. And while there may be an agreement between the leaders not to go further this year with further gun control efforts, it's my understanding there is no such agreement for next year or the year after or the year after that.

So I will conclude by saying this: You just can't have a heart at all if you don't feel for the families and friends and neighbors of the victims of that Newtown massacre. You don't have to be a mom or a dad to know how diabolically evil it is for someone to go in there and shoot first-graders. Everyone understands that we need to do something to address that. Mental health issues, school safety enhancements, but when it comes to further regulations on guns and ammunition, in one of the states that is touted as having right now some of the most tough gun laws in the United States of America, I think goes one step too far.

And for that reason, Madam President, with the utmost respect to the proponents of legislation, and with the utmost respect to the moms and the dads and the husbands and the wives and the brothers and the sisters and all of the God-fearing, law-abiding

citizens in the State of Connecticut, I will have to vote no
this afternoon.

Thank you.

THE CHAIR:

Thank you.

Senator Meyer.

SENATOR MEYER:

Thank you, Madam President.

What a journey it's been for us, these last several months, for
each one of us. I'm 77 years of age, and yet I have learned so
much in the last two-and-a-half months about Connecticut, about
our residents, about their feelings.

I heard, first and foremost, fear because of Newtown. And fear
came from two sources -- and you, you heard it too, I'm sure --
the fear of -- of homeowners that if they didn't have guns with
multiple rounds, they would never be able to protect themselves.
One -- one constituent of mine, in Guilford, said to me, I need
more than ten rounds in my gun magazine because I'm lousy shot.
When they come in my home, I'll -- I'll miss the first ten
rounds.

And -- and I also heard fear, as you've heard fear, from so many
people who have families and are concerned about what's going to
happen as long as we have this obsession with guns. And I -- I
felt and I've -- I'm sure many of you feel that there is too
great, in Connecticut and in the country, an obsession with
assault guns and with the large-capacity gun magazines.

I also heard -- we heard a bit from Senator Kissel on this --
about great objection to government interference. I went into a
gun shop yesterday. There was a huge poster, as you walk in the
gun shop. It said, Background checks start with the President;
okay? Government interference is another thing that I heard more
loudly than I've ever heard before, in my eight years in the
State Senate.

So what do we have before us today? Clearly we have the most
comprehensive gun violence legislation in America. It deals with
so many facets and in such a comprehensive way; reasonable gun

restriction; mental health; school security, as our colleagues have well articulated this morning and this afternoon.

But I must say to you, too, that this bill has a significant and alarming omission that we must in the future address, and that omission is that it allows gun owners today who have the large-capacity magazines of more than ten rounds, it allows them to keep them for the rest of their lives.

Adam Lanza killed those kids and adults because he had a 30-round -- he had 10, actually -- 30-round magazines that he brought to that elementary school that morning. And we learned that because of these gun magazines, he was able to fire what looks like 154 bullets, 154 rounds in about 4 minutes.

The Newtown parents, we all got a letter from them on Monday of this week. They reminded us of the key issue here. The letter says that our proposal grandfathers existing, large-capacity magazines, leaving a gaping hole on what we believe is the most dangerous feature of an assault weapon. And it goes on and says how can we not remove large-capacity magazine from Connecticut if we know that it might save even one more child, teacher or parent? That addresses a problem that we in the future must undertake.

Yesterday, I stood in line, for a long time, at a gun shop and -- and purchased a couple of gun magazines that I want to share with you. This -- this one here is -- is the kind that the -- the Newtown killer used. It's a 30; it contains 30 bullets, 30 rounds in it. And, unfortunately, those of -- those people who have this magazine will be able to keep it under the current legislation. This one actually contains 60 rounds. The salesman in the gun shop said, you better grab it quick; it's the last one. We won't get any more in until Friday, he said. Okay? That's the climate. That's the environment that we're facing today.

I did prepare, I did prepare an amendment that I'm not going to call. I prepared an amendment, which actually is LCO 5453, to deal with this omission, what I believe is an omission. We will look at that some other day, maybe in some other year. But we made a step today, but I want to just remind you from the vantage point of many of us and many of our constituents, what we're doing today is a work in progress.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Guglielmo.

SENATOR GUGLIELMO:

Thank you, Madam President.

You know, I have -- I'm the Ranking Member on Public Safety, so
I sat through the two, 18-hour-or-so public hearings, and I
heard from a lot of people. And like Senator Meyer, I learned a
lot, myself. I -- I did know something about firearms from my
time in the service and because I'm a member of a local rod and
gun club, but rather hardly an expert; but I did learn.

But even before we get into the weeds of this bill, which is --
I don't know, Scott has it here -- 140 pages or so, I -- I knew
I was going to vote no because I didn't need to get into the
weeds of the legislation; I can't get by the premise.

See, the premise set, that boggles my mind and boggled the minds
of so many of the people who testified in front of our
committee, is you have two columns, you know. And one column you
have a deranged young man, a mass murderer. I wouldn't even call
him a "shooter" -- that kinds of glorifies him -- he's a mass
murderer. A sick individual hero-worshipped other mass murders,
apparently. We don't know that for a fact, because we don't have
the police report; we got drips and drabs, but that's an
argument for another day. I mean, should we even be here without
a complete police report? I -- I think not, but that's what
happened.

So that's the column we have; we have a mass murderer, somebody
who's very, very sick. And then in the other column, we have
ordinary citizens, clean record, work hard, pay their taxes,
many of them Veterans, want to be left alone, never caused a
problem in the past, won't today, won't tomorrow. So how does
this body connect the dots between the mass murderer and the
ordinary citizen? See, that's what I don't get. So getting into
the weeds about what we're going to ban from the average
citizen, the ordinary guy and gal, I'm not interesting in that.
Because anytime you go down that path, I think it's wrong,
because you're punishing the wrong teem; it's just simple. The
premise is wrong.

And I'm going to wait today to hear if anybody connects those
dots for me, how we get Adam Lanza tied up with the guys at the
Rockville Fish and Game Club. That's what I want to know. And I
have a lot of rod and gun clubs in my district. I'm a member of
Rockville Fish and Game. I'm an honorary member of the Fin Fur
and Feather, up in Chaplin. I've gone to all the game dinners,
wondered what I was eating in the game stew, always a concern of
mine but a lot of, lot of others, too, I think. We got Somers
sportsmen's club, one in Ashford, one in Pomfret, so I know a
lot of these folks over the 21 years that I've served.

I'm a city boy, basically, so this was all an education to me
when I moved up here in the 1960s. And so I got to know these
people. So what I do know is that they're not a problem; never
were, never will be, not now, not ever. But I also know we're
doing them great harm psychologically, because they feel hurt
that they're being lumped together with somebody who's obviously
sick and deranged, and being a straw man, basically, to be
knocked down for what happened in Newtown. I don't know if
they're more sad than mad, but I've been talking to a lot of
them and it's hard to say.

The other component of this, which I'll just touch on, is there
is an economic component to this; and they were here a couple of
weeks ago, all the guys and gals that work in the industry in
Connecticut that produces firearms and ammunition. We're a state
that's known for that. We had pride in being -- oh, in fact we
designated a park over there, at Colt. It was state money, as I
recall, because we were proud of our history of firearms, but
now I don't know as -- I guess we're not.

But the point I'm having to make or want to make is there's 5000
jobs connected indirectly or directly with the firearms'
industry is Connecticut. Hartford Courant today, if you haven't
read it, there's a column in the business page and Dan Haar
makes that point, made it -- has had several good columns on the
economic impact.

But one point I hadn't thought about until today, when he raised
that in his column, I thought that, well, this will be bad for
these manufacturers because they'll lose the Connecticut market.
But see, there's a component that I wasn't aware of that he
brought up in the article, that people who buy firearms in other
states, the other 49, boycott guns that are made in states that
have a bad repetition, who stick a sharp stick in the eye of gun
owners. So you can buy that AR-15, because there's no patent, in
several states by several manufacturers; don't have to buy the

Connecticut AR-15, and they won't. And that's what happens in other states, have done this.

And I believe it was the Vice President of Mossberg who said, he called it "brand damage. " We're going to have damage to the brand. He is getting offers every day, from all over this country, from other states, to relocate. And we all know here that this is not exactly the home of business friendly. We tax people too much. We regulate them too much. I ran a small business most of my life, my daughter runs it now; it is hard. It's hard everywhere, but it -- we make it really hard in Connecticut, almost adversarial in Connecticut. So now he's getting all these offers from other states, and his quote was something to the effect, if I stay here I might be out of business in three years because of this brand damage. What choice do I have? So that's the economic component.

You never want to trade, you know, guns for blood -- I mean money for blood, but there is an economic component, and I think if you don't mention it, you're make -- it's avoiding part of the equation.

Then, you know, the interesting thing that I thought about, you -- you know, most of the, most of you who know me know I don't care for corporate welfare. I don't like giving money to big companies, but we do it. We did it under Republican Governors, too, so I'm not blaming Governor Malloy. I think it takes -- is a bad precedent for Governor -- government to pick winners and losers; never made any sense to me. I was a small-business guy. I never understood why government was in that business of picking winners and losers, but we do it.

So here we are willing to throw out, potentially, 5000 jobs, and we gave $ 291 million to Jackson Laboratories for 300 jobs; I didn't vote for that. That didn't make any sense. Ninety-one million to Starwood Corporation for 800 jobs. We have ESPN, CIGNA, and its goes on and on. So what are we going to -- you know, it just doesn't make any sense to me.

On the one hand -- in fact, when Cabelas came in, we

-- we -- they got state aid. Any you, any of you've gone to Cabelas, you see where that road leads. You get off 84; you drive into their parking lot. You go there before you go to Rentschler Field; it's easier to get in there. And we designed that for them because we wanted them here. Now we're saying, apparently, we don't want them here.

And, finally, like Senator Kissel said, you know, just because I'm on this side of the issue does not mean I don't respect the others; I do. And just because I'm on this side of the issue doesn't mean that I'm not appalled by what happened in Newtown. I'm a grandfather of eight. I've got three in elementary school, and if you think that I thought that anything in this bill would help make them safer, that I wouldn't vote for it, you're mistaken.

The morning that this happened, I was in my youngest grandson's preschool class. Preschool and kindergarten, December 14th, 9:30, had their Christmas pageant. My little guy has got red, curly hair and blue eyes. I don't know where that came from but I don't ask. But he's a red, curly headed guy, blue eyes, and if I may say so, really cute as a button. They're all in there and they've got their little hats, their elf hats, taped to their head that they made in art class. And they're singing Christmas songs and Kwanzaa and -- and all the different songs of the season. And they're so earnest and they're trying so hard. You know, you can't walk -- everybody walked out with a smile. My -- my mother was there; she's 96. Even my oldest grandson, who's 20, he came. Obviously my daughter and son-in-law and my wife and I, along with a packed room full of people, grandparents, parents, aunts and uncles, everybody is smiling.

And then you get into your car. You turn on the radio and you say, wow, how can this happen? How can somebody be so sick as to kill 20 babies, like my little guy, like John's little guys? So I understand that we have to do something.

People say you have to do something, but we could do a lot of things, and some of them are in this bill. We could reinstate the gun trafficking task force, for a million bucks; it's in this bill. That's a good thing, like John said, you know, Senator Kissel said, there are good things in this bill. That's a good thing. It worked.

We can make a minimum mandatory sentence for straw buyers. You buy a, you buy a weapon for somebody who is illegal and you know what? That judge has got no discretion. You're going to jail for two or three years, whatever we say. And if you think that wouldn't be a deterrent, I think you're mistaken. Because to be a straw buyer, you got to have a clean record. To have a clean record, you can't be familiar with our corrections' system. And the last thing most people with clean records want to do is go into our correction system. That would be a real deterrent. That would be doing something.

You could put more money into Senator Williams' hand for school security, which we did do in this bill, $ 15 million.

You could totally eliminate the early release program, which I'm not sure whether this does it or not. There's -- we've only had the bill for a little bit, so I'm not sure. It says it does it but I'd like to read the details.

So basically, I guess, the problem is I can't connect the dots between Adam Lanza and the -- and the good guys. So I think we need to do something, but I guess we should be doing something that does good, not something that just feels good.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Coleman.

SENATOR COLEMAN:

Thank you, very much, Madam President.

I rise in proud support of this bill before us, and the first thing that I want to do is to commend all of the members who served on the Bipartisan Task Force, but, in particular, Senator Williams and Senator McKinney for, I think, the phenomenal leadership that they exhibited in the work that they did in connection with the task force.

I'm very pleased that the task force efforts were characterized by bipartisanship and that the approach, as well as the product that was yielded, was comprehensive in nature. And I had the honor of serving on the Gun Violence Prevention Work Group that was chaired or Co-chaired by Senator Looney, who did his usual, very capable and thoughtful job in leading the work of that work group.

I'll be very brief. I certainly just wanted to make two comments, and the first was that I do believe that what we do today will make it less likely that an incident like the incident that occurred in Newtown will occur again. Will it guarantee that such an incident will not occur? I don't believe so. But, frankly, I have a difficult time in understanding those who argue that because we can't guarantee that regulation of

firearms will prevent such an incident from occurring in the
future, that we should do -- do nothing.

Doing nothing, it seems to me, would tend to make it likely that
such an incident will reoccur, and that is not sensible to me. I
think the young lives that were taken in Newtown demand some
type of action on our part and including some type of action
that will involve regulation of firearms.

The second point that I wanted to make very briefly is that I
find it to be tragic and unfortunate that it took an incident
like the one in Newtown to focus our concern and our attention
on gun violence. And I say it because gun incidents and killings
occur on too frequent and regular basis in some of the urban
centers in our state; but having said that, I'm very gratified
that there was an effort, considerable effort that was made in
the provision that's in -- of this bill that will have the
effect of addressing some of the violence, that occurs in
districts like mine and in some of the urban centers throughout
our state.

There was reference made to the Heller Decision. And the thing
that struck me about the Heller Decision is paraphrasing. I
believe it was Justice Scalia who said that no person has the
right to own any kind of weapon for any purpose whatsoever. And
I find that language in that U. S. Supreme Court decision to be
very consistent with what we're doing in this bill, and
particularly as regards the expansion of our assault weapons
ban.

And our own State Supreme Court, in Benjamin v. Bailey, upheld
our assault weapons ban, which, again, is consistent, I think,
with our effort here today. And so, Madam President, again, I
commend the members of the task force and particularly the
leaders of that group, and I intend to be a proud supporter of
this bill.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Frantz.

SENATOR FRANTZ:

Thank you, Madam President.

I rise to make one, very short comment about the bill in the
backdrop of what every single person in this Circle would agree
to be a completely unacceptable massacre that occurred on
December 14th in Sandy Hook. And my short comment, before I
introduce a couple of amendments, three amendments, through you,
Madam President, is that way too much of this bill is, it
emphasizes gun-related regulations and rules and conditions.

If you look at the 139 pages of this bill, two-thirds of it is
devoted to guns, and it happens to be in the first section of
the bill, as opposed to the second or third section of the bill,
which cover mental health and school security. It's a big bill
and, as usual, we got it very shortly before we came onto the
floors here, so we haven't had a chance to completely review
everything, but we got the gist of it, thanks to the people at
OLR who was -- who were able to summarize it.

So, despite the fact that I believe, in my judgment, there is
too much emphasis on gun regulations and new ones, it does have
and make provisions for mental health improvements and school
security improvements, and the money is there. And so there are
some good parts to this bill.

And so through you, Madam President, the Clerk has an amendment,
LCO Number 5458. Will the Clerk please call that amendment.

THE CHAIR:

Mr. Clerk.

Senator, do you want to summarize?

SENATOR FRANTZ:

Yes. I move adoption of the amendment, waive the reading, and
seek to summarize, if okay --

THE CHAIR:

Please --

SENATOR FRANTZ:

-- with you.

THE CHAIR:

-- Senator -- Mr. Clerk.

THE CLERK:

LCO Number 5458, Senate Amendment Schedule "A," offered by Senator Frantz.

THE CHAIR:

Senator Frantz, now you make your motion, please.

SENATOR FRANTZ:

Thank you, Madam President.

I do move -- I move adoption of the amendment, waive the reading, and seek to summarize. And --

THE CHAIR:

The motion is on adopting and summarize. Will you remark, sir?

SENATOR FRANTZ:

Thank you, Madam President.

What this amendment does, 5458, is it simply carves out shotguns from all of the new regulations that are suggested in the bill before you today. And additionally what it does is it carves out shotgun shell purchases from all the regulations that are suggested in today's bill before us.

Everybody who has read the bill knows that if you are going to -- if this bill is signed into law -- in the future go out and buy a couple of boxes of shotgun shells, you will have to show some form of credential, whether it's an ammunition certificate, an eligibility certificate, a carry permit or the like.

This -- this covers shotguns, which as most of us know who are involved with the sport of shooting, shotguns are primarily used for recreational purposes. They're used to train younger people how to shoot a -- a longer gun responsibly, used for sporting clay purposes and for bird hunting, and that about it. And there aren't very many of those types of firearms that are used in

criminal activities, and therefore I think it's a reasonable
request to -- to carve them out.

Additionally, gun clubs -- there are many, many of them
throughout the entire State of Connecticut -- and it's going to
be a nightmare to try to figure out how to get rounds of -- of
shotgun shells to club members as well as to guests. Are they
purchasing this ammunition? Are they not purchasing it? Is it
part of the, you know, guest fees that they pay? Is part of the
-- membership fee? We don't know. It's a can of worms. How are
we going to enforce something like that?

So, Madam President, I would ask for a roll call vote on this
particular amendment, whenever you're ready.

THE CHAIR:

A roll call will be had, sir.

Senate -- Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I rise to oppose the amendment. What we're striving for in this
bill is consistency as to ammunition and to firearms, for that
matter, in terms of the permitting process and the certificates
that are required.

I certainly agree with Senator Frantz that shotguns, when
properly used, are absolutely legitimate sporting rifles and
they have been for many, many years. However, shotguns,
unfortunately, are not immune from being used by criminals for
illegal purpose. As a matter of fact, there are some shotguns
that have nicknames such as "street sweeper. " For that reason,
Madam President, I oppose the amendment.

THE CHAIR:

Thank you.

Will you remark? Will you remark?

If not, Mr. Clerk, will you call for a roll call vote on Senate
"A," and the machine will be open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Immediate roll call has been ordered in the Senate.

THE CHAIR:

Have all members voted? If all members have voted, the machine will be closed. And Mr. Clerk, will you call the tally, please.

THE CLERK:

Senate Amendment Schedule "A," for Emergency Certified Bill Number 1160.

Total Number Voting 36 Necessary -- those voting Yea 11

Those voting Nay 25

THE CHAIR:

The amendment fails.

Will you remark?

Senator Frantz.

SENATOR FRANTZ:

Thank you, Madam President.

Second amendment of the three that I'd like to introduce to you, the Clerk has that amendment. It's LCO Number 5459. Will the Clerk please call that amendment.

THE CHAIR:

Mr. Clerk.

THE CLERK:

LCO Number 5459, Senator Amendment Schedule "B," offered by Senator Frantz.

THE CHAIR:

Senator Frantz.

SENATOR FRANTZ:

Thank you, Madam President. I move adoption and seek to summarize.

THE CHAIR:

The question is on adoption. Will you remark, sir?

SENATOR FRANTZ:

Thank you, Madam President.

What 5459 does is it distinguishes handguns and pistols from long guns, in terms of their maximum magazine capacity. In this bill, we're looking at a maximum capacity of 10 for the long rifles and 10 for pistols and handguns. What the amendment calls for is there to be a carve-out of handguns and pistols and allow that maximum capacity to be 17 as opposed to 10. The simple reason for that is that you have a much shorter gun, which is much more inaccurate because of its shorter barrel length, typically about three-to-five inches -- some are longer, but three-to-five inches is a normal pistol barrel length -- and the fact that it's very hard to steady, unlike a rifle which you can use your shoulder to steady and draw a bead on whatever the target is.

If, in fact, the Constitution, both the State Constitution and the U. S. Constitution guarantees our right to defend ourselves with firearms, I believe that it's a fair concession to make because they're more inaccurate. It's probably about the equivalent of 10 in a longer gun in terms of accuracy. But when you're trying to defend yourself, it's very difficult to hit your target. We know for a fact that police departments average about 16 percent when they're going after a perpetrator. It takes a lot of rounds to stop that perpetrator in his or her tracks.

