**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> NED LAMONT, ET AL., <br><br> Defendants. | Civil Action No. 3:22-CV-01118(JBA) |

**BRIEF OF *AMICI CURIAE* BRADY AND MARCH FOR OUR LIVES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

*Of Counsel:*

Daniel Weltz
Rachel Bercovitz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
DWeltz@cov.com
RBercovitz@cov.com

Douglas N. Letter
Shira Lauren Feldman
Brady
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

Ciara Wren Malone
March for Our Lives
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

Timothy C. Hester (phv207107)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................ 1

INTRODUCTION ........................................................................................ 1

I.   THE CHALLENGED LAW DOES NOT IMPLICATE THE SECOND
     AMENDMENT BECAUSE IT IMPOSES NO BURDEN ON THE RIGHT TO
     SELF-DEFENSE. ........................................................................... 4

     A.   The Second Amendment Right as Articulated in *Bruen* and *Heller* Is
          Based on "Self-Defense," and Plaintiffs Make No Showing That Self-
          Defense Is Implicated by the Challenged Law. .................................. 4

     B.   Plaintiffs Cannot Establish That the Challenged Law Burdens the Right to
          Self-Defense ................................................................................ 5

II.  IN ANY EVENT, THE CHALLENGED LAW IS ANALOGOUS TO
     HISTORICAL REGULATIONS OF FIREARMS AND IS THEREFORE
     CONSTITUTIONAL UNDER THE SECOND AMENDMENT. .................... 7

     A.   *Bruen* Instructs Courts to Evaluate Historical "Analogues" to a Challenged
          Firearms Regulation to Assess Whether It Imposes a "Comparable
          Burden" on Self-Defense. ............................................................. 8

     B.   The Challenged Law Is Analogous to Historical Firearms Restrictions
          That Did Not Burden the Right of Armed Self-Defense. ...................... 9

     C.   The Challenged Law Is "Relevantly Similar" to Historical Laws
          Restricting Weapons Capable of Firing Repeatedly Without Reloading. .......... 12

          1.   Firearms Capable of Firing Repeatedly Without Reloading Were
               Not Broadly Available Until After Enactment of the Fourteenth
               Amendment .................................................................... 13

          2.   Modern Firearms Capable of Firing Repeatedly Are
               Fundamentally Different from Historical Antecedents .................. 16

          3.   Under *Bruen*, a "More Nuanced Approach" to Historical Analogies
               Is Required Where Firearms Capable of Firing Repeatedly Without
               Reloading Were Not In Widespread Circulation Until the Early
               20th Century .................................................................. 17

CONCLUSION ........................................................................................ 19

i

<u>T</u>ABLE OF <u>A</u>UTHORITIES

**Cases**                                                                                                    **Page(s)**

*Andrews v. State,*
   50 Tenn. 165 (1871)....................................................................................................10, 11

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*
   *(ANJRPC),* 910 F.3d 106 (3d Cir. 2018) ...........................................................5, 7

*Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey* ("*ANJRPC*
   *II*"), 974 F.3d 237 (3d Cir. 2020).........................................................................14

*Colorado Outfitters Ass'n v. Hickenlooper,*
   24 F. Supp. 3d 1050 (D. Colo. 2014)......................................................................7

*Cont'l Ins. Co. v. Illinois Dep't of Transp.,*
   709 F.2d 471 (7th Cir. 1983) ..................................................................................2

*Ctr. for Biological Diversity v. Morgenweck,*
   351 F. Supp. 2d 1137 (D. Colo. 2004)....................................................................2

*District of Columbia v. Heller,*
   554 U.S. 570 (2008)........................................................................................ *passim*

*Duncan v. Bonta,*
   19 F.4th 1087 (9th Cir. 2021) .............................................................................5, 6

*English v. State,*
   35 Tex. 473 (1871)................................................................................................11

*Heller v. D.C.* (*Heller II*),
   670 F.3d 1244 (D.C. Cir. 2011).............................................................................18

*Hill v. State,*
   53 Ga. 472 (1874) ................................................................................................10

*Kolbe v. Hogan,*
   849 F.3d 114 (4th Cir. 2017) ..................................................................................5

*Kolbe v. O'Malley,*
   42 F. Supp. 3d 768 (D. Md. 2014) ..........................................................................7

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010)...........................................................................................2, 5

*New York State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022)..................................................................................... *passim*

*Ocean State Tactical, LLC v. State of Rhode Island*,
  2022 WL 17721175 (D.R.I. Dec. 14, 2022) ................................................................3

*O'Neill v. State*,
  16 Ala. 65 (1849) ................................................................................................10

*Oregon Firearms Fed'n, Inc. v. Brown*,
  2022 WL 17454829 (D. Or. Dec. 6, 2022) ........................................................3, 18

*Rocky Mountain Gun Owners v. Polis*,
  467 P.3d 314 (Colo. 2020) ..............................................................................5, 6

*State v. Buzzard*,
  4 Ark. 18 (1842) ............................................................................................11, 12

*State v. Chandler*,
  5 La. Ann. 489 (1850) ........................................................................................12

*State v. Jumel*,
  13 La. Ann. 399 (1858) ......................................................................................12

*State v. Misch*,
  214 Vt. 309 (2021) ..........................................................................................5, 7

*State v. Mitchell*,
  3 Blackf. 229 (Ind. 1833) ..................................................................................11

*State v. Reid*,
  1 Ala. 612 (1840) ..............................................................................................11

*Ex parte Thomas*,
  97 P. 260 (Okla. 1908) ......................................................................................11

*United States v. Cox*,
  906 F.3d 1170 (10th Cir. 2018) ..........................................................................3

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019) ..............................................................................5, 6

*Young v. Conway*,
  698 F.3d 69 (2d Cir. 2012) ..................................................................................2

