**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS *et al.*, <br><br>            Plaintiffs, <br><br>     v. <br><br><br> NED LAMONT *et al.*, <br><br>            Defendants. | Civil Action No. 3:22 CV 1118 |

**[PROPOSED] *AMICUS CURIAE* BRIEF OF GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

I.      INTEREST OF *AMICUS CURIAE*..................................................................1

II.     INTRODUCTION ...........................................................................................2

III.    ARGUMENT ...................................................................................................3

        A.      *Bruen's* New Second Amendment Test Effectively Requires the
                Consideration of Social Science Research.............................................3

        B.      Because the Connecticut Statutes Address Unprecedented Social and
                Technological Conditions, *Bruen* Requires a Nuanced Analysis When
                Comparing it with Historical Laws..........................................................4

                1.      The Frequency and Lethality of Premeditated Public Mass
                        Shootings Is, Itself, a Novel Societal Concern. ...........................5

                2.      The Rise of Mass Shootings Coincides with Unprecedented
                        Societal Concerns, Which the Founders Could Never Have
                        Imagined. ......................................................................................5

                        a.      *Social Media* ...................................................................5

                        b.      *Urbanization* ...................................................................6

                3.      Advances in Gun Technology Have Combined with These Societal
                        Changes to Create the Perfect Storm for Mass Shootings. .........7

                4.      *Bruen* Demands Nuance in Analyzing Historical Analogues....8

        C.      Plaintiffs' Formulation of "Common Use" Is Inherently Flawed...........8

        D.      Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-
                Defense" Weapons Protected by the Second Amendment. ...................11

IV.     CONCLUSION...............................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018)......................................................................................1

*District of Columbia v. Heller*,
  554 U.S. 570 (2008).......................................................................................... *passim*

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  417 F. Sup. 3d 747 (W.D. Va. 2019) ........................................................................1

*Libertarian Party of Erie Cnty. v. Cuomo*,
  970 F.3d 106 (2d Cir. 2020).....................................................................................1

*McDonald v. City of Chicago, Ill.*,
  561 U.S. 742 (2010)...................................................................................................1

*Md. Shall Issue v. Hogan*,
  353 F. Sup. 3d 400 (D. Md. 2018) ...........................................................................1

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022).................................................................................... *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  804 F. 3d 242 (2d Cir. 2015)..................................................................................10

*Oregon Firearms Fed'n, Inc. v. Brown*,
  No. 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022).............................10

*Peruta v. County of San Diego*,
  824 F.3d 919 (9th Cir. 2016) ...................................................................................1

*Stimmel v. Sessions*,
  879 F.3d 198 (6th Cir. 2018) ...................................................................................1

*Worman v. Healey*,
  922 F. 3d 26 (1st Cir. 2019)......................................................................................9

**Statutes**

CONN. GEN. STAT. §§ 53-202a-c.....................................................................................2

CONN. GEN. STAT. § 53-202w..........................................................................................2

## Other Authorities

*1866 Yellowboy Rifle History*, UBERTI USA, https://tinyurl.com/3x2wjth3 ................................. 7

Army Field Manual No. 3-22-9, Chapter 7, § 7-8 (Apr. 23, 2003),
  https://tinyurl.com/3reu38px ...................................................................... 11

Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the United
  States*, WASH. POST (May 9, 2021), https://tinyurl.com/537ww9z4 ........................... 4

Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with
  the 1994–2004 Federal Assault Weapons Ban: Analysis of Open–source Data*,
  86(1) J. Trauma & Acute Care Surgery 11 (2019), https://tinyurl.com/yzehttj3 ............ 13

Christopher Ingraham, *What 'Arms' Looked Like When The 2nd Amendment Was
  Written*, WASH. POST (June 13, 2016), https://tinyurl.com/mu5ety64 ........................ 7

Danielle Campoamor, *Uvalde's only pediatrician shares the horror of treating
  school shooting victims*, NBC NEWS (May 29, 2022),
  https://tinyurl.com/27hr2p2w ..................................................................... 13

*Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, HOUSE
  COMM. ON OVERSIGHT AND REFORM (June 8, 2022),
  https://tinyurl.com/y98a4wed ..................................................................... 13

*Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19
  Pandemic*, U.S. CENSUS BUREAU (Dec. 22, 2022),
  https://tinyurl.com/5n7hvh4n ...................................................................... 9

H.R REP. NO. 103-489, at 25 (1994) ................................................................ 6

Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the
  Debate on Guns*, THE ATLANTIC (Feb. 22, 2018), https://tinyurl.com/2uc4bepe ............ 12

*How Fast Can You Fire An Ar-15? Rate Of Fire By Caliber Rate*, NECKBONE
  ARMORY, https://tinyurl.com/2z944k7h ............................................................ 7

Maria Hammack, "A Brief History of Mass Shootings," BEHIND THE TOWER
  (2016), https://tinyurl.com/yc85z9pn ............................................................. 4

Michael Jensen et al., *Use of Social Media By US Extremists*, NAT'L CONSORTIUM
  FOR THE STUDY OF TERRORISM AND RESPONSES TO TERRORISM (2019),
  https://tinyurl.com/3s9nmbbc ...................................................................... 5

Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*,
  CAMBRIDGE UNIV. PRESS (Aug. 24, 2020),
  https://tinyurl.com/bdds6wf9 ...................................................................... 5

Pete Yost, *ATF: 68,000 guns in Mexico traced to U.S.*, WASH. POST (April 27, 2012), https://tinyurl.com/mypszcus ............................................................... 9

POP CULTURE: 1800, U.S. CENSUS BUREAU (Dec. 9, 2022), https://tinyurl.com/78cxvafx ....................................................................... 6

Sam Bocetta, *The Complete History of the AR-15 Rifle*, SMALL WARS JOURNAL (July 12, 2017), https://tinyurl.com/2jwemryz ...................................... 12

Sara Swann, *The history of the AR-15 and how it became a symbol of American gun culture,* POYNTER (June 29, 2022), https://tinyurl.com/5bffkafr ................... 12

Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt ............................................................ 13

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HASTINGS CONST. L.Q. 145 (2022), https://tinyurl.com/zx52dvsmc .............................. 8

Scott Pelley, *What Makes the AR-15 Style Rifle the Weapon of Choice for Mass Shooters?*, CBS (June 23, 2019), https://tinyurl.com/3y97wn33 ................ 12

Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, ROLLING STONE (Feb. 22, 2018), https://tinyurl.com/4nedm6fa ................................................................... 12

Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack*, REUTERS.COM (May 15, 2022), https://tinyurl.com/bdzbf8us ............................. 6

Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk ........................... 6

*Winchester Model 1866 Short 38 Special Lever Action Rifle*, WINCHESTER GUN STORE, https://tinyurl.com/yc3cv2zc ....................................................... 7

*Winchester Model 1866 Yellow Boy*, GUN CRITIC, https://tinyurl.com/2p8j76xe ......................... 7

## I.    INTEREST OF *AMICUS CURIAE*

Amicus curiae Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded more than a quarter-century ago and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence, and advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention.

Giffords Law Center has filed numerous amicus curiae briefs around the country, providing technical expertise and analysis in gun-related cases. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010); *D.C. v. Heller*, 554 U.S. 570 (2008); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020). Moreover, multiple courts have cited research and information from Giffords Law Center's amicus briefs in Second Amendment rulings. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Stimmel v. Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019); *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018).

## II.      INTRODUCTION

Connecticut General Statutes sections 53-202a-c and 53-202w (the "Connecticut Statutes" or the "Statutes") are constitutional under the new test set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* dictates that when a law regulates conduct covered by the plain text of the Second Amendment, courts must determine if the "regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. The Connecticut Statutes are constitutional because they are consistent with this Nation's historical tradition of firearm regulation: they are relevantly similar to historical regulations that were designed to address pressing public safety concerns of the time. When considering the unprecedented social and technological conditions the Statutes address, *Bruen* requires a "nuanced approach" to the analogical inquiry to avoid creating a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2132-2133.

