# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

NATIONAL ASSOCIATION FOR GUN RIGHTS, and )
TONI THERESA SPERA FLANIGAN )
)
      Plaintiffs, )
)      Civil Action No.
v. )      3:22-cv-1118 (JBA)
)
NED LAMONT, is his official capacity as the Governor )
of the State of Connecticut; )
PATRICK J. GRIFFIN, is his official capacity as the )
Chief State's Attorney of the State of Connecticut; and )
SHARMESE L. WALCOTT, in her official capacity as )
the State's Attorney, Hartford Judicial District, )
)
      Defendants. )

## REPLY IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.    Justice Thomas: Laws Like the Connecticut Statute are Clearly Unconstitutional..................................................................................1

II.    The State's Central Premise is False.............................................................2

III.    This Case is Very Simple................................................................................4

IV.    The Legal Analysis Controlling This Case is Indistinguishable from *Heller*.....................................................................................................7

V.    The State Misapprehends *Bruen's* Historical Test.......................................8

VI.    The State's Burden is to Identify "an Enduring American Tradition," Not a Handful of Isolated Examples and Outliers.............................9

VII.    The State's "Advanced Technology" Argument Wilts in *Heller's* Glare...........9

VIII.    The State Cannot Identify a Historical Tradition of Absolute Bans of Commonly Held Arms..................................................................10

A.    The Relevant Time Period Does Not Include the 20th Century .........................10

B.    The State Was Unable to Show Historical Analogues........................................12

C.    Conclusion: An Arms Ban Would Have Been Unthinkable to the Founders......15

IX.    The State's Reliance on *Cuomo's* "Pre-*Bruen* Analysis" is Baffling..................16

X.    The Court Should Reject the State's Attempt to Shift its Burden onto Plaintiffs .............................................................................................17

XI.    Magazines Are Arms ...................................................................................19

    A.    The State's Argument is Counter to *Heller* ..............................................19

    B.    The State's Argument is Contrary to Lower Courts' Holdings ...............19

    C.    Magazines are an Essential Component to Semi-automatic Firearms.....20

    D.    Silencers Are Not Essential to the Operation of Any Firearm................26

XII.    The State Bans Firearms, Not Firearm Accessories ............................................27

XIII.    The Banned Arms Do Not Fall Within the Category of Weapons That Are Not Protected by the Second Amendment ......................27

    A.    The Court is Bound by Second Circuit Precedent: The Banned Arms are in Common Use ..................................................28

B.   The Banned Firearms are Not Dangerous and Unusual............................28

C.   The State's "Weapons Most Useful in Military Service"
     Argument Fails........................................................................................31

XIV.   The Court Should Reject the State's Efforts to Distort
       the *Heller/Bruen* "Common Use" Analysis .........................................35

A.   There is No Requirement to Show Actual Use .......................................35

B.   The State's Effort to Distort the Common Use Metric Fails .................37

XV.   The Overwhelming Majority of the State's Response
      Does Not Address Any Matter Relevant to the *Heller/Bruen* Test ....................39

A.   The State's Means-End Argument is Simply Irrelevant .........................39

B.   Constitutional Law is Not Grounded in Emotional Appeals .................41

C.   The Availability Heuristic is not a Constitutional Doctrine ..................42

XVI.   There is No Historic Tradition Supporting a Magazine Ban ..............................43

XVII.   The State Tacitly Admits its Handgun Ban is Unconstitutional ........................43

XVIII. Plaintiffs' Facial Challenge is Supported by Supreme Court Precedent ............44

XIX.   The Other Temporary Injunction Factors Are Met...............................................46

XX.   Conclusion   .........................................................................................47

## I.   Justice Thomas: Laws Like the Connecticut Statute are Clearly Unconstitutional

This is not a close case. The Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes." *D.C. v. Heller*, 554 U.S. 570, 625 (2008). Justice Thomas, the author of *Bruen* (joined by Justice Scalia, the author of *Heller*), provided a roadmap to the resolution of this matter in his dissent from denial of certiorari in *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015). Justice Thomas examined an arms ban that was for practical purposes identical to Connecticut's Statute. He noted millions of Americans own AR-style semiautomatic rifles for lawful purposes, including self-defense and target shooting. *Id.* (Thomas, J., dissenting). "**Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons**." *Id.* (emphasis added).

The State has hired numerous experts and submitted hundreds of pages of material in an effort to make this case seem complicated. It is not. This case turns on *Heller's* simple rule to which Justice Thomas alluded. Is the firearm hardware commonly owned by law-abiding citizens for lawful purposes? "If the answer[ is] "yes," the test is over." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019) (emphasis added).[1] Here, the answer is unquestionably "yes." The test is over. The State has categorically banned weapons commonly possessed by law-abiding citizens for lawful purposes. The law is unconstitutional. It is just that simple.

---

[1] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 213 L. Ed. 2d 1109, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022), *and rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).

II.     **The State's Central Premise is False**

The Central Premise of the State's argument is that when it decided *Heller*, the Supreme Court surely never intended to extend Second Amendment protection to a category of arms that can be used in mass shootings. Resp. 18-19. The State's Central Premise rests on a fundamental misunderstanding of *Heller* and is therefore false. This is easily demonstrated.

On April 16, 2007, Seung Hui Cho committed a mass shooting at Virginia Tech University.[2]  At the time, Cho's crime was the worst mass shooting in American history. *Id*. Cho fired 174 rounds, killed 32 people, and wounded around 17 others.[3] Aside from the first two murders, Cho was able to do all of this in only a few minutes. *Id*. Cho did not use an "assault rifle" to commit his crimes.[4] He used two semiautomatic handguns. *Id*.

*Helle*r was argued less than one year later on March 18, 2008,[5] and D.C. made sure the Court was aware that the worst mass shooting in U.S. history up until then had recently been committed with handguns like those banned by its ordinance. It wrote in its brief: "In the recent Virginia Tech shooting, a single student with two **handguns** discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53 (emphasis added). Thus, when it decided *Heller*, the Supreme Court was keenly aware that semiautomatic handguns could be used in mass shootings. Nevertheless, it held that D.C.'s ban was unconstitutional. In doing so, the Court wrote:

> **We are aware of the problem of handgun violence** in this country, and **we take seriously the concerns raised by the many** *amici* **who believe that prohibition of handgun ownership is a solution**. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating

---

[2] Ben Williamson, *The Gunslinger to the Ivory Tower Came: Should Universities Have A Duty to Prevent Rampage Killings?,* 60 Fla. L. Rev. 895, 895–96 (2008).
[3] Grant Arnold, *Arming the Good Guys: School Zones and the Second Amendment*, 2015 B.Y.U. Educ. & L.J. 481, 500–01 (2015).
[4] *Craig R. Whitney, A Liberal's Case for the Second Amendment, 31 T.M. Cooley L. Rev. 15, 19 (2014).*
[5] *Id*., 554 U.S. at 570.

handguns, [] But the enshrinement of constitutional rights necessarily **takes certain policy choices off the table. These include the absolute prohibition of handguns** held and used for self-defense in the home.

*Heller*, 554 U.S. at 636 (emphasis added).

The Virginia Tech shooter killed more people with his semi-automatic handguns (32 fatalities) than the Sandy Hook (26 fatalities), Aurora (12 fatalities), and San Bernadino (14 fatalities) shooters killed with their semi-automatic rifles. Yet only months later the Supreme Court held that the very weapons used by the Virginia Tech shooter were protected by the Second Amendment. It follows that the State's Central Premise is false. The fact that a weapon can be used in mass shootings does not disqualify it from Second Amendment protection.[6]

In *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), *abrogated on other grounds by Bruen*, the Second Circuit recognized this logic (though it failed to apply the logic, which is why its approach has been abrogated). In that case the Court noted that, if anything, the handguns held constitutional in *Heller* were more dangerous than the semi-automatic rifles banned by the State. *Id*., 804 F.3d at 256. The Court stated: "Though handguns comprise only about one-third of the nation's firearms, by some estimates they account for 71 percent to 83 percent of the firearms used in murders and 84 percent to 90 percent of the firearms used in other violent crimes. That evidence of disproportionate criminal use did not prevent the Supreme Court from holding that handguns merited constitutional protection." *Id*.

---

[6] *See also Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (Posner, J.). The Court reviewed the evidence Illinois submitted to prove its regulation would reduce violence. The Court held this evidence was irrelevant under *Heller*, writing: "Anyway the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts. 554 U.S. at 636, 128 S.Ct. 2783. **If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban,** *Heller* **would have been decided the other way,** for that possibility was as great in the District of Columbia as it is in Illinois." *Id*., 702 F.3d at 939.

3

The case for upholding Second Amendment rights is even more compelling here than in *Heller*. In *Heller*, the Court held that the rights of the millions of Americans who possess handguns will not be taken away even though handguns are used by thousands of criminals to kill over ten thousand people every year.[7] The Court was unpersuaded by Justice Breyer's dissent in which he pointed out that handguns "are specially linked to urban gun deaths and injuries, and [] are the overwhelmingly favorite weapon of armed criminals." *Id.*, 554 U.S. at 682 (Breyer, J., dissenting). In contrast, as horrific as mass shootings are, they account for only a fraction of 1% of firearm homicides.[8] Millions of law-abiding citizens own semi-automatic rifles like those banned by the State. Curcuruto Dec. ¶ 6. The rights of those millions cannot be taken away because a few maniacs use semi-automatic rifles to kill tens of people each year in mass shootings.

Then-Judge Kavanaugh expressed the matter this way in his dissent in *Heller II*:

> [C]onsidering just the public safety rationale invoked by D.C., **semi-automatic handguns are more dangerous as a class** than semi-automatic rifles . . . [H]andguns 'are the overwhelmingly favorite weapon of armed criminals.'... So it would seem a bit backwards – at least from a public safety perspective – to interpret the Second Amendment to protect semi-automatic handguns but not semi-automatic rifles. … [Heller erects a] serious hurdle … in the way of D.C.'s attempt to ban semi-automatic rifles. Put simply, **it would strain logic and common sense to conclude that the Second Amendment protects semi-automatic handguns but does not protect semi-automatic rifles**.

