**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS and TONI THERESA SPERA FLANIGAN,<br><br>*Plaintiffs*,<br><br>v.<br><br>NED LAMONT, in his official capacity as the Governor of the State of Connecticut,<br><br>PATRICK J. GRIFFIN, in his official capacity as the Chief State's Attorney of the State of Connecticut, and<br><br>SHARMESE L. WALCOTT, in her official capacity as the State's Attorney, Hartford Judicial District,<br><br>*Defendants*. | Civil Action No. 3:22-cv-01118-JBA<br><br>February 7, 2023 |

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 2

ARGUMENT ............................................................................................................................ 3

I. Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct ................................................... 3

II. The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 .......... 6

III. This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers" or "Anomalous" ........................................................... 13

CONCLUSION ....................................................................................................................... 16

## TABLE OF AUTHORITIES

***Cases***

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018) ..... 2

*Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177 (2007) ..... 18

*Defense Distributed v. Bonta*, No. 2:22-cv-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022), *adopted by* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022) ..... 7

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..... passim

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) ..... 8

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..... 8, 12

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ..... 18

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ..... 8

*Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011) ..... 14, 17

*Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022) ..... 5

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..... 6, 11, 17

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ..... passim

*Ocean State Tactical, LLC v. Rhode Island*, No. 1:22-cv-00246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023) ..... 6

*Or. Firearms Fed'n v. Brown*, No. 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ..... 6, 14, 15

*Rehaif v. United States*, 139 S. Ct. 2191 (2019) ..... 2

**TABLE OF AUTHORITIES—Continued**

*Rupp v. Becerra*,
401 F. Supp. 3d 978 (C.D. Cal. 2019) *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022) ..... 2

*Teter v. Connors*,
460 F. Supp. 3d 989 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020) ..... 2

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) ..... 8

*United States v. Reyna*,
No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ..... 4

*United States v. Tilotta*,
No. 3:19-cr-4768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ..... 7

***Other Authorities***

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ..... 9

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ..... 10, 14

Conn. Gen. Stat. § 53-202b ..... 7

Conn. Gen. Stat. § 53-202w ..... 7

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ..... 10, 14

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ..... 9

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ..... 8

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ..... 11

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety Support Fund ("Everytown") is the education, research, and litigation arm of Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund), the nation's largest gun-violence-prevention organization, including over 110,000 in Connecticut. The organization has nearly ten million supporters across the country. Everytown for Gun Safety was founded in 2014 as the combined effort of (a) Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and (b) Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Mayors representing 11 Connecticut cities and towns are members of Mayors Against Illegal Guns. Everytown for Gun Safety also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 60 amicus briefs in Second Amendment and other firearms cases. Everytown's briefs have offered historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. *See, e.g.*, *Christian v. Nigrelli*, No. 22-2987, Dkt. 79 (2d Cir. Jan. 30, 2023); *Antonyuk v. Nigrelli*, No. 22-908, Dkt. 193 (2d Cir. Jan. 17, 2023); *Nat'l Ass'n for Gun Rts. v. City of Highland Park, Ill.*, No. 1:22-cv-04774, Dkt. 70 (N.D. Ill. Feb. 1, 2023). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992 n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

For the reasons set out in Defendant's Memorandum in Support of their Opposition to Plaintiffs' Motion for Preliminary Injunction, Dkt. 37 (Jan. 31, 2023) ("State Mem."), Connecticut's law prohibiting the sale and possession of assault weapons and large-capacity magazines is constitutional under the Second Amendment framework adopted in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).[2] Everytown submits this amicus brief to address in depth three methodological points. ***First***, as to the initial, textual inquiry required by *Bruen*, Plaintiffs have not met their burden to establish that assault weapons and large-capacity magazines are protected "arms" within the meaning of the Second Amendment. ***Second***, in applying *Bruen*'s historical inquiry—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis not on 1791 (when the Second Amendment was ratified), but on 1868 (when the Fourteenth Amendment made the Second Amendment applicable to the states). Moreover, 1868 is not a cutoff date for the analysis; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added).

[2] This amicus brief addresses only some aspects of Plaintiffs' Second Amendment claim. However, the Court should deny Plaintiffs' motion for a preliminary injunction in its entirety for the reasons set forth by the State.

This is particularly so where, as here, the challenged ordinance implicates "unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132. ***Third***, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. This third point is not directly implicated here, given the robust historical record adduced by the State, *see* State Mem. at 26–39, but we highlight the issue in case the Court chooses to address it.

## ARGUMENT

### I. Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen* requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if people, weapons, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See, e.g., United States v. Reyna*, No. 3:21-cr-00041, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) (dismissing defendant's challenge to indictment and plea because "§ 922(k)'s regulated conduct [possession of a firearm with an obliterated serial number] is outside [the] scope of the Second Amendment" and that fact "is enough to decide" the case; declining to reach historical inquiry).