So with that, Madam President, unless there are any questions, I would ask for a roll vote as well.

THE CHAIR:

A roll call vote will be taken --

SENATOR FRANTZ:

A roll call vote.

THE CHAIR:

-- at the time.

Will you remark?

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I rise to oppose the amendment. Again, we want to be consistent. We want to have our ten-round limitation for magazines to be consistent throughout, whether it's long guns or pistols.

I would also point out the worst mass shooting in American history, at Virginia Tech University, was conducted with pistols, more than 50 people shot, more than 30 people killed.

THE CHAIR:

Thank you.

Will you remark? Will you remark?

If not, Mr. Clerk, will you call for a roll call vote, and the machine will be open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators please report to the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

If all members have voted, if all members have voted, the machine will be closed. Mr. Clerk, will you please call a tally.

THE CLERK:

Senator Amendment Schedule "B," for Emergency Certified Bill Number 1160.

Those voting Yea 10

Those voting Nay 26

Absent, not voting 0

Total Voting Number is 36

THE CHAIR:

Senate Bill -- Senate Amendment "B" has failed.

Senator -- Senator Frantz.

SENATOR FRANTZ:

Thank you, Madam President.

The last amendment is LCO 5461. The Clerk, I believe, has that amendment. And will the Clerk please call that amendment.

THE CHAIR:

Mr. Clerk, will you please call the amendment.

THE CLERK:

LCO Number 5461, Senate Amendment Schedule "B," [sic] offered by Senator Frantz.

THE CHAIR:

Senator Frantz.

SENATOR FRANTZ:

Thank you, Madam President.

I move adoption and seek to summarize (inaudible) --

THE CHAIR:

The motion is on adoption. Will you proceed, sir?

SENATOR FRANTZ:

Thank you.

Madam President and colleagues around the Circle, 5461 very simply exempts from the regulations called for in today's bill the scrutiny and the required credentials to purchase . 22 caliber ammunition. Most of you know what it is. It's very small. It's about an inch long or so, something like that. And, you know, 20 -- it's quarter-of-an-inch in diameter, as far as the projectile, the actual bullet part of the, of the round is concerned. It's not very powerful. It's used primarily for plinking and for target shooting. It's used by young, youngsters, you know, as young as 8 and 10 years old, when they're first learning how to use a firearm for target practice.

It's -- I think the law just goes far too -- it just goes too far when it comes to regulating essentially a very, very tiny round of ammunition that is enjoyed by older folks, younger folks, and people of all ages, for that matter.

And, with that, Madam President, I would also ask for a roll call vote.

THE CHAIR:

A roll call vote will be had.

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President

I rise to oppose the amendment; . 22 caliber can certainly be fatal. And, again, what we want is consistency in how we treat the purchase of ammunition and the credentialing and the background checks that are required.

Thank you, Madam President.

THE CHAIR:

Thank you.

Will you remark? Will you remark?

If not, Mr. Clerk, please call for the, a roll call vote, and the machine will be open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators please report to the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

Have all members voted? If all members voted, the machine will be closed. And, Mr. Clerk, will you please call the tally.

THE CLERK:

Senate Amendment Schedule "B," [sic] for Senate Bill 1160.

Those voting Yea 10

Those voting Nay 26

Absent, not voting 0

Total Voting Number 36

THE CHAIR:

Senate Amendment "C" fails.

Will you remark?

Senator Duff?

SENATOR DUFF:

Yup. Thank you, Madam President.

You know, we go back to that day, on December 14th, and it started off like any other day. It was a cold, clear day, almost like today is, and we were having meetings. As a matter of fact, Senator Boucher and I were sitting next to each other at the Norwalk Senior Center when we received an e-mail about a shooting in Newtown and not quite sure what that meant and what was really happening, on only to find out later the horror of that day, what really had actually happened.

And I remember thinking that we all wanted to do something. And as elected officials, that's kind of why we're here; we like to fix things. We want to help people and do good. And I remember that a lot of other people felt the same way as well. Everybody wanted to do something, where it was money to Newtown, whether

it was -- people were sending Teddy Bears. It almost evoked
memories after 9-11.

And today, because of the hard work of so many people, my
colleagues who worked on those committees, our Legislative
leaders, our Governor, our Lieutenant Governor, we're here today
to vote on something that will hopefully prevent future
tragedies like the one that we saw in Newtown.

As a citizen of this state and as a State Senator, I'm honored
and privileged to vote for this bill today. I'm proud of the
fact that it is a bipartisan bill, that Democrats and
Republicans have come together to make a law that addresses not
only gun violence but also mental health and school security.

I would hope that the residents of the state are proud that we
have a strong, comprehensive, and bipartisan bill. Indeed, the
eyes of the state and the nation are on us, and I can only hope
that other Legislatures around the nation and in Washington will
follow our bipartisan lead today.

Some will say that we have gone too fast, but the process that
we have has worked. We have taken our time. We are here to pass
laws without passion or prejudice, and I would say that if we
came in a few days after the Newtown tragedy, a bill that we
have might look a lot different than the one we have today.

But we had bipartisan committees to look and investigate and to
make recommendations. And I was not on those committees, but
whether you were on those committees or not, we've all taken the
time and met with our constituents here at the Capitol, in our
districts, we've talked on the phone, we have literally returned
thousands of e-mails to our constituents, and we have attended
forums. We've had a lengthy and a thoughtful process, whether
you agree or disagree with the legislation we have today.

And because of that, while not a unanimous sentiment, I feel
confident in how a majority of my constituents feel about this
issue today. Therefore, I will be voting yes and I urge my
colleagues to do the same.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator LeBeau, first.

SENATOR LeBEAU:

Thank you, Madam President.

I rise in support of the bill, and I'd like to thank the
leadership of this Chamber, particularly Senator Williams and
the -- and Senator McKinney for their work, and all of the
members of the task force that led us here today.

I did not attend many of those meetings, but I have to tell you
I watched some of CPTV that went late into the night. I could
not believe the number of people who showed and gave of
themselves and their opinions, many of here -- I'm sure are here
today, and the -- the patience and the forbearance of the -- the
Legislators who were part of that process. I, in some ways, this
was our finest hour.

I find the debate and the general debate that we've had over the
last three months rather ironic, because it seems that both
sides -- and actually Senator Meyer mentioned this earlier --
that both sides are coming from a place of fear. We saw a
slaughter in Newtown, and I think that's what we fear. We fear
that again. We fear that for our kids. With fear that for our
families. And we've, the other side -- and you can tell from
their signs and their words -- they fear tyranny, the -- the
loss of their rights.

And I'm reminded of a book that I recently read for the second
time, the Pulitzer Prize-winning book called, "The Battle Cry of
Freedom. " It's about the Civil War. And in the preface to the
book, the author, McPherson, talks about how both and -- both
sides thought they were fighting for freedom, the South for the
freedom to have its way of life; the North for the personal
freedom for the slaves.

Now, interesting that that is not what the war started off as.
The South, because of its fear, because of its fear of its loss
of rights, started the war. The North was not there to get rid
of slavery; they just didn't want the expansion of slavery. But
by 1863, the purpose of the war had changed for -- to have to

-- as a declaration for freedom for all.

Today, there's a war, and thank God it's not a war. Thank God
that we're not fighting each other. We're disagreeing with each

other in a civil way, in a, in a way that our forefathers laid out for us to settle our differences. The hearing process that -- that was an -- an incredible -- as I was referring to earlier -- an incredible hearing process, over 60 hours of hearings and people listening and to each other and trying to reason with each other.

And I believe that what has come out of this is a balanced bill, a bill that contains -- I, you know, I out talking at a -- a meeting the other night in South Windsor -- it's part of my district -- and people, all they could, all they focused on were the gun aspects of the bill. And I said, no, there's -- there's a lot more to this bill. There's a major emphasis on mental health. There's a major emphasis on school safety. And, yes there are restrictions on guns and ammunition.

And so I think -- and I think that part of the bill is balanced. I know some folks in the audience here today, and in the galleries, do not believe so but I do. And it balances the need that we have, our basic needs for public safety versus the need, as -- and said by Senator Kissel -- for -- for self-prosection and the Second Amendment rights.

But let me remind folks that no rights are unabridged. There is no right in the Constitution that is unabridged, whether -- whether it's the right to free speech or the right to gun ownership. There's nobody here asking because want to have RPGs or a tank or a nuclear weapon or grenades. That's an abridgment of the rights, and those have been accepted by the Supreme Court. The question is whether these rights, these abridgments of rights are reasonable. And I believe that are.

And I find it ironic, I -- listening to Senator Kissel, who I have tremendous respect for and is my neighbor, that his -- we come back to fear, the fear of incrementalism, the fear not of what we're voting on today but what we might vote on tomorrow.

I accept what we're voting on today as a good and balanced bill, and I will vote for it for that reason. And I respect the members of this Circle, and I respect the members up in the galleries. And I respect the voters at home, to ensure that as we move forward, we will continue to act in a fair and balanced way.

And to Senator Guglielmo, my other neighbor on the other side, and that we share Ellington, we don't share this view, Senator,

because I believe that this bill does good and not just feels good.

Thank you, Madam President.

THE CHAIR:

Senator Gerratana.

SENATOR GERRATANA:

Madam President, thank you, so much, for the opportunity to speak today in favor of this emergency certified bill. Yes is it emergency certified, but let me tell you, many, many months of work has gone into it.

I want to thank my leadership, Senator Williams, and, of course, Senator Looney for appointing me to the Bipartisan Task Force. My focus and my energy was on the subcommittee, the Mental Health Subcommittee, and I am proud to say that the work that Senator Harp, under the leadership of Senator Harp and also Representative Woods, we came up with some legislation that goes a long, long way to helping us all deal with the, not just with the tragedy that happened in Newtown but for our state in understanding what the mental health challenges are going to be.

Amongst the provisions are ones that we talked to about with the health care providers in our state and, indeed, beyond our state. And I have to applaud them all. They came to our hearing, our 12-hour hearing on mental health issues; many of them came with such wonderful suggestions. And, also, we got to know so many things about behavioral mental health that we were not totally aware of. Amongst that information was that we have many loops and gaps in our system of delivery, here in the state. So this underlying bill, of course, goes to address that.

I want to thank, in particular, the American Academy of Pediatricians. Our pediatricians in our country have been, indeed, on the front line in bringing forth to us the changes in health care and health care reform. They have developed a concept called the "patient-centered homes. " This is where, for pediatricians, it is the child who is at the center, and it is for pediatricians to coordinate all the care for that child.

So I want to applaud them and, in particular, two doctors, two distinguished doctors here in our state. One is Dr. Andrew Lustbader, of Yale University, and the other is Dr. Dan Connor,

at UConn Health Center, both researchers in child psychology and actively treating children and also adolescents. I thank them for their work and for bringing to us a plan that will make sure that no child, no child in the State of Connecticut will go without some access to mental health, a system of coordination and care that we are badly in need of. And this came out during the task force, and that is being enacted.

I also want to say that, you know, we all spent a lot of time researching and reading, and in his book, David Hemenway, in "Private Guns and Public Health" says public health is pro-health; it is not anti-gun. And access to guns is a big part of the public health challenges in our country today. Nine thousand people are killed a day, due to this chronic illness.

So I want to say that the underlying bill also provides for us further work to do. But, Senator LeBeau, I want you to know that we should not live in fear. Connecticut should not live in fear, and Connecticut should know that from this day forward, with passage of this bill, that we will heal.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Bye.

SENATOR BYE:

Thank you, Madam President.

Thanks to members of the Senate for their comments so far.

I want to focus on five ways that this bill and the process to getting here makes Connecticut safer. Number one, this bill requires an ammunition eligibility certificate to purchase ammunition. This could easily be an overlooked part of this bill, but this requirement keeps ammunition out of the hands of illegal gun owners. So I think, you know, Senator Looney has been championing this, and I think he's right. I think this is one of the most important parts of this bill.

The bill, also, number two, establishes a behavioral health task force that will work to create a system of supports for adolescents who have behavioral health challenges. As many of

you, I heard from so many people through this process. But one
Connecticut tragedy is the supports that are not there for
families who are begging for help for their adolescents who need
mental health supports. That's a tragedy that's going on now,
and this bill has a process in place to address that Connecticut
tragedy. Parents' stories are so difficult to hear, those who
are struggling.

Number three, this bill bans high-capacity magazines with over
ten rounds. Again, over the fourth -- four months, I've come to
understand that this accessory is what enables mass destruction,
the number of bullets that can be fired so quickly. And this
bill is in reaction to a mass shooting. This is a critical
component of this bill that will make Connecticut safer.

The bill also addresses safety in our schools and safety on our
college campuses in a smart, systematic way. It will be informed
my best practices and by law enforcement professionals in our
state.

This bill also will set up a process that -- again, something
that could be overlooked -- to develop standards for our public
schools. Right now, there are really no standards that
superintendents have to say how many social workers do I need;
how many guidance counselors; how many school psychologists. And
I'm really proud that this was added into the task force, the
behavioral health task force. Because, let's face it, schools
are focused on education, but that's where the kids are. That's
where some of these problems are expressed, and that's a really
critical component.

The fifth way that this bill makes Connecticut safer is the
model that our leadership presented to us and to our state about
how to solve problems with a democratic process. Sandy Hook
brought us together as a state. We had a collective grief, a
collective love for the families of the victims, and a
collective resolve to address all the different facets of this
terrible tragedy.

What's making us different is how we're approaching it. We took
our time. We listened to both sides. We were bonded by this
experience, and we knew that for our state to heal, we needed to
model respectful discourse; that's what democracy is. And a fair
and balances democracy helps avoid violence; there's a peaceful
transfer, a peaceful imposition of laws.

Our grief, our love, and our resolve for change in Connecticut
does not know party labors -- party labels. Our legislative
leaders decided that we would just proceed in a bipartisan
fashion and we would have a conversation as a state. We had many
hours of conversations and not just here. Like many of you, I
spent hours in hearings.

I also talked for hours with mothers who organized and were
horrified by these murders and mobilized to make a difference. I
spent an afternoon at a gun club, and I learned a lot that
helped me understand about guns.

I went to community forums about gun safety. One gun owner spent
hours in his living room showing me his equipment, how easily
guns are adapted, what a magazine is. He -- he literally wanted
me to understand the vocabulary and the way that the guns
worked.

And then last Monday I was privileged to join the Episcopal
Bishops of Connecticut in the Stations of the Cross in honor of
Sandy Hook.

These are the five ways, the process, and the items in that bill
that I believe Connecticut will be safer, democracy at work.

There are members of this Senate who are going to vote against
this bill, and they've told you their concerns, and -- and
others will too. That's part of democracy. But be sure that
every member of this Circle cares deeply for the victims and for
their families and made contributes to this bill or other
policies that help the public be more safe in Connecticut.

Our Senate leaders spent weeks, literally weeks negotiating and
talking through proposals in good faith. Thank you for your
belief in us and for your determination to get a bill that was
collective and that will make a difference for Connecticut.

I'm so proud of our state today, but I wish we weren't here
right now doing this emergency certified bill. Like everyone
sitting here today, I wish we could turn back the clock and take
back those five minutes, about as long as my remarks; that's how
long it took for that mass destruction where over 150 bullets
were fired at children and at teachers, and 26 of them were
murdered.

Courageous staff put themselves in harm's way; some were killed.
Countless others' lives were saved because of the courage of

other teachers. That day, every parent and every teacher realized that any teacher would give what Lincoln coined "the last full measure of devotion" for their students to protect them. I wish Connecticut never had to realize that.

Families in Sandy Hook faced terror as they raced to gather their children. Twenty of those families would return with a state trooper and not with their child. No one wishes we could turn back the clock more than those families or the hundreds of others whose children escaped but who face repercussions of this senseless violence.

In his calls for improved gun safety laws, our President keeps referring to all the missed birthdays, the missed graduations and other life events that have been robbed by American -- from American families because of gun violence. In Connecticut, these references hold special meanings for so many of us sitting here today and at home.

Some of us in the Chamber know someone who will miss a life event in the wake of Sandy Hook, like President Obama referred to. For me, it's Ana Grace Marquez-Greene. Ana Grace would have turned seven this week. Anyone who's seen her pictures or heard her sing knows that our whole world lost a Connecticut treasure on that day. Her brother and parents will never have that amazing little girl in their lives again. We all wish she was having an uneventful seventh birthday this week and that she would be showered with the love and caring that her family showered on her each day; if only. But we can't turn back the clock; we can only go forward.

And we've gone forward with collaborative, innovative, ground-breaking legislation, and we can look forward with Connecticut and with pride in this democratic process. And in the legacy and in the model policies that I believe this legislation brings to these United States.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Model Bottolea -- Bartolomeo -- I'm sorry, Dante, again.

SENATOR BARTOLOMEO:

Thank you, Madam President.

I stand here to thank our leadership, the Republican leadership and every single one of --

THE CHAIR:

Senator, the microphone is not on.

SENATOR BARTOLOMEO:

Hello?

A VOICE:

(Inaudible. )

THE CHAIR:

Senator, would you use -- oh, there you go.

SENATOR BARTOLOMEO:

I think --

THE CHAIR:

Try it.

SENATOR BARTOLOMEO:

-- we're on. Are we --

THE CHAIR:

No.

SENATOR BARTOLOMEO:

-- live?

THE CHAIR:

Why don't you try Senator Meyer's microphone.

SENATOR BARTOLOMEO:

Thank you, Madam President.

THE CHAIR:

Thank you.

SENATOR BARTOLOMEO:

I would like to thank not only our leadership on the Democratic's Caucus but also the leadership of the Republican Caucus and every Senator and Representative who serves in this building and serves their community, because each and every one of us, regardless of how we choose to vote on this bill, has spent countless hours of research or reflection to do what's right for them and to make this decision, and no one has taken this lightly.

I do support this bill and I'd like to mention a few of the things that I appreciate most, that are within this bill. This bill works to strengthen laws that we already have on the books. We look to straw purchases, which was previously a class B misdemeanor. And the penalty at that point was a slap on the wrist. And now we are increasing this penalty to a two-year, mandatory minimum, with prison sentence, and we do that for at least ten other felonies.

It also closes at least one of the loopholes in the earned risk reduction credit program, and these are both issues that I have fought for since I began here, recently.

It also -- I served on the School Safety and Security Working Group, and this bill helps our districts who are looking for guidance with the existing and future school construction so that we can harden our buildings but not our learning environment. And, for me, that's very important, and for educators and for children. We need our schools to remain a place where our students and our teachers feel comfortable and enthusiastic about learning. So this bill will help us to recognize that school districts are already struggling for funding for educational purposes and for their, for their educational programs. And it will make available grant funding to increase the security measures to harden their exteriors and not their interiors.

This bill also has the Department of Mental Health and Addiction Services working in collaboration with the State Department of Education to administer training of an international, already

established program called the "mental health first aid program. " It teaches educators and staff to recognize this, the signs of mental health issues and concerns, and it connects them to those mental health services.

Certainly there's aspects of this bill that may be difficult for some of us to swallow. But, actually, as my grandmother always said, when you're faced with a very difficult decision, you have to weigh your pluses and minuses. The fact that we've compromised and worked in a bipartisan way to put together a bill that I believe will lead the nation in very important and much-needed reform absolutely is -- is a positive. And I am proud and pleased to be able to support this bill.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Markley.

SENATOR MARKLEY:

Thank you, Madam President.

I want to say that it's a difficult thing to speak about anything in reference to this tragedy. I think that our language is inadequate to the pain that we know was suffered, especially by the parents involved, by the relatives of the children and the teachers who were involved and by the responders, by the people who -- who felt the pain, you -- you, yourself, Madam President, and the Governor who were very much on the scene throughout it.

We only have the language that we have, ourselves, to speak with, and that's the best we can do. I think that it's a tragedy that made me think back to other experiences I've had in my life that I think we all shared. I'd go back so far, beyond most of you here in this Circle or most of you in this room, back to the moment I remember in second grade when I heard that President Kennedy had been shot, something that I'll never forget, one of those experiences where I can see where I was sitting and who was standing where and how we were told about it and over the years, other such events, that sometimes I think are what makes old men and women of us, the emotion that we go through and what

it takes out of us; so my apologies for not having words
commensurate to address such a situation.