**Statutes**

Act of Feb. 4, 1812, ch. 195, 1812 Del. Sess. Laws 522 ..............................................10

Act of Jan. 30, 1847, ch. 79, 1846–47 Va. Acts 67 ....................................................10

Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256............................................18

Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887 ............................................................18

Act of July 8, 1932, Pub. L. No. 72-275, 47 Stat. 650......................................................18

Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245 ............................................................19

Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189..........................................................19

**Other Authorities**

*Armed Citizen Stories*, NRA-ILA, https://perma.cc/H9BC-95HF................................................6

Charles Worman, *The Iconic Pepperbox Revolving Pistol*, J. Antiques &
    Collectibles, https://perma.cc/E3K8-W3LH ...........................................................15

Christopher Ingraham, *What 'Arms' Looked Like When the 2nd Amendment Was
    Written*, Wash. Post (June 13, 2016), https://perma.cc/H6X5-C2NL.............................16, 17

Claude Werner, *The Armed Citizen – A Five Year Analysis*, Guns Save Lives
    (Mar. 12, 2012), https://perma.cc/QTL7-U8EM .........................................................6

Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory
    (Mar. 12, 2019), https://perma.cc/4ZJA-5V4M .........................................................17

Danielle Hollembaek, *The Pepperbox Pistol*, Rock Island Auction Co. (Jan. 16,
    2019), https://perma.cc/2ERY-26CX.......................................................................15

Declaration of Edward Troiano, *Ocean State Tactical, LLC v. State of Rhode
    Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-3)............................................7

Declaration of James W. Johnson, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md.
    2014), No. 1:13-cv-02841 (ECF No. 44-3) (filed Feb. 14, 2014)...............................................7

Declaration of Lucy P. Allen, *Nat'l Ass'n for Gun Rights v. Lamont*, No. 3:22-cv-
    1118 (D. Conn. Jan. 31, 2023) (ECF No. 37-4).........................................................6

Declaration of Michael Vorenberg, *Nat'l Ass'n for Gun Rights v. Campbell*, No.
    1:22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-11) ................................................13, 16

Declaration of Robert Spitzer, *Nat'l Ass'n for Gun Rights v. Campbell*, No. 1:22-
    cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-10)....................................12, 13, 14, 16, 19

Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill
    Someone*, Forbes (Feb. 15, 2017), https://perma.cc/YR7L-PWPS .........................................17

*Firearms History and the Technology of Gun Violence*, UC Davis Library,
    https://perma.cc/YHZ6-8QPG ...........................................................................16

*Girandoni Air Rifle*, Fandom: Military Wiki, https://perma.cc/4RFA-Q9BK.............................14

John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure* (Mar. 15, 2011), https://perma.cc/57AB-X2BE .......................................................................14

Mike Markowitz, *The Girandoni Air Rifle: A Weapon Ahead of Its Time?*, Defense Media Network (May 14, 2013), https://perma.cc/5F8G-UZAR ............................14

@NRA_museums, *Gun of the Day: Wheellock 16-Shooter*, TWITTER (Oct. 21, 2018, 9:01 AM), https://perma.cc/6H68-TF7Y. ....................................................13

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007).............................................................................................10

Rock Island Auction Co., *Repeating Flintlock Rifles?!?*, YouTube (Sept. 7, 2021), https://www.youtube.com/watch?v=0FkW-CSTCwo. ...........................................15

Ryan Hodges, *The 1866 Rifle*, Taylor's & Company (Aug. 26, 2020), https://perma.cc/7STW-8WMS .........................................................................16

*Wheelgun Wednesday: A Closer Look at Pepperbox Pistols*, The Firearm Blog (Dec. 8, 2021), https://perma.cc/2Z2U-RJ62 ...........................................................15

*Winchester 1866 Prototype Musket*, The Armourer's Bench, https://perma.cc/PB83-TSM4 ............................................................................16

*Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://perma.cc/PRY3-YHSN ..........................................................................16

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are national gun violence prevention organizations with an acute interest in ensuring that firearms are regulated in ways that will reduce the staggering incidence of gun violence in this country.  *Amici* also have a particular interest in ensuring that litigation related to the constitutionality of firearms regulations is fully informed by empirical research, authorities and factual information of the sort addressed in this brief.

Brady is the nation's most longstanding non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy and political action.  Brady has filed numerous *amicus* briefs in cases involving the constitutionality of firearms regulations, and courts have cited Brady's research and expertise.

March for Our Lives ("MFOL") is a youth-led non-profit organization dedicated to promoting civic engagement, education and direct action by youth to achieve sensible gun violence prevention policies that will save lives.  MFOL has filed numerous *amicus* briefs in cases involving firearm regulations.[1]

## INTRODUCTION

By moving for a preliminary injunction, Plaintiffs bear the evidentiary burden of demonstrating that the regulation impinges on the right of armed self-defense in violation of Plaintiffs' Second Amendment rights, and that Plaintiffs will suffer irreparable injury absent an interlocutory injunction.  This brief discusses empirical research and factual information, in the

---

[1] No party or counsel to any party in this matter authored this brief in part or in whole, no party or counsel to any party in this matter contributed money intended to fund the preparation or submission of this brief, and no person other than *amici* contributed money intended to fund the preparation or submission of this brief.

manner of a "Brandeis brief," to make clear that Plaintiffs have not carried their evidentiary burden.[2]

Connecticut General Statute Sections 53-202a–c and 53-202w, which prohibit assault weapons and certain large-capacity magazines ("LCMs") capable of accepting more than ten rounds of ammunition (the "Challenged Law"), are constitutional under the Second Amendment because they do not impose any burden on the "right of armed self-defense" recognized by the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) and *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008). As the Court stated in *Bruen*, "individual self-defense is 'the **central component**' of the Second Amendment right." 142 S. Ct. at 2133 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599)) (emphasis in original). "All that we decide in this case is that the Second Amendment protects the rights of law-abiding people to carry a gun outside the home **for self-defense**." *Bruen*, 142 S. Ct. at 2159 (Alito, J., concurring).[3]