The Statutes restrict the use and possession of semiautomatic rifles, shotguns and pistols with military-style features and the capability to accept large-capacity magazines ("LCMs"). CONN. GEN. STAT. 53-202w. The weapons and features governed by the Statutes are uniquely dangerous, not quintessential self-defense weapons, and therefore, not covered by the plain text of the Second Amendment. These weapons are designed to kill large numbers of people quickly, making them significantly more lethal than any firearms in the 1700s or 1800s.

And, as we show below, Plaintiffs' version of the common use test is inherently flawed, and their claim that LCMs are in common use is not supported by the evidence.

### III.    ARGUMENT

**A.    *Bruen's* New Second Amendment Test Effectively Requires the Consideration of Social Science Research.**

In *Bruen*, the Supreme Court articulated a new standard for determining whether a regulation impinges on the Second Amendment. Under *Bruen*, the party challenging a law bears the initial burden of showing that the regulated conduct is covered by the Second Amendment's plain text. The burden then shifts to the government to demonstrate that the regulation is "consistent with this Nation's historical tradition" of firearms regulation. *Bruen*, 142 S. Ct. 2111, 2135 (2022). The Court explained that there is no need for a modern regulation to be the "twin" of a historical regulation, because "[w]hile the historical analogies in [*Bruen*] and […] *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132.

In cases involving "unprecedented societal concerns or dramatic technological changes," *Bruen* endorsed nuanced analogical reasoning to determine whether the challenged law is "relevantly similar" to historical laws. *Id.* at 2132. The Court pointed to two important—but non-exclusive—considerations for lower courts: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added).

Comparing the motivations (the "whys") and the implementations (the "hows") of modern and historical laws requires courts to consider relevant social science research regarding the prevailing conditions in modern and historical American society. Such research helps courts properly contextualize modern and historical laws and the prevailing social backdrop against which those laws were passed, inquiries that are critical under *Bruen*.

In sum, *Bruen* created a new test for determining constitutionality under the Second Amendment, one that turns to historical precedent while leaving room for flexibility and nuanced

analysis in the context of unprecedented circumstances. This analysis of historical analogues demands that gun safety regulations be viewed in light of relevant prevailing societal conditions, and social science research provides indispensable evidence of these conditions.

> **B.**     **Because the Connecticut Statutes Address Unprecedented Social and Technological Conditions, *Bruen* Requires a Nuanced Analysis When Comparing it with Historical Laws.**

Over the past 200 years, unprecedented societal changes have accompanied advances in firearms technology, which have been followed by a dramatic rise in the frequency and lethality of mass shootings. This uniquely modern danger motivated the Connecticut Statutes, which like many regulations spanning our nation's history, were designed to protect the public.[1]

> **1.**     **The Frequency and Lethality of Premeditated Public Mass Shootings Is, Itself, a Novel Societal Concern.**

It is indisputable that the United States has experienced an exponential upward trend in the frequency of public mass shootings. Giffords Law Center could find only two instances of mass shootings in America throughout all of the 18th and 19th centuries,[2] both of which occurred in 1891 and neither of which involved fatalities (likely due to the limitations of gun technology at the time).[3] From 1900-1965, one scholar estimates that 25 mass shootings occurred.[4] By contrast, sources report over 600 mass shootings ***per year*** in each of the last three years (611 in 2020, 690 in 2021, and 648 in 2022).[5]

---

[1] *See* Defs.' Opp'n to Mot. for Prelim. Inj. at 4–7 (explaining motivations).
[2] As used here, a "mass shooting" is a shooting in which four or more people (other than the perpetrator(s)) are injured and/or killed, where victims are selected indiscriminately, and where the murders are not attributable to any other underlying criminal activity or circumstance.
[3] *See* Maria Hammack, "A Brief History of Mass Shootings," BEHIND THE TOWER (2016), https://tinyurl.com/yc85z9pn (last visited Dec. 9, 2022).
[4] *See* Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the United States*, WASH. POST (May 9, 2021), https://tinyurl.com/537ww9z4.
[5] *See Mass Shooting Data from 2020, 2021, and 2022*, GUN VIOLENCE ARCHIVE, Past Summary Ledgers | Gun Violence Archive (last visited Jan. 12, 2023).