*Heller v. D.C.*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)

(emphasis added).[9]

### III.    This Case is Very Simple

---

[7] U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI, available at https://bit.ly/31WmQ1V (last visited Feb. 12, 2023).
[8] Compare FBI total firearm homicides in 2019 (10,258), *supra*, note 7, to 2019 mass shooting homicides from Exhibit B to the Klarevas Declaration (51).
[9] Plaintiffs shall refer to Judge Kavanaugh's dissent in this case as "*Heller II*." Even though Judge Kavanaugh was in dissent, after *Bruen* his analysis almost certainly accurately reflects the law. Indeed, in *Bruen,* the Court cited Judge Kavanaugh's dissent with approval multiple times. *See, id.*, 142 S. Ct. at 2129, n.5, 2134, 2137,

The State has submitted over 800 pages of material to the Court in an effort to make the issues in this case appear complex. They are not. This is a very simple case. The two-part *Heller/Bruen* test states:

> [T]he standard for applying the Second Amendment is as follows:
>
> [Step One:] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> [Step Two:] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.*, 142 S. Ct. at 2129–30.

"*Bruen* makes clear that the first step is one based **solely** on the text of the Second Amendment to determine if it presumptively protects an individual's conduct – a presumption that the [government] can **then** rebut with history and tradition. *U.S. v. Harrison*, 2023 WL 1771138 *4 (W.D. Okla. 2023) (emphasis in original). "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., possessing certain bearable arms – "the Constitution presumptively protects that conduct." *Id.*, 142 S. Ct. at 2126. It is just that simple. Plaintiffs have met their burden.

"Given that the Second Amendment presumptively protects [Plaintiffs'] conduct, the burden shifts to the [government] to demonstrate that [its absolute ban] is "consistent with the Nation's historical tradition of firearm regulation." *U.S. v. Harrison*, *supra*, *5. But under *Heller*, absolute bans of commonly held firearms are "categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right – like the handgun bans at issue in those cases … are categorically unconstitutional.")

Therefore, it is impossible for the State to carry its burden under step two of the *Heller/Bruen* test. The reason for this is apparent from *Heller* itself – there is no historical analogue to such a ban. "[A]fter considering 'founding-era historical precedent,' including 'various restrictive laws in the colonial period,' and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Bruen*, 142 S. Ct. at 2131.

Here, the State has also been unable to identify a regulation analogous to its absolute ban on a category[10] of guns that is in common use by law-abiding citizens for lawful purposes. This is unsurprising. After a no doubt exhaustive search, D.C. was unable to identify a single historical analogue (far less a widespread American tradition) of banning any category of commonly held firearms. And no one else has come close to doing so in the intervening 15 years. There is no reason to expect the State would be able to do so now. This is not to say that the State has not proposed analogues. But as discussed in more detail below, their search was no more successful than D.C.'s, and their proposals can be rejected for the same reason *Heller* rejected D.C.'s proposals – i.e., they do not "remotely burden the right of self-defense as much as [the State's] absolute ban." *Heller*, 554 U.S. at 632

In summary, the complete absence of regulations even remotely analogous to D.C.'s absolute ban allowed *Bruen* to characterize the *Heller* historical inquiry as "relatively simple." *Id.*, 142 S. Ct. at 2132. It was simple because, under *Heller*, absolute bans of commonly held firearms are, in the words of the Seventh Circuit, "categorically unconstitutional." *Ezell, supra. See also People v. Webb*, 2019 IL 122951, 131 N.E.3d 93) (absolute bans are "necessarily"

---

[10] The State admits its ban is categorical. It writes that the Statutes ban a sub-category of arms. Resp. 5. A "sub-category" is, of course, a category.

unconstitutional).[11] To this day no regulation even remotely analogous to the State's ban has ever been identified. Therefore, this case, like *Heller*, is simple. The Statute cannot withstand constitutional scrutiny because the State cannot carry its burden under step two of the *Heller/Bruen* test. The Court could end its analysis here.

## IV.    The Legal Analysis Controlling This Case is Indistinguishable from *Heller*

In *Bruen*, the Court stated: "In some cases, [the historical] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.*, 142 S. Ct. at 2131. "The District in *Heller* addressed a perceived societal problem … and it employed a regulation – a flat ban on the possession of handguns in the home – that the Founders themselves could have adopted to confront that problem." *Id.* And since none of the laws adopted by the Founders "was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Id.*

The State has identified mass shootings as the societal problem it seeks to address with its arms ban. Resp. 28. But the State concedes that lawmakers in the founding era "were not strangers to the idea of mass casualty events, and even mass murder." Resp. 30. Thus, the State admits that the problem it has identified is, in *Bruen's* words, "a general societal problem that has persisted since the 18th century." In addressing a societal problem, the State has employed a regulation – a flat ban on the possession of certain arms – that the Founders themselves could

---

[11] In that case, the Court held that a commonly held bearable arm may not be "subjected to a categorical ban." *Id.*, 2019 IL 122951, ¶ 21, 131 N.E.3d 93, 98. And since the Illinois statute in question constituted a categorical ban "that provision **necessarily** [could not] stand." *Id.* (emphasis added).

7

have adopted to confront that problem. And since none of the laws adopted by the Founders are analogous to the State's ban, the ban is unconstitutional.

The State seems to believe that even though the general problem of mass casualty events was familiar to the Founders, the logic of *Heller* does not apply to the specific problem of mass shootings by a single shooter. Resp. 30. But the State's focus on this subset of gun violence does not distinguish this case from *Heller*, because D.C. could have made an identical argument. In fact, D.C. **did** make an identical argument. D.C. identified the "harms posed by handguns" it was seeking to address. Brief of Petitioners, *D.C. v. Heller*, *supra*, 49-55. One of those harms was the use of semi-automatic handguns in mass shootings. *Id*., at 53. And D.C. specifically identified the single shooter incident at Virginia Tech as an example of the harm it was seeking to address with its ban. Thus, D.C. identified mass shootings by a single shooter as one of the societal problems it was seeking to address. But the single shooter mass shooting problem D.C. identified did not change the result. The Court held, even in the face of this issue, that D.C. was required to demonstrate a historical tradition comparable to its absolute firearms ban. There is no such tradition and the law was declared unconstitutional.

## V.     The State Misapprehends *Bruen's* Historical Test

The State seems to believe that if it is able to identify an unprecedented societal concern, it need not identify a founding era analogue that is "relevantly similar" to its Statute. This is why it spends nearly four pages of its brief arguing that gunpowder storage regulations are analogous to a categorical firearms ban. Resp. 36-39.

The State misapprehends *Bruen's* historical test. Under *Bruen*, a court must determine whether the Statute imposes a **comparable** burden as that imposed by an historical analogue from the founding era. *Id*., 142 S. Ct. at 2132–33 (emphasis added). The Court did note that

when a regulation implicates unprecedented societal concerns or dramatic technological changes, the search for historical analogies may be more "nuanced." *Id*. But it never suggested that in those cases, the search for similar founding era analogues may be abandoned altogether. Even in these cases, the government is required to identify a "**relevantly similar**" tradition justifying its regulation. *Id*. (emphasis added). As discussed above, this case is straightforward and simple. It is not in the "nuanced" category. But even if that were not the case, the State would still be required to show founding era regulations that are relevantly similar to its absolute ban. It has not.

## VI.   The State's Burden is to Identify "an Enduring American Tradition," Not a Handful of Isolated Examples and Outliers

Even if the State were able to identify a handful of isolated examples and outliers, that would not carry its burden. "[T]he burden falls on [the State] to show that [its regulation] is consistent with this **Nation's** historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135 (emphasis added). The issue is whether a widespread and enduring tradition of regulation existed, and a few isolated regulations do not establish such a tradition. The "bare existence" of "localized restrictions" is insufficient to counter an American tradition." *Id.*, 142 S. Ct. at 2154. A handful of examples is insufficient to show a tradition. *Id.*, 142 S. Ct. at 2142 (three regulations insufficient to show a tradition). Isolated examples do not "demonstrate a broad tradition of [the] States." *Id.*, 142 S. Ct. at 2156.

## VII.   The State's "Advanced Technology" Argument Wilts in *Heller's* Glare

The thrust of the State's argument appears to be that even if there is no founding era precedent analogous to its ban, the ban is nevertheless constitutional because of the increase in firearms' lethality compared to firearms of the founding era. Resp. 29-30. But the State's argument wilts in *Heller's* glare. The modern handguns at issue in *Heller* were the product of

9

exactly the same sort of technological innovation described by the State. Those handguns produced the same societal problem identified by the State (i.e., mass shooting). Nevertheless, the Supreme Court held that D.C.'s ban was an extreme historical outlier, *Heller*, 554 U.S. at 629, and for that reason the ban was unconstitutional.

The flaw in the State's argument is that it believes that merely identifying advances in firearm technology satisfies its burden. But *Bruen* flatly states it does not: "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*, 142 S.Ct. at 2132, *quoting Heller*, 554 U.S. at 582.

In summary, the issue before the Court is whether historical precedent from the founding era evinces a comparable tradition of regulation with the purpose of controlling the societal problem identified by the State. *Id.* 142 S. Ct. at 2131-32 (internal citations and quotation marks omitted). Like D.C., the State cannot point to a single founding-era law (far less a national tradition) that prohibited the mere possession of an entire class of commonly held firearms. The significance of this dearth of evidence cannot be overstated. As Judge Kavanagh stated in *Heller II* with respect to D.C.'s ban of semi-automatic rifles, the historical facts are substantially the same as in *Heller* and therefore the result should be the same as well. *Id.*, 670 F.3d at 1287.

## VIII.   The State Cannot Identify a Historical Tradition of Absolute Bans of Commonly Held Arms

### A.      The Relevant Time Period Does Not Include the 20th Century

The first issue in an historical inquiry is to identify the relevant time period, and the State does not appear to understand what that time period is. In *Bruen*, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood

10

to have **when the people adopted them**.'" *Id.*, 142 S.Ct at 2136, *citing Heller*, 554 U.S. at 634-35 (emphasis in the original). The Second Amendment was adopted in 1791. The Court cautioned against "giving postenactment history more weight than it can rightly bear." 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citation omitted). In examining the relevant history that was offered in that case, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614). The Court need not resolve the issue of whether 1791 or 1868 is the proper timeframe, because, as in *Bruen*, "the lack of support for [the State's] law in either period makes it unnecessary to choose between them." *Id.*, 142 S.Ct. at 2163 (Barrett, J., concurring)[12]

Finally, whatever may be the case as to 19th century laws, *Bruen* held that 20th century laws are certainly irrelevant to the historical inquiry. *Id.*, 142 S. Ct. at 2154, n. 28 ("We will not address 20th century historical evidence …").