As the State notes, *see* State Mem. at 11-12, it is Plaintiffs' burden to satisfy the initial, textual inquiry. This is so for at least two reasons. First, *Bruen* itself makes this clear, by indicating

that a presumption that the Constitution protects a plaintiff's conduct arises only *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of litigation—then *Bruen* would have said that the presumption exists from the outset. Second, placing the initial burden on the plaintiff accords with the Court's approach to other constitutional rights. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421. Accordingly, multiple courts have read *Bruen* to place the burden on the plaintiff challenging a regulation to establish that the Second Amendment's plain text covers their conduct. *See, e.g.*, *Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-CV-01815-IM, 2022 WL 17454829, at *11 (D. Or. Dec. 6, 2022) ("Plaintiffs have not shown that large-capacity magazines are weapons in common use for lawful purposes like self-defense such that they fall within the plain text of the Second Amendment." (cleaned up)).

Here, Plaintiffs have failed to satisfy their burden under the Second Amendment's textual inquiry because they have failed to establish that assault weapons and large-capacity magazines are among the "arms" that the Second Amendment protects. In *Heller*, the Court held that, to fall within the Second Amendment's text, a weapon must not only be a "bearable arm" or "[w]eapon[] of offence," but must also be one "in common use" and "typically possessed by law-abiding citizens for lawful purposes" like self-defense. *Heller*, 554 U.S. at 581-82, 625-27.[3] *Bruen* further

[3] Specifically, *Heller* began with dictionary definitions of "arms," including as "[w]eapons of offence, or armour of defence" and observed that the Second Amendment "extends, prima facie,

confirmed that the inquiry should focus on common use for the lawful purpose of self-defense.[4] As the State explains, *see*, State Mem. at 11-26, Plaintiffs have not carried this burden here with respect to either assault weapons or large-capacity magazines.[5] That alone is enough to defeat Plaintiffs' motion. *See Ocean State Tactical*, 2022 WL 17721175, at *2, *11-15 (denying motion for preliminary injunction in challenge to large-capacity magazine law because "plaintiffs have failed in their burden to demonstrate that LCMs are 'Arms' within the meaning of the Second Amendment's text" and "have failed to prove that LCMs are weapons relating to self-defense"); *Or. Firearms Fed'n*, 2022 WL 17454829, at *9-12 (making similar findings in denying motion for a temporary restraining order as to Oregon large-capacity magazine law).[6]

---

to all instruments that constitute bearable arms." 554 U.S. at 581-82. It then explained that the Second Amendment applies only to weapons "in common use" and "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625-27; *see also id.* at 627 (noting that "M-16 rifles and the like" may be banned).

[4] *Bruen* had no occasion to detail the operation of the textual inquiry with respect to "arms," because in that case, New York did not dispute that the Second Amendment's text applied to the "people" ("two ordinary, law-abiding, adult citizens") and the arms ("handguns") at issue. *See* 142 S. Ct. at 2134. But in applying that test, the Court's articulation—"[n]or does any party dispute that handguns are *weapons 'in common use' today for self-defense*," *id.* (emphasis added)—indicated that the "arms" the Second Amendment covers are those commonly used for self-defense. This limitation coheres with the Supreme Court's repeated emphasis that "individual self-defense is the central component of the Second Amendment right." 142 S. Ct. at 2133 (cleaned up) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599)); *see also id.* at 2132 (explaining that "the Second Amendment's definition of 'arms' … covers modern instruments that facilitate armed self-defense"); *Ocean State Tactical, LLC v. Rhode Island*, No. 1:22-cv-00246, 2022 WL 17721175, at *11 (D.R.I. Dec. 14, 2022) (noting, in a Second Amendment challenge to a state law prohibiting large-capacity magazines, that the focus under *Bruen*'s plain-text inquiry "must be on whether the LCM Ban unduly impairs the right of an individual to engage in self-defense"), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023).

[5] As the State demonstrates, assault weapons and large-capacity magazines are "dangerous and unusual weapons." *See* State Mem. at 16-20.

[6] With respect to any challenge to Connecticut's prohibitions on the sale, offer or exposure for sale, importation into the state, transfer, distribution, or giving of assault weapons and large-capacity magazines and on the purchase of large-capacity magazines, *see* Conn. Gen. Stat. §§ 53-202b, 53-202w, the textual arguments here fall even further from the mark. *Cf. United States v. Tilotta*, No. 3:19-cr-4768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (explaining that,

In sum, the conduct in which Plaintiffs seek to engage is not covered by the plain text of the Second Amendment and Plaintiffs have not met their burden to establish otherwise. Accordingly, they are not entitled to relief and the Court need not proceed further.