I'm also going to -- in the course of what I have to say -- use
a few analogies, and I feel like analogies are always dangerous
things, because they're inherently imperfect, illuminating, as
far as it goes, but I think they can tend to be reductive of --
of the situation, and I -- I certainly don't mean to do that.

But I want to express myself as clearly as I can and speak my
mind on this, and not at great length. I've kind of taken an
oath to myself not to impede unnecessarily the business of this
Chamber. I'd like to use my words as much as possible to
illuminate, if nothing else, my own perspective but not to be a
barrier to finishing the work that needs to be done here.

Let me say it's a strange thing in my own mind that I've become
so involved and so committed on this issue. I'm not a gun owner.
I was not raised in that, in that culture. I think I probably,
as a young person, shared some of doubts about the reasons that
somebody would be interested in those activities, and hunting,
so forth.

I had a period of my life when I had the experience of living
with a number of young men for, well, from out West, who came
from a very different part of the world and had a very different
background and who became very good friends of mine, who I've
had affection and respect for. And it was at that time that I
realized that my own perspective on these things was -- was not
the only perspective that existed but that one is accustomed to
what you grow up with that seems right, and it seems natural.
And it made me, let's say, neutral on the subject in a certain
way, neither drawn to or interested, particularly, in guns but
appreciating the fact that others were drawn to them and as,
perhaps, was an important lesson for me to learn at that point
in my life, because I've seen that in many other ways in many
other things since then.

I guess the question when you look at a gun is to some extent
what do you see. Do you see something which is a -- a tool, a
mechanical object designed, whether it's for shooting a target,
shooting an animal, for self-defense, whatever it is, but a
neutral object in the way that most mechanical objects we deal
with in this world are? Or do we see something which is
essentially, inherently a bad thing, an evil? And I would say if
it is, if a gun is a tool like other guns, if it's some -- like
other things -- like other mechanical objects, it's reasonable

to expect restrictions on its safety, like we would with anything else, like we do with cars, for instance, to say they have to be operated safely, there has to be a reasonable amount of regulation and so forth. And if there are problems with them that can be addressed by putting restrictions on them, we might consider those restrictions, leaving aside the question of whether guns for other reasons have -- are -- are privileged.

If you see a gun inherently as an evil thing, then I think it's a natural thing to want to restrict it to the point of extinction. And I think that's the basic division in this Chamber. And, again, I don't say this to put words in anyone's mouth -- and forgive me if I do that -- but I think that there's an outlook toward guns, which naturally lends one to want to restrict it as much as possible.

I used the analogy in discussing this, a few months ago, to alcohol. I think that alcohol is, perhaps, as much an evil, in a way, as anything that we have in common circulation; I say that as one who has tasted and enjoyed that evil myself. But it is, what I can tell my young nephews, it's a vice, and a vice to my mind is something that you always want to be trying to do less of and not more of, that you want to be consciously aware of. But I think alcohol has done -- and I've seen in my own life -- more damage that maybe anything else that I've seen and I think something that kills more people a year than almost anything else.

It was recognized; a movement emerged in this country a-hundred-and-fifty years ago, a-hundred-and-forty years ago to get alcohol out of our society, I think a reasonable position, in many ways. And by political process and political pressure, it triumphed finally, and the decision was made to eliminate it entirely. That, to my mind, is a reasonable position if you see something as an inherent evil, which is to get rid of it, to say no more of it. The trouble in that case was it couldn't be done.

And I would say the trouble with, in this case, is it can't be done either, whatever you might think of the wisdom of it. What I think we have with guns is an attempt to identify some of them as particularly bad as opposed to others, as if we were to say we have an alcohol problem, we have a drinking problem, so we're going to ban not even hard liquor, let's say, but -- but mixed drinks that are served in cocktail glasses. We'll ban Manhattans; we'll ban martinis. Well, if you think there's a drinking problem, that might have some very small effect, but it

doesn't get at it, because essentially the danger is still there.

I feel that we're doing a very similar thing, when we talk about what we call "assault weapons. " Every gun is an assault weapon if it is used with the intent to commit an assault. And to try to pick out certain guns and say this is the problem, I think is intellectually dishonest in the sense that we're not really addressing what the problem is nor are we really being honest about what we're trying to accomplish.

I think that the characteristics by which we define an assault weapon are, in fact, largely cosmetic. We were sitting in the caucus on Monday, looking at pictures of different guns which would or would not be prohibited. If we wanted to talk about what makes the guns dangerous, I think we'd talk about what's brought to my attention many times by people who are in favor of gun control, which is the rate of fire of the guns. But the fact is all these guns fire fast.

The -- with a semi-automatic gun -- and almost the guns that we -- are manufactured and bought now in our society are semi-automatic -- the limiting factor on the rate of fire is not the gun, it's -- it's the finger on the trigger. And the bullet, one bullet is going to come out every time that trigger is squeezed. And, really, the only thing to control that finger is the mind of the person that's holding the weapon or the potential weapon and the soul of the person that holds that weapon.

There's something wrong in our society that events take place like what happened in Newtown, that can't be, can't be credited to any inanimate object. They are the result of a kind of a derangement that I think is beyond our understanding. The idea that a young man could -- whatever he might have fantasized about or imagined -- that he could actually walk into a classroom and look at those young children and do what we did is -- is something that, to my mind, is closer to a kind of a possession. And I don't believe that as Legislators, we can do very much to address that.

I think that it behooves us to look about it, to look at it in the broadest sense that we possibly can and not in the narrowest sense. And I think the broadest sense is a lack of humanity that has occurred between people, in part because of the way that we relate to each other and that we communicate with each other. I feel like there's -- there's a dissociation that I've -- I've witnessed increase in my own lifetime.

We might say, what is the harm of attempting to limit the kind of guns that are available? I'd say that at the point that we recognize that that is not the solution to the problem and that the discrimination between guns is not going to make this world a safer place, I think then we face the problem that we have people who have a deep interest in this, just as they, as they might have an interest in anything else. And that's something you can only understand by knowing the people involved, law-abiding, and in many ways could not be more law abiding, the pillars of the society, frequently Veterans, frequently law enforcement officers who have not done anything to -- to threaten or to destroy life in this society, who find that their -- their past time, their interest is going to be demonized and they, themselves, brought under suspicion and made to be in a criminal position to suit what I would only say is an obscure agenda. And if they feel that what is going on moves in the direction of confiscation, I think they are entitled, and I think they're right to feel that way, because I see no sense that there is an end to what those who are suspicious of guns would ask for to try to make the society safer.

We've heard today, and I don't -- I -- I think it's an honest response -- I don't -- I don't mean to criticize the statement, that this is -- from some advocates of this legislation -- that this is a step in the right direction. I've not heard anyone who advocates it say this is the end of what needs to be done. If it were, we might at least have something to talk about, but I feel that if the point of this is to, is to take at any given moment what can be taken, then to come back for what remains at another moment, then those who are being affected by it are bound to feel that way.

I'd say that there's two other issues, I think, in America, one in history and one current, that are very similar that way. One was abolition, where the South was very defensive, not necessarily because of what they were defending as far as the rights to open the territories up to slavery and so forth, but the sense that any constriction of those rights put them on the, on the way to the elimination of slavery.

I think the same situation exists today with abortion. Those who defend abortion are very jealous of every kind of abortion, every situation, every restriction on abortion, because they know that once the, once the -- the ban starts to tighten around it, that the practice or the legality of the practice moves in the direction of extinction, the same as the case with gun --

with guns. And I think that -- that their, that those who are concerned are right to be concerned.

In response to this situation and in response to the fact that I think that the bill before us contains many things which are helpful -- I don't think anything which is decisively helpful -- you know, I think the task forces did the best job they could in the time they had available to them. I was on the Mental Health Task Force. Senator Harp, my respect for Senator Harp over the years, working with her on Appropriations has risen week by week, and I thought she did an excellent job, and Terrie Wood, my Co-Ranking Member on Human Services, likewise, yet all we really could do was to identify a few things that we thought were working and put more weight behind them and identify a few things that we thought needed to be looked at and ask that they be looked at, nonetheless, I think a step in the right direction, the same with the school security section.

And the gun safety section, I think, also has elements in it that we all agreed upon, what elements of what started out to be, to my mind, a genuinely bipartisan bill, a genuinely consensus bill that could attract the votes of everyone in this Chamber.

In the interest of promoting that approach, I would ask that the Clerk call an amendment, LCO Number 5460.

THE CHAIR:

Mr. Clerk, will you please call the amendment.

THE CLERK:

LCO Number 5460, Senate Amendment Schedule "D," offered by Senator Markley, and Representative Sampson.

THE CHAIR:

Senator Markley.

SENATOR MARKLEY:

Thank you, Madam President.

I would move adoption of the amendment and beg your leave to summarize without reading.

THE CHAIR:

The motion is on -- on adoption. Will you remark, sir?

SENATOR MARKLEY:

Thank you, very much, Madam President.

As I said, this preserves the recommendations of the

-- the Mental Health and the School Safety Task Force. It also, it also preserves those aspects of the Gun Safety Task Force that I think are, in fact, the most likely to deal with the kinds of problems which led to the tragedy in December; that is, it includes the mental health look-back periods. It includes the increased penalty for crimes, either committed with a gun or involving the possession of a gun illegally. It includes the safe-storage provisions and, in fact, also offers a tax credit to encourage the purchase of safes, which would enable safe storage. And it also provides an opportunity for schools to incorporate into the grants, which we've made available to them for school security, the opportunity to apply for funds to be used for school security officers, as well as for the hardening of the, of the building, itself.

I think it is, I think it's a good bill, which I do not believe infringes on the rights of law-abiding gun owners, who I do not believe are the people who deserve to be -- who -- who deserve what the, what the bill before us would do. And I urge adoption of the amendment.

THE CHAIR:

Will you remark?

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I would ask that then the vote is taken, it be taken by roll.

And I rise to oppose the amendment. In my review of this, it appears that it strikes out more or less the essence of the gun violence preservation or protection and prevention measures. You know, I -- I appreciate Senator Markley's point of view, but I

believe I don't see anything in here in term of the background
checks. Am I wrong about that? I -- I mean, I don't, I don't
mean to ask that as a, as a question, but I -- I -- and, of
course, the dangerous offender registry is very important.

But, Madam President, really, the heart of our response in terms
of gun violence prevention when it cams to the Newtown tragedy
and all of the other mass shootings that I enumerated at the
outset, come down to a stronger restriction on the assault
weapons that have been used in these mass shootings and a
limitation on the large-capacity magazines. So for those
reasons, Madam President, I oppose the amendment.

THE CHAIR:

Will you remark?

Senator Welch.

SENATOR WELCH:

Thank you, Madam President.

I -- I rise in support of this amendment, and my purpose for
speaking is something that I think Senator Coleman mentioned
earlier, and that is that those of us who do not support the
underlying bill couldn't fathom that, that doing nothing was an
option. And this is to say that we're not for doing nothing; in
fact, we are for doing something. All of us have been moved,
have been touched by this horror that happened in Newtown and --
and all that was revealed to us in the days that follow.

An action is appropriation, action with mental health, action
with hardening our schools, even action in keeping guns out of
the hands of felons, on ending straw purchases, on background
checks. We need to do something and this amendment, I think, is
an appropriate something.

Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Will you remark?

Senator Boucher.

SENATOR BOUCHER:

Thank you. Thank you, Madam President.

Madam President, I have a question, please, through you to the
proponent of the amendment, if I could, please.

THE CHAIR:

Senator Markley, prepare yourself.

Please proceed, sir --

SENATOR BOUCHER:

Madam --

THE CHAIR:

-- ma'am.

SENATOR BOUCHER:

Madam President, the question has to do with school resource
offices and the funding of school resource office, if I could
get clarification on that point, through you.

THE CHAIR:

Senator Markley.

SENATOR MARKLEY:

Senator Boucher, and through you, Madam President, I

-- I believe as the, as the bill was put together by myself and
Representative Sampson, that the idea is that the money which is
available for -- for towns to apply for -- for grants for
hardening of the schools would also include in a competitive
grant basis the possibility of applying for grants for school
security officers as well.

THE CHAIR:

Senator Boucher.

SENATOR BOUCHER:

Thank you, Madam President.

I appreciate that clarification. The -- the further question, and the last question would be, would that funding continue into the future or is it a one-time, one-year funding; and, does then the school district have to support that additional operating expense going forward? Through you, Madam President.

THE CHAIR:

Senator Markley.

SENATOR MARKLEY:

I believe that the funding would last as long as the

-- and from the state -- as long as the money which is designated for the general program of school hardening was -- was available. If that was no longer there, then it would not go forward unless the state made a decision to fund -- fund it.

THE CHAIR:

Senator Boucher.

SENATOR BOUCHER:

Thank you, Madam President. I'm much appreciative for the answers.

THE CHAIR:

Thank you.

Will you remark? Will you remark?

If not, Mr. Clerk, will you please call for a roll call vote and the machine will be open.

THE CLERK:

Immediate roll call has been ordered to the Senate. Senators to the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

If all members have voted, all members have voted, the machine will be closed. Mr. Clerk, will you please call a tally.

THE CLERK:

Senate Amendment Schedule "D," for Senate Bill 1160.

Total Number Voting 36

Those voting Yea 11

Those voting Nay 25

Absent, not voting 0

THE CHAIR:

Senate "D" has failed.

Senator Markley.

SENATOR MARKLEY:

Thank you, Madam President.

If I may continue briefly, one aspect of this amendment that I, in fact, neglected to mention is addressing the section concerning the Risk Reduction Earned Credit Program, the so-called "early release" program. I voted against that when it first showed up as an implement in the implementer bill and have been an opponent of the program ever since. I know it is addressed in the bill which we have before us. I feel that what has been done in that bill is inadequate and, again, possibly worse than inadequate in that it -- it would seem to make almost no difference, while giving us the sense that we've addressed something which is a danger.

And if I may say in -- in reference to that, we're told in this bill that violent criminals will be forced to serve at least 85 percent of their original sentence. It's my understanding, from what both the Governor and Mike Lawlor, his advisor on these issues has said, that the violent criminals are already serving 85 percent of their sentences. I think they've been thoroughly clear on that, and I feel like either this program needs to be changed to change clearly or we should get rid of it and start over again.

I'm going to say after we're done on this amendment, I have just a word to say about the process by which we arrived here today, but I think that we are repeating the mistake we made with the early release program when it was initiated. It was initiated without any hearings, as part of an implementer bill, something that was so little understood at the time it was voted on that the -- the fine Democratic State Representative who brought it out had to explain the next day, after the vote had taken place, that he had not been correctly informed as to the terms of the bill. We've lived with it since, and I believe that we have lived with it and we've lived with tragedy as a result of it since.

We have another one before us, again, on very short notice, and one part of the bill that changed between yesterday afternoon and this morning was specifically the Risk Reduction Program. I think that I have no confidence in the changes that have been made, and I don't have the opportunity between now and the moment that we vote to gain the confidence that I'd need to in these changes.

So I have a second amendment, LCO Number 5462. If

I --

THE CHAIR:

Mr. Clerk.

SENATOR MARKLEY:

-- may ask the Clerk.

THE CLERK:

LCO Number 5462, Senate Amendment Schedule "E," offered by Senator Markley.

THE CHAIR:

Senator Markley.

SENATOR MARKLEY:

Thank you, Madam President.

Again, if I -- I would move adoption of the amendment and ask
that the reading be waived, so that I may summarize it.

THE CHAIR:

Motion is on adoption. Will you remark, sir?

SENATOR MARKLEY:

Thank you, Madam President.

This amendment would simply eliminate the Risk Reduction Earned
Credit Program. I believe there may be aspects of it which are
worthwhile, but I think that, I think fiddling with it in the
way that we're doing with the underlying bill is going to give
us a false sense of security. And unless we can take this up,
from the ground up and subject it to the regular public hearing
process, which it has never been through, and have a full
discussion of it, we will not have a piece of legislation we can
all have confidence in. So I would urge adoption of this
amendment.

Thank you.

THE CHAIR:

Thank you.

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I rise to oppose the amendment and also to -- to bring good news
to Senator Markley, even though I'm opposing the amendment.

The good news is that the -- the language which affects the risk
reduction credit in our bill, which prohibits anyone who's been
convicted of a violent crime as defined in the statute from
being released prior to serving a minimum of 85 percent of their
original sentence, that language is identical to language in
Raised Bill 6657 of the current session, sponsored by your
colleagues, Senators Kissel and Welch. That bill had a public
hearing before the Judiciary Committee on March 22nd.

For those reasons, Madam President, I oppose the amendment.

THE CHAIR:

Will you remark?

Senator Boucher.

SENATOR BOUCHER:

Thank you, Madam President.

Madam President, I actually rise to support the amendment. I think our good colleague, Senator Markley, has made excellent points. I think the fact that this particular program, after it was rolled out, clearly was seen to have serious flaws, problems, and actually resulted in some very serious crimes being perpetrated after the fact.

And I think he does bring up a good, a good argument for the support of this particular amendment, although I do appreciate the President of the Senate's description of the fact, in giving us at least some amount of comfort, that possibly this works to mitigate some of the issues. However, I think the idea of eliminating the language and starting fresh and looking at the issue does deserve some credit. For that reason, I am supporting the amendment.

Thank you.

THE CHAIR:

Thank you, Senator.

Will you remark?

Senator Williams.

SENATOR WILLIAMS:

Madam President, I must have neglected to ask for a roll call vote. I do that, so at this time.

Thank you.

THE CHAIR:

A roll call vote will be had.

And will you remark? Will you remark?

If not, Mr. Clerk, will you open the machine -- oh, yeah -- call for a roll call vote, and I will open the machine.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators please return to the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

If all members have voted, if all members have voted, the machine will be closed. Mr. Clerk, will you call the tally.

THE CLERK:

Senate Bill -- I'm sorry -- Senate Amendment Schedule "E," for Senate Bill 1160.

Total Number Voting 36

Those voting Yea 14

Those voting Nay 22

Absent, not voting 0

THE CHAIR:

The amendment fails.

Will you remark?

Senator Markley.

SENATOR MARKLEY:

Thank you, Madam President.

Let me say one thing as I've, as I promised, about the process of this -- which I was referring to the process of the amendment before -- the process of the bill that's before us. I may be the only person that rises to say this, and I say it with all respect for the leadership we have here, which I've -- I deeply respect on both sides -- but I think we made a mistake by trying

to move forward with this bill the way we did. I think that we have the experience in this Chamber of moving bills through a regular process, through committees, and subjecting them to normal public hearings. And I think that when we step away from that process, we are on, we are on shifting ground, and we never know how it's going to end up.

In this case, I think it was done, as I think almost everything here is done, with the best intentions. But I feel that the intention may have been, first of all, to bring unanimity, which we will not achieve and maybe could not achieve, and, second, I think to speed the process. I think in the end, it's rather paralyzed our process here.

I think that we've gone through a period of a couple of months when other business has moved forward in a desultory way while the attention of the leadership was focused on reaching an agreement on these issues.

I'd further say, and maybe most pointedly, that although the process lasted a number of months, it still has ended in an unseemly rush, to my mind. A final version of this bill was only in my hands this morning. The bill that we had before us yesterday afternoon was still not the final bill, and it wasn't until Monday that we really knew for sure what the outlines of that final bill were going to be. That's not time enough for us to act properly, and I would -- I'm somewhat at a loss as to why the extra days -- because it would only be a matter of days and not weeks -- were not granted for us to examine this bill.

I'm also at a loss to understand why there was no hearing on the bill in its final form. This has been -- and it's something that I've brought up throughout the process -- I know that it can't be guaranteed by any given party involved in it, but I think it's something that we owe to the people of Connecticut with these bills. The fact that there were hearings on the subject matter, that there were opportunities on different individual bills that were going through the process for people to testify -- well, it may be better than nothing, but to my mind it's not adequate, especially to -- for a bill of the significance of what we're voting on here today.

And, again, when we're talking about something that is only a matter of days or a week, I wouldn't be favoring delaying this process for a matter of months but long enough for the people to weigh in on it. I think we do wrong when we do this, and I've

seen it more times than I like since I've been back in this
Chamber.

I'll say two final things. One is I've had a very unusual
experience in returning here after many years, and I wasn't sure
how well I'd handle it. Until recently, I thought I was handling
it pretty well, but I have thought to myself what -- what was it
that -- that -- what was it that -- why did fate desire that I
should be here again at this time. And every now and then I feel
like I have a message from the past to deliver. So my message
from today, for those who might be weighing in their own minds
how to vote on this, I was out of this Chamber for 24 years
fully -- I won't say, I won't, I won't round up -- 24 years from
the end of my first term to the beginning of my second term.