Here, Plaintiffs do not even argue that the Challenged Law impinges on the "right of armed self-defense" recognized in *Bruen* and *Heller*. Nor could they possibly make any such showing – the overwhelming body of case law and empirical data demonstrate that LCMs are not needed for

---

[2] *See Young v. Conway*, 698 F.3d 69, 78 (2d Cir. 2012) ("referenc[ing] an extensive body of scientific literature presented . . . by *amicus curiae* the Innocence Project"); *Cont'l Ins. Co. v. Illinois Dep't of Transp.*, 709 F.2d 471, 475 (7th Cir. 1983) (declining to reach the merits where plaintiff did not "produce evidence, or argument, or the kind of 'legislative facts' associated with a 'Brandeis brief,' that might persuade the district court or this court" regarding the merits); *Ctr. for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137, 1144 (D. Colo. 2004) ("tak[ing] judicial notice of the contents of documents as 'legislative facts' . . . for the limited purpose of establishing that the view of [the U.S. Fish and Wildlife Service] as to the merits of the Petition is not necessarily shared by all in the scientific and environmental communities") (citing the Brandeis brief submitted in *Muller v. Oregon*, 208 U.S. 412 (1908)).

[3] All emphases supplied unless otherwise noted.

"armed self-defense," and Plaintiffs make no showing to the contrary.  For this fundamental reason, Plaintiffs' claim should be rejected at the threshold because they have failed to make the required showing that the Challenged Law impinges on their Second Amendment right to "armed self-defense" as articulated in *Bruen* and *Heller*.  (Part I, *infra*.)

Beyond that fundamental legal flaw, Plaintiffs' claim should also be rejected because the Challenged Law is "relevantly similar" to historical firearms regulations that limited where firearms could be carried, what weapons could lawfully be possessed, and the manner in which weapons could be carried.  (Part II, *infra*.)  Although this Court need not reach this question of historical analogues, given Plaintiffs' failure to make any showing that the Challenged Law "burden[s] . . . the right of armed self-defense" articulated in *Bruen*, 142 S. Ct. at 2133, these historical analogues further demonstrate that the Challenged Law is constitutional under the Second Amendment standards established in *Bruen* and *Heller*.

The Challenged Law is also constitutional for the separate and independent reason that LCMs are accessories not subject to constitutional protection as "arms" under the Second Amendment because they are not required to use a firearm, and the regulation of them does not prevent the use of any firearm.[4]  This brief does not address that separate bar to Plaintiffs' Second Amendment challenge, but rather demonstrates why the Challenged Law is constitutional even assuming *arguendo* that LCMs are "arms" within the scope of the Second Amendment.

---

[4]  *See, e.g.*, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (silencers are not required to operate a firearm and therefore are not "arms" subject to Second Amendment protection).  *See also Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, at *9 (D. Or. Dec. 6, 2022) ("Plaintiffs have not produced evidence that these weapons . . . cannot operate with magazines that contain ten or fewer rounds."); *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175, at *12 (D.R.I. Dec. 14, 2022) ("[A] firearm can fire bullets without a detachable magazine, and in any event, a firearm does not need a magazine containing more than ten rounds to be useful.").

This brief addresses only the Challenged Law's ban on LCMs and, therefore, does not address the provisions of the Challenged Law prohibiting assault weapons.  But for the same reasons that a ban on LCMs containing more than 10 rounds is constitutional under the Second Amendment, as explained here, prohibitions on assault weapons that can fire more than 40 bullets in a minute are also constitutional.

## ARGUMENT

## I.   THE CHALLENGED LAW DOES NOT IMPLICATE THE SECOND AMENDMENT BECAUSE IT IMPOSES NO BURDEN ON THE RIGHT TO SELF-DEFENSE.

Plaintiffs make no showing that the Challenged Law has any impact whatsoever on the "individual right to self-defense" articulated in *Bruen* and *Heller*.  Nor could they.  Accordingly, the Challenged Law raises no Second Amendment issue, and Plaintiffs' claims should be rejected at the threshold, as a matter of law, for failure to demonstrate or even argue that this Law "burden[s] a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S. Ct. at 2133.

### A.   The Second Amendment Right as Articulated in *Bruen* and *Heller* Is Based on "Self-Defense," and Plaintiffs Make No Showing That Self-Defense Is Implicated by the Challenged Law.

Plaintiffs assert that, under *Bruen* and *Heller*, the "end of the analysis" is whether firearms are "typically possessed by law-abiding citizens for lawful purposes."  Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, ECF No. 28-1, at 10 ("Mem.").  That flatly misstates the scope of the Second Amendment as articulated by *Bruen* and *Heller*.  Under *Bruen*, "the Second and Fourteenth Amendments protect an individual right to keep and bear arms *for self-defense*."  142 S. Ct. at 2125.  The Court's entire analysis in *Bruen* centered on the "individual right to *armed self-defense*."  *Id.* at 2128.  Thus, *Bruen* evaluated whether "modern and historical regulations impose a comparable burden on the right of *armed self-defense*."  *Id.* at 2133.  And it broadly recognized "[t]he constitutional right to bear arms in public *for self-defense*."

4

*Id*. at 2156.  "As we stated in *Heller* and repeated in *McDonald*, 'individual self-defense is "the **central component**" of the Second Amendment right.'"  *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599)) (emphasis in original).