Together, these figures demonstrate that the phenomenon of mass shootings is strikingly more prevalent in modern-day America than it was at any point in the prior 200 years.

2.        **The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns, Which the Founders Could Never Have Imagined.**

Several modern social phenomena coincided with a dramatic increase in mass shootings over the 21st century, making firearms regulation especially imperative. The proliferation of social media platforms and transformative urbanization are two poignant examples.

a.        *Social Media*

Social media platforms, through which users may instantaneously interact and share public and private information, create a means of communication that is exponentially faster, farther-reaching, and more difficult to regulate than anything the Founders could possibly have imagined. Numerous studies have correlated social media usage with increases in anti-social behavior; political, religious, and social extremism; mental health disorders; and ultimately, mass shootings. Social media has specifically been shown to play an important role in the radicalization of American extremists,[6] as a mounting body of evidence shows that content-ranking algorithms can limit users' exposure to contrary viewpoints, creating "echo chambers" that intensify pre-existing biases.[7]

Amid such violent and frenetic discourse, many perpetrators of mass shootings have been inspired by what they read online. One example (from far too many to choose from) is the May 2022 Buffalo supermarket shooting, in which the 18-year-old gunman published a racist, violent

---

[6] *See, e.g.* MICHAEL JENSEN ET AL., *Use of Social Media By US Extremists,* NAT'L CONSORTIUM FOR THE STUDY OF TERRORISM AND RESPONSES TO TERRORISM (2019), https://tinyurl.com/3s9nmbbc.
[7] *See* Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization,* CAMBRIDGE UNIV. PRESS (Aug. 24, 2020), https://tinyurl.com/bdds6wf9.

manifesto online before broadcasting the shooting live on social media.[8] According to an investigation by the New York Attorney General, the gunman's "path towards becoming a white supremacist terrorist began upon viewing on the 4chan [social media] website a brief clip of a [previous] mass shooting."[9] The shooter also posted material on a different social media platform named Discord "with the explicit goal of provoking future mass shootings."[10] A *Reuters* article observed that the shooting "appear[ed] to be the latest in a line of 'copycat' gunmen carrying out deadlier mass shootings inspired by previous attackers."[11]

b.   *Urbanization*

In addition to social media, urbanization has radically transformed society since the Founders' era. In 1800, the United States averaged 6.1 people per square mile.[12] By 2020, this increased by a staggering 1500% to an average of 93 per square mile.[13]

This explosion in population density has profoundly changed the way people associate. People gather in large groups more frequently than would have been possible before urbanization and mass industrialization, including in schools that accommodate thousands of students, tightly packed commuter trains and buses, large office buildings, and crowded night clubs, concerts, movie theaters, malls, and parades. These gatherings create so-called "sitting duck" situations in which mass shooters can efficiently injure or kill large numbers of people in a single event.[14]

---

[8] *See Investigative Report on the role of online platforms in the tragic mass shooting in Buffalo on May 14, 2022*, OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, October 18, 2022.

[9] *Id*. at 3.

[10] *Id*.

[11] Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack*, REUTERS.COM (May 15, 2022), https://tinyurl.com/bdzbf8us.

[12] POP CULTURE: 1800, U.S. CENSUS BUREAU (Dec. 9, 2022), https://tinyurl.com/78cxvafx.

[13] Because these figures are an average of the population density of all areas of the country, the much lower density in rural areas means that the numbers drastically understate the impact of the population density in *urban* areas, where most mass shootings occur.

[14] *See, e.g.*, Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk (reporting that Last Vegas shooting lasted only 11 minutes but killed 58 concertgoers and injured nearly 1,000 others).

### 3. Advances in Gun Technology Have Combined with These Societal Changes to Create the Perfect Storm for Mass Shootings.