---

[12] *Bruen* noted an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope ..." *Id.*, 142 S.Ct. at 2138. At the same time, however, the Court noted that it had "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*, 142 S.Ct. at 2137 (citations omitted). The founding era is key. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (2022), available at bit.ly/3Xwtgze (last visited Feb. 16, 2023). This is evident for at least two reasons. First, in *McDonald*, the Court held that the Second Amendment bears the same meaning as applied against the federal government as it does against the states. *Id.*, 561 U.S. at 765. Second, the Supreme Court has always treated the time of the ratification of the Bill of Rights as the key historical period for understanding the scope of those rights – regardless of whether the Court was applying the Amendments against the federal government or against the states. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011); *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).

**B.      The State Was Unable to Show Historical Analogues**

In *Heller*, the Court held there was no historical justification for a categorial ban of

commonly held arms such as the one at issue in this case. The State has not identified anything in

the historical record that even remotely suggests that *Heller's* conclusion should be reconsidered.

As then-Judge Kavanaugh stated in *Heller II*, weapons of the type banned by the State "have not

traditionally been banned and are in common use today, and are thus protected under *Heller*."

*Heller II*, 670 F.3d at 1287; see also *Bonta*, 542 F. Supp. 3d at 1024 ("a ban on modern rifles has

no historical pedigree."). [13]

Though, as discussed above, this is a simple case, the Court might nevertheless want to

review the State's historical analysis, such as it is. The State's burden is to justify its arms ban by

demonstrating it is consistent with the Nation's historical tradition of firearm regulation. To do

this, it must identify a relevantly similar historical analogue to its ban.  The State's brief is 42

pages long. The State does not even attempt to carry its burden until page 33. In other words,

nearly 80% of the State's brief does not address any issue relevant to its burden under *Bruen's*

second step. When the State does, finally, get around to addressing the sole issue relevant to its

case, it is unable to identify any historical analogues that "remotely burden the right of self-

defense as much as [its] absolute ban." *Heller*, 554 U.S. at 632.

The State gets off to a rough start by nominating certain handgun regulations as historical

analogues. Resp. 34. The State writes that the "regulations on classes of unprecedentedly

dangerous weapons also included some handguns. For example, during the Founding era, some

areas in the country restricted newly developed percussion-cap pistols, which users could carry

loaded for a long period without concern for corrosion—a concern that previously limited the use

---

[13] *Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021), vacated and remanded on other grounds, 2022 WL
3095986 (9th Cir. 2022). Plaintiffs will refer to this opinion as "*Bonta*."

of weapons." But if these regulations on **handguns** could serve as historical analogues for a categorical ban on arms, *Heller* would have gone the other way. This will not do.

The state next nominates regulations on dynamite. Resp. 34. But dynamite was not invented until 1867.[14] That is nearly a century after the founding era. Moreover, dynamite, to the extent it can be considered an arm, would obviously be a dangerous and unusual arm, not analogous to the commonly held arms banned by the State. Also, even dynamite was never absolutely banned, so any regulation would not burden the right as much as a ban.

Next, the state nominates regulation of machineguns. It is hard to understand why the State would cite machinegun regulations from the 20th century, because, as noted above, such precedents are irrelevant to the historical analysis. *Bruen*, 142 S. Ct. at 2154, n. 28. Moreover, *Heller* clearly states that regulation of machineguns is not analogous to a ban on commonly held arms.

Next, the State writes that "every state (including Connecticut) except one passed regulations restricting carrying certain concealable weapons" (Resp. 35), and suggests that its absolute arms ban is "equivalent" to such laws. Again, *Heller* stated the opposite. The Court noted that prohibitions on carrying concealed weapons were always considered lawful under the Second Amendment. *Id.*, 554 U.S. at 626. Yet, such prohibitions on the **method of carry**, were not analogous to D.C.'s **absolute ban** on commonly held arms. *Andrews v. State*, 50 Tenn. 165 (1871), is an early case cited multiple times in *Heller*. The Tennessee Supreme Court made this same point:

> So we may say, with reference to such arms, as we have held, [a citizen] **may keep** and use in the ordinary mode known to the country, no law can punish him for so doing, while he uses such arms at home or on his own premises; he may do with his own as he will, while doing no wrong to others. **Yet, when he carries his**

---

[14] Encyclopedia Britannica, available at https://www.britannica.com/technology/dynamite (last visited Feb. 17, 2023).

> property abroad, **goes among the people in public assemblages where others are to be affected by his conduct, then he brings himself within the pale of public regulation**, and must submit to such restriction on the mode of using or carrying his property as the people through their Legislature, shall see fit to impose for the general good.

*Id*. 50 Tenn. at 185–86 (emphasis added).

The distinction between possession and carry has come down to the present day. In *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012), *abrogated on other grounds by Bruen*, the Second Circuit made the same point as *Andrews*: "It seems quite obvious to us that possession of a weapon in the home has far different implications than carrying a concealed weapon in public." *Id*., 701 F.3d at 99. As the Court made clear in *Heller*, regulation of concealed carry is not analogous to a prohibition on possession and the State's assertion that the regulations are "equivalent" is false.

Next, in an extended discussion, the State argues that regulation of gunpowder storage and firearm storage are analogous to a ban on commonly held arms. Resp. 36-39. The Court can safely ignore this argument because the Supreme Court has already rejected an identical argument. In *Heller*, the Court stated:

> The other laws Justice Breyer cites are gunpowder-storage laws that he concedes did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home. Post, at 2849 – 2850. Nothing about those fire-safety laws undermines our analysis; **they do not remotely burden the right of self-defense as much as an absolute ban on handguns**. Nor, correspondingly, does our analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents.

*Id*., 554 U.S. at 2819-20 (emphasis added).

Finally, the State drops a footnote in which it identifies ten specific laws as possible historical analogues. Resp. 33, n.8.[15] This is, to say the least, an odd way for the State to attempt

---

[15] 1837 Ala. Laws 7, No. 11, § 2; 1837 Ga. Laws 90, § 1; 1837-1838 Tenn. Pub. Acts 200-01, §§ 1–2; 1838 Fla. Laws 36, No. 24, § 1; 1838 Va. Acts 76, ch. 101, § 1; 1839 Ala. Acts 67, ch. 77; 1858-1859 N.C. Sess. Laws 34-36,

to carry its burden under the historical inquiry. One would expect that, since this is the crux of the case the State must demonstrate, it would set out the text of the laws followed by a discussion of why they are analogous to its law. In a very real sense, the State has literally relegated the main argument it needed to make in its brief to a single footnote. Be that as it may, Plaintiffs have attached Exhibit 1 in which they set forth the text of the laws cited by the State and their detailed analysis of each of those laws.

###### C.        Conclusion: An Arms Ban Would Have Been Unthinkable to the Founders

The Founders would never have tolerated a categorical arms ban – much less insisted upon it like the State. We can know this because the Founders never did impose any gun ban as a solution to a societal problem, no matter how serious. Mark W. Smith, *NYSRPA v. Bruen: A Supreme Court Victory for the Right to Keep and Bear Arms-and A Strong Rebuke to "Inferior Courts,"* 2022 Harv. J.L. & Pub. Pol'y Per Curiam 24, 8 (2022). Bans on the possession of commonly held firearms are a strictly 20th and 21st century phenomenon. *Id*. So, the State's historical burden is impossible to meet, because such bans have no basis whatsoever in the early history of the republic. *Id.*

Indeed, far from banning arms in the Founding period, there were laws **requiring** people to be armed with particular kinds of weapons. *Id*. The Militia Act of 1792, 1 STAT. 271 (1792), required every "free able-bodied white male citizen of the respective states" between eighteen and forty-five years of age to be enrolled in the militia. Those men were required to provide themselves, at their own expense, very specific firearms, ammunition, and equipment. Thus, the laws at the Founding prescribed the firearms citizens **had to have**, not those they **could not have**. *Smith, supra.*

---

Pub. Laws., ch. 25, § 27, pt. 15; 1868 Ala. Laws 11; 1868 Fla. Laws 95, ch. 7, § 11; 1850 Mass. Gen. Law, ch. 194 § 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.

The Founding generation's solution for mass killings was not to deprive ordinary citizens of weapons needed for defense, but for armed citizens to have an active role in preventing, or minimizing the harm caused by, such killings. *Id*. The *North-Carolina Gazette* published an account of an incident in which "a Demoniac being left in a Room, in which were 18 loaded Muskets," shot three men and wounded another with a sword, "upon which the People present, without further Ceremony, shot him dead." Quoted in Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms*, 105 (2008), citing *North Carolina Gazette* (Newbern), July 7, 1775 at 3, col. 1. Halbrook concludes: "For the Founders, the right of the subject to be armed for defense of self and the community was necessary to suppress such tragedies – they never imagined a world in which they would be disarmed for the supposed benefit of preventing access to weapons by madmen." *Id*.

Passing a law that deprived citizens of commonly held arms would have been unthinkable to the Founders. That is why the State's task of identifying such a founding era law is hopeless. There is no historical analogue to the State's arms ban, and for that reason it is unconstitutional. The remainder of this brief discusses various errors and distortions in the State's brief, but the Court could end its analysis here as well.

## IX.    The State's Reliance on *Cuomo's* "Pre-*Bruen* Analysis" is Baffling

The State repeatedly cites *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) for the proposition that the Statutes are constitutional. *See, e.g*., Resp. 7, n. 3, 9, 11. This is baffling, because *Cuomo* reached the holding cited by the State pursuant to the two-tiered means-end test specifically rejected in *Bruen*. The State does note in passing that *Cuomo* upheld the Statutes "under a pre-*Bruen* analysis." If "pre-*Bruen* analysis" is a euphemism for

"that analysis which *Bruen* expressly and repeatedly rejected," then the State is correct.[16] The whole point of *Bruen* was to repudiate the means-end test adopted by the circuit courts, including the one adopted by the Second Circuit in *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) (expressly abrogated in *Bruen*). *Cuomo* rests squarely on *Kachalsky's* abrogated means-end test and falls with it, which is why the State's continued reliance on that case is inexplicable.