## II. The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

As just explained, the text of the Second Amendment is dispositive. Additionally, as the State's brief explains, if the Court proceeds to *Bruen*'s historical inquiry—under which it must inquire whether the regulation is consistent with the Nation's historical tradition of firearm regulation—Plaintiffs' motion should be denied regardless whether the historical analysis focuses on 1791 or 1868. As a legal matter, however, the historical inquiry should center on 1868, when the Fourteenth Amendment was ratified and the Second Amendment was made applicable to the states.

Prior to *Bruen*, several circuits concluded that the relevant time period for Second Amendment historical analysis of state and local laws was the Fourteenth Amendment's ratification.[7] *See Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim

"textually, the ordinary meaning of 'keep and bear' does not include 'sell or transfer'"); *Defense Distributed v. Bonta*, No. 2:22-cv-6200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (concluding that the Second Amendment's plain text "quite-clearly" does not include any "implicit[]" right to "acquire and manufacture firearms" or "to purchase arms" (internal quotation marks omitted)), *adopted by* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).

[7] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).

*Bruen* does not alter that sensible conclusion. It is true that *Bruen* did not formally resolve "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." 142 S. Ct. at 2138 (explaining that it did not need to resolve the issue because the public understanding "for all relevant purposes" in the case before it was the same in 1791 and 1868). However, the Supreme Court also explained in *Bruen* that the historical inquiry applied in the lower courts pre-*Bruen* was "broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the historical analyses in the cases cited above remain good law.

As the State's brief explains, the law challenged in this case is constitutional whether the historical analysis focuses on the period around 1791 or the period around 1868: neither time period supports any viable Second Amendment rights with respect to assault weapons and large-capacity magazines. *See* State Mem. at 26-39.[8] But if the Court reaches the question of which historical time period is relevant, it should conclude that 1868 is the correct focus.

---

[8] Even if this Court were to focus on 1791 and conclude—contrary to the State's evidence—that history left the Second Amendment's meaning at that time unclear, 19th-century (and even 20th-century) history should be used to clarify that meaning. *See, e.g.*, State Mem. at 33-35; *Or. Firearms Fed'n*, 2022 WL 17454829, at *14 n.22 (finding that 20th-century regulations "confirm[] earlier historical trends offered by Defendants of legislative efforts to ban weapons that 'were developed with a focus on military applications and supplying military needs,' 'spread to ... civilian markets and use,' and then became commonly used for criminality rather than self-defense"); *infra* pp. 11-13.

To begin with, in a case involving a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

As noted, *Bruen* did not formally resolve this timing question. It also acknowledged prior cases that had "assumed" that the scope of the right for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions

controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[9] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

[9] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

There is good reason for this to be the leading originalist view. For one thing, insisting that the 1791 understanding should govern states and localities simply would not make sense in light of the Supreme Court's lengthy discussion in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by now-Chief Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period would also be inconsistent with *Bruen.* In *Bruen*, the Supreme Court instructed the lower courts on how to apply the historical methodology by using the example of the longstanding tradition of sensitive-places restrictions. In doing so, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added). That reference to the "19th century" would be incomprehensible if the 18th century were the only relevant analytical period. Notably, in the pages of the article and brief the Court cited for that proposition, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[10]

[10] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing

Finally, an exchange at the oral argument in *Bruen* illustrates that 1868 is the correct focus. During argument, the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

In sum, should the Court reach *Bruen*'s historical inquiry, the correct focus is the period around 1868, not the period around 1791. Moreover, 1868 is not a cutoff: *Heller* teaches that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same).[11] *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting a decision quoting James Madison).

---

relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

[11] Nor is 1868 a firm starting line for the inquiry; indeed, both *Heller* and *Bruen* examined history preceding even 1791. *See Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45. correctly points to such history in its brief. *See* State Mem. at 36-37.

Furthermore, *Bruen* recognized that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern technological development or modern societal concern that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical laws addressing the development or concern to be found in that period. That is precisely the situation presented by this case. As the State explains, *see* State Mem. at 4-5, 27-32, the challenged law was adopted primarily in response to "dramatic technological changes," *Bruen*, 142 S. Ct. at 2132—the exponential increase in the lethality of firearms and magazines—and the "unprecedented societal concern[]," *id.*, that followed, namely, an epidemic of mass shootings. *See Or. Firearms Fed'n*, 2022 WL 17454829, at *12-13 (similarly finding, in denying plaintiffs' motion for a temporary restraining order, that large-capacity magazines "implicate a dramatic change in firearms technology" and "also implicate unprecedented societal concerns" arising from mass shootings). A "more nuanced approach" to history is thus fully warranted.