And I didn't think about my service in this. You know, my name,
my name is on that plaque over there, because I happen to be
here when we renovated the hall. I used to drive by and think
isn't it funny I used to serve there and that my name is there,
never thinking that I'd -- I'd join it, I'd -- I'd be reunited
with my plaque.

I didn't think obsessively about that term but I thought about
it from time to time. And one thing, when I thought about votes
that I cast, was I thought I have never regretting doing what I
thought was right, looking at it over decades. The only votes I
regretted were the votes that I cast for what I thought were
political reasons, because I felt pressure of one sort or
another. And take that as the advice of somebody who had a long
time to reflect on it.

And the second thing I'd say, as I said before, I don't have a
passion for firearms. But for whatever reason, I have a passion
far personal liberty, and I am very wary to do anything without
extremely strong cause which restricts personal liberty. And I
also have a passion and a deep respect that has grown throughout
my life perhaps to love, for the Constitution of this country,
which is really what makes us a country. We don't come from the
same place. We haven't always occupied the same piece of land.
We don't even necessarily share the same history, but there is
one document that defines what the country is. And out of
respect for that document, among other reasons, I will oppose
this bill.

Thank you.

THE CHAIR:

Senator Hartley.

SENATOR HARTLEY:

Thank you, very much, Madam President.

Madam President, it was some weeks ago when we gathered in this Chamber to deal with the first responders on that day, to provide for them a safety net which we never had to previously think about before, never having been faced with this kind of tragedy. And we came together and did that, and there -- there was a collective sigh of relief at -- as we finished that proposal that day.

But it was truncated because we knew that our work had only just begun. We knew that the next iteration was one that was going to be far more difficult of a task. And from that time to this afternoon, and perhaps going into this evening, we have strived to resolve that next and looming part of this situation.

Madam President, in all of my years of service -- and I served with you in the House and now have the pleasure to have you officiate in this Chamber -- I have never seen a more polarized issue than this. And yes it is a tragedy that brought us here. We, I don't believe, would be talking and dealing with the -- the gravity of this situation, that unspeakable day, that horror, the -- the mass, the violent slaughter of the innocents and those who were their appointed caretakers.

But this assembly came together and we came together in a way that we have never come together before. It wasn't partisan and was beyond bipartisanship; it was a way that we've never been together before. We were one body. There were no divides, no D's, no R's, we were talking about policy and the terrible circumstances that brought us here. And we strove to recognize, to the best of our ability, that it is our job to ensure the welfare and the security of our citizenry, our families, our children, but we also knew, at the very same time, that it was our duty, our charge to protect the rights of the law-abiding citizens of this state, and that weighed upon us equally.

As the Chairman of the Public Safety Committee and as also a member of the Gun Task Force, I would be derelict if I didn't recognize the incredible efforts that went in. And -- and I would also like to say that perhaps maybe some might interpret this as self-congratulations and back-patting; there is none of that here today. It is about a tragedy that brought us here and

about our respect for each other; opinions, the same or different; and, how we proceeded in a respectful, dignified manner with a task that we all would choose not to have had before us.

But I -- I do want to recognize the work of the Public Safety Committee and particularly our clerk, all of our members, and -- and probably most of all the hundreds and the thousands of citizens who communicated with us, e-mail, letters, phone calls, and -- and those who then came to all of the hearings, and -- and to the hearing that the Public Safety Committee had, which was some 16 hours in the offing.

And especially to those who came and signed up that day but couldn't stay to testify, because as we went into the wee hours of the morning, one particular individual who was there with their children who could not stay, another individual who had to get home to take care of a family member, know that we read your testimony. We recognized your presence, and it was all very much part of our process.

And for those who actually were in the room and testified and felt outnumbered, felt outnumbered because their position was very different than perhaps the greater number that were in the room, I apologize to you if you felt outnumbered. But you should know that everyone who came before us was on an equal footing and everyone's input counted in the same manner.

And I should hope that as you look at this legislation today, you will see the reflection of your input, of your participation, because it clearly is a result of all of that input. I think what we have here today is very, very different than where we started in this conversation, and that is to your credit and in large measure because you, in a very respectful, democratic way, worked with us and -- and continued to dialogue with us.

Having said that, though, this legislation is not unlike other legislation that we pass, and it is far from perfect. It is very infallible; we recognize that. In fact, there's no legislation that we can pass or even presume to pass that is going to be the legislation, the end-all, the be-all, in terms of the cure. And many have said it before me, and probably far more articulate, that we cannot ensure, as we stand here today, to those families and to this entire state that this will never happen again, but yet we can do our best.

And I recall the affirmism which says that the perfect is the enemy of the good, and we know that we're not perfect. In fact, we know how imperfect we are and we know how imperfect our work is. However, that does not mean that we should ever sit by idly without trying to do better.

I recognize the shortcomings in S. B. 11 -- what is it, 1160? But there are some very important parts to that, the gun felony registry, the universal background checks, the addressing the issue of the private transfers; we recognize the -- the flaws and the holes in those processes, they, the behavioral health portion, which is so important, which so many families who find themselves in these circumstances recognize the need for, whether they have insurance or not. And -- and, of course, the school security piece.

And so, Madam President, for those reasons and recognizing our shortcomings, I would like to point out that this is our humble effort and it will bear a dividend.

Thank you, Madam President.

THE CHAIR:

Thank you.

Senator Cassano.

SENATOR CASSANO:

Thank you, Madam President.

I, too, rise to support the bill, and I'd like to make a couple comments about the bill, itself, and -- and why we're here, I guess. Obviously Newtown was the trigger.

I grew up in Nantucket. I'll never forget, as a junior in high school, I had to go to a town meeting to -- as part of a political science class or history class and see our town meeting form of government work. The town meeting had a bill before it, $ 15,000; an allocation of $ 15,000 would be the local share to pay for an instrument landing system for Nantucket. The federal government would have paid the rest; I think it was 85,000, and the good voters of Nantucket voted it down. It was too much money.

August 15th that year, 1958, about 11 o'clock, I was driving in
from the beach. We were fishing and we could hear a plane, but
we couldn't see it in Nantucket fog, and it crashed. Twenty-four
Nantucket people died that night. And they called for a special
meeting, and we appropriated the $ 15,000, a month later.
Tragedy brings about a response.

And the tragedy of Newtown has brought a response, a response
that for many of us is very difficult to support because none of
us can be happy with every part of the bill. Perhaps the good
thing is that it's taken a month for the bill to pass, over a
month. Four hearings have taken place. I was not on a committee
but I kept going in and out on that hearing that went until 3 a.
m. in the morning. I left by ten o'clock. I congratulate those
that waited and stayed through it.

The courtesy, the respect of the hundreds who waited all day,
came here in the morning and left here at night was incredible
to see. Some of the things that we might have included in the
bill if we passed it then, antique guns might have had to be
registered, retroactive takings, a whole bunch of things that
would have made the bill far more draconian are not in this
bill, as we tried to balance it.

Mental health issues are now a part of the bill that might not
have been at that time. Think about what that might have meant?
Columbine happened years ago; maybe the bill should have been
written after Columbine or after the movie theater massacre or
after one of those other types of events that has happened. But
when it happened in our own state, we had to react.

As we see the recent news of both the shooter and his mother,
maybe if good mental health was available to either one of
those, this might not have happened, but we don't have those
protections. This bill provides those protections.

I've heard from people that, you know, the gun, that the gun
manufacturers will leave. If I live in Montana and I want a
Colt, I'm buying a Colt; it's as simple as that. When you buy a
gun, you buy a brand. You buy something that you're comfortable
with, Remington if you do or (inaudible), whatever it might be,
Winchester, you buy a brand. So I'm not concerned about that.

Schools; I think it's a start. I'm not satisfied with that part
of the bill. I don't think it goes far enough. We have a public
school in Manchester for children through -- two through four,
five; Head Start school, 212 kids. Why aren't they protected or

the parochial schools? And maybe some day they will be, as we look at future legislation to deal with those issues. I understand that you have to start somewhere, and what this bill does, it starts.

E-mails; we have literally hundreds of e-mails. I have 192 e-mails in the last 24 hours. I get a kick out of one guy, said I had to e-mail you three times because I get points. I don't know who's giving the points out, but the e-mails are pretty much split, maybe 55/45, whatever it might be, mostly, many of them, good friends of mine, former police officers. I was a mayor for 14 years; I used to go and qualify every year when they qualified. And friends that I qualified with are saying you can't support this. I think we have to support it because it's a step forward.

And to the crowd that came that night, to the crowd that's here today, I applaud them. I applaud them for either side that they stand on because of the respect that they have offered us through this process today.

When I went on Public Safety, three years ago, they said, oh, Public Safety; ha-ha, you got the gun crowd. Well, the gun crowd ought to be pretty proud of themselves, the way they handled themselves in this whole process, because they did try to provide information.

I can't tell you how many times I met with people in my office, in town, and so on, to learn about this gun and that gun and this clip and that clip and this magazine, and so on. And so I look at this, I look at this as a, as a compromise that is important to Connecticut, because I think it will make us a better state.

And I would hope that as we have bills in the future dealing with things such as a billion-dollar deficit and some of the other types of legislation, that we get the same kind of citizen support that this bill has gotten from both sides.

Thank you.

THE CHAIR:

Thank you.

Senator Crisco.

SENATOR CRISCO:

Thank you, Madam President.

Madam President, I rise in -- in support of the bill. I wish to
commend Senator Williams and Senator Looney and Senator McKinney
and Senator Fasano and the Chairs of our various subcommittees
for their leadership. I was particularly impressed not with the
knee-jerk reaction to issues that occur from time to time, but
about the, but also about the thoughtful, responsible
consideration with the numerous hearings and the hours by
various Chairmen, like Senator Hartley, to wee hours of the
morning to hear every position possible. And I just want to laud
my -- my colleagues for what, for their leadership, what they
have done.

Because what we are doing, we're acting responsible. We are not
addressing gun control; we're addressing gun sense. And we heard
many times that the major issue is mental illnesses. And through
the leadership of Senator Harp, we have drafted something like
12 different measures, 12 different measures in regard to mental
illness. Granted, maybe some of them should have been addressed
before and it took a tragedy like Newtown to refocus us on
mental illness.

I have the utmost respect for those people who have their
ideology in regards to the Second Amendment, their rights. But
what about the rights of Ana, Daniel, and -- and Madeline; they
have rights too. As in the Declaration of Independence, they
have the right to life. That right was taken away from them, and
in their honor, the least we could do is provide legislation
that will address the issue, not a hundred percent; that can
never happen, but hopefully it could address the issue that
might avert another Newtown.

So, you know, the -- we have been criticized for our process,
but I believe it's better to have tried than to not have tried
at all. And I just take great pride as being a member of this
Circle. There are great many profiles in courage by both sides
of the issue, and I hope that when we take the final vote, that
they'll be all green lights for the children of Newtown and the
adults.

Thank you.

THE CHAIR:

The next speaker will be Senator Welch, followed by Leone,
followed by Musto, followed by Ayala -- Ayala.

Senator Welch

SENATOR WELCH:

Thank you, Madam President.

As I said in support of Senator Markley's amendment, there is no
doubt that this tragedy has touched every person, every heart in
this Circle, in this room, in the stands there, whether as a
citizen watching the horror on TV that day, whether as a member
of this government or a Legislator on the ground there that day,
whether as a part of a task force.

And I do thank Senator Williams, Senator Looney, and Senator
McKinney for placing me on the Mental Health Task Force, where
you could hear the testimony of the moms and dads, the brothers
and sisters, the friends who lost their loved ones that day. No
doubt it was moving.

It was moving to me, even the next day, as I dropped my wife off
to go into the bakery to pick up some cookies for an event we
were going to, to listen to my 5-year-old girl, my 5-year-old
daughter say, Daddy, I hope they don't shoot her in that
restaurant. It is moving. It motivated me. It motivated me to
roll up my sleeves and be a part of a task force to make sure
that a madman could never commit a mass murder like this again.

But the bill we have before us falls short of that. If that is
our goal, this bill falls short. And it does so at the cost of
losing liberty. What this -- this country is all about freedom;
it's all about liberty. Whether you believe it was divinely
given to us, whether or not it was a natural progression of
government over the years, whether or not it was our following a
natural law, this country is about freedom. And with great
freedom comes great responsibility; I think everybody here
acknowledges that, great responsibility. And I will be the first
to concede that as -- as citizens, as moms and dads, as
neighbors, we have not lived up to that responsibility. But the
irresponsibility of some ought not to mean the loss of liberty
for others.

Senator Kissel, I think, rightly noted on the fear of
incrementalism, fear shared by some in the Circle, fear shared
by people we represent out there. And no sooner did he express

that fear that I think it was somewhat confirmed by the comments
that Senator Meyer made then; there's more to be done here. And
I think Senator Markley rightly noted that if this was the end,
if this was all we were talking about, maybe there would be more
consensus. But I think there's a general consensus that that is
not all we are talking about.

I think Senator Williams appropriately listed the horrible
events that have taken place in this country over the years and
identified a common theme of weapons, guns used in those
horrible events. But -- but I see another common theme, and that
is evil. That is evil men and women doing evil things,
irrespective of what the modality is. And I don't see this Bill
1160 getting to the heart of evil. I don't see this bill
convincing the mass murder of Newtown that there's another way,
that he could change. I don't see this bill accomplishing those
goals.

What I do see is I see us saying to one generation, it is okay
to defend yourself in a certain manner but to the next
generation, in a world that continues to grow darker, that
continues to become less safe, that continues to become scarier,
it's not okay for you to defend yourself in that same manner.

I do applaud those who put the process together, who worked so
hard to come up with some really good ideas. And 1160 does
contain some really good ideas, things we ought to do, things we
ought to execute on. But at the end of the day, weighing what
this country is about, I cannot support it.

Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Senator Leone.

SENATOR LEONE:

Thank you, Madam President.

I wish to rise, just to make some brief comments on the bill
before us. And first, I'd like to thank our Senate leadership on
both sides of the aisle, as well as our House leadership on both
sides of the aisle for all the work that has been done to
present what's before us today. And I know it couldn't have been

easy; rightly so, it shouldn't be easy. This is a very, as was mentioned, polarizing, personal, emotional issue.

We have a lot of history in our country on the ability to defend ourselves, and we should be able to defend ourselves. I respect the ability for a person to defend their life, their personal property, their family, and I don't see anything in this bill that takes that away. You can still own your weapons. You can still have your ammunition. You can still defend your personal property, your family. You can still go to the gun clubs and the shooting ranges for your sport. You can still do those things. And as I look at the -- the language of the bill, and as I look at the title -- and I think the title says it all in term of what we're trying to do here -- this is AN ACT CONCERNING GUN VIOLENCE PREVENTION AND CHILDREN'S SAFETY. Again, that's gun violence prevention, not gun violence taking-away, gun violence prevention and improving children's safety, all because of what happened that dreadful day, December 14th, in Newtown.

And as I look back at the common thread of all the other areas that had those mass shootings, those mass killings, whether it was the two times in Colorado, Arizona, Virginia, numerous others, the common thread is not the one rifle, the one pistol, the one revolver; it's these assault weapons with high-capacity rounds that can shoot multiple rounds in a minute, weapons that are meant for war to defend our country, not to shoot our neighbors, not to shoot our loved ones, not to shoot someone going to school, not to shoot someone going to the store or to a place or worship. It's for war.

And if anyone has been in the military and has shot those weapons, you would know the destruction that it's capable of. And I suspect that many of these mass murderers never served a day in their life in the military to know what it could do, to see the effects. And I respect all the people that are here today on both sides of the issue. I know they're -- they're real; we can't discount them but we do have to confront them. We do have to debate this issue to find the way to move forward to protect the public welfare, to protect the safety of our constituents.

So December 14th, unfortunately, is going to be forever etched in the minds of every Connecticut citizen, maybe not other states. I suspect so, because it seems that this particular act, that has culminated after so many others, all of which we had hoped something would have done then, but because this was so heinous, so horrendous that it went after our children, five,

six, seven years old. And any parent that has children in that age range -- and I'm one of them, as well as many others -- and even for those that have older children, you can still see that face in your children when they were that old or that young, I should say, the kind of impact that it has on any parent, on anybody. I don't think you would have a heart if -- if it didn't.

So today I see as a defining moment for us here in Connecticut. It's a defining moment because we have to act. We can choose not do something here because of the tragedy that happened, and I ask how can we not? We must. Those children, our children are our future. Those deaths in Newtown -- and I don't call Newtown as some other place; it's not my town; those aren't my constituents -- I look at them as they are my constituents. Those are our children. It could have been any of our children. It's the old phrase it happened over there; it's not going to happen here.

Well, in fact, it did happen here, and those deaths in Newtown, they represent the loss, not only the future of those children and those families but all of us. We've all lost a sense of humanity when that happened. And if we choose not to act, to address it in some way -- and it's been mentioned, this may not be perfect. It doesn't address every need. It may go too far for some, not far enough for others, but the point is we're here to try and prevent it from happening again, to have some measure of prevention, to have some measure of improvement in our children's safety.

So I hope that some day when history looks back and looks back on this Chamber and the House and the State of Connecticut -- and I hope all eyes are watching us in what we're trying to do here -- the message that we're trying to send is not to harm people and to harm their rights but to protect those rights and to protect our children, to protect our people from having this kind of tragedy happen again here in Connecticut, and not just in Connecticut but in other states as well and across the world, I hope.

I just don't want another senseless act to happen and we have not acted. At some point, we have to ask ourselves, when is it enough? When, how terrible does it have to be for us to do something? I believe this legislation will help. I pray and hope that it will, not just in Connecticut but everywhere.

And it's because of that, it's because of the prevention and the improvement in safety for our children and our families and our neighbors that we hope this never happens again. And if there's some other loophole where some madman finds a way to circumvent these, these precautions that we've put into place, we'll have to come back. We'll have to do something. But my hope is well, we don't. My hope is that this sends a clear message, and it's for that, that I support this bill.

And I thank you.

THE CHAIR:

Thank you.

It'll be Senator Musto, followed by Ayala, Maynard, and Linares.

Senator Musto.

SENATOR MUSTO:

Thank you, Madam President.

Madam President, I rise in support of this bill. The incident in Newtown may have gotten us here today, but what we are doing is we are setting policy for the whole state, both those people who own guns, the sportsmen, people who enjoy shooting them, people who collect them, and also for people who are victims of gun violence and the rest of us who are neither.

I support both sides of this argument and my concerns with this bill, I share some of them. Senator Markley brought up some; Senator Kissel brought up some. I share some of those concerns, but on balance, I think this bill strikes the right balance for the State of Connecticut and the people here.

We have heard a great deal from people who are opposed to this bill, and one of the reasons I support this bill is because a lot of those concerns are addressed in the bill. We've heard that we should not be confiscating people's magazines, confiscating people's guns. This bill does not do that.

We have heard that we should be focusing on mental health. We should be focusing on school safety. We should be focusing on the things that make people safer outside of the gun arena -- this bill does do that -- and that we should enforce the laws we have on the books and make them stronger for people who are

actually criminals, who are using guns in a way that harm other
people, not for self-defense, not guns in the hands of our law
enforcement and military, but for those criminals who are using
them in robberies, in murders, in home invasions, who are
trafficking guns to those people who shouldn't have them, who
are trafficking ammunition to those people who shouldn't have
them. This bill does that as well.

We are talking about school safety here as well and trying to
figure out how to make those areas where we leave our children
every day safer. Senators Cassano -- Senator Cassano's points on
that are well taken as well. There are a lot of good arguments
from the people around the Circle on all sides of this bill, and
I'm proud to be part of this debate. I'm not going to talk a lot
about those things that have already been spoken of, because
there's no need to hear it again.

This bill will not prevent all gun crimes. It will not prevent a
lunatic from getting a hold of a firearm and killing a bunch of
people, children, adults, teachers, law enforcement, others. But
we all hope, even those who are not supporting this bill, I
suspect, hope that this bill will at least save some lives, that
it will prevent some gun crimes.

And that is why I'm supporting this bill, in the hope that it
will prevent future crimes that some people will be saved by it,
and that it does not take anything away from the people who
currently have guns and it puts the proper focus on criminals
and our mental health system and the safety of our society.