Plaintiffs are therefore wrong in suggesting that the Second Amendment right extends to any firearm "typically possessed . . . for lawful purposes."  Mem. at 10.  The Second Amendment, as *Bruen* establishes, applies only to "commonly used firearms **for self-defense**," *Bruen*, 142 S. Ct. at 2138.  Nothing in *Bruen* suggests that the Second Amendment extends to other "lawful purposes" of a firearm.  Notably, Plaintiffs do not even argue that LCMs are in "common use" for self-defense, nor do they argue that these regulations impose a "burden on the right of armed self-defense."  *Id.* at 2133–34.  Plaintiffs have therefore failed to make even a threshold showing that the Challenged Law impinges in any way on the Second Amendment right articulated in *Bruen* and *Heller*.

## B.  Plaintiffs Cannot Establish That the Challenged Law Burdens the Right to Self-Defense.

Furthermore, it is clear that Plaintiffs could not make a showing that the Challenged Law burdens the "right to armed self-defense" articulated in *Bruen* and *Heller*.  Empirical research, thoroughly examined by numerous courts,[5] establishes that LCMs are not necessary for self-defense.

---

[5] *See Duncan v. Bonta*, 19 F.4th 1087, 1104–05 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded on other grounds*, 49 F.4th 1228 (9th Cir. 2022); *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey (ANJRPC),* 910 F.3d 106, 121 n.25 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *State v. Misch*, 214 Vt. 309, 356–57 (2021), *reargument denied* (Mar. 29, 2021); *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020).

LCM restrictions do not burden the "right to armed self-defense" because the ability to fire more than ten rounds without reloading is fundamentally unnecessary for self-defense. The National Rifle Association's own database of "armed citizen" accounts shows that the use of more than ten rounds of ammunition for self-defense is "extremely rare."[6] Studies of this database by firearms instructor Claude Werner (analyzing data from 1997 to 2001), and by economist Lucy P. Allen (evaluating 2011 to 2017 data), have found that the average number of shots fired by civilians in self-defense was about *two*.[7] Moreover, of 736 self-defense incidents from January 2011 to May 2017 reflected in the NRA database, there were only "*two* incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets."[8]

Numerous federal and state courts have similarly found no evidence that firing more than ten bullets without reloading is necessary for self-defense. The First Circuit, for example, found that "not one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired." *Worman*, 922 F.3d at 37. The Ninth Circuit found that "[t]he use of more than ten bullets in defense of the home is *'rare,'* or *non-existent*." *Duncan*, 19 F.4th at 1104–05 (citations omitted). And the Colorado Supreme Court concluded "that [i]n no case had a person fired even five shots in self-defense, let alone ten, fifteen, or more." *Rocky Mountain Gun Owners*, 467 P.3d at 331 (quotations and citation omitted); *see*

---

[6] Declaration of Lucy P. Allen ¶ 6 (ECF No. 37-4) [hereinafter "Allen Decl."]; *see also Armed Citizen Stories*, NRA-ILA, https://perma.cc/H9BC-95HF (last visited Feb. 3, 2023).

[7] *See* Claude Werner, *The Armed Citizen – A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), https://perma.cc/QTL7-U8EM (average of 2.2 defensive shots fired per incident from 1997–2001); Allen Decl., *supra* note 6, at ¶ 9 (same, from January 2011 to May 2017).

[8] Allen Decl., *supra* note 6, at ¶ 9.

*also ANJRPC,* 910 F.3d at 121 n.25.[9]  Experts have similarly concluded and testified that the ability to fire more than ten rounds without reloading is fundamentally unnecessary for self-defense.[10]

    In short, Plaintiffs do not and cannot demonstrate that LCMs are needed for "armed self-defense," the central inquiry directed by the Supreme Court in *Bruen*, 142 S. Ct. at 2133.  Plaintiffs have accordingly failed to show that the Challenged Law infringes their Second Amendment rights as articulated in *Bruen* and *Heller.*

## II.    IN ANY EVENT, THE CHALLENGED LAW IS ANALOGOUS TO HISTORICAL REGULATIONS OF FIREARMS AND IS THEREFORE CONSTITUTIONAL UNDER THE SECOND AMENDMENT.

    Because Plaintiffs have made no showing (nor could they) that the Challenged Law imposes **any** burden on "a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S. Ct. at 2133, the Court need not reach the question whether the Challenged Law is "consistent with this

---

[9] *See also Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 787 (D. Md. 2014), *aff'd in part, vacated in part, remanded sub nom. Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), *and aff'd*, 849 F.3d 114 (4th Cir. 2017) ("Maryland law enforcement officials are unaware of any Marylander . . . needing to fire more than ten rounds, to protect himself."); *Misch*, 214 Vt. at 356 ("[I]t appears from the available data that . . . the large-capacity magazine [] is almost never used for self-defense.")

[10] *See* Declaration of Edward Troiano ¶¶ 9, 10, *Ocean State Tactical, LLC v. State of Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-3)  ("I am unaware of **any incident** in which a civilian has **ever** fired as many as 10 rounds in self-defense."); Declaration of James W. Johnson ¶¶ 2, 30, 31, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), No. 1:13-cv-02841 (ECF No. 44-3) (filed Feb. 14, 2014) (then-Baltimore County Police Chief testifying that he was "**unaware of any self-defense incident**" in Baltimore County or "anywhere else in Maryland" for which "it was necessary to fire as many as 10 rounds in self-defense").  Using LCMS to fire numerous rounds is more likely to cause bystander injuries and fatalities than to serve a bona fide need for self-defense.  *See*, *e.g.*, *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1072 (D. Colo. 2014), *vacated and remanded on other grounds*, 823 F.3d 537 (10th Cir. 2016) (quoting Plaintiffs' expert, a firearms instructor with more than 40 years of experience in defensive firearm use, who testified that individuals with a "high-capacity semiautomatic weapon" often "feel the need to 'spray and pray,' meaning that they believe that they should fire all of their rounds in the hope that at least one shot will hit the intended target").

Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126.  That step of the Second Amendment analysis applies only where the question is "whether modern and historical regulations impose a ***comparable burden on the right of armed self-defense***" and "whether that burden is comparably justified." *Id*. at 2132–33.  Here, where Plaintiffs do not even argue that there is any "burden on the right of armed self-defense" (and where the overwhelming weight of evidence demonstrates there is no such burden, *see* Part I.B, *supra*), the analysis does not even proceed as far as the analogical reasoning called for by *Bruen*.  But, in any event, historical analogues demonstrate conclusively that the Challenged Law is consistent with the nation's history of firearms regulations.

> **A.**   ***Bruen*** **Instructs Courts to Evaluate Historical "Analogues" to a Challenged Firearms Regulation to Assess Whether It Imposes a "Comparable Burden" on Self-Defense.**

*Bruen* directs courts evaluating a Second Amendment challenge to assess whether a modern regulation is "consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126.  "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearms regulation requires a determination of whether the two regulations are relevantly similar."  *Id*. at 2132 (quotations and citation omitted).  This "analogical reasoning requires only that the government identify a well-established and representative historical ***analogue***, not a historical ***twin***.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  *Id*. at 2133 (emphases in original).

As the Supreme Court recognized, "the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms."  *Id*. at 2138.  "Properly interpreted, the Second Amendment allows a 'variety' of gun regulations."  *Id*. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

**B.** **The Challenged Law Is Analogous to Historical Firearms Restrictions That Did Not Burden the Right of Armed Self-Defense.**

The Challenged Law is "relevantly similar" to historical laws that restricted the manner of carrying firearms without burdening the right of armed self-defense. *Bruen*, 142 S. Ct. at 2133.

During the Founding Era and the period surrounding ratification of the Fourteenth Amendment, states enacted numerous restrictions on where arms may be brought, what arms may be possessed, and the manner in which arms may be carried. These laws included restrictions on carrying firearms into sensitive places, limitations on the type of arms individuals could lawfully possess, and prohibitions on the concealed carry of arms. Some of these laws were enacted shortly after ratification of the Fourteenth Amendment, but the "public understanding" of the scope of the Second Amendment can be properly discerned from statutes adopted by legislatures shortly before or after they ratified the Fourteenth Amendment. *See Bruen*, 142 S. Ct. at 2136 (noting that the "***public understanding*** of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation" (quotations omitted) (emphasis in original)).

Applying the *Bruen* standard, the Challenged Law is "relevantly similar" to these historical laws because it imposes a "comparable burden" on the right of armed self-defense. *Id.* at 2132–33. Unlike the regulations addressed in *Bruen* and *Heller*, which the Supreme Court held entirely prevented the exercise of the right to armed self-defense, *see id.* at 2156 (New York's "proper-cause" requirement); *Heller*, 554 U.S. at 635–36 (District of Columbia's restriction on handgun possession in the home), the Challenged Law does not prevent armed self-defense. *See* Part I.B, *supra*). For that reason, the Challenged Law is "relevantly similar" to these historical laws. *Bruen*, 142 S. Ct. at 2133.

1. ***Sensitive places.***  Around the time of the ratification of the Bill of Rights, colonial Philadelphia, New York and Boston prohibited the discharge of firearms within their cities.[11]  By the time of the Fourteenth Amendment's ratification in 1868, states such as Virginia and Delaware had passed regulations on the discharge of firearms in sensitive or crowded public places.[12]

Other states, such as Georgia, prohibited the carrying of weapons in sensitive places.  For example, a 19th century Georgia law prohibited the carrying of pistols, revolvers and other "deadly weapon[s]" to courthouses, polling places, places of public worship, "or any other public gathering in this state." *Hill v. State*, 53 Ga. 472, 474 (1874).  The Georgia Supreme Court in 1874 upheld the law against a challenge under the Second Amendment and Georgia state constitutional analogue, reasoning that carrying arms to sensitive places was simply not necessary for the right to "use [arms] as to become familiar with that use," but did risk impinging on the "constitutional duties of the legislature" to ensure "[t]he preservation of the public peace, and the protection of the people against violence." *Id*. at 477–79.

2. ***Excessively dangerous weapons.***  States have also historically regulated weapons deemed excessively dangerous, and courts have consistently upheld these laws, reasoning that such arms are not necessary for self-defense.  For example, the Alabama Supreme Court wrote in 1849 that an individual possessing "deadly or unusual weapons for the purpose of an affray . . . may be guilty of this offence, without coming to actual blows." *O'Neill v. State*, 16 Ala. 65, 67 (1849).  Shortly after the Civil War, the Tennessee Supreme Court in *Andrews v. State* upheld the constitutionality of a statute making it unlawful "for any person to publicly or privately carry a

---

[11] *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162–63 (2007).

[12] *See* Act of Jan. 30, 1847, ch. 79, 1846–47 Va. Acts 67; Act of Feb. 4, 1812, ch. 195, 1812 Del. Sess. Laws 522, 522–24.

dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver." 50 Tenn. 165, 171, 186 (1871). The court wrote: "[a]dmitting the right of self-defense in its broadest sense, still on sound principle every good citizen is bound to yield his preference as to the means to be used, to the demands of the public good." *Id*. at 188–89.

That same year, the Texas Supreme Court in *English v. State* upheld a law that regulated, and in some cases prohibited, the carrying of pistols, dirks and certain other "deadly weapons" against a challenge under the Second Amendment and state constitutional analogue. 35 Tex. 473, 474, 477 (1871). The court held that the law did not interfere with the right to self-defense because the law "makes all necessary exceptions, and points out the place, the time and the manner in which certain deadly weapons may be carried as means of self-defense, and these exceptional cases, in our judgment, fully cover all the wants of society." *Id*. at 477.