Against the backdrop of these societal changes, advances in gun technology allow even an inexperienced shooter to kill more people more rapidly than ever before. The typical Revolutionary-era musket: (i) could hold just one round at a time; (ii) could fire no more than two to three rounds per minute; (iii) had a maximum accurate range of 55 yards; and (iv) had a muzzle velocity of approximately 1,000 feet per second.[15] By contrast, a typical modern AR-15: (i) can hold 30 rounds (30 times more); (ii) can fire up to 300 rounds per minute (100 to 150 times more)[16]; (iii) can shoot accurately from approximately 600 yards (11 times further); and (iv) attains a muzzle velocity of over 3,000 feet per second (three times faster).[17] Although firearms technology improved between the founding and the start of the Civil War in 1861, even the most advanced firearms of that era came nowhere close to an AR-15. For example, the Winchester Model 1866 had a magazine capacity of 11 to 15 rounds,[18] a maximum effective range of approximately 150 yards (about one fourth that of an AR-15), a muzzle velocity of just 1,060 feet per second (roughly one third the speed of an AR-15) and could fire only 10 shots per minute.[19]

As discussed below, these technological changes have led to drastically different survival outcomes in the event of a shooting.

---

[15] Christopher Ingraham, *What 'Arms' Looked Like When The 2nd Amendment Was Written*, WASH. POST (June 13, 2016), https://tinyurl.com/mu5ety64. "Muzzle velocity" is the speed of a projectile when leaving the muzzle of a gun, and is a general measure of the power and lethality of a firearm.

[16] AR-15s come in different makes and models, and can be modified in different ways that dramatically increase the firing capacity. *See How Fast Can You Fire An Ar-15? Rate Of Fire By Caliber*, NECKBONE ARMORY, *available at* https://tinyurl.com/2z944k7h ("Most modern rifles have a fire rate of about 300 rounds per minute . . . .").

[17] *Id.*; H.R REP. NO. 103-489, at 25 (1994).

[18] *Winchester Model 1866 Short 38 Special Lever Action Rifle*, WINCHESTER GUN STORE, https://tinyurl.com/yc3cv2zc.

[19] *Winchester Model 1866 Yellow Boy*, GUN CRITIC, https://tinyurl.com/2p8j76xe; *1866 Yellowboy Rifle History*, UBERTI USA, ("The gun's . . . rate of 10 or more shots per minute was a game changer."), https://tinyurl.com/3x2wjth3.

### 4.  *Bruen* Demands Nuance in Analyzing Historical Analogues.

Under *Bruen,* a court must look to the respective "whys" and "hows" of gun regulations to determine if historical and modern laws are analogous. 142 S. Ct. at 2133. The motivation behind the Connecticut Statutes—that is, their "why"—is to promote public safety.[20] Many (if not all) gun regulations passed at the time of the Founding and throughout our history had the same motivation: to protect the public from deadly harm.[21] This is a strong link between the present and past "whys."

To analogize present and past "hows," the Court must determine if the Connecticut Statutes impose a "burden on the right of armed self-defense" that is "comparable" to the burden imposed by historical laws. *Id.* at 2133. The Connecticut legislature was forced to contend with realities that legislatures of the past did not, primarily the increase in mass shootings, the shifts in our society, and the advances in gun technology, but—like prior legislatures—it felt compelled to design regulations to protect public safety. Employing the nuanced approach required by *Bruen*, *id.* at 2132, and for the reasons stated in Connecticut's Opposition, the Connecticut Statutes are relevantly similar to several historical weapons regulations, and thus consistent with the nation's tradition of firearm regulation. *See* Defendants' Opposition at 32–39. The Statutes are constitutional under *Bruen*.

### C.  Plaintiffs' Formulation of "Common Use" Is Inherently Flawed.

Plaintiffs argue that simply because millions of assault weapons and LCMs are "in circulation," *i.e.*, manufactured in or imported into the United States since 1960, they are in

---

[20] *See* Defs.' Opp'n. to Mot. for Prelim. Inj. at 4–7 (explaining motivations (the "whys") for the Connecticut Statutes).