**X.    The Court Should Reject the State's Attempt to Shift its Burden onto Plaintiffs**

The State asserts that Plaintiffs must make a "threshold showing" that the banned arms are: (1) not "dangerous and unusual"; (2) in "common use"; and (3) "typically owned by 'law-abiding citizens for lawful purposes.'" Resp. 11-12. This is false. Plaintiffs' burden does not require showing any of these things, much less all of them. Under *Bruen*, Plaintiffs need only show that the Second Amendment's plain text covers their conduct. *Id.*, 142 S. Ct. at 2129–30. Under *Heller* "the Second Amendment extends, prima facie, to **all** instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132 (emphasis added). Wait a second. Didn't *Heller* expressly say that dangerous and unusual weapons are not protected? Yes, but it reached this issue under the "history" prong, not the "text" prong. That is why the phrase "prima facie" in the quoted passage is important. Under the text prong "all" bearable arms (including dangerous and unusual arms) are **presumptively** protected. *Bruen*, 142 S. Ct. at 2116. Under the history prong, that presumption has been rebutted with respect to "dangerous and unusual" arms.

In other words, when an individual establishes that her regulated conduct involves possessing any instrument that constitutes a bearable arm, she has established a prima facie case

---

[16] *Cuomo* is not the only case abrogated by *Bruen* that the State relies on in its brief. When a case has been abrogated, the customary practice is to alert the Court with the signal "*abrogated by.*" This is true even if the particular point for which the case is cited was not rejected by the higher court, in which case the note "*abrogated on other grounds by*" would be appropriate. **26 times** the State cites cases that were abrogated by *Bruen*. Yet, a search reveals the word "abrogated" does not appear in the brief.

that "the Constitution presumptively protects that conduct." *Id*, 142 S. Ct. at 2116. The government can rebut that presumption by establishing that its "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. One way the government can do that is by showing the firearm is dangerous and unusual, because a prohibition of such arms "is fairly supported" by "historical tradition." *Heller*, 554 U.S. at 627. Thus, while all bearable arms are prima facie protected, history is used to determine which modern arms are actually protected, *Bruen*, 142 S. Ct. at 2132, and dangerous and unusual weapons are not.

This is not an academic point. The State is pushing its skewed interpretation of the first prong of the *Heller* test in an attempt to shift its burden onto Plaintiffs. In *U.S. v. Harrison*, 2023 WL 1771138 (W.D. Okla. 2023), the Court rejected a similar tactic, holding that the government's "approach shoehorns the government's historical-tradition burden onto *Bruen's* initial presumption, a presumption based simply on the Second Amendment's plain text." *Id*., *4.

The Court might reasonably ask why, if this is so, Plaintiffs have submitted so much evidence regarding the "common use" issue if they are not required to do so to meet their burden. The answer is that while Plaintiffs are not required to submit evidence of common use, they may submit such evidence to shortcut, as it were, the resolution of the second prong. As discussed in detail above (*See* Section III), an absolute ban of a commonly used firearm is "categorically" or "necessarily" unconstitutional. That means that if Plaintiffs do show that the banned weapons are in common use (which they have), the State cannot meet its burden under the historical tradition test and the Ordinance is "necessarily" unconstitutional.

**XI.**  **Magazines Are Arms**

**A.**  **The State's Argument is Counter to *Heller***

"Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications … the Second Amendment extends, prima facie, to all [bearable arms] even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 583. The State's arguments about magazines come perilously close to the borderline frivolous arguments to which *Heller* alluded. The State notes that in the founding era the word "magazine" referred to a building where gunpowder was stored. Resp. 13. The point seems to be that since the Founders did not use the word "magazine" to refer to an arm, modern magazines are not arms. The Founders did not use the phrase "stun gun" to refer to an arm either. But a stun gun is certainly an arm. *Caetano v. Connecticut*, 577 U.S. 411 (2016).

**B.**  **The State's Argument is Contrary to Lower Courts' Holdings**

Lower courts have rejected the "accessory" argument asserted by the State here. For example, in *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014), the Court rejected the argument, writing:

> [The government] also contends that the prohibited magazines are not 'arms' within the meaning of the Second Amendment. This argument is not persuasive. First, … no court has found that such magazines do not qualify as 'arms' under the Second Amendment. [gathered cases omitted] Second, if [the government] is right that magazines and ammunition are not 'arms,' any jurisdiction could effectively ban all weapons simply by forbidding magazines and ammunition. This argument's logic would abrogate all Second Amendment protections. Rather, the court finds that the prohibited magazines are 'weapons of offence, or armour of defence,' as **they are integral components to vast categories of guns**.

*Id*. at 1276 (emphasis added).

19

The Ninth Circuit affirmed in *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015). In that case, the Court held that "to the extent that certain firearms capable of use with a magazine – e.g., certain semiautomatic handguns – are commonly possessed by law-abiding citizens for lawful purposes, **our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines** necessary to render those firearms operable." *Id*. 779 F.3d at 998 (emphasis added). To be sure, pursuant to its pre-*Bruen* analysis, the Court upheld the ban on "large capacity" magazines. But it did so on the basis the government's ban on the subset of magazines survived intermediate scrutiny. *Id*. 779 F.3d at 1000. The Court never held that magazines are not arms. In fact, it held just the opposite. That holding is subsumed within the Court's holding that the Second Amendment protects the right to possess at least some magazines. *Id*. 779 F.3d at 998.

### C.      Magazines are an Essential Component to Semi-automatic Firearms

The State attempts to define an entire class of arms out of existence. Resp. 12. But the State's effort to define its problem away fails, because whether magazines are "arms" is not decided by the State's linguistic fiat. The State's primary argument is based on the declaration of Dennis Baron, an expert in "corpus linguistics. Baron states the "lexical data" indicates that in the founding era the term "arms" did not include "magazines." Baron Dec. ¶ 78. This argument proves nothing. Rather, it demonstrates why the "counting words" approach of corpus linguistics advocates like Baron is all but worthless for constitutional analysis.[17] Indeed, in *Heller* Justice Scalia described the conclusions drawn by the dissent based on Baron's and his colleagues' work as "worthy of the Mad Hatter." *Id*., 554 U.S. at 589. Nothing has changed since then.

---

[17] *See generally* Mark W. Smith & Dan M. Peterson, *Big Data Comes for Textualism: The Use and Abuse of Corpus Linguistics in Second Amendment Litigation*, 70 Drake L. Rev. 387 (2022).

Baron states that in the founding era "magazine" referred to a kind of building. Baron Dec. ¶ 24. Therefore, Baron applied his approach to the term "cartridge boxes"[18] instead and concluded that in the founding era a box containing cartridges was considered an "accoutrement" and not an arm. Baron Dec. ¶ 34. And since a modern magazine is like a "cartridge box," it is not an arm either. *Id*. No one disputes that everyone in the founding era understood a box containing ammunition was an accoutrement and not itself an arm. But Baron goes off the rails when he asserts that a modern magazine, like a cartridge box, is also nothing but an "ammunition container" (*Id*., ¶ 55) and therefor it is an accoutrement too. If a magazine were merely a box containing ammunition, no one would argue that it is an arm. But the very source Baron cites states that it is more than merely a container. It performs a function, i.e., feeding ammunition. The OED, which Baron cites, states that a magazine **feeds ammunition** into the breech of a firearm. *Id*., ¶ 55 (emphasis added). Even the State admits a magazine has an active function and is not a mere box. Resp. 14 (magazine holds "ammunition **and** feeds it into a firearm" (emphasis added)). As discussed in detail below, the fact that a magazine performs an essential active function in the operation of a semi-automatic firearm (indeed, it is what makes semi-automatic fire possible) is what sets it aside from a mere box. Baron's fundamental premise upon which all of his conclusions rest (i.e., a modern magazine is just a box) is flawed, and the conclusions he reaches based on that premise are false.

Moreover, according to Baron, the term "arms" does not include ammunition or critical parts of weapons like the trigger either. Baron Dec. ¶ 9, 78. Thus, under Baron's analysis, Connecticut could ban the sale and possession of ammunition and firearms parts essential for firearms to function without violating the Second Amendment, because it would not have banned

---

[18] And "cartouch boxes," but the terms mean the same thing.

any "arm" as the Founders understood the word. That Baron's methods lead to such an absurd conclusion demonstrates why his methods are unsuitable for constitutional analysis. *See Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) (If the magazines are not arms, "any jurisdiction could effectively ban all weapons simply by forbidding magazines … This argument's logic would abrogate all Second Amendment protections.").

Contra Professor Baron, the issue is not whether a magazine is analogous to an 18th century box. Rather, the issue is whether they fit within the 18th century meaning of the word "arms." The meaning of that word in the 18th century is no different from the meaning today. *Heller*, 554 U.S. at 581. *Heller* noted that Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id*, *quoting* 1 A New and Complete Law Dictionary.

Consider an 18th century musket. The lead ball the musket fired is not, standing alone, an arm, but it is essential to the functioning of a musket. Thus, the lead ball is a "thing that a man … takes into his hands to … strike another." Thus, it would be absurd to argue that the Founders would have interpreted the Second Amendment to protect muskets but not the ammunition necessary to make them function. That is why in *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), the Court noted that while recognizing the Second Amendment does not explicitly protect ammunition, "without bullets, the right to bear arms would be meaningless." *Id*. at 967. *Jackson* thus held that "'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Id. See also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (closely related rights protected). Justice

22

Thomas, the author of *Bruen*, cited both *Jackson* and *Ezell* with approval in *Luis v. United States*, 578 U.S. 5 (2016), in which he explained that constitutional rights implicitly protect those closely related items necessary to their exercise. *Id.*, 578 U.S. at 26-27 (Thomas J., concurring).

Thus, whether a magazine falls within the definition of "arms" involves a functional analysis – i.e., is a magazine necessary for a semi-automatic firearm to function?[19] The answer to that question is that a magazine is vital to the operation of a semi-automatic firearm. Indeed, magazines are what make semi-automatic fire possible at all.

Detachable magazines are necessary to make semi-automatic firearms operate safely and effectively. Passmaneck Dec. ¶ 6. Without such magazines, semi-automatic firearms are inoperable. *Id.* The feed angle, magazine spring pressure, and feed ramps are all design features coupled between the magazine (when inserted into the magazine well) and the firearm to ensure function as intended. *Id.* A magazines is not merely a box in which ammunition is stored. *Id.* ¶ 7. Rather, it is a dynamic component that performs a function in any semi-automatic firearm. *Id.* The magazine holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. *Id.* If there is no magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. *Id.* Thus, without magazines as designed dynamic components, semi-automatic firearms would not exist. *Id.* In other words, a magazine is a necessary and integral part of the operation of every semi-automatic firearm. *Id.*

---

[19] If the State wanted to introduce expert testimony on the crucial question, it should have retained a firearms expert, not a linguist. That the State opted for a linguist is telling.