Here, state and local laws from the period beginning around Reconstruction—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of Massachusetts's law. *See, e.g.*, State Mem. at 33-35 (discussing late 19th- and early 20th-century laws regulating particularly dangerous weapons, features, and accessories soon after they emerged in the commercial market, including prohibitions and restrictions of multi-shot guns and automatic

and semiautomatic firearms capable of firing a large number of rounds without reloading, which were consistent with earlier laws restricting access to weaponry that demonstrably threaten public safety but have no legitimate use for self-defense, such as Bowie knives, as well as earlier regulations restricting access to gunpowder); *see also, e.g.*, *Or. Firearms Fed'n*, 2022 WL 17454829, at *12-14 (finding, in denying plaintiffs' motion for a temporary restraining order, that large-capacity magazine prohibitions are "consistent with the Nation's historical tradition of firearm regulation").[12] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, it should then consider this later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for regulations like Connecticut's law.

## III. This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers" or "Anomalous"

Plaintiffs contend that purportedly "anomalous laws" from a "few" jurisdictions are insufficient to establish a historical tradition under *Bruen*. Plaintiffs' Motion for Preliminary Injunction ("Pl. Mot.") at 26.[13] That assertion is not implicated in this case, given the robust record of historical laws adduced by the State. *See, e.g.*, Dkts. 37-6 & 37-7 (expert historian declarations of Professor Randolph Roth and Professor Saul Cornell discussing analogous historical weapon and weapon feature and accessories regulations from before the founding, through the

[12] To be clear, whether laws precisely like the challenged law existed in 1868 (or 1791) is not the question before this Court. *Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

[13] Challengers in other recent Second Amendment cases have similarly sought to dismiss historical regulations as "outliers" insufficient to satisfy the requirements of *Bruen*. *See, e.g.*, Pls.' Suppl. Br. at 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers").

Reconstruction era, and into the 20th century); State Mem. at 26--39. But to the extent this Court chooses to address the issue here, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

*Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* In doing so, the Court cited sources for the historical record that justified restrictions in those three locations based on *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[14] In addition, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were from a single colony, Maryland, and were enacted three years apart, in 1647 and 1650. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[15] Thus, under *Bruen*'s analysis, a small number of laws can establish this nation's tradition of

[14] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

[15] Notably, one of the Court's sources stated that, "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." Kopel & Greenlee, 13 Charleston L. Rev. at 235. Accordingly, the Court's reliance on this source further confirms that widespread acceptance of a practice of carrying guns as a matter of policy does not indicate that the practice was constitutionally protected. *See also infra* pp. 15-16 (explaining that to infer constitutional protection from absence of regulation would run against basic principles of federalism).

firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[16]

That a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles: states are entitled to effectuate policies of their choice, tailored to local conditions, so long as such policies lie within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. *See, e.g.*, State Mem. at 39. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second

[16] Although *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition,"142 S. Ct. at 2142, that tentative statement should not be given undue weight, given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *Id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is indisputably no such "overwhelming" evidence of a right to sell, offer or expose for sale, import into the state, transfer, distribute, give, possess, or purchase assault weapons or large-capacity magazines. In addition, Plaintiffs also appear to suggest (with a "*cf.*" citation) that then–D.C. Circuit Judge Kavanaugh's dissent in *Heller II* endorsed a rule that laws in six states are not enough to establish a history of regulation. *See* Pl. Mot. at 26. But that is not so (nor would it be controlling in any event). Then-Judge Kavanaugh was not referring to historical laws, but instead to the question whether "modern laws alone" could demonstrate constitutionality under the Second Amendment, and his reference to "six states" (in his own "*cf.*" citation) was in a parenthetical summary of a death-penalty case, not a case involving guns or the Second Amendment. *See Heller II*, 670 F.3d at 1292 (Kavanaugh, J., dissenting).

Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate all the way to the limits of constitutional permissibility. *Cf., e.g., Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not support any inference that their citizens considered such restrictions unconstitutional.[17]

**CONCLUSION**

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: February 7, 2023

Respectfully submitted,

/s/ Damian K. Gunningsmith
Damian K. Gunningsmith (Bar No. ct29430)
CARMODY TORRANCE SANDAK & HENNESSEY LLP
195 Church Street
New Haven, CT 06509
Telephone: (203) 784-3185
Fax: (203) 784-3199
dgunningsmith@carmodylaw.com

William J. Taylor, Jr. (*pro hac vice* forthcoming)
EVERYTOWN LAW
450 Lexington Ave, P.O. Box 4184
New York, NY 10017
Phone: (646) 324-8124
Fax: (917) 410-6932
wtaylor@everytown.org

[17] Indeed, any such inference would be untenable in light of the Court's statement the very next day after *Bruen* was decided that "the fact that many States in the late 18th and early 19th century did not criminalize" certain conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022).