So if there is, I know there are some people in this Circle who
have, are still thinking about this; I would just ask you to
consider the arguments that have been made against the bill or
against this process, in general, are addressed in this bill.
The good things are addressed in this bill and we do them. The
things that we've been warned against, this bill does not do.
And for that reason, I support it.

Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Senator Ayala.

SENATOR AYALA:

Thank you, Madam President.

Today I stand in support of this bill. I want to thank the leadership in this Chamber and the leadership in the Chamber below in spending the countless hours, days, in putting together this bill that we're going to vote for.

We're here today because of that tragic event that happened in Newtown, and many people in this Circle have spoken, probably much more eloquent that I can, in defense of those little ones that their lives were so tragically taken.

But today I stand in support of the people in my community, in my district, in urban centers that have faced this, year in, year out, countless number of youth who have died in the streets of our urban centers. Their stories are not told. They have been forgotten. The mothers, fathers, family members, brothers, and sisters who in their own way have lost a piece of their lives; they didn't have advocacy groups stand up for them. They had no e-mail campaigns done in favor of them.

They have had vigils. They have had church services. They have had moments in places like Bridgeport, New Haven, Hartford, and other urban centers where they reach out to their community leaders. They reach out to their mayors. They reach out to their council members. They reach out to local law enforcement, and they reach out to Legislators.

And in a roundabout way, we've gotten here today, and today I want to present their stories. And I want to support this bill because I do believe that there are portions in this bill that speak directly to the tools, to the resources that our police officers can use to combat gun violence in our urban centers.

I pray that there will never, ever be another Newtown tragedy in the State of Connecticut or in these, in these United States. I don't know if that will happen or not. Unfortunately, what I can predict is that somewhere, sometime before this year is out, the city that I call home, Bridgeport will face gun violence again. New Haven and Hartford, other places that without a doubt, probably they can't predict the day or time, but somewhere throughout, gun violence will erupt.

When I look at this bill, I had the opportunity to speak to our chief of police, Chief Gaudette, in Bridgeport, and one of the items that he asked us to do, one of the points that he thought was important was having a gun offender registry. This is in

this bill. This piece provides another tool, another resource for our chief of police, for local police to go after the bad guys, to go after those people that would terrorize our community.

As I continue to look at this bill and I look at another piece that speaks to becoming another tool or resource for our police department and our legal system is the reclassification of gun trafficking laws, higher fines and higher penalties. That's where the problem is at when we look at places like Bridgeport, the trafficking of guns, people coming into our city, bringing these guns and putting them into the hands of criminals, of people who want to do bad. I have no pity for any one of those if they have to serve more time or if they have to pay more money because they decide that the City of Bridgeport is fair game to bring in their guns.

I don't mind if a person from the City of Bridgeport attains a gun legally through gun permits and does what he or she have to do. That's the law; I respect that. But when I have thugs, and when I have folks coming into my community and they want to put the -- their -- those guns into the hands of little ones, teenagers who may not necessarily have the level of respect for life as a grown folk, there's a problem. Our little ones, unfortunately through all types of different issues, whether it's violent games that they're playing or any other things that they might be seeing on TV, sometime are conditioned to think that life is a game and that you can hit the restart button after you lose a life, that things come back to normal. Well, that's not the reality that we live in, and I hope that after this bill gets passed, it's not the reality that those drug -- those -- excuse me -- those gun traffickers are going to have thinking that Bridgeport is still open for business for them.

The last piece that I'd like to address, I'd like to address the issue of mental health. The mental health issue is a serious component to this bill and one that I think is just as important as the violence, the gun violence prevention.

As a teacher, I've had the opportunity to see many students, students that for whatever reason may have been socially awkward, introverts, students that may have had a tough time in socializing with other students. And there's a tremendous responsibility as a classroom teacher to identify who those students are, because in doing so, we can prevent some honorific other event from happening.

But it goes much further than just having a teacher identify. Most of my colleagues, I would say a great portion of them, are able to do, are able to do so, but it goes a step further than that. After identifying who these students are, after putting in a referral into a school social worker, school psychologist, it's about having the resources at the schools to be able to take that referral, analyze, talk with the student, and hopefully bring this young man or young lady to a place where they're not at odds with who they are. Will we save a life because of that? Your guess is as good as mine, but I do believe that we do prevent anything from happening if we have those resources there.

So I hope that in this brief moment in sharing my thoughts with my colleagues around the Circle and sharing the stories of the countless number of individuals in my 43 years that I lived in the City of Bridgeport who have lost their lives, friends, relatives, and on a very sad note, several of my students, former students of mine who have lost their lives on the streets of Bridgeport because of the senseless gun violence.

I believe that this is a proper step. I believe that this is the right thing to do for the State of Connecticut, and, as such, I will be voting in the -- I mean the affirmative, today.

Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Senator Maynard.

SENATOR MAYNARD:

Thank you, Madam President.

We consider today legislation that was conceived in tragedy and borne out of the hard labor of political compromise, and it's that compromise that I think has led us today to a lot of the discussion and misgivings that some of us feel about the bill. I speak to colleagues with whom, for whom I have the highest regard, and I am so grateful for the opportunity over the last three months to have had, even at different times in the moments of heating dialogue and debate, a mutual respect that was offered to each of us on both sides of the aisle.

I think the tragedy at Newtown left us in its initial days with a -- a sense that we needed to act with a spirit of unity and bipartisanship and that we wanted a bill that would address comprehensively what we thought might be the underlying causes. I think, unfortunately in some respects, the bipartisanship that we have sought and that we are achieving in some measure today also put some of us in a bit of a box as we began to consider what elements of a bill we could all agree upon. And I think it was there that we began to see the challenges of bipartisanship on an issue so emotionally driven.

I come from a part of the state that has a great many rural residents, has a -- a proud gun tradition, and has so many folks who are friends and neighbors, sportsmen, gun owners, folks who really take great pride personally in their safe handling of guns and their knowledge of weapons, in their respect for the rule of law, in teaching those to their children and enjoying hunting and competitions and shooting and also feel a very strong connection to the right to protect themselves personally, either against intruders or against, as they feel might occur in some future time, a -- an oppressive government.

It is their right to feel that. I don't share their same wariness of the government, because I have the great privilege of working within a governmental body. And I know that while we don't always get everything right, we do have the opportunity to change the law, and undoubtedly will again, as we discuss these issues down the road.

But I understand the misgivings of my neighbors and friends and people from all over the state and, indeed, all over the country who feel very passionately about any erosion of their Second Amendment rights and will defend them as a principle, not because their gun nuts, not because they're some fringe element, but because they hold this deep conviction that this is part of who we are as a people. It was established in the Bill of Rights when we, when we confirmed the Constitution, itself, when it was ratified. So I understand that passion, and I often think, as a Democrat, we also defend hard-won rights as we perceive them.

And I know it's not analogous, except for the underlying right, that we jealously guard a woman's right to choose. After that hard-won battle, Democrats are very wary of giving any ground, even if it seems reasonable, even at something as simple in -- in some states as a, as a 24-hour waiting period, we will not see to any infringement of that right.

And so while I don't share the same doubt and misgiving about an abusive government that my Second Amendment friends do, I understand their passion. I understand their desire not to let government act precipitously and infringe that right without deep reflection and care. We've sought to do that here. I believe our leaders have done an incredible job trying to forge a package that we can have broad bipartisan support. And I believe that they sought with the best of intentions to protect the citizens of this state, particularly our young children in this aftermath of such a horror.

On the other hand, I feel that the process, itself, confined us to a point where I am not comfortable with some provisions of the bill that I feel I don't have a great enough understanding of or a comfort level with what it might mean down the road. I -- I think a bill this large, this comprehensive, and with as many moving parts as it has really deserves more scrutiny than I feel I've had the ability to give it.

Now, there's no question everyone in this room wants to ensure that no tragedy occurs to the lives of any children in this state or any person in this state, similar to the kind of mass shooting that we experienced. I think where, in my view, the bill runs a little off track is that it seeks to address the actions of people determined to inflict harm on others in a mass shooting.

You know, ten of the worst mass murders in the history of the United States were committed by white men under 25 years of age. They're all -- many ended in suicide, and -- and the acts were carried out with a kind of calculated indifference and dispassion that is just hard for us to comprehend. We come to the conclusion that these people must be mentally hill because who but a -- a crazy, mad person could -- could kill people wantonly without cause. And yet it happens over and over again in various parts of our country, perpetrated by people who are not making a political statement so much as acting out in frustration. Perhaps it is a political statement. Who knows the minds of these people; they die, often at their own hand, before we have the opportunity to understand what could have provoked such an attack.

But I believe that our law-abiding citizens who are going to be affected by this bill deeply resent, as I would, the implication that they cannot be trusting with these weapons, that they cannot be trusted to abide by the law, and that somehow the gesture that we're making to hopefully assuage the pain and

suffering of those who've been so affected by the shootings in Newtown, that -- that may must give up or be burdened with a new set of requirements and reporting and -- and potential felony convictions, should they choose not to or make some kind of mistake in the future.

I just don't have a comfort level with a bill that goes that far, and I know it's very hard to balance things at -- these things out. We live in a, in a country that respects the rule of law, and we, and we try our -- our very best to respect each other's rights.

I've -- I've operated as a Democrat, again, as I say, under the principle that I would like to pass laws that provide maximum benefit, while preserving maximum liberty.

CONNECTICUT GENERAL ASSEMBLY

SENATE

WEDNESDAY, APRIL 3, 2013

SENATOR MAYNARD:

-- and that is a tough balance to achieve very often in this country. And as a member of this body, I feel a much greater level of comfort as, as someone who deals with the law, because I know, as I said at the beginning, that we have the ability to change it.

But I am aware of the discomfiture of those who feel that we may not come back, we may not correct those excesses in this law. And they may see, now or in the future, a diminution of their Second Amendment rights or their right to defend their family or themselves.

So I guess what I'm asking of this body is even if we make the decision today, as we in every likelihood will, to go forward with this bill that we maintain a respect for the rights of those people who think differently about the role of government who are not quite as comfortable with it as we are, who don't feel that it always provides a benevolent protection for them but sometimes may, actually, appear to them as, as something that is intrusive in their lives. And that is their right, as it is ours, to, to believe differently.

While I'd like to join today with colleagues who've worked so diligently to produce this bill, I find myself troubled, as I said, by those aspects of the bill and will be voting no today. The hard work that's gone into this bill though is not without merit. I am deeply committed to future efforts toward greater gun safety and improved mental health access.

And I intend to join with my colleagues as we leave here and go forward either in this session or in future sessions to do that which protects the lives of our children and, and makes the kinds of laws that, that can balance the interests of our, of our citizens against the need for further protection. So I thank you, Madam President, for the opportunity.

THE CHAIR:

Thank you.

Senator Linares.

SENATOR LINARES:

Thank you, Madam President.

I represent 12 towns, 12 beautiful towns, on the Connecticut River and the Connecticut Shoreline. And on behalf of my entire district, I wanted to take a moment to share my thoughts and prayers with the families that were affected by this horrific tragedy in Newtown, Connecticut.

When just making a decision about this bill, ultimately my, my thought was that at some point I'm going to be knocking on the door of a, of a constituent's house and looking in the eyes of a mother with her kids by her side. And ultimately, my decision would be based on whether or not I feel we have done the best work to help prevent another act of evil from horrifying our state.

Today, I will vote no on this bill and stand here for the honest, hardworking, law-abiding citizens that I feel we are, is, this bill is creating unnecessary harm for. I do believe that we need to head in the direction of improving our mental health system in the State of Connecticut. I believe that we missed an opportunity to reform our mental health programs in a responsible and thoughtful way.

As I was sitting here, an e-mail came to me from a constituent. He said, I'm writing to ask for your help. There has been a proposal that will eliminate all grant funding for inpatient and outpatient mental health programs. That means nearly $ 3 million in reductions to mental health programs for people in your district. This is not the direction I believe we need to head in in order to prevent another tragedy like this from occurring.

I also feel that never should the voice of the people be silenced. I do have my reservations with the fact that the people have not had a chance to voice their opinion on the final language of this bill. I think that we, more work needs to be done, that we need to focus on mental health, and I stand today in opposition to this bill for those reasons, and I ask my colleagues to follow. Thank you.

THE CHAIR:

Thank you.

Senator Fonfara.

SENATOR FONFARA:

Thank you, Madam President.

I rise in support of this bill, and I want to thank all those who helped us get us to this point today. Madam President, there are two things that are true, among many things, particularly true about the legislative process. The first is that we rarely act proactively, and the second is that we deal with issues du jour or of the day.

With respect to the tragedy that has brought us here today, we're unable to do anything to address that issue proactively, sadly. But I pray that we do not treat what happened in Newtown and the effects of it as the issue du jour, because, unfortunately, and sadly likely, somewhere in this country, and hopefully I'm wrong on this but maybe even in this state, there exists and likely will exist other Adam Lanzas.

And while this bill and this process never will allow us to prevent fully a repeat of the horror of Sandy Hook or Aurora, Colorado, or Virginia Tech, our charge is to do everything we can to minimize such a thing from happening again. I think this bill goes a long way in making that effort.

What is the profile, sadly, what is the profile of these individuals, young, angry and withdrawn, some mentally disturbed, maybe a video game watcher, a violent video game watcher, access to firearms, maybe copycatters? Like with suicide, many contemplated, few committed.

But as lawmakers, it is impossible for us to write a law that could identify that, those few individuals that go from contemplation to action. And I believe that it is our responsibility to not treat this tragedy and the results of it as an issue du jour. The mental health aspect of this must continue to be our challenge.

We must find ways to identify those better, the Adam Lanzas of our communities better so that the families who are living with and will live with this tragedy for the rest of their lives will feel at least something, something positive came from it so that others don't have to live with it as well. And I pray that we will continue to work at that aspect of this as we move beyond today. Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Senator Boucher, for the second time, and then followed by Senator McLachlan and then Senator Kane.

SENATOR BOUCHER:

Thank you, Madam President.

And for the second time, as was mentioned very often this afternoon, that this has become one of the most polarizing issues that we have faced and that we have 36 Senate seats around this circle, all of them about exactly the same size. And I have to say that the district that I represent with seven towns is probably one of the most polarized in this particular issue and oftentimes in other district, other issues as well.

I might add just as an aside that those individuals that reside in that Senate seat tend to vote maybe 15 to 20,000 more individuals or votes that are cast in many of our elections, which means they're very politically active. And they were never more active than they were on this particular issue. I think many of the busses that came up here on both sides of the issue probably emanated from the 26th District.

I can tell you this, that I, you have all received phone calls and e-mails by the hundreds. We have received them by the thousands. And it's one person, our aide, that's there that's on the front line of these phone calls and these e-mails. And although you strive to get back to everyone, it's become literally impossible to do that given the reaction that we've received.

And I have to say that this issue has touched all of us personally in some way or another. And some of those very children that were in the room next door to the ones where none of the children survived sat with me here in this chair on many an occasion and in cars and in parades. And, fortunately, they survived but not without the kind of emotional damage that those children have received.

And I know that even those that were not immediately there, my next-door neighbors' fifth graders and fourth graders come over regularly and tell me about how they're practicing hiding in their closets to see if they can all fit in their school closets. And one of them said to me she's even tried to fit in her locker, and she can do it. To think that that is what is going through their minds right now is absolutely devastating.

But I also have to speak up on behalf of some parents and family members that have individuals like Adam Lanza in their household, and they live in fear in every day. And I have to speak on behalf as well, because one of my priorities is not just school security, but it's mental health issues.

And I was very torn on the area to spend some time on in delving into this issue and in speaking on behalf of them and the many hospitals that we have in our state that have told me that their psychiatric units and ERs confront this issue every day where they have the severely mentally impacted and ill individuals that they do not have a place to, to put them at the same time that we, as a state, have closed down mental health facilities that the Mental Health Subcommittee has done a lot of work but has left a big, gaping hole and gap in addressing the serious lack of placement, appropriate placements, in institutions that we have closed for politically correct and, and cost-related reasons.

One of the individuals from one of my districts in Ridgefield called me to talk to me about the fact that their son was also killed by someone that was let out of Fairfield Hills, which was a mental illness facility in Newtown, Connecticut. That patient

was mainstreamed and put in a community in Stamford. They ended up burning the apartment where their son resided and was killed. This individual should have had oversight.

Someone should be, have been watching to see that they received their medication. When they were in a facility, they had that oversight. They had that expertise located there. We have to ask ourself as a state, are we going to continue to be politically correct, or are we going to broach this subject in an honest way, and is there a proper place for institutionalization and the issue of involuntary commitment, all of which in this bill becomes a study?

And I understand that there's financial constraints, but we have to address this, and I hope that we do look at this very serious issue in a future session. And also to mention in support of our good, new Senator from Bridgeport, Senator Ayala, he is so right that we have gun violence every single day and every single week in our major cities in Connecticut. It disproportionately affects our minority populations in those cities, and it's something that we can't turn a deaf ear to and eye to. And fortunately, there are some aspects of this bill that do think about that.

I had an interesting experience that maybe some of the others here had as well in the House when we were debating the assault weapons ban when members of the Clerk's Office would follow me into the ladies' room to say, you know, I live in the inner city in Hartford, and every weekend somebody comes in there with a vehicle full of contraband weapons and opens up the trunk of their car and sells them straight out for cash without any background check, without any permits. And how do we address that? I'm very pleased to see that some of that is in here.

I know that finally what I wanted to talk about was the fact that our founding fathers were actually, and mothers, I might add, were brilliant, brilliant in the aspect that they created three branches of government, the executive branch that proposes, the legislative branch that disposes or decides, and the judiciary, which adjudicates.

And although the Connecticut Constitution gives every citizen the right to bear arms in defense of himself and even the state, the law though also does regulate the sale, the use, and the possession of firearms. And as such, our judiciary, some say that this bill is too far-reaching. It goes too far. Then, in

fact, it will be adjudicated, and those aspects that don't pass
muster can be struck down as was in New York.

This was quite an effort, and for those that say it was a closed
effort, I don't believe it was. I think it was one of the more
open that we've had in a long time just judging by the
individuals that have come forward, provided testimony, that
provided e-mails, calls, all of which we have read and all of
which were considered with, with regards to the final product.

Thank you, Madam President. Appreciate the opportunity to just
say a few closing remarks.

THE CHAIR:

Thank you.

Senator McLachlan.

SENATOR MCLACHLAN:

Thank you, Madam President.

I was proud to have served on the bipartisan task force that
studied the problems following December 14th and was assigned to
the School Security Subcommittee where we clearly identified
that Sandy Hook Elementary School's procedures, including
lockdown, actually saved lives. But the process of our study
told us there's much more that can be done.

This bill begins the process of looking carefully at security of
our children. But let us be clear that we can't possibly expect
our school buildings to become Fort Knox. We should look
carefully, much more carefully, though at mental health in our
state. We've heard a lot of comments about that today, but it's
not proportionately showing in this piece of legislation. And I
think that it deserves priority attention.

I must say I am disappointed the bill has created a task force
where we really should be leaving the real action, should not be
leaving the real action for another day. It's a complicated
question. Clearly understood, it's very complicated. How do we
address the nightmare of a madman? No question that's a
difficult question.

But the professionals in the mental health field have told us
and have made it really very clear that one of the major

problems in Connecticut is insufficient resources. Senator
Linares just mentioned a, an e-mail that he received just today,
and I've gotten several of those over the last several days,
whereby mental health funding is being dramatically cut. That's
a problem.

I also heard many stories of families struggling with challenged
children. They were very vocal over the last several months,
those families who have lived through apparently what the
murderers' family may have lived through, the challenge of how
to, to get resources within the system in Connecticut.

Now we have some best practices here in Connecticut. One of them
I learned from the Commissioner was something known as assertive
community treatment, and that's in this bill today. That's good
news. But here's the problem. It's currently in three cities,
and we're only adding three more. We have 169 towns in
Connecticut.

Now granted, this is an expensive program that needs to be
prioritized, and I understand that. But if we have a best
practice like that, let us find ways quickly to use those best
practices in a more cost-efficient manner and make it statewide
or more readily available than what we're talking about. So we
have much more work to do.

Gun control is a very tough topic for everyone in this room
today, for the literally thousands of people that I have heard
from and tried to communicate with over the last several months
who have called my office, my home, my cellphone, e-mails,
thousands of people. And I'm just one of 36 Senate districts.
And I heard from people across the state. It wasn't just Western
Connecticut who was communicating with me. They were calling and
writing from all over the state.