3. **Concealed carry.** States have regulated the concealed carry of firearms for more than two centuries, and courts have repeatedly upheld these laws because they impose no burden on self-defense. *See, e.g.*, *State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833) (upholding a state concealed carry law against a Second Amendment challenge); *Ex parte Thomas*, 97 P. 260, 265 (Okla. 1908) (same, against a challenge under the state constitutional analogue). In 1840, the Alabama Supreme Court upheld a concealed carry conviction against a challenge under a state constitutional analogue to the Second Amendment, concluding that "[t]here was no evidence . . . that the defendant could not have defended himself as successfully, by carrying the pistol openly, as by secreting it about his person." *State v. Reid*, 1 Ala. 612, 614, 621 (1840).

Two years later, the Arkansas Supreme Court upheld the state's concealed carry statute, which prohibited the "wear[ing] [of] any pistol . . . concealed as a weapon, unless upon a journey." *State v. Buzzard*, 4 Ark. 18, 18 (1842) (divided opinion). One justice found that the rights protected

by the Second Amendment were "not in the slightest degree encroached upon by the legislative enactment of this State prohibiting the wearing of concealed weapons." *Id*. at 31 (Dickinson, J.). Another justice similarly stated that the Second Amendment creates "no such immunity as exempts it from all legal regulation and control." *Id*. at 22 (Ringo, C.J.).

In 1850, the Louisiana Supreme Court upheld the constitutionality of a concealed carry statute, writing that the law "interfered with no man's right to carry arms" and was "absolutely necessary to . . . prevent bloodshed and assassinations." *State v. Chandler*, 5 La. Ann. 489, 489–90 (1850). Eight years later, the Louisiana Supreme Court reaffirmed the constitutionality of a substantially similar provision, holding that the statute did "not infringe the right of the people to keep or bear arms," but rather restricted "only *a particular mode* of bearing arms which is found dangerous to the peace of society." *State v. Jumel*, 13 La. Ann. 399, 399–400 (1858) (emphasis in original).

These regulations demonstrate that states have a broad and deep tradition of regulating the manner of carrying firearms, and that courts have consistently upheld such laws when they imposed little or no burden on the right of armed self-defense. The Challenged Law is ***relevantly similar*** to these historical restrictions because it likewise does not burden the right of armed self-defense articulated in *Bruen* and *Heller*. (Part I.B, *supra*.)

C.     **The Challenged Law Is "Relevantly Similar" to Historical Laws Restricting Weapons Capable of Firing Repeatedly Without Reloading.**

The Challenged Law is also consistent with nearly a century of state firearms laws restricting weapons capable of firing repeatedly without reloading.[13] Weapons capable of firing repeatedly without reloading were not in widespread circulation until ***after*** ratification of the

---

[13] *See*, *e.g.*, Declaration of Robert Spitzer ¶¶ 23–34, *Nat'l Ass'n for Gun Rights v. Campbell*, 1:22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-10) [hereinafter "Spitzer Decl."].

Fourteenth Amendment in 1868, and **long after** ratification of the Second Amendment in 1791. As a result, such laws date to those weapons' entry into widespread circulation, rather than to the Founding Era or the Civil War when they were not legally possessed by most civilians.  *See, e.g.,* Declaration of Michael Vorenberg ¶ 51, *Nat'l Ass'n for Gun Rights v. Campbell*, No. 1:22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-11) [hereinafter Vorenberg Decl.] ("Rifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction.  Furthermore . . . legal possession . . . was limited almost exclusively to U.S. soldiers and civilian law enforcement officers.").

## 1. *Firearms Capable of Firing Repeatedly Without Reloading Were Not Broadly Available Until After Enactment of the Fourteenth Amendment.*

During the Founding Era, civilians did ***not*** have widespread access to firearms capable of firing more than ten rounds without reloading.  Plaintiffs misleadingly claim that "arms that could fire more than 10 rounds without reloading" have "been available for centuries."  Mem. at 25. However, no firearm capable of firing more than ten rounds without reloading became "well established in the mainstream of American gun ownership," *see id*. (quotations and citation omitted), prior to the late 19th or early 20th century.

Plaintiffs cite several firearms invented before ratification of the Fourteenth Amendment (Mem. at 23–25), but none was widely used by civilians.[14]  First, Plaintiffs describe a firearm invented around 1580 that could fire more than ten rounds without reloading.  Mem. at 23. However, the firearm, a 16-round wheel lock shooter, was "anything but common."[15]  The

---

[14] The firearms are discussed in chronological order based on when they were historically introduced.

[15] *See* Spitzer Decl., *supra* note 13, at ¶ 38.  The firearm also "might have been affordable only [to] kings and nobility."  @NRA_museums, *Gun of the Day: Wheellock 16-Shooter*, TWITTER (Oct. 21, 2018, 9:01 AM), https://perma.cc/6H68-TF7Y.

firearm's mechanism gave the gunman "no control of the interval between shots" and was "the most discredited" of "ideas for producing multishot firearms."[16]

Second, Plaintiffs refer to the Girandoni air rifle (Mem. at 24), which Professor David B. Kopel, cited by Plaintiffs (Mem. at 25), describes as "the state of the art for multi-shot guns" when the Second Amendment was ratified.  David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 88 Alb. L. Rev. 849, 853 (2015).  However, the Girandoni air rifle was not a civilian rifle.  It was a military firearm that required a wagon-mounted pump filled with water to sustain the pressure needed to operate; without the pump, the weapon required nearly 1,500 manual hand pumps to restore power.[17]  Moreover, the weapon was delicate, would frequently malfunction, and faced significant manufacturing difficulties.[18]  Only 1,500 or so were ever built.[19]

Third, Plaintiffs refer to an 1821 repeater, which they assert could fire up to 20 rounds.  *See* Mem. at 24 (citing *Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey* ("*ANJRPC II*"), 974 F.3d 237, 255 (3d Cir. 2020) (Matey, J., dissenting), *cert. granted, judgment vacated sub nom. Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894 (2022)).  However, this firearm, known as the Jennings Flintlock rifle, was not common.  *See ANJRPC II*, 974 F.3d at 255 (Matey, J., dissenting) (noting that "[t]echnical challenges" "limited widespread adoption" of the rifle, which failed to "achiev[e] real popularity" (quotations omitted)).  Just 521

---

[16] Spitzer Decl., *supra* note 13, at ¶ 38 (quotations and citation omitted).