[21] *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 168-69 (2022), https://tinyurl.com/zx2dvsmc (Reconstruction-era laws were enacted to protect public safety and were a direct response to the "newly-rising levels of gun violence"). Also, as identified by Connecticut, there are a variety of historical laws similar in purpose to the Statutes, all of which had the goal of preventing contemporary violence. *See* Defs.' Opp'n to Mot. for Prelim. Inj. at 32–39.

"common use" for self-defense, and thus covered by the plain text of the Second Amendment. This definition of "common use" grossly overstates actual ownership and use and ignores the requirement that such weapons must be in common use for *lawful self-defense*. *See Bruen*, 142 S. Ct. at 2133 ("[I]ndividual self-defense is 'the central component' of the Second Amendment right." (citation omitted)).

Preliminarily, Plaintiffs overstate, as a matter of methodology, the number of weapons and LCMs actually possessed by civilians for a lawful purpose. Plaintiffs claim that there are over twenty-four million assault rifles "in circulation" in the United States, and that these rifles constitute "roughly thirty-five percent of all newly manufactured guns sold in America."[22] Plaintiffs similarly claim that Americans own 115 million LCMs, and that this accounts for "approximately half of all privately owned magazines in the United States."[23] But the Plaintiffs fail to allege what percentage of the 333 million people in the United States[24] currently own these assault weapons or LCMs, as compared to how many are in the possession of a smaller number of gun enthusiasts and collectors who own multiple such weapons. Moreover, the number of weapons and LCMs "in circulation" presumably includes not only weapons and LCMs possessed by civilians, but also weapons and LCMs used by law enforcement, sitting in warehouses or on store shelves,[25] and sold directly or indirectly to organized crime, such as the well-documented pipeline of firearms that end up trafficked across the southern border into Mexico.[26]

---

[22] Mot. for Prelim. Inj. at 17.
[23] Mot. for Prelim. Inj. at 22.
[24] *Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic*, U.S. CENSUS BUREAU (Dec. 22, 2022), https://tinyurl.com/5n7hvh4n.
[25] As noted in Connecticut's Opposition, the number of *produced* weapons is not equal to the number of individuals who *own* them. Defs.' Opp'n. to Mot. for Prelim. Inj. at 25.
[26] *See*, e.g., Pete Yost, *ATF: 68,000 guns in Mex. traced to U.S.*, WASH. POST (April 27, 2012), https://tinyurl.com/mypszcus.

Plaintiffs also cite several cases in support of their flawed understanding of "common use,"[27] but those cases short-circuit the "common use" analysis in favor of the often more dispositive question of means-end scrutiny, which *Bruen* has since abolished. *Bruen*, 142 S. Ct. at 2127-2128. For example, in *New York State Rifle & Pistol Ass'n v. Cuomo*, which predates *Bruen*'s overhaul of Second Amendment constitutional methodology, the Second Circuit relied on "ownership statistics" to find that assault weapons were in "common use." 804 F.3d 242, 257 (2d Cir. 2015). But the court recognized "that reliable empirical evidence of lawful possession for lawful purposes was 'elusive,'" and there was an "absence of clear[] guidance from the Supreme Court or strong[] evidence in the record." *Id.* Likewise, in *Worman v. Healey*, a challenge to a Massachusetts law similar to the Statutes, the First Circuit was "reluctant to plunge into th[e] factbound morass," but observed that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical." 922 F.3d 26, 35–36 (1st Cir. 2019).

Further, Plaintiffs' argument ignores a critical piece of the equation (and Plaintiffs' thus fail to carry their burden): assault weapons and LCMs must be shown to be in "common use" for the *lawful purpose of self-defense*. *See Bruen*, 142 S. Ct. at 2138. Plaintiffs state that because millions of assault weapons and LCMs are in circulation and used "for all manner of lawful purposes, including self-defense, sporting, and hunting," the common use test is satisfied.[28] But as the Supreme Court held in *Heller*, and did not disturb in *Bruen*, commonality alone is not enough. *Heller*, 554 U.S. at 624–625 (regulations on machine guns are presumptively constitutional because they are not used "for lawful purpose like self-defense"); *see Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, at *8 n.13 (D. Or. Dec. 6, 2022) ("The Second Amendment,

---

[27] Mot. for Prelim. Inj. at 15–16, 21–22.
[28] Mot. for Prelim. Inj. at 21.

therefore, requires a court to consider not only the prevalence of a particular firearm, but also the nature of that firearm's use among civilians.").