It may be technically possible to fire a semi-automatic weapon without a magazine by manually opening the action each time the weapon is fired and manually inserting a single round into the chamber. Bu this makes the semi-automatic firearm unreliable, unsafe, and subject to being damaged. *Id.* ¶ 8. The interaction of the extractor and ejector to the cartridge as it is loaded into the chamber is necessary to ensure safe and reliable function. *Id.* Closing the action of a semi-automatic firearm after a cartridge has been placed manually into the chamber may damage the extractor and or ejector. *Id.* Furthermore, since the case head of the cartridge cannot be held in proper relation to the bolt or breech face, the action may not fully close. *Id.* This is called an "out of battery" condition and the firearm, depending on the degree of the out of battery condition, may not fire at all, or it may fire with a resulting case rupture that is dangerous to the user and damaging to the firearm. *Id.* On those firearms (such as the AR15) with a floating firing pin, closing the action on a chambered round without the necessary magazine in place can result in an unintended discharge without a pull of the trigger known as a "slam-fire." *Id.* This is obviously a dangerous condition, and while rare, closing the bolt without the magazine in place increases the chances of a slam-fire. *Id.*

In *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175 (D.R.I. 2022), apparently acting as its own firearms expert, the district court asserted that a "a firearm can fire bullets without a detachable magazine." *Id.* \*12 (citing no expert). As Plaintiffs' expert has demonstrated, this is a dubious proposition. But even assuming *arguendo* the Court were correct, the statement has no constitutional relevance. Plaintiffs' expert, Mark Passameck states that in order for a semi-automatic firearm to operate qua semi-automatic firearm, a magazine must be inserted. Passameck Dec. ¶ 7. This is just common sense. If cartridges are not being fed from a magazine, semi-automatic fire is impossible because the cartridges would have to be fed

24

manually after each shot. In other words, without a magazine, a semi-automatic firearm is reduced to a single shot firearm. Thus, *Ocean State Tactical* effectively holds that the State could constitutionally outlaw multi-shot firearms by outlawing magazines. That is obviously inconsistent with *Heller*, to say the least.

Apparently recognizing this obvious point, the State seems to concede that some sized magazine is necessary. Resp. 14 (arguing that a magazine of a particular size is not necessary but not arguing that no magazine at all is necessary). And even one of the cases cited by the State recognizes that a magazine of some size is necessary. *See Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, *9 (D. Or. 2022) ("magazines in general **are necessary** to the use of firearms for self-defense").

The State's confusion regarding this issue results from conflating the first step of the *Heller/Bruen* test (text) with the second step (history). The Courts in *Brown* and *Ocean State Tactical* are also confused in this regard. That is why those cases are patently erroneous. Under the first step, a magazine is a bearable arm and thus presumptively protected. Does this mean that the State cannot ban so-called large capacity magazines? Not necessarily. Just like any arm, if the State can demonstrate that a regulation banning large capacity magazines is "consistent with the Nation's historical tradition of firearm regulation," it can ban them (though, as discussed below, it cannot make such a demonstration).

In summary, a magazine of some size is necessary to make the Second Amendment right to fire a semi-automatic rifle effective. Therefore, magazines, in general, constitute bearable arms that are prima facia protected by the Second Amendment under prong one (text) of the *Heller/Bruen* test. Whether magazines of a particular size can be banned is a different question that must be resolved under prong two (history) of that test.

That issue is easily resolved under *Heller's* "common use" analysis. The State does not dispute that American citizens hold over 150 million such magazines. Instead, it resorts to the "plaintiffs have access to other arms" canard specifically rejected by *Heller*, which held that "[i]t is no answer to say … that it is permissible to ban the possession of [some arms] so long as the possession of other [other arms]… is allowed." *Id.*, 554 U.S. at 629. The State also argues that those 150 million magazines are not "commonly used" because smaller magazines are available. This is a *non sequitur*. The State cannot reasonably dispute that the Banned Magazines are arms that are commonly used for lawful purposes. Therefore, a categorical ban of the magazines is "necessarily" unconstitutional.

### D.        Silencers Are Not Essential to the Operation of Any Firearm

The State argues that magazines are like silencers, and since courts have held that silencers are accessories (and not arms), magazines are also not arms. Resp. 14-15. But the State assumes that magazines are like silencers. It does not demonstrate it. And, in fact, one of the very cases cited by the State, *United States v. Hasson*, 2019 WL 4573424 (D. Md. 2019), destroys its own argument. In *Hasson*, the Court held that silencers are not arms because they do "not contain, **feed**, or project ammunition." Id., *4 (emphasis added). But, as discussed above, a magazine does **feed** ammunition. In *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) (*abrogated on other grounds by Bruen*), the Court held that "[b]ecause magazines **feed** ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." (emphasis added). And in *Hasson*, the Court cited *Ass'n of New Jersey Rifle & Pistol Clubs* to distinguish silencers (which it held are accessories) from magazines (which it

26

acknowledged are arms). For the reasons noted in *Hasson*, the State's reliance on silencer cases is unavailing.

## XII.   The State Bans Firearms, Not Firearm Accessories

In a similar argument, the State asserts that "to the extent that Conn. Gen. Stat. § 53-202a lists banned features rather than weapons themselves, such restrictions fall outside the Second Amendment because those features are not 'arms.'" Resp. 15. This argument fails as well. The statute does not ban the features (e.g., folding stocks, pistol grips, flash suppressors, etc.). This is easily demonstrated. An "assault weapons" banned by the statute is defined as a "semiautomatic, centerfire rifle that has an ability to accept a detachable magazine **and** has at least one of the following [features]." Conn. Gen. Stat. § 53-202a(1)(E)(i). The conjunctive is important. The statute bans semi-automatic rifles with at least one of the features. It does not ban the features themselves. Thus, a bolt action rifle with a folding stock (or any of the other features) is not an "assault weapon."

The issue in this case is not whether the State can ban various features. The issue is whether the State can ban rifles that that are commonly used by law-abiding citizens for lawful purposes that happen to bear those features. The difference, which the State attempts to elide with this argument, is, needless to say, important.

## XIII.   The Banned Arms Do Not Fall Within the Category of Weapons That Are Not Protected by the Second Amendment

The State's effort to fit the banned arms into a constitutionally unprotected category fails. *Heller* stated "dangerous and unusual" weapons may be subjected to a categorical ban. *Id*., 554 U.S. at 627. Sophisticated military arms that are "highly unusual in society at large" are a sub-category of dangerous and unusual weapons. *Id*. The State argues that it may ban commonly held

semi-automatic rifles because they are dangerous weapons of war. Resp. 16. This argument is meritless.

**A.      The Court is Bound by Second Circuit Precedent: The Banned Arms are in Common Use**

Plaintiffs have submitted overwhelming (and uncontested evidence) that the banned arms are in common use (more than 20 million rifles; more than 150 million magazines). But even if Plaintiffs had presented no evidence on this issue, the Court will nevertheless be bound to hold that the banned arms are in common use. In *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), *abrogated on other grounds by Bruen*, the Court considered the common use evidence submitted by the plaintiffs in that case and held as follows: "Even accepting the most conservative estimates cite0d by the parties and by *amici*, the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*. The D.C. Circuit reached the same conclusion in its well-reasoned decision in *Heller II* …" *Id.*, 804 F.3d at 255. As set forth below, the fact that the arms are in common use destroys the State's "dangerous and unusual" argument.

**B.      The Banned Firearms are Not Dangerous and Unusual**

The State argues that it may ban certain semi-automatic rifles that it calls "assault weapons" because they "have been understood to pose unusual risks." Resp. 16, *quoting Cuomo*, 804 F.3d at 262, *abrogated by Bruen*. Even if this is true (which Plaintiffs do not concede), it does not matter for purposes of the *Heller* test, because "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. … If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." *Caetano v. Connecticut*, 577 U.S. 411, 418 (2016) (Alito, J., concurring).

The State misapprehends the issue. The banned rifles are perfectly legal to build, buy, and own under federal law and the laws of over 40 states. *Bonta*, 542 F. Supp. 3d at 1022. There are probably more rifles such as those banned by the State in circulation than there are Ford F-150 pickup trucks. *Id*. In 2018, 909,330 Ford F-150s were sold; twice as many rifles of this type were sold the same year. *Id*. The AR-15 in particular, the quintessential arm banned by the State, is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287, and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). These rifles are the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. See National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report*, 9, available at https://bit.ly/3gWhI8E (last visited Jan. 30, 2023).[20]

Similarly, the Banned Magazines are in common use. In 2021, a professional survey firm conducted a comprehensive assessment of firearms ownership and use patterns in America. William English, *2021 National Firearms Survey: Updated Analysis (*hereinafter, "English"), 1, available at https://bit.ly/3yPfoHw (last visited Jan. 30, 2023). The survey was administered to a representative sample of approximately 54,000 U.S. residents aged 18 and over, and it identified 16,708 gun owners. *Id*. According to the survey, 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to 542 million such magazines have been owned. English, 20. There is nothing surprising about that result. Many of the most popular semi-automatic rifles are manufactured with standard magazines holding more than ten rounds. *See, e.g*., David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 and

---

[20] *See also* Mot. 14-20 for an extensive discussion of this issue.

ALB. L. REV. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds."). Indeed, over three quarters of modern sporting rifle magazines in the country have a capacity of more than 10 rounds. *See* Modern Sporting Rifle Comprehensive Consumer Report, at 31, NSSF (July 14, 2022), available at https://bit.ly/3GLmErS (last visited Jan 30, 2023). The State does not attempt to refute Plaintiffs' evidence regarding these numbers. Thus, the State has conceded that Americans own over 100 million magazines like the ones it has banned.

Because the arms banned by the State are not unusual, they cannot be both dangerous and unusual. It follows that, as Justice Alito wrote, their relative dangerousness is irrelevant because they belong to a class of arms commonly used for lawful purposes.[21] Thus, the State's argument about whether these weapons are more dangerous relative to other weapons is irrelevant. The argument misses the point, because even if they are dangerous, they are not both dangerous and unusual.