It's a very challenging topic and, I must tell you, a painful,
sleepless night challenge for me. The major problem that I had
with early discussions about gun control here since the task
force started working was seizure. There seemed to be a need,
and I heard it again today from Senator Meyer, who he and I
disagree that illegal seizure is a priority in the Constitution,
and we should not be going down that road.

And so I'm thankful that the bill before us today does have the
grandfather clause and allows for those responsible gun owners
to keep the property that they've bought and paid for. Now that

comes with strings, and I understand that. And they're not happy about that either, but that's a balance. That is a balance.

Our State Constitution has very firm rights to bear arms. Some would say that the Connecticut Constitution right to bear arms exceeds that of the United States Constitution. And so I asked questions of a lot of experts in constitutional law. What happens with the legislation before us in a future contest in the court?

I'm told, and this is a matter of opinion that I've gotten from professionals -- I'm not a lawyer, I'm a layperson Legislator, I call myself -- this, I am told this bill will withstand a challenge. And the reason why is that the leadership decided to take out the grandfather, take out the, the seizure part of it and add the grandfather clause to the bill. There are so many more things about this legislation that make so many people uncomfortable, including me.

But I've got to share with you where I was on December 14th. Immediately upon hearing news of this tragedy -- I was in Danbury -- I drove straight to Saint Rose of Lima Church in Newtown where I have friends who are parishioners there, family members who are parishioners there and whose, the pastor, Monsignor Bob Weiss, is someone who I respect a great deal.

So I went to Saint Rose and kneeled down and prayed for hours. And during that period of time in the afternoon, I greeted family members who lost their family member at Sandy Hook Elementary School. And later that day, in the evening, I stayed there and joined the community in a prayer service.

December 14th changed a lot of people's viewpoint on a lot of things, on the preciousness of life, on the priority of our lives, and it certainly affected me in a very great way, quite frankly, more than I would have anticipated, something as emotional as that would have done for me. And so it forced me to take pause and think about this debate in a different way that I never had before.

What I found was that Caroline Phoebe Previdi, who was six years old, a first grader, an adorable young girl whose grandparents and great-grandparents I've known all of my life, was lost that day at Sandy Hook. And that's what I'm talking about, that it forces you to really look at things differently, I, I hope objectively, because under different circumstances, I would look at this bill very differently.

But today I'm supporting this bill in hopes, in hopes that I am properly honoring Carline Phoebe Previdi.

Thank you.

THE CHAIR:

Thank you, Senator.

Senator Kane.

SENATOR KANE:

Thank you, Madam President. If I may, I have a few questions to the proponent of the bill.

THE CHAIR:

Please proceed, sir.

Senator Williams, prepare yourself.

SENATOR KANE:

Thank you, Madam President.

Just a few questions, if I may, Senator Williams. In the bill, it talks about the provision of individuals under the age of 21, and it says that military individuals may use or may be exempt in the use and discharge of their duties.

What about those individuals who may have been, who have served their service through our country, come back, and they're still under 21, possibly -- maybe they were injured, maybe, who knows -- and want to purchase a long gun? These individuals, are they still exempt? I mean, they served our country. They have incredible training in the military. They come back, and they're not able to get a gun without a certificate or a permit.

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

Federal law, from what I understand, prohibits them from purchasing a pistol. And in the State of Connecticut, the law before us conforms that to centerfire assault rifles as well.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

So a . 22-caliber or a shotgun, that, that would be okay? It's, you know, hunting, that kind of thing. It's just not the centerfire, centerfire.

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Through you, Madam President, that's correct.

SENATOR KANE:

Thank --

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

Thank you for that answer.

On the mental health eligibility verification, it, I think it says that if you were voluntarily in a facility, let's say, it, within six months or involuntary, involuntarily within five years, there would be this look-back. The, is, is that just a check-off on the application?

Through you, Madam President.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

A check-off on the application, you mean if they are attempting
to purchase a firearm? Yeah, they would be asked that question,
but it's my understanding, and I can double check this, that
that information of the commitment at a hospital for psychiatric
disabilities, which is the commitment that we're talking about,
would be reported to the Commissioner of DMHAS, the Department
of Mental Health and Addiction Services, and that that could
also be reported to DESPP --

THE CHAIR:

Senator Kane.

SENATOR WILLIAMS:

-- which is our public safety agency.

SENATOR KANE:

Thank you, Madam President.

And is that a violation of our HIPAA laws?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Not that I'm aware of.

Madam President, through you.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

There's also in the bill a gun offender registry, but it says that it is not public record or subject to FOI. And part of the argument that law-abiding gun owners make and I will make and many people will make is that many of the crimes that are committed by, with guns are committed by the bad guys.

And why wouldn't this registry be ethi-liable? I mean, if we have a sex offender registry, and you're able to know if in your neighborhood there is a, a sex offender, why wouldn't we be able to know if someone is a convicted felon with a gun crime? Why wouldn't we have that information available to our public?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Madam President, through you to Senator Kane, the purpose of the registry is to assist law enforcement. So law enforcement has access to this list for the very purpose that you're talking about to be aware of the propensity, not the guarantee, but the propensity of those who have offended in the past in terms of gun crimes to offend again.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Through you, Madam President.

Thank you, but what's the difference between a gun offender registry and a sex offender registry? If, if those are made public, why wouldn't this be made public? I would consider, I don't know, but maybe they're equally as dangerous if not more.

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I can only tell the good Senator Kane that the purpose of this was as a tool for law enforcement. It was not discussed in terms of the sex offender list. I suspect if we had discussed that, we might have talked about the different natures of the crime.

In terms of a sex offender list, you're very concerned about whether that person might be around young people in some way. In, in this instance, we are talking about a tool for law enforcement. Whether we want to consider what you are proposing to make this public in the future, that is something that we could certainly consider. Right now, it's for law enforcement.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I, I appreciate that answer. That's, that's, I appreciate that. That's, I think it's important, because we, we're, you know, we're talking about the bad guys here. I think the public has a right to know, so I, I appreciate that answer.

When we talk about the, registering the high-capacity magazines, it's, it, one of the stipulations is that that registration would go to the DMHAS Commissioner. A, am I right about that, and, B, why would we submit those names to the Commissioner of DMHAS, Department of Mental Health?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

You're talking about the magazines that are in possession now prior to the enactment of this law that would be declared.

SENATOR KANE:

Yes.

SENATOR WILLIAMS:

Because there has to be a repository for that declaration, and to us, it made the most sense to have that repository in our public safety agency.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I'm not disputing that. I, I believe it says, not in, in addition to Department of Public Safety but DMHAS, Department of Mental Health and Addiction Services.

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I suspect that it is a backup registry in terms of the information that would be available to DMHAS and as, as a, a, registry for the Public Safety Department. I think that the DMHAS reference may be important when we look at some of the other potential gun issues regarding what we were just talking about in terms of commitment. Does a person have not only a gun, but does the person in addition have a high-capacity magazine?

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I, I appreciate that answer, but I still don't understand how
owning a large-capacity magazine has any connection with mental
health and the fact that these individuals' names would be given
to the Department of Mental Health and Addiction Services. I can
understand the public safety, because public safety, you know,
you would have that registration.

But that, that just puts a, an assumption that if an individual
owns a large-capacity magazine that there may be a mental health
issue as well, and you're submitting the name to the Department
of Mental Health and Addiction Services. And, and I don't, I, I
don't know if I, and I can't agree with that, and I don't have
to believe that's fair. If, if you want to respond, you're more
than welcome, but I can move on, certainly, if you want.

SENATOR WILLIAMS:

I'll stand by my previous answer. Thank you, Senator Kane.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

In the list of banned weapons, there is a Colt Match Target
rifle. Can you describe what that rifle is?

Through you, Madam President.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

I don't have a photograph in front of me, Senator Kane, so I
could not describe that from a photographic point of view.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I guess my question is, is it a target rifle, meaning one that is used for target shooting, one that is used in a, in a range? And I was just curious why that one was on the list.

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

Through you to Senator Kane, all of the guns that are on the list meet the criteria of the physical characteristics test. And that, those are the assault weapons, for the most part designed originally with a military platform, capable of semi-automatic fire and centerfire as opposed to rimfire.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President. And of these rifles that are on this banned list, how many of them are made in Connecticut? Are we aware of how many?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

I am not aware of the precise number.

Through you, Madam President.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

And the OFA analysis, is there any impact on the economic impact this will have on the State of Connecticut, meaning the, the number of manufacturers we have in the State of Connecticut, the number of manufacturing jobs we have in the State of Connecticut, the ancillary businesses who feed those manufacturers in the State of Connecticut? Is there any economic impact in this OFA analysis?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Madam President, not to my knowledge, no.

THE CHAIR:

Senator Kane.

SENATOR KANE:

That's, thank you, Madam President.

And one last question, if I may, through you. It talks about the statewide trafficking task force, and, and I know that Senator Harp and I have been in agreement in trying to keep that in the budget. It was removed from the budget. Will it be placed in the budget yet again, or are we going to fund this task force?

I know Senator Guglielmo came and testified in front of the Public Safety Committee not too recently and asked for this to be placed back in. So if, if we're going to put this in, in this bill, are we then going to be funding the statewide trafficking task force?

Through you.

THE CHAIR:

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

Through you to Senator Kane, yes, in the amount of $ 1 million.

SENATOR KANE:

Good. Great.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I thank the Senate President for indulging me in answering --

SENATOR WILLIAMS:

Thank you.

SENATOR KANE:

-- my questions. I appreciate the answers that you gave. I certainly appreciate the fact that you're willing to work with me on a couple of those questions that I asked you. And hopefully, we can move those discussions forward as, as we progress.

I still believe that we have some very deep questions on the economic impact that this bill is going to have on the State of Connecticut and the great manufacturing that we have here and the history that we have here.

I also, if I may, Madam President, I just want to change gears a little bit, because I, too, have a couple of amendments that I would like to offer to this body, one of which, well, actually, if you don't mind, I'll ask the Clerk to read LCO 5467, and I'd be allowed to summarize.

THE CHAIR:

Mr. Clerk, will you please call the LCO.

THE CLERK:

LCO Number 5467, Senate Amendment Schedule "F" offered by
Senator Kane.

THE CHAIR:

Senator Kane.

SENATOR KANE:

Thank you. I move adoption.

THE CHAIR:

Motion is on adoption. Will you remark, sir?

SENATOR KANE:

I will. Thank you, Madam President.

In the bill -- I believe it's in Section 23, Lines 1008 through
1011 -- it talks about the exemption of police officers in this
bill. And I think that's a very good idea, because I've gotten
calls, e-mails, Facebook messages from police officers
throughout the state who said, you know, these guys put their,
these men and women put their lives on the line every day. And
they are targets for crime. They are targets for the bad guys.

And it does say in the bill that whether they're on duty or off
duty, they are exempt from this bill. However, it doesn't
mention retired members of the military and/or police
departments. And I still believe that these individuals who have
given, you know, ultimate and incredible sacrifices for the
State of Connecticut by putting on a badge and, and protecting
the citizens of our state are still targets even after they
retire. So this amendment simply adds retired officers to that
list.

Thank you, Madam President.

THE CHAIR:

Will you remark?

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I rise to oppose the amendment. The intention of the exemption is for active members of police departments and the military. The exemption that you're talking about would allow them to purchase or import high-capacity magazines as retired members, so we do not want to endorse that. I understand your respect for their service. We have great respect for their service, and that's why we have an exemption for active members of police departments in the military.

THE CHAIR:

Will you remark?

Senator Kane.

SENATOR KANE:

I would ask for a roll call vote, please.

THE CHAIR:

Thank you. Will you remark? If not, Mr. Clerk, will you call for a roll call vote? And the machine will be open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators return to the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

If all members have voted, if all members have voted, the machine will be closed, and the Clerk will call the tally. Please, please.

THE CLERK:

On Senate Amendment Schedule "F" for Senate Bill 1160,

Total Number Voting 35

Necessary for Adoption 18

Those voting Yea 12

Those voting Nay 23

Those absent and not voting 1

THE CHAIR:

Amendment fails.

Senator Kane.

SENATOR KANE:

Well, you didn't have to bang that so hard, Madam President.

THE CHAIR:

I wanted to wake you up, sir.

SENATOR KANE:

I, I would, if you'll indulge me, I'd like to offer another amendment.

THE CHAIR:

Is that a question?

SENATOR KANE:

It's a promise.

THE CHAIR:

Please proceed, sir.

SENATOR KANE: If, if the Clerk would call LCO 5475, and I'd be allowed to summarize.

THE CHAIR:

Mr. Clerk.

THE CLERK:

LCO Number 5475, Senate Amendment Schedule "G" offered by
Senator Kane.

THE CHAIR:

Senator Kane.

SENATOR KANE:

I move adoption.

THE CHAIR:

Motion is on adoption. Will you remark, sir?

SENATOR KANE:

I will. Thank you, Madam President.

This amendment comes to me from a constituent of mine who is
very knowledgeable on this issue and on the Second Amendment
and, and the different guns that are out there. And it was
actually very interesting meeting with this gentleman many
times, because he provided me with a great deal of education on
this issue.

The idea, Madam President, if you look at Sections 54 through 56
of the bill, it talks about safe storage. And what we've done is
we've added individuals who may not be legally able to possess
a, a weapon and if you know of someone who is possibly a felon
or what have you. So I think the idea for all of us, right,
around this circle, is we want safety. We want more people to be
careful, mindful, and protective of their guns. So what we want,
ladies and gentlemen, is more safe storage.

Now in the bill, it says what a person would consider, consider
reasonable. And we talked about this in caucus, and we says,
well, if you have a, a two-year-old, then you could put it up on
a shelf, you know. But in my mind, maybe that's not reasonable.
Maybe to you it is. Maybe to the next person it isn't. What I
would like to see is individuals go out and buy safes and safe
storage and lock these weapons up if they are in possession of
them, because we know how many accidents happen.

However, that is quite a burden on these individuals, because
these safes, this storage, lockboxes, if you will, cost hundreds
of dollars if not thousands of dollars. What this amendment

would do is provide incentive for people to go out and purchase these safes by giving them a tax credit on their personal income tax return.

So we're going to say to you, John Q. Public, we want you to be safe. We want your children to be safe. Please go out and get us a lock box or some kind of safe, store it properly, and we will give you a tax credit, a simple tax credit on your personal income tax return that will create a great incentive for more safety. After all, that's why we're here today, is to provide better safety for our constituents in the State of Connecticut. And when it does come to a vote, I would ask for roll call.

Thank you, Madam President.

THE CHAIR:

Thank you, Senator Kane.

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I again rise to oppose the amendment. Folks who have dangerous weapons also have responsibilities to safeguard those weapons. And it's not appropriate to ask the rest of the people of the state to pay for that through a tax exemption. So, Madam President, I would oppose this.

I would also further note that the way the lockbox is defined is also vague enough to include someone's safe for not just firearms but for all sorts of other valuables. Madam President, this is the wrong road to go down, and I would oppose the amendment.

THE CHAIR:

Thank you. Will you remark? Will you remark?

If not, Mr. Clerk, will you call for a roll call vote, and the machine will be open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators, please return to the Chamber. Immediate roll call has been ordered in the Senate.

THE CHAIR:

Have all Members voted? All Members have voted. The machine will be closed.

And, Mr. Clerk, will you call for the tally, please.

THE CLERK:

On Second Amendment Schedule "G" for Senate Bill 1160,

Total Number Voting 36

Necessary for Adoption 19

Those voting Yea 12

Those voting Nay 24

Those absent and not voting 0

THE CHAIR:

Amendment fails.

Senator Kane.

SENATOR KANE:

Thank you, Madam President.

I did want to offer a couple things that I thought would make the bill a little bit better. Obviously, we can continue those conversations as the session moves on. As everyone in this circle, I have had many, many meetings on this subject.

And, in fact, you know, I tell my, my daughter, who's six, when she asks, well, where are you going today, because I, I went on Sunday morning, I went on Saturday morning, I, I've been all over the district, and she said, where are you going? I said, to another meeting on guns? And I said, yeah. My daughter recommended that all guns be replaced by Nerf guns. So that's her recommendation. And it's not a bad idea, but --

THE CHAIR:

Is that an amendment, sir?

SENATOR KANE:

Yeah, yeah, I, I would, I would like to make that amendment. But in, in all honesty, it has taken all of us away from everything that is, is taking place in, in the Legislature, the, the budget and all the other bills that are taking place during this Legislative Session. And, of course, it's important that we be here today and that we solve this issue once and for all so we can maybe start looking at the budget and the budget deficit that we have.

As you know, I serve a nearby town, and, and Southbury is part of my district, which is a neighboring of Newtown. In fact, I have a bill in the Public Safety Committee that just got out of the Public Safety Committee in regards to active shooter incidents and the communication that takes place between police departments. And I think it will go a long way to help police departments respond to these type of incidents.

But you also know, Madam President, that my wife is a clinical psychologist. And she was in Newtown right from minute one. And she got a call at her organization that said there was a gun at a elementary school. And not knowing what is taking place, she went down there, because she thought maybe a, a child had a gun, or there was an incident of a person with a gun. And she was there to provide counseling and support to the children, to the teachers, to the families.

When she had gotten there, she had no idea what was taking place but certainly spent the day, Senator McKinney, yourself, Governor, and was assigned to one of the families of the victims. And she stayed there Friday until 3: 00 in the morning and went again on Saturday, went again on Sunday, was there all week with this family that she was assigned to with a state trooper and a person from the clergy, and that was another thing I had to educate my children on. Why, why isn't Mom home on the weekends? She never works on the weekends. Where is she?

So she spent a great deal of time in Newtown with the families of this tragic event. She also spent a great deal of time with the teachers and the first responders subsequently and has recently been down there as this past week. And it's been a very difficult situation in our household, certainly, because of the

type of response that her and her team have given to the people
of Newtown. So I've struggled with this since December 14th.

And as a lot of people mentioned, we were here doing the deficit
mitigation, and all you knew was what you saw on the news. And,
but what I did was I agreed to meet with people on the issue.
And I agreed to meet with members or constituents of the 32nd
District and even beyond sometimes, whether it be locally or
here or wherever. And I wanted to educate myself on the bill,
because I don't want to just look at it from an emotional
standpoint, but I want to look at it from a logical standpoint.

And one of the biggest things I've heard from many people is
that we need to enforce the laws that we currently have, because
many, many crimes are committed by people who do bad things and
are bad people, not the good guys who are law-abiding citizens
who want to protect their family or protect the Second Amendment
and protect their rights. So what we need to do is start looking
in the mirror and start looking at the laws that we have in
place, and why not make sure that we enforce those laws to the
nth degree?

The last thing we want to do here today, ladies and gentlemen,
is give people a false sense of security that once we slap this
paper down, that's it, there will be no further Newtowns, there
will be no further Virginia Techs, there will be no Columbines
and what have you. That's not true, because you can't stop evil,
and you can't stop evildoers. So whatever we do here today,
let's not pretend to the public of the State of Connecticut that
we have solved the issue, because I don't believe we have.

When we talk about the issue of guns, we took action, right? We
said, all right, we're going to ban this, do this, do this, do
this. When we talk about mental health, we created a task force.
And let's talk about the real problem in the State of
Connecticut and in the United States of America. It's the
societal problems that we have in our families and in mental
health with a whole host of different issues.

So rather than we take action on one particular portion of this
bill, let's take action on all of it. Let's talk about the real
issues that are affecting our society and why we are going in a
direction that none of us would like to see. I, I participated
on the Mental Health Subcommittee, and I appreciated what
Senator Harp said and how we sat there for 12 hours, and it was
well-participated.

But did we go enough? Did we do enough? You know, did we really attack the problem, which is the mental health in our state? We need, as Senator Linares stated, to be funding more programs and to be not looking at cuts in social services or certain areas that we can really help. So instead, we're going to say, we're going to ban this, ban this, ban this, because that's the real issue. It's not, folks. It's not.

The real issue is our society and how far it has dropped and where we're going with it. So let's not kid ourselves. Let's make sure that the way we prevent another tragedy is to, by really looking at the, in the mirror and looking at society as a whole.

So for those reasons, Madam President, although I can tell you that my wife certainly won't be happy with my vote, but I will tell you that I don't believe we've done enough in mental health to solve this problem, yet, are looking at one portion and not the whole thing. Thank you.