[17] John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, Guns.com (Mar. 15, 2011), https://perma.cc/57AB-X2BE.

[18] *Girandoni Air Rifle*, Fandom: Military Wiki, https://perma.cc/4RFA-Q9BK (last visited Feb. 3, 2023).

[19] Mike Markowitz, *The Girandoni Air Rifle: A Weapon Ahead of Its Time?*, Defense Media Network (May 14, 2013), https://perma.cc/5F8G-UZAR.

of these firearms were produced for use by the New York militia, and manual manipulation was required between each shot of this rifle, unlike a modern semi-automatic firearm.[20]

Fourth, Plaintiffs cite the "Pepperbox-style pistol," which they describe as a "popular" firearm that was marketed to civilians and could fire up to twenty-four rounds without reloading. Mem. at 23. However, pepperbox pistols could generally fire just five or six rounds without reloading.[21] Although a Belgian pepperbox pistol with 24 different barrels was manufactured, it was "monstrously unwield[y]."[22] The weapon was also notorious because of its shortcomings: its accuracy did not extend "much beyond the width of a poker table"[23]; its firing power was extremely modest[24]; and it was so unreliable that at times all of its barrels would fire at the same time (known as "chain-firing") with little predictability as to where the bullets would end up. Mark Twain described the pistol this way:  "Sometimes all its six barrels would go off at once, and then there was no safe place in all the region round about, but behind it."[25]

Fifth, Plaintiffs cite the Winchester repeating rifles of 1866 and 1873 (*see* Mem. at 23–25), but both rifles had significant limitations. The 1866 rifle's exposed magazine was open to dirt and debris, which could lead to jamming; the barrel become dangerously hot after firing; the rifle suffered from poor accuracy at longer ranges; the weapon was very heavy when fully loaded; and

---

[20]  Rock Island Auction Co., *Repeating Flintlock Rifles?!?*, YouTube (Sept. 7, 2021), https://www.youtube.com/watch?v=0FkW-CSTCwo.

[21]  Charles Worman, *The Iconic Pepperbox Revolving Pistol*, J. Antiques & Collectibles, https://perma.cc/E3K8-W3LH (last visited Feb. 3, 2023).

[22]  *Wheelgun Wednesday: A Closer Look at Pepperbox Pistols*, The Firearm Blog (Dec. 8, 2021), https://perma.cc/2Z2U-RJ62; Worman, *supra* note 21.

[23]  Worman, *supra* note 21.

[24]  Danielle Hollembaek, *The Pepperbox Pistol*, Rock Island Auction Co. (Jan. 16, 2019), https://perma.cc/2ERY-26CX.

[25]  *Id*.

the rifle required the shooter to manually manipulate a lever in between each shot (unlike modern semi-automatic firearms).[26]  Further, sales of the 1866 rifle almost entirely postdated ratification of the Fourteenth Amendment.[27]  Sales of the 1873 Winchester – initially a military firearm that did not become popular with civilians until the late-19th or early-20th century – completely postdated ratification of the Fourteenth Amendment.[28]

> **2.      *Modern Firearms Capable of Firing Repeatedly Are Fundamentally Different from Historical Antecedents.***

Modern firearms capable of firing repeatedly without reloading bear little resemblance to their historical predecessors.  At the time of the Founding, the typical Revolutionary-era musket (i) could hold just one round at a time, (ii) could fire no more than three rounds per minute, (iii) had a maximum accurate range of 55 yards, and (iv) had a muzzle velocity of approximately 1,000 feet per second.[29]  Further, because gunpowder degrades and damages weapons, these muskets had to be loaded before they could even be used.[30]  By contrast, a typical modern AR-15 (i) can hold 30 rounds, (ii) can fire approximately 45 rounds per minute, (iii) can shoot accurately from

---

[26] *See* Ryan Hodges, *The 1866 Rifle*, Taylor's & Company (Aug. 26, 2020), https://perma.cc/7STW-8WMS; *Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://perma.cc/PRY3-YHSN (last visited Feb. 3, 2023); Spitzer Decl., *supra* note 13, at ¶ 48.

[27] The first deliveries of the Winchester rifle were not made until 1867, and the model sold just 4,500 firearms worldwide in its first five months on the civilian market.  *Winchester 1866 Prototype Musket*, The Armourer's Bench, https://perma.cc/PB83-TSM4 (last visited Feb. 3, 2023).

[28] Spitzer Decl., *supra* note 13, at ¶ 48; Vorenberg Decl., supra page 13, at ¶ 21.

[29] Christopher Ingraham, *What 'Arms' Looked Like When the 2nd Amendment Was Written*, Wash. Post (June 13, 2016), https://perma.cc/H6X5-C2NL.

[30] *See, e.g.*, *Firearms History and the Technology of Gun Violence*, UC Davis Library, https://perma.cc/YHZ6-8QPG (last visited Feb. 4, 2023) (describing the "complicated process" of loading muskets used by soldiers during the Civil War).