Plaintiffs' test also dangerously fails to consider the potential of the firearms industry over-saturating the market to manufacture "common use." A manufacturer should not be able to circumvent regulations by driving sales of a particular weapon until the weapon becomes regarded as in "common use," essentially manufacturing a very profitable expansion of the Second Amendment's protections. Constitutional rights cannot be so easily manipulated.

As *Bruen* shed no further light on the definition of "common use," this court should follow the recent decision of its peer in Oregon and find that just because there are millions of LCMs in circulation does not mean they are in "common use." *See Oregon Firearms Fed'n, Inc.*, 2022 WL 17454829. The approach suggested by Plaintiffs is an unprincipled and short-sighted test that does not account for the broad and thorough analysis required in the post-*Bruen* landscape.

### D.   Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment.

The Supreme Court has held that the Second Amendment right to bear "arms" protects the right of law-abiding, responsible citizens to possess a handgun—the "quintessential self-defense weapon"—in and outside the home for self-defense. *Heller*, 554 U.S. at 629, 635; *Bruen*, 142 S. Ct. at 2122. Yet the Court has cautioned that the Second Amendment should not be understood as conferring a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," and has explicitly endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626–627.[29]

---

[29] *Bruen* makes clear that many regulations implicating Second Amendment rights will survive scrutiny under the Court's analytical framework. *See Bruen*, 142 S. Ct. at 2133–34 ("[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check.).

Assault weapons are not the ordinary handguns at issue in *Heller* and *Bruen*, but rather, are dangerous military-style firearms. The AR-15 rifle, for example, traces its origins to a military grade rifle designed in the late 1950s.[30] Indeed, the AR-15's "phenomenal lethality" has made versions of it the U.S. military's standard-issue assault rifle since the Vietnam War.[31] The U.S. Army Field Manual instructs soldiers that semiautomatic fire is "[t]he most important firing technique during modern, fast moving combat," emphasizing that it is "surprising how devastatingly accurate rapid [semiautomatic] fire can be."[32]

Assault weapons are also exponentially more lethal than any firearms available during the ratification of the Second or Fourteenth Amendments or throughout most of our nation's history. Semiautomatic assault rifles fire bullets at a higher velocity than other types of firearms (such as semiautomatic handguns), which results in more grievous injuries.[33] Bullets from a 9mm handgun travel around 800 miles per hour, but bullets from semiautomatic rifles can travel three times faster and strike with twice the force.[34] When traveling through the body, bullets fired from semiautomatic rifles cause "cavitation," whereby a swath of tissue several inches from the bullet's path ripples away from the bullet and then settles back.[35] In describing the difference between gun-shot wounds inflicted by a semiautomatic rifle and those inflicted by a 9mm handgun, Peter Rhee,

---

[30] *See* Sam Bocetta, *The Complete History of the AR-15 Rifle*, SMALL WARS JOURNAL (July 12, 2017), https://tinyurl.com/2jwemryz; Sara Swann, *The history of the AR-15 and how it became a symbol of American gun culture*, POYNTER (June 29, 2022), https://tinyurl.com/5bffkafr.

[31] Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, ROLLING STONE (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.

[32] U.S. Army Field Manual No. 3-22-9, Chapter 7, § 7-8, (Apr. 23, 2003), https://tinyurl.com/3reu38px.

[33] *See, e.g.*, Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, THE ATLANTIC (Feb. 22, 2018), https://tinyurl.com/2uc4bepe (explaining the difference between injuries inflicted by semiautomatic rifles versus handguns).