Finally, the State's argument proves too much. If semi-automatic weapons and the magazines that make them function may be banned as such merely because they are excessively dangerous, *Heller* would have been decided the other way. As then-Judge Kavanaugh noted in *Heller II*, "the Supreme Court held that handguns – the vast majority of which today are semi-automatic – are constitutionally protected because they have not traditionally been banned and are in common use by law-abiding citizens. There is **no meaningful or persuasive constitutional distinction** between semi-automatic handguns and semi-automatic rifles." *Id*., 670 F.3d at 1269 (emphasis added). "It follows from *Heller's* protection of semi-automatic handguns that semi-automatic rifles are also constitutionally protected." *Id*. The reason there is

---

[21] *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring).[21]

no meaningful constitutional distinction is "that semi-automatic **rifles** fire at the same general

rate as semi-automatic **handguns**." *Id.*, at 1289.[22] *See also, Bonta*, 542 F. Supp. 3d at 1061

(same). In summary, the State's effort to cast the most popular rifle in America as "dangerous

**and** unusual" fails.

### C.     The State's "Weapons Most Useful in Military Service" Argument Fails

The State asserts that these commonly possessed arms may be banned because they are

"weapons that are most useful in military service." Resp. 16. The State misapprehends *Heller*

because it held no such thing. Two passages from *Heller* show that the State's interpretation is

the opposite of what the Court meant. First, the Court stated:

> We may as well consider at this point … what types of weapons *Miller* permits. Read in
> isolation, *Miller's* phrase 'part of ordinary military equipment' could mean that only those
> weapons useful in warfare are protected. That would be a startling reading of the opinion,
> since it would mean that the National Firearms Act's restrictions on **machineguns** (not
> challenged in *Miller*) might be unconstitutional, **machineguns being useful in warfare
> in 1939**. We think that *Miller's* 'ordinary military equipment' language must be read in
> tandem with what comes after: '[O]rdinarily when called for [militia] service [able-
> bodied] men were expected to appear bearing arms supplied by themselves and of the
> kind in common use at the time.' [*United States v. Miller*, 307 U.S. 174, 179 (1939)]. The
> traditional militia was formed from a pool of men bringing arms 'in common use at the
> time' for lawful purposes like self-defense. … We therefore read *Miller* to say only that
> the Second Amendment does not protect those weapons not typically possessed by law-
> abiding citizens for lawful purposes …

*Id.*, 554 U.S. at 624-25 (emphasis added). Expanding on this passage from *Miller*, the Court

stated:

> We also recognize another important limitation on the right to keep and carry arms. *Miller*
> said, as we have explained, that the sorts of weapons protected were those 'in common
> use at the time.' 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly
> supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual
> weapons.' [citations omitted]
>
> It may be objected that if weapons that are most useful in military service – M–16 rifles
> and the like – may be banned, then the Second Amendment right is completely detached

---

[22] Judge Kavanaugh was undoubtedly correct. Indeed, as comparing the Highland Park shooting with the Virginia
Tech shooting shows, semi-automatic handguns can sometimes be more dangerous than semi-automatic rifles.

from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require **sophisticated arms that are highly unusual in society at large**. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

*Heller*, 554 U.S. 570, 627–28 (emphasis added).

Both of these passages are extended discussions of *Miller* in which the Court clarified "what types of weapons *Miller* permits." In both passages, the Court distinguishes between two categories of weapons, the first of which is not protected by the Second Amendment and the second of which is. In the first passage, the Court refers to: (1) "[O]rdinary military equipment"; and (2) Arms supplied by men called for militia service. The Court noted that this second category consists of arms in common use for lawful purposes. In the second passage, the Court refers to these same categories using slightly different terms: (1) "[W]eapons that are most useful in military service." This phrase means the same thing as "ordinary military equipment" in *Miller*. The Court gives three examples of this type of weapon: machineguns like the M-16,[23] bombers, and tanks. (2) Arms supplied by men called for militia service. Again, this category has the same "weapons in common use" meaning set forth in *Miller*.

One thing is clear. Weapons in common use brought to militia service by members of the militia are protected by the Second Amendment. What do militia members do with those weapons when they bring them to militia service? They fight wars.[24] It would be extremely anomalous, therefore, if *Heller* were interpreted to mean simultaneously that (1) weapons in common use brought for militia service for fighting wars are protected by the Second

---

[23] *See Staples v. United States*, 511 U.S. 600, 603 (1994) (stating that the M-16 rifle is a military machinegun).

[24] *See* U.S. Const. amend. V (referring to "the Militia, when in actual service in time of War").

Amendment, and (2) all weapons useful for fighting wars are not protected by the Second Amendment. If the Court were to adopt the State's argument, this is the nonsensical result it would have to reach. This is not the law. "*Miller* and *Heller* [merely] recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." *Caetano v. Connecticut*, 577 U.S. 411, 419 (2016) (Alito, J., concurring). The State's error lies in distorting the language Justice Scalia used. He said that "weapons that are most useful for military service" may be banned. But in the very passage cited by the State, Justice Scalia clarified that by "weapons that are most useful for military service" he meant "sophisticated arms that are highly unusual in society at large" such as machineguns, bombers, and tanks that are wielded by a nation-state's standing army. He contrasted such sophisticated and "highly unusual arms" with arms brought by men for militia service that were "'in common use at the time' for lawful purposes."[25]

In summary, when he used the phrase "weapons that are most useful for military service," Justice Scalia did not, as the State asserts, mean all weapons useful in warfare. Rather, he used the phrase to contrast specialized weapons employed by a standing army (not protected by the Second Amendment) with weapons in common use by law abiding-citizens for lawful purposes (protected by the Second Amendment). At the end of the day, Justice Scalia was simply stating the "common use" formulation in different terms.[26]

---

[25] *See Bonta* 542 F. Supp. 3d at 1014–15 (The banned rifles are not "bazookas, howitzers, or machineguns" solely useful for military purposes; they are ordinary, popular, rifles.).

[26] In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (*abrogated by Bruen*), Judge Traxler made this same point. He wrote that just calling an arm a "weapon of war" is irrelevant, because under *Heller* the phrase "weapons that are most useful for military service" does not include "weapons typically possessed by law-abiding citizens." *Id*., 849 F.3d at156 (Traxler, J., dissenting).

It is easily demonstrated that *Heller* did not hold that any weapon used in a war may be banned. From 1911 to 1986, the United States Army issued Colt M1911 pistols to its soldiers. Passmaneck Dec. ¶ 3. After 1986 the Army issued Beretta Model 92 pistols to its soldiers. *Id.*, ¶ 4. The Colt M1911 was used by soldiers in war (World War I, World War II, Korea, Vietnam, etc.). *Id.*, ¶ 3. The Beretta Model 92 was also used by soldiers in war (the Gulf War, Iraq, Afghanistan, etc.). *Id.*, ¶ 4. Colt and Beretta have all along sold identical models of these semi-automatic handguns in the civilian market, and they are widely possessed by civilians. *Id.*, ¶¶ 3-5. The possession of these handguns is protected under *Heller*. Thus, certain "weapons of war" are indeed protected by the Second Amendment if the weapons are of a type that is widely possessed by law-abiding citizens for lawful purposes. *Id*.

Finally, in its argument, the State focuses on the military's M-16 machine gun (Resp. 17) and argues there is no practical difference between that weapon and semi-automatic weapons like the AR-15, and therefore the latter may be banned like the former. But this argument is precluded by *Staples v. United States*, 511 U.S. 600 (1994). In that case the Court held that the distinction between the fully automatic M-16 and semi-automatic weapons such as the AR-15 is legally significant. *Accord, Bonta*, 542 F. Supp. 3d at 1056–57 (same). It stated that it is not lawful for a civilian to possess a machine gun like an M-16, and it contrasted that with semi-automatic weapons (like the AR-15 at issue in that case) which "**traditionally have been widely accepted as lawful possessions**." *Id.*, 511 U.S. at 612 (emphasis added). The AR-15 is the quintessential semi-automatic rifle that the State seeks to ban. Yet as the Supreme Court noted in *Staples*, the AR-15 is in common use by law-abiding citizens and has traditionally been lawful to possess. *Heller II*, 670 F.3d at 1288. Thus, even if the AR-15 were useful for warfare as the State says (a debatable question, since the State has not introduced a single example anywhere in the

34

world of a national army that uses the AR-15), it is nevertheless protected by the Second

Amendment because it is exactly the sort of arm "in common use at the time" contemplated by

*Heller*.

**XIV.  The Court Should Reject the State's Efforts to Distort the *Heller/Bruen* "Common Use" Analysis**

      **A.  There is No Requirement to Show Actual Use**

According to the State, an arm is not protected unless it is in fact frequently actually used

for self-defense. Resp. 20. The State's interpretation flies in the face of *Heller's* plain language.

In *Heller* the Supreme Court did not focus on "use" in isolation; the Court held that the Second

Amendment conferred an individual right to **keep** and bear arms. *Id*., 554 U.S. at 595 (emphasis

added). The Court held that "keep arms" means "possessing arms." *Id*., 554 U.S. at 583. And the

Court held that banning "the most preferred firearm in the nation to **keep** and use for protection

of one's home and family [fails] constitutional muster." *Id*., 554 U.S. at 628–29 (cleaned up;

emphasis added). The conjunctive is important. If the State's interpretation of *Heller* were

correct, the word "keep" in that sentence would be superfluous. It is not. *Heller* held that the

Second Amendment protects both the right to possess (i.e., keep) arms and the right to use those

arms should the occasion arise. To be constitutionally protected, it is enough that the arms in

question are commonly possessed for self-defense and other lawful purposes. *Heller* cast the

matter alternatively in terms of "use" (in the passage quoted by the State) and "possession" in

other places: "[The Second Amendment protects arms that are ] typically **possessed** by law-

abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added).

Moreover, by posing and then using cherry-picked data to answer its own question of

whether "assault weapons" are frequently used in self-defense, the State is simply reframing this

case into a policy question: Does the average citizen really need a semi-automatic rifle like those

it has banned? But the premise of its question was already rejected by *Heller*, which held that it is the choices of the American People – and not their government – that settle the question.

Nowhere in *Heller* did the Court suggest that it is necessary to show that a weapon's actual use in self-defense meets some threshold the State has not identified.  *Heller* simply listed some of the reasons why Americans "may prefer" handguns; for example, a defender can dial a phone with one hand while holding the gun with the other hand. *Id*., 554 U.S. at 629. *Heller* offered no data about defensive handgun use – such as whether anyone has ever actually dialed a phone with one hand while holding a handgun in the other. Instead, *Heller* concluded that the reasons people chose handguns was not, in the end, relevant to the constitutional analysis. The Court wrote: "**Whatever the reason**, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid." *Id*. (emphasis added).