THE CHAIR:

Thank you, Senator Kane.

Senator Harp.

SENATOR HARP:

Thank you very much, Madam President.

I'm sure you know that I stand to support this bill, but I, I want to talk a little bit about experiences that I had as a child. When I was eight years old, I had a classmate who sat a couple of seats behind me in the opposite row. And in my school, in the third grade, they wanted kids to dance with each other. And there was only one person who would dance with me, and that was the guy that sat behind me in the row. His name was Myron Hanson.

And so Myron Hanson was a, a lot taller than me, but most people probably were at that time, a hazel-eyed kid with spiky blonde hair, I guess a crew cut. That's what kids had back then. And he was also one of the kids who would play with me on the playground, so Myron was someone that I knew. We talked about, we had a lot of fun with our group of friends.

So one day after a long weekend, I came back to school only to learn from our principal who came into our classroom to tell us that Myron Hanson had been killed. And he had been killed accidentally, because he and his cousin went into their grandfather's house and got the hunting rifle that the grandfather had, took it into the barn and were playing with it, and he was accidentally shot and killed.

And so the thing that I remember the most about the third grade, the only name I remember is Myron Hanson. And so I know that we've heard about the families. They will be traumatized. But what I think about are all of the children in that school who knew one of the children, who knew those teachers. They will be my age decades later seeing those faces, remembering those names.

And I've got to tell you, one of the things that I learned in doing the mental health task force is that there are these things that they have now identified called adverse childhood events. What happened to our classroom with Myron Hanson was an adverse childhood event.

They basically say that if you have, and those are traumatic events, if you have more than three of those before the time you become an adult -- and they've studied this with actually middle-class populations in California -- they have discovered that people who have had more than three -- if you think about how many you could have in a lifetime before you're an adult -- that you are more likely as an adult to have a chronic illness, that your life expectancy is shorter and so that these traumatic events are really, really important.

And as a society, we have not figured out yet how to deal with them. But I've got to say that like Senator Kane's wife, there are so many of our child guidance clinics that have been in Newtown helping the families but also helping the children who have suffered through and will suffer through for the rest of their life this experience. So I just want to set that aside, because this is something that will live with them forever. And those are names and faces that they will remember forever, I know.

I wanted to just say something about guns. And I know in our caucus -- and we heard this at the hearing turned in another way -- that -- and I think Senator Williams shared this story -- that right around the time this happened in Newtown, there was a

person who went and attacked a classroom full of children in China with a knife. No one died.

What we learned is that of all the gun deaths in the nation, most of them are not homicides. Only a third of them are. Two-thirds of them are suicides. And they are not the people that we think of as sick in the same way that the shooter in Newtown was sick. These are people who are depressed. And as you know, depression is something even, that is very difficult to get help for in our state.

And the thing that makes guns different, we learn, is the lethality of them. You know, you can be a cutter, and you can survive from that, but if you shoot that gun accidentally, as my friend Myron shot that gun, it is lethal. And so it really is something that ought to be respected. It is a privilege that ought to be respected and handled with care.

Now about five years ago, we -- and I guess it started as long ago as eight years ago -- we engaged in an effort to raise the age of juvenile jurisdiction. What did we learn during that time? We learned that Connecticut did not have an agency or a system of mental health services for 16- and 17-year-olds.

There was not one agency that was responsible for that. The Department of Mental Health and Addiction Services was responsible for people who are 18 years and over. The Department of Children and Families largely took care of children up to about 15. So you had this gap that existed until, I guess we actually just implemented the 17-year-olds recently. And so there was no mental health delivery system for them. There still isn't now.

During the hearings, and I think a lot of my colleagues were really shocked to find we were one of the first states in this country to implement mental health and substance abuse parity. And it was, when we debated that, there were those who said to us, be careful what you ask for, because you may lose access to mental health care. And the reality is that we did.

And one of the things that this bill is trying to do is to assure that what we thought we have we will actually have, because it was said time and time again during the hearing that you had to almost make yourself poor to get access to the best mental health services. They either occurred in the Department of Mental Health and Addiction Services or in DMHAS. The things that helped the most commercial insurance won't pay for.

The other thing that we learned was that because there's no real place to get paid from, we don't have adequate numbers of child psychiatrists. And that's why you see the access mental health initiative in the bill. So, yes, we have a long way to go to build an adequate mental health delivery system. There are a lot of reasons for that.

And, yes, there were cuts in the proposal that was made to us, but we can together do something about that as that bill rolls forward. And, yes, there was not a lot in this bill, but there are opportunities to begin to embellish that system as we move forward on the budget.

But what is important about this bill is that it represents to the people, to the children whose lives are forever changed, the ones who will live this, with this for the rest of their lives, that we intend to ameliorate the conditions as best we can.

Is it perfect? Absolutely not. But does it reflect our care, our concern, and our worry for the people of this state? Does it reflect our concern for their safety? Does it reflect an intent to build a system that is fragile at best? It does. And I would say to you that vote with me on behalf of the children who will live with this horrific scene in their mind for the rest of their lives.

THE CHAIR:

Thank you, Senator.

Senator Osten.

SENATOR OSTEN:

Thank you, Madam President.

I find myself today in a quandary. I plan on voting no on this piece of legislation. And I've thought about it ever since December 14th knowing that I had been elected and would be sitting in this room with legislation that would try to address a tragedy that happened to children.

And I would very much like to say that the package before us here today would make changes so that no one would have to see another dead six-year-old, that no one would have to respond to a tragedy as significant that happened down at Sandy Hook. But

this legislation does not provide that protection, in my opinion.

It puts at risk legal gun owners, the constituents in the 19th District, many of whom have reached out to me in rural Connecticut. It puts at risk those people who purchase weapons for their own use whether through hunting or in competitions or just as hobbyists. And they have that right by our Constitution. The Second Amendment in Connecticut's Constitution is clear that people have the right to bear arms.

I forever fight for the rights that are implicit in our Constitution. Freedom of speech and freedom of religion are two that I also hold very dear to my heart. We have already enough rules on the books today. Some of you may not know it, but I worked in the Department of Correction for 21 years. I saw people come back year after year after year. They plea bargained away the gun charges that were already put against them.

We can create a registry of those who commit crimes with deadly weapons, but if we don't find them guilty of weapons charges, the registry will remain empty. It's terrible to sit, stand here today and say that there will be children who will forever have effects against them. This is not a new phenomenon.

We have children and families that are being damaged every day in, in our urban cities, and today, this piece of legislation does nothing to stop handguns and young men from killing other young men. I'd like to stand here and say that we're going to correct all the ills of the world with those who use weapons illegally, but I believe that this piece of legislation attacks the legal gun owners and those who have them for their own protection.

We have a clear problem with mental health in this state that we have not addressed for years. And while this holds a little bit of promise for something to happen in the future, the problem is expensive. We currently use our prison system every day to house those that judges cannot find another place for.

As a matter of fact, about 20 to 25 percent of the inmate population is chronically mentally ill. Because we have no other spot for them, we have our correctional officers and those in, those staff who work there handling people with mental illness on a daily basis. And if our population is in the 20,000 range, that's 5,000 people.

I would very much like to say today that what you have crafted
here -- and I know you worked very hard on it -- it's clear that
people put their minds and their hearts into this legislation --
but I do believe it gives people a false sense of security here.
I don't think it stops those people who have chosen to act out
badly.

Adam Lanza and his family were troubled. We ignored that for
many years. Other people knew that family was troubled. It's
clear just by the report that they knew that family was
troubled. Adam Lanza was the one who killed those 20 young
children and those six adults. He's the one we should hold
accountable today, not the legal gun owners in this state.

There are things in this bill that I could support, but there
are many things in this bill that I cannot based on what my
constituents have said to me. People have a right to bear arms,
and we already have enough restrictions on them, and we do not
need any more. I also cried when those young children died that
day, as every one of us around here did.

And if I could assure those parents that this legislation would
stop it from happening again, I would vote yes. That is not the
truth. I look forward to working with this body as we move
forward to stop plea bargaining of gun charges so that we can
hold those people accountable over and over again.

I'm very proud of standing here today. As a Vietnam era veteran,
I'm so proud of our country, but I also know that we protect our
company, our country with that very basic right, that right to
bear arms. I've sat here today and listened to everyone that's
spoken, and you've all spoken from the heart. I also speak from
the heart, and I believe with all my heart that this is not the
right way to go. I think this bill should have had another
public hearing so we could have heard yet one more time with
exact language what people needed to say. It would have been a
week or so more. That's not a bad thing.

We can't make our schools into prisons. We want our children to
flourish. We don't want them to be afraid to go to school. I
worked in that prison environment for 21 years. I think that you
can make our schools safer. Please don't make them into prisons.
They'll be impacted, as I have been, as all my colleagues have
been that worked in that system.

I, today, stand in opposition to the bill here, as I have said
all along I would, representing the constituents in the 19th

District, representing those legal gun owners, representing
corrections officers and police officers from around the state
who have contacted me and respecting each and every one of you
for the opinions that you hold. Thank you very much.

THE CHAIR:

Thank you. Will you remark?

Senator Witkos.

SENATOR WITKOS:

Thank you, and good evening, Madam President.

I want to preface my remarks by offering my condolences once
again to the families of the Newtown victims and not only to the
families of the Newtown victims but to the victims of everyone
who's suffered a needless loss to gun violence in our big
cities, which we hear about almost on a weekly basis.

I'd also like to offer my, my thanks to all the members of the,
the different task forces, the working groups. I think they
carried out their duties with dignity, countless hours listening
to testimony from everybody that came to Hartford and down in
the town of Newtown. I'd also like to offer thanks to the
leaders and the time that they put in negotiating the final
aspects of the bill.

It certainly was a struggle to try to achieve balance. And the
balance I talk about is the balance of making sure that we do
something productive in the State of Connecticut while guarding
the rights of others. I'd also like to thank the manufacturers
and the citizens who took days off from work to come up and
testify numerous times.

Imagine, it's not something to gloat about, what did you do on
vacation? Well, I spent my day at the State Capitol two and
three times testifying in front of a legislative panel. I,
myself, served on two of the working groups, School Safety and
Gun Violence. I also sat through hearings on the Public Safety
Committee. But I didn't think that was enough, because I didn't
see a lot of my constituents here.

So I held my own gun hearing in my district. It went for six
hours. And I sat across the table from my constituents, giving
them the opportunity to speak to me and speak their mind. I also

received over 7,000 e-mails since December 15th on this topic from in-state residents and over the past two days over 100 phone calls. But all of this is in the name of good government, I would say.

But what I find to be distasteful are the comments of folks that say, ignore the people on the fringe. We're saying to ignore the people that we were chosen to represent here in Hartford, and I don't believe that's right. All they're asking at times is to see and read the bill. And I ask you, is that too much to ask for?

I know we can say we've had a public hearing on different parts of the bill, and it's been in through different committees. But the sum of the parts don't necessarily mean the whole of the bill. It could be taken out in a different context.

So I thought personally that Senate Bill 1160 should have been out there for the public to read its, in its entirety and offer comments too. I wouldn't have minded another 7,000 e-mails, honestly. But when I read through the bill, and I did read the bill, I thought the root cause was barely mentioned, and that was mental health.

Yes, we formed a task force to look at some case management of up to 100 people in probation. And we created a consultation and care coordination program. But we didn't get to the two words that I felt were so prevalent in all the hearings, which was access and control. From speaker to speaker to expert to novice, it was all about access and control.

We did a couple access and control items. We created a safe storage provision in the bill, and we offered a five-year look-back for, of mental health illness, but that's it. I wish we could have done something on psychotropic drugs. I wish we could have done something to work with a task force with our federal legislative delegation to loosen up the HIPAA regulations so our agencies can talk to each other, so if somebody is aware of something that's happening, they have the ability to communicate that.

As I said, I sat down face to face with my constituents for over six hours. And as they came up to the table, they said, I want you to oppose everything, some people did. And I said, well, let's wait a minute. Let's talk about somebody just opposing everything. Do you support universal background checks? Well, yes, I do.

What about if you, if we created a, the provision that's in the
bill that says you have to show an identification to buy
ammunition, because what I'm told, the big mayors, the big-city
mayors that came up said that's the problem in their inner
cities. They buy the guns on the black market, but they don't
necessarily get the ammunition. So if we can control the flow of
the ammunition, maybe we can prevent some of the inner city
deaths.

And as I explained myself, they said, well, I, I guess I can
support that too. And then we were going down through the items,
and they said, well, we can support that. So I said, there is
common ground, but we just need to give them the opportunity to
have that conversation.

And then somebody said to me something that I hadn't thought of
from that perspective before. It was about technology. They
said, Kevin, how many people do you know use wooden golf clubs
on the golf course anymore? Well, they're aluminum. How many
people use a wooden tennis racquet? That was graphite. How many
people ski with wooden water skis? Those are fiberglass.

And then I said, well, you know, obviously, the next question
would be, well, those don't kill people. They said, well, Kevin,
automobiles, they used to, when they first were created, they
used to run ten miles an hour. Now they can go 150 miles an
hour. And drugs, years ago, it was marijuana, but now it's crack
cocaine.

And, yes, even guns have evolved with technology, from the
single-shot black powder musket to today's modern sporting
rifle. You know, it changes so quickly. When I started in law
enforcement 28 years ago, I carried a six-shot revolver with
double speed loaders. People probably don't even know what a
double speed loader is. And when I retired, I was carrying a .
40-caliber semi-automatic Smith and Wesson.

Nobody can foresee the future, because we don't know where
technology is going to bring us in ten to 15 years from now. But
this bill attempts to address that through cosmetic limitations.
And I ask you, if you happen to put makeup on, when you look in
the mirror, you begin the makeup process, you know what it does?
It changes your appearance, but it does not change who you are.

And that's what we're attempting to do here with the limiting of
the cosmetic features on these weapons. If you use the same
caliber of bullet, excuse me, if you use the same caliber of a

bullet, you'll have the same velocity and the same penetration.
The only thing you're changing is what it looks like and how you
hold it.

The bill further attempts to limit gun ownership. And I say to
you that your actions and the actions of the media have caused
gun ownership to increase. How often do we see on the 6: 00 news
lines at the gun stores and the retail outlets and the empty
spaces on the shelf? That's a direct cause of the action of this
Legislature.

During my hearing I had in my district, I had a manufacturer
come up to me and said, you know, Kevin? He goes, I manufacture
the springs in these magazines. I've sold more springs in the
past four months than I have in the past four years, because
there's a buying spree, because people are afraid. The lines are
being created by law-abiding citizens, because criminals don't
wait in lines, nor do they follow the law.

You know, I asked the tough questions of both the opponents and
the proponents during the public hearings to see if what we did
would have any impact. And sadly, both sides agreed that it
won't. Ownership without banning allows the magazines to stay in
the population. And requiring only ten rounds in a 30-round
magazine focuses on law-abiding citizens, something that we all
know a criminal will never, ever follow.

In closing, there are a lot of great things in the bill, and I
wish I could be casting a yes vote today. And it's the two
issues in the bill that I have difficulty with, and those were
the two issues that took the longest time, I believe -- though I
was not in the room -- that caused the negotiations to get us to
where they are today. And that is the assault weapon expansion
and the high-capacity magazine.

And during my time in my hearings, people would come up to me
and say, where do you stand on the Second Amendment? And I'd
say, well, what do you mean? And more people carried around a
pocketbook of the Constitution. They'd flip to open a page, and
they'd start reading the Second Amendment. My comment to them
were, don't tell me something from 1791.

Look to the most recent case in 2008 in the Heller versus D. C.
case, because it was the United States Supreme Court that
analyzed the Second Amendment and offered an opinion. And in
their opinion, they said that the government has the right to

say who can own guns, where they can carry them, and what types of guns can they carry.

So they had me thinking, well, maybe I will be supporting this bill, because if that's the most recent ruling, it's not an infringement upon the Second Amendment rights of our citizens that is so profoundly spoken. But then I started doing a little research, and I found out that as recent as last Friday there's over 1. 28 million guns registered in the State of Connecticut.

And those are only the number of guns that are registered, that there are many, many long guns that were purchased that never had to be registered. So I would, I think it would be fair to say that it would probably be closer to two million. And somewhere during the hours and hours of testimony, I heard that there were 154,000 AR-15's.

So I thought to myself, if there's 154,000 AR-15's registered in the State of Connecticut, maybe five percent, how, how does that dovetail into what was ruled in the Heller versus D. C. case? Now I told you they said they, they can state who has them, where they have them, and what types.

But it went on further to say the who are the folks that are convicted felons and folks with mental illness, the where, government has a right to create gun-free zones in our schools, in our municipal buildings, and on the what types, government has the right to ban guns that are not in common use at that time. That's where my difficulties lay. Is five percent considered common use at that time? I probably could go either way on that one.

But the one part that I could not overcome was the high capacity magazines, because I know that almost every handgun and every long gun that can be sold has a magazine capacity greater than ten. And it has been around a long, long time. Therefore, that I consider to be in common use.

And I believe by us passing this bill today, we are creating a direct violation of the Constitution. It was said that the tree of liberty shall be pruned at times to make it stronger, but I say to you that once you start pruning the roots of the tree, the tree of liberty will suffer a withering death.

Thank you.

THE CHAIR:

Thank you, Senator. Will you remark? Will you remark?

Senator Fasano.

SENATOR FASANO:

Thank you, Madam President.

Madam President, I debated whether or not to speak tonight, and, because we've been here for so long, but I'm going to approach this perhaps in a little different method. And this is the reason why I have decided to speak.

Madam President, when the Newtown issue tragedy struck our state, we began to be polarized literally that day and days after. People were clinging to sides and talking about these gun issues before we even had the chance and the opportunity to mourn those that were lost at Newtown. And as time went on, we did mourn, but then there came time that we realized, and all of us in this circle know that everyone is going to be looking at us, State of Connecticut, the Legislature, to determine what to do.

And what it seemed to me was happening was in Washington, D. C. , they were doing nothing. There was a lot of finger pointing. There was a lot of discussion and press conferences, but there was no talking. There was no communicating. And I think it what's abundantly clear to this Legislature is we need not to follow what Washington did, and that takes courage. That takes courage.

The leaders of the Senate, the leaders of the House, the six leaders, got together and said, at the very least, let's start with a public hearing, and let's do it bipartisan and see what we have out there and listen. And then from those parts, Republicans and Democrats, core beliefs on all sides, let's see what we can put together, if possible.

And after the public hearings, now some may argue that when we had those hearings -- and I was not part of those committees except for the, when we went down to Sandy Hook -- but some may argue, well, that's your job to be in those hearings. And I, I, and we're elected. That's what you voluntarily decide to do.

I agree with that in part, but I would suggest an argument can be made that many folks around this circle and in the House went above and beyond the call of duty to stay 14, 16 hours during a

hearing to hear every single person that came to speak. And for those Legislators and all, most of us in the circle who did that, I think that's important. And they didn't just disappear. Legislators sat there through those hearings taking copious notes so that they could formulate ideas, which they gave to leaders.

The bill we have in front of us is a culmination of that, but there were other steps, because when those ideas got to the leaders, the leaders had to decide what they were going to do. And their choice was either stay with the core beliefs that could bifurcate a nation and started bifurcate our state or try to find common ground, which means certain core beliefs would have to be left to the wayside.

And I congratulate the leaders, because each of them, to be at that table, had to give up something they believe in to reach a common ground. Is this the perfect solution? No. Are you ever going to draft any legislation that's going to stop another Sandy Hook? I suggest never, no matter what you do. Unfortunately, it's the society that we live in, and it's sad. It's sad we're even having a conversation about 20 kids being killed in a school, sad.

But to reach common ground, you have to have the will to say, we have to unite the state, and we have to bring essential values together, and that's what these leaders did. Now there are a variety of amendments around this floor. And part of reaching a compromise is to be devoted to that work ethic and that compromise.

I voted against a number of my colleagues' amendments. Had it not been on this bill, I would have supported my colleagues' amendments. But when leadership and others give their word that they're going to support a bill that brings a common ground to this Chamber, then you cannot say, but I will support amendments to that common ground.

So I voted no on those amendments, because we came to a conclusion. Once again, it's not perfect, and that's why I voted against those amendments, not that they were not good ideas, not that they did not have validity, but in this building, you have one thing, and that is your promise and your word. And if you don't have that, you have nothing.