16

approximately 600 yards, (iv) attains a muzzle velocity of over 3,000 feet per second, and (v) can be stored loaded and can be immediately fired.[31]

Even the most advanced firearms of the Civil War era were a far cry from the modern AR-15.  For example, the 1866 Winchester rifle, discussed *supra*, had a maximum effective range of approximately 100 yards (about one-sixth of an AR-15) and had a muzzle velocity of just 1,100 feet per second (roughly one-third of an AR-15).[32]  Increased firing power, coupled with advanced ballistics,[33] have made modern firearms far more deadly and fundamentally different from their historical predecessors.

### 3. *Under* **Bruen***, a "More Nuanced Approach" to Historical Analogies Is Required Where Firearms Capable of Firing Repeatedly Without Reloading Were Not In Widespread Circulation Until the Early 20th Century.*

Plaintiffs cite several additional firearms introduced in the early- to mid-20th century as evidence that "there is no historical tradition of restricting firearms capable of firing more than 10 rounds without reloading."  Mem. at 23 (capitalizations omitted).  They cite the Auto Ordnance Company's semi-automatic rifle (1927, 30 rounds), the Browning Hi-Power pistol (1935, 13 rounds), and the AR-15 (1963, 30-round magazine).  *Id.* at 24.  However, these firearms were introduced more than a half century after ratification of the Fourteenth Amendment and more than a century after ratification of the Second Amendment.  Because these firearms **did not exist**, the lack of any "historical tradition" of regulating them when the Second and Fourteenth Amendments were enacted is meaningless.

---

[31] *See* Ingraham, *supra* note 29.

[32] Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://perma.cc/4ZJA-5V4M.

[33] *See*, *e.g.*, Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://perma.cc/YR7L-PWPS.

As *Bruen* recognizes, courts must adopt a "more nuanced approach" in light of "dramatic technological changes" in firearms technology.  142 S. Ct. at 2132.  There may inherently be no comparable regulation from the Colonial Period or Antebellum Era when the technology now at issue simply ***did not exist*** then.  *See Oregon Firearms Fed'n, Inc.*, 2022 WL 17454829, at *12. As *Bruen* acknowledged, "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." 142 S. Ct. at 2132.

More to the point, and contrary to Plaintiffs' claims, as civilians gained more widespread access to weapons capable of firing repeatedly without reloading, Congress and the states ***did respond*** by passing laws regulating these weapons.  For example, in 1927, Rhode Island passed a law prohibiting "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[34]  That same year, Michigan prohibited any firearm that fired more than sixteen times without reloading.[35]  In 1932, Congress passed a law prohibiting "any firearm" in the District of Columbia "which shoots automatically or semiautomatically more than twelve shots without reloading" – a prohibition that has existed in some regulatory form ever since.[36]  In 1933, Ohio outlawed any firearm that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading," and South Dakota banned firearms "from which more than five shots or bullets may be rapidly, or

---

[34] Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, §§ 1, 4.

[35] Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888, § 3.

[36] Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652; *see also Heller v. D.C.* (*Heller II*), 670 F.3d 1244, 1248 (D.C. Cir. 2011), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

automatically, or semi-automatically discharged from a magazine."[37]  In total, between 1925 and 1934, at least 31 states and the District of Columbia restricted access to certain weapons capable of firing repeatedly without reloading,[38] and at least 22 states plus the District of Columbia restricted ammunition magazines or similar feeding devices, and/or had round capacity limits.[39]

In short, unlike the handgun regulations addressed in *Bruen* and *Heller*, for which the Supreme Court looked to historical antecedents limiting the right of armed self-defense, under *Bruen* a "more nuanced approach" is required when evaluating restrictions on firearms technology that did not exist before 1791 or 1868.  142 S. Ct. at 2132.  Applying that "more nuanced approach," these early 20th century laws demonstrate a clear history and tradition of regulating firearms that can fire repeatedly without reloading.  And they reflect a recognition that such regulations do not impinge on any legitimate needs for armed self-defense, but are instead intended to reduce the carnage that can result when many rounds can be fired without reloading.

## CONCLUSION

The Challenged Law does not violate the Second Amendment because (1) applying the standards of *Bruen* and *Heller*, the Challenged Law does not burden the right to "armed self-defense" (and Plaintiffs make no showing of any such burden), and (2) the Challenged Law is "relevantly similar" to historical laws that imposed restrictions on firearms without burdening "the right of armed self-defense," *Bruen*, 142 S. Ct. at 2132–33.

---

[37] Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189, § 12819-3; Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245, 245, § 1.

[38] *See* Spitzer Decl., *supra* note 13, at ¶ 23.  Although most of these laws restricted access to fully automatic weapons, at least seven and as many as ten states, plus the District of Columbia, restricted semi-automatic weapons.  *Id*. ¶ 29.

[39] *See id*. ¶ 32.

Dated: February 7, 2023

*Of Counsel:*

Daniel Weltz
Rachel Bercovitz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
DWeltz@cov.com
RBercovitz@cov.com

Douglas N. Letter
Shira Lauren Feldman
Brady
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

Ciara Wren Malone
March for Our Lives
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

Respectfully submitted,

/s/ Timothy C. Hester
Timothy C. Hester (phv207107)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*

20

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2023, an electronic copy of the foregoing *Amicus Curiae* Brief was filed with the Clerk of Court for the United States District Court for the District of Connecticut using the Court's *CM-ECF* system and was served electronically by the Notice of Docket Activity upon registered *CM-ECF* participants.

Dated: February 7, 2023                    Respectfully submitted,


                                            /s/ Timothy C. Hester
                                            Timothy C. Hester (phv207107)
                                            COVINGTON & BURLING LLP
                                            One CityCenter
                                            850 Tenth Street, NW
                                            Washington, DC 20001
                                            (202) 662-6000
                                            thester@cov.com