[34] Scott Pelley, *What Makes the AR-15 Style Rifle the Weapon of Choice for Mass Shooters?*, CBS (June 23, 2019), https://tinyurl.com/3y97wn33.

[35] Sher, *supra* note 33.

a trauma surgeon at the University of Arizona, stated: "One looks like a grenade went off in there," while "[t]he other looks like a bad knife cut."[36]

The effects of assault weapons are particularly devastating in mass shootings involving child victims. Roy Guerrero, a pediatrician in Uvalde, Texas, where a May 2022 mass shooting resulted in the deaths of 19 elementary school students and two adults, recalled victims with "[o]pen chest wounds," "war wounds," wounds akin to "decapitation," "as if things exploded once the bullets hit the bodies."[37] In his congressional testimony, Dr. Guerrero recalled seeing children "whose bodies had been so pulverized by the bullets fired at them, over and over again, whose flesh had been so ripped apart, that the only clue as to their identities were the blood spattered cartoon clothes still clinging to them. Clinging for life and finding none."[38]

Common-sense laws like the Connecticut Statutes are effective in reducing violence by regulating "dangerous and unusual" assault weapons without impeding the right to possess a handgun for self-defense within and outside the home. The effectiveness of such laws is evidenced by the relative success of the federal assault weapons ban, in effect from 1994 to 2004. When compared with the periods before and after the ban, the ban period was "associated with an approximately 85% reduction in mass shooting fatalities."[39]

\* \* \*

---

[36] Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt; *see also* Dickinson, *supra* note 31 (quoting Navy trauma surgeon Dr. Philip Rhee, who operated on Congresswoman Gabrielle Giffords, as saying that while handgun wounds are comparable to "stabbing with a bullet," shooting someone with an AR-15 is "as if you shot somebody with a Coke can").

[37] Danielle Campoamor, *Uvalde's only pediatrician shares the horror of treating school shooting victims*, NBC NEWS (May 29, 2022), https://tinyurl.com/27hr2p2w.

[38] *Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, HOUSE COMM. ON OVERSIGHT AND REFORM (June 8, 2022), https://tinyurl.com/y98a4wed.

[39] Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994–2004 Federal Assault Weapons Ban: Analysis of Open–source Data*, 86(1) J. Trauma & Acute Care Surgery 11, 15 (2019), https://tinyurl.com/yzehttj3.

In sum, the Connecticut Statutes are consistent with this Nation's "historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, because they are relevantly similar to historical regulations designed to address public safety. The Statutes also regulate the possession of uniquely dangerous assault weapons, which weapons (and the LCMs often attached to them) are neither in common use for self-defense, nor necessary or useful in self-defense.

## IV.    CONCLUSION

For the reasons set forth above and those set forth by Connecticut in its Opposition, the Connecticut Statutes are constitutional, and the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated: February 7, 2023                              Respectfully submitted,

/s/      *Jennifer Loeb*
Jennifer Loeb*
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Tel: 202 777 4500
jennifer.loeb@freshfields.com

Aaron Marcu*
Elliot Friedman*
Freshfields Bruckhaus Deringer US LLP
601 Lexington Ave., 31st Floor
New York, NY 10022
Tel: 212 277 4000
aaron.marcu@freshfields.com
elliot.friedman@freshfields.com

Deirdre Daly (ct23128)
Finn Dixon & Herling LLP
Six Landmark Square
Stamford, CT 06901
Tel: 203 325 5050
ddaly@fdh.com

*Attorneys for Amicus Curiae*
Giffords Law Center to Prevent Gun
Violence

* *Pro hac vice*

## CERTIFICATE OF SERVICE

I certify that, on February 7, 2023, a true and correct copy of the foregoing was filed with the Clerk of the United States District Court for the District of Connecticut via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/      *Jennifer Loeb*
Jennifer Loeb*
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Tel: 202 777 4500
jennifer.loeb@freshfields.com

*Attorney for Amicus Curiae*
Giffords Law Center to Prevent Gun
Violence

*\* Pro hac vice*

16