In *Bruen*, the Court picked up where *Heller* left off. In its discussion of whether the plain text of the Second Amendment protected the course of conduct at issue, the Court stated that the Second Amendment protects the right to "**possess** and carry weapons **in case of** confrontation." *Bruen*, 142 S. Ct. at 2134 (internal citations and quotation marks omitted; emphasis added). The right encompasses the right to be "**armed and ready** for offensive or defensive action in a case of conflict with another person." *Id*. (internal citations and quotation marks omitted; emphasis added). The right thus encompasses the right to "'keep' firearms … at the ready for self-defense … **beyond moments of actual confrontation**." *Id*.[27]

Not only is the State wrong as a legal matter, but also it gets its basic facts wrong. As Plaintiffs demonstrated in their Motion, the assertion that citizens do not use these weapons for

---

[27] Moreover, this argument fails because the Second Amendment protects a personal right to keep arms for all lawful purposes, not only self-defense. *Heller*, 554 U.S. at 624.

self-defense is not true. Mot. 17.[28] Of the 25.3 million Americans who have defended themselves

with a firearm, 13.1% (3.3 million) have used a rifle. English, 12, 15.

### B.        The State's Effort to Distort the Common Use Metric Fails

Next, the State makes the astounding argument that even if there are more than 20 million

people who owne firearms like the one it has banned, that is not enough to show common use.

Resp. 25. The State argues that the absolute number of firearms is irrelevant and the important

metric is the proportion of people in the population as a whole who own such firearms. *Id*. The

State then argues that since "only" 6.4 million of 333 million Americans own firearms like those

it has banned, those firearms are not in common use. *Id*. The State's argument fails as a matter of

fact because 30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similarly

styled rifle. English, 33. It also fails as a matter of law. Nothing in *Heller* suggests that

ownership as a percentage of the population is the relevant metric.[29]

In his *Friedman*, Justice Thomas simply noted that millions of Americans own AR-style

rifles. *Id*. (Thomas, J., dissenting). That bare fact, standing alone, was sufficient to establish

common use. *Id*. Justice Alito concurs. In *Caetano,* he wrote that in determining whether the

arms at issue (i.e., stun guns and Tasers) are commonly used, the relevant statistic is that over

**200,000** Tasers and stun guns have been sold to private citizens who may lawfully possess them

in 45 States. *Id*., 577 U.S. at 420 (internal citations and quotation marks omitted; emphasis

added). And while semi-automatic rifles are less popular than handguns, Connecticut's

categorical ban of such weapons violates the Second Amendment. If this were not the case, a

---

[28] *See also Friedman v. City of Highland Park*, *Illinois*, 784 F.3d 406, 411 (7th Cir. 2015). *Friedman* (*abrogated on other grounds by Bruen*). ("[A]ssault weapons can be beneficial for self-defense because they are lighter than many rifles and less dangerous per shot than large-caliber pistols or revolvers [and] Householders too frightened or infirm to aim carefully may be able to wield them more effectively than the pistols.")

[29] The State's focus only on arms owned in Connecticut is misplaced. Resp. 25. The metric is arms chosen by the "American people," not the people of a particular state. *Heller*, 554 U.S. at 629.

state would be free to ban all weapons except handguns, because handguns are the most popular weapon chosen by Americans for self-defense, *Id*., and all other arms are less commonly used. If approximately 200,000 arms in 45 states meets the "commonly used" threshold, surely tens of millions of arms in 41 states meets it as well.

Following *Caetano*, the Illinois Supreme Court held the same thing with respect to stun guns. See *People v. Webb*, 2019 IL 122951, 131 N.E.3d 93 (stun gun ban "necessarily" unconstitutional). Other courts are in accord as well. *See Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (analyzing commonality by reviewing raw number percentage and jurisdiction counting); *Duncan v. Becerra ("Duncan IV")*, 970 F.3d 1133, 1147 (9th Cir. 2020)[30] ("Commonality is determined largely by statistics."); *Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen*., 910 F.3d 106, 116 (3d Cir. 2018) (finding an arm is commonly owned because the record shows that "millions" are owned); *Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017*), abrogated by Bruen* (2022) (Traxler, J. dissenting) (consensus among courts is that the test is an "objective and largely statistical inquiry"); and *Heller v. D.C*., 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'").

Finally, this matter was settled in the Second Circuit by *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), *abrogated on other grounds by Bruen*. There, the court held: "Even accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons at issue are 'in common use' as that term was used in *Heller*."

---

[30] *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

XV. **The Overwhelming Majority of the State's Response Does Not Address Any Matter Relevant to the *Heller/Bruen* Test**

A. **The State's Means-End Argument is Simply Irrelevant**

Instead of attempting to carry its burden under *Heller/Bruen*, the vast majority of the State's brief consists of an elaborate means-end argument of the type specifically prohibited by *Bruen*. For page after page, the State goes on trying to demonstrate that banning semi-automatic firearms and certain magazines promotes the important governmental interest of public safety. *See,* e.g., Resp. 18-22. In other words, the State argues that the means it has employed (banning arms) serves a salutary end (increasing public safety). This argument is astonishing. The State appears to be so devoted to its discredited Central Premise (See Section II), that it cannot grasp *Bruen's* clear holding. The means-end argument it advances is precisely what the Supreme Court held a government may not do to justify a firearms regulation. "To justify its regulation, the government **may not simply posit that the regulation promotes an important interest**. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added). This is because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*, 142 S. Ct. at 2127. Certainly, the State believes its law promotes an important governmental interest, but just as certainly, under *Bruen*, the State's belief is irrelevant to the constitutional analysis.

Perhaps anticipating that governments would push back or ignore its holding as the State has done here, *Bruen* emphasized its rejection of means-end scrutiny by repeating it over and over: *Heller* does "not support applying means-end scrutiny in the Second Amendment context."

*Id.* "[*Heller*] did not invoke any means-end test." *Id.*, 142 S. Ct. at 2129. "[*Heller*] expressly

rejected the application of any judge-empowering interest-balancing inquiry that asks whether

the statute burdens a protected interest in a way or to an extent that is out of proportion to the

statute's salutary effects upon other important governmental interests." *Id.* (internal citations and

quotation marks omitted). "[T]he Second Amendment does not permit – let alone require –

judges to assess the costs and benefits of firearms restrictions under means-end scrutiny." *Id.*

(cleaned up). "We declined to engage in means-end scrutiny because the very enumeration of the

right takes out of the hands of government … the power to decide on a case-by-case basis

whether the right is really worth insisting upon." *Id.* (cleaned up). "We then concluded [that a]

constitutional guarantee subject to future judges' assessments of its usefulness is no

constitutional guarantee at all." *Id.* "*Heller* specifically ruled out the intermediate-scrutiny test."

*Id.* *Heller* expressly rejected the dissent's interest-balancing inquiry. *Id.* (internal quotation

marks omitted).

It is impossible to come away from even a cursory reading of *Bruen* and not understand

that means-end scrutiny is forbidden. Yet, the State devoted most of its brief to a means-end

argument. Plaintiffs are sorely tempted to get into the factual weeds with the State, because

practically everything the State says in support of its means-end analysis is either flat out wrong

or substantially distorted. But Plaintiffs will resist this temptation, because almost the whole

point of *Bruen* is that it is not "legitimate" for judges to make "empirical judgments" about the

"costs and benefits of firearms restrictions." *Id.*, 142 S. Ct. at 2130, *quoting McDonald*, 561 U.S.

at 790-91. There is, therefore, nothing to be gained by challenging the empirical predicate of the

State's means-end analysis. That discussion – though it makes up the bulk of the State's brief – is

simply irrelevant to the Court's resolution of this case. Accordingly, as difficult as it is, Plaintiffs will ignore the means-end red herring, and they hope the Court will ignore it as well.

### B.   Constitutional Law is Not Grounded in Emotional Appeals

When the State was not engaging in a means-end analysis, it was making a raw emotional argument centered on the Sandy Hook shooting. This argument does not help the State carry its burden under *Heller/Bruen*, and, of course, that is not its purpose. In this case, all of the law is on Plaintiffs' side, and all of the emotion is on the State's side, so naturally the State plays to its strength. The State has an advantage. Plaintiffs sound heartless and callous when they point out that the State's argument is legally irrelevant. The State's brief is a masterpiece of the rhetorical art of *pathos* (appeal to emotion). But as Justice Alito wrote in *Bruen* in response to a similar appeal by Justice Breyer, the State's emotional appeal is not relevant to the issues before the Court. *Id.*, 142 S. Ct. 2111, 2157 (Alito, J., concurring).

This case is like *Heller II*, in which then-Judge Kavanaugh noted that "emotions run high on both sides of the policy issue because of the vital public safety interests at stake." *Id.*, 670 F.3d at 1295. Judge Kavanaugh wrote that he was "acutely aware" of the gun violence that plagued D.C. and, as a citizen, he shared the city's goal of reducing or eliminating the violence. *Id.* And while he respected the motivation behind the city's gun laws, a faithful application of *Heller* precluded him from deferring to the city's assault weapon ban. A judge's task, he said, is to apply the Constitution and the precedents of the Supreme Court, regardless of whether he or she personally agrees as a matter of first principles or policy. *Id.*, 670 F.3d at 1295-96. Judge VanDyke put the matter this way: "The emotional impact of these tragedies does all the work for the government [but] that is precisely where judges must cut through the emotion and do their

job of holding the government to its … burden." *Duncan V*, 19 F.4th at 1168 (VanDyke, J., dissenting).

### C.   The Availability Heuristic is not a Constitutional Doctrine

In *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015), Judge Easterbrook wrote that "[i]f it has no other effect, Highland Park's ["assault weapon" ban] may increase the public's sense of safety. Mass shootings are rare, but they are highly salient, and people tend to overestimate the likelihood of salient events … If a ban on semiautomatic guns and large-capacity magazines reduces the **perceived** risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit." *Id.*, 784 F.3d at 412 (emphasis added). In other words, Judge Easterbrook relied on the availability heuristic[31] as a justification for upholding the ordinance. *See also Kolbe v. Hogan*, 813 F.3d 160, 182 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017) (Traxler, J., dissenting) (rejecting *Friedman* because under its "view, a significant restriction on a fundamental right might be justified by benefits that are quite literally imagined into existence."); *Bonta*, 542 F. Supp. 3d at 1055 (*Friedman* upheld the ban because it was "good for the community psyche."). The State downplays the fact that the actual risk of these weapons being used by criminals is extremely low, Resp. 27, and instead attempts to justify its ban based on the perceived risk in the community. Resp. 17. But *pace* Judge Easterbrook, it was never constitutionally licit to justify a burden on constitutional rights by appealing to the psychological distortions of risk assessment caused by the availability heuristic. And *Bruen* makes clear that all means-end arguments, including this one, are out of bounds.

---

[31] The "availability heuristic" is the psychological phenomenon where judgments are heavily biased by dramatic incidents. Louis Klarevas, *Rampage Nation* 61 (2016). An example of the availability heuristic is the fact that many people are afraid to fly because airplanes have crashed, even though airplane crashes are exceedingly rare and airplane travel is very safe.

**XVI.   There is No Historic Tradition Supporting a Magazine Ban**

Plaintiffs demonstrated there is no historic tradition in this Nation supporting the State's magazine ban. Motion 21-25. *See also Duncan III*, 366 F.Supp.3d at 1149-53 ("History shows … restrictions on the possession of firearm magazines of any size have no historical pedigree."); *Duncan IV*, 970 F.3d at 1147-51 (when the Founders ratified the Second Amendment, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years); *Duncan V*, 19 F.4th at 1148-59 (Bumatay, J., dissenting) (summarizing history). In response, the State cites *Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829 (D. Or. 2022), a case in which the Court upheld a magazine ban. In that case, the Court made the same error the State has made in its brief when it failed to recognize the overwhelming evidence that such magazines are in common use. *Id.* *9. That case is also irrelevant, because the Oregon law in question was later enjoined in a state court proceeding as an unreasonable restriction on the right to keep and bear arms under state law.[32]

**XVII.   The State Tacitly Admits its Handgun Ban is Unconstitutional**

*Heller's* central holding is that a categorical ban of handguns violates the Second Amendment. *Id.*, 554 U.S. at 628–29. But under Conn. Gen. Stat. Ann. § 53-202c(a), it is a felony to possess an "assault weapon," and the definition of "assault weapon" includes a number of handguns. Conn. Gen. Stat. § 53-202a(1). For example, the definition includes "any of the following specified semiautomatic firearms . . . Wilkinson 'Linda' **Pistol**."[33] *Id.* (emphasis

---

[32] *See Arnold v. Kotek*, 370 Or. 716, 719 (2023).
[33] The Statute uses the term "pistol," but the term is synonymous with "handgun." *Merriam-Webster's Collegiate Dictionary* 525 (10th ed.2001). The State says that of the 22 pistols listed, 13 are variants of rifles. Resp. 6, n. 2. That leaves 9 that are not plus the catchall category for pistols with fixed magazines.  There can be no doubt. The Statute bans handguns.

added). Also, the definition includes a general ban of any semiautomatic **pistol** with a fixed magazine that accepts 11 or more rounds. *Id.* (emphasis added).

The State admits the challenged Statutes ban certain handguns. Resp. 6, n.2. To be sure, the State labels the banned handguns with the ominous sounding epithet "assault pistol." But the term "pistol" is synonymous with "handgun." *Merriam-Webster's Collegiate Dictionary* 525 (10th ed. 2001). And adding the ominous descriptor "assault" does not change the fundamental reality. The State bans handguns, and a constitutional principle cannot be evaded through semantics. Thus, the State's handgun ban cannot be reconciled with *Heller*, and, notably, the State does not attempt to do so. By not defending its handgun ban, the State tacitly admits that its handgun ban is indefensible. Therefore, irrespective of anything else, at the very least, the State's handgun ban must immediately be declared unconstitutional and enjoined.

## XVIII. Plaintiffs' Facial Challenge is Supported by Supreme Court Precedent

As one of its main defenses, the State repeatedly relies on the "no set of circumstances" standard that was articulated in *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 184 (2d Cir. 2017). The State argues that at the very least its ban of grenade launchers is constitutional, and therefore the law may not be challenged facially even if it unconstitutionally bans millions of other arms. This is not the law.

The "no set of circumstances" rule does not apply because *Bruen* created an exception to the rule. Under the standard set forth in *Bruen*, if the Second Amendment covers the Plaintiffs' conduct, and the government cannot "demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation," then the regulation is invalid. Period. It would appear to defy this standard for this Court to find that the Statutes are is inconsistent with history and tradition, just to watch them be saved by the one possible application that may be

constitutional. *Antonyuk v. Hochul* 2022 WL 16744700, 47-48 (N.D.N.Y.) (rejecting "no set of circumstances" defense in Second Amendment challenge).

Moreover, even before *Bruen*, the Supreme Court created the "large fraction" exception to the general "no set of circumstances" rule. In *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992), *abrogated on other grounds, Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, (2022), the Court allowed a facial challenge to a statute when the statute would unconstitutionally impact a fundamental right in "a large fraction" of the cases to which the statute applies. *Id.*, 505 U.S. at 895. And, in 2016, the Supreme Court expressly adopted the *Casey* plurality's "large fraction" framework. *See Whole Woman's Health v. Hellerstedt,* 579 U.S. 582 (2016), *abrogated on other grounds in Dobbs*. This case, in which the State argues its law cannot be challenged because one small area of application may be constitutional even if millions of other applications are not is exactly why the Supreme Court developed the "large fraction" rule.

The "no set of circumstances" rule also does not apply in cases involving the loss of fundamental rights. *See Farrell v. Burke*, 449 F.3d 470, 496 (2d Cir. 2006) ("When fundamental rights are implicated … the rules are different.") Second Amendment rights are "fundamental rights." *McDonald v. City of Chicago, Ill*., 561 U.S. 742, 778 (2010). The general rule disfavoring facial vagueness challenges does not apply in the First Amendment context. *Id*. Under *Bruen*, Second Amendment rights are now on par with First Amendment rights. *Id*., 142 S.Ct. at 2156. To the extent *Cuomo* held otherwise in the context of facial challenges, this holding too was abrogated by *Bruen*. When fundamental rights are at stake, the question is not whether the law is unconstitutional in all of its applications. Rather, a facial challenge may go forward when the "challenged regulation reaches a substantial amount of constitutionally

protected conduct." *Farrell*, 449 F.3d at 496, *citing Kolender v. Lawson*, 461 U.S. 352, 358 n. 8 (1983).

Finally, even if the "no set of circumstances" rule applies (which Plaintiffs do not concede), the State's law may still be challenged facially because it "lacks a plainly legitimate sweep." *See United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) ("In order to succeed in his facial challenge … Decastro would need to show that no set of circumstances exists under which the statute would be valid, i.e., that the law is unconstitutional in all of its applications, or at least that it lacks a plainly legitimate sweep.") (internal quotation marks omitted). Thus, for Plaintiffs' challenge to go forward, they need only show that the Statutes have "a substantial chilling effect on protected conduct." *Farrell*, 449 F.3d at 497.

## XIX.   The Other Temporary Injunction Factors Are Met

Finally, the State argues that Plaintiffs have not demonstrated the other preliminary injunction factors in addition to probable success on the merits. But Plaintiffs cited *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). In that case the Second Circuit held that in a constitutional case likelihood of success on the merits is the dominant, if not the dispositive, factor. The State did not cite, much less attempt to distinguish, this case.

But even if the other factors are somehow relevant, Plaintiffs have met them. First, the State claims that Plaintiffs have not suffered irreparable injury because they have access to weapons that have not been banned. Resp. 40. This argument, again, runs headlong into *Heller*, which held that "[i]t is no answer to say … that it is permissible to ban [certain firearms] so long as the possession of other firearms … is allowed." *Id*., 554 U.S. at 629.

Moreover, when a plaintiff establishes a constitutional violation has occurred, she has necessarily established irreparable harm. *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211,

224 (2d Cir. 2021), *quoting Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984), *quoting* 11C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948, at 440 (1973).[34] See also *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (quoting Wright & Miller for same proposition in Second Amendment context).

As for the public interest prong, securing constitutional rights is always in the public interest, because the government does not have an interest in the enforcement of an unconstitutional law. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). "In a suit against the government, balancing of the equities merges into [a court's] consideration of the public interest." *SAM Party of New York v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021). And the balance of the equities and the public interest favor securing constitutional rights. *In re A.H.*, 999 F.3d 98, 103 (2d Cir. 2021).

In summary, as argued in the Motion, the probable success on the merits prong is determinative. If Plaintiffs have established their constitutional rights are violated by the Statutes, they have necessarily established the irreparable harm, public interest and balance of the equities prongs. They have established probable success on the merits. Therefore all preliminary injunction factors weigh in favor of granting injunctive relief.[35]

## XX.   Conclusion

For the foregoing reasons, Plaintiffs respectfully renew their motion for entry of a preliminary injunction enjoining enforcement of the Ordinance against them.

---

[34] The current edition of Wright and Miller has identical language.
[35] The State quotes *Sound Around Inc. v. Shenzhen Keenray Innovations Ltd*., 2022 WL 17811475, at *2 (E.D.N.Y. 2022), for the proposition that the preliminary injunction factors must be established by clear and convincing evidence. And *Sound Around, Inc*. does say that, but this is clear error based on the Court's misreading of *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007). In *Sussman* the Court required a "clear showing" from the movant. In context, *Sussman* stated the movant must make a clear showing (in the sense of "strong showing") of likelihood of success on the merits. Nothing in *Sussman* hints at changing the normal preponderance standard in civil cases. Any such holding would be precluded by Second Circuit precedent. *See, e.g., Fed. Exp. Corp. v. Fed. Espresso, Inc*., 201 F.3d 168, 177 (2d Cir. 2000) (preponderance standard is applicable for preliminary injunction).

*/s/ Barry K. Arrington*
_____

Barry K. Arrington
4195 Wadsworth Blvd.
Wheat Ridge, CO 80033
(303) 205-7870
barry@arringtonpc.com
Pro Hac Vice

John J. Radshaw (ct19882)
65 Trumbull Street
2d Floor
New Haven, CT 06510
(203) 654-9695 Office
(203) 721-6182 Facsimile
jjr@jjr-esq.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*
_____

Barry K. Arrington

48