This bill is going to get criticized by many for a variety of reasons coming from a variety of levels. One thing they can't

criticize is our work ethic, our ability to listen to our
constituents, take in what we heard, and for our leadership,
House, Senate, Democrat, and Republicans, to be able to come
together and work on probably one of the hardest if not the
hardest problem to face -- I'll talk for myself, for me -- for
the last 12 years and I would suggest for this Chamber in who
knows how many years.

We can disagree, because that's what this Chamber is about. If I
had a criticism, I do agree that the mental health issue, which
is complicated, and we are doing a task force on it, has to come
through at the end of the day. Are we going to find some
glitches that have to be fixed? Yes, we will.

Some people we, said we went too fast. Others say we went too
slow. Without a doubt, there isn't a person in this Chamber who
can't say we felt pressure to do something. And that pressure
mounted, and we did the best we could. So, Madam President, I
plan on supporting this bill. I think it's the right thing to
do. Thank you.

THE CHAIR:

Thank you, Senator Fasano.

Senator Looney.

SENATOR LOONEY:

Thank you, Madam President.

I'm rising to speak in support of the bill. Madam President,
parts of this bill are a culmination of 20 years of debate and
discussion dating back to the original assault weapons ban that
was passed in 1993. And, of course, the issue of assault weapons
is only, is only a part of what's in this comprehensive package.

Some of the provisions of the bill were actually approved by
this State Senate in 2001, including adding the Bushmaster
assault rifle that was used by Adam Lanza at Sandy Hook school,
adding that weapon to the list of assault weapons that are
banned from future sale or required to be registered. That was
in that, in that bill, as was the ban on large capacity
magazines.

That was a, a bill that many of us were proud to support and the
State Senate passed in 2001. Unfortunately, it was not passed by

the House of Representatives that year. But that was also a
bipartisan vote, just as we are hoping to have a bipartisan vote
this evening. And Senator McKinney showed great leadership then
in supporting that bill as he has shown throughout this whole
process in working for consensus on this one.

Then Senator Nickerson, Freedman, Gennaro, and Aniskovich were
all supporters of that, of that bill, and it was a, a strongly
supported bipartisan bill in the Senate. Other provisions in
this bill are, are more recently advocated, and that is the, the
issue of the Violent Weapon Offender Registry, which has been
pushed by a number of urban Legislators for several years at the
request of urban police chiefs, the expansion of the permit
process for ammunition and for long guns, as well as universal
background checks.

These are issues that have been debated for several years in one
form or another in the General Assembly and have come forward to
be included in this, in this comprehensive bill. In addition, in
terms of the, the discussions of the, of the six leaders after
the conclusion of the work of, of the task force, I certainly
wanted to second what Senator Fasano said, that there was a, a
great deal of good will and genuine good faith in all of those
discussions.

And, certainly, as I said earlier, Senator Williams deserves
enormous credit for his leadership in keeping us on task as does
Speaker Sharkey and, but Senator McKinney and Representative
Cafaro I think also deserve great credit for their work in that,
in that process, the, the willingness to find consensus, the
willingness to, to move from, from prior positions, the
willingness to look for common ground. All of us worked
together.

My counterpart, Representative Arasimowicz, the House Majority
Leader, and I, we're also very proud and very pleased to be part
of that, of that process. And it was one that when we finally
came to conclusion, we were, in fact, proud of the result and
hoping that we would have a result here that would be a model
for the nation, a model of bipartisanship and not reflecting
the, the very destructive divides that we see in other states
and in the United States Congress.

Much discussion has been made this, this evening of, of the
mental health portions of the bill and the fact that, that some
of it relates to a, a study of the, a task force with a special
focus on 16- to 25-year-olds to study Connecticut's mental

health system. And that is true, there is that task force, but there are also substantive provisions in the bill that address mental health as well.

Requiring the insurance department to evaluate and report on its method for determining compliance with state and federal mental health parity laws, that is a, that is a requirement, not just a, a subject of future study. Requiring that certain mental health and substance abuse services be considered urgent care requests and shorten the review time of those from 72 hours in current law to 24 hours, that is an important change, also instituting a more robust definition of clinical peer with regard to the review of mental health and substance abuse services to ensure that the health professionals who review the claim have similar qualifications to the health professional who prescribed the treatment, also designating disorder treatment criteria for mental health and substance abuse so that coverage decisions are, in fact, more consistent from carrier to carrier, and consumers are given a clear reason for a denial when there is a denial, requires insurers also to inform consumers that they have the right to appeal a denial and that they can request additional information and can contact the Office of Health Care Advocate for assistance.

In fact, Madam President, one of the, the commentators on the mental health portions of the bill was our health care advocate, Victoria Veltri, who described this as a very strong and bold piece of legislation that includes many more protections for consumers than ever existed before in the state, she said. And she also added that the bill adds a level of transparency that never existed before.

So this is a very important step forward, not just, in effect, a, a promise for future study but a substantive change that we are all looking to implement now. So this is a very important bill on so many fronts, Madam President, that, that I certainly am, am proud to support this evening. I think it is historic legislation for our state and for our nation and urge support of the bill this evening.

And one final, just one final note, Madam President, a word of special thanks and commendation I think should go to, to Joel Rudikoff, our counsel who has been working on these issues for so many years, was a, a advisor to then Majority Leader George Jepsen on the, on the, the 2001 legislation.

And obviously, there was a, there was staff of all four caucuses
in the meetings with the, with the six leaders, but, but Joel,
in so many ways, was the, was the key person in terms of staff
because of the fact on the, on the gun-related issues that he
has been living with this and working with this for, for so
long.

So, so, Madam President, on so many fronts, this is an important
bill that we need to support this evening that comes to us out
of the terrible, the crucible of the tragedy of Newtown. But it
is something that gives us something of which we can be proud
not only of the end result but also of the process that got us
here. Thank you, Madam President.

THE CHAIR:

Thank you, Senator.

Senator McKinney.

SENATOR MCKINNEY:

Thank you, Madam President.

Madam President, like many in this circle, perhaps downstairs in
the House and around the State of Connecticut, as I stand here
today, I'm brought back to December 14th. I started that morning
going to a meeting in Bridgeport, actually, I'm sorry, in
Fairfield, with a group of nonprofits from Bridgeport and the
Greater Bridgeport area about concerns they had over some budget
cuts.

And after the meeting, I got into my car and saw a news alert on
my phone that there had been reported a shooting in a school in
Newtown, Connecticut. And for some reason, I turned my car
around and headed up to Newtown.

Other things have happened during the 14-plus years I've been
fortunate to serve in this Senate, but I've never driven to that
type of an event. When bad things happen, I think it's best for
elected officials to stay away and let the public safety
officials do what they need to do. But there was something that
told me I needed to go.

When I arrived, the scene was unlike anything I had ever seen
before, and I parked my car in downtown Sandy Hook, because the
police had blocked off streets. And as I, not running, but

walking fast up to the firehouse, parents were walking by with their children, some holding them, some holding their hands, many crying.

I got to the firehouse, and the first person I saw was Pat Llodra, who's been a friend for many years and is an incredible woman and the first selectman of Newtown. And she informed me privately off to the side of what was the initial report given to her from the public safety officials, which was a conversation I won't forget. It was actually an initial report that was worse than what happened. But I knew then that my life had changed, as had so many others.

And seeing the parents that day, parents who had reconnected with their children and then parents who, who did not, the teachers and school administrators who were in the firehouse, state and local police officers, volunteer and professional firefighters, emergency service personnel, EMS from all over the State of Connecticut, clergy from all different faiths but especially Father Bob, Monsignor, Robert Weiss, as Senator McLachlan mentioned, and just the community of Newtown and then my phone ringing off the hook and text messages from colleagues around the circle and in the House.

I said the other day in Danbury, and I'll say again, Mike McLachlan has been a second state senator for Newtown since December 14th, and I appreciate his words and, and more his prayers for the people in Newtown. And since then, I've been working, as have others, especially with my colleagues in the House, Representative Hovey and Representative Bolinsky and Representative Carter, yourself, the Governor, and others, to see what we can do to heal that community, if we can do anything, what we can do to make Connecticut safer, and what we can do to hope that this is a one-time event that never happens again.

I've said that this issue for me is something that should be and is above politics. We have all talked, and I, I have not been shy in the past in this circle about talking about my frustration with the partisanship of our politics today.

We are all elected to come to our government to see what we can do to make Connecticut better. And we all come representing diverse citizens across the state with different ideas and different ideologies. And no one should put their principles down, but everyone should try to work with each other to see if we can find common ground.

And I'm proud that we've done that on what is in my 14-plus years the most important issue that I've had to deal with. Keeping people safe, protecting our citizens, is a core function of what we do, and that's what we're trying to accomplish in the bill before us. And I also hope the message that we can send -- if those outside the walls of Connecticut are listening -- is to encourage them to do the same, encourage our elected officials in Washington to put aside the politics and try to see if they can work with one another to find some common ground.

I have been, not surprised, heartened by the immense citizen involvement in this issue. I have received more e-mails and phone calls and text messages, I think. Starting on Monday, I've received over 500, 600 text messages alone from people advocating their positions. We've had 63 hours of public hearings, 34 hours alone on gun-related bills. I don't know if we've ever had that many hours of public testimony on any one issue in the 14 years that I've served here.

Most heartening is all of the first-time, I'll call them first-time activists on both sides of the issue. I can't tell you how many people have, have met with me or talked to me or called me and said, I've never called my state senator before. I didn't know who my state senator was. But I'm doing it now. I have to. I feel compelled. This is so important to me.

And to all those, people on both sides, I say two things. One, thank you, thank you for bringing your voice to us as your elected officials. And secondly, keep paying attention. Keep paying attention to everything that we do, because it has an impact on how we represent you.

What we have today is a comprehensive package. Many people have said it, and I'll, I, I don't disagree. It's not perfect. But it is a package that attempts to make our schools safer. It is a package that tries to improve our mental health system, although admittedly there is much more we need to do there. And it is a package that tries to reduce gun violence in our society.

The media has focused a lot on the gun violence part of that issue and not as much on the school safety issue or the mental health. I think it is worth pointing out though that in many of the public hearings in the School Security Committee that Senator Boucher chaired and the Governor's Task Force, there were various experts who came forward and said, there are things that we can do that can prevent this from happening again. And

one of the most critical is the threat assessment teams that
we've put into this bill.

So there are measures beyond guns that people and experts have
said, if you do them, you can prevent something like this from
happening. And I think we've done some of those. Many people
today, on both sides but especially those who stand against the
bill before us, have talked about the Constitution and the need
to protect the rights of the citizens of Connecticut that are
guaranteed under our state and federal Constitution. And the
Second Amendment is one of those rights.

The United States Constitution guarantees the right to keep and
bear arms, a right that existed long before the Constitution.
The Constitution didn't create the right. It guarantees that
right. As someone who had the good fortune of clerking for our
state's highest court and was a law clerk to a Connecticut
Supreme Court justice as he sat and made decisions on what our
state Constitution meant and rights afforded under that
Constitution, I know how important that is and with any laws but
particularly gun laws or speech laws or search and seizure-type
laws.

My threshold question always is and must be, will this law
violate that Constitution? And although I know there are people
that disagree, I do not believe this violates either the rights
afforded in the State Constitution or the Federal Constitution.
I don't do that based on emotion. I do that based on studying
and research, reading articles and cases. I've read the Heller
case several times and the Miller case and what they mean.

I also know that there is precedence for things like limiting
magazine sizes to ten and assault weapon definitions. We've had
one in Connecticut since 1993. Other states have had them. New
York has limited magazine sizes to ten rounds for years, and our
country lived with a magazine ban and an assault weapon ban for
ten years. None of those laws were ever seen as violating
constitutions and thrown out.

And I would argue that some didn't challenge many of those laws,
because they knew indeed their challenges would have failed.
That doesn't mean this bill doesn't have burdens on people to
exercise their rights, because there are some. I clearly admit
that.

I've done a lot of town hall meetings. I know we all tend to do
them. And one of the things that, a, a theme that's come through

many of the meetings is that people are very fearful of what
they believe is in the bill or what they believe passing this
bill will lead to in the future more so than what this bill
actually does.

Last night, I spent several hours talking to people about what
was in the bill. And I think many were surprised. Many thought
the bill required them to annually register all of their guns.
It does not. Many thought they were going to be required to
purchase liability insurance. They are not. Others thought the
bill confiscated their guns or magazines. It does not. Some
thought there was going to be a tax on ammunitions that they
couldn't afford. The bill does not do that.

We have heard from our colleagues today, we've heard from
advocates, we've, we will probably hear from people in the House
that this bill doesn't go as far as some would like. And those
individuals get to exercise their rights as elected officials or
as citizens to advocate for further laws if they see fit.

But those bills in the future that may come are not before me
today. And I am voting today on what is before us, and I believe
it is a good package. I, I will close with the reason I stand
here. I, I am blessed, I have been blessed for over 14 years to
be the State Senator for Newtown, Connecticut.

And I've told you all -- and I apologize for repeating myself --
I wake up in the morning, I got the green ribbon and the
guardian angel from a police officer, and I try to put it on my
jacket every day to remember those that we've lost, because I
stand here, I stand here as their voice, as their elected
representative and the 20 children we've lost.

And so today, in making this vote, I want to be the voice for
Charlotte Bacon and Daniel Barden and Olivia Engel and Josephine
Gay and Ana Marquez-Green and Dylan Hockley and Madeleine Hsu
and Catherine Hubbard and Chase Kowalski and Jessie Lewis and
James Mattioli and Grace McDonnell and Emilie Parker and Jack
Pinto and Noah Pozner and Caroline Previdi and Jessica Rekos and
Avielle Richman and Benjamin Wheeler and Allison Wyatt and their
siblings and their moms and their dads.

And I get to be the voice of six incredible professionals,
teachers, administrators, principals, Rachel Davino and Anne
Marie Murphy and Lauren Rousseau and Victoria Soto and Mary
Sherlach and Dawn Hochsprung.

I, I received a text early this morning from a friend of mine
I've known for over 35 years. We met in eighth grade. His wife
works at Sandy Hook Elementary School, and, and one of the
guilts I carry with me is that it took me several hours at the
firehouse before I realized I forgot to ask if she survived.
I've known him for 35 years. I've known his wife for 25 years.
And I frantically asked Colonel Stebbins if she was alive. So I
wanted to read his text and let him have the last word for me as
their voice today.

His text read, John, good luck and good job on all your efforts
following Sandy Hook. You are making the world a better and
safer place. And I pray that he's right.

THE CHAIR:

Thank you, Senator.

Ladies and gentlemen, ladies and gentlemen, I ask you not to do
that. I apologize. We asked both sides not to do this.

Senator Williams.

SENATOR WILLIAMS:

Thank you, Madam President.

I want to begin by thanking Senator McKinney for his leadership
on behalf of his constituents and his caring in their incredible
hour of need and his leadership here in this circle and in this
process. Senator McKinney, we don't agree all the time, but you
are a treasured and valued friend and colleague in this circle,
and I appreciate your leadership on this issue. This has been a
journey for all of us.

The last 110 days after the tragedy in Newtown has brought a new
commitment in the State of Connecticut. What we have seen is
Legislators, Democrats and Republicans, not turning away but
looking to take action to bring meaning to this senseless
tragedy. This will go beyond today.

Folks have talked about mental health issues, and I want to
point out the task force that was put together by Governor
Malloy is continuing to meet. Their recommendations on mental
health issues are not due until December of this year. I want to
thank the Governor for his work. I want to thank Governor Malloy

for his priorities, so many of which are incorporated in this
bill.

And, Madam President, Lieutenant Governor Wyman, I want to thank
you. I know that you and the Governor have been to Newtown so
many times and attended the funerals of those young children.
Thank you for representing us and our state. For those who
believe we should be doing more in terms of mental health
services, I don't think anyone in this, in this circle will
disagree.

But if you're saying we cannot or should not move forward on gun
violence prevention measures because it's all about mental
health, I would strongly disagree. Senator Harp mentioned the
example of the mentally deranged individual who went into an
elementary school armed with a knife, and he injured many
children. None died.

It's access to the weapons of war, the access to the weapons
that can kill mass amounts of children or adults in our schools
and in our communities. That is the essential issue when it
comes to mass killings and all of the mass killings that we have
seen in the last ten to 20 years but primarily the last ten
years.

So, yes, we must address mental health issues, but we cannot
ignore the access to those weapons. And we must do all we can to
prevent those who would harm our children from having those
weapons. There are those who would say, you know, I don't think
this bill is going to do anything, all that permitting, all of
the background checks. You know, they can't even agree on
background checks in Washington, D. C. But that's what it takes
to keep the guns out of the hands of criminals. Isn't that what
we all want?

There was just some information that came out very recently from
the Johns Hopkins School of Public Health, and they have studied
this issue carefully. They've said, common sense policies
adopted at the state and local level succeed in reducing the
diversion of guns to criminals.

And what specifically? Strong regulation and oversight of
licensed gun dealers, regulation of gun sales by private
sellers, and permit to purchase licensing systems, exactly what
we have in this bill. And what's the result of that?
Significantly fewer guns are diverted into criminal hands. This

is exactly what we should be doing to help protect our children and our communities.

Now there are some who would say, well, there's enough rules on the books. But if you have a loophole in your rules that allows folks to purchase firearms, perhaps as many as 40 percent of all the firearm sales, without background checks, those checks that can keep the guns out of criminal hands, do we have enough rules on the books, or does it not make sense to close that loophole? That's what this bill does.

There are some who would say, well, this bill will simply provide a false sense of security. And you know what? You can't promise that this will prevent all of the mass shootings and Adam Lanza murders in the future. Well, you know what? No one is guaranteeing that. No one is claiming that this bill will solve all of the problems.

But as Senator Coleman said earlier, to say that since it doesn't solve all the problems we should do nothing is wrong. And when it comes to the issue of that sense of security, and that might lead to a question, is there anything in this bill that could have prevented that tragedy at Sandy Hook, I mean, the short answer is we'll never know.

But if this bill had been in effect when Adam Lanza was a small boy going off to school for the first time, I think we have to ask ourselves, what would have happened if his primary caregivers, if his pediatrician, as a young boy, had had access to specialists, behavior consultants, not just folks who were looking at learning disabilities but behavioral issues?

What if, as he got older in school, there was a heightened sense of awareness among everyone in the school about the behavioral issues, the mental health issues? What if there could have been greater outreach to him and others like him to remove him from his isolation and connect him to peers and adults? If you don't think these issues are going on right now in our schools in Connecticut and across the country, you're wrong. We ought to be making these efforts, taking these steps now.

This bill does that. And what if, at the time that his mother purchased firearms, she could not have purchased an assault rifle, not a military assault rifle designed to shoot dozens if not hundreds of people in a matter of minutes and could not have bought high-capacity magazines to go along with it?

I don't know what the outcome would have been. I don't know. But
I can tell you this. It's worth our effort to pass this bill.
This has been a tremendous effort of Democrats and Republicans
putting aside partisanship, transcending politics. This is a new
and historic model for the country on an issue that has
typically been the most controversial and divisive.

We, in Connecticut, are breaking new ground today. So I am proud
of this process. I am proud of my colleagues, Democrats and
Republicans in the Senate, in the House. We have done things
differently, and we should have done things differently given
the magnitude of the tragedy that we face.

Madam President, I urge passage of this bill.

THE CHAIR:

Thank you.

Will you remark? Will you remark?

If not, Mr. Clerk, will you call, call for a roll call vote, and
the machine is open.

THE CLERK:

Immediate roll call has been ordered in the Senate. Senators,
please return to the Chamber. Immediate roll call has been
ordered in the Senate.

THE CHAIR:

If all members have voted, all members have voted? The machine
will be locked.

Mr. Clerk, will you please call a tally.

THE CLERK:

Emergency Certified Bill Number 1160.

Total Number Voting 36

Necessary for Adoption 19

Those voting Yea 26

Those voting Nay 10

Those absent and not voting 0

THE CHAIR:

The bill passes.

Senator Looney.

Please, ladies and gentlemen.

Senator Looney.

SENATOR LOONEY:

Thank you. Thank you, Madam President. Madam President, I move for immediate transmittal to the House of Representatives of Emergency Certified Bill 1160 for which the House awaits.

THE CHAIR:

Seeing no objection, so ordered